**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------x

In re:                                                              Chapter 11

LIGHTSQUARED INC., *et al.*[1]                                      Case No. 12-12080 (SCC)

                         Debtors.                  Jointly Administered

--------------------------------------------------------------------------x
HARBINGER CAPITAL PARTNERS LLC, HGW US
HOLDING COMPANY LP, BLUE LINE DZM CORP.,
AND HARBINGER CAPITAL PARTNERS SP, INC.,

                        Plaintiffs,

         -against-                                        Adv. Pro. No. 13-1390 (SCC)

CHARLES W. ERGEN, ECHOSTAR CORPORATION,
DISH NETWORK CORPORATION, L-BAND
ACQUISITION LLC, SP SPECIAL OPPORTUNITIES
LLC, SP SPECIAL OPPORTUNITIES HOLDINGS
LLC, SOUND POINT CAPITAL MANAGEMENT LP,
AND STEPHEN KETCHUM,

                    Defendants.

--------------------------------------------------------------------------x
THE AD HOC SECURED GROUP OF LIGHTSQUARED
LP LENDERS, LIGHTSQUARED INC., et al., MAST
CAPITAL MANAGEMENT, LLC, AND U.S. BANK
NATIONAL ASSOCIATION,

                    Intervenors.

--------------------------------------------------------------------------x

**MEMORANDUM DECISION**
**GRANTING MOTIONS TO DISMISS COMPLAINT**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), LightSquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629) and One Dot Six TVCC Corp. (0040).

A P P E A R A N C E S :

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    David M. Friedman, Esq.
       Jed I. Bergman, Esq.

*Attorneys for Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc.*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:    Rachel C. Strickland, Esq.
       James C. Dugan, Esq.

*Attorneys for Defendants Charles W. Ergen, SP Special Opportunities, LLC, and Special Opportunities Holdings LLC*

SULLIVAN & CROMWELL LLP

125 Broad Street
New York, NY 10004
By:    Robert J. Giuffra, Jr., Esq.
       Brian T. Frawley, Esq.
       Brian D. Glueckstein, Esq.

*Attorneys for Defendants DISH Network Corporation, EchoStar Corporation and L-Band Acquisition, LLC*

O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
By:    Charles E. Bachman, Esq.
       Peter M. Friedman, Esq.
       Alexander Elliot Slater, Esq.

*Attorneys for Defendants Sound Point Capital Management, L.P. and Stephen Ketchum*

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
By:     Matthew S. Barr, Esq.
        Alan J. Stone, Esq.
        Karen Gartenberg, Esq.

*Attorneys for Intervenor Debtors*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, NY 10036
By:     Philip C. Dublin, Esq.
        Michael S. Stamer, Esq.

*Attorneys for Intervenors U.S. Bank National Association and MAST Capital Management, LLC*

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By:     Thomas E Lauria, Esq.
        Glenn M. Kurtz, Esq.

*Attorneys for Intervenor Ad Hoc Secured Group of LightSquared LP Lenders*

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................................4

I.    The Debtors and the Commencement of the Bankruptcy Cases............................................4

II.   The LightSquared LP Credit Agreement ..............................................................................5

III.  The Defendants ....................................................................................................................7

IV.   The Defendants' Alleged Scheme .......................................................................................8

PROCEDURAL HISTORY..................................................................................................9

STANDARD OF REVIEW ................................................................................................12

DISCUSSION .....................................................................................................................13

I.    Harbinger's Equitable Disallowance Claim (Count One) is Dismissed with Prejudice ....13

      A.  Applicable Statutory Provisions and Case Law.................................................14

          1.  Section 502 of the Bankruptcy Code .................................................14

          2.  Section 510 of the Bankruptcy Code .................................................15

          3.  Applicable Case Law .........................................................................15

      B.  The Bankruptcy Code Does Not Permit Equitable Disallowance ......................20

          1.  Statutory Interpretation .....................................................................20

              a.  The Plain Language of Section 502
                  Does Not Permit Equitable Disallowance.................................20

              b.  The Court Cannot Equitably Disallow a
                  Claim Under Section 105(a) ....................................................22

              c.  Section 510(c) Provides an Equitable
                  Remedy of Subordination, Not Disallowance ..........................23

          2.  Some Observations on the Use of Legislative History .....................24

II.   Harbinger Has Failed to State a Claim for Fraud
      or in Tort Against the Ergen Defendants ........................................................................26

      A.  Fraud (Count Two) ............................................................................27

1. Defendants' Alleged Material False Representations and Omissions.............28

   a.  Material False Representations .................................................28

   b.  Material Omissions .................................................................32

2. Defendants' Intent ......................................................................34

3. Harbinger's Reliance ..................................................................36

B. Tortious Interference with (i) Prospective
Economic Advantage with LightSquared Creditors and
(ii) the Jefferies Relationship (Counts Four and Five) .........................37

1. Harbinger's Allegations of Tortious Interference
with Creditor Relationship ..........................................................38

2. Harbinger's Allegations of Tortious Interference
with Jefferies Relationship .........................................................39

3. Harbinger Has Not Pled Facts Sufficient
to Demonstrate Tortious Interference with Either
the Creditor Relationship or the Jefferies Relationship..................................40

C. Unfair Competition (Count Six) ......................................................41

D. Civil Conspiracy (Count Seven)........................................................44

III. Harbinger Has Failed to State a Claim for Fraud
or in Tort Against the DISH Defendants .................................................44

IV. Harbinger Has Failed to State a Claim for Fraud
or in Tort Against the Sound Point Capital Defendants ..................................46

V. Objection to the Claim of SPSO under
Section 502 of the Bankruptcy Code (Count Eight) ........................................48

CONCLUSION.................................................................................48

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the motions (the "Motions to Dismiss")[2] of defendants Charles W. Ergen ("Mr. Ergen"), SP Special Opportunities, LLC ("SPSO"), Special Opportunities Holdings LLC ("SO Holdings," and, collectively with Mr. Ergen and SPSO, the "Ergen Defendants"), EchoStar Corporation ("EchoStar"), DISH Network Corporation ("DISH"), L-Band Acquisition, LLC ("LBAC," and, collectively with EchoStar and DISH, the "DISH Defendants"), Sound Point Capital Management, L.P. ("Sound Point Capital"), and Stephen Ketchum ("Mr. Ketchum," and, together with Sound Point Capital, the "Sound Point Capital Defendants")[3] seeking to dismiss the amended complaint (the "Amended Complaint")[4] of Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger").

As stated in the Amended Complaint, Harbinger "brings this action against Ergen and entities he controls, including DISH, EchoStar, LBAC, SPSO, and SO Holdings, to seek redress for Defendants' fraud and other tortious conduct aimed at misappropriating Harbinger's control over and investment in LightSquared, and destroying Harbinger's contractual rights and business opportunities relating to that investment." Am. Compl. ¶ 1.  More specifically, Harbinger alleges that DISH and EchoStar, acting through Mr. Ergen as their executive chairman, and with the assistance of Sound Point Capital and Mr. Ketchum in forming SPSO, engaged in subterfuge and fraudulently purchased certain secured debt obligations of LightSquared LP (the "Loan Debt") issued under the Credit Agreement (as defined below), in order to gain control of LightSquared Inc. and its debtor subsidiaries ("LightSquared" or the "Debtors") and derail Harbinger's (i)

---

[2] Dkt. Nos. 29, 32, and 34, respectively.
[3] The Ergen Defendants, the DISH Defendants, and the Sound Point Capital Defendants will be referred to collectively herein as the "Defendants."
[4] Dkt. No. 43.

1

control over and equity interest in the Debtors and their assets, (ii) plans for the reorganization of the Debtors, and (iii) attempts to gain exit financing for such reorganization. In addition, Harbinger alleges that Mr. Ergen and DISH/EchoStar, through LBAC, made a low-ball, bad-faith offer to purchase the Debtors' wireless spectrum at a discount in order to confuse and deter other potential purchasers from making a reasonable bid for such assets. Harbinger asserts that the "Defendants' fraudulent scheme has materially harmed Harbinger's contractual rights and opportunities as LightSquared's controlling shareholder, and will improperly provide Ergen and his entities with an unfair advantage as a bidder for the spectrum assets . . . ." Id.

By their three separate Motions to Dismiss, each group of Defendants asserts, among other things, that the Amended Complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"), made applicable herein by Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and should be dismissed. More specifically, the Defendants argue that SPSO, the entity that purchased $1,013,082,326.30 in Loan Debt[5] and, as of July 26, 2013, held $824,323,097.83 in Loan Debt,[6] was permitted to do so under the applicable provisions of the Credit Agreement because SPSO is not a "Disqualified Company" as defined in the Credit Agreement, nor is it a subsidiary of a Disqualified Company. The Ergen Defendants and the DISH Defendants (collectively, the "Ergen/DISH Defendants") further assert that they owed no duty to Harbinger, which, they maintain, precludes the assertion of any fraud claim. In the absence of a claim for

---

[5] See Ex. B to Joinder of SP Special Opportunities, LLC to the Ad Hoc Secured Group of LightSquared LP Lenders' (I) Reply in Further Support of the Emergency Motion of the Ad Hoc Secured Group Of LightSquared LP Lenders to Enforce this Court's Order Pursuant to 11 U.S.C. § 1121(d) Further Extending LightSquared's Exclusive Periods to File a Plan of Reorganization and to Solicit Acceptances Thereof, and (II) Objection to LightSquared's Cross-Motion for Entry of Order Pursuant to 11 U.S.C. § 105(a) Relieving LightSquared of Certain Obligations Thereunder, and the Joinders Thereto, Case No. 12-12080 (Bankr. S.D.N.Y. July 9, 2013) [Dkt. No. 728] (the "LightSquared Trading Summary"). A total of $188,759,227.85 in trades of Loan Debt remains "unsettled."

[6] See Revised Seventh Supplemental Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019, Case No. 12-12080 (Bankr. S.D.N.Y. July 26, 2013) [Dkt. No. 777].

fraud, the Defendants argue that Harbinger has failed to state a claim in each of the other causes of action in the Amended Complaint. Defendants further argue that Harbinger lacks "standing" or the right to assert the claims alleged in the Amended Complaint, as Harbinger lacks a protectable right or interest that could serve as a basis for the claims. Finally, Defendants argue that any such claims belong exclusively to the Debtors. The DISH Defendants also argue that Harbinger has failed to meet the heightened pleading standard required by Rule 9(b) (made applicable herein by Bankruptcy Rule 7009) with respect to its fraud claim, and that the Amended Complaint is replete with impermissible "group pleading," characterized by broad allegations against groups of Defendants without particularized assertions of the specific allegations being made against each of the Defendants.

For the reasons set forth below, the Motions to Dismiss are granted as follows: (i) with respect to Count One, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted, and Count One is dismissed with prejudice; (ii) with respect to Counts Two, Four, Five, Six, and Seven, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted; (iii) with respect to Counts Two, Four, Five, Six, and Seven, the Motion of the DISH Defendants to Dismiss the Amended Complaint is granted; (iv) with respect to Counts Three, Six, and Seven, the Motion of the Sound Point Capital Defendants to Dismiss the Amended Complaint is granted; and (v) with respect to Count Eight, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted, and Count Eight is dismissed without prejudice to the rights of any party-in-interest, including Harbinger, to seek disallowance of SPSO's claim under section 502 of the Bankruptcy Code on grounds not inconsistent with this Decision. Because the Debtors' intervention in this Adversary Proceeding was not based on a separate complaint but rather on a statement linked to the Amended Complaint [Dkt. No. 15] (the

"Debtors' Intervention"), the Debtors are granted leave to plead and file an amended complaint in this Adversary Proceeding against any or all of the Defendants reflecting causes of action not inconsistent with this Decision.

## BACKGROUND

The Court assumes general familiarity with the widely-publicized background facts of the Debtors' chapter 11 cases (the "Bankruptcy Cases") and the dispute between Harbinger and the Debtors, on the one hand, and Mr. Ergen and the DISH/EchoStar parties on the other hand, and will provide only the most relevant facts for purposes of this Rule 12(b)(6) Decision.

## I.    The Debtors and the Commencement of the Bankruptcy Cases.

LightSquared is a provider of communications and broadband services; it has been delivering satellite-based mobile voice and data services since 1995 to hundreds of thousands of devices used in the public safety, security, transportation, fleet management, and asset tracking sectors.    To provide these services, LightSquared licenses spectrum from the Federal Communications Commission ("FCC").    Harbinger, an investment fund, indirectly owns in excess of 82% of the equity of LightSquared.    Harbinger is controlled by Mr. Philip Falcone. Am. Compl. ¶ 29.

