Rachel C. Strickland
Tariq Mundiya
James C. Dugan
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000

*Counsel for SP Special Opportunities, LLC and
Charles W. Ergen*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | : | Case No. 12-12080 (SCC) |
| Debtors. | : | Jointly Administered |

------------------------------------------------------------------------x    Adv. Proc. No. 13-01390-scc

| | | |
|---|---|---|
| LIGHTSQUARED LP, LIGHTSQUARED INC., LIGHTSQUARED INVESTORS HOLDINGS INC., TMI COMMUNICATIONS DELAWARE LIMITED PARTNERSHIP, LIGHTSQUARED GP INC., ATC TECHNOLOGIES, LLC, LIGHTSQUARED CORP., LIGHTSQUARED INC. OF VIRGINIA, LIGHTSQUARED SUBSIDIARY LLC, SKYTERRA HOLDINGS (CANADA) INC., AND SKYTERRA (CANADA) INC. | : : : : : : | |
| Plaintiff-Intervenors, | : : | |
| vs. | : | |
| SP SPECIAL OPPORTUNITIES, LLC, DISH NETWORK CORPORATION, ECHOSTAR CORPORATION, AND CHARLES W. ERGEN | : : | |
| Defendants. | : | |

------------------------------------------------------------------------x

**TRIAL BRIEF OF DEFENDANTS
SP SPECIAL OPPORTUNITIES, LLC AND CHARLES W. ERGEN**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ................................................................................................................................. 7

CLAIMS AND DEFENSES ................................................................................................ 17

I.      LightSquared Does Not Have Evidence to Support Its Claims for Declaratory
        Judgment and Breach of Contract Against SPSO. ............................................... 17

II.     Claim Disallowance Is Inappropriate Because Plaintiffs Cannot Overcome the
        Prima Facie Validity of SPSO's Claims ............................................................... 24

III.    LightSquared's Tortious Interference Claim Fails for the Same Reasons as Its
        Contract Claim ...................................................................................................... 27

IV.     Designation of SPSO's Votes Pursuant to Section 1126(e) of the Bankruptcy
        Code Is Not Appropriate Here ............................................................................. 29

V.      There Is No Basis for the Equitable Subordination of SPSO's Claims. ............... 30

CONCLUSION ................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*In re 37-02 Plaza LLC*,
    387 B.R. 413 (Bankr. E.D.N.Y. 2008) ...............................................................................24

*In re 785 Partners LLC*,
    No. 11-13702 (SMB), 2012 WL 401497 (Bankr. S.D.N.Y. Feb. 7, 2012) ........................26

*In re Adelphia Commc'ns Corp.*,
    359 B.R. 54 (Bankr. S.D.N.Y. 2006) ................................................................................29

*Am. Med. Ass'n v. United Healthcare Corp.*,
    No. 00-CV-2800, 2001 WL 863561 (S.D.N.Y. July 31, 2001) .........................................26

*In re Ballard*,
    100 B.R. 526 (Bankr. D. Nev. 1989).................................................................................20

*In re Britton*,
    288 B.R. 170 (Bankr. N.D.N.Y. 2002)..............................................................................26

*CMR Mortg. Fund, LLC v. Canpartners Realty Holding Co. IV LLC*
    *(In re CMR Mortg. Fund, LLC)*,
    416 BR. 720 (Bankr. N.D. Cal. 2009).........................................................................31, 32

*Cole v. Metro. Life Ins. Co.*,
    27 A.D.2d 832 (4th Dep't 2000) ......................................................................................26

*Delphi Corp. v. Appaloosa Mgmt. L.P. (In re Delphi Corp.)*,
    No. 05- 44481 (RDD), 2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008) .................31

*DISH Network Corp. v. DBSB North America, Inc. (In re DBSD North America, Inc.)*,
    634 F.3d 79 (2d Cir. 2011) ............................................................................................6, 29

*Dixon v. Thatcher*,
    742 P.2d 1029 (Nev. 1987) ..............................................................................................19

*In re Elmira Litho, Inc.*,
    174 B.R. 892 (Bankr. S.D.N.Y. 1994) ..............................................................................24

*Fleisher v. Phoenix Life Ins. Co.*,
    858 F. Supp. 2d 290 (S.D.N.Y. 2012) ..............................................................................23

*Fleming v. Hymes-Esposito*,
    No. 12 Civ. 1154, 2013 WL 1285431 (S.D.N.Y. Mar. 29, 2013).......................................27

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    669 F. Supp. 2d 405 (S.D.N.Y. 2009) ............................................................................17

*ICD Holdings S.A. v. Frankel*,
    976 F. Supp. 234 (S.D.N.Y. 1997) ................................................................................23

*Island Two LLC v. Island One, Inc.*,
    No. 13 Civ. 02121 (LGS), 2013 WL 5380216 (S.D.N.Y. Sept. 26, 2013) ........................27

*Israel v. Wood Dolson Co.*,
    1 N.Y.2d 116 (1956)....................................................................................................27

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
    413 B.R. 115 (Bankr. S.D.N.Y. 2008) .............................................................................39

*Kennel v. Carson City Sch. Dist.*,
    738 F. Supp. 376 (D. Nev. 1990) ...................................................................................21

*Keyworth v. Nev. Packard Mines Co.*,
    186 P. 1110 (Nev. 1920) ...............................................................................................21

*Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.)*,
    No. 10-05524, 2011 WL 1042767 (Bankr. S.D.N.Y. Mar. 17, 2011)................................31

*Lyndhurst Trading Corp. v. Kaufman*,
    182 F.3d 900 (2d Cir. 1994) .........................................................................................20

*Maalouf v. Salomon Smith Barney, Inc.*,
    02 Civ. 4770 (SAS), 2004 WL 2008848 (S.D.N.Y. Sept. 8, 2004),
    *aff'd sub nom. Maalouf v. Citigroup Global Markets, Inc.*,
    156 F. App'x 367 (2d Cir. 2005)....................................................................................28

*Nev. Power Co. v. Monsanto Co.*,
    891 F. Supp. 1406 (D. Nev. 1995) .................................................................................21

*Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.*,
    No. 12 Civ. 3584(JCF), 2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) .............................28

*Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) .............................................................................31

*Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 282 (Bankr. S.D.N.Y. 2010) .............................................................................28

*Pravin Banker Assocs. Ltd. v. Banco Popular Del Peru*,
      109 F.3d 850 (2d Cir. 1997) ...........................................................................26

*Prime Ins. Syndicate, Inc. v. Damaso*,
      471 F. Supp. 2d 1087 (D. Nev. 2007) ...........................................................20

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*,
      914 F. Supp. 2d 480 (S.D.N.Y. 2012) ...........................................................25

*Raby v. Am. Int'l Specialty Lines Ins. Co.*,
      268 F. App'x 566 (9th Cir. 2008)....................................................................21

*In re Rockefeller Ctr. Props.*,
      272 B.R. 524 (Bankr. S.D.N.Y. 2000) ...........................................................24

*In re Sunbeam Corp.*,
      284 B.R. 355 (Bankr. S.D.N.Y. 2002) ...........................................................19

*Sullivan v. Int'l Fid. Ins. Co.*,
      96 A.D.2d 555 (N.Y. App. Div. 1983)............................................................26

*Truck Ins. Exchange v. Palmer J. Swanson, Inc.*,
      189 P.3d 656 (Nev. 2008) ..............................................................................19

*USACM Liquidating Trust v. Deloitte & Touche, LLP*,
      764 F. Supp. 2d 1210 (D. Nev. 2010) ...........................................................20

### Statutes

11 U.S.C. § 502(a) ......................................................................................................24

11 U.S.C. § 502(b) ......................................................................................................24

11 U.S.C. § 502(b)(1) .................................................................................................23

11 U.S.C. § 1121 ...........................................................................................................6

11 U.S.C. § 1121(b) ....................................................................................................33

11 U.S.C. § 1121(d) ....................................................................................................33

11 U.S.C. § 1126(e) ................................................................................................6, 29

Fed. R. Bankr. P. 3001(f).............................................................................................24

## Other Authorities

114 Am. Jur. *Proof of Facts* 3d 403 (2013)..................................................................................22

BLACK'S LAW DICTIONARY (9th Ed. 2009)..................................................................................18

Defendants SP Special Opportunities, LLC ("SPSO") and Charles W. Ergen (together with SPSO, the "Ergen Defendants") respectfully submit this Trial Brief in connection with the trial scheduled to commence on January 9, 2014.

## PRELIMINARY STATEMENT

Saturday, May 5, 2012.  It was the day after SPSO had purchased over $247 million of LightSquared LP debt from Carl Icahn and the decision-makers for LightSquared were trying to figure out what it meant for the company.  Mired with a spectrum asset that was useless without certain Federal Communications Commission ("FCC") approvals being granted, LightSquared was just days away from filing for bankruptcy.  Philip Falcone, whose Harbinger Capital ("Harbinger") owned more than 80 percent of LightSquared's equity, emailed Ara Cohen of Knighthead Capital Management, LLC, a holder of LightSquared's debt, about the SPSO trade:  "Maybe we shouldn't file if [Ergen] is circling the wagons. *Though I think is a positive. May bring in another strategic.*"  LightSquared filed for bankruptcy on May 15, 2012.  A few days later, LightSquared's financial advisor, Moelis & Company, filed with its retention application, sworn declarations filed in this Court identified Charles Ergen and DISH Network as a "Part[y] in Interest" for conflict-check purposes.[1]

More than a year later, LightSquared was still trying to come up with a feasible plan to emerge.[2]  But its efforts had not worked and it had nothing to do with Charles Ergen, SPSO, DISH Network, or EchoStar Corporation.  It had to do with the fact that LightSquared is

---

[1]    Neither Mr. Ergen nor DISH has any claim or interest in these cases.  SPSO is the only Ergen affiliate that is a creditor in LightSquared's cases.  Mr. Hootnick testified that the list of parties in interest was provided to Moelis by LightSquared's counsel (who, in turn, presumably got it from LightSquared itself) at the outset of their engagement for purposes of running a conflict check.  (Ex. A, Hootnick Tr. at 33:24-34:11, 35:5-20.)  Other "suspected" owners of LightSquared debt were not included as a "Part[y] in Interest" in Mr. Hootnick's sworn disclosure to this Court.