For over ten years, the Debtors have been engaged in efforts to develop a next-generation ancillary terrestrial network ("ATC Network") that would employ both satellite service and ground-based antennas to provide nationwide state-of-the-art "4G-LTE" (Fourth Generation - Long Term Evolution) broadband mobile services.    Id. ¶ 30.    In pursuit of that goal, LightSquared has participated in extensive regulatory proceedings before the FCC.    In 2010, the FCC approved the ATC Network and imposed certain build-out requirements on LightSquared.[7]

---

[7] *See LightSquared v. Deere, et al.*, Adv. Pro. No. 13-01670 (Bankr. S.D.N.Y. Nov. 1, 2013) ("*LightSquared v. Deere*"), Complaint [Dkt. No. 1] at ¶ 3.

Harbinger's investment in LightSquared was made in connection with this FCC approval;[8] incident to Harbinger's acquisition of its controlling equity interest in LightSquared, Harbinger entered into an agreement with the FCC to have LightSquared build out the ATC Network and provide coverage to at least 260 million people by the end of 2015.  Id. ¶ 31.  LightSquared and Harbinger have invested billions of dollars to develop the ATC Network.[9]

In February 2012, the FCC issued a formal notice proposing to suspend indefinitely the Debtors' plan to build out the ATC Network.  Following the issuance of the FCC Notice, on May 14, 2012 (the "Petition Date"), the Debtors commenced these Bankruptcy Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Id. ¶¶ 32-33.

## II.   <u>The LightSquared LP Credit Agreement</u>.

In order to raise the funds necessary to accomplish the ATC Network build-out, LightSquared LP, a subsidiary of LightSquared Inc., entered into an $850 million credit agreement (the "Credit Agreement"), dated as of October 1, 2012, by and among LightSquared LP; LightSquared Inc.; certain Parent Guarantors; certain Subsidiary Guarantors; UBS Securities, LLC as Arranger, Documentation Agent, and Syndication Agent; UBS, AG as Administrative Agent; and the entities that from time to time would serve as Lenders (all as defined therein).  The total aggregate amount of Loan Debt outstanding under the Credit Agreement as of the Petition Date was $1,700,571,100.00, approximately 82% ($1,379,606,450.74) of which, as of July 26, 2013, was held by members of the Ad Hoc Secured

---

[8] Harbinger made its first investment in LightSquared's predecessor, SkyTerra, in 2004.  *See Harbinger v. Deere, et al.*, Case No. 13-cv-5543 (S.D.N.Y. Aug. 9, 2013) ("*Harbinger v. Deere*"), Complaint [Dkt. No. 1] at ¶ 123.

[9] *See LightSquared v. Deere*, Complaint ¶ 3 ("To date, LightSquared has invested approximately $4 billion to develop its network"); *Harbinger v. Deere*, Complaint ¶ 152 ("Harbinger invested . . . almost $1.9 billion").

Group of LightSquared LP Lenders (the "Ad Hoc Secured Group"), including the $824,323,097.83 held by SPSO.[10]

The Credit Agreement includes a series of provisions that, as alleged by Harbinger, were meant to "protect LightSquared and Harbinger from opportunistic competitors, such as Defendants, who might pose as lenders to develop a position in LightSquared's capital structure." Am. Compl. ¶ 38. In particular, Section 10.04 of the Credit Agreement permits an existing lender to "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement." Credit Agreement § 10.04(b).[11] The definition of "Eligible Assignee" states that it "shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person or any Disqualified Company." Id. § 1.01. A "Disqualified Company" is defined as "any operating company which is a direct competitor of the Borrower," as well as "any known subsidiary thereof." Id. A list of Disqualified Companies is included on Schedule 1.01(a) to the Credit Agreement. (The initial version of Schedule 1.01(a) included EchoStar; it was amended in May, 2012 to add DISH, among other entities.) Accordingly, each of DISH and EchoStar is a "Disqualified Company" under the Credit Agreement, and thus neither can be an "Eligible Assignee." Mr. Ergen himself, as a natural person, also cannot be an "Eligible Assignee."

---

[10] *See* Revised Seventh Supplemental Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019, Case No. 12-12080 (Bankr. S.D.N.Y. July 26, 2013) [Dkt. No. 777].

[11] Under the Credit Agreement, the prior written consent of UBS, AG ("UBS"), the Administrative Agent, is required for any transfer of an interest in the Loan Debt. Credit Agreement § 10.04(b). To effectuate such a transfer, the parties must execute and deliver to UBS certain documentation (the "Purchase Documentation"), which requires the prospective purchaser to make various representations concerning, among other things, its status as an "Eligible Assignee." Id. §§ 10.04(a) and (b)(ii)(C). Subject to acceptance of the transfer, the prospective purchaser or "Eligible Assignee" becomes a party to the Credit Agreement and shall "have the rights and obligations of a Lender under [the Credit Agreement] . . . ." Id. § 10.04(b). As part of its acceptance and recordation of transfers, UBS records the names and addresses of the Lenders under the Credit Agreement (including Eligible Assignees that have become Lenders pursuant to accepted transfers of Loan Debt) and their interest in the Loan Debt in a register (the "Register"). Id. § 10.04(c).

III.    **The Defendants**.

DISH is a provider of broadband and satellite television services and is the second largest satellite television provider in the United States.  DISH Defs.' Mem. (as defined below) 4.  As alleged in the Amended Complaint, DISH, a competitor of LightSquared, aims to expand its broadband offerings, including by building out an integrated terrestrial network, similar to that which LightSquared intends to offer.  Am. Compl. ¶ 20.

EchoStar is a satellite communications company that operates, leases, or manages a number of satellites, including the satellites that provide services to EchoStar's sister company, DISH.  Id. ¶ 19; DISH Defs.' Mem. 4.  EchoStar and DISH are publicly traded companies, and neither company owns an interest in the other.  Id.

Charles W. Ergen is the founder, the Executive Chairman of the boards of directors, an employee, and the majority owner of both DISH and EchoStar.  As of November 30, 2012, Mr. Ergen controlled approximately 88% of DISH's voting shares and approximately 80% of EchoStar's voting shares.  Am. Compl. ¶ 18.

LBAC is a wholly-owned subsidiary of DISH and is the "stalking horse" bidder in connection with the upcoming auction of certain assets of LightSquared LP, including the spectrum.  DISH Defs.' Mem. 4; Am. Compl. ¶ 21.  Harbinger alleges that LBAC was formed for the sole purpose of bidding on LightSquared LP's spectrum assets.  Id. ¶ 21.

SPSO is an investment vehicle organized under the laws of Delaware, with headquarters in New York.  SPSO's sole member and manager is SO Holdings, which in turn has Mr. Ergen as its sole member and managing member.  Am. Compl. ¶¶ 22-23.  SPSO was formed on or about May 16, 2012, at Mr. Ergen's direction, by Sound Point Capital.  Id. ¶ 22.  SPSO has been

acquiring debt of LightSquared LP since at least April 2012,[12] and, as of July 26, 2013, held $824,323,097.83 of Loan Debt of LightSquared LP.[13]

Sound Point Capital is an investment management and advisory firm; it serves as trading manager and investment advisor for SPSO and facilitates and advises SPSO on its investments and investment strategies.  Am. Compl. ¶ 24.  Stephen Ketchum is Sound Point Capital's founder and managing member, and he serves as the trading manager of SPSO.  Id. ¶ 25.  Mr. Ketchum is a former banker to DISH and has a longstanding relationship with Mr. Ergen, having worked with EchoStar since its founding.  Id. ¶¶ 24-25.  Sound Point Capital and Mr. Ketchum do not own any interest in SPSO or SO Holdings, none of their employees or representatives is employed by SPSO or SO Holdings, and they do not own for their own benefit any debt securities issued by any of the Debtors, including Loan Debt.  Sound Point Capital Defs.' Mem. (as defined below) 4.

## IV.    The Defendants' Alleged Scheme.

Harbinger alleges that, in order to circumvent the trading restrictions in the Credit Agreement, Mr. Ergen, taking direction from DISH and EchoStar, engaged Sound Point Capital and Mr. Ketchum to form SPSO, an investment vehicle created for the sole purpose of purchasing substantial quantities of Loan Debt.  SPSO began making purchases of Loan Debt in April 2012;[14] in connection with such purchases, SPSO (through its broker, Sound Point Capital) was required to represent that it was an "Eligible Assignee" under the Credit Agreement. Harbinger asserts that SPSO is not in fact an "Eligible Assignee" by virtue of the relationship between and among Mr. Ergen, SPSO, DISH, and EchoStar – to wit, due to the ability of DISH

---

[12] Am. Compl. ¶ 22.
[13] See Revised Seventh Supplemental Verified Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019, Case No. 12-12080 (Bankr. S.D.N.Y. July 26, 2013) [Dkt. No. 777].
[14] See LightSquared Trading Summary.

and EchoStar to control SPSO through their agent Mr. Ergen, SPSO is or should be considered to

be a subsidiary of DISH and EchoStar, and thus is a "Disqualified Company" under the Credit

Agreement and not eligible to purchase Loan Debt.

Harbinger further alleges that SPSO and the Sound Point Capital Defendants (at the

direction of Mr. Ergen, DISH, and EchoStar) concealed the connection between SPSO, Mr.

Ergen, and "Disqualified Companies" DISH and EchoStar, despite the inquiries of Harbinger and

the Debtors.  Through SPSO, Harbinger maintains, "Defendants fraudulently infiltrated the

senior-most tranche of LightSquared's capital structure, secretly amassing, based on knowing

misrepresentations of fact, a position as the single largest holder of LightSquared's [Loan

Debt]."  Am. Compl. ¶ 2.

In addition, Harbinger alleges that Defendants purposefully and strategically delayed the

closing of trades of Loan Debt to prevent Harbinger from being able to (i) successfully negotiate

a plan of reorganization with the Debtors' creditors during the Debtors' exclusive period, and (ii)

secure exit financing for the Debtors' reorganization. *See* id. ¶¶ 7-9.  Finally, Harbinger asserts

that Defendant LBAC was formed to make a "low ball" offer for LightSquared LP's spectrum to

create doubt and confusion among potential investors as to the true value of the spectrum assets.

*See* id. ¶ 10.  Harbinger alleges that the Defendants all worked together at the behest of Mr.

Ergen, DISH, and EchoStar to orchestrate a fraud that would result in the wresting of control of

the Debtors away from Harbinger to the advantage of its competitors.

## **PROCEDURAL HISTORY**

Harbinger commenced this Adversary Proceeding by filing a complaint (the

"Complaint") against the Defendants [Dkt. No 1].  The Complaint asserted seven causes of

action against the Defendants: (i) Equitable Disallowance against SPSO (Count One); (ii) Fraud

against Mr. Ergen, SPSO, SO Holdings, DISH, EchoStar, and LBAC (Count Two); (iii) Aiding and Abetting Fraud against Sound Point Capital and Mr. Ketchum (Count Three); (iv) Tortious Interference with Prospective Economic Advantage against Mr. Ergen, SPSO, SO Holdings, DISH, EchoStar, and LBAC (Count Four); (v) Tortious Interference with Jefferies Relationship against Mr. Ergen, SPSO, SO Holdings, DISH, EchoStar, and LBAC (Count Five); (vi) Unfair Competition against all Defendants (Count Six); and (vii) Civil Conspiracy against all Defendants (Count Seven).

Notices of intervention were filed by (i) U.S. Bank National Association and MAST Capital Management, LLC (together, "U.S. Bank/MAST"), (ii) the Ad Hoc Secured Group,[15] and (iii) the Debtors [Dkt. Nos. 12, 14, and 15, respectively]. The Debtor's Intervention states that the Debtors intervene as plaintiffs (i) in the first cause of action of the Complaint only to the extent that the first cause of action seeks declaratory relief on the issue of whether the purchase of Loan Debt by SPSO and SO Holdings was in compliance with the Credit Agreement, and (ii) in any other claim or cause of action against SPSO and SO Holdings to the extent that it raises the issue of whether the purchase of Loan Debt was in compliance with the Credit Agreement. The notice of intervention filed by U.S. Bank/MAST, as plaintiffs, reserves their rights to assert certain claims or causes of action against the Defendants, on behalf of the Debtors' estates, if the Debtors do not intervene in the Adversary Proceeding. As a result of the Debtors' Intervention, it would appear that the intervention by U.S. Bank/MAST as plaintiffs has been rendered largely academic.

---

[15] As stated in its notice of intervention, as of August 22, 2013, the Ad Hoc Secured Group was comprised of Capital Research and Management Company, Cyrus Capital Partners, L.P., Fir Tree Capital Opportunity Master Fund, L.P., Intermarket Corporation, SP Special Opportunities LLC, and UBS AG, Stamford Branch.

On September 9, 2013, the Motions to Dismiss and memoranda in support were filed by (i) the Ergen Defendants [Dkt. No. 30] (the "Ergen Defendants' Memorandum"), (ii) the DISH Defendants [Dkt. Nos. 33] (the "DISH Defendants' Memorandum"), and (iii) the Sound Point Capital Defendants [Dkt. No. 35] (the "Sound Point Defendants' Memorandum").  In support of their Motion to Dismiss, the Ergen Defendants also filed the Declaration of James C. Dugan, counsel for the Ergen Defendants [Dkt. No. 31].