[2]    Throughout this period, the Debtors were primarily, if not exclusively, pursuing alternatives that left Harbinger in place or with a significant equity stake.  Strategic options were limited to minority equity investments.  (Ex. BB, Smith Tr. at 118:7-119:5, 165:4-165:9, 168:18-22.)

sitting on spectrum assets that no one can currently use.  At a July 1, 2013 meeting of

LightSquared's board of directors, LightSquared's CEO Doug Smith reported on this.  The

company's meetings with investors revealed that investors were concerned about the value of

LightSquared's spectrum, the FCC approval process, and potential acquirers of the spectrum in

the future.  Meanwhile, meetings with "three of the four major wireless operators" revealed that

"each of the operators had expressed a common view that they might be interested in a strategic

relationship *only after the conclusion of the FCC approval process*."  Significantly, Mr. Smith

appears to have made no mention of SPSO's presence in LightSquared's capital structure being a

concern to any investors, an after-the-fact litigation position adopted because LightSquared

cannot articulate any cognizable claim of harm.  At trial, the Ergen Defendants will demonstrate

that there is no evidence to support the assertion that potential bidders (to the extent any were

truly sought) were deterred by the presence of a "competitor" in LightSquared's capital structure.

LightSquared's own expert, William Derrough, an investment banker at Moelis, could not

identify a single bidder who was actually deterred.  It is indisputable that LightSquared was

facing—and continues to face—significant regulatory challenges to the use of its spectrum.

Those challenges are a matter of public record and available for all potential bidders to see.

Other than LBAC, the only substantive proposal from a party outside the capital structure,

Centerbridge, was conditioned on FCC approval, and even that was in the scene only long

enough for LightSquared to use it as an excuse to cancel the auction before it exited the stage.

Out of options and seeking to delay long enough for the FCC to act, Harbinger

and LightSquared lashed out.  They commenced this lawsuit to distract attention from their utter

failure to manage the company out of bankruptcy.

LightSquared's claims in this case boil down to the question of whether SPSO intentionally breached the Credit Agreement, dated October 1, 2010, among LightSquared LP and its lenders governing LightSquared's Loan Debt (the "Credit Agreement") when it acquired a majority position in the Loan Debt between April 2012 and April 2013.  The latest of LightSquared's ever-changing theories about how this occurred are:  (a) SPSO was prohibited from acquiring the debt as a "Disqualified Company" because it is a "known subsidiary" of DISH and/or EchoStar under a misguided understanding of agency law, (b) SPSO is really a "natural person," or (c) SPSO was a "sham entity" that deprived LightSquared of its bargained-for benefits inherent in the Credit Agreement.  No matter which combination of these shifting theories Plaintiffs ultimately advance at trial, the facts and evidence flatly contradict any claim that SPSO's acquisition of LightSquared Loan Debt breached the Credit Agreement.  The evidence presented at trial will show that SPSO is owned and controlled by Mr. Ergen, and is not owned or controlled by DISH or EchoStar, and therefore the transfer restriction in the Credit Agreement, which applies only to "known subsidiaries" of DISH or EchoStar, did not apply to SPSO.

LightSquared's case is not helped by its reliance on agency law.  First, the evidence demonstrates that neither Mr. Ergen nor Mr. Kiser—a close friend of Mr. Ergen's who is separately employed as DISH's Treasurer—possessed the authority to act on behalf of DISH or EchoStar in purchasing the LightSquared Loan Debt.  Mr. Ergen and Mr. Kiser were required by DISH and EchoStar policy to obtain board approval before causing DISH or EchoStar to invest anything more than $125 million in a given security during a single quarter.  As the evidence demonstrates, such approvals were neither sought nor granted because this was a personal investment for Mr. Ergen.  The evidence is clear that Mr. Ergen believed his

investments were private matters that were of no concern to DISH or EchoStar as neither

company was permitted to buy LightSquared Loan Debt.  In fact, Mr. Ergen did not disclose his

trades to the DISH and EchoStar boards until May 2013, after the final trade had been initiated.

In light of Mr. Ergen's personal investment, and following such disclosure, in order to determine

whether DISH wanted to pursue a bid for LightSquared's assets, the DISH board formed a

special committee, a fact that is inconsistent with any notion that DISH had controlled SPSO all

along.  Moreover, neither Mr. Ergen nor Mr. Kiser gave any indication to anyone that they were

acting as agents of DISH or EchoStar in directing SPSO's Loan Debt purchases.  Indeed, as Mr.

Ketchum of Sound Point Capital Management LP ("Sound Point"), who assisted in executing

SPSO's trades, testified, it was made clear to him that the Loan Debt was being purchased for

Mr. Ergen's personal benefit, and not for the benefit of DISH.  Nor is there evidence that any

director, officer, or employee of DISH or EchoStar—as the alleged principals—made any

representations or otherwise created the appearance that Mr. Ergen or Mr. Kiser were authorized

to act for the companies in making the trades.  In short, LightSquared cannot prove its "agency"

theory of liability.

Given the problems with its "agency" theory, LightSquared now adds two new

theories as to how SPSO breached the Credit Agreement.  Both should be rejected because they

were never pled by LightSquared.  *First*, LightSquared contends that SPSO breached the Credit

Agreement because it was really a "natural person" and was therefore barred from acquiring the

Loan Debt.  This theory has already been rejected by the Court and LightSquared cannot

plausibly contend that it was improper for an investment entity to purchase the Loan Debt.  And

while LightSquared argues that SPSO was undercapitalized, it cannot contest that SPSO paid for

every one of the Loan Debt trades it made.  If Plaintiffs are correct, the broadly accepted practice

of using investment vehicles to engage in corporate transactions would become obsolete and disregarding the corporate form would become customary. Such a result is not mandated by any facts or law, and is further proof that this is the last gasp of a lawsuit that has no merit. *Second*, LightSquared contends SPSO's trades breached the covenant of good faith and fair dealing. This claim fails because New York law prohibits implied covenant claims that are based on the same allegations underlying an attendant breach of contract claim, as LightSquared alleges here.

Because SPSO was an Eligible Assignee under the terms of the Credit Agreement and did not breach the Credit Agreement, LightSquared's claim for tortious interference with contract against Mr. Ergen also fails. Absent any breach by SPSO, LightSquared cannot prove any tortious interference by Mr. Ergen. Similarly, LightSquared's claim that Mr. Ergen caused UBS to breach the Credit Agreement fails because UBS had no obligation to independently determine whether acquirers of Loan Debt were Eligible Assignees and thus could not have breached the Credit Agreement by assigning the debt to SPSO. Tellingly, LightSquared has not brought a claim against UBS.

Plaintiffs' objections to the allowance of SPSO's claims pursuant to section 502(b) of the Bankruptcy Code should be rejected because they, too, are based entirely on the incorrect notion that SPSO breached the Credit Agreement in acquiring the Loan Debt. These objections also fail for the independent reason that the Credit Agreement contains no provision that voids transfers made in violation of the transfer restrictions, let alone excuses LightSquared from its obligations with respect to any debt so transferred. To the contrary, the Credit Agreement expressly provides that even in cases where a lender breaches the assignment restrictions, LightSquared's obligations are not excused. Given this express language, even if the

Court were to find that SPSO breached the Credit Agreement (and it should not), there would still be no basis on which to disallow SPSO's claims.

LightSquared's claim—raised for the first time on the eve of trial—that SPSO's votes in these bankruptcy proceedings should be designated under section 1126(e) of the Bankruptcy Code should be rejected. This request appears nowhere in the Complaint and can be disregarded on that basis alone. LightSquared's argument rests on *DISH Network Corp. v. DBSB North America, Inc. (In re DBSD North America, Inc.)*, 634 F.3d 79 (2d Cir. 2011), which is inapposite, as SPSO's acquisition of the LightSquared Loan Debt is factually distinguishable from the *DBSD* case. Specifically, SPSO's Loan Debt purchases—which were made for investment purposes, at discounted prices, and were unrelated to any potential acquisition of LightSquared—started before LightSquared even filed for bankruptcy protection. It makes no sense to conclude that SPSO bought its claims for the purpose of interfering with LightSquared's plan of reorganization because when the first of those purchases was made (and for more than a year thereafter), there was no plan with which to interfere.

Finally, Plaintiffs cannot demonstrate that SPSO's claims should be equitably subordinated—an extreme and sparingly used remedy that is inappropriate here. Plaintiffs' request for equitable subordination is based on the unsubstantiated assertion that in purchasing the Loan Debt, SPSO intended to secretly infiltrate LightSquared's capital structure and interfere with LightSquared's efforts—dominated by Harbinger in any event—to negotiate a consensual plan of reorganization with its creditors and secure exit financing. Plaintiffs' contention is devoid of a legal or factual basis for several reasons. For one, debtors in possession like LightSquared have *no* legal right—under section 1121 of the Bankruptcy Code or otherwise—to halt trading or to have holders of debt actively engage with them, a fact that completely

undermines any theories of harm.  In addition, the record is clear that SPSO's Loan Debt

ownership position was regularly monitored by Plaintiffs, that Mr. Ergen was widely rumored to

be associated with SPSO, that Plaintiffs did nothing to investigate rumors that he was acquiring

claims against LightSquared, and that Plaintiffs stood idly by while SPSO's trades closed—even

*after* confirming that Mr. Ergen was SPSO's ultimate owner.  Steven Zelin, the financial advisor

to the Ad Hoc Secured Group of LightSquared LP lenders (the "Ad Hoc Group"), has testified

unambiguously that neither Mr. Ergen nor SPSO interfered with negotiations between Plaintiffs

and LightSquared's creditors or potential sources of exit financing.  To the extent those

negotiations failed, it was a result of Plaintiffs' own conduct and posture, disagreements on

economic terms, and persisting uneasiness regarding Harbinger's continued participation in the

enterprise and regulatory action on LightSquared's pending spectrum use applications.  SPSO's

acquisition of the Loan Debt had nothing to do with these obstacles to agreement.  In fact, it was

LightSquared who sought to use SPSO's acquisitions to go on the offensive against the Ad Hoc

Group and seek relief from certain protections in the Exclusivity Stipulation.

　　　　　The evidence to be presented at trial compels but one conclusion:  the Ergen

Defendants are not liable on any of Plaintiffs' claims.

## FACTS

**I.    Mr. Ergen's Purchases of LightSquared Loan Debt.**

　　　　　Mr. Ergen first considered LightSquared Loan Debt as a possible investment in

the fall of 2011, based on his view that an investment in the Loan Debt at distressed prices

offered the potential for an attractive return because "it had a double-digit coupon rate, and, in

my opinion, it had very good collateral" to support the debt.  (Ex. B, Ergen Tr. at 68:8-11.)[3]

---

[3]　　　　References to "Ex. _" refer to exhibits to the Declaration of Tariq Mundiya, dated January 8, 2014.

Before investing personally, Mr. Ergen asked DISH's Treasurer, Mr. Kiser, with whom he

shared a longstanding personal relationship, to determine who could purchase the Loan Debt.

(*Id.* at 69:12-15.)  Mr. Ergen made this inquiry mindful that bank debt sometimes contains

restrictions on who may buy the debt.  (*Id*. at 69:18-22.)  He was also mindful that if DISH could

buy the Loan Debt, it could constitute a corporate opportunity for DISH.  (*Id.* at 81:20-82:2; Ex.