On September 30, 2013, Harbinger filed the Amended Complaint [Dkt. No. 43], which (i) more expansively set forth its contentions that, at all relevant times, Mr. Ergen was acting in his capacity as an agent of DISH and/or EchoStar, and not as an individual or as an indirect owner of the SPSO Defendants, and (ii) bolstered its allegations that SPSO is a "subsidiary" of DISH and/or EchoStar via Mr. Ergen and, accordingly, is or should be considered to be a "Disqualified Company" under the Credit Agreement.  By the Amended Complaint, Harbinger also asserts an additional cause of action – Objection to Claim of SPSO under section 502 of the Bankruptcy Code (Count Eight) – which is almost entirely predicated on the facts pled in the first forty-nine pages of the Amended Complaint.

On October 3 and 5, 2013, the Ergen Defendants, the Sound Point Capital Defendants, and the DISH Defendants each filed an additional memorandum of law in support of their respective Motions to Dismiss [Dkt Nos. 44-46].

On October 9, 2013, the Debtors filed a memorandum of law in opposition to the Motions to Dismiss, solely with respect to Counts One and Eight of the Amended Complaint [Dkt. No. 50] (the "Debtors' Opposition").  Harbinger also filed a memorandum of law in opposition to the Motions to Dismiss, which was an impressive 96 pages in length. [Dkt. No. 51] (the "Harbinger Opposition").  Both memoranda substantially rest on the argument that the

Amended Complaint pleads in sufficient factual detail that SPSO is, or, by reason of the relationship between and among Mr. Ergen, SPSO, and the DISH/EchoStar parties, should be deemed to be a "Disqualified Company" under the terms of the Credit Agreement and was therefore not eligible to purchase the Loan Debt.  U.S. Bank/MAST subsequently filed a Joinder to the Debtors' Opposition [Dkt. No 53].

On October 22, 2013, the Ergen Defendants, the DISH Defendants, and the Sound Point Capital Defendants each filed a reply to the opposition of Harbinger to the Motions to Dismiss [Dkt. Nos. 59-61].  Included in the reply filed by the Ergen Defendants (the "Ergen Defendants' Reply") was a response to the Debtors' Opposition.

On October 29, 2013, the Court held oral argument on the Motions to Dismiss and, after a recess, read into the record a brief preliminary ruling, subject in all respects to the Decision set forth herein.

## **STANDARD OF REVIEW**

Under Rule 12(b)(6), to survive a motion to dismiss, a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a motion to dismiss, the court must "accept as true all factual allegations set out in the plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).  Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  *Sweet*

*v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In addition, when a complaint alleges fraud, the complaint is subject to the "heightened pleading requirements" of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." *Jalee Consulting Group, Inc. v. XenoOne, Inc*., 908 F. Supp. 2d 387, 394 (S.D.N.Y. 2012). Specifically, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id*. (quoting *Lerner v. Fleet Bank, N.A*., 459 F.3d 273, 290 (2d Cir. 2006)). "Allegations that are conclusory or unsupported by factual assertions are insufficient" to satisfy the requirements of Rule 9(b). *Premium Mortg. Corp. v. Equifax Info. Svcs., LLC*., 583 F.3d 103, 108 (2d Cir. 2009).

## DISCUSSION

I.    **Harbinger's Equitable Disallowance
      Claim (Count One) is Dismissed with Prejudice**.

Harbinger asserts that the claim of SPSO must be equitably disallowed due to its "grossly inequitable conduct." Am. Compl. ¶ 93. Specifically, Harbinger maintains[16] that, even if SPSO's purchases of Loan Debt were permitted by the Credit Agreement and are not otherwise subject to disallowance under the Credit Agreement, applicable state law, or other specific provisions of section 502(b) of the Bankruptcy Code, this Court nonetheless has the equitable power to disallow SPSO's approximately $824 million claim in its entirety, the economic effect of which would be the subordination of such claim to the interests of the Debtors' equity holders, including Harbinger. While conceding that the circumstances under which this scenario would

---

[16] By the Debtors' Intervention and, as detailed in the Debtors' Opposition, the Debtors join this argument.

occur are "even rarer" than those justifying equitable subordination of a claim pursuant to section 510(c), Harbinger and the Debtors insist nonetheless that the Bankruptcy Code contemplates the Court engaging in such an exercise. When asked at the Hearing to delineate the test or criteria that the Court should apply in analyzing a request for equitable disallowance, counsel for Harbinger invoked the famous Justice Potter Stewart definition of pornography: "[Y]ou don't really know what it is until you see it."[17]

In analyzing whether there exists a basis for equitable disallowance under the Bankruptcy Code, the Court must first turn to the relevant sections of the Bankruptcy Code. *See, e.g., In re Caldor Corp.*, 303 F.3d 161, 167 (2d Cir. 2002) ("The task of resolving a dispute over the meaning of a provision of the Bankruptcy Code 'begins where all such inquiries must begin: with the language of the statute itself.'") (citation omitted). The words "equitable disallowance" do not appear anywhere in the Bankruptcy Code, nor was the remedy of equitable disallowance included in the text of the Bankruptcy Act. Accordingly, we must first turn to the provision of the Code dealing with the allowance of claims - section 502 - and also examine the provision mostly closely linked to the concept of equitable disallowance - section 510(c).

A. **Applicable Statutory Provisions and Case Law**.

1. **Section 502 of the Bankruptcy Code**.

Section 502 of the Bankruptcy Code, entitled "Allowance of claims or interests," provides that a properly filed proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Various other subsections of section 502 set forth the grounds for disallowing a claim, including section 502(b)(1), which authorizes disallowance because the claim is unenforceable under any agreement or applicable law. Section 502(b) provides: "[T]he court . . . shall allow such claim in such amount, except to the extent that (1) such claim is

---

[17] *See* Oct. 29, 2013 Hearing Transcript [Dkt. No. 64] ("10/29/13 Hr'g Trans.") at 114:3-7.

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law . . . ."  11 U.S.C. § 502(b).  This language could not be plainer – if a claimant would be

estopped under non-bankruptcy law from having a valid claim against the debtor, a party may

seek disallowance of the claim under section 502(b)(1).  Equitable disallowance is not one of the

specified exceptions to the allowance of a claim articulated in section 502(b) or any other

subsection of section 502.[18]   There is no catch-all "equities" exception, nor any language

directing the court to inquire into the good faith of the claimant (*see*, *e.g.*, 11 U.S.C. §§

1129(a)(3), 1126(e)) or, more broadly, to consider the interests of justice (*see, e.g.*, 28 U.S.C. §

1412).

### 2.  <u>Section 510 of the Bankruptcy Code</u>.

Section 510 of the Bankruptcy Code addresses subordination of claims; specifically,

section 510(c)(1) provides that, after notice and a hearing, the court may, "under principles of

equitable subordination, subordinate for purposes of distribution all or part of an allowed claim

to all or part of another allowed claim or all or part of an allowed interest to all or part of another

allowed interest . . . ."  11 U.S.C. § 510(c)(1).  Section 510(c) does not, on its face, provide for

the disallowance of any claim or interest based on principals of equity or otherwise.

### 3.  <u>Applicable Case Law</u>.

Courts analyzing the question of equitable disallowance have most frequently focused on

*Pepper v. Litton*, a storied 1939 case in which the Supreme Court affirmed a district court's

equitable disallowance of the claim of an insider of the debtor.[19]   It is instructive to analyze the

underlying facts of *Pepper v. Litton* to place the remedy of equitable disallowance into the

---

[18] Section 502(j) states that a "reconsidered claim may be allowed or disallowed according to the equities of the case," but there is no concomitant subsection of section 502 (or any other section of the Bankruptcy Code) that permits the court to allow or disallow a claim in the first instance "according to the equities of the case."
[19] 308 U.S. 295 (1939).

context of the particulars of section 502. In *Pepper*, a creditor sued the Dixie Splint Coal Company ("Dixie") for royalties due under a lease. While the royalties action was pending, and anticipating that the creditor would recover, Litton, the sole shareholder of Dixie, obtained a judgment against Dixie for alleged accumulated salary claims which had lain dormant for years. Litton then caused an execution to be issued on his judgment and purchased all of Dixie's corporate assets at the execution sale, after which he caused Dixie to file a voluntary petition in bankruptcy. Litton then filed a claim in the bankruptcy case to recover the unsatisfied portion of his judgment. Dixie's bankruptcy trustee brought a state court action to have Litton's judgment set aside and to recover the assets obtained at the sale but was unsuccessful.

When Litton's bankruptcy claim came before the District Court, it disallowed the claim and held that the trustee should recover the corporate assets purchased by Litton at the execution sale. Of particular significance is the fact that the District Court in *Pepper* concluded that the decision by the state court that the trustee was estopped from attacking the Litton judgment in state court did not prevent the bankruptcy court from considering the validity of the judgment. After reviewing the facts, the District Court then concluded (i) that Litton and Dixie "had made a 'deliberate and carefully planned attempt' to avoid 'the payment of a just debt'"; (ii) that Litton and Dixie "were 'in reality the same'"; and (iii) that "the alleged salary claims underlying the Litton judgment did not represent an 'honest debt' of the bankrupt corporation, being merely bookkeeping entries for the double purpose of lessening income taxes and of enabling Litton to appear as a creditor of the corporation in case it became financially involved." *Id.* at 301. The Court of Appeals for the Fourth Circuit reversed, holding that the decision of the state court was *res judicata*. The Supreme Court reversed the Court of Appeals and affirmed the District Court's ruling.

Relying on the District Court's findings that Litton had executed a "general fraudulent plan" to use his long-dormant claims to impair the rights of a valid creditor from recovering from the debtor corporation, the Supreme Court upheld the disallowance of Litton's claim. *Id.* at 311-12. Although *Pepper* generally refers to "disallowance" and "subordination" interchangeably, as if they were the same remedy, it identifies disallowance as the appropriate remedy for claims that "are fictitious or a sham." *Id.* at 310. Thus, the Supreme Court's holding in *Pepper* did not directly address whether such a remedy exists with respect to a claim that has a valid basis under applicable law but against which a party brings an equitable attack.[20]

Other than *Pepper v. Litton*, which was decided under the Bankruptcy Act, no Bankruptcy Code case has been cited to the Court in which the claim of a creditor has been equitably disallowed. While courts in this District and others have permitted claims for equitable disallowance to survive motions to dismiss, no court has ever employed equitable disallowance as a remedy or sanction under the Bankruptcy Code. *See, e.g., Adelphia Communs. Corp. v. Bank of Am., N.A. (In re Adelphia Communs. Corp.)*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ("*Adelphia I*"), *aff'd in relevant part*, *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008) ("*Adelphia II*"); *In re Wash. Mutual, Inc.*, 461 B.R. 200, 256-259 (Bankr. D. Del. 2011) (permitting assertion of equitable disallowance but in circumstances in which it appeared that the subject claim was otherwise invalid and disallowable on section 502(b) grounds).

In *Adelphia I*, the Official Committee of Unsecured Creditors commenced an adversary proceeding against approximately 380 defendants, including Adelphia's bank lenders and other

---

[20] Under the Code, there is a remedy at law (disallowance pursuant to section 502(b)(1)) that could be invoked in response to a fictitious claim by a fiduciary based on total disregard of the corporate entity. In other words, putting aside the *res judicata* issues involved in *Pepper*, Litton's claim would be disallowed today pursuant to section 502(b)(1), without resort to equitable disallowance.

commercial and investment banks, asserting over 50 causes of action, one of which was equitable disallowance of all of the defendants' claims. In ruling on the defendants' motions to dismiss, Judge Gerber denied the motions with respect to equitable disallowance, a ruling that was affirmed on appeal by District Judge McKenna (in *Adelphia II*). In his decision, Judge Gerber noted that, when textual analysis is inconclusive – here, sections 502 and 510 of the Bankruptcy Code are both silent, neither authorizing nor prohibiting equitable disallowance – the court should turn to legislative history. With respect to equitable disallowance, the court stated that it "is not writing on a clean slate" in two important respects: (i) relevant legislative history, and (ii) caselaw that holds that, on matters where the Code is silent, courts looks to pre-Code law.[21] *Adelphia I*, 365 B.R. at 71. In examining the legislative history of section 510(c), the court focused on the following statement accompanying section 510:

> This section is intended to codify case law, such as *Pepper v. Litton*, 308 U.S. 295, 60 S. Ct. 238, 84 L. Ed. 281 (1939), and *Taylor v. Standard Gas and Electric Co.*, 306 U.S. 307, 59 S. Ct. 543, 83 L. Ed. 669 (1938), and is not intended to limit the court's power in any way.… Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances.[22]

Judge Gerber held that the court was not in a position to conclude that, by explicitly addressing equitable *subordination* in the Code, Congress intended to foreclose the possibility of equitable *disallowance* as another remedy under *Pepper* and its progeny. *Id.* at 72-73. The court noted, however, that, even if permissible, a penalty such as equitable disallowance will have to be evaluated in the context of whether it is appropriate based on the facts and circumstances of the case, as it is a "draconian" remedy. *Id.* at 73.