C, Kiser Tr. at 49:20-50:2.)  Put differently, Mr. Ergen inquired because doing so was  good

corporate governance.  For the same reason, he continued to inquire "from time to time" about

DISH's eligibility to purchase Loan Debt after LightSquared filed for chapter 11 relief, as he was

cognizant of the possibility that the bankruptcy filing could have altered the applicability of such

restrictions.  (Ex. B, Ergen Tr. at 81:22-82:1.)  After following up with Stephen Ketchum of

Sound Point and DISH's outside counsel, Mr. Kiser informed Mr. Ergen that DISH was

precluded from purchasing the Loan Debt but that Mr. Ergen could do so using a special purpose

vehicle.  (Ex. B, Ergen Tr. at 74:24-75:4; 77:21-78:16; Ex. C, Kiser Tr. at 51:4-10.)

Several months later, Mr. Ergen and Mr. Kiser again discussed the possibility of

Mr. Ergen's making a personal investment in the LightSquared Loan Debt.  (Ex. C, Kiser Tr. at

28:6-14; 33:10-20; 36:12-38:15.)  Mr. Kiser was privy to Mr. Ergen's financial affairs, having

for years assisted Mr. Ergen with various personal investments.  Thus, Mr. Kiser had access to

Mr. Ergen's personal financial advisors, tax accountants, and lawyers, and often dealt with them

at Mr. Ergen's request.  (*Id.* at 36:12-37:12.)  For example, Mr. Kiser had regular contact with

Summit Capital ("Summit"), a family office that handles personal financial matters for Mr.

Ergen and his family.  Furthermore, it was not unusual for Mr. Kiser to contact Bear Creek Asset

Management, which is one of Mr. Ergen's financial advisors, on Mr. Ergen's behalf.  (*Id.* at

96:10-11; 129:18-22; 153:16-23.)

To facilitate Mr. Ergen's investment in LightSquared Loan Debt, Mr. Kiser, with assistance from Summit, set up special purpose entities called Bal Harbour Capital Management LLC and Bal Harbour Holdings LLC ("Bal Harbour"). (Ex.C, Kiser Tr. at 55:11-56:14.) Mr. Gouger—a principal of Summit who is also Mr. Ergen's personal tax accountant and lawyer— was the authorized agent for Bal Harbour. In April 2012, Mr. Kiser directed Mr. Ketchum at Sound Point to execute an initial trade for LightSquared's Loan Debt (with a par value of $5 million) on Mr. Ergen's behalf. (*Id.* at 56:2-58:14.)

Shortly thereafter, Mr. Kiser noticed that Bal Harbour's organizational documents contained a Colorado address that could be used to link Bal Harbour to Mr. Ergen. Mr. Ergen is known to have expertise in spectrum businesses and he believed that the price for the debt would increase if market participants were aware that a "spectrum guru[]" was investing in LightSquared. (Ex.C, Kiser Tr. at 73:7-18.) Consistent with Mr. Ergen's desire to maintain confidentiality, Mr. Kiser had Sound Point set up a new investment vehicle, SPSO, without a Colorado address. (*Id.* at 119:25-120:9.) It was through SPSO that all of Mr. Ergen's LightSquared Loan Debt trades closed. There is no evidence—because none exists—that the change from Bal Harbour to SPSO was intended to hide any connection to DISH or EchoStar.

Between April 2012 and April 2013, SPSO entered into a series of trades through which it acquired over $840 million worth of LightSquared's outstanding Loan Debt, becoming LightSquared's largest secured creditor with its majority holding. During this period, Mr. Ergen and Mr. Kiser would discuss the range of prices at which Mr. Ergen was willing to purchase the Loan Debt, and until the trading price reached those levels, SPSO would not enter into a trade. (Ex. C, Kiser Tr. at 58:4-58:14; 62:5-63:5.) Mr. Kiser would check with Mr. Ergen to make sure

he agreed with purchasing the Loan Debt at a particular price, and would not authorize Sound

Point to make any trade without Mr. Ergen's consent.

With respect to SPSO's trades in LightSquared Loan Debt, discovery has

confirmed, and the evidence at trial will establish, the following facts:

- SPSO is a limited liability company whose sole and managing member is Special Opportunities Holdings LLC ("SOH"). SOH is a limited liability company whose sole and managing member is Mr. Ergen. Neither DISH nor EchoStar have any, direct or indirect, ownership interest in, or agreement with, SPSO or SOH. (Ex. B, Ergen Tr. at 226:10-13; 229:13-20.)

- In directing SPSO's trades in LightSquared Loan Debt, Mr. Kiser at all times considered himself to be acting on behalf of Mr. Ergen in his personal capacity, and not on behalf of DISH or EchoStar. Mr. Kiser acted solely at the request of Mr. Ergen and SPSO when assisting Mr. Ergen with the trades. (Ex. B, Kiser Tr. at 49:17-19; 58:8-14; 62:15-63:18.)

- Witnesses have testified and will testify that the funding for SPSO's trades in LightSquared Loan Debt came entirely from Mr. Ergen's personal funds. No DISH or EchoStar funds were ever used. (*See* Ex. B Ergen Tr. at 138:2-7; 143:2-5; Ex. C, Kiser Tr. at 59-60; 129.)

- For Stephen Ketchum, who executed the trades, it was crystal clear that the trades were for Mr. Ergen and not DISH because Jason Kiser had told him "on a number of different occasions" that the trades were for Mr. Ergen's "personal capacity, [using] his personal money." (Ex. D, Ketchum Tr. at 269:5-270:4; Ex. FF, 5/6/2012 Email from Ketchum to group (LSQ-SPCD-000000903 (new account was for "family office").)

- Pursuant to DISH and EchoStar investment policies, neither Mr. Ergen nor Mr. Kiser had authority to commit DISH or EchoStar to spending more than $125 million in a single investment (or series of investments) in any quarter, or more than $200 million for multiple investments within a common industry. (*See* Ex. E, DISH Investment Policy.) Neither Mr. Ergen nor Mr. Kiser requested or received such authorization in connection with the LightSquared Loan Debt trades.

- Other than with Mr. Ergen, Mr. Kiser did not discuss SPSO's purchases with anyone at DISH or EchoStar. (Ex. C, Kiser Tr. at 69:11-70:8.) He considered all of Mr. Ergen's investments to be Mr. Ergen's private and confidential matters. (*Id.* at 115:17-21; 185:19-23.)

-10-

- SPSO did not purposefully delay the closing of any Loan Debt trade except for the purpose of liquidating other personal investments to fund a trade, or to obtain favorable float through a weekend.  (Ex. B, Ergen Tr. at 144; Ex. C, Kiser Tr. at 105; Ex. D, Ketchum Tr. at 149-51.)  There is no evidence that Mr. Ergen or Mr. Kiser intended to delay the closing of a trade in order to obstruct, hinder, or interfere with any proceedings in LightSquared's bankruptcy or to otherwise make it more difficult for LightSquared to negotiate with its lenders or arrange for financing.

- All of SPSO's trades were made at discounted prices, below par.  (Ex. B, Ergen Tr. at 186-87.)  Throughout the relevant period, there were several instances when Sound Point offered SPSO the opportunity to purchase the Loan Debt and SPSO passed on those opportunities.  (*Id.* at 171:15-172:19; Ex. C, Kiser Tr. at 62:15-63:5.)

- Mr. Ergen's personal investments in LightSquared Loan Debt were not disclosed to the DISH or EchoStar boards of directors until May 2013.  Following that disclosure, the DISH board convened a Special Transaction Committee ("STC") to investigate whether it even wanted to pursue a bid for LightSquared's assets.  (Ex. B, Ergen Tr. at 301:8-302:11; Ex. F, Howard Tr. at 73:5-74:3.)

The evidence presented at trial will also establish that when Mr. Ergen began buying LightSquared Loan Debt, he did not view LightSquared as a potential strategic acquisition for DISH.  Mr. Ergen testified that "[a]t no point in 2012" did he consider LightSquared a "possible acquisition target for DISH" because the company "didn't make any sense for DISH at that time."  (Ex. B, Ergen Tr. at 190:7-18.)  Throughout 2012 and early 2013, DISH and Mr. Ergen were preoccupied with a number of important initiatives that had far greater priority than LightSquared.  Those initiatives included the potential acquisitions of Sprint and Clearwire, which were much larger and would have been important potential acquisitions for DISH.  (*Id.*)  Indeed, in January 2013, Mark Hootnick, financial advisor to LightSquared, testified that "major players that we believe would be interested in this spectrum are all involved in other transactions and therefore would be unlikely to pursue an M&A transaction with LightSquared, currently."  (Ex. G, 1/31/13 Hr'g Tr. at 124:10-13.)  Likewise, Doug Smith testified that although LightSquared had reached out to Sprint many times over several months,

"they had a lot going on" including "the activity with So[ft]Bank and DISH and Clearwire from

an M&A perspective." (Ex. BB, Smith Tr. at 170:4-16.) Mr. Ergen additionally observed at the

time that LightSquared's business, particularly in light of adverse rulings by the FCC, carried a

high degree of risk. Despite that, Mr. Ergen viewed LightSquared as a good personal investment

opportunity. (Ex. B, Ergen Tr. at 272:17-273:9.)

## II.    The LBAC Bid to Acquire LightSquared's Spectrum Assets

In late March 2013, Mr. Ergen's views of LightSquared began to change due to

industry shifts. Only then did Mr. Ergen inform Mr. Kiser that he was interested in exploring a

potential proposal to purchase LightSquared's assets. And only then did Mr. Ergen ask Mr.

Kiser to retain bankruptcy counsel who had assisted in prior acquisitions.

In the Spring of 2013, the wireless communications industry chessboard began to

realign with a wave of acquisitions, and there appeared to be a shift in the FCC's objectives that

opened the possibility that DISH would be able to obtain approval to use up to all 40 MHz of its

existing core spectrum holdings as downlink.[4] (Ex. B, Ergen Tr. at 114:21-115:15.) At the same

time, DISH's contemplated acquisitions of Sprint and Clearwire were encountering various

roadblocks. (*Id.* at 245:25-246:3; Ex. C, Kiser Tr. at 76:23-77:3; 211:2-6.) At that point, Mr.

Ergen began to consider LightSquared a potential acquisition as a back-up opportunity for DISH.

(Ex. B, Ergen Tr. at 187:14-188:5; 190:7-25; 191:2-10; 247:20-248:5; 250:11-251:13.) In early

May 2013—after SPSO had entered into its final Loan Debt trade—Mr. Ergen met with DISH's

and EchoStar's boards of directors to present the acquisition of LightSquared's spectrum assets

in a bankruptcy auction as a potential corporate opportunity for DISH and/or EchoStar. Mr.