---

[21] Judge Gerber observed that "if this Court were writing on a clean slate, arguments based on the maxim '*expressio unius*' would have some force, especially in the context of section 502, where other exceptions to allowability were expressly set forth." *Adelphia I*, 365 B.R. at 71.

[22] *Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Session 359 (1977) (*reprinted in* Volume C COLLIER ON BANKRUPTCY App. Pt. 4-1495 (16th ed. 2013))). Judge Gerber also cited to case law reflecting courts' reluctance to accept arguments interpreting the Code in a manner contrary to pre-Code practice.

In *Adelphia II*, Judge McKenna affirmed Judge Gerber's decision and added his own nuanced reading of the legislative history, observing that, while the legislative history neither mandates nor prohibits equitable disallowance, it does not suggest a congressional intent to disavow *Pepper* and eliminate the use of equitable disallowance under all circumstances.[23] *Adelphia II*, 390 B.R. at 76.  While Judge McKenna stated that "[i]n these circumstances, the Court cannot find in the legislative history . . . a basis to attribute to Congress an intent that the Code should authorize equitable disallowance as well as equitable subordination"[24] he agreed that "equitable disallowance is permissible under *Pepper*," subject to Judge Gerber's caveats regarding the doctrine's applicability to the facts of the case.  *Id*. at 76 (citing *Adelphia I*, 365 B.R. at 71).  The lack of agreement of these two distinguished jurists as to the meaning and relevance of the legislative history gives this Court some pause and highlights the perils of reliance on the tea leaves of legislative history, especially in an instance such as this in which it is not unreasonable to conclude that the statutory language is express and clear on its face.[25]

---

[23] In *Adelphia II*, Judge McKenna conducted an extensive review of the legislative history of section 510, which was enacted as part of the Bankruptcy Reform Act of 1978.  As Judge McKenna and Judge Gerber both observed, the House Judiciary Committee Report that accompanied H.R. 8200 states, in relevant part, "[Section 510] is intended to codify case law, such as *Pepper v. Litton* . . . and is not intended to limit the court's power in any way . . . . Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances." H.R. Rep. No. 595, 95th Congr., 1st Sess. 359 (1977).  However, Section 510 of House Bill 8200, which was entitled "Subordination of claims," did not include any provision for disallowance of claims and authorized subordination of an allowed claim or interest to another allowed claim or interest "on equitable grounds." Id.  In contrast to the House Bill, the Senate amendment, Senate Bill 2266, contained a subsection 510(c)(3) entitled "Subordination or disallowance of claims;" this Subsection 510(c)(3) of Senate Bill 2266 would have authorized the court to "disallow, in part or in whole, any claim or interest in accordance with the equities of the case."  The version of section 510 that was enacted, however, did not include any reference to "disallowance;" such language was deleted in its entirety while still at the Senate level.  Judge McKenna noted that "[i]n the circumstances… the Court cannot give any weight to the omission of Section 510(c)(3) of S.2266 from the Bankruptcy Code.  Congress could have decided to do away with equitable disallowance, or it could have thought specific reference to it was superfluous."  *Adelphia II*, 390 B.R. at 75-76.

[24] *Id*. at 75.

[25] One must consider the massive scale of the *Adelphia* litigation when reviewing the analysis of equitable disallowance in the context of that case: equitable disallowance was claim number 33 out of over 50 causes of action, and the complaint named approximately 380 defendants.

### B.  **The Bankruptcy Code Does Not Permit Equitable Disallowance**.

With enormous respect to those courts who have held to the contrary, this Court holds that the Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b) of the Bankruptcy Code.

### 1.  **Statutory Interpretation**.

#### a.  **The Plain Language of Section 502 Does Not Permit Equitable Disallowance**.

First, in accordance with general rules of statutory interpretation, a plain reading of section 502 of the Bankruptcy Code does not permit equitable disallowance, as it is not among the enumerated exceptions to allowance of a claim.  While not expressly ruling on the question of whether equitable disallowance exists as a remedy under the Code, the Supreme Court has held that if there is no basis to disallow a claim under section 502, the claim must be allowed. *Travelers Cas. & Surety Co. of Am. v. Pacific Gas & Electric Co.*, 549 U.S. 443, 449 (2007) (holding that, under the Bankruptcy Code, the court "'shall allow' [a] claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b).") (citing § 502(b)).[26]  If Congress had wanted to include a "catch-all" provision for disallowance of claims when the equities of a case justified such a remedy, it could have easily included such a provision in section 502, as it did for equitable subordination in section 510(c).

---

[26] *See also HSBC Bank USA, N.A. v. Calpine Corp.*, No. 07 Civ. 3088 (GBD), 2010 U.S. Dist. LEXIS 96792 at *18 (S.D.N.Y. Sept. 15, 2010) ("All claims are allowed unless specifically proscribed by one of the nine exceptions listed in § 502(b).") (citing *Travelers*, 549 U.S. at 449); *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826, 838-39 (9th Cir. 2009) (holding that a court "must find a basis in section 502 to disallow a claim, and absent such basis, [the court] must allow [the claim].") (citations omitted); *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 426 (9th Cir. B.A.P. 2005) ("Section 502(b) sets forth the exclusive grounds for disallowance of claims . . . ."); *Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)*, 318 B.R. 147, 152 (8th Cir. B.A.P. 2004) (rejecting the argument that claims may be objected to as tardy as such a basis is not enumerated in Section 502(b) of the Bankruptcy Code:  "The Bankruptcy Code could not be more clear: a claim, proof of which is filed, shall be allowed unless it falls within one of the exceptions set forth in Section 502(b)."); *In re Moreno*, 341 B.R. 813, 817 (Bankr. S.D. Fla. 2006) ("§ 502(b) sets out the exclusive exceptions for disallowance of a claim.").

This reading of section 502(b) – that if a claim is not subject to disallowance for any of the reasons specified therein, it must be allowed – is not only consistent with the statute but also with the over-arching principle that the Code should not be employed to void parties' rights under applicable non-bankruptcy law in the absence of specific direction from Congress.   The Supreme Court has described this reading of section 502(b)(1) as consistent with both the plain text and with "the settled principle that '[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'"   *Travelers*, 549 U.S. at 450 (citations omitted).   Simply put, it must surely be the case that if a creditor engages in conduct egregious enough to justify equitable disallowance of its claim, there must be a basis under applicable law to disallow such claim pursuant to section 502(b)(1).   As noted by the Fifth Circuit in *Mobile Steel*, the seminal case on equitable subordination:

> Disallowance of claims on equitable grounds would add nothing to the protection against unfairness already afforded the bankrupt and its creditors. If the claimant's inequitable conduct is directed against the creditors, they are fully protected by subordination. If the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely the claim is either invalid or the bankrupt possesses a clear defense against it.* Thus, where the bankrupt is the victim it has an adequate remedy at law. It follows that disallowance of a wrongdoer's claim on nonstatutory grounds would be an inappropriate form of equitable relief.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 n. 10 (5th Cir. 1977) (internal citations omitted) (emphasis added).[27]   When Congress determined to abrogate substantive state

---

[27] *See also 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (stating in dicta that "[t]he doctrine [of equitable subordination] is limited to reordering priorities, and does not permit disallowance of claims . . . . If the conduct of the creditor is so egregious that it affects the validity of the claim under applicable principles of law, the debtor can seek to disallow it as part of the claims allowance process.") (citing *In re Mobile Steel*, 563 F.2d at 699); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) ("The equitable subordination doctrine, codified in part in Section 510(c) of the Bankruptcy Code, is limited to reordering priorities; it does not permit disallowance of

law in the Code, it did so explicitly.  *See*, *e.g.*, section 365(e) (*ipso facto* clauses); section 365(f) (anti-assignment clauses); section 502(b)(6) (cap on lease rejection damages).  It did not do so with respect to the disallowance of claims on equitable grounds.

**b.  <u>The Court Cannot Equitably Disallow a Claim under Section 105(a)</u>**.

Moreover, while bankruptcy courts indeed possess equitable powers under section 105(a) of the Bankruptcy Code, section 105 cannot be used to expand such powers beyond the contours of applicable law.  Section 105(a), in pertinent part, permits a bankruptcy court, as a court of equity, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  It does not, however, give a bankruptcy court *carte blanche* to do whatever is deemed to be equitable, particularly by creating remedies that extend the substantive reach of the statute.  As the Second Circuit has stated,

> This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code. It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.

*In re Smart World Techs., LLC*, 423 F.3d 166, 184 (2d Cir. 2005).

Pending in the United States Supreme Court this Term is the case of *Law v. Siegel*, 435 Fed. Appx. 697 (9th Cir. 2011), *petition for cert. granted*, 81 U.S.L.W. 3689 (U.S. June 17, 2013) (No. 12-5196), which raises the question of whether the bankruptcy court may surcharge property of a debtor that is otherwise exempt pursuant to the applicable provisions of section 522 of the Code using (a) its grant of equitable powers under section 105 of the Code or (b) its inherent power to sanction misconduct.  In *Law*, the trustee sought to surcharge (*i.e.* to treat as non-exempt) the debtor's exempt property in order to compensate the estate for costs incurred as

---

claims.") (citing *In re 80 Nassau Assocs.*, 169 B.R. at 836-37); *Grede v. Bank of N.Y.*, 2009 U.S. Dist. LEXIS 6184, *27-28 (N.D. Ill. Jan. 27, 2009) ("[Equitable disallowance is] a remedy which is not authorized by the Bankruptcy Code.").

a result of the debtor's bad faith litigation.  *Law* poses a question that is structurally similar to the

one before this Court: does the Code allow a bankruptcy court to exercise its equitable powers to

contravene a specific contrary provision of the Code?  The issue in this case is *a fortiori* to the

issue in *Law* since here the Code is arguably silent on equitable disallowance, except to the

extent of course that section 502(b) or section 510(c) can be read as a prohibition of equitable

disallowance.  Decades of cases limiting the interpretation of section 105 suggest that the

bankruptcy court does not possess unlimited equitable powers untethered to specific Code

provisions.  If the Supreme Court were to hold to the contrary in *Law*, this Court's views on

equitable disallowance may need to be revisited.

### c.  Section 510(c) Provides an Equitable Remedy of Subordination, Not Disallowance.

As a remedy for claims subject to equitable attack, section 510(c) of the Bankruptcy

Code provides for the subordination of a claim to other claims.  It does not, however, provide for

the subordination of a claim to equity.[28]  As a threshold matter, this limitation undermines the

notion that equitable disallowance is an available remedy because, in equitably disallowing a

claim, a bankruptcy court would effectively achieve the very result the Bankruptcy Code

precludes: the equitable subordination of debt to equity.[29]  Such a result would constitute a

---

[28] *See, e.g., Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 504 (Bankr. W.D. Pa. 2007) (Section 510(c) only "authorizes the subordination of *claims to other claims or interests to other interests* but its language does not extend to treatment of interests vis-à-vis claims") (citations omitted) (emphasis in original); *Town & Country Corp. v. Hare & Co. (In re Town & Country Corp.)*, 2000 Bankr. LEXIS 1755 at *16-17 (1st Cir. B.A.P. 2000) (Section 510(c) is designed to "deal with equitable subordination of claims to other claims or interest to other interests . . . . The Panel will not import some other interpretation to § 510(c) when its language is clear and unambiguous on its face."); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 836-837 (Bankr. S.D.N.Y. 1994) (Section 510(c) "empowers the Bankruptcy Court, under 'principles of equitable subordination,' to subordinate, for purposes of distribution, claims to other claims, and interests to other interests...."); 4 COLLIER ON BANKRUPTCY ¶ 510.05 at 510-17 (16th ed. 2013) ("Under subsection (c)(1), claims may be subordinated to claims, and interests may be subordinated to interests, but claims may not be subordinated to interests.").

[29] *See, e.g., Murgillo v. California State Bd. of Equalization (In re Murgillo)*, 176 B.R. 524, 532-33 (9th Cir. B.A.P. 1994) (rejecting debtor's attempt to equitably disallow a claim and finding that should the bankruptcy court "make an equitable exception to the general rule of § 502(b) [it] would serve to bypass the specific code provision for

penalty, not a remedy, as there is nothing equitable about allowing a debtor to evade a valid

obligation enforceable under applicable law.[30]  While claim subordination provides an equitable

remedy that protects creditors against unfairness, equitable disallowance adds only the prospect

of a windfall for equity.  *See, e.g., Mobile Steel*, 563 F.2d at 699, n.10 (noting that creditors

victimized by inequitable conduct are protected by subordination).  Indeed, in *Pepper v. Litton*,

the claim disallowed by the court was a sham claim asserted by the debtor's insider, and

equitable disallowance was invoked to protect an innocent creditor.  In circumstances in which a

claim is valid, however, reliance on *Pepper* to support the remedy of equitable disallowance is

simply misplaced.[31]

## 2. Some Observations on the Use of Legislative History.

Based on the foregoing analysis, the Court concludes that it is not necessary or

appropriate to delve into legislative history in order to hold that the Code does not permit

equitable disallowance of claims.  Moreover, where, as here, the legislative history raises more

questions than it answers, and two distinguished jurists, Judge McKenna and Judge Gerber, have

---

equitable treatment of an allowed claim -- § 510(c). . . . [T]he proper exercise of the bankruptcy court's equitable powers under § 502 is through investigation into the existence, validity and enforceability of claims leading to their allowance or disallowance; and the proper exercise of equitable powers regarding allowed claims is through the equitable subordination provisions of § 510(c).") (citations omitted).