---

[4]    This development, which previously seemed unlikely, rendered LightSquared's uplink spectrum more
attractive to DISH, as that uplink spectrum could now be paired with DISH's existing assets. Prior to that
time, DISH was focused on acquiring operating companies with different spectrum characteristics. (Ex. B,
Ergen Tr. at 113:21-114:14.)

Ergen disclosed for the first time the significant personal investment he had made in

LightSquared's Loan Debt.  In presenting the potential LightSquared opportunity, Mr. Ergen

discussed the amount and timing of a proposed bid and the key terms of a proposed acquisition.

On May 15, 2013, Mr. Ergen submitted through L-Band Acquisition, LLC

("LBAC") a $2 billion cash offer for substantially all of LightSquared's spectrum assets (the

"LBAC Bid").  (*See* Ex. H, 5/15/13 Email from Strickland to Hootnick (SPSO-00003172).)  The

term sheet for the LBAC Bid identified the "Buyer" in the proposed transaction as a "[n]ewly-

formed entity . . . to be owned by one or more of Charles Ergen, affiliated companies, and/or

third parties."  By letter dated May 30, 3013, LBAC offered to transfer 100 percent ownership

interest in LBAC to DISH.  (*See* Ex. I, 5/30/13 Email from Strickland to Woolery, Markel, and

Hopkinson (SPSO-00012410).)

## III.  The DISH Board Forms a Special Transaction Committee to Determine Whether to Pursue the Proposed Bid

Around this time, Mr. Ergen learned that in response to his disclosures and

presentation to the Board earlier that month, the DISH Board had convened a Special

Transaction Committee consisting of Mr. Goodbarn and Mr. Howard, two independent members

of DISH's Board.  (*See* Ex. J, 5/22/13 Email from Howard to Goodbarn (SPSO-00012405).)  The

STC was tasked with, among other things, evaluating whether DISH was interested in a potential

bid for LightSquared LP's spectrum assets and if so, how much DISH would be willing to pay.

In evaluating a potential LightSquared transaction, the STC reviewed and asked questions about

SPSO's investment in the LightSquared Loan Debt.  (Ex. F, Howard Tr. at 86:6-86:25, 112:8-

112:14.)  Plaintiffs' suggestion that DISH—not Mr. Ergen—had purchased LightSquared Loan

Debt is untenable given that a special committee of the DISH board was reviewing whether there might be a conflict of interest *between* Mr. Ergen and DISH.[5]

Within weeks, the STC retained independent legal and financial advisors to assist in its review.  Mr. Ergen cooperated with the STC and its advisors, offering to make himself and outside counsel available to answer any questions the STC might have.  (*See* Ex. J, 5/22/13 Email from Howard to Goodbarn (SPSO-00012405); Ex. K, 5/22/13 Email from Ergen to Goodbarn (SPSO-00012407).)  During the course of its review, the STC requested from Mr. Ergen information regarding SPSO's Loan Debt purchases, information that neither the STC nor the DISH board possessed.  (*See* Ex. L, 6/19/13 Email from Goodbarn to Ergen (SPSO-00012418).)  Mr. Ergen and SPSO's counsel informed the STC's counsel about the Loan Debt purchases, including the disclosure that was publicly filed in the LightSquared bankruptcy proceedings.  The STC, however, was not informed of the prices at which Mr. Ergen purchased the Loan Debt.

By late June 2013, it became evident that DISH's efforts to acquire Sprint and Clearwire were not going to be successful, and Mr. Ergen and the STC shifted their focus to the potential LightSquared transaction.  (Ex. B, Ergen Tr. at 96:8-98:2.)  As DISH was actively considering whether to acquire LBAC, the STC's legal advisors (as well as DISH's outside and internal counsel) reviewed and commented on drafts of an asset purchase agreement.  On July 18, 2013, the Ad Hoc Group requested that LBAC raise its offer as a condition to supporting a plan with the LBAC bid as a stalking horse.  (Ex. M, 7/18/13 Email from Ehrhart to DISH board (SPSO-00012440).)

**IV.     DISH's Approval of a $2.22 Billion Bid for LightSquared's Spectrum Assets**

---

[5]     A Special Litigation Committee was later formed at DISH to investigate the circumstances surrounding SPSO's purchase of the LightSquared Loan Debt, further highlighting the frivolous nature of the claim that the purchases were in fact made by DISH.

On July 21, 2013, following its receipt of a fairness opinion from its financial advisors, the STC recommended to DISH's full board that DISH acquire LBAC and make a $2.22 billion bid for LightSquared's spectrum assets. The STC's recommendation, however, made it clear that SPSO's Loan Debt purchases could be subject to further review. (*See*, *e.g.*, Ex. F, Howard Tr. at 290:14-291:3.) Indeed, the June 17, 2013 DISH Special Committee minutes could not be clearer that the Special Committee was looking for information relating to Mr. Ergen's private trades: "The Committee discussed the need for additional information from Mr. Ergen regarding his acquisition of LightSquared debt and/or preferred stock, as well as regarding the rationale and business case for an acquisition by the Corporation of LightSquared's L-Band Mobile Satellite Service Spectrum." (*Id.* at 182:15-183:3.) The July 21, 2013 DISH Special Committee minutes are to the same effect: "Mr. Hopkinson [of Cadwalader] also discussed the fact that the Committee had made a written request to Mr. Ergen for information regarding his purchases of debt and/or other securities issued by LightSquared." (*Id.* at 279:13-23.) DISH's full board subsequently approved the STC's recommendation that LBAC make a bid for LightSquared. (*Id*. at 287:4-13.) Thereafter, DISH acquired full ownership of LBAC.

On July 23, 2013, the Ad Hoc Group (which SPSO had joined on June 13, 2013) filed a plan of reorganization for LightSquared, supported by LBAC's $2.22 billion bid. SPSO did not participate in any of the Group's deliberations. (Ex. N, Zelin Tr. at 102:2-4.) The members of the Ad Hoc Group, which had sought a sale of LightSquared in connection with the prior exclusivity battle, did not need SPSO to convince them to pursue any available transaction at a level that was more than sufficient to pay them in full, in cash.

## V.    LightSquared's Problems Are of LightSquared's and Harbinger's Own Making

Evidence demonstrates that before SPSO even began investing in the Loan Debt, LightSquared was engaged in negotiations with the Ad Hoc Group regarding a plan to reorganize

the company.  And while the negotiations continued after SPSO started purchasing the Loan

Debt, the results did not change:  the negotiations failed.  The record is replete with evidence that

LightSquared's inability to broker a deal with the Ad Hoc Group was caused by the fact that the

negotiations were dominated by Harbinger and centered on its unrealistic demands that it retain

its equity position and wait out FCC approval no matter how long it took or how much it cost.

Steven Zelin, advisor to the Ad Hoc Group, testified that Plaintiffs were concerned about "trying

to protect the equity's interest," were "unwilling to sell [LightSquared's] assets" (Ex. N, Zelin

Tr. at 112:6-24, 134:8-22), and had "put all of their eggs" into the FCC's approving their

proposed spectrum swap (*id.* at 33:20-35:5).  Those terms were untenable to the company's

creditors, not because of anything that SPSO or Mr. Ergen did, but because they benefited the

equity holders of a bankrupt company at the expense of the company's creditors.  (*See id.* at

108:5-110:11.)

　　　　Mr. Zelin was clear that SPSO's trading had "zero impact" on negotiations

between LightSquared and its creditors.  (*Id.* at 104:25-105:5.)  Even after SPSO joined the Ad

Hoc Group in June 2013, Mr. Ergen and SPSO had "[n]o role whatsoever" in the Ad Hoc Group.

(*Id.* at 102:2-4.)  Asked whether "SPSO or its advisors impact[ed] in any way the negotiations

that the ad hoc group was having with either Harbinger or LightSquared," Mr. Zelin's response

was crystal clear:  "Other than [LBAC's] giving us an alternative, not at all."  (*Id.*)

　　　　More recently, LightSquared's own ability to shoot itself in the foot was on

display when it canceled the auction of its assets at the last minute on the promise of a

transaction with Centerbridge.  (*See* Ex. O, Mike Spector & Emily Glazer, *Centerbridge Reaches*

*Tentative Deal for LightSquared*, Wall Street Journal (Dec. 11, 2013).)[6]  But Centerbridge

---

[6]    Available at http://online.wsj.com/news/articles/SB10001424052702303293604579252533167000744.

dropped out in less than a week's time evidently because of "uncertainty over when federal regulators would clear the way for the company to build out its wireless network." (*See* Ex. P, Mike Spector, Emily Glazer & Joseph Checkler, *Centerbridge Won't Proceed With Deal to Buy LightSquared*, Wall Street Journal (Dec. 17, 2013).)[7]  It is apparent that LightSquared has yet to face reality:  it sits on a spectrum asset that is all but useless to most investors for the foreseeable future and has made untenable demands of its creditors contrary to its fiduciary duties.  Those things are not SPSO's or Mr. Ergen's fault and they should not be held liable for LightSquared's own failings.

### CLAIMS AND DEFENSES

Plaintiffs will be unable to prove any of their claims at trial.  Most critically, Plaintiffs cannot prove the central contention underlying all of their claims—that SPSO's acquisition of LightSquared Loan Debt constituted a breach of the Credit Agreement.  The standards relevant to Plaintiffs' claims are set forth below.

**I.      LightSquared Does Not Have Evidence to Support Its Claims for Declaratory Judgment and Breach of Contract Against SPSO.**

To make out its breach of contract claims against SPSO, LightSquared must prove:  (1) the existence of an agreement between LightSquared and SPSO; (2) adequate performance of the contract by LightSquared; (3) breach of the contract by SPSO; and (4) damages.  *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009).  The key issue for trial is whether SPSO breached the transfer restrictions in the LightSquared Credit Agreement by acquiring the Loan Debt.  It did not.

**A.      The Terms of The Credit Agreement Disprove LightSquared's Claims.**

---

[7]        Available at http://online.wsj.com/news/articles/SB10001424052702304858104579264250473641312.

The Credit Agreement permits "Eligible Assignee[s]" to acquire the LightSquared Loan Debt. (Ex. Q, Credit Agreement §§ 1.01, 10.04(a).) Excluded from the definition of "Eligible Assignee" are certain "Disqualified Compan[ies]"—including DISH and EchoStar— and "any known subsidiar[ies] thereof." (*Id.*) Although LightSquared has advanced a myriad of theories as to why SPSO is not an Eligible Assignee, all are flatly discredited by the evidence.

SPSO is not a "subsidiary" of DISH or EchoStar under the plain meaning of the term. According to BLACK'S LAW DICTIONARY, a "subsidiary corporation" is defined as "a corporation in which a parent corporation has a controlling share." (9th ed. 2009) The evidence is clear that neither DISH nor EchoStar are parents of SPSO or have controlling shares of SPSO.