[30] *See, e.g., Keppel v. Tiffin Sav. Bank*, 197 U.S. 356, 363 (U.S. 1905) ("[C]ourts of bankruptcy are guided by equitable considerations… The fallacy lies in assuming that courts have power to inflict penalties, although the law has not imposed them").

[31] At least one commentator has observed that the Supreme Court's ruling in *Pepper v. Litton* should not be relied on by courts as a basis for the equitable disallowance of claims. Hon. Alan M. Ahart, *Why the Equitable Disallowance of Claims in Bankruptcy Must be Disallowed*, 20 AM. BANKR. INST. L. REV. 445, 460 (2012) ("[B]ecause the [Court's] reasoning was flawed and because *Pepper v. Litton* relied upon [Act] provisions that were repealed, it is no longer authoritative."). Judge Ahart notes that while section 57(k) of the Act provided that a claim that had been allowed or rejected may be later re-allowed or re-rejected "in whole or in part, according to the equities of the case," the Act did not provide for the disallowance of claims on an equitable basis in the first instance. *Id.* at 450 (quoting *Pepper*, 308 U.S. at 305, n.12) (citing 11 U.S.C. § 57(k) (1976) (repealed in 1978)). Further, section 57(k) of the Act only allowed for such reconsideration *for cause*; thus, the Court had to find a non-equities-based reason to reconsider the allowance (or rejection) of a claim.  The Court in *Pepper* relied on its equitable powers to, in essence, "side step" this requirement, and rejected Litton's claim on equitable grounds in the first instance as the claim was "ascertained to be without lawful existence." *Pepper*, 308 U.S. at 305.  Judge Ahart concludes that the Court did not have authority under any express provision of the Act to equitably disallow a claim in the first instance, and, thus, the Court was in error in its ruling.  Ahart, 20 AM. BANKR. INST. L. REV. at 451.

different commentary as to its significance, it seems prudent to avoid the temptation to look beyond the text itself.

Courts and scholars alike have struggled with the appropriateness of judges' reliance on legislative history in interpreting a statute. Although statutes are all too often open to differing interpretations, many courts and commentators have argued against using legislative history as it does not present a full picture of congressional intent.[32] As stated by the Supreme Court in *Exxon Mobil Corp. v. Allapattah Servs.*,

> Legislative history is itself often murky, ambiguous, and contradictory… investigation of legislative history has a tendency to become… an exercise in 'looking over a crowd and picking out your friends.' [J]udicial reliance on legislative materials like committee reports… may give unrepresentative committee members--or, worse yet, unelected staffers and lobbyists--both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

545 U.S. 546, 568 (2005) (examining the legislative history of supplemental jurisdiction under 28 U.S.C. § 1367) (internal citations omitted).

Other jurists consider legislative history to be an effective and necessary tool in determining congressional intent in certain circumstances. For example, Justice Breyer has identified five primary situations in which judges should use legislative history: avoiding absurdity, illuminating drafting errors, determining specialized meanings, identifying a reasonable purpose, and choosing among reasonable alternatives of a politically controversial statute. *See* Kenneth R. Dortzbach, *Legislative History: The Philosophies of Justices Scalia and Breyer and the Use of Legislative History by the Wisconsin State Courts*, 80 MARQ. L. REV. 161,

---

[32] *See, e.g.*, Hon. Patricia M. Wald (Ret.), *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 200 (1983) ("Much of the pertinent legislative discussion is unrecorded or inadequately recorded…."); Jonathan T. Molot, *Exchange: The Rise and Fall of Textualism*, 106 COLUM. L. REV. 1, 28-29 (2006) ("[W]hen judges rely on legislative history they risk elevating the views of those select few. Rather than enforcing the language enacted by both Houses of Congress and signed by the President, purposivist judges enforce the policy preferences of a subset of legislators, thereby violating the Constitution's carefully crafted lawmaking procedures.") (internal citations omitted).

170-171 (1996).  Responding to criticism that legislative history may not reflect the true will of

Congress, Justice Breyer observed that legislative history is "never a substitute for the law, but

simply a device, like a dictionary, to interpret the law."  Hon. Thomas F. Waldron and Neil M.

Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two

Years of BAPCPA*, 81 AM. BANKR. L.J. 195, 216 (2007).  As the Supreme Court has reminded

us,

> The task of resolving the dispute over the meaning of [a
> Bankruptcy Code section] begins where all such inquiries must
> begin: with the language of the statute itself . . . .  [This] is also
> where the inquiry should end, for where, as here, the statute's
> language is plain, . . . "the sole function of the courts is to enforce
> it according to its terms."

*U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citations omitted).  Here, it seems

prudent to avoid entirely the thicket of legislative history, and begin and end the inquiry with the

language of the Code.

Based on the foregoing, the Court holds that equitable disallowance is not permitted

under the Bankruptcy Code.  Accordingly, the Ergen Defendants' Motion to Dismiss the

Complaint is granted with respect to Count One, and Count One is dismissed with prejudice.

II.    **Harbinger Has Failed to State a Claim
       For Fraud or in Tort Against the Ergen Defendants**.

Harbinger asserts five tort-based claims against the Ergen Defendants: Fraud (Count

Two); Tortious Interference with Economic Advantage and Business Relationship (Counts Four

and Five); Unfair Competition (Count Six); and Civil Conspiracy (Count Seven).  Each claim

fails as a matter of law, for the following reasons.

26

## A. **Fraud (Count Two)**.

To assert a claim for fraud under New York law, a plaintiff must allege: (a) a material false representation or an omission of a material fact;[33] (b) that the defendant made with the intention to defraud the plaintiff; (c) upon which the plaintiff reasonably relied; and (d) that caused injury to the plaintiff. *See Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc*., 280 F. Supp. 2d 184, 204 (S.D.N.Y. 2003). In support of its fraud claim, Harbinger alleges that the Ergen/DISH Defendants (i) caused SPSO to make false statements of material fact regarding its status as an "Eligible Assignee" and (ii) failed to disclose material information that was known only to them and not to Harbinger, including that SPSO was ineligible to purchase Loan Debt pursuant to the terms of the Credit Agreement and was actually purchasing Loan Debt on behalf of Mr. Ergen and the DISH Defendants. Harbinger further alleges that the Ergen/DISH Defendants made such false statements and material omissions with the intention of preventing Harbinger from taking steps to stop the Ergen/DISH Defendants from acquiring significant holdings in the Debtors. Am. Compl. ¶ 100. Harbinger alleges that it reasonably relied on such false statements and omissions in (i) continuing to invest labor, capital, and other resources into the Debtors and (ii) refraining from taking steps to prevent the allegedly improper purchases of Loan Debt. Id. Finally, Harbinger alleges that, as a result of the Ergen/DISH Defendants' "fraudulent scheme," it will lose its unique controlling interest in the Debtors and suffer billions of dollars in damages. Id. As discussed in detail below, Harbinger has failed to allege facts sufficient to support its fraud claim.

---

[33] To bring a claim for fraudulent omission of a material fact, a plaintiff must also allege that the defendant had a duty to disclose the information. *Gomez-Jimenez v. New York Law School*, 956 N.Y.S.2d 54, 59 (N.Y. App. Div. 2012); *Banque Arabe et Internationale D'Invesissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995).

1. **Defendants' Alleged Material False Representations and Fraudulent Omissions**.

   a. **Material False Representations**.

The fundamental premise of Harbinger's fraud claim is that SPSO made false and misleading affirmative statements of material fact when it represented to UBS that it was an "Eligible Assignee" entitled to purchase Loan Debt, when in fact, it was not. Harbinger has not alleged that any Defendant other than SPSO made any affirmative statement about its status as an "Eligible Assignee." However, Harbinger argues that "DISH and EchoStar, acting through Ergen, caused SPSO to make these misrepresentations" and thus are responsible for such alleged misrepresentations. Am. Compl. ¶ 98. By their Motions to Dismiss and accompanying memoranda of law, the Ergen/DISH Defendants argue that there is no cause of action for fraud as SPSO's statement that it is an "Eligible Assignee" was true, or, at worst, not intentionally false.[34] All of this turns on the meaning of the word "subsidiary" under the Credit Agreement, and whether or not it has the same meaning as "Subsidiary."

Pursuant to the Credit Agreement, various competitors of the Debtors, including DISH and EchoStar and any of their "subsidiaries," were defined to be "Disqualified Companies" and as such, were not eligible to purchase Loan Debt. Although "Subsidiary" is defined in the Credit Agreement, in relevant part, as "any other person that is otherwise Controlled[35] by the parent and/or one or more subsidiaries of the parent," Credit Agreement § 1.01, the word "subsidiary" as used in the definition of Disqualified Company[36] is not capitalized.

---

[34] A fraud claim must be dismissed if a complaint fails to allege that the defendant made a false statement. *See, e.g., Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 403-04 (S.D.N.Y. 2012) (dismissing fraud claim where plaintiff failed to plead an affirmative misrepresentation); *Gomez-Jimenez v. New York Law School*, 956 N.Y.S.2d at 59-60 (dismissing fraud claim where alleged misrepresentation was not false).

[35] "Control" under the Credit Agreement is defined, in part, as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through ownership of voting securities, by contract or otherwise . . . ." Credit Agreement § 1.01.

[36] A "Disqualified Company" is defined in the Credit Agreement in relevant part as "any operating company which is a direct competitor of the Borrower," as well as "any known subsidiary thereof." Credit Agreement § 1.01.

By the Amended Complaint, Harbinger largely ignores the Credit Agreement's failure to use the defined term "Subsidiary" and submits that the word "subsidiary" as used in the definition of "Disqualified Company" should be given the same meaning as "Subsidiary."[37] Accordingly, Harbinger contends, because SPSO is "Controlled" by DISH and/or EchoStar through Mr. Ergen, SPSO is or should be considered to be a "Subsidiary" of DISH and/or EchoStar and, thus, a "Disqualified Company" pursuant to the terms of the Credit Agreement. Am. Compl. ¶¶ 42-43. Harbinger argues that the defined term "Subsidiary" is broad in scope and turns on the issue of "Control" which, it asserts, entails a factual inquiry.

In response, the Ergen Defendants argue that, under the plain meaning of the Credit Agreement, SPSO is not a "subsidiary" of DISH/EchoStar, as it is owned and controlled by its sole member, SP Holdings, which, in turn, is owned and controlled by Mr. Ergen. Ergen Defs.' Mem. 8-10. The Ergen Defendants urge that the term "subsidiary" as used in the definition of "Disqualified Company" should not be given the same meaning as the defined term "Subsidiary." Id. 9 n.6. Contrary to Harbinger's view, they say, the size of the letter does matter.

The Ergen Defendants make the following observations regarding the definition of "subsidiary." First, the Ergen Defendants note that the Credit Agreement specifically defines the term "Affiliate" in relevant part as "with respect to a specified person, another person that… is under common Control with the person specified . . . ." Credit Agreement § 1.01. The term

---

[37] Harbinger argues that, because the Credit Agreement does not require that terms be capitalized to retain their defined meaning, the fact that "subsidiary" is not capitalized in the definition of "Disqualified Company" is of no consequence. The Court does not find this argument persuasive. Further, Harbinger and the Debtors argue that even if the dictionary definition of "subsidiary" is to be applied (given the lack of capitalization), *Black's Law Dictionary* defines "subsidiary" as "subordinate; under another's control" and argue that even the dictionary definition of "subsidiary" turns on the issue of control. Harbinger Opp. 44, n. 21; Debtors' Opp. 7-8. However, that is the definition of "subsidiary" as an *adjective*. The only definition in *Black's Law Dictionary* for "subsidiary" as a *noun* is a shortened version of "subsidiary corporation," which is defined as "a corporation in which a parent corporation has a controlling share."