Furthermore, to the extent the Court considers extrinsic evidence of the intended scope of the definition of Eligible Assignee in the Credit Agreement, that evidence shows that the definition was drawn to exclude only Disqualified Companies and their known subsidiaries, not affiliates of Disqualified Companies, such as SPSO. Specifically, the drafting history of the Credit Agreement demonstrates that while LightSquared initially proposed that the definition of Eligible Assignee exclude "Affiliates" of Disqualified Companies, UBS's counsel proposed a narrower restriction on "known subsidiaries" of Disqualified Companies, and LightSquared agreed to that change. (Ex. R, 9/18/2010 Latham Draft Credit Agreement ¶ 1.01; Ex. S, 9/19/2010 Milbank Draft Credit Agreement ¶ 1.01; Ex. T, 9/21/2010 Latham Draft Credit Agreement ¶ 1.01.) Moreover, the LightSquared Stockholders' Agreement, which governs trades in LightSquared's preferred shares, excludes "Affiliates" of Disqualified Companies from purchasing preferred shares, thereby demonstrating that LightSquared fully appreciated the significance of those different terms and understood that the Credit Agreement's purchaser

restrictions were limited in scope. (Ex. U, 10/1/10 Stockholders' Agreement.) LightSquared must now live with the contractual language to which it agreed.

**B.    Neither DISH nor EchoStar Controlled SPSO Through Mr. Ergen or Mr. Kiser.**

LightSquared cannot prove its theory that DISH and/or EchoStar controlled SPSO because Mr. Ergen and/or Mr. Kiser were allegedly acting as agents of DISH or EchoStar in making the trades. (*See* Trial Br. at 15-20.)[8]  Under Nevada law, "[t]o bind a principal, the agent must have actual authority, express or implied, or apparent authority." *Dixon v. Thatcher*, 742 P.2d 1029, 1031 (Nev. 1987).  Not one of these agency theories is supported by the evidence.

With respect to actual express authority, pursuant to DISH's and EchoStar's investment guidelines, the record is clear that Mr. Ergen and Mr. Kiser needed board approval before investing more than $125 million in any quarter.  Thus, neither Mr. Ergen nor Mr. Kiser had the authority to commit DISH or EchoStar to, for example, a $247 million trade for LightSquared Loan Debt on May 4, 2012 without express board approval and such approval was neither sought nor given.  Indeed, the evidence demonstrates that, other than by press reports, the DISH and EchoStar boards were not even informed of Mr. Ergen's Loan Debt purchases until after he had entered into the last trade into.  Upon learning of the purchases, DISH's board formed the STC to investigate whether it was even interested in pursuing the transaction.  The STC then hired lawyers and an investment bank to assist it and proceeded to take *nearly three months* to consider the transaction.  These undisputed facts surrounding the formation of the STC

---

[8]    LightSquared does not even try to contend that either SPSO or Mr. Ergen was an "alter ego" of DISH or EchoStar.  This failure to plead an alter ego claim is not surprising:  LightSquared cannot meet the "high standard" required for alter ego liability because the facts in this case do not come close to establishing that DISH, EchoStar, Mr. Ergen, or SPSO (or any combination thereof) "operated as a single economic entity." *In re Sunbeam Corp.*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) (citation omitted) (applying DE law); *see Truck Ins. Exchange v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 660 (Nev. 2008) ("[T]he corporate cloak is not lightly thrown aside . . . the alter ego doctrine is an exception to the general rule recognizing corporate independence.") (quotation marks omitted).

flatly contradict any contention that the trades were made on either company's behalf, or with any express authorization.

Nor did Mr. Ergen or Mr. Kiser act with implied authority from DISH or EchoStar in purchasing LightSquared's Loan Debt.  Under Nevada law, "[i]mplied authority is that which the agent reasonably believes himself to possess as a result of representations by the principal or of acts of the agent permitted by the principal over a course of time in which the principal has acquiesced."  *In re Ballard*, 100 B.R. 526, 529 (Bankr. D. Nev. 1989).  The evidence clearly demonstrates that neither Mr. Ergen nor Mr. Kiser believed that DISH could purchase the Loan Debt.

Moreover, despite their corporate titles, neither Mr. Ergen nor Mr. Kiser said or did anything to suggest that they were acting on behalf of either corporation in directing SPSO's trades, which (as LightSquared's cases hold) is necessary for their actions to be "imputed" to DISH and/or EchoStar.  *See*, *e.g.*, *Lyndhurst Trading Corp. v. Kaufman*, 182 F.3d 900 (2d Cir. 1994) (treasurer manipulated company books to protect company's collateral on loans); *USACM Liquidating Trust v. Deloitte & Touche, LLP*, 764 F. Supp. 2d 1210 (D. Nev. 2010) (managers operated company as fraud).  Mr. Kiser told Mr. Ketchum at Sound Point "on a number of different occasions" that the trades were for Mr. Ergen's "personal capacity, [using] his personal money."  (Ex. D, Ketchum Tr. at 269:6-270:4.)  When DISH Vice President Thomas Cullen learned of the trades, he "viewed [it] as a personal investment, and [] didn't ask any questions" precisely because it was a personal investment.  (Ex. V, Cullen Tr. at 20:16-22:4.)[9]  *See*

---

[9]     Any contention by LightSquared that DISH was estopped from denying that it has ratified Mr. Ergen's Loan Debt purchases is meritless.  The doctrine of estoppel by ratification only applies where someone is misled into believing that an agent is authorized to enter into a contract, and the alleged principal subsequently attempts to disavow the contract on that basis.  *See Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087, 1097 (D. Nev. 2007) ("To establish estoppel, a litigant must establish four elements: (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the

*Keyworth v. Nev. Packard Mines Co.*, 186 P. 1110, 1113 (Nev. 1920) ("The knowledge acquired by the officers or agents of the corporation, while not acting for the corporation, but while acting for themselves, is not imputable to the corporation.") (citation omitted).  The evidence is thus inconsistent with any suggestion that SPSO's Loan Debt purchases should be imputed to DISH under an implied agency theory.

Finally, DISH and EchoStar cannot be understood to have controlled SPSO based on the principle of apparent authority.  "Apparent authority arises when a principal holds his agent out as possessing certain authority or permits him to exercise or to represent himself as possessing such authority under circumstances that would estop the principal from denying its existence."  *Kennel v. Carson City Sch. Dist.*, 738 F. Supp. 376, 379 (D. Nev. 1990).  "[A]bsent a showing of third party reliance on some conduct *of the alleged principal*, there can be no apparent agency."  *Nev. Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1418 (D. Nev. 1995) (emphasis added, citation omitted).  There is no evidence that DISH or EchoStar made any representations that Mr. Ergen or Mr. Kiser were acting on their behalf in directing SPSO's trades, or that they put Mr. Ergen or Mr. Kiser in a position to acquire the Loan Debt, believing they would do so.  The evidence is overwhelmingly to the contrary and will show that the DISH and EchoStar did not have knowledge of the underlying trading, much less that they made representations that Messrs. Ergen and Kiser were acting on either company's behalf.  Apparent authority cannot—as LightSquared suggests—be derived solely from the conduct of Mr. Ergen or Mr. Kiser.  *See Raby v. Am. Int'l Specialty Lines Ins. Co.*, 268 F. App'x 566, 567 (9th Cir. 2008) ("Under Nevada law it is 'indispensable' to note that reliance may be only upon what the

---

party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped.") (internal quotation marks and citation omitted).  Here, it is clear that nobody was led to believe that Mr. Ergen or Mr. Kiser were directing the trades on behalf of DISH.

principal has done and that the acts of the agent cannot be relied upon as alone sufficient to

support apparent agency.") (citation omitted).[10]

### C.    LightSquared's Contention that SPSO Was a "Natural Person" Is Baseless.

LightSquared now contends that SPSO qualifies as a "natural person" (*i.e.*, the

functional equivalent of Mr. Ergen) and was thus barred from purchasing the Loan Debt.  (Trial

Br. at 20-22.)  This claim deserves but scant attention, as it appears nowhere in LightSquared's

Complaint.  In any event, it is entirely lawful, and not at all unusual, for individuals to create

limited liability investment vehicles.  (*See* Ex. W, 12/10/13 Hr'g. Tr. at 22 (noting that

individuals form special investment vehicles for investing "all the time").)  And Mr. Ergen

testified that he was advised that using an investment vehicle was the appropriate method of

doing this type of investing.  (Ex. B, Ergen Tr. at 286:3-9.)  Moreover, the purpose of a

restriction on assignments to natural persons is to keep unsophisticated investors from acquiring

a company's debt, a concern not at issue here.  Even crediting LightSquared's unpled allegation,

it proves too much.  According to LightSquared, no one should be permitted to invest in the

Loan Debt because natural persons stand behind every corporate form.  LightSquared further

contends that SPSO was undercapitalized, borrowing an element from veil-piercing cases that has

no applicability here.[11]  And while LightSquared irrelevantly complains that SPSO was founded

with a mere $10 capital contribution—more than enough capitalization considering it had no

---

[10]    When DISH has attempted to acquire entities out of chapter 11, including through "loan to own" strategies, the transactions and acquisition strategy were approved by DISH's board of directors, the acquisitions were publicly disclosed, and DISH representatives have testified that the company's principal objective in purchasing debt was to acquire the company and vote down other plans.  In other words, DISH is not shy about making its intentions known and the lack of any action on the part of DISH here establishes that the trades were not the acts of DISH's agents.

[11]    Whether a corporation has been undercapitalized goes to whether the corporation abuses the corporate form by "do[ing] business without providing sufficient finances to meet credit responsibilities."  114 Am. Jur. *Proof of Facts* 3d 403 (2013).  That is not at issue here and the amount of funding Mr. Ergen contributed to SPSO is irrelevant.  SPSO did fund all of the trades and there is no dispute that it did not meet its credit responsibilities.

liabilities—it cannot deny that all of SPSO's trades were closed and all transferors have been paid.

More fundamentally, LightSquared's "natural person" argument is at odds with LightSquared's theory of harm underlying this entire case. LightSquared has continually argued that the alleged harm here was that a competitor entered its capital structure. Putting aside that there is no evidence that SPSO caused any harm at all, LightSquared cannot now assert that all the damage SPSO allegedly caused was due to the fact that it was really a "natural person."