"Affiliate" was not included in the definition of "Disqualified Company."  If Harbinger is correct about the expansive definition of "subsidiary" there would seem to be no need for a separate term "Affiliate."[38]  Second, Schedule 1.01(a) to the Credit Agreement, which specifically lists all "Disqualified Companies," originally included EchoStar and was later amended to include, among other entities, DISH.  Under Harbinger's view, such an amendment would have been unnecessary, as DISH would have been considered a "Subsidiary" of EchoStar under the common "Control" of Ergen.[39]  Third, the Ergen Defendants assert that, because the word "subsidiary" contained in the definition of "Disqualified Company" begins with a lowercase "s", it is not a reference to the term "Subsidiary" as defined in the Credit Agreement.  The Ergen Defendants argue that, accordingly, the dictionary definition of "subsidiary" should be applied, and they cite to case law that relies on *Black's Law Dictionary* for the definition of "subsidiary" – meaning a corporate entity in which another corporate entity has a controlling economic interest.[40]

While the Court makes no findings of fact on a motion to dismiss, it appears that the Ergen Defendants may have had an understanding of the word "subsidiary" as used in the Credit Agreement that is different from the meaning asserted by Harbinger.  Nonetheless, even under Harbinger's interpretation of the "Subsidiary" v. "subsidiary" issue, Harbinger has failed to state a claim for fraud that can survive the Ergen Defendants' Motion to Dismiss.

Even if one were to assume that the term "subsidiary" as used in the definition of "Disqualified Company" has the meaning of the defined term "Subsidiary," Harbinger has not pled facts sufficient to support its claim that DISH or EchoStar has the ability to control SPSO, making SPSO a "Subsidiary" or a "subsidiary" of either company and a "Disqualified Company"

---

[38] Ergen Defs.' Mem. 9-10.
[39] Ergen Defs.' Reply 2 n.2.
[40] Ergen Defs.' Mem. 9 n.6.

under the Credit Agreement. The Ergen Defendants aptly summarize Harbinger's allegations regarding control – "because Mr. Ergen could control each of DISH, EchoStar, and SPSO, he must be deemed to have directed DISH and EchoStar to direct himself to direct SPSO to buy LightSquared Debt."[41] In response, Harbinger asserts an agency theory to impute the actions of Mr. Ergen to DISH and EchoStar; it argues that in directing SPSO to purchase Loan Debt, Mr. Ergen was acting as DISH/EchoStar's agent and carrying out directives on their behalf.[42] Such agency and imputation allegations are not clearly set forth in the Amended Complaint, and, even if they were, the assertions in the Amended Complaint regarding Mr. Ergen's unbounded scope of corporate authority over DISH and EchoStar would seem to undermine any basis for an agency theory. "An essential characteristic of an agency relationship" is that the agent acts "subject to [the principal's] control." *In re Shulman Transp. Enters.*, 744 F.2d 293, 295 (2d Cir. 1984); *see also Global Entm't, Inc. v. N.Y. Tel. Co.*, 2000 U.S. Dist. LEXIS 16038, at *18 (S.D.N.Y. Nov. 6, 2000) ("the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent."). In particular, the Amended Complaint does not allege that Mr. Ergen acted subject to the control of DISH or EchoStar as an agent would; in fact, Harbinger alleges just the opposite: "Ergen controls DISH and EchoStar and makes decisions on their behalf; Ergen then acts unilaterally and with complete authority for DISH and EchoStar to carry out those decisions . . . ." Am. Compl. ¶ 43. In an attempt to resolve these conflicting positions, Harbinger states that Mr. Ergen "define[s] the scope of his own agency as he sees fit."[43] It is unclear, as matter of law, how Mr. Ergen can be both an agent and a principal.

---

[41] Ergen Defs.' Reply 2.
[42] Harbinger Opp. 37-41.
[43] Harbinger Opp. 34.

Harbinger's agency theory thus fails. It has not asserted alter-ego or veil-piercing claims against the Ergen/DISH Defendants, nor any other basis to support its pivotal allegation that DISH or EchoStar had "Control" or "control" over SPSO. Accordingly, Harbinger has failed to allege facts to support its assertions that (i) SPSO is a subsidiary of DISH or EchoStar and, thus, is a "Disqualified Company" under the Credit Agreement and (ii) SPSO's representation that it was an "Eligible Assignee" was false. Harbinger has not alleged that any other Defendant besides SPSO made any material false statements. As such, Harbinger has not pled facts to support the allegation of a material false representation by the Ergen/DISH Defendants.

### b. **Material Omissions**.

Harbinger asserts that, while the "Amended Complaint rests principally on affirmative misstatements"[44], the Ergen/DISH Defendants also made actionable omissions relating to the facts that (a) SPSO was purchasing the Loan Debt on behalf of Mr. Ergen, DISH, and EchoStar, (b) SPSO was not an "Eligible Assignee," and (c) SPSO was actually a "Disqualified Company." Am. Compl. ¶¶ 98-99. To bring a claim based on an omission of material fact or fraudulent concealment, a plaintiff must also allege that the defendant had a duty to disclose the information. *Gomez-Jimenez v. New York Law School*, 956 N.Y.S.2d at 59; *Banque Arabe et Internationale D'Invesissement v. Md. Nat'l Bank*, 57 F.3d at 153. Under New York law, the duty to disclose arises "in a business transaction if: '(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge.'" *Nomura Sec.*, 280 F. Supp. 2d at 205 (citation omitted).[45]

---

[44] Harbinger Opp. 45.
[45] *See also Strasser v. Prudential Sec., Inc.*, 630 N.Y.S.2d 80, 82 (N.Y. App. Div. 1995) (duty to disclose exists "when nondisclosure would le[a]d the person to . . . forego action that might otherwise have been taken for the protection of that person") (internal citations omitted).

Harbinger alleges that, at the time SPSO was purchasing Loan Debt, the Ergen/DISH Defendants had a duty to disclose the connection among SPSO, Mr. Ergen, and DISH/EchoStar because (i) such Defendants possessed "superior" knowledge regarding SPSO's status as a "Disqualified Company", (ii) Harbinger did not have such knowledge, and (iii) such Defendants knew that UBS and Harbinger were acting under the mistaken belief that SPSO was an "Eligible Assignee." *See* Am. Compl. ¶ 99; Harbinger Opp. 46-47.[46]

However, Harbinger and the Ergen/DISH Defendants are not parties to a "business transaction" such that a duty to disclose would arise on the part of any of the Ergen/DISH Defendants.[47] Harbinger is not a party to the Credit Agreement and was not a counterparty to any of the trades of Loan Debt; neither were the Ergen/DISH Defendants, other than SPSO. Accordingly, the Ergen/DISH Defendants had no duty to disclose based on their "superior knowledge" of SPSO's ownership structure. If any such duty existed, it was imposed solely on SPSO, as a party to the trades of Loan Debt (after becoming a "Lender" under the Credit

---

[46] Harbinger further alleges that the Ergen/DISH Defendants were under a duty to disclose SPSO's relationship with Ergen and DISH/EchoStar because their "affirmative misstatements about SPSO being qualified to purchase the Loan Debt [were] misleading." Am. Compl. ¶ 99. Under New York law, there is also a duty to disclose "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *Tomoka Re Holdings, Inc. v. Loughlin*, 2004 U.S. Dist. LEXIS 8931, at *12 (S.D.N.Y. May 19, 2004) (citations omitted); *see also Sheridan Drive-In, Inc. v. State of New York*, 228 N.Y.S.2d 576, 585 (N.Y. App. Div. 1962) ("If an ambiguous term is used in making a representation in a business transaction . . . there is liability for fraud if the erroneous impression created by the ambiguous representation is not corrected."). Harbinger argues that if the Ergen/DISH Defendants had any doubt as to whether SPSO's representation was accurate, it was such Defendants' duty to share the whole truth, and not conceal it to their own commercial advantage. Harbinger Opp. 45-46. As discussed above, Harbinger has failed adequately to plead that affirmative misstatements were made by any of the Ergen/DISH Defendants regarding SPSO's representation that it was an "Eligible Assignee," let alone any partial or ambiguous statements that needed to be corrected. Accordingly, Harbinger cannot rely on the duty to disclose that arises to correct a prior misstatement.

[47] *Nomura Sec.*, 280 F. Supp. 2d at 205. In each of the cases cited by Harbinger in support of the duty to disclose, the plaintiffs and defendants were *counterparties* to a business transaction or agreement. *See Tomoka Re Holdings*, 2004 U.S. Dist. LEXIS 8931, at *12-13; *Nomura Sec.*, 280 F. Supp. 2d at 205; *Sheridan Drive-In*, 228 N.Y.S.2d at 585. While Courts have held that the duty to disclose "is not limited to parties in privity of contract," *Strasser*, 630 N.Y.S.2d at 82, a duty is only owed to a party that could reasonably expect such a disclosure, based on fiduciary duty or otherwise. *See Abu Dhab.*, 888 F. Supp. at 451 n. 96; *Nomura Sec.*, 280 F. Supp. 2d at 205.

Agreement),[48] and SPSO would have been required to make appropriate disclosures to the counterparties to the trades and/or the parties to the Credit Agreement, not to Harbinger. Moreover, even if information regarding SPSO's status was not "readily available" to Harbinger, because Harbinger was not a counterparty to a transaction with the Ergen/DISH Defendants, such Defendants had no reason to consider whether Harbinger, or any other third party, was acting on the basis of mistaken knowledge.   As Harbinger has not pled facts sufficient to demonstrate that the Ergen/DISH Defendants owed a duty of disclosure to Harbinger, it has also not pled facts to support the allegation of a material omission by any Defendant.

### 2.  **Defendants' Intent**.

To plead fraud, a plaintiff must also make a showing of scienter, or defendant's intent to defraud it.  *Nomura Sec.*, 280 F. Supp. 2d at 207 (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir. 1993)).  Although a plaintiff need not allege scienter in detail, it must allege facts that are at least suggestive of intent to defraud.  This may be done either "by alleging a motive for the commission of a fraud or by identifying 'circumstances indicating conscious behavior by the defendants.'"  *Id.* (citing *Brass*, 987 F.2d at 152-53).

By the Amended Complaint, Harbinger alleges that Defendants made misrepresentations and omitted facts "intending to prevent Harbinger from taking steps to stop the Ergen Defendants from acquiring a significant holding in LightSquared."  Am. Compl. ¶ 100.  Harbinger argues that the Ergen/DISH Defendants' fraudulent intent is demonstrated by the "mantle of secrecy and deception in which Ergen cloaked his purchases [of Loan Debt]," including (i) the use of a special purpose entity (SPSO) to purchase the Loan Debt; (ii) the use of the Sound Point Capital Defendants to form SPSO to avoid a paper trail to Mr. Ergen or DISH/EchoStar; (iii) the failure to disclose the ownership structure of SPSO, and (iv) the entrance by SPSO into transactions to

---

[48] *See* Credit Agreement § 10.04(b).

purchase securities of the Debtors that SPSO knew would not close.  Am. Compl. ¶¶ 87, 98, 100;

Harbinger Opp. 53-54.

The allegation that the Ergen Defendants used SPSO to purchase the Loan Debt and

failed to disclose its the ownership structure – even if characterized as keeping Mr. Ergen's

ownership role a "secret" – fails to provide a compelling inference of fraudulent intent, given the

typical market practice of investors purchasing distressed debt through special purpose vehicles.

*See* Ergen Defs.' Reply 6.  No distressed debt investor wants to reveal its holdings and strategy a

moment before it is absolutely necessary.  With respect to the "hung trades" (as discussed in

detail in Section II.B. below), the Court finds that Harbinger has not pled facts sufficient to

demonstrate that the Ergen Defendants knowingly and intentionally, and for tactical purposes,

interfered with the closing of trades or entered into trades that they knew SPSO was unable to

execute; market factors may well have played a role.[49]  Further, none of these allegations

supports the theory that the Ergen/DISH Defendants intended to defraud *Harbinger*, who was not

a counterparty to any transaction.

Harbinger also argues that it was regularly provided the Lender List and had access to the

Register,[50] which contained information regarding the "Eligible Assignees," and that Defendants

knew that Harbinger had access to the Register.  Am. Compl. ¶ 55; Harbinger Opp. 49.  But so

what?  Harbinger's access to the Lender List and Register does not provide a basis for Harbinger

---

[49] In pleading scienter based on allegations of motive or improper intent, plaintiff must plead facts that give rise to an inference that is "more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfiraudulent [sic] intent."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) (holding that the pleading requirements for scienter in common law fraud claims under New York law are similar to the pleading requirements for scienter under federal securities law, and quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (discussing scienter in the context of a securities fraud action)).  *See also* discussion in Section II.B. *infra*.

[50] The Register, as maintained by UBS as Administrative Agent under the Credit Agreement, contains the names and addresses of the Lenders (including Eligible Assignees that have become Lenders pursuant to accepted transfers of Loan Debt) and their interest in Loan Debt.  Harbinger alleges (i) that UBS also created a separate list of the names and addresses of the Lenders who were Eligible Assignees, along with their interest in Loan Debt (the "Lender List"), and (ii) that UBS provided the Lender List to LightSquared from time to time; in turn, LightSquared shared the Lender List with Harbinger.  Am. Compl. ¶ 55.

to allege that the Ergen/DISH Defendants intended for Harbinger to rely on such information.  If anything, it presents the interesting question of Harbinger's actual knowledge of Mr. Ergen's possible connection to SPSO – a question not before the Court today but likely to be raised at some point as these proceedings unfold.  *See* 10/29/13 Hr'g Trans. at 88:23-89:11.