**D.    LightSquared's New-Found Breach of Good Faith and Fair Dealing Claim Fails.**

Unable to prove its breach of contract claim, LightSquared now advances the theory that SPSO breached the implied covenant of good faith and fair dealing. (Trial Br. at 23-24.) Again, this theory appears nowhere in LightSquared's Complaint and should be rejected on that basis. Putting that aside, a claim for breach of the implied covenant of fair dealing should be dismissed "where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (internal quotations and citation omitted). LightSquared contends that SPSO breached express provisions of the Credit Agreement when it acquired the Loan Debt. It cannot also contend that the same conduct breached an implied covenant. *See Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299-300 (S.D.N.Y. 2012) (dismissing implied covenant of good faith and fair dealing claim because "the conduct alleged [was] exactly the same as the charge of the express breach of contract claim"). Moreover, LightSquared's implied covenant claim is premised on the contention that the SPSO Loan Debt trades were entered into for the benefit of DISH or EchoStar so that one or both of those companies could acquire the assets of LightSquared in bankruptcy. But the evidence establishes

that SPSO began buying LightSquared Loan Debt before LightSquared even filed for bankruptcy protection. Moreover, throughout the entirety of the one-year period during which SPSO was trading, Mr. Ergen viewed LightSquared as a personal investment opportunity, and not a potential strategic acquisition for DISH. There is no evidence to the contrary.

In sum, LightSquared cannot prove any breach of the Credit Agreement by SPSO. Accordingly, Counts I and II of LightSquared's Complaint against SPSO fail.

## II.    Claim Disallowance Is Inappropriate Because Plaintiffs Cannot Overcome the Prima Facie Validity of SPSO's Claims

Both LightSquared and Harbinger have asserted objections to the allowance of SPSO's claims under section 502(b) of the Bankruptcy Code. (Trial Br. at 27-29; Harb. Trial Br. at 2, 17.) Pursuant to section 502(a) of the Code, and Bankruptcy Rule 3001(f), a properly filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim unless a party in interest objects. *See In re Elmira Litho, Inc.*, 174 B.R. 892, 901 (Bankr. S.D.N.Y. 1994) (citing Fed. R. Bankr. P. 3001(f)). Claim disallowance under section 502(b)(1) of the Bankruptcy Code requires an objecting party to introduce "sufficient evidence to overcome that claim's prima facie validity." *In re 37-02 Plaza LLC*, 387 B.R. 413, 417 (Bankr. E.D.N.Y. 2008) (citing *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000)).

There is no evidence in the record to overcome the *prima facie* validity of SPSO's claims and to warrant disallowance under section 502(b). In fact, LightSquared's and Harbinger's section 502(b) objections are premised entirely on the contention that SPSO was not an Eligible Assignee and therefore breached the Credit Agreement by acquiring the LightSquared Loan Debt. As explained above, that contention lacks support in both the plain language of the Credit Agreement and the record developed through discovery.

Further, even if the Court were to conclude that SPSO was not an Eligible Assignee, SPSO's claims would still be enforceable against the LightSquared estate. Nothing in the Credit Agreement treats transfers in violation of the transfer restrictions as void or voidable, let alone renders the transferred Loan Debt claims unenforceable against LightSquared – an extraordinary remedy that no commercial lender would agree to and would allow borrowers to realize enormous windfalls as a result of improper transfers. To the contrary, section 10.04(b) of the Credit Agreement expressly provides that "[a]ny assignment or transfer by a Lender of rights or obligations under [the Credit] Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(d)." In turn, section 10.04(d) provides that LightSquared "agrees that any breach by any Lender or participant or sub-participant of the restrictions on assignment hereunder (including, without limitation, to Disqualified Companies) *shall not excuse, in any respect, performance by the Borrower under the Loan Documents.*" (Emphasis added) Further to this point, section 10.16 of the Credit Agreement also states that "all obligations of the Loan Parties [the Borrower and Guarantors] hereunder shall be *absolute and unconditional* irrespective of . . . any lack of validity or enforceability of any Loan Document or any other . . . circumstance which might otherwise constitute a defense available to, or a discharge of, the Loan Parties." (Emphasis added)

Under these circumstances, New York law makes clear that the transfer of rights and obligations to SPSO under the Credit Agreement remains valid. *See Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012) (contractual provisions prohibiting assignments are not enforceable except where "the relevant provision of the contract contains 'clear, definite, and appropriate' language declaring an assignment

invalid") (quoting *Sullivan v. Int'l Fid. Ins. Co.*, 96 A.D.2d 555, 556 (N.Y. App. Div. 1983); *In re 785 Partners LLC*, No. 11-13702 (SMB), 2012 WL 401497, at *3 (Bankr. S.D.N.Y. Feb. 7, 2012) (assignment of a loan is valid, rendering the assignee "a secured creditor and party in interest" in the bankruptcy, even if the assignee did not meet the definition of an Eligible Lender, where the contract lacked language invalidating an improper assignment); *In re Britton*, 288 B.R. 170, 173 (Bankr. N.D.N.Y. 2002) (quoting *Pravin Banker Assocs. Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997)) (finding that under New York law, "to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, [a contractual] clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way").[12]

SPSO's claim is enforceable in this bankruptcy proceeding even if Plaintiffs establish that SPSO was not an Eligible Assignee.  As the Court put it in a prior hearing, "the contract also specifically says that if [the lenders] mess up on the eligible assignee part, it doesn't affect the obligation of the borrower . . . [t]hey borrowed the money, they owe the money."  (Ex. X, 10/29/13 Hr'g. Tr. at 116:15-18.)  Accordingly, irrespective of whether SPSO breached the Credit Agreement—and it did not—SPSO's claims should not be disallowed pursuant to section 502(b).

---

[12]    LightSquared cites numerous cases for the proposition that language in an agreement declaring the invalidity of an assignment renders an assignment voidable.  *See, e.g., Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2001 WL 863561, at *12 (S.D.N.Y. July 31, 2001); *Cole v. Metro. Life Ins. Co.*, 27 A.D.2d 832, 833 (4th Dep't 2000).  That may be, but that is not the situation here.  Here, the Credit Agreement expressly provides that it is enforceable "irrespective of . . . any lack of validity or enforceability of any Loan Document or any other . . . circumstance which might otherwise constitute a defense available to, or a discharge of, the Loan Parties."  Credit Agreement ¶ 10.16.

**III.    LightSquared's Tortious Interference Claim Fails for the Same Reasons as Its Contract Claim**

LightSquared claims that Mr. Ergen tortiously interfered with the Credit

Agreement by causing SPSO to represent that it was an Eligible Assignee and to purchase Loan

Debt in breach of the Credit Agreement or by causing UBS to transfer the debt to SPSO.  (Trial

Br. at 29.)  To recover on this claim, LightSquared must prove:

(1)    the existence of a valid contract between LightSquared and SPSO;

(2)    Mr. Ergen's knowledge of the contract;

(3)    Mr. Ergen's intentional procurement of SPSO's or UBS's breach of the contract without justification;

(4)    the actual breach of the contract; and

(5)    damages resulting therefrom.

*Island Two LLC v. Island One, Inc.*, No. 13 Civ. 02121 (LGS), 2013 WL 5380216, at *2

(S.D.N.Y. Sept. 26, 2013) (internal quotations and citation omitted).

As discussed above, SPSO was an Eligible Assignee, and thus did not breach the

Credit Agreement in connection with SPSO's Loan Debt purchases.  Accordingly, LightSquared

cannot establish its tortious interference claim against Mr. Ergen.  *See Israel v. Wood Dolson*

*Co.*, 1 N.Y.2d 116, 120 (1956) (an action for intentional procurement of a breach of contract

"must fail if there was no such breach"); *see also Fleming v. Hymes-Esposito*, No. 12 Civ. 1154,

2013 WL 1285431, at *5 (S.D.N.Y. Mar. 29, 2013) (dismissing tortious interference claim for

failure to allege a breach of the contract).  Similarly, UBS did not breach the Credit Agreement[13]

---

[13]    Conspicuously, LightSquared has not brought any claims against UBS.  That is because the terms of the Credit Agreement, and its drafting history, make clear that UBS could not be held liable for breach.

because it had no obligation to independently determine whether acquirers of Loan Debt were

Eligible Assignees, so that claim fails as well.[14]

Even if SPSO breached the Credit Agreement, LightSquared's tortious

interference claim against Mr. Ergen fails because his alleged act of interference (*i.e.*, directing

the purchase of Loan Debt by SPSO) was motivated by a lawful, economic purpose—to invest in

the Loan Debt. *See Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12 Civ. 3584

(JCF), 2013 WL 1500333, at *5 (S.D.N.Y. Apr. 12, 2013) ("A claim for tortious interference

with contract cannot rest on the conduct that is incidental to some other lawful purpose.")

(internal quotations omitted).  Under New York law, "actions taken to protect an economic

interest[] are justified and cannot give rise to a tortious interference claim." *Id.* (quoting *Picard*

*v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 282, 294 (Bankr. S.D.N.Y. 2010)).

Finally, LightSquared's tortious interference claim fails because it cannot show

that it has been damaged by any actions taken by Mr. Ergen.  LightSquared has impermissibly

taken a "wait and see" approach to damages—wait and see what happens to the company, then

blame it on Mr. Ergen and SPSO.  *See Maalouf v. Salomon Smith Barney, Inc*., No. 02 Civ. 4770

(SAS), 2004 WL 2008848, at *8 (S.D.N.Y. Sept. 8, 2004) (rejecting tortious interference claim

where damages were "entirely speculative"), *aff'd sub nom. Maalouf v. Citigroup Global*

*Markets, Inc*., 156 F. App'x 367 (2d Cir. 2005).  Moreover, the Court has already discredited

LightSquared's theory that SPSO's acquiring the Loan Debt gave LBAC a "leg up" in bidding

for LightSquared's assets because that scenario is no different from any credit bidder.  (*See* Ex.

W, 12/10/13 Hr'g Tr. at 86:14-18; *id.* at 86:19-25 ("[T]here's no general prohibition about

---

[14]    LightSquared never addresses the disconnect between its breach of contract claim—premised on multiple definitions of the word "subsidiary" rendering the Credit Agreement "the paradigmatical ambiguous provision" (Ex. W, 12/10/13 Hr'g Tr. at 108:16)—and its tortious interference claim, which requires evidence that Mr. Ergen *intentionally* procured the breach of the Credit Agreement.  Mistakenly relying on the wrong definition of "subsidiary" is a far cry from purposefully causing a breach.

somebody buying debt at a discount and then they have a strategic advantage . . . [s]o I can't go

down that path").)  As the Court pointed out, the fact that LightSquared was in a court-

supervised sale process where "anybody can come in and bid," severs any connection between

Mr. Ergen's conduct and the harm LightSquared complains of.  (*Id.* at 84:24-85:11.)  And protest

all it wants, Mr. Ergen is not to blame for LightSquared canceling its scheduled auction only to

see Centerbridge drop out because of the uncertainty surrounding FCC approval.