Accordingly, Harbinger has failed to plead facts to support the allegations that the Ergen/DISH Defendants made any material misstatements or omissions with the intent to defraud Harbinger.

### 3.  <u>Harbinger's Reliance</u>.

Harbinger alleges that it reasonably relied upon the Ergen/DISH Defendants' misrepresentations and omissions as it continued to invest labor, capital, and other resources into LightSquared and refrained from taking steps to curb the improper purchases of the Loan Debt,[51] but it fails to plead facts to support such allegations.

As an initial matter, Harbinger did not have the right to rely on any representations or omissions made with respect to the Loan Debt, as it was not a party to the Credit Agreement or a counterparty to the trades of Loan Debt; that was the Debtors' right, and responsibility.  Further, the reasonableness of Harbinger's alleged reliance is undermined by its own apparent lack of action.  It is undisputed that SPSO began purchasing Loan Debt over a year prior to the filing of the Complaint.[52]  It is also undisputed that, in the interim, there were widespread media reports that Mr. Ergen (or another of LightSquared's competitors) was purchasing the Loan Debt.  Harbinger alleges that it and Debtors made "inquiries" as to who "was behind" SPSO, but those inquiries were rebuffed.  Am. Compl. ¶¶ 6, 58.  Details regarding such inquiries are woefully lacking in the Amended Complaint.  Further, both before and after SPSO formally appeared in

---

[51] Am. Compl. ¶ 100.
[52] *See* LightSquared Trading Summary.

the Bankruptcy Cases in May 2013, neither Harbinger (nor the Debtors) made any attempt in this Court to prevent the closing of significant blocks of open SPSO trades, or made any request for relief from this Court to investigate or invalidate SPSO's purchases of the Loan Debt.[53] Accordingly, Harbinger has failed to plead facts supporting a right to rely on any misstatement or omission of any of the Defendants, or that its reliance was reasonable.

For the foregoing reasons, Harbinger has failed to state a claim for fraud.[54]  Moreover, any claim relating to the alleged violation of the Credit Agreement by SPSO in purchasing the Loan Debt is most fundamentally a breach of contract claim, and, as such, can only be asserted by a party to the Credit Agreement; here, LightSquared.  Accordingly, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted with respect to Count Two, and Count Two is dismissed without prejudice to the rights of the Debtors to assert such a claim in an amended complaint filed in this Adversary Proceeding.

### B.  Tortious Interference with (i) Prospective Economic Advantage with LightSquared Creditors and (ii) the Jefferies Relationship (Counts Four and Five).

To state a claim for tortious interference with prospective business relations under New York law, a plaintiff must establish: (i) a prospective business relationship between plaintiff and a third party; (ii) defendant's interference with that relationship; (iii) through wrongful means or with the purpose of harming the plaintiff; and (iv) injury to the relationship.  *See Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 221-222 (S.D.N.Y. 2010). "'[W]rongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not however, include

---

[53] *See*, *generally*, docket of Case No. 12-12080 (SCC).
[54] Based on the foregoing, it is not necessary to discuss the final element of the legal test for fraud – causation of injury to the plaintiff.  Further, as discussed in Section II.C. below, Harbinger's loss of its "unique controlling interest in the Debtors" is not an injury or basis on which relief can be sought.

persuasion alone although it is knowingly directed at interference with the [prospective] contract." *Carvel Corp. v. Noonan*, 350 F.3d 6, 19 (2d Cir. 2003) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp*., 50 N.Y.2d 183, 191 (N.Y. 1980)).

### 1.  Harbinger's Allegations of Tortious Interference with Creditor Relationship.

In Count Four of the Amended Complaint, Harbinger alleges that the Ergen/DISH Defendants tortiously interfered with Harbinger's relationship with the Debtors' creditors and with the universe of potential strategic and financial investors in the Debtors, through (i) SPSO's fraudulent purchase of Loan Debt, (ii) SPSO's purposeful holding open of trades, and (iii) LBAC's tendering of a "low-ball" bid for spectrum assets.  All of this, says Harbinger, interfered with its ability to negotiate a "full-pay plan" with the Debtors' creditors.  Am. Compl. ¶ 111.

With respect to Harbinger's allegations that SPSO tortiously interfered with Harbinger's relationship with the Debtors' creditors by fraudulently purchasing Loan Debt, Harbinger maintains that SPSO fraudulently represented that it was an "Eligible Assignee" under the Credit Agreement, as discussed more fully in Section II above.  Harbinger alleges that this material misrepresentation permitted SPSO to wrongfully gain control of the Ad Hoc Secured Group in order to prematurely cut off Harbinger and the Debtors' negotiations with the Ad Hoc Secured Group.  Id.

Regarding SPSO's intentional holding open of trades, Harbinger maintains that the Ergen Defendants refused to close nearly $594,000,000 in Loan Debt trades (closer to $610,000,000 counting trades held by brokers on that date) – which constituted a "blocking position" of more than 33% of the total outstanding Loan Debt obligations.[55]  By keeping these trades open, the Ergen Defendants allegedly prevented: (a) other holders of Loan Debt from knowing if and when

---

[55] Harbinger Opp. 68; Am. Compl. ¶ 64.  The LightSquared Trading Summary includes a schedule reflecting trade date, closing date, and amount of Loan Debt purchased.  *See* LightSquared Trading Summary.

holders would dispose of their claims, thus freezing them out of taking action as either existing creditors or potential exit lenders and (b) the Debtors and Harbinger from determining the true holders of the Loan Debt, leaving them without a critical mass of lenders with whom to engage, and unable to secure exit financing and negotiate a "full-pay plan" during the exclusivity period. Harbinger Opp. 68.

Finally, Harbinger makes the conclusory allegation that the amount of LBAC's bid for the assets of LightSquared LP caused potential investors to undervalue the Debtors' spectrum assets, further deterring them from investing in the Debtors. Am. Compl. ¶ 10.

### 2. Harbinger's Allegations of Tortious Interference with Jefferies Relationship.

With respect to tortious interference with its relationship with Jefferies (Count Five), Harbinger alleges that the Ergen Defendants caused SPSO to enter into two "back-to-back" transactions with Jefferies LLC ("Jefferies")[56] for purchases of Loan Debt and preferred interests of LightSquared LP, despite the Ergen Defendants' knowledge that SPSO was unable to acquire preferred interests of LightSquared LP.[57] Am. Compl. ¶ 117. In entering into the trades with SPSO, Jefferies allegedly relied upon the Ergen Defendants' misrepresentations that SPSO was a permitted purchaser. Harbinger alleges that the Ergen Defendants, acting through SPSO, later refused to settle or unwind the trades, leaving Jefferies with over $160 million in uncertain and

---

[56] On June 7, 2013, this Court entered an order authorizing the Debtors to retain Jefferies to seek exit financing for the Debtors. Harbinger voluntary undertook to pay $80 million in fees incident to the retention. *See* Order, Pursuant to 11 U.S.C. §§ 105(a) and 363, Authorizing LightSquared To (A) Enter Into and Perform Under Engagement Letter Related to Exit Financing Arrangements, (B) Pay Fees and Expenses in Connection Therewith, and (C) Provide Related Indemnities, Case No. 12-12080 (Bankr. S.D.N.Y. June 7, 2013) [Dkt. No. 667]. Included in the Debtors' motion seeking entry of this order was a statement that, prior to the date of the motion, Jefferies had served and continues to serve as the broker for trades of and/or may hold or own, securities of the Debtors. *See* Dkt. No. 645 at 4 n.6. In addition, the Debtors stated that, while Jefferies may wear two hats in these proceedings, the professionals at Jefferies performing exit financing services will not share confidential or otherwise non-public information with the branch of Jefferies that trades or owns securities of the Debtors. Id.

[57] Harbinger's allegation that SPSO was unable to purchase preferred interests of LightSquared LP is based on Section 2.1 of the LightSquared Inc. Stockholders' Agreement, which prohibits, until a date certain, the transfer of such preferred interests to EchoStar or its "respective Affiliates or funds managed by such entities or their Affiliates." Am. Compl. ¶ 71 (citing § 2.1 of the Stockholders' Agreement).

unexpected exposure to the Debtors.  This trading "interference" prevented (i) Jefferies from

performing on its contractual commitment to raise the full amount of exit financing sought and

(ii) Harbinger from being able to propose a plan that would pay all the Debtors' creditors in cash

and enable Harbinger to maintain its controlling interest in LightSquared.  Am. Compl. ¶¶ 117-

119.

### 3. Harbinger Has Not Pled Facts Sufficient to Demonstrate Tortious Interference with Either the Creditor Relationship or the Jefferies Relationship.

Harbinger has not pled any facts that establish that it had an independent and protectable

relationship with the Debtors' creditors or with Jefferies, or a protectable interest in or right to

negotiate with the Debtors' creditors during the Debtors' exclusive periods.  Not for the first time

in these Bankruptcy Cases, Harbinger conflates its interests with those of the Debtors.  As stated

by the Ergen Defendants, "that Harbinger thinks it is entitled to negotiate with the Ad Hoc

Secured Group such that any action to 'cut off' its negotiations tortiously interferes with its

economic advantage demonstrates that Harbinger's real concern here is to retain control of

LightSquared's assets, not to maximize value for the Estate."  Ergen Defs.' Mem. 21.  If there is

a viable cause of action based on these allegations, it belongs to the Debtors, not to Harbinger.

Further, Harbinger has failed to set forth facts sufficient to demonstrate that (i) the Ergen

Defendants knowingly and intentionally kept the Loan Debt trades open indefinitely, or had the

ability to do so, or (ii) the Ergen Defendants entered into the Jefferies bundled trades for tactical

purposes.  The Court agrees with the Ergen Defendants that there are a myriad of market factors

that could have influenced the timing of the closing of the trades.[58]  Accordingly, Harbinger has

---

[58] As discussed above, "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 323-24.

not sufficiently alleged that the Ergen Defendants tortuously interfered with the closing of the trades through "wrongful means" or with the intent to harm Harbinger.

Moreover, to the extent the purported interference claims rest on Harbinger's speculation that the Debtors might have fared better in various plan and exit financing negotiations but for SPSO's alleged misconduct, Harbinger has not adequately pled that any such missed opportunity necessarily would have materialized but for the Ergen Defendants' purported tortious interference.

Accordingly, the Court concludes that Harbinger has not alleged the elements of tortious interference with sufficient particularity to state a claim with respect to Harbinger's relationship with (i) the Debtors' creditors or (ii) Jefferies. The Motion of the Ergen Defendants to Dismiss the Amended Complaint with respect to Counts Four and Five is granted, and such Counts are dismissed without prejudice to the rights of the Debtors to assert such claims in an amended complaint filed in this Adversary Proceeding.

### C.   Unfair Competition (Count Six).

Under New York law, in order to succeed on a misappropriation and unfair competition claim, "'plaintiffs must establish some wrongful appropriation or use of the plaintiffs' . . . property." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295 (2d Cir. 2006).[59] "'The essence of an unfair competition claim . . . is that the defendant has misappropriated the labors and expenditures of another . . .' [in] bad faith." *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 2011 U.S. Dist. LEXIS 52945, *26 (S.D.N.Y. May 12, 2011) (quoting *Saratoga Vichy Spring*

---

[59] *See Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 198 (2d Cir. 2001) (affirming grant of summary judgment to defendant on plaintiff's unfair competition claim where plaintiff failed to show "some appropriation of an idea or knowledge in which [plaintiff] had a property interest or a contractual arrangement creating such an interest"); *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 493 (N.Y. Sup. Ct. 1950) ("Clearly, some property rights in the plaintiffs and interference with and misappropriation of them by defendants are necessary to a cause of action."), *aff'd*, 107 N.Y.S.2d 795 (N.Y. App. Div. 1951).

*Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). Harbinger has failed to plead facts to support its allegation of unfair competition.

Harbinger alleges that it had a protectable commercial advantage in exercising its control rights over the Debtors, without "infiltration by competitors." Am. Compl. ¶ 122. Sounding the same theme it attempts to assert in connection with its tortious interference claims, Harbinger contends that "the Defendants" misappropriated Harbinger's control of the Debtors by fraudulently acquiring Loan Debt through SPSO in order to obtain a blocking position in the Debtors' capital structure. With this position, Harbinger posits, the Ergen/DISH Defendants could unfairly compete against Harbinger by (i) forcing Harbinger to sell the Debtors' assets to them or (ii) preventing the confirmation of a plan that retains Harbinger's equity in the Debtors. Id. Invoking the specter of *DBSD*,[60] Harbinger cries foul. However, *DBSD* is not dispositive with respect to the Motions to Dismiss, and is perhaps not even relevant to this case, as its holding was limited to vote designation in connection with the purchase of claims for the strategic purpose of blocking a filed plan of reorganization.[61] As the parties are aware, we are not yet at the plan confirmation stage in these Bankruptcy Cases. Parties-in-interest, including Harbinger, will have an opportunity at the appropriate time to object to the LBAC bid, and/or move to designate SPSO's vote accepting or rejecting a plan of reorganization.