### IV.    Designation of SPSO's Votes Pursuant to Section 1126(e) of the Bankruptcy Code Is Not Appropriate Here

On the eve of trial, LightSquared has raised an additional request for relief—the

designation of SPSO's votes pursuant to section 1126(e) of the Bankruptcy Code.  (*See* Joint Pre-

Trial Order.)  That provision allows bankruptcy courts to designate, or disregard, the votes of

"any entity whose acceptance or rejection of such plan was not in good faith."  11 U.S.C. §

1126(e).  Courts have noted that section 1126(e) should be used "sparingly, as the 'exception, not

the rule.'"  *In re DBSD N. Am., Inc.*, 634 F.3d at 101-02 (quoting *In re Adelphia Commc'ns

Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006)).  For this reason, "a party seeking to designate

another's vote bears the burden of proving that it was not cast in good faith."  *Id.*

Having included it nowhere in its Complaint, LightSquared's request for

designation is inappropriate and should be rejected.  However, presuming that the Court

entertains LightSquared's designation claim, it still fails because it lacks any basis in the law or

the facts.  LightSquared's request for designation rests on the Second Circuit's decision in *In re

DBSD North America, Inc.*, in which DISH's votes were designated based on findings that it had

"bought a blocking position in (and in fact the entirety of) a class of claims, *after a plan had

been proposed, and with the intention not to maximize its return on the debt but to enter a

strategic transaction with [the Debtor].*"  *Id.* at 104 (emphasis added).

-29-

SPSO's acquisition of LightSquared Loan Debt presents an entirely different set of circumstances than in *DBSD*. Here, SPSO undisputedly bought the Loan Debt before any chapter 11 plan had been proposed. It began purchasing the Loan Debt before LightSquared even filed for bankruptcy protection. Moreover, as discussed above, the Loan Debt was not purchased with any intention of acquiring LightSquared's spectrum assets. Indeed, Mr. Ergen and DISH were focused on other strategic acquisitions at the time and did not view LightSquared as a potential strategic opportunity until, at the earliest, the Spring of 2013. Rather, the Loan Debt was purchased for Mr. Ergen's personal investment purposes. Mr. Ergen purchased the debt at distressed prices and was focused on maximizing his return on his investment and not acquiring the company. *Contra id.* at 104 (creditor's motives evinced by "its willingness to overpay for the claims it bought"). Thus, even if the Court considers LightSquared's designation request—and it should not—the request should be rejected.[15]

## V.    There Is No Basis for the Equitable Subordination of SPSO's Claims.

LightSquared's Prayer for Relief seeks the equitable subordination of SPSO's claims to all non-equity claims.[16] (*See* Trial Br. at 33-34.) To establish its entitlement to equitable subordination (a remedy that is even more drastic than vote designation, which, as described in Section IV, *supra*, is not appropriate here), LightSquared must prove:

(1)    that SPSO engaged in inequitable conduct;

(2)    that the misconduct caused injury to LightSquared or conferred an unfair advantage to SPSO; and

---

[15]    Based on the plans on file, LightSquared would not even receive any benefit from designation of SPSO's vote, as it would have no effect on any class's acceptance or rejection of any plan. The chapter 11 plan filed by the Ad Hoc Group was approved by the class of holders of Loan Debt, whether or not SPSO's vote is counted, and LightSquared's plan deems SPSO's claim unimpaired and not entitled to vote.

[16]    Harbinger's Second Amended Complaint asserted a separate cause of action for equitable subordination against SPSO that was dismissed without prejudice subject to the consideration of subordination in the context of a plan of reorganization.

(3)    that bestowing the remedy of equitable subordination is not inconsistent with bankruptcy law.

*Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.)*, No. 10-05524, 2011 WL 1042767, at *3 (Bankr. S.D.N.Y. Mar. 17, 2011) (citation omitted).  "Traditionally, inequitable conduct has been found only in cases involving at least one of the following three paradigms:  (i) fraud, illegality, or breach of fiduciary or other legally recognized duties; (ii) undercapitalization of the debtor; and (iii) control or use of the debtor as a mere instrumentality or alter ego to benefit another."  *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010) (citations omitted).  If the claim is against a non-insider, the debtor must show "gross and egregious conduct" for equitable subordination to be appropriate.  *See CMR Mortg. Fund, LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortg. Fund, LLC)*, 416 BR. 720, 736 (Bankr. N.D. Cal. 2009).  LightSquared's allegations do not fit within any of these paradigms—demonstrating the inappropriateness of equitable subordination.  The allegations LightSquared *does* raise are belied by the evidence.

LightSquared's case against the Ergen Defendants hinges on the alleged ambiguity in the Credit Agreement that supposedly renders SPSO a "known subsidiary" of DISH and/or EchoStar despite not being owned or controlled by either.  There is no question that the Ergen Defendants' reading of that alleged ambiguity is perfectly reasonable and any trades based on that interpretation are insufficient grounds on which to premise equitable subordination.  *See Delphi Corp. v. Appaloosa Mgmt. L.P. (In re Delphi Corp.)*, No. 05- 44481 (RDD), 2008 WL 3486615, at *23 (Bankr. S.D.N.Y. Aug. 11, 2008) ("a simple intentional breach claim does not rise to the level of misconduct sufficient to support a claim for equitable subordination"); *CMR*

*Mortg.*, 416 B.R. at 736 ("these acts cannot be inequitable because they are expressly authorized by the Credit Agreement").

LightSquared claims that SPSO "purposely concealed its identity to prevent LightSquared from suspecting that a direct competitor had entered its capital structure with the intent of using its claims to steer the bankruptcy process." (Trial Br. at 33.)  But there is nothing "inequitable" or at all uncommon about a distressed debt investor seeking to maintain the confidentiality of his investment.  Indeed, this Court has already recognized this common "market practice." (*See* 11/21/13 Mem. Decision at 35.)  Mr. Ergen's efforts to maintain the confidentiality of his investment in LightSquared grew out of his concern that, were he revealed to be the buyer behind SPSO, the price of the LightSquared Loan Debt would increase.  The record is devoid of any evidence that Mr. Ergen's concern for confidentiality was motivated by a desire to secretly infiltrate LightSquared's capital structure or to obtain some leverage in future acquisition proposals.

Moreover, as the evidence demonstrates, despite Mr. Ergen's desire for confidentiality, SPSO's trades were hardly a secret.  It was "the world's worst kept secret" in Mr. Ergen's words.  Indeed, the press swirled with reports that Mr. Ergen was the buyer behind SPSO.  In an April 3, 2013 email to Mr. Holtz at Harbinger, Mr. Hootnick of Moelis, LightSquared's own financial advisor, commented that it was "widely believed" that Mr. Ergen and/or DISH were buying up LightSquared's Loan Debt through SPSO.  As Mr. Hootnick testified, "[t]here were reports in Bloomberg, LCD, Debt Wire.  The credit markets were talking about it.  It was all over the place." (Ex. H, Hootnick Depo. Tr. at 130:21-131:2.)  Mr. Zelin of Blackstone, the financial advisor to the Ad Hoc Group lenders agreed, testifying that "it always had been the assumption going in that it was [Mr.] Ergen who was behind the purchase, because

of the SPSO relationship, I guess, the Ketchum/Ergen relationship." (Ex. W, Zelin Depo. Tr. at 145:9-16.) Mr. Falcone of Harbinger himself expressed awareness of Mr. Ergen's purchases as early as May 2012 and, indeed, thought it was "a positive" because it "[m]ay bring in another strategic" bidder. (Ex. Y, 5/5/12 Email from P. Falcone to A. Cohen.)

LightSquared's contention that the Ergen Defendants "delayed the closing of several trades, which stymied LightSquared's ability to negotiate with its creditors during the exclusivity period" (Trial Br. at 33.), fares no better. First, as a threshold legal matter, LightSquared's characterization of its rights during the exclusive periods specified in Section 1121 of the Bankruptcy Code expands far beyond what the statute provides. Section 1121 gives LightSquared only the right to file and solicit votes on a chapter 11 plan within the exclusivity periods specified in Section 1121 of the Bankruptcy Code. *See* 11 U.S.C. § 1121(b), (d). It is not even alleged—nor could it be—that any of the Ergen Defendants filed or solicited votes on a chapter 11 plan during LightSquared's exclusive periods. Section 1121 does *not* give the debtor the exclusive right to negotiate with stakeholders or guarantee that a debtor will always be able to identify who each one of those stakeholders is,[17] and it certainly does not impose a *de facto* "lock up" agreement between a debtor and its stakeholders that would preclude such stakeholders from trading in and out of a debtor's equity or debt. Yet, this is apparently the construction of section 1121 that LightSquared asks the Court to adopt. The Court should

---

[17]    Notably, while the issue is ultimately irrelevant for the reasons set forth above, the evidence demonstrates that LightSquared *did* have substantial information regarding the identity of the parties who were selling Loan Debt to SPSO. (*See* Ex. Z, 6/13/13 Email from M. Barr to R. Strickland (identifying counterparties to various open trades with SPSO and the amounts of such trades).) In fact, LightSquared had far more clarity than SPSO had as to the true counterparties to SPSO's trades, which undermines LightSquared's theory that SPSO deliberately attempted to interfere with LightSquared's negotiations with members of the Ad Hoc Group. SPSO traded through brokers and, other than press reports in one or two instances, at the time trades were initiated, SPSO did not know the identity of the sellers.

decline LightSquared's invitation, which would represent a radical departure from the language of section 1121 and change the face of bankruptcy law as we know it.

Second, as a factual matter, LightSquared kept well abreast of the relative ownership positions of Loan Debt holders, including SPSO.  Indeed, as LightSquared's Chief Financial Officer, Mr. Montagner, testified, LightSquared updated its holding lists "multiple times a week."  (Ex. AA, Montagner Depo. Tr. at 67-68; *see also* Ex. A, Hootnick Tr. at 97-98 (LightSquared "regularly would update the holding list regarding Sound Point and any other trades").)  If LightSquared really believed that it was being harmed, it could have sought relief from this Court or sought to take Rule 2004 discovery to confirm SPSO's affiliation with Mr. Ergen.  It did not.  And while LightSquared alleges that it could not be sure that Mr. Ergen was the owner of SPSO because there was speculation that Cablevision and/or Carlos Slim may have been behind SPSO's Loan Debt purchases (*See* Trial Br. at 10), LightSquared did *nothing* to confirm the accuracy of such rumors.  (*See* Ex. AA, Montagner Depo. Tr. at 65:15-16 ("No, we didn't reach out—I don't remember reaching out to any of [Cablevision or Carlos Slim]"); *see also* Ex. A, Hootnick Tr. at 52:20-24 ("Q: And did you make any efforts to reach out to anyone who represented Carlos Slim to understand if he was behind the purchase?  A: I did not").)  Indeed in declarations supporting Moelis's retention in this case, filed in *May 2012*, both Mr. Ergen and DISH Network were identified as "potential parties in interest."  Cablevision, Telmex, and Carlos Slim were not.  (*See* Dkt. No. 66, Schedule 1.)