Harbinger fails to plead allegations sufficient to support its theory that its "control rights" over the Debtors have been wrongfully "misappropriated." As discussed in section II.B. above,

---

[60] *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79 (2d Cir. 2010) ("*DBSD*").

[61] In *DBSD*, the Second Circuit upheld the bankruptcy court's designation of DISH's votes to reject a plan of reorganization. The court held that because DISH purchased a blocking position *after* a plan had been proposed, with the intention "to use status as a creditor to provide advantages over proposing a plan as an outsider, or making a traditional bid for the company or its assets" it voted with "ulterior motives" and not in good faith. *DBSD*, 634 F.3d at 104 (quoting *In re DBSD*, 421 B.R. 133, 139-40 (Bankr. S.D.N.Y. 2009)). The Second Circuit also specifically limited its ruling to circumstances in which parties purchase claims for the strategic purpose of blocking a plan: "[the] ruling today should deter only attempts to 'obtain a blocking position' and thereby 'control the bankruptcy process for [a] potentially strategic asset' . . . our opinion imposes no categorical prohibition on purchasing claims with acquisitive or other strategic intentions." *DBSD*, 634 F.3d at 105 (internal citations omitted).

Harbinger does not have a right or protectable interest that it can assert as a basis to bring these causes of action based in tort.  Any such claims, if they exist, belong to the Debtors.  Similarly, Harbinger does not have (and has not pled) "a protectable commercial advantage in exercising control rights over the Debtors" (Harbinger Opp. 78) once the Debtors sought chapter 11 protection.  The Debtors' chapter 11 filings mean that any such "control rights" Harbinger may have had prepetition were relinquished to the Debtors as debtors-in-possession and fiduciaries for all stakeholders, as of the Petition Date.  Harbinger is not prohibited from doing everything lawfully within its power to protect its equity investment in the Debtors, but its rights stop where the debtor-in-possession's rights and obligations begin.  Harbinger's unfair competition theory – that the Defendants are trying to usurp control over the Bankruptcy Cases or force the sale of certain assets belonging to the Debtors – is an impermissible attempt to turn a party's participation in the chapter 11 process (which is governed by Code provisions dealing with the termination of exclusivity and other related concepts) into a tort.

Further, Harbinger is hard-pressed to allege that its "control" over the Debtors has been misappropriated.  Indeed, its allegations about "forced sales" and loss of control over the reorganization process are rather undercut by the terms of the proposed plan of reorganization it recently filed, which contemplates a plan in which Harbinger would maintain its equity stake in the reorganized Debtors.[62]  If Harbinger ultimately loses its economic "control" of LightSquared, it will be as a result of a bankruptcy process run in accordance with applicable provisions of the Code and untainted by actionable conduct in connection therewith.

The Court concludes that Harbinger has not pled allegations sufficient to state a claim for unfair competition.  Accordingly, the Motion of the Ergen Defendants to Dismiss the Amended

---

[62] *See* Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed by Harbinger, Case No. 12-12080 (Bankr. S.D.N.Y. DATE) [Dkt. No. 821].

Complaint is granted with respect to Count Six, and Count Six is dismissed without prejudice to the Debtors to assert such a claim in an amended complaint filed in this Adversary Proceeding.

### D. **Civil Conspiracy (Count Seven)**.

Civil conspiracy claims cannot survive where, as is the case here, there is no underlying tort claim. "New York does not recognize an independent tort of conspiracy." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). Accordingly, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted with respect to Count Seven, and Count Seven is dismissed without prejudice to the rights of the Debtors to assert such a claim in an amended complaint filed in this Adversary Proceeding.

### III. **Harbinger Has Failed to State a Claim For Fraud or in Tort Against the DISH Defendants**.

Harbinger asserts five claims against the DISH Defendants: Fraud (Count Two); Tortious Interference with Economic Advantage and Business Relationship (Counts Four and Five); Unfair Competition (Count Six); and Civil Conspiracy (Count Seven). Each claim fails as a matter of law because (a) the allegations of the Amended Complaint do not meet the heightened pleading standards required under Rule 9(b), reflecting, among other deficiencies, group pleading with respect to the several DISH Defendants and (b) for the reasons discussed in Section III above, Harbinger's tort and fraud claims fail to survive dismissal pursuant to Rule 12(b)(6).

The Amended Complaint collectively defines Defendants LBAC, DISH, EchoStar, Mr. Ergen, SPSO, and SO Holdings as the "Ergen Defendants" and proceeds to allege facts in support of its tort-based claims against the "Ergen Defendants." Harbinger has not pled specific allegations with respect to the each of the DISH Defendants. A plaintiff alleging fraud must specifically identify (i) what allegedly fraudulent statements were made; (ii) when those

statements were made; (iii) by whom and to whom; and (iv) the fraudulent nature of the statements. *See e.g., United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc*., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement." *In re Crude Oil Commodity Litig.*, 2007 U.S. Dist. LEXIS 47902, at *6 (S.D.N.Y. June 28, 2007); *see also Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011) (The "plaintiff [must] differentiate his allegations as to each defendant and inform each defendant separately of the specific allegations.").

The Amended Complaint's fraud claim against the DISH Defendants rests entirely on Harbinger's assertion that the "Ergen Defendants" misstated or failed to state facts regarding "the true identity of the investors purchasing the Loan Debt" and SPSO's eligibility to purchase the Loan Debt. Am. Compl. ¶¶ 98–99. Harbinger has not alleged that any of the DISH Defendants (or any Defendant, other than SPSO) made any affirmative statement about SPSO's status as an "Eligible Assignee." Instead, Harbinger argues that "DISH and EchoStar, acting through Mr. Ergen, caused SPSO to make these misrepresentations" and thus are responsible for such alleged misrepresentations. Id. ¶ 98. Harbinger argues – but has not pled – that the DISH Defendants are properly grouped together with the Ergen Defendants because "Ergen not only controls the [DISH Defendants], he also acts unilaterally on their behalf . . . the acts of Ergen are imputed to these Defendants." Harbinger Opp. 32-33.

Similarly, Harbinger has failed to plead any specific allegations with respect to the DISH Defendants in support of the tortious interference, unfair competition, and civil conspiracy

45

claims, but instead lumps them together with its allegations against the "Ergen Defendants." As discussed in detail in Section II.A. above, Harbinger's imputation or agency theory, insofar as it has been pled, is insufficient as a matter of law. Accordingly, Harbinger has not pled a basis on which the DISH Defendants as a group or individually can be held responsible for the alleged acts of Mr. Ergen and/or SPSO.

As Harbinger has not set forth any specific allegations with respect to each of the DISH Defendants, the Amended Complaint does not meet the heightened pleading standards required by Rule 9(b). The Motion of the DISH Defendants to Dismiss Counts Two, Four, Five, Six, and Seven of the Amended Complaint is granted, and such counts are dismissed without prejudice to the Debtors' rights to replead causes of action against the DISH Defendants in an amended complaint filed in this Adversary Proceeding.

## IV.   Harbinger Has Failed to State a Claim For Fraud or in Tort Against the Sound Point Capital Defendants.

Harbinger asserts three claims against the Sound Point Capital Defendants: (i) Aiding and Abetting Fraud (Count Three); (ii) Unfair Competition (Count Six); and (iii) Civil Conspiracy (Count Seven). Each of Harbinger's claims against the Sound Point Capital Defendants is linked to and derivative of its claims against the Ergen Defendants, and rests on the Sound Point Capital Defendants' alleged involvement in brokering purchases of Loan Debt by SPSO.

The only specific allegations Harbinger makes with respect to the Sound Point Capital Defendants are that they: (i) signed and disseminated the Loan Debt Purchase Documentation as SPSO's "investment advisor"; (ii) signed the certificates of formation as an "authorized person" for SPSO and SO Holdings; (iii) served as a broker to SPSO and arranged the trades whereby SPSO acquired Loan Debt; (iv) used their expertise in the telecommunications industry to identify Loan Debt holders to begin purchasing the Loan Debt in April 2012 (before SPSO was

formed in May 2013); and (v) acted as the public face of SPSO to conceal SPSO's affiliation with Mr. Ergen/DISH. *See* Am. Compl. ¶¶ 24, 61, 105.

As discussed in detail in Section II above, Harbinger has not stated any viable claims in tort or for fraud in connection with SPSO's acquisition of Loan Debt. As a consequence, the claims asserted against the Sound Point Capital Defendants in Counts Three, Six, and Seven must be dismissed because the commission of fraud by the Ergen and DISH Defendants is a predicate to such counts.

Moreover, the Court agrees with the Sound Point Capital Defendants that, even if the fraud claims had been adequately pled, Harbinger has failed to allege conduct by the Sound Point Capital Defendants that would constitute "substantial assistance" in the alleged fraud sufficient to support a claim of aiding and abetting fraud.[63] Harbinger does not explain or allege how these acts fall outside of normal bank and broker services. As a non-discretionary fund, Sound Point Capital asserts that it takes direction from its clients and does not have authority to act on its own, and Harbinger does not allege otherwise. Sound Point Capital, at least on the record of this Motion to Dismiss, was no more than a functionary arranging trades between third parties and SPSO, and closing them as and when instructed by its client, SPSO. Further, Harbinger has not pled facts to establish that the Sound Point Capital Defendants owed any duty to Harbinger whatsoever, let alone facts that would support a claim of aiding and abetting fraud.[64]

Accordingly, the Motion of the Sound Point Capital Defendants to Dismiss the Amended Complaint is granted with respect to Counts Three, Six, and Seven, and such Counts are

---

[63] *See, e.g., Berman v. Morgan Keegan & Co., Inc.*, 455 F. Appx. 92, 96 (2d Cir. 2012) (Allegations that a broker assisted the client's fraud by executing securities transactions on the client's behalf and at the client's direction are "insufficient to constitute 'substantial assistance.'"); *CRT Invs., Ltd. v BDO Seidman, LLP*, 925 N.Y.S.2d 439, 441 (N.Y. App. Div. 2011) ("'[S]ubstantial assistance,' a necessary element of aiding and abetting fraud, means more than just performing routine business services for the alleged fraudster.").
[64] *See Kolbeck v. LIT Am.*, 923 F. Supp. 557, 571-572 (S.D.N.Y. 1996) ("Securities brokers do not owe a general duty of care or disclosure to the public simply because they are market professionals.").

dismissed without prejudice to the rights of the Debtors to include allegations against the Sound

Point Capital Defendants in an amended complaint filed in this Adversary Proceeding.

## V.    Objection to the Claim of SPSO under
## Section 502 of the Bankruptcy Code (Count Eight).

Harbinger asserts that because SPSO was not an "Eligible Assignee" as defined in the

Credit Agreement, the purported transfers to SPSO of Loan Debt are void, and SPSO has no

rights, claims, or remedies under the Credit Agreement.  The Debtors have intervened with

respect to Count Eight.

The allegations pled by Harbinger in support of disallowance of SPSO's claim under

section 502 of the Code are based on the same allegations proffered with respect to its fraud and

tort-based causes of action.  Such causes of action are dismissed, for the reasons set forth above.

Accordingly, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted

with respect to Count Eight, and Count Eight is dismissed without prejudice to the rights of the

Debtors, or any other party-in-interest, including Harbinger, to assert an objection to the

allowance of SPSO's claim pursuant to section 502(b) of the Code.  Such an objection may be

lodged as a claims objection pursuant to Bankruptcy Rule 3007; for the sake of efficiency, it may

also be asserted in an amended complaint filed in this Adversary Proceeding.

## CONCLUSION

Based on the foregoing, the Motions to Dismiss are granted as follows: (i) with respect to

Count One, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted,

and Count One is dismissed with prejudice; (ii) with respect to Counts Two, Four, Five, Six, and

Seven, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted; (iii)

with respect to Counts Two, Four, Five, Six, and Seven, the Motion of the DISH Defendants to

Dismiss the Amended Complaint is granted; (iv) with respect to Counts Three, Six, and Seven,

the Motion of the Sound Point Capital Defendants to Dismiss the Amended Complaint is granted; and (v) with respect to Count Eight, the Motion of the Ergen Defendants to Dismiss the Amended Complaint is granted, and Count Eight is dismissed without prejudice to the rights of any party-in-interest, including Harbinger, to seek disallowance of SPSO's claim under section 502 of the Bankruptcy Code on grounds not inconsistent with this Decision.   Because the Debtors' Intervention was not filed as a separate complaint but rather as a statement linked to the Amended Complaint, the Debtors are granted leave to plead and file an amended complaint in this Adversary Proceeding against any or all of the Defendants reflecting causes of action not inconsistent with this Decision.   A separate Order reflecting such determinations has been entered on the Docket of this Adversary Proceeding [Dkt. No. 65].

IT IS SO ORDERED.

Dated: New York, New York
         November 21, 2013

                                        /s/ Shelley C. Chapman_____
                                        UNITED STATES BANKRUPTCY JUDGE