To the extent LightSquared believed that the presence of a competitor in its capital structure posed a threat of serious harm, LightSquared could have sought discovery under Bankruptcy Rule 2004 to confirm the identity of SPSO's ultimate owner, or sought other relief from the Bankruptcy Court to protect itself and/or mitigate any such harm.  Yet, despite the fact

that LightSquared apparently considered "using some . . . discovery techniques" to determine

who was behind SPSO (Ex. A, Hootnick Tr. at 106:2-4), LightSquared chose not to exercise any

of these options, instead it elected only to contact, on an informal basis, professionals—who

owed a duty of confidentiality to their clients—to inquire as to SPSO's ownership.  LightSquared

asks the Court to accept that LightSquared and Harbinger (who, over the course of these cases,

collectively have been advised by three or more large, sophisticated law firms) decided not to

take any further action notwithstanding their alleged belief that a competitor's participation in

LightSquared's capital structure could result in billions of dollars of damages to LightSquared.

This is simply implausible.

      LightSquared's other conduct further undermines its allegations with respect to

the harm caused by SPSO's activity.  Even after SPSO's counsel confirmed Mr. Ergen's

ownership of SPSO, LightSquared sat by idly as SPSO closed trade after trade of Loan Debt.

Rather than taking any action to prevent SPSO's several then-open trades from closing,

LightSquared's counsel instead emailed SPSO's counsel asking why such trades had not yet

closed, and when such trades would close.  (Ex. Z, 6/13/13 Email from M. Barr to R. Strickland).

LightSquared never threatened to seek, and did not seek, any injunction or other judicial relief to

prevent the trades from closing.  While LightSquared's inaction is baffling in light of its

allegations of grave harm to its estate, at the time, LightSquared's motive for waiting and

watching while such trades closed was obvious.  In May 2013, LightSquared sought to rely upon

SPSO's substantial Loan Debt holdings for its own benefit, as a basis to invoke its rights under

paragraph 15 of the February 13, 2013 exclusivity stipulation (Docket. No. 522-A) (the

"Exclusivity Stipulation") between the Debtors, the Ad Hoc Group and certain other parties in

interest.  Paragraph 15 generally allowed LightSquared to terminate certain lender protections

and other confidential provisions in the Exclusivity Stipulation if any holder or group of holders of Loan Debt unaffiliated with the Ad Hoc Group acquired an amount of Loan Debt greater than the aggregate amount held by the Ad Hoc Group and failed to execute a plan support agreement with the Ad Hoc Group within a specified time period.  (*See* Exclusivity Stipulation at ¶ 15; Ex. BB, Smith Tr. at 154:12-25; Ex. CC, 5/18/13 Email from Falcone to Smith (HARB00005028).) According to Doug Smith, LightSquared was eager to be relieved from its obligations under those confidential provisions, as they presented an obstacle to LightSquared's and Harbinger's singular objective of achieving confirmation of a plan that would preserve Harbinger's equity interests in LightSquared, and saw SPSO's Loan Debt acquisitions as a means to achieve that objective.

Even leaving aside the inconsistencies between LightSquared's litigation position and its prior conduct, the evidence shows SPSO's acquiring the Loan Debt had "zero impact" on negotiations between the Ad Hoc Group and LightSquared.  (Ex. N, Zelin Tr. at 104:25-105:5.) Significant disagreements have always existed between LightSquared and Harbinger on the one hand, and LightSquared's creditors on the other, regarding the economic aspects of any plan of reorganization (*e.g.*, what equity stake the creditors would be granted) and how to address the uncertainties surrounding LightSquared's pending regulatory applications.  There is no evidence to suggest that had SPSO not purchased the Loan Debt, those disagreements would have somehow evaporated.  Nor is there any evidence that SPSO caused the Ad Hoc Group to file a plan promoting the LBAC bid, through its membership in the Ad Hoc Group, by virtue of its blocking position, or otherwise.  Rather, LBAC's bid was attractive to the Ad Hoc Group (and would have been attractive even if SPSO did not hold a single dollar of Loan Debt) because it represented a means to prompt repayment of the Loan Debt in full, in cash, and was less

conditional than other alternatives being discussed at the time.  In any event, as Mr. Zelin

testified, SPSO and Mr. Ergen played "no role whatsoever" in the Ad Hoc Group's activities, did

"not at all" interfere with the Ad Hoc Group's negotiations with Harbinger, and had "zero

impact" on the breakdown of those negotiations.  (*Id.* at 102:2-103:3, 104:25-105:5.)

   That the parties could not agree on terms was an outcome that had nothing to do

with SPSO's status as a creditor, but rather because Harbinger (and specifically its Chairman,

Mr. Falcone) has prioritized its own interests to the detriment of other stakeholders.[18]  Harbinger

has been singularly fixated on a plan of reorganization that allows it to await (more or less

indefinitely) resolution of LightSquared's pending applications with the FCC and preserves its

ownership of the spectrum assets.  As Mr. Zelin testified, Harbinger has adopted this posture "to

the exclusion of other resolutions," (*id.* at 45-46) thus limiting the range of potential

compromises.

   Moreover, the specter of Harbinger—and, in particular, Mr. Falcone—remaining

involved in LightSquared post-emergence was, in and of itself, a significant impediment to

formulating a restructuring transaction.  As LightSquared's own expert, Mr. Derrough, testified,

potential transaction counterparties had concerns about Harbinger's role in LightSquared going

forward and the risks posed by Mr. Falcone's problems with the SEC.  (*See* Ex. DD, Derrough

Depo. Tr. at 85:19-21 ("Q: Were [Falcone's] SEC problems ever discussed by several investors?

A: I believe so."); 88:21-22 ("Q:  Right, but weren't investors raising questions about [Falcone's

SEC issues] as part of their diligence?  A:  I think Mr. Falcone's involvement was a question.").)

Certain counterparties raised additional concerns about their ability to participate meaningfully

---

[18] Harbinger acknowledged this recently when it stated in its opposition to the Ergen Defendants' motion to dismiss that its only interest was protecting its "control over LightSquared that it invested in and has worked to protect."  (Harb. Opp. Mot. Dismiss at 13 (filed Oct. 9, 2013).)  Given this, it is all the more surprising that Mr. Hootnick and Mr. Smith delegated so much of the negotiations to Harbinger (*See* Ex. N, Zelin Tr. at 69:18-71:18) and then seem surprised that things have not gone well for the company.

in a reorganized LightSquared with Harbinger in its ownership structure.  (*See id.* at 87:21-88:7

("Q:  Did any member of the Moelis team express to you or discuss with you whether other

potential investors in LightSquared had raised the issue of Mr. Falcone's role going forward?  A:

I believe I heard that it was a topic of conversation.  Q:  What did either of Mr. Hootnick, Holtz

or Ahern say on that subject?  A:  Probably similar comments to what I said earlier.  How does

an investor get majority control, majority ownership, those kinds of things with Mr. Falcone

owning what he has.").)  The risks associated with Mr. Falcone's continued involvement in

LightSquared were so well-known that exit financing for the company was referred to as having

an "embedded Phil risk premium."  (Ex. EE, 6/6/13 Email from G. Deeds to E. Massaro

(KCM0006735).)  At bottom, the evidence shows that the parties engaged in restructuring

discussions with LightSquared had far more concern about Harbinger's and Mr. Falcone's

potential involvement in a transaction than SPSO's or Mr. Ergen's.

        The evidence will similarly show that neither SPSO nor Mr. Ergen is responsible

for LightSquared's and Harbinger's failures to secure exit financing or to attract a higher offer

from a strategic bidder.  LightSquared's theory here is at odds with the rest of its case.

LightSquared would have the Court believe that SPSO's acquisition of LightSquared Loan Debt

was a secret (and therefore allegedly harmful), but also well-known (and therefore allegedly

harmful).  In no event were SPSO's purchases harmful, but LightSquared should at least pick an

internally consistent theory.  In any event, Mr. Hootnick's testimony in January 2013 puts lie to

the claim that SPSO had any impact on the behavior of outside investors, as he admitted that

"[t]he major players that we believe would be interested in this spectrum are all involved in other

transactions and therefore would be unlikely to pursue an M&A transaction with LightSquared,

currently."  (Ex. G, 1/31/13 Hr'g Tr. at 124:10-13.)  Additionally, the absence of sufficient exit

financing commitments has stemmed from ongoing uncertainties regarding LightSquared's pending applications with regulators.  In fact, to this day, neither LightSquared nor Harbinger has been able to secure an exit financing commitment that is not contingent upon favorable action by the FCC.  Such action is far from assured, and thus imbues any such proposal with significant execution risk.  If anything, SPSO's and Mr. Ergen's involvement here prompted LightSquared to move forward with these cases rather than to continue to wait for an outcome that may never materialize.  In any event, nothing about LBAC's $2.22 billion stalking horse bid precluded another bidder from offering a higher price for LightSquared's spectrum assets. Indeed, Douglas Smith, LightSquared's CEO, in reporting to Mr. Falcone regarding LightSquared's discussions with potential strategic investors, noted that "the Charlie bid [referring to LBAC's bid] is helpful in that it has captured everyone's attention."  (Ex. BB, Smith Tr. at 161:6-23.)  The absence of a bid is simply a function of the market's perception of the value of LightSquared's assets, not the conduct of the Ergen Defendants.

For all these reasons, LightSquared cannot prove that the Ergen Defendants engaged in inequitable conduct in connection with their acquisition of the Loan Debt, or that any of the Ergen Defendants' conduct harmed LightSquared stakeholders.  Accordingly, there is simply no factual or legal basis upon which to impose the "extraordinary remedy" of equitable subordination.  *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) (citation omitted).

## CONCLUSION

LightSquared's case depends on bald assertions that legitimate, lawful activities— maintaining the confidentiality of a significant investment to avoid slippage in price, using special investment vehicles, doing basic due diligence about an investment, and acquiring blocking rights to protect an investment—are instead evidence of wrongdoing.  LightSquared's

case depends on ignoring that DISH had no use for LightSquared's spectrum when SPSO started investing. And it hinges on an opportunistic interpretation of the Credit Agreement that cannot be squared with the plain language or its drafting history. Simply put, this trial will bear out that Plaintiffs do not have the evidence to hold Mr. Ergen and SPSO liable for the harms that have befallen LightSquared, all of which are of LightSquared's and Harbinger's own making. For the foregoing reasons, the Ergen Defendants respectfully submit that the evidence will show that they are not liable on any of the claims to be tried in this action and that judgment should be entered in their favor.

Dated: New York, New York
        January 8, 2014

                                        WILLKIE FARR & GALLAGHER LLP


                                        By:  /s/ Tariq Mundiya
                                            Rachel C. Strickland
                                            Tariq Mundiya
                                            James C. Dugan

                                            787 Seventh Avenue
                                            New York, New York  10019
                                            (212) 728-8000

                                        *Counsel for SP Special Opportunities, LLC and
                                        Charles W. Ergen*