1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Lead Case No. 12-12080-scc Adv. Proc. No. 13-01390-scc

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7  LIGHTSQUARED, INC., et al.,

8            Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10  HARBINGER CAPITAL PARTNERS LLC, et al.,

11            Plaintiffs,

12         - against -

13  ERGEN, et al.,

14            Defendants.

15  - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            January 9, 2014

21            10:07 AM

22  B E F O R E:

23  HON. SHELLEY C. CHAPMAN

24  U.S. BANKRUPTCY JUDGE

25

2

1

2    Confirmation Hearing

3

4    Adversary Proceeding: 13-01390-scc HARBINGER CAPITAL PARTNERS

5    LLC, et al. v. ERGEN, et al.

6

7    TRIAL

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Dena Page

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1
2    A P P E A R A N C E S :
3    MILBANK, TWEED, HADLEY & MCCLOY LLP
4         Attorneys for Debtors
5         One Chase Manhattan Plaza
6         New York, NY 10005
7
8    BY:   KAREN GARTENBERG, ESQ.
9          ALAN J. STONE, ESQ.
10         MATTHEW S. BARR, ESQ.
11         MICHAEL L. HIRSCHFELD, ESQ.
12
13
14   KIRKLAND & ELLIS LLP
15         Attorneys for Special Committee
16         601 Lexington Avenue
17         New York, NY 10022
18
19   BY:   JOSHUA A. SUSSBERG, ESQ.
20
21
22
23
24
25

4

1   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2        Attorneys for Ad Hoc Group of Preferred LP Holders

3        Four Times Square

4        New York, NY 10036

5

6   BY:   SHANA A. ELBERG, ESQ.

7

8

9   WHITE & CASE LLP

10        Attorneys for Ad Hoc Secured Group of Lenders

11        1155 Avenue of the Americas

12        New York, NY 10036

13

14   BY:   THOMAS E. LAURIA, ESQ.

15        JULIA M. WINTERS, ESQ.

16        ANDREW C. AMBRUOSO, ESQ.

17        GLENN M. KURTZ, ESQ.

18

19

20   SIMPSON THACHER & BARTLETT LLP

21        Attorneys for JPMorgan Chase Bank, N.A.

22        425 Lexington Avenue

23        New York, NY 10017

24

25   BY:   SANDY QUSBA, ESQ.

5

1

2   AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for U.S. Bank N.A. as Administrative Agent

4        One Bryant Park

5        New York, NY 10036

6

7   BY:   PHILIP C. DUBLIN, ESQ.

8         DEBORAH J. NEWMAN, ESQ.

9

10

11  BINGHAM MCCUTCHEN LLP

12        Attorneys for Centaurus Capital and

13         Melody Business Finance

14        399 Park Avenue

15        New York, NY 10022

16

17  BY:   JEFFREY S. SABIN, ESQ.

18

19

20  MORITT HOCK & HAMROFF, LLP

21        Attorneys for Crown Castle USA, Inc.

22        400 Garden City Plaza

23        Garden City, NY 11530

24

25  BY:   LESLIE A. BERKOFF, ESQ.

6

1

2    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

3          Attorneys for Harbinger Capital Partners LLC

4          1633 Broadway

5          New York, NY 10019

6

7    BY:    DAVID M. FRIEDMAN, ESQ.

8            ADAM L. SHIFF, ESQ.

9            JED I. BERGMAN, ESQ.

10

11

12    WILLKIE FARR & GALLAGHER LLP

13          Attorneys for L-Band Acquisition

14          787 Seventh Avenue

15          New York, NY 10019

16

17    BY:    MATTHEW FREIMUTH, ESQ.

18            RACHEL C. STRICKLAND, ESQ.

19            TARIQ MUNDIYA, ESQ.

20

21

22

23

24

25

7

1

2  STROOCK & STROOCK & LAVAN LLP

3       Attorneys for Fortress

4       180 Maiden Lane

5       New York, NY 10038

6

7  BY:   KRISTOPHER M. HANSEN, ESQ.

8

9

10  STROOCK & STROOCK & LAVAN LLP

11       Attorneys for Fortress

12       2039 Century Park East

13       Los Angeles, CA 90067

14

15  BY:   FRANK A. MEROLA, ESQ.

16

17

18  SULLIVAN & CROMWELL LLP

19       Attorneys for Dish and EchoStar

20       125 Broad Street

21       New York, NY 10004

22

23  BY:   BRIAN T. FRAWLEY, ESQ.

24       BRIAN D. GLUECKSTEIN, ESQ.

25       ROBERT J. GIUFFRA, ESQ.

**8**

1

2   MAGNOZZI & KYE, LLP

3           Attorneys for Oracle America, Inc.

4           23 Green Street

5           Suite 302

6           Huntington, NY 11743

7

8   BY:   AMISH R. DOSHI, ESQ.

9

10

11   KARPE LAW

12           Attorneys for ACE American Insurance

13           44 Wall Street

14           12th Floor

15           New York, NY 10005

16

17   BY:   KAREL S. KARPE, ESQ.

18

19

20

21

22

23

24

25

9

1

2   DONTZIN NAGY & FLEISSIG LLP

3        930 Madison Avenue

4        New York, NY 10075

5

6   BY:   RACHEL K. CLAPP, ESQ.

7         MATTHEW S. DONTZIN, ESQ.

8         TIBOR L. NAGY, JR., ESQ.

9         DAVID A. FLEISSIG, ESQ.

10

11  ALSO PRESENT:  (TELEPHONICALLY)

12        JOHN WANDER, The Blackstone Group

13

14

15

16

17

18

19

20

21

22

23

24

25

**LIGHTSQUARED, INC., ET AL.**

10

1                          P R O C E E D I N G S

2                  THE COURT:  Good morning.  Please have a seat.

3                  All right.  Good morning folks.  There is an overflow

4       room.  I know everyone would like to be in this room.  As I

5       mentioned earlier in the week, if there are members of the

6       press, I would strongly encourage you to use the overflow room

7       so that members of the trial teams can be in this room and be

8       comfortable in this room.

9                  I'm not seeing any volunteers.

10                 All right.  We're going to be at this for a long time.

11      So I'm really going to urge you to try to accommodate each

12      other.

13                 I see Ms. Schwartz standing in the background with her

14      coat on.  She needs to get a seat.

15                 All right, Mr. Sussberg.

16                 MR. SUSSBERG:  Good morning, Your Honor.

17                 THE COURT:  Good morning.

18                 MR. SUSSBERG:  I wanted to make a short statement

19      before the opening statements.

20                 THE COURT:  Okay.

21                 MR. SUSSBERG:  And then I know Mr. Stone wants to lay

22      some predicates from a procedural standpoint before --

23                 THE COURT:  Sure.

24                 MR. SUSSBERG:  -- the opening statements begin.

25                 THE COURT:  Okay.

**LIGHTSQUARED, INC., ET AL.**

11

1          MR. SUSSBERG:  And this is very brief, Your Honor.

2          But as previewed at the hearing on Tuesday, we learned

3  yesterday from Mr. Lauria that LBAC provided written notice of

4  termination of the plan support agreement because a milestone

5  had not been satisfied.

6          As expected, on the heels of Tuesday's hearing before

7  Your Honor, the special committee and the debtors spent the

8  last forty-eight hours conversing with most all of the

9  constituents in this room, including the ad hoc group of LP

10  lenders and MAST.

11          As we stand here today, Your Honor literally in the

12  throes of analyzing a multitude of possibilities and solutions,

13  what became most clear to the special committee that was

14  important, and I think Your Honor referenced this as well on

15  Tuesday, was that moving forward in the adversary proceeding is

16  of critical importance in these cases, and we agree with that.

17  And through the adversary proceeding, Your Honor, a

18  demonstration by the debtors of inequitable conduct by DISH and

19  SPSO could yield remedies that result in solutions.

20          And just briefly, Your Honor, inequitable conduct

21  could lead to the fashioning of a remedy that results in a

22  turnover of profits to the debtors' estates of any profits that

23  would be realized on account of the purchases made by SPSO.

24  Inequitable conduct could lead to the fashioning of an

25  equitable subordination remedy and a differentiation between

1   SPSO on the one hand and the non-SPSO lenders on the other

2   hand.  And this, too, could lead to an overall restructuring

3   solution.

4          Now the debtors' standalone plan as Your Honor is

5   aware, the confirmation of which is scheduled to go forward on

6   January 21st, does not require or contemplate a specific

7   outcome with respect to this adversary or any desired outcome

8   that's contemplated in the adversary proceeding.

9          But that being said, Your Honor, a remedy that's

10  fashioned as part of this adversary proceeding can make that

11  standalone plan much more attractive, especially to currently

12  non-constituents that are not supporting that plan, or

13  constituents that aren't supporting that plan.

14         The special committee Your Honor stands here today

15  before you simply to note --

16         THE COURT:  Did you mean what you just said the first

17  time, did you mean non-constituents as well as constituents?

18         MR. SUSSBERG:  It could be all encompassing.  Most

19  importantly, it could mean more support from the constituents

20  in this room, but it could be others as well.

21         And, Your Honor, we simply stand here to note that

22  there are various possibilities, all of which are under

23  analysis, as always, an incredibly fluid situation.  But we

24  think it's important, as has always been the case, to move

25  forward with this adversary proceeding and potentially unlock

**LIGHTSQUARED, INC., ET AL.**

13

1   solutions can yield value in an overall maximizing solution.

2            THE COURT:  Can I ask one question?  And I don't know

3   if you're the right person to answer it.  In light of the

4   termination of the plan support agreement, does that affect the

5   adversary in the sense of moving the goal post, if you will?

6   Will I now be hearing as part of the so-called -- or the

7   inequitable conduct, your words, will that include the recent

8   events relating to the termination of the plan support

9   agreement?

10           MR. SUSSBERG:  Your Honor, I would turn the podium

11  over to Mr. Lauria to answer that question --

12           THE COURT:  Okay.

13           MR. SUSSBERG:  -- because I think that's a question

14  for him.

15           THE COURT:  Okay.  Thank you.

16           MR. LAURIA:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. LAURIA:  Tom Lauria with White & Case for the ad

19  hoc group of LP secured lenders.

20           I think just to answer the Court's question, we're

21  assessing all of our options at this point.  I think it's

22  important for the Court to know that pursuant to the plan

23  support agreement and as reflected in the notice that we

24  received on Tuesday night, the termination of the plan support

25  agreement is not effective until 11:59 on Friday, tomorrow.

**LIGHTSQUARED, INC., ET AL.**

1            THE COURT:  Because it's a three-day lead, right?

2            MR. LAURIA:  Right, right.

3            So, you know, we're continuing to engage in

4    discussions with LBAC and DISH and we're considering all of our

5    alternatives.

6            We've had -- as Mr. Sussberg referenced, we're in

7    discussions with the companies and its advisors, we're talking

8    to the other stakeholders and we're trying to figure out what

9    the consequences are and what they may mean for the trial on

10   the adversary.

11           You may find the ad hoc group taking an active role or

12   a more active role in connection with this adversary depending

13   on where we come out --

14           THE COURT:  Well, that's kind of where I'm going to.

15           MR. LAURIA:  Right.

16           THE COURT:  Because I don't want to find myself in a

17   situation where you get to that -- the end of that seventy-two

18   hours and then you say you need a do-over in any respect.

19           So we're starting for all purposes --

20           MR. LAURIA:  Right.

21           THE COURT:  -- with eyes wide open as to that

22   ambiguity that you have in your go-forward position, right?

23           MR. LAURIA:  Right.  We understand completely.

24           THE COURT:  Okay.

25           MR. LAURIA:  And, you know, if we're, you know,

**LIGHTSQUARED, INC., ET AL.**

15

1  jumping in at some point, we understand we're jumping in and

2  we're not going for a do-over.

3  THE COURT:  Okay.  All right.  Yes, good morning.

4  MR. GIUFFRA:  Your Honor, can I just be heard for a

5  second.

6  THE COURT:  Yes, you can, but I neglected to take the

7  role of the folks on the phone.  So just hold it for one second

8  and let me do that and then we'll move forward.

9  On the phone this morning we have Mr. Brown from White

10  & Case, Mr. Daigle from Capital Research, Mr. Ehmer from Silver

11  Point, Mr. Enos from Young Conaway, Mr. Fraser from Fortress,

12  Ms. Iacob from Debt Wire, Ms. Lee from Milbank, Mr. Sanjana

13  from Reorg Research, Mr. Siegel from Stroock, Mr. Smalley from

14  Seaport, Mr. Wander from Blackstone, Mr. Wilson from Skadden,

15  Mr. Zatz from White & Case.

16  All right.  I apologize.  Go ahead.

17  MR. GIUFFRA:  Yes, Your Honor.  Robert Giuffra,

18  Sullivan & Cromwell, for DISH and EchoStar.  I just wanted to

19  make three points quickly.

20  THE COURT:  Okay.

21  MR. GIUFFRA:  LBAC, as best I can tell, is not a party

22  to this adversary proceeding.

23  THE COURT:  That's correct.

24  MR. GIUFFRA:  And it would in our view be a due

25  process problem to start introducing evidence and taking

**LIGHTSQUARED, INC., ET AL.**

16

1  evidence in the adversary proceeding where LBAC is not a party

2  for some future claim that I don't believe is pled in the

3  complaint.

4  And second, Your Honor, there are no equitable claims

5  that are being brought against DISH or EchoStar, only that

6  single tortious interference claim.

7  So I just think we need to be careful about -- this

8  case, as Your Honor properly noted at the last hearing, is

9  focused on what's before the Court, not some future speculative

10  claim.

11  THE COURT:  Right.  Well, I think we all agree.

12  MR. GIUFFRA:  Okay, thank you, Your Honor.

13  THE COURT:  I simply wanted to articulate what seemed

14  obvious to me was an ambiguity that was facing the ad hoc group

15  in light of where we are with respect to the termination of the

16  LBAC bid, and that's why I said what I said.  I quite agree

17  with you.

18  I'm trying the second amended complaint and the

19  complaint and that's it.

20  MR. GIUFFRA:  Okay.  Thank you very much, Your Honor.

21  THE COURT:  Okay.  Okay.

22  MR. LAURIA:  Right.  Thank you, Your Honor.  We're in

23  agreement.

24  THE COURT:  Okay.

25  MR. LAURIA:  There is no dispute on this.

1            THE COURT:  Right.

2            MR. LAURIA:  We're going to figure out where we are

3    and if we need to, we'll --

4            THE COURT:  You'll let us know in real time.  Okay,

5    very good.

6            MR. LAURIA:  Right, right.  Thanks.

7            THE COURT:  Okay, very good.

8            All right.  Is there anything else in the nature of

9    housekeeping matters that we should do before we get started?

10           Good morning, Mr. Stone.

11           MR. STONE:  Your Honor, good morning.  Alan Stone,

12   Milbank, Tweed, Hadley & McCloy here on behalf of the debtors.

13           Your Honor, I rise only to say that we have invoked

14   the Rule and that we believe that that applies to opening

15   statements as well and that recipient witnesses should not be

16   informed or given transcripts of the openings or any

17   examination before they testify.

18           THE COURT:  Okay.  Okay.  All right.  Very good.

19           Mr. Barr?

20           MR. BARR:  Good morning, Your Honor.  Matthew Barr of

21   Milbank, Tweed, Hadley & McCloy on behalf of the LightSquared

22   plaintiff debtors.

23           Your Honor, this lawsuit stems from yet another

24   episode in a pattern that --

25           THE COURT:  Are you actually starting now?

**LIGHTSQUARED, INC., ET AL.**

18

1           MR. BARR:  I'm sorry.

2           THE COURT:  I thought you were telling me something

3   else in a preliminary nature.

4           Before you actually start --

5           MR. BARR:  Yes, Your Honor.

6           THE COURT:  -- I need to tell you folks that I need to

7   go to a judge's meeting today for fifteen minutes at 12:30.

8   Ordinarily, I wouldn't impose a fixed time for a break, but I

9   have a mandatory meeting that I have to do.

10          So we can see where we are at 12:30 and that can

11  either become your forty-five-minute or hour-long lunch break,

12  whatever you like, or we can simply make that a true fifteen-

13  minute break and come back and keep going.

14          The rules of engagement are we're at your disposal.

15  I'll keep going without a break for a really long time.  So I

16  just ask you to let me know when you want to take a break and

17  just keep an eye on the witnesses once they take the stand.

18          MR. BARR:  Great.

19          THE COURT:  So now you can actually begin.

20          MR. BARR:  Now I can start over.

21          THE COURT:  Yes.

22          MR. BARR:  Thank you, Your Honor.

23          MR. KURTZ:  Your Honor, can I make one clarification?

24          THE COURT:  Yes, Mr. Kurtz.

25          MR. KURTZ:  Glenn Kurtz from White & Case on behalf of

**LIGHTSQUARED, INC., ET AL.**

19

1   the ad hoc group.  Steve Zell is in the room and I've confirmed

2   with debtors counsel that invoking the rule doesn't apply to

3   experts.  If there's an objection from anyone else --

4           THE COURT:  All right.  Any issue?  Anyone have an

5   objection?

6           MR. FRAWLEY:  No, Your Honor, thank you.

7           THE COURT:  Mr. Mundiya?

8           MR. MUNDIYA:  No objection, Your Honor.

9           THE COURT:  Okay.  All right.  Very good.  Is he the

10   only one that is coming in under that exception at the moment?

11           MR. STONE:  At the moment.  Mr. Hootnick may appear

12   from time to time at the trial.

13           THE COURT:  And Mr. Derrough as well?

14           MR. STONE:  Mr. Derrough is going to be here for his

15   testimony.

16           THE COURT:  Okay.  All right.  Okay.  Very good.

17           MR. BARR:  Your Honor, before I start, I'm going to do

18   an opening for the LightSquared plaintiffs.

19           THE COURT:  Okay.

20           MR. BARR:  Mr. Friedman then is going to do an opening

21   for his intervention.

22           THE COURT:  Okay.

23           MR. BARR:  And then I don't know how many on the other

24   side.

25           THE COURT:  Okay.  All right.  I have read everything

1   that you've submitted, including the brief that was submitted

2   this morning by SPSO and Mr. Ergen.  So don't feel obligated to

3   go through every single point.

4           MR. BARR:  Excellent.  Thank you, Your Honor.

5           So we're starting again.  This lawsuit, Your Honor,

6   stems from yet another episode in a pattern that Mr. Ergen and

7   his controlled entities DISH and EchoStar employ against

8   distressed companies, in particular in Chapter 11 cases, to

9   gain controlling positions in debt and securities for strategic

10  purposes to steer the outcome of those cases.

11          This situation is even more interesting, Your Honor,

12  because those trades were done in the face of contract

13  provisions that restrict those entities from purchasing the

14  debt.

15          Unfortunately, for Mr. Ergen in this case his

16  controlled entities DISH and EchoStar were prohibited from

17  investing in LightSquared's debt and equity securities and

18  capital structure and their subsidiaries and affiliates were

19  restricted as well, because they are direct competitors and the

20  credit agreement and corporate governance wanted to restrict

21  and prevent direct competitors from being involved in the

22  capital structure for obvious reasons.

23          The evidence will show that LightSquared Spectrum is a

24  valuable asset and strategic asset in the hands of DISH and

25  EchoStar, and that Mr. Ergen and others did what they believed

1   necessary to put themselves in the pole position to gain

2   control of those assets.

3          After inquiring into whether DISH and EchoStar could

4   directly make purchases of the securities and the debt, Mr.

5   Ergen, Mr. Kaiser and others came up with what they believed

6   was a work around the restrictions.

7          Their work around, however, doesn't work and they've

8   harmed these estates.

9          Your Honor should not allow this type of conduct to

10  stand, as other judges in this district haven't allowed it to

11  standby the same parties, at best under similar circumstances.

12         And I say at best under similar circumstances, Your

13  Honor, because this is different because Mr. Ergen and his

14  friends have come up with a scheme to get around restrictions

15  that prevented him from doing exactly what he did.

16         Your Honor, there are some basic undisputed facts that

17  you will hear during the trial.

18         In 2011, Mr. Ergen, who is the executive chairman of

19  both DISH and EchoStar, began looking at the LightSquared debt.

20  At that time he asked Mr. Jason Kaiser, who is the treasurer

21  and vice-president of corporate development at DISH and serves

22  as a similar role at EchoStar, to check to see if DISH could

23  buy the LightSquared debt and securities.

24         Mr. Kaiser checked with Sullivan & Cromwell, DISH's

25  outside counsel, and was told that DISH and EchoStar were not

**LIGHTSQUARED, INC., ET AL.**

22

1   permitted to buy the debt under the terms of the credit

2   agreement.

3          You will hear then that Mr. Kaiser asked Sullivan &

4   Cromwell whether Mr. Ergen could buy the debt personally.

5          We don't know the answer to that, because Sullivan &

6   Cromwell and the defendants invoked a privilege and we don't

7   know how they answered.  But we do know that Mr. Ergen through

8   SPSO started to the buy the debt after that question.

9          The trades were placed by Mr. Kaiser and executed by

10  Sound Point Capital Management.

11         To accomplish these trades, Mr. Ergen set up two

12  special purpose vehicles with a variation of the name Bal

13  Harbor and capitalized each of them with ten dollars.

14         Just as the first trade of LightSquared debt was about

15  to close, Mr. Kaiser realized that the Bal Harbor registration

16  documents and forms listed DISH and EchoStar's corporate

17  headquarters address on it.  To protect the identity of the

18  ultimate purchaser and not lead people to DISH and EchoStar's

19  doorstep, Mr. Kaiser quickly with Mr. Ketchum set up two

20  different special purpose vehicles, SP Holdings and SPSO and

21  similarly capitalized each of them with ten dollars.

22         The evidence will show, however, that these new

23  entities failed to insulate DISH and EchoStar from the trades

24  because you can't hide from the ultimate beneficiary of the

25  trades.

**LIGHTSQUARED, INC., ET AL.**

23

1          Even though the addresses were changed, SPSO was run

2     by DISH/EchoStar executives.  It was run out of their offices.

3     They used DISH/EchoStar e-mails, phones, facilities, et cetera,

4     Your Honor.

5          The discovery that was produced by SPSO in this case

6     was searched in and pulled from servers at DISH and EchoStar.

7          The evidence will show that SPSO is really

8     DISH/EchoStar and thus, Your Honor, the scheme established was

9     a failed attempt to get around the credit agreement

10    restrictions.

11         Mr. Ergen set out to purchase a blocking position

12    through SPSO and eventually purchased more than half of the LP

13    debt and tried to purchase a substantial majority of the LP

14    preferred securities.

15         There are three important areas of facts or inferences

16    that are in dispute, Your Honor, whether the purchases of the

17    debt were personal investments, and that's what you hear the

18    defendants try to convince you; whether the purchases of dealt

19    were authorized in any way by DISH; and whether there was an

20    effort to delay the closing of the trades.

21         With respect to whether the trades were personal

22    investments, Your Honor, the evidence will show that leading up

23    to the LP debt trades, DISH was aggressively pursuing Spectrum

24    Holding companies in the hopes of finding a suitable partner

25    for which it to align.

**LIGHTSQUARED, INC., ET AL.**

24

1    DISH was motivated by a desire to build out a network

2    that it was ill prepared to do on its own.

3    The evidence will show that LightSquared, and in

4    particular its Spectrum, was of great interest to DISH as a

5    strategic partner and from a strategic standpoint.

6    It is well settled and well known in the industry that

7    certain of LightSquared Spectrum could be successfully paired

8    with certain spectrum of DISH and create tremendous value for

9    the DISH EchoStar entities.

10    Mr. Ergen himself recognized these potential synergies

11    in 2011 when he admits to having first analyzed the possibility

12    that buying LightSquared would be a good thing for DISH.

13    Mr. Ergen, having purchased other distressed

14    securities in the past for DISH, was aware that there may be

15    restrictions in credit agreements and other documents

16    preventing competitors from buying in a capital structure.

17    So he asked Mr. Kaiser to find out whether DISH and

18    EchoStar can buy the securities.

19    He didn't ask just once, Your Honor.  The evidence

20    will show that he continually asked.

21    And from time to time Mr. Kaiser checked to see if

22    changes -- if things have changed, for example, the filing of

23    the Chapter 11 case, whether that had the restrictions of DISH

24    and EchoStar fall away so that they can directly purchase the

25    securities.

**LIGHTSQUARED, INC., ET AL.**

1          He was told that they were not and they couldn't.

2          So Mr. Ergen responded to Mr. Kaiser, continue to

3    purchase the debt and purchase a controlling position if the

4    company, meaning DISH and EchoStar, can't.

5          Mr. Kaiser fulfilled the orders of Mr. Ergen and

6    continued to buy the securities.

7          The evidence will also show that DISH's resources were

8    used to accomplish the trades.

9          In addition to the time that the executive vice-

10   president and treasurer of DISH and EchoStar used or employed

11   in closing these trades and Mr. Ergen the executive chairman,

12   largest shareholder, voting control member of DISH and

13   EchoStar -- as I mentioned DISH's phones, DISH's e-mails and

14   DISH's facilities were used in connection with each and every

15   trade that was made.

16         And the money that was used for the trades, although,

17   Your Honor, we have been told comes from and the evidence shows

18   comes from Mr. Ergen's family trust account, was managed by the

19   same management firm that manages DISH and EchoStar's cash and

20   investments.

21         The trades were also placed using the same investment

22   advisor Sound Point that DISH has used in the past, at least

23   once when buying distressed assets.

24         The record will also show in a presentation to the

25   DISH and EchoStar board in May of 2013 that Mr. Ergen told the

1    board that the purchases of the debt in LightSquared compliment

2    the acquisition strategy for the assets of LightSquared and

3    that the purchases of the debt would allow DISH to influence

4    these Chapter 11 cases.

5         Furthermore, the evidence will show a personal

6    congratulations sent to Mr. Ergen by Mr. Ketchum, Mr. Ketchum

7    of Sound Point, who is the party that executed each of the

8    trades on behalf of Mr. Ergen and Mr. Kaiser, congratulating

9    him for purchasing a satellite spectrum company upon the

10   purchase by SPSO of a blocking position in the LP debt.

11        This doesn't sound, Your Honor, like a coupon and a

12   collateral package that Mr. Ergen likes for his personal

13   investment that the defendants are going to want you to

14   believe, Your Honor, but it does speak volumes of the true

15   intended beneficiary of the LightSquared debt purchases, which

16   is DISH, Your Honor, especially in connection with their

17   strategy as Mr. Ergen complimented with his debt purchases of

18   purchasing the assets.

19        With respect to whether the purchase of the debt were

20   authorized by DISH, Your Honor, the evidence will show by the

21   nature of their very positions, Mr. Ergen and Mr. Kaiser had

22   the authority to purchase the debt for DISH.  And the evidence

23   will provide that, Your Honor.

24        That Mr. Ergen was asked by board members, including

25   DISH in-house counsel and Tom Cullen, DISH's director of

1    corporate development, the person at DISH that is responsible

2    for their Spectrum strategy, whether there is any truth to the

3    rumors that Mr. Ergen was buying LightSquared's debt.

4           Mr. Ergen's response was there may be some truth to

5    that.

6           The board's choice to sit idly by as Mr. Ergen

7    finished the job was nothing more than the preverbal wink and a

8    nod, Your Honor.

9           DISH and EchoStar's boards were dominated by inside

10    directors who worked for Mr. Ergen.

11           So the fact that the defendants are telling us that

12    they didn't have the authority under the investment guidelines

13    to purchase more than -- a little more than one hundred million

14    dollars of securities at any time in any distressed entity is a

15    mere formality, since he controlled the outcome of basically

16    any discussion and any decision.

17           DISH also ultimately accepted the benefits of Mr.

18    Ergen's debt purchases.  As I mentioned, Mr. Ergen told the

19    board that my debt purchases compliment and are going to help

20    you control LBAC, these Chapter 11 cases, when you make your

21    bid for the company.

22           Well, as we all know, DISH ultimately did make the bid

23    for the company and bought LBAC from Mr. Ergen for a dollar.

24           These facts establish that SPSO is nothing other than

25    DISH's proxy with respect to executing the trades in a global

**LIGHTSQUARED, INC., ET AL.**

28

1   holistic plan to gain control of these Chapter 11 cases and to

2   take these assets through its bid.

3         The trades were intentionally delayed, Your Honor, and

4   the evidence will show that the hung trades were intentionally

5   delayed.

6         They will try to convince you that it was for economic

7   purposes.  The evidence, however, doesn't make that clear at

8   all.  We think, and as we've put in our documents, there were

9   other reasons.

10        But irrespective of the motivation, Your Honor, the

11   delay, as Your Honor was here with us at all times, caused

12   significant confusion in these Chapter 11 cases, and we submit

13   caused harm to the debtors in these Chapter 11 cases, and the

14   timing of each of those hung trades and what came from those

15   hung trades is very suspect, Your Honor.

16        Taking all of these in combination establishes, Your

17   Honor, in our view that Mr. Ergen's story is just not credible,

18   that these were personal investments through SPSO.

19        When Mr. Ergen takes the stand, hopefully in the next

20   couple of days, you will hear a very nice polished story that

21   ties everything up in a neat package.

22        I don't believe, Your Honor, I need to remind you to

23   think critically when you hear the testimony, but what I

24   thought made sense is that I would preview a couple of points

25   that you'll hear from Mr. Ergen and explain why the Court

**LIGHTSQUARED, INC., ET AL.**

1    should be skeptical.

2         You will hear testimony that Mr. Ergen spent somewhere

3    around 700 million dollars of his own money without once

4    thinking that LightSquared Spectrum could be a strategic asset

5    for DISH, the entity that he controls.

6         But the following undisputed facts show why that

7    simply cannot be the case.

8         Prior to pursuing LightSquared, DISH had just acquired

9    two other MS S companies.  Less than two years before, DISH had

10   itself explored the idea of pairing its Spectrum with

11   LightSquared Spectrum.

12        DISH admittedly needed a partner to build out a

13   network because DISH was ill prepared to do so on its own.

14        Mr. Ergen admitted to the DISH board and the EchoStar

15   board that the debt purchases complimented LBAC's acquisition

16   strategy for the LightSquared assets and would allow them to

17   influence the Chapter 11 cases.

18        In addition, you will hear testimony that Mr. Ergen

19   spent 700 million dollars from his family trust and that while

20   Mr. Ergen admits that that was the largest dollar amount

21   personally invested ever, he claims he never once disclosed it

22   to his wife, who importantly is a DISH board member and very

23   importantly is a trustee of the family trust.

24        Ultimately the evidence will show that the credit

25   agreement closed a door for DISH, that Mr. Ergen, through SPSO,

**LIGHTSQUARED, INC., ET AL.**

30

1    created a window.

2         Your Honor, the harm to LightSquared as a result of
3    this conduct has been significant.

4         Mr. Ergen first used the improper purchases of the
5    debt in equity securities to confuse and frustrate
6    LightSquared's attempt to negotiate with stakeholders, as the
7    hung trades made it virtually impossible to identify the owner
8    of those securities and the debt.

9         It also made it impossible for those parties to talk
10   to us, because they had a pending sale of their securities and
11   their debt to somebody else.

12        He used that debt position in LBAC's bid to distract
13   others from getting involved in the Chapter 11 cases.

14        And now, on the eve of confirmation you heard, Your
15   Honor, DISH withdrew its bid and terminated the PSA.

16        One can only speculate why they did that at this point
17   in time, Your Honor, whether it's to force the special
18   committee to run to them to try to revitalize that purchase,
19   Your Honor, whether they're trying to buy it at a lower price,
20   or whether as a competitor this was part of their scheme to
21   bring us to the brink when we know we're in a cash poor
22   position to either liquidate or for them to put a competitor
23   out of business, Your Honor.

24        In any event, you will hear things like loan-to-own
25   testimony.  Mr. Ergen's loan-to-own mission on behalf of DISH

**LIGHTSQUARED, INC., ET AL.**

31

1     here has failed for the moment, but the harm to LightSquared

2     has been done.

3         The evidence presented at trial will fully satisfy

4     LightSquared's burden of proof of these proceedings.

5         And I thank you, Your Honor.

6         THE COURT:  Thank you, Mr. Barr.

7         Mr. Friedman.

8         MR. FRIEDMAN:  Your Honor, thank you.  David Friedman

9     for Harbinger Capital Partners.

10         Your Honor, the vast majority of my remarks will be

11     focused on a single issue.  It's an issue that I refer to

12     tongue and cheek as ergonomics.  Ergonomics being the

13     advancement of a factual theory that is demonstrably

14     overwhelmingly at odds with the evidence.

15         That factual theory, Your Honor, is that Charles Ergen

16     bought this LightSquared debt personally.

17         I'd like to point out -- and I will do my best not to

18     overlap with Mr. Barr and to the extent I do I'll be very brief

19     on those points, I'd like to make ten points that any one of

20     which would refute the notion that Mr. Ergen bought this debt

21     personally and collectively, overwhelmingly rebut that notion.

22         Point one, Your Honor, is what did Mr. Ergen do when

23     he first became interested in LightSquared debt?  Did he speak

24     to his personal lawyers?  Did he speak to his personal

25     financial advisors?  Or did he go to DISH?

**LIGHTSQUARED, INC., ET AL.**

1          The answer, of course, is he went to DISH.  He spoke

2    to Mr. Kaiser.  He spoke to Sullivan & Cromwell.  This is in

3    2011.

4          And as Mr. Kaiser testified, after speaking with

5    Sullivan & Cromwell, he says, "I told him," I told Charlie

6    Ergen, "that the companies couldn't buy it."

7          By the way, this is 2011.  This is at a point when

8    EchoStar is the only disqualified company.  EchoStar is the

9    only one.  And he sought advice from Sullivan & Cromwell.  And

10   the only disqualified company relating to Mr. Ergen was

11   EchoStar, not DISH yet.  And even on that basis, Sullivan &

12   Cromwell advised Mr. Kaiser who relayed to Mr. Ergen that

13   neither DISH nor EchoStar could buy the debt.

14         Point number two, Your Honor, is Mr. Ergen's own words

15   which indicate the fact that the only reason he would possibly

16   consider buying this debt for his personal account is if and

17   only if DISH could not be a buyer.

18         So on October 4th of 2012, Mr. Ergen instructs Mr.

19   Kaiser, quote, it's on the screen, "if we can't be sure the

20   company can buy them" --

21         THE COURT:  I'm sorry.  Mr. Friedman, hold on.  Am I

22   supposed to be looking at the screen?  It was flashing pages

23   and I turned it off to not distract me, but if you want me to

24   be looking, I will turn it back on.

25         MR. FRIEDMAN:  Okay.  I suppose I'd prefer you to look

**LIGHTSQUARED, INC., ET AL.**

1   at the screen.

2           THE COURT:  I didn't know if the gentleman in the back

3   was simply testing it or whether I was supposed to be looking.

4   Hold on.  Let me catch up with you.

5           Go ahead.

6           MR. FRIEDMAN:  So Mr. Ergen in October of 2012 says to

7   Mr. Kaiser, "Jay, if we can't be sure the company can buy them,

8   then I am interested to increase my position at the seventy-

9   five level at least up to a thirty-three percent ownership

10  level of the class."

11          The point being that Mr. Ergen was, if you will, a

12  default buyer.  He would be the guy that would buy it if and

13  only if DISH couldn't.

14          Now, point three, Your Honor, I think addresses sort

15  of the obvious question.

16          One of the ways to test whether Mr. Ergen really

17  bought this for his personal account is to inquire, is this

18  something you do?  You know, as a matter of course, do you make

19  personal investments in Spectrum companies?  Do you make

20  personal investments at this magnitude?

21          So the first point, Your Honor, is that Mr. Ergen had

22  never recalled making a personal investment above a hundred

23  million dollars before.  And he was quite candid in saying --

24  if you could put it up on the screen, he was asked the

25  question, "Is it fair to say that LightSquared is the largest

**LIGHTSQUARED, INC., ET AL.**

34

1   personal -- in terms of dollars, largest personal investment

2   you've made in any one company other than DISH and EchoStar?"

3   Mr. Ergen qualified, "And the U.S. Government," meaning that he

4   had purchased Treasury bills as well -- "company, right."  He

5   said, "Company, yes."  It's the largest personal investment he

6   ever made.

7           The second point, Your Honor, is that he spent all his

8   money.  He spent all his non-DISH money on these debt

9   purchases.

10          He testified he spent about 800 million dollars buying

11  LightSquared.  Then he said, "It's my money, I spent most of my

12  personal money to do it, I mean other than" -- then he says,

13  "Take it back.  The vast majority of my money is in DISH.  But

14  in terms of my money outside of DISH, I spent most of my

15  money."

16          Then the question is, "Well, are you a personal

17  spectrum buyer?  Is this something that you do?"  So Mr.

18  Leblanc asked him these questions and he asked him, "Had you

19  ever personally bought distressed debt in a spectrum-owning

20  asset before?"

21          Answer, "I don't think so."

22          "Have you ever bought distressed debt in any company

23  that you would consider a competitor of DISH?"

24          Answer, "I don't think so."

25          "Have you ever invested personally in any company that

**LIGHTSQUARED, INC., ET AL.**

35

1  you'd consider as a strategic investment for DISH?"

2          Answer, "I don't think so."

3          The next point, Your Honor, is, well, if it's a

4  personal investment -- you know, I can't speak for all husbands

5  and wives out there, but if it's a personal investment you

6  would think there would be some discussion within the marital

7  unit as to, you know, I'm going to -- you know, honey, I'm

8  going to spend all my money on some Spectrum assets, what do

9  you think?

10          He made it very clear.  He was asked a question, "I

11  may have asked this already, but indulge me.  You never told

12  her -- she may not have asked you, but you never told her that

13  you purchased a debt personally, right?"

14          Answer, "No."

15          Now, Your Honor, this point is even more incredible

16  when you consider what we learned yesterday about the

17  management of Mr. Ergen's funds.

18          So all the money, all the 700 million dollars came

19  from a trust established in Mr. Ergen's daughter's name, a

20  trust, again, in which both he and his wife serve as trustees.

21          So on top of the fact that he took all his money to do

22  something he had never done before from a trust established

23  from his daughter, he never told the other trustee, his wife,

24  that he was even doing this.

25          And this was a trust that was conservatively managed

**LIGHTSQUARED, INC., ET AL.**

1   with A-rated securities, fully diversified, and it was

2   completely depleted to buy this debt.

3           So, Your Honor, I ask you to listen to the evidence

4   and just ask the question, is it remotely credible that Mr.

5   Ergen liquidated several hundred million dollars of

6   conservatively managed A-rated diversified assets in his

7   daughter's trust for which he and his wife serve as trustees to

8   make a "personal investment in the distressed debt of a single

9   corporate issuer that was either on the brink of or already in

10  bankruptcy"?

11          Your Honor, this is simply a stunningly unbelievable

12  position.

13          And the only reason, Your Honor -- what that forces us

14  to conclude is that the only reason that Mr. Ergen ever would

15  have done that, the only reason is that the money was never at

16  risk.   The money that he took from his daughter's trust fund

17  was never at risk.

18          Why?  Because he controlled DISH and he had the power,

19  the inclination and the means to force DISH to make a bid that

20  would monetize and recycle those funds back to his daughter's

21  trust fund.

22          Point four, Your Honor, when people make personal

23  investments, they, you would think, would speak to their

24  personal advisors.

25          I think like most people, I have a business, my

1   business has its accountants, my business has its, you know,

2   executive directors, those people.  I go home, I have my

3   personal issues, I deal with my personal lawyer, my personal

4   financial advisor, my estate planner.  That's how most people

5   run their lives.

6         Mr. Ergen had a family office.  He had the capacity to

7   go through his family office.  He had personal financial

8   advisors.

9         He turned to Jason Kaiser when he wanted to make this

10   investment and he turned to Steven Ketchum with whom he had no

11   prior relationship.  I won't go through the testimony because I

12   think it's just going to take time.  It's undisputed.

13         And the next point, which is point five, which is also

14   undisputed, not worthy of taking the time to go through the

15   testimony, is that everything that was done here was done with

16   DISH e-mails, DISH phones, DISH offices.

17         And even though Mr. Ergen is quite strident in saying

18   that Mr. Kaiser was acting for his personal benefit, Mr. Kaiser

19   went out and booked over a billion-plus dollars, negotiated and

20   executed over a billion dollars worth of debt trades, and

21   purportedly in Mr. Ergen's personal capacity, Mr. Ergen didn't

22   pay for it, didn't pay them a thing.  A billion dollars worth

23   of debt trades.  Mr. Kaiser got no compensation for that.  The

24   only compensation Mr. Kaiser ever got was from DISH.

25         Now, the sixth point, Your Honor, I think is a key

**LIGHTSQUARED, INC., ET AL.**

38

1    one.  And this is from the words of Mr. Ketchum, that this

2    investment was a "loan-to-own."

3         Mr. Ketchum explained that SPSO's investment in

4    LightSquared "was a loan-to-own in the sense that most

5    investors believed that given the capital structure of the

6    company, that the term loan B was likely to be exchanged for

7    equity securities or that was my expectation."

8         So this is a loan-to-own.  And then, indeed, after the

9    final purchase was booked that got Mr. Ergen up above a billion

10   dollars of LightSquared debt, what does Mr. Ketchum write to

11   Mr. Kaiser?  He writes, "You just bought a Spectrum company."

12        This e-mail was from Mr. Ketchum to Mr. Richard, but

13   it relates to an earlier e-mail.  The original e-mail was from

14   Mr. Ketchum to Mr. Kaiser, which says, "You just bought a

15   Spectrum company", following which Mr. Ketchum then wrote in a

16   following e-mail, "There may be a bunch of press, since we now

17   control the company and I want to manage it."

18        So we -- Ketchum, Kaiser, they now control

19   LightSquared.  They want to manage it.

20        Point seven really is the analog to point six.  And I

21   think this is really where it all comes together.

22        Charlie Ergen never wanted to own a Spectrum company.

23   There's no evidence that Charlie Ergen ever owned a Spectrum

24   company, ever wanted to own a Spectrum company.  He had just

25   spent all his personal wealth on this debt.

**LIGHTSQUARED, INC., ET AL.**

39

1          Your Honor knows what it costs to run a Spectrum

2    company.  There was no money left.  This wasn't for him

3    personally.  He had never done it before.  He never even bought

4    the securities of a Spectrum company before, let alone owned a

5    Spectrum company.

6          So this loan-to-own, that was the internal

7    characterization of the loan by the Ketchum/Ergen team.  This

8    loan-to-own could not have been a loan-to-own for Ergen

9    personally.

10          And in fact, when Ergen was asked at a conference

11    call, a DISH conference call, about the LightSquared Spectrum,

12    he said the LightSquared is "Interesting to DISH because the

13    Spectrum potentially could fit with the existing Spectrum that

14    DISH has in the long term, so putting all that Spectrum

15    together at the same time maintains the ability to use the

16    satellite for voice and data, makes a lot of sense."

17          It makes a lot of sense for DISH to own the Spectrum.

18    It makes absolutely no sense for Charles Ergen to own the

19    Spectrum personally, he doesn't have any other Spectrum assets.

20    He doesn't have any other synergies.  He doesn't have the

21    ability to combine any Spectrum from one company to another.

22    The loan-to-own was the loan-to-own for DISH and only DISH.

23          And indeed, what happened?  As soon as Mr. Ergen

24    amassed his position of a billion dollars of debt, and this is

25    point eight, what does he do?  He goes right to the DISH Board

**LIGHTSQUARED, INC., ET AL.**

1    and he says, folks, we should buy LightSquared.

2            And what's the reason he says we should buy

3    LightSquared?  He writes in that PowerPoint -- and I think Your

4    Honor saw the whole PowerPoint in an in camera review, we've

5    only seen the first page, but what does he say about the

6    reasons why DISH should buy LightSquared?  He says, "Mr.

7    Ergen's substantial interests in L2 debt and preferred stock

8    compliments any acquisition strategy and could have significant

9    influence in L2's Chapter 11 cases."

10           As Mr. Barr said, it was a unitary whole.  It was a

11   joint strategy to purchase this company and the debt was the

12   fulcrum acquisition that levered DISH into the acquisition mode

13   here.

14           And, Your Honor, point nine is Your Honor saw this

15   herself.  I mean, this played out largely in the courtroom.

16   What was the sequence of events?

17           First, SPSO made their trades and by March 28th of

18   2013 it contracted for over a billion dollars of debt.

19           June 13, 2013, SPSO joins the ad hoc group.

20           Nine days later, LBAC, which up until that point --

21   remember LBAC had made their unsolicited bid a couple of months

22   earlier and LBAC was identified at that point as an entity

23   controlled or owned by Charles Ergen or one of his affiliated

24   companies.  It wasn't even identified as what it was.

25           But right after SPSO joined the ad hoc group, LBAC is

**LIGHTSQUARED, INC., ET AL.**

41

1   sold by Charles Ergen to DISH for one dollar.  That was on July

2   22, 2013.

3          And then the very next day, the ad hoc group signs the

4   plan support agreement with LBAC and SPSO and it has attached

5   to it a draft asset purchase agreement.

6          By the way, I think that the plan support agreement,

7   at least until today, was considered a binding document.  Maybe

8   it still is a binding document.  The board never approved the

9   plan support agreement.  The plan support agreement was a

10  multi-billion dollar transaction that committed LBAC into a

11  significant obligation.

12         There's some notion here that the board -- and I'll

13  get to this in a minute -- that somehow the board has limits,

14  places limits on what Mr. Ergen can do.

15         The plan support agreement was signed without any

16  board approval.  Most of the directors read about it in the

17  newspaper.

18         The last point, Your Honor, which is just more of an

19  emphasis on that, is the whole notion --

20         THE COURT:  Mr. Friedman, can I stop you for a

21  moment --

22         MR. FRIEDMAN:  Yeah.

23         THE COURT:  -- and just ask one question before you

24  move along?

25         MR. FRIEDMAN:  Sure.

**LIGHTSQUARED, INC., ET AL.**

42

1              THE COURT:  One of your points, I think it might have

2      been point seven or point eight, was this is a unitary hold.

3              MR. FRIEDMAN:  Right.

4              THE COURT:  This is a unitary hold that the end game

5      was in mind --

6              MR. FRIEDMAN:  Right.

7              THE COURT:  -- from some earlier point, if not at the

8      very beginning, but as it moved along.

9              MR. FRIEDMAN:  Right.

10             THE COURT:  So how is that observation or theory

11     affected by the current facts on the ground, which is that the

12     bid has been terminated and Mr. Ergen through SPSO is now

13     sitting with 700 or 800 million dollars of debt in an

14     environment that's uncertain as to how he's going to recover

15     that?

16             MR. FRIEDMAN:  Right.  So it's a very interesting

17     question and my first answer is I don't know anything --

18             THE COURT:  Well, your first answer has to be you

19     don't know.

20             MR. FRIEDMAN:  Right.

21             THE COURT:  Right.

22             MR. FRIEDMAN:  So the answer is I don't know.  But

23     here's what I think.

24             What I think is, number one, I would really need to

25     understand the motivations and strategies that Mr. Ergen is

**LIGHTSQUARED, INC., ET AL.**

43

1   deploying.  He terminated -- remember, I'm not a fan of the

2   deal, so I don't want to sit here and be an advocate of it, as

3   you know.

4           THE COURT:  No, I understand.

5           MR. FRIEDMAN:  But having said that --

6           THE COURT:  I'm just trying to understand in a

7   holistic way --

8           MR. FRIEDMAN:  Sure.

9           THE COURT:  -- the unitary theory, right?

10          MR. FRIEDMAN:  Sure.

11          THE COURT:  The ergonomics, as you put it.

12          MR. FRIEDMAN:  Right.  So in the first instance, they

13  terminated a transaction, as I believe Mr. Sussberg said, and I

14  haven't seen the letter, but as it was reported to me, on the

15  basis of failing to meet milestones.

16          Now, Your Honor had heard over the last couple weeks

17  something about technical issues.  Personally, I don't think

18  and I believe I know, there aren't any technical issues that

19  would have merited termination.  So he is now using milestones.

20  Milestones, these are milestones that have been breached, if

21  you will, or hadn't been met for over a month.  So the idea

22  that, you know, the milestone is a trigger for a termination,

23  when you could have terminated on that basis over a month ago,

24  just suggests to me that --

25          THE COURT:  Okay.  But now you're answering a

**LIGHTSQUARED, INC., ET AL.**

44

1  different question than the one I asked.

2        MR. FRIEDMAN:  There's a lot I don't know is what I'm

3  saying so --

4        THE COURT:  Right.

5        MR. FRIEDMAN:  The second thing is, I think, the

6  breach of contract action, which is what really this is.  I

7  mean, the crux of the case is a breach of contract action,

8  invokes a more basic question which is did SPSO and Ergen

9  violate -- did DISH violate the contract because Ergen and SPSO

10  were the surrogates of DISH, that they were simply acting --

11  going out and doing DISH's work, doing DISH's bidding.

12        I think you measure all of that at the time of the

13  breach.  I don't think you measure that at a future date.  I

14  think if somebody breaches a contract and then for some reason

15  has a change of heart, for whatever reason, still breached the

16  contract.

17        So that's all I -- I mean, I think that's what I have

18  to sort of -- my thoughts right now.

19        THE COURT:  That's fine.

20        MR. FRIEDMAN:  Okay.  So I guess the last thing I

21  really want to say is -- one last main nor point after that,

22  but the last thing I want to say is what you're going to hear

23  from DISH in particular is this is a public company, they've

24  got investment guidelines, they've got a board of directors.

25  They don't simply do these types of things without following

1   the protocols, and hence, because the board did not authorize

2   Charles Ergen to buy this debt on behalf of DISH, if it wasn't

3   authorized, it couldn't have happened.

4         Again, there's all kinds of law to talk about here on

5   that, which is not for now, primarily, you know, Kirschner and

6   mediators and all the cases that say whether the board

7   authorizes you or not, corporations are stuck with the actions

8   of their management.  But the premise isn't true.  The premise

9   that the board somehow controls Mr. Ergen is exactly wrong;

10  it's exactly the opposite.  The board doesn't control Mr.

11  Ergen; Mr. Ergen controls the board.

12        So just by way of -- and we get all of this, by the

13  way, because the problem with that is all the other directors

14  other than Mr. Goodbarn are under the control of Mr. Ergen.  So

15  the only person that really is going to give you sort of an

16  honest answer as to how the board functions is the only outside

17  director today at DISH, and his name is Steven Goodbarn.

18        And Mr. Goodbarn was asked in a deposition today, "Is

19  it your view that Charlie is essentially responsible for what

20  DISH does in connection with the LightSquared bankruptcy?" and

21  his answer was "yes".

22        And then, in response to a fact that was revealed that

23  he refused to sit on a special litigation committee, he gave an

24  answer and he came up with a number of reasons and then there

25  was a follow-up question which I think is just -- will shorten

**LIGHTSQUARED, INC., ET AL.**

1  this, which he was asked, "So it was your view that nobody else

2  could act in an independent way of Charlie, correct?  It was

3  your view that nobody else could act in an independent way of

4  Charlie, correct?"  And he said, "That is correct."

5       And so, Your Honor, you put that all together, and

6  this whole fiction of separateness between Ergen and Sound

7  Point on the one hand and Ergen and DISH on the other hand, it

8  just falls away.

9       Now, Mr. Ergen is going to sit in the witness stand

10 and he is going to stay time and time again this was a personal

11 investment.  He is absolutely locked in to that testimony.  I

12 can't stop him from saying it.  I don't think anybody is good

13 enough at cross-examination to stop him from saying it.  He's

14 going to say it time and time and time again.  But, Your Honor,

15 it's not a credible position and, frankly, it makes no sense.

16 As I said before, it makes no sense that Charles Ergen was

17 going to buy a Spectrum company personally when the whole

18 thesis of the investment were the synergies between DISH and

19 LightSquared.

20       SPSO, Your Honor, plain and simple, was a parking lot.

21 It was a parking lot for the LightSquared debt to be placed to

22 evade contractual restrictions just long enough to amass the

23 level of debt needed to join the ad hoc committee and lever the

24 DISH acquisition.

25       As I said, Mr. Ergen's personal money, or I should say

**LIGHTSQUARED, INC., ET AL.**

47

1    rather, his daughter's personal money was never at risk.  I

2    don't think he would have raided his daughter's trust fund if

3    he really thought there was any risk to that money, to take it

4    from treasury bills, blue chip stocks, and to put it all -- a

5    diversified portfolio, to put it all in a single investment

6    that he never made before -- not if it was a risk, Your Honor,

7    because he had the power to recycle the funds through the LBAC

8    acquisition.

9         He's still going to say it's personal, Your Honor, but

10   I would suggest, Your Honor, that when you try to ask yourself,

11   you know, how is this someone who could look me in the eye and

12   say this was a personal investment, I would refer Your Honor to

13   what I think is a very telling episode that occurred in 2012

14   when the rumors started in May that Mr. Ergen was behind Sound

15   Point.  A number of the directors were curious about it, and

16   they went to Stanton Dodge who is the general counsel of DISH,

17   and they said, can you find out.

18        So Mr. Dodge went over to Mr. Ergen and said, are

19   these stories true that you're buying the debt?  And what Mr.

20   Ergen said, I'm quoting, he said, "I communicated that there

21   might be some truth to the story, there might be some truth to

22   the story."

23        Your Honor, this was his own in-house lawyer.  This

24   was somebody on his side.  This was not when in response to an

25   article from the press, this was not in response to an e-mail

**LIGHTSQUARED, INC., ET AL.**

48

1   from Falcone, this was not in response to a deposition.  This

2   was his own guy.  And the most he could say, when he had

3   amassed a billion dollars of debt, was that there might be some

4   truth to the story.

5         And one last point -- if we could just back up a page.

6         One last point, Your Honor, which is that this whole

7   notion of separateness, it's a litigation strategy.  And Mr.

8   Goodbarn made that clear.

9         And what was said -- Mr. Goodbarn said, and I'm

10  quoting, "There was potential which became actual litigation on

11  the part of Harbinger against him, and he was.  He wanted to be

12  as clean as possible with regard to working with DISH so that

13  he didn't gum up that suit, so to speak."

14        And then what he was asked, well, what do you mean,

15  what's the connection between the Harbinger lawsuit and the

16  special committee, and he said, "because it would say that he

17  was working with -- I think the gist of the suit was that he

18  was working with DISH to get around their restrictions to buy

19  the stock."  I mean, obviously he meant the debt.  So this was

20  a reason given for not sharing information about his trades

21  with the committee at the time.

22        So when -- Mr. Giuffra will get up and say these were

23  separate people doing separate things.  Even if it's true, it

24  was just a litigation strategy to create the illusion of

25  separateness so they could defend this lawsuit by saying Mr.

1    Ergen is not acting for DISH, not because there was any

2    substance to it.  But if he's actually going to sit in the

3    witness stand and say, I didn't talk to this guy at DISH, I

4    didn't talk to that guy at DISH, it's only because he had the

5    litigation in mind and recognized that by doing that it might

6    create bad facts on the ground.

7           Now, let me just make one last and completely

8    unrelated point.

9           The principal of my client, Philip Falcone, did not

10   know, did not know until May 2013 that SPSO was acting for

11   Ergen or DISH, the same day that everybody else knew.  The

12   rumors started flying about a year earlier, April or May of

13   2012 that Ergen might be the buyer.  And for the first couple

14   of days of May 2012, Phil is e-mailing people trying to smoke

15   out a response as to whether Ergen was the buyer.  He said a

16   couple of e-mails say, I know it's Ergen.  He sent an e-mail to

17   somebody at DISH saying, I know you bought the bonds.  He sent,

18   I think, an e-mail to somebody at Jeffries saying it's Ergen.

19          He didn't know.  He didn't have any way to know.  He's

20   never spoken to Ergen since any of this started.  Never spoken

21   to any of Ergen's guys.  He never even spoken to Ketchum,

22   doesn't even know Ketchum, doesn't know anybody who works for

23   Ketchum.  He had no ability to learn that it was Ergen.

24          Now, they're going to show you a couple of e-mails in

25   early 2012 where Falcone says, I know it's Ergen, I know it's

**LIGHTSQUARED, INC., ET AL.**

1    Ergen.  This is not internal e-mails within the Falcone, you

2    know, sphere but accusing other people of making the accusation

3    or making the statement that Ergen bought the debt.  And he

4    absolutely wrote those e-mails and he absolutely said those

5    things.

         And he will testify that he didn't know it was Ergen

6    and he was fishing; it was a fishing expedition from the

7    beginning.  But what I want to show you -- because I know

8    you're going to see those e-mails, I want to show you some

9    other e-mails, about seven of them, that take you through the

10   history from May of 2012 to May of 2013 that will show you what

11   Mr. Falcone knew.

12         So beginning of May of 2012, May 11th, this is just a

13   few days after he writes the e-mail saying I know it's Ergen,

14   Mr. Falcone writes, from the bottom up, "It's not Charlie."  He

15   writes to his consultant "it's not Charlie."  The consultant

16   writes back, "Yeah, the question is who, Carlos, Dolan, and

17   who?"  Falcone writes, "But it's definitely not Charlie."  So

18   the consultant writes back, "Well, it's good that it's not

19   Charlie, but now we need to find out who it is."  He writes

20   back, "Cablevision."  That's on May 11th, okay.

21         The same day he writes an e-mail to the ad hoc lender

22   group, really just a settlement discussion, but at the bottom

23   he says, "I don't believe it's Ergen."  Again, he writes that

24   to other people.

25         Then May 24th he writes an e-mail where he says, "I

**LIGHTSQUARED, INC., ET AL.**

1    understand that it's Carlos Slim, but I do not know that for

2    certain."  That's on May 24th.  The same day, on May 24th, a

3    blog comes out which says, "It now appears that many of the

4    debt holders, and perhaps even Harbinger LightSquared, seem to

5    have concluded that it is not Charlie Ergen backing Sound

6    Point, but the funding for the purchase of Carl Icahn instead

7    came from yet another billionaire, Carlos Slim of Telmex."

8            You fast forward to October of 2012, Mr. Voight from

9    Jefferies writes to Mr. Falcone, "Don't think it's Ergen, Phil.

10   I am very close to his right-hand guy.  I should be shocked if

11   he's lying to me."  Falcone writes back, "Ergen."  Then he

12   writes back, "I think it's AT&T."  Clearly --

13           THE COURT:  Actually those e-mails go in the -- you

14   have to read them from the bottom up.

15           MR. FRIEDMAN:  All right, I'm sorry.  Thank you.

16           "I think it's AT&T."  Thank you.  He writes, "I think

17   it's AT&T."  Then he writes "Ergen."  Then Voight says, "I

18   don't think it's Ergen.  I'd be shocked if my friend was lying

19   to me."

20           January 8th, 2013, the same guys from Jeffries who

21   said, I'm sure it's not Ergen, my guy would never lie to me,

22   now says it's Ergen.  Falcone says, "Romeo thinks it's AT&T."

23   Voight from Jeffries who, again, had said it's definitely not

24   Ergen, says, I bet Ergen.  He is scooping all the Spectrum up,

25   you should buy DISH and sats equity in -- I'm not even sure

**LIGHTSQUARED, INC., ET AL.**

52

1    what that means.

2          But then Falcone writes back -- Falcone writes back,

3    when going back.  Falcone writes back, "Our regulatory" -- this

4    is the last thing he said, "Our regulatory guys think it will

5    be tough to do us and ClearWire."  So that's Falcone's theory

6    why it's not Ergen because the regulatory guys thought that

7    since Ergen at the time was trying to acquire ClearWire, he

8    wouldn't be able to go after LightSquared.

9          Finally, on May 21st -- to show you how in the dark

10   everybody was on this thing, on May 21st, this is like the day

11   before, the word comes out that it's Ergen.  Falcone writes to

12   Matt Barr and Doug Smith and Barry Ridings (ph.) and his

13   consultant, "If I were a betting man, I would say that Sound

14   Point is Slim."

15         So my point, Your Honor, is where there are hunches

16   and predictions and theories and did Falcone think it might

17   have been Ergen for a day or two, and did he send e-mails out

18   that said, you know, I know you sold to Ergen or I know you

19   bought the bonds, hoping to get a response, sure.  He is

20   fishing like crazy, as by the way is Mr. Hootnick, Mr. Smith --

21   I mean, there was a concerted effort among everybody at

22   Harbinger and LightSquared to reach all their sources to try to

23   find out what's going on.  At the end of the day, from May of

24   2012 to May of 2013, the day before the announcement comes out,

25   Falcone still thought it was Carlos Slim.

**LIGHTSQUARED, INC., ET AL.**

53

1          So I just bring this up, Your Honor, to point this

2     out -- I don't think, by the way, it matters.  I mean, I don't

3     think any of that matters because, even if somebody knew

4     something or had a hunch or whatever, if their argument is that

5     somehow it creates a waiver, you know, it's a much, much higher

6     burden than that to argue that you have a waiver.  But I just

7     want to make the point, Your Honor, because it's a credibility

8     issue for us.  We've made the point all along that we didn't

9     know.  And I wanted Your Honor to know that there's going to be

10    a different side to this story than I think you're about to

11    hear from them.

12          So unless Your Honor has any questions, thank you.

13          THE COURT:  All right.  Thank you, Mr. Friedman.

14          All right, who would like to go next?

15          MS. STRICKLAND:  Good morning.

16          THE COURT:  Morning.

17          MS. STRICKLAND:  For the record, Rachel Strickland,

18    Willkie Farr & Gallagher, on behalf of Charles Ergen and SPSO.

19          The way that LightSquared and Harbinger have

20    characterized the bankruptcy process in their pleadings has me

21    scratching my head.  So I just wanted to spend a few minutes on

22    those disconnects because I think that the case boils down to

23    ten fundamentals.

24          The first thing is that trading happens in bankruptcy.

25    Except for NOL and similar orders, the debtors do not have the

1   ability to halt or stymie trading, not because they're in

2   Chapter 11, not during exclusivity, not after.  That means that

3   new parties can buy, old parties can sell, and if that results

4   in a revolving door that's hard to pin down, so be it.  That is

5   one of the lumps the debtor has to deal with and they don't

6   have any rights or entitlements in that regard.

7          Two.  Other than disclosure required by Rule 2019,

8   creditors have no obligation to make public disclosure about

9   their holdings.  They have no duty to engage in the case.  They

10   can hold debt and never file a notice of appearance.

11          Three.  When investing significant sums in bank debt

12   or securities of an entity in bankruptcy, it is not unusual for

13   investors to be mindful of voting standards.  "Block" is not a

14   dirty word.  The protections of 1129(b) are there to protect

15   creditors.  If a proposed or potential treatment is not to a

16   creditor's liking, that creditor is much better off if a debtor

17   or another plan proponent has to meet the standards of 1129(b).

18          Four.  If there is enough value to pay a senior

19   secured creditor class in full, and junior creditors, or as

20   Harbinger says in this case, even equity or actually in the

21   money, unimpairment is always an option.  Then block or no

22   block, the votes in an unimpaired class are irrelevant.  Blocks

23   are also of no help in a sale process, and it doesn't establish

24   numerosity.

25          Number five.  Chapter 11 cases are unpredictable.  An

1    investor, especially one without access to non-public

2    information, has no idea when a company may or may not choose

3    to file for bankruptcy.  That investor does not know who the

4    company is negotiating with or what plans it may file a year or

5    more down the road.  Cases take a lot of twists and turns, and

6    while grand master plans hatched years in advance make for good

7    pleadings, they are not based on reality.

8         Six.  There is no prohibition ever of making a cash

9    offer to buy a company at any price.  While credit bidding is

10   also permitted and codified, a cash offer may be submitted by

11   any person or entity at any time.  And in most cases, it's

12   actually welcome.

13        Seven.  Rule 2004 is a super helpful tool.  On the

14   motion of any party-in-interest, the court may order an

15   examination of any entity.  Case law says it can be a fishing

16   expedition.  And the rules say it can relate to any matter

17   which affects the administration of a debtor's estate.

18        Harbinger and LightSquared have great lawyers.  They

19   know lots of ways to definitively determine information.  And

20   in fact, if they believe that their estate is being damaged to

21   the tune of billions of dollars, they have a duty to do that.

22        If someone calls my broker or my lawyer and asks a

23   question about me, I hope both decline to answer the question.

24   The job of brokers and lawyers is not to answer questions posed

25   by bankers who cold call them about their clients unless, of

1    course, they're compelled by legal process.

2            Calling a broker or a lawyer is not the best way to

3    find out information.  Interestingly, however, Mr. Hootnick

4    will testify that nobody ever bothered to try and call Carlos

5    Slim's representatives or Dolan's representatives, or AT&T's

6    representatives.  None of them.  Ever.

7            Eight.  Companies that are worried about billions of

8    dollars in damages don't wait a year and reserve rights.  They

9    don't wait a week.  They don't ask a party they suspect is

10   inflicting harm when they are going to cause more damage as

11   they sit and watch.  They stop it.

12           Nine.  Separate legal identities do matter.

13   Substantive consolidation in a bankruptcy context is a

14   difficult thing to achieve.  So is piercing the corporate veil.

15   So is proving alter ego.  Affiliates have separate identities.

16   Harbinger has a separate identity from LightSquared.  Mr.

17   Falcone has a separate identity from both Harbinger and

18   LightSquared.

19           Mr. Falcone's phone calls from Harbinger's offices,

20   whether they are for LightSquared or for his personal life,

21   that can be separated out.  Mr. Falcone's e-mails, whether he

22   is e-mailing from his Harbinger.com account or his Gmail

23   account or his LightSquared account, those can be separated.

24           Mr. Falcone has conversations with and does business

25   with Mr. Murgio, with Mr. Abruzzi, and lots of other people who

**LIGHTSQUARED, INC., ET AL.**

57

```
 1    hold positions and work with LightSquared and with Harbinger.
 2    And while I wouldn't infer any of those conversations are
 3    necessarily for LightSquared or for Harbinger, I wouldn't even
 4    be surprised if, especially over the course of the last year,
 5    they didn't discuss all kinds of matters that were personal,
 6    that were financial, that were legal.  People wear multiple
 7    hats and that is okay.
 8            Ten.  Chairman of companies make personal investments
 9    too.  That's allowed.  Public companies also make investments
10    and do transactions.  And that, too, is allowed.  And it's
11    governed by rules and laws.  Public companies have duties of
12    disclosure, and fiduciaries owe a duty of care and a duty of
13    loyalty.
14            It's not bad that Mr. Ergen checked to see who could
15    buy the debt.
16            THE COURT:  Well, let me take you up on that one.
17            So he's the chairman, right?
18            MS. STRICKLAND:  Right.
19            THE COURT:  And he checks to find out whether EchoStar
20    or DISH can buy the debt, and he gets told no.
21            MS. STRICKLAND:  Right.
22            THE COURT:  And the question, I think that's been --
23    of course, we haven't had the evidence yet, but it's been
24    stated that he asked the question of Mr. Kiser.
25            MS. STRICKLAND:  Yes.
```

**LIGHTSQUARED, INC., ET AL.**

1    THE COURT:  Okay.  So he's certainly aware of his

2    fiduciary duties and the doctrines of corporate opportunity and

3    duties of loyalty, et cetera, right?

4        MS. STRICKLAND:  Yes.

5        THE COURT:  So at that point, am I going to hear that

6    he conducted further inquiries as to whether or not, for

7    example, DISH through an affiliate could have acquired the

8    debt?  In other words, am I going to hear that, because of the

9    separate identities, he went the extra mile to figure out, in

10   the first instance, how he, as the executive chairman of DISH,

11   could capture this opportunity for DISH before he went ahead

12   and invested his own personal money?

13       MS. STRICKLAND:  What you're going to hear, Your

14   Honor, is that he asked the question.  He said, bank debt is

15   something that I know that there are sometimes restrictions in,

16   find out who can buy.  Not thinking about it going in one

17   direction or another.  But before he left, he said, find out

18   who can buy.  And the question was asked and it came back, the

19   companies can't buy, it's appropriate to go do it through a

20   structure.

21       THE COURT:  So he -- but he only asked his friend, Mr.

22   Kiser.  He didn't ask the general counsel of DISH, for example.

23       MS. STRICKLAND:  He asked Mr. Kiser and asked Mr.

24   Kiser to check with a lawyer.  And Mr. Kiser did.

25       THE COURT:  Thank you.

1           MS. STRICKLAND:  And he did ask again, because he

2     wondered whether or not, when the company filed for bankruptcy,

3     the rules changed.  And because he is a fiduciary, you wouldn't

4     just keep doing something and not worry about whether or not it

5     was a corporate opportunity.  So it's good that he asked.  And

6     had he not asked the question at all, this lawsuit and other

7     lawsuits would be about something else entirely.

8           So it's also not bad that Mr. Ergen offered DISH and

9     EchoStar the opportunity to stand in LBAC's shoes for its cash

10    bid either.  It's the proper conduct for a fiduciary when a

11    corporate opportunity is involved.  And it's true that Mr.

12    Ergen has not invested in Spectrum before.  But one has to ask

13    whether or not that's in part because those things were a

14    corporate opportunities.

15          I mentioned the fundamentals, all of which Your Honor

16    knows, because this case seems to be all about parties guessing

17    at motivations and inferring conduct, to explain why this case

18    has been and continues to be very, very difficult.  Mr.

19    Sussberg suggested this morning that a "remedy" might ease

20    their liquidity shortfall.  So even though most of these

21    problems existed before SPSO had any investment in LightSquared

22    and certainly before it had any active role in these cases, you

23    can't just punish somebody because you need a fix.

24          Today starts the evidence, and that means we leave the

25    land of innuendo and inference and we get down to facts and

1    credibility.  And we really welcome that, because although this

2    table is very long on innuendo and inference, they're very

3    short on evidence.  The facts, as you'll hear them over the

4    course of the next week are as follows:

5           You will hear that Mr. Ergen knows a lot about

6    Spectrum.  He has spent his life in this business.  And if

7    you're going to make a very, very large personal investment,

8    knowing a lot is a good thing.  I think Mr. Falcone made a very

9    similar bet.

10          You will hear that Mr. Ergen is the executive chairman

11   of two public companies, DISH and EchoStar.  That translates

12   into a few things.  First, that means he's really busy; he

13   works a lot.  He works on corporate business in his office; he

14   works on personal business in his office.  He also works on

15   corporate business from his home.  He conducts company business

16   a lot.  When he's doing company business, it involves official

17   channels, approvals, guidelines, and disclosure.  Personal

18   business doesn't.

19          You will hear that Mr. Ergen interviewed Jason Kiser

20   when Jason was applying for his first real job out of college.

21   They got along and their relationship grew.  They socialize

22   outside the office.  Their families get together.  Charlie

23   trusts Jason.  Charlie trusts Jason enough to discuss his

24   personal and financial matters.  Jason is familiar with

25   Charlie's accounts, his real estate.  He was the one who helped

1    him buy his ranch.  He knows Charlie's assets managers, his

2    brokers, his lawyers.  And when he was asked to help out, he

3    called them.

4           Charlie's assets managers and brokers and lawyers,

5    they know Jason too.  They know that he helps Charlie from time

6    to time.  And not because Charlie is his boss, but because

7    they've known each other for twenty-seven years and he trusts

8    him.  And when you are a business chairman of two public

9    companies, it's a good thing to have people who can help you

10   out and who can do things for you and who -- Mr. Ergen does

11   things for him.  They are close.

12          You will hear that Jason works at DISH.  That's how

13   Charlie and he met.  That isn't, however, the only facet.  It's

14   not what defines them as people every moment of every day.

15   Their titles are work are one fact.  It's been great for

16   inferences, but given the burdens that the plaintiffs have,

17   they're going to need a lot more than titles.

18          You will hear that Mr. Ergen began investing in

19   LightSquared through an appropriate vehicle before LightSquared

20   ever filed for bankruptcy.  He did want to keep SPSO's trades

21   confidential, not because he wanted to interfere with

22   LightSquared, not because he wanted to do anything other than

23   buy debt at the lowest possible price.  Market knowledge that

24   Mr. Ergen was investing was very likely to make the price go

25   up.  Very few investors publicize their investments, and very

1 few people go to work and talk to people about what their

2 private investments are.  If investing confidentially becomes

3 impermissible, that would be new law.  Not only is it not

4 illegal, it's justifiable, it's rationale, and most

5 importantly, it's not antagonistic or adverse to the company.

6 The company has to pay back the same amount no matter what the

7 price is that's paid in the secondary market.

8           You will hear that despite his desire, Mr. Ergen

9 wasn't successful at keeping things confidential.  Mr. Falcone

10 did know.  So I, too, have a few things for your screen, and

11 what I have is just a smattering.

12           Mr. Falcone wrote about Ergen's investment to

13 LightSquared, to other investors, to his own professionals, to

14 DISH, and to the press.  There's a few things to note about

15 this.  First, when Mr. Falcone or his counsel tells you they

16 were smoking people out in these e-mails and really just trying

17 to suss out who was really buying it, ask yourself, is he

18 bluffing to his own advisors, is he bluffing to the press?

19 What would that achieve?

20           Here, the plaintiff's case relies in part on the fact

21 that market perception that a so-called competitor was in the

22 capital structure harmed and caused billions of dollars to

23 LightSquared.  So does it make sense then that the person

24 talking to Matthew Goldstein at thomsonreuters.com says, we

25 confirmed Icahn?  He's fronting for Ergen.  And then goes on to

**LIGHTSQUARED, INC., ET AL.**

1    say, don't attribute this to me.  That's what they're saying

2    caused billions of dollars of damages, the market perception

3    that a creditor -- a competitor was in their capital structure.

4         I'm sure he was trying to smoke things out when he

5    called the press.

6         It wasn't just Falcone that knew.  LightSquared knew

7    it too.  And I agree with Mr. Friedman, it doesn't matter

8    whether they knew it for a certainty or just had a strong

9    suspicion.  If they were really worried about billions of

10   dollars of damages, they had a foolproof tool at their disposal

11   to find out and deal with it.  They didn't.  They reserved

12   their rights for a year.

13        You will hear --

14        THE COURT:  The foolproof tool being coming and

15   seeking relief in this court?

16        MS. STRICKLAND:  Absolutely.

17        You will hear that some of SPSO's trades indeed closed

18   faster than others.  What you will not hear is a strategy to

19   interfere with these cases.  Some of the smallest and most

20   immaterial trades were among the longest lead times.  Others

21   that were large closed much more quickly.  As is often the norm

22   for debt trades, there is no norm.  No investor needs to

23   catalog and justify every thought and motivation they have ever

24   had at all points in time in order to have their debt repaid.

25        But you will hear that Mr. Ergen wasn't thinking about

**LIGHTSQUARED, INC., ET AL.**

1    buying LightSquared in the fall of 2011.  And one of the things

2    to note about the screens and the documents and everything else

3    is to watch the dates.  When he began thinking about

4    LightSquared in the fall of 2011, when he first asked that

5    question, who can buy, or in 2012 when SPSO first began to

6    initiate trades, for lots of reasons LightSquared did not make

7    sense for DISH.  As an investment, Mr. Ergen thought it was a

8    good investment.

9            But DISH and its board were very busy.  They were in

10   the midst of obtaining approvals for two recent transactions,

11   DBSD and TERRASTAR.  And although much has been said and will

12   be said about DISH and DBSD, the thing that is most notable

13   about DBSD to me is that DISH made a bid, DISH bought a bunch

14   of debt, DISH made disclosure, and when DISH folks were being

15   questioned about their strategy to buy debt, to propose a plan,

16   to vote down another plan, those folks honestly testified that

17   DISH bought that debt, sometimes above par, with the intent to

18   acquire the company.

19           And whether everyone agrees with the new precedent

20   that DBSD made, that's not important.  What's important is that

21   DISH, a big public company, made its moves out in the open.  It

22   bought those companies, DBSD and TERRASTAR and Blockbuster, and

23   all of these other acquisitions that are filled in the briefs,

24   it bought them out in the open, bought them out of bankruptcy,

25   because DISH and the DISH Board of Directors thought those were

**LIGHTSQUARED, INC., ET AL.**

65

1    good acquisitions for DISH's shareholders.

2            You will also hear that when the dust settles on those

3    transactions --

4            THE COURT:  Isn't one answer that I'm going to hear or

5    one different interpretation of that is that the reason that

6    those were done out in the open is because they could be done

7    out in the open as opposed to this transaction which was

8    determined at an early point transactional -- I'm using that

9    loosely -- the purchases of the debt were not permitted to be

10   done by DISH and therefore could not be done by DISH out in the

11   open?  Isn't that the response to that observation?

12           MS. STRICKLAND:  Absolutely it is.  And there's two

13   reasons why that response doesn't do a thing.

14           The first is that obtaining a blocking position in

15   senior secured debt doesn't buy you a company.  It doesn't give

16   you the pole position.  It doesn't give you control.  You can

17   be crammed.  You can be unimpaired.  You can be outbidded at a

18   363 auction.  It just doesn't do it.

19           And the second reason why it doesn't matter is

20   because -- just because you say --

21           THE COURT:  But let me take it up a notch on that one.

22           The other side is going to tell me in a normal

23   situation, that might be true.  But here, all of those

24   different scenarios -- you're at risk when you buy debt, you

25   don't know what's going to happen.  But here, the difference

1   is, they're going to tell me, is that from the get-go Mr. Ergen

2   could control the outcome because he could get DISH to approve

3   a cash bid at a level that would pay him and his fellow debt

4   holders in full, including post-petition interest and however

5   folks wanted to characterize in full.

6         So isn't that the response that they're going to give

7   to your very accurate observation that outcomes are uncertain

8   in Chapter 11?

9         MS. STRICKLAND:  They have developed a whole bunch of

10   theories that are along those lines.  What they don't have are

11   facts to prove them.

12         And part of what is so interesting about the Nevada

13   backdrop here is there's loads and loads of testimony saying

14   this isn't a super-seeker DISH plot.  There are a bunch of

15   folks at DISH that didn't know, were unhappy that they didn't

16   know, don't have information about the prices paid for the

17   debt.  Special transaction committees were appointed.  Special

18   litigation committees were appointed.  Fairness opinions were

19   obtained.  The board ramped up and took three months to

20   evaluate whether or not it wanted LBAC as an opportunity

21   between May and July 22nd of this year.  It doesn't comport

22   with the facts.

23         So yes, there's a lot of those theories and a lot of

24   those inferences, a lot of those stories, but the evidence just

25   doesn't support it.

**LIGHTSQUARED, INC., ET AL.**

1      DISH, very much after DBSD and after TERRASTAR,

2   absolutely had its sight set on other targets.  It just wasn't

3   LightSquared.  They had their sights set on a myriad of other

4   companies that would have been much better fits for DISH.

5      You're going to hear about MetroPCS, Sprint,

6   ClearWire, bids that played out publicly, as one would expect

7   of a public company, bids that required all of DISH's

8   bandwidth, all of its board and management bandwidths.  As Mr.

9   Falcone's regulatory people noted, you can only go to the FCC

10  for so many transactions, all of DISH's financing capabilities.

11  They very much wanted Sprint and ClearWire.  I kept waiting to

12  read a brief saying that that was all a charade, too.  It's

13  not.  That's what they were doing, and they were doing it, for

14  a long time during this whole period.  So you can't have all of

15  those irons in the fire.  LightSquared was not on the agenda.

16  Not then.

17      You'll hear why technically LightSquared wasn't a good

18  match for DISH and why Sprint and others were a better fit.

19  And the timeline is going to it be important, because it's not

20  just the fact that they were busy with Sprint and ClearWire,

21  but it's also because the Spectrum assets for a long period of

22  time did not match with what DISH already had.

23      Ultimately, however, a lot of things changed.  During

24  the course of 2013, a lot of things changed with respect to

25  DISH's perception of what it could use its own Spectrum for and

**LIGHTSQUARED, INC., ET AL.**

1    thus what it made sense to pair it with.  There were changes at

2    the FCC.  And then and only then, after Sprint fell apart,

3    after ClearWire fell apart, after MetroPCS, their first choice,

4    second choices, third choices, by far, fell away.  Only at that

5    point and only after they got different indications from the

6    FCC than they had ever had before did it even make sense

7    strategically, technically, financially for LightSquared and

8    its uplink to become a more attractive possibility.

9        So the plaintiffs will tell you that the reason why

10   DISH decided to bid when it did is because SPSO had the block.

11       Mr. Ergen decided to bid in May of this year because

12   the world had changed.  His view of LightSquared had changed.

13   And LightSquared became interesting to him in a way it

14   previously hadn't been.

15       DISH, on the other hand, in May, they're still focused

16   on Sprint.  Far, far, far from executing on the grand master

17   plan conspiracy hatched in 2011, carefully plotted out over

18   years.

19       THE COURT:  May of 2012 or 2013?

20       MS. STRICKLAND:  May of 2013.

21       We talked about the special transaction committee, the

22   special litigation committee of DISH.  This case isn't about

23   Nevada, but that backdrop can't be ignored in the sense that

24   the plaintiffs are asking for a lot of inferences to be drawn

25   that don't make sense in light of that.

**LIGHTSQUARED, INC., ET AL.**

69

1           You will hear that after Mr. Ergen presented the

2     opportunity to both boards in May of 2013, they did, they

3     waited three months before they decided to go ahead.  They got

4     separate independent law firms and financial advisors, they got

5     fairness opinions, and they ultimately decided --

6           THE COURT:  Hold on a moment.

7           MR. STONE:  Your Honor, I hate to interrupt an

8     opening --

9           THE COURT:  Yes, Mr. Stone.

10           MR. STONE:  -- but, you know, I appreciate Ms.

11     Strickland's testimony, but the fact is that we were blocked

12     from discovery into -- largely into the Nevada matters.  We

13     didn't explore those issues in depositions, so this is really

14     inappropriate.

15           MS. STRICKLAND:  I don't think it's really

16     inappropriate when they have the transcripts and it's not true,

17     it's a public -- matter of public record, and they've attached

18     most of the public filings from Nevada, but either way --

19           THE COURT:  In any event, you're not testifying,

20     you're just giving an argument, so --

21           MS. STRICKLAND:  I am.

22           Companies don't buy other companies because of

23     blocking positions an affiliate has in debt.  Blocking

24     positions only get you so far.  Companies buy companies, in

25     this case for cash, because they make business sense and

**LIGHTSQUARED, INC., ET AL.**

70

1   they're good for shareholders.  Conspiracy theories aside, Mr.

2   Ergen and Mr. Kiser weren't acting as agents for DISH or

3   EchoStar.  When SPSO bought the debt in LightSquared, they were

4   acting for SPSO owned entirely, funded entirely by Mr. Ergen.

5          SPSO isn't a natural person, their newest theory, and

6   setting up a vehicle doesn't subvert or breach a single thing.

7   Mr. Ergen is a natural person.  He is a person.  He's not a

8   subsidiary.  And no rational reading of any contract or

9   dictionary changes that.

10          Charles Ergen has spent a lot of his own money

11   investing in LightSquared.  And whether that investment turns

12   out to be a good investment or a bad investment, it's on him.

13   There is no one reimbursing, backstopping, taking any downside

14   risk, not one penny other than Charles Ergen.  There's no

15   agreement.  There is no failsafe.  And he didn't nothing wrong.

16   He deserves to vote.  He deserves to receive the exact same

17   recovery, whatever it may be, as the rest of his class.  That's

18   fair and that's the law.

19          LightSquared has had a lot of litigation in these

20   cases, which I don't need to tell you, first with the ad hoc

21   lenders.  They wanted Mr. Lauria and his clients out of their

22   hair.  And at that time Mr. Hootnick was more than happy to

23   take me to lunch.  Mr. Smith and Mr. Barr were writing letters

24   and e-mails, tallying up SPSO's holdings, even those that

25   hadn't yet closed.

1          In fact, Mr. Barr came to Your Honor in June of this

2    year to talk about SPSO's holdings.  He wasn't complaining

3    about them.  He wasn't trying to enjoin them.  He was saying,

4    "these trades will close as a fait accompli, and you should let

5    me count them to invalidate the exclusivity stipulation

6    provisions."

7          At that time, SPSO was openly owned by Mr. Ergen.  But

8    it was helpful to them, because at that time they wanted to

9    slay the dragon they were currently fighting.  At that time

10   LightSquared was not at all confused about who held what.  They

11   had been tracking through ClearPar as they had weekly

12   throughout the cases, who sold, what the amount was, what the

13   date was.

14         Mr. Barr sent me an e-mail detailing each of those

15   trades, the counterparty, the amount, the date, and asked me

16   when is SPSO going to close these -- not don't close them,

17   please don't close them -- when is SPSO going to close these.

18         So SPSO was worried.  We also came to the court.  We

19   also went to the parties.  We were worried about the

20   stipulation which contained lender protections, at least one of

21   which we knew about, which was a provision that was public that

22   said, if the group was large, that that debt that Mr. Ergen

23   held through SPSO couldn't be primed.  And then there were

24   other provisions we didn't even know about, because they were

25   redacted.  And we came in before we did anything and said, we

1    don't think this is fair; we think we should be able to know

2    what's in there.  And we came into the case late.  The

3    stipulation said what it said.  We upfront, in front of

4    everyone, said, well, I guess if we have to join the committee

5    solely for the purpose of keeping the protections in place, we

6    will do that.

7            And SPSO did join the committee before its holdings

8    reached a point that it would trigger any lender protections

9    that were important to investors in LightSquared's debt to

10   maintain, even the ones we were not even privy too.  We joined.

11   We joined after coming to you.  We joined after coming to the

12   company and all of the parties in interest.  Our motivations

13   were set out loud in advance.  And then, after we joined the

14   committee, everything changed.  Then Mr. Hootnick was not

15   interested in having lunch with me anymore.  Mr. Hootnick

16   stopped returning my calls.

17           After joining, Mr. Falcone sent an e-mail that you'll

18   see to Mr. Smith, asking Mr. Smith if as CEO he was planning on

19   attacking Ergen and the ad hoc committee.  If LightSquared

20   couldn't get a deal done, if LightSquared couldn't get

21   financing, if LightSquared couldn't get the FCC approval it has

22   been waiting and waiting and waiting for, they should look in

23   the mirror or maybe they should call Mr. Falcone.

24           SPSO is not the cause of this company's woes; it just

25   isn't.  Invalidating an investment of any size is a big deal.

**LIGHTSQUARED, INC., ET AL.**

73

1    It's a very heavy consequence and it has to be supported by

2    facts, by lots and lots of facts that prove absolutely

3    egregious conduct.  And after sitting around and watching SPSO

4    trade for a year, a job title and an inference isn't going to

5    cut it.  And that's all they have.

6            THE COURT:  Thank you, Ms. Strickland.

7            Yes, Mr. Giuffra.

8            MR. GIUFFRA:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MR. GIUFFRA:  Robert Giuffra, Sullivan & Cromwell.

11   And it's my privilege to represent DISH and EchoStar along with

12   my partners, Brian Frawley and Brian Glueckstein.

13           I have some handouts that I want to just give Your

14   Honor, if I could approach.

15           THE COURT:  Sure.  Do the other parties have them?

16           MR. GIUFFRA:  Yes, I'm giving them out right now.

17           Your Honor, the evidence in this case will show that

18   there's absolutely no basis for the claims against DISH and

19   EchoStar.  They are an afterthought.

20           As Your Honor knows, there's just a single legal claim

21   that's been sustained and that's for tortious interference.

22   And in fact, in LightSquared's brief submitted last night, they

23   relegate just three and a half pages of their thirty-five-page

24   brief to this single tortious interference claim.

25           Now, last month, I tried to persuade Your Honor to

1    dismiss that claim and I was unsuccessful.  And I should say we

2    appreciate all the time Your Honor has spent on this case and

3    putting in a long opinion on the first motion to dismiss by

4    Harbinger.  But on that motion to dismiss, as on any motion to

5    dismiss, Your Honor had to accept the allegations of the

6    complaint as true.  That's the law.  You had to draw the

7    reasonable inferences from the facts that were pled in the

8    plaintiff's favor.

9            And now we've had lots of discovery.  We've had lots

10   of document discovery, deposition discovery.  At trial, the

11   burden is now on LightSquared.  They've got no benefit of

12   inferences.  The trial is about proof, not speculation, not

13   innuendo, not labels.  In fact, it was interesting Mr. Barr

14   actually used the words "one can only speculate about why

15   things happen."  Well, speculation is not the stuff of proof.

16   Facts are.  And the evidence is going to show here that

17   LightSquared cannot satisfy its burden of proving tortious

18   interference against DISH or EchoStar.

19           THE COURT:  Let me ask you a question.  There's a

20   difference between speculation and inferences, right?

21           MR. GIUFFRA:  Absolutely, Your Honor.

22           THE COURT:  Everybody's going to put on their evidence

23   and I'm going to be asked to draw inferences from the evidence,

24   right.  So that's not speculation, is it?

25           MR. GIUFFRA:  But, for example, Your Honor, they claim

**LIGHTSQUARED, INC., ET AL.**

1  there's damage here from the fact that Mr. Ergen was in the

2  capital structure.  We'll demonstrate at this trial there's no

3  evidence to support that.  It's pure speculation.

4          THE COURT:  All right.  I'm asking really a different

5  question, which is that for -- Ms. Strickland told me that I'm

6  going to hear, and I believe we're going to hear from Mr.

7  Ergen, testimony that this was a personal investment --

8          MR. GIUFFRA:  Absolutely.

9          THE COURT:  -- and the parties have all assured me

10  that he's going to be very certain in that regard and we'll

11  see.  My question though, with respect to speculation though,

12  is that the parties also can adduce other facts and evidence

13  and ask me to draw inferences that are contrary to that

14  testimony, right?

15          MR. GIUFFRA:  Absolutely, Your Honor, no question, no

16  question.

17          THE COURT:  Okay.

18          MR. GIUFFRA:  Now, in a tortious interference case,

19  LightSquared has the burden of proving by a preponderance of

20  the evidence five elements.  They've got to show a valid

21  contract between the plaintiff and a third party.  They've got

22  to show the defendant's knowledge of that contract.  They've

23  got to show the defendant's intentional procurement of the

24  third party's breach of that contract without justification.

25  They've got to show the actual breach of the contract,

**LIGHTSQUARED, INC., ET AL.**

1  something we haven't heard much about during the presentations

2  this morning.  No one has talked about the credit agreement or

3  the transfer restrictions, which is really what the case

4  ultimately is about.  You've got to show damages.  You've got

5  to show those five elements to make a claim.

6          Now, when I was here on the Harbinger motion to

7  dismiss in October, I explained that DISH and EchoStar were

8  public companies with boards and thousand was shareholders and

9  that they had to comply with SEC reporting requirements.  And

10 discovery has confirmed that those companies have investment

11 policies to ensure board consideration of large investments.

12 In the case of DISH, the investment policy requires that going

13 to the board, if you do a transaction of more than 125 million

14 dollars.  In the case of EchoStar, fifty million dollars.  And

15 the evidence in this case will show that Mr. Ergen, not DISH or

16 EchoStar, personally bought the debt.

17         It will show that Mr. Ergen continues to own the debt.

18 It will show that Mr. Ergen -- and this is a really important

19 point -- bears one hundred percent of the downside.  If the

20 transaction here -- and Your Honor actually hit it on exactly

21 right.  You know, things are uncertain right now, how this is

22 all going to turn out, no one knows the extent to which

23 creditors are going to be paid, and discovery has made clear,

24 and they've gotten all the documents that exist in the world,

25 there's no evidence of some secret deal between DISH and

**LIGHTSQUARED, INC., ET AL.**

1    EchoStar and Mr. Ergen to indemnify Mr. Ergen if it turns out

2    that this big investment turns out to not be worth anything.

3            Now, his wife and his daughter may be mad, but he's

4    got no downside protection here.  If there was downside

5    protection, that's the kind of thing they would have discovered

6    in the course of discovery.  There is no downside protection.

7    The debt was bought with Mr. Ergen's money.  He bears the risk.

8    And right now, there's more risk than there was a month ago in

9    connection with that purchase.

10           There's no evidence here of a secret deal that the

11   boards of DISH or EchoStar authorized him to go out and buy

12   this debt.  Nothing.  That would be the first thing they would

13   have put on of the screen for Your Honor.  They haven't done

14   that.  It doesn't exist.

15           There's no evidence that the boards of DISH or

16   EchoStar even knew about the purchases by Mr. Ergen of

17   LightSquared debt until May 2013, after he had already acquired

18   the debt.

19           Simply put, there is no evidence as opposed to

20   speculation, innuendo, to support what was Harbinger's original

21   claim that DISH, EchoStar, and Mr. Ergen were all one and the

22   same.  Doesn't exist.

23           THE COURT:  But that's what I was talking about with

24   the difference between speculation and inference, because the

25   inference that they're going to ask me to draw from this fact

**LIGHTSQUARED, INC., ET AL.**

1   that the board and the special committee did not know about the

2   debt purchases, and there has also been some indications that

3   there were less than crystal-clear answers given to direct

4   questions by, I think, Mr. Cullen and Mr. Dodge on the point.

5   The inference that they're going to ask me to draw is that he

6   didn't need to tell them because he knew the ending of the

7   story.  He knew that when he wanted to get the debt repaid, he

8   would simply cause the board to approve a cash bid that would

9   make him whole.  That's the inference that they're going to ask

10  me to draw from the fact that the board was not informed of his

11  debt purchases, right?

12        MR. GIUFFRA:  That's their inference, Your Honor.  But

13  the counter-inference, the counter-facts are whose money was

14  used, and sitting here today, who's bearing all the risk, and

15  the risk is now being borne by Mr. Ergen and his daughter and

16  his wife and their trusts.  And there's no secret deal.  And

17  there's a public board of directors that, as Ms. Strickland has

18  pointed out, appointed a transaction committee and a special

19  litigation committee, and he's got no protection.  You know,

20  it's his investment.

21        And they can speculate about what he could cause them

22  to do or not cause them to do.  This is matter that's now in

23  two courthouses in this country, a public company with special

24  litigation committees, special transaction committees, and the

25  facts don't support this speculation that this was somehow a

1    risk-free deal that Mr. Ergen could engage in, because as I

2    have said, there is no evidence of an indemnity agreement

3    between Mr. Ergen and DISH or EchoStar.  So if the debt turns

4    out to be worth nothing, Mr. Ergen has lost all the money he's

5    invested.

6         Now, in this case LightSquared is looking to blame

7    someone for its failure to manage this company out of

8    bankruptcy and the significant FCC challenges that it faces.

9         This litigation is a smokescreen.  It's a way to

10   divert attention.  There's no evidence of corporate

11   skullduggery here.  There's speculation about it, and it's a

12   constantly changing speculation.

13        This case ultimately against DISH and EchoStar rests

14   on a flawed theory of agency.  But agency law is not a tool of

15   contract interpretation.  There is no basis to expand the

16   definition of disqualified company in the loan agreement based

17   on, you know, agency concepts.  You look to the language of the

18   contract.

19        Now as the Court has requested, we haven't moved for

20   summary judgment, but we believe the factual record here will

21   make it quite clear that the Court should grant judgment and

22   our plan is to move for judgment at the end of the plaintiff's

23   case.

24        Now one of the things that struck me about the

25   openings this morning was the fact that LightSquared and

**LIGHTSQUARED, INC., ET AL.**

80

1    Harbinger completely ignored the plain language of the relevant

2    contractual provision, the transfer restrictions.  That's the

3    elephant in the room that nobody'll talk about here.

4            And through this litigation, what LightSquared and

5    Harbinger are asking this Court to do is to rewrite the

6    transfer restrictions in their own credit agreement.  They want

7    the Court to ignore exactly what that credit agreement says and

8    they want the Court to ignore the fact that LightSquared and

9    its very sophisticated lawyers could have negotiated broader

10   transfer restrictions.  But they didn't do so.

11            And that's ultimately, Your Honor, if you take

12   nothing away from my opening, that's the fatal flaw in the

13   case.

14            When we moved to dismiss the last time in December,

15   LightSquared told the Court you couldn't rule on what the

16   contract said.  And they sort of indicated that, you know, we

17   needed discovery and there would be questions about, well,

18   what's the scope of the transfer restrictions.

19            Well, now we're at trial.  It's telling that

20   LightSquared is not offering any evidence, witnesses,

21   documents, about the drafting or negotiation of the relevant

22   provision, and it's actually nine words long, I counted it last

23   night, that is ultimately at the center of this case.

24            The witness list doesn't include for LightSquared

25   anybody involved in drafting or negotiating the contract, even

**LIGHTSQUARED, INC., ET AL.**

1   though Milbank was involved in doing so.

2          They're not citing any extrinsic evidence.  And when

3   all is said and done, this case begins and ends with the

4   language of that transfer restriction.  Because if the court

5   rules that SPSO was not a disqualified purchaser, this case is

6   over.

7          If Your Honor agrees with our interpretation of those

8   nine words, this case is over.

9          Now, it's fundamental to any tortious interference

10  case that there must be an underlying breach of contract.

11         And here, the breach is those nine words in the

12  transfer restriction.

13         Now, the transfer restriction language doesn't say

14  anything about indirect purchases, it doesn't say anything

15  about purchases by affiliates.

16         The transfer restriction simply says, and I'm the

17  first person to actually read it in this proceeding this

18  morning, "a disqualified company will include any known

19  subsidiary thereof" -- and as Your Honor well knows and made

20  the point back in October, lower case subsidiary, not defined

21  term, Subsidiary.

22         Now even worse Harbinger in their brief goes so far as

23  to say that the contract language doesn't matter.  Just impute

24  the actions of Ergen to DISH and EchoStar.

25         But this is a contract case at bottom.  Now contract

**LIGHTSQUARED, INC., ET AL.**

82

1  interpretation, as the Court knows, is a legal issue for the

2  Court to decide.

3        The Court must decide whether the contract language --

4        THE COURT:  Let me ask you a question,

5  hypothetically -- not this case or not anything that has been

6  previewed in this case.

7        There's evidence that, in fact, Mr. Ergen intended

8  this to be for DISH's benefit, that there is correspondence

9  between, hypothetically, between Mr. Ergen and Mr. Kiser that

10  says I want to get this for DISH, looks like it violates the

11  credit agreement, let's do indirectly what we can't do

12  directly.

13        In other words, there's evidence supporting the

14  theory, I think it was Harbinger used the word, front.  Mr.

15  Falcone used the word, front.

16        Suppose that were a stipulated fact, okay, and now put

17  that together with your statement, which I agree with as a

18  matter of law, it's about the contract, it's about the words of

19  the contact.  Okay.  We have  evidence that this was a front

20  for DISH.  Who wins?

21        MR. GIUFFRA:  We do, Your Honor.  And we win because

22  LightSquared and its very sophisticated lawyers know how to

23  draft the type of ironclad transfer restrictions that they now

24  want the Court to rewrite into the contract.

25        THE COURT:  So even though -- so I read the contract

**LIGHTSQUARED, INC., ET AL.**

1   and the words say what they say, obviously, and I have to

2   figure out what they mean.  And in the face of evidence that

3   this was a conspiracy, a front, a sham, a pass-through,

4   whatever labels you want to put on it, in the face of evidence

5   that that is true, nonetheless it's your view that I should

6   interpret the contract to mean that this purchase was okay?

7        MR. GIUFFRA:  Your Honor, they haven't put forward any

8   extrinsic evidence challenging that, nothing.

9        THE COURT:  I'm just asking you the hypothetical .

10       MR. GIUFFRA:  The language, courts -- courts typically

11  in New York State look, particularly in contracts involving

12  sophisticated parties, to the words in the contract.  And they

13  hold those sophisticated parties to those words because those

14  sophisticated lawyers and in this case Latham & Watkins and

15  Milbank Tweed, they can draft -- and I'm going to show you in a

16  second how the drafting history of this contract worked out --

17  but there is nothing wrong, absolutely nothing with the parties

18  structuring a transaction that complies with a transfer

19  restriction even if a different transaction wouldn't comply.

20       That's what lawyers are paid to do every day.

21       And what happened here, Your Honor, was UBS, as the

22  administrative agent which was represented by Latham & Watkins,

23  had incentives to have a narrower transfer restriction.  And

24  they wanted the debt to be attractive to the market and they

25  wanted eligible assignees to be broader.

**LIGHTSQUARED, INC., ET AL.**

1          So as a result of what was arm's-length negotiation

2    involving top law firms, we got a more narrow transfer

3    restriction.

4          I'll take the court in a minute exactly through how

5    that drafting history went down, and it's pretty clear that

6    these sophisticated lawyers could have drafted this language in

7    a way that would have clearly picked up Mr. Ergen or some

8    entity controlled by Mr. Ergen.

9          But it's a fundamental principle of New York contract

10   law that you first look to the words and you apply the words,

11   and that's because sophisticated parties have to be held to the

12   deal that they struck, not some other deal.  Otherwise, words

13   would have no meaning and in every case you would start to be

14   looking at, well, sort of, what might people have intended.

15         And, so, you know, this case has to be evaluated by

16   the language of the transfer restriction, nothing more, nothing

17   less.

18         And that's where in our view the case begins and ends.

19         Now let me start with a few propositions in terms of

20   the breach of contract, which is the first element of the claim

21   of tortious interference.

22         Here, SPSO did not breach the credit agreement.

23   Without a breach, there's no tortious interference.

24         SPSO, by the plain language of the nine words on the

25   contract, is ineligible assignee.

**LIGHTSQUARED, INC., ET AL.**

1          The plain language of this contract says, again,

2   disqualified company will include any known subsidiary thereof.

3   "Known subsidiary."

4          Now the word subsidiary means, and we cite cases in

5   our papers, controlled by another corporation, by ownership of

6   at least a majority of the shares.

7          Black's Law Dictionary talks about controlling share.

8   DISH and EchoStar don't own one share of SPSO.  Nothing.  Zero.

9   They don't have controlling share of SPSO.

10          In fact, the evidence in this case will show that DISH

11   and EchoStar have no economic interest, no voting power, they

12   have no up side, they have no down side.  It's all on Mr. Ergen

13   because the evidence -- and we've taken discovery, we're out of

14   the realm of speculation -- owns SPSO solely in his personal

15   capacity.

16          And let me take you through, Your Honor, the drafting

17   history.  Because this is really important to get out.

18          Now LightSquared tried but was unsuccessful in getting

19   a broader transfer restriction.

20          And in fact, the drafting history makes clear, as the

21   plain language of the contract does, that the current transfer

22   restriction is not broad enough to include the "agency" and"

23   indirect purchaser" theories that LightSquared wants to

24   advance.

25          In facts the words agency and the words indirect

1    purchaser, that could have been put in the contract if they

2    wanted to negotiate that.

3            Let's put up slide 4 in the book I've given Your

4    Honor.  This is a September 18, 2010, credit agreement draft

5    from Latham & Watkins.  And they're representing UBS.

6            And hey have a provision which provides that an

7    eligible assignees shall not include the borrower or any of its

8    affiliates or subsidiaries and any natural person or any person

9    listed on schedule 101 A.

10           So those were the people that DISH and EchoStar would

11   have been listed on that provision.

12           And then Milbank, they don't like that proposal, so

13   they come up and -- let's put up slide 5 -- they change the

14   language and they say let's add the word competitor, in the

15   September 19, 2010 draft.

16           And they have, you know, that a competitor is not an

17   eligible assignee.  And then they propose defining competitor

18   to mean any person listed in the schedule and then any

19   affiliate any such person, which would have picked up Mr. Ergen

20   and SPSO and we wouldn't be here to do.

21           Now what happens next?  Let's turn to slide 6.  Latham

22   & Watkins comes back on behalf of UBS which wants a narrower

23   restriction and they come back with the language that

24   ultimately appears in the contract.

25           They take out this competitor language.  They don't

**LIGHTSQUARED, INC., ET AL.**

87

1   agree to the affiliate language.  And they agree to a

2   disqualified company will include any known subsidiary thereof.

3   Known subsidiary.

4          That's because these restrictions are intended to

5   apply to people selling the debt.  That someone who is a holder

6   of the debt can't sell the debt to a known subsidiary of a

7   disqualified company.

8          There is no evidence that SPSO is a known subsidiary

9   Of DISH or EchoStar.  Zero.  De nada.

10         Again, let's go to slide 7.  Final words, and again

11  this is what this case is ultimately about, these nine words.

12  It's not about all the innuendo, it's not about all the

13  speculation.  It's about Your Honor's interpretation of these

14  nine words.

15         We had a situation where through arms length

16  negotiations sophisticated counsel came upon these words, and

17  they affirmatively rejected broader language.

18         Now we know that the evidence will show that in May

19  2012 LightSquared added DISH to the list of disqualified

20  companies.  Even though EchoStar was already on the list.  They

21  added them.

22         That sort of confirms that control affiliate doesn't

23  work, because they made a decision themselves in May 2012 to

24  add DISH.  And how parties act in light of a contract isn't

25  something the Court can take into account in interpreting the

**LIGHTSQUARED, INC., ET AL.**

88

1   contract.

2           Now Section 10.04 of the credit agreement requires

3   that the disqualified company be known to the lender.

4           There is no evidence here that any lender knew or even

5   suspected that SPSO was a subsidiary of DISH.

6           In fact, LightSquared claims the opposite.  They claim

7   that SPSO sought to conceal the fact that there was some

8   connection to avoid market speculation.

9           In addition, Your Honor, Section 10.04B, and this is

10  slide 8, applies to the lender.  It restricts the lender.  It

11  doesn't talk about the person who obtains the debt.  The

12  provision was intended to apply to assignments by lenders.

13          And there is a case, Your Honor, which we cite in our

14  papers, involving Citibank, it's a Second Circuit case 1983

15  where the Second Circuit held that under New York Law and anti-

16  assignment.  Clause is a personal promise of the assignor and

17  gives rise to potential damages only against the assignor, not

18  the assignee.

19          And this contract by its terms applies only to the

20  assignor, not the assignee.

21          So it's pretty clear here, there's no breach, and they

22  certainly don't allege a breach by UBS, and without a breach by

23  UBS there is no tortious interference claim.  In fact, UBS had

24  no duty to ascertain or inquire about any statement made by any

25  assignee here, SPSO.

**LIGHTSQUARED, INC., ET AL.**

89

1         Section 9.03, which we've talked about before makes

2    that quite clear.

3         THE COURT:  Let me stop you on that point with respect

4    to who's the beneficiary of the rights.

5         So, again, hypothetically, if there were a breach,

6    right, you're saying that that cause of action is against the

7    assignor?

8         MR. GIUFFRA:  Yes, Your Honor.  In fact, the language

9    in the contract which talks about known subsidiaries, would be

10   supportive of that theory.

11        So I think there's a lot of --

12        THE COURT:  I understand, I understand the point that

13   you made.  But now let me ask the next question.

14        So take the contract provision and put it in the

15   bankruptcy realm.  So therefore because there is only a cause

16   of action against the assignor, does that mean that there is no

17   basis if a violation were found, a breach were found for

18   equitable subordination of the claim?

19        MR. GIUFFRA:  I think Your Honor would have to find a

20   breach, because it's all about the transfer restrictions.  So

21   if there is no breach of the contract, presumably --

22        THE COURT:  Right, so if there is a breach -- but you

23   were just saying if there is a breach it's a claim against the

24   assignor?

25        MR. GIUFFRA:  Correct.

**LIGHTSQUARED, INC., ET AL.**

1        THE COURT:  Okay.  So if there is a breach, is that

2   the type of conduct that would support equitable subordination?

3        MR. GIUFFRA:  Our position would be no, because that's

4   a drastic remedy.

5        So without this breach of the credit agreement which

6   SPSO, no tortious interference claim.

7        Now, in addition, the second element, which no one

8   talked about the elements of the claims against us in the

9   opening, they've got to prove by a preponderance of the

10  evidence that DISH or EchoStar intentionally sought to cause a

11  breach and was the proximate cause of the breach.

12       Now there is no evidence in this case that DISH or

13  EchoStar took any intentional action to cause a breach.  They

14  relied totally on their flawed agency theory where they want to

15  essentially impute actions of Mr. Ergen and Mr. Kiser by virtue

16  of their corporate positions to DISH and EchoStar.

17       Now the discovery that's been taken, Your Honor, it's

18  important to talk about it, because that's why when you have a

19  trial it's different than that motion to dismiss.

20       Thousands of documents have been produced.  They've

21  had access to the board minutes.  They've taken thirteen

22  depositions, including Gary Howard who was a board member, who

23  was a member of the independent committee that looked at the

24  transactional issues.  And the facts that are now before the

25  Court will show that Ergen purchased the debt in his personal

1   capacity, he was assisted by Kiser, but Kiser had previously

2   done personal financial matters for him, that he did it on his

3   own time, that the funds that were used to purchase the debt

4   were Mr. Ergen's funds, no DISH or EchoStar funds were used,

5   and that the boards learned of the purchases after the fact in

6   May.

7           There is no conspiracy between the board and Mr.

8   Ergen.  And in fact, Your Honor, the board and EchoStar as I

9   mentioned before have investment policies, and let's just

10  briefly I'll be done, I promise, Your Honor, by 12:30, with the

11  slide -- let's put slide 10 up, please -- there is an

12  investment policy.  Mr. Ergen notwithstanding his position at

13  the company, his stock ownership or anything else, could not

14  make an acquisition of more than 125 million in a single

15  transaction without going back to his board.  EchoStar fifty

16  million.

17          These are written policies.  They have no evidence

18  that they weren't followed and that they weren't followed in

19  the past.

20          In fact, in the case of the DBSD and TerraStar

21  matters, those transactions were approved by the board.  They

22  were not transactions that Mr. Ergen sort of just did on his

23  own.

24          And here, there is no evidence that approval was

25  sought before the debt was bought by the board.

**LIGHTSQUARED, INC., ET AL.**

1       And the evidence will also show, as Ms. Strickland

2   pointed out that DISH itself only began considering

3   LightSquared as a potential acquisition target and they've got

4   the board minutes in May 2013 after the Sprint and Clearwire

5   deals looked like they wouldn't succeed.

6       It's also something again, and they took Mr. Howard's

7   deposition, that DISH appointed a special transaction committee

8   of independent directors to consider the opportunity because of

9   the conflict.  And I talked about this in October.  And the

10  appointment of that special transaction committee is

11  inconsistent with some prearranged deal between DISH and its

12  board and Mr. Ergen to use Mr. Ergen's investment in the debt

13  where he bears all the down side risk to pursue LightSquared.

14      In fact, the transaction committee went out and hired

15  counsel, Perella Weinberg did evaluation opinion before the

16  decision was made to go forward and pursue the LBAC

17  opportunity.

18      The evidence that will be presented to the Court will

19  making it clear that that special transaction committee asked

20  questions of Ergen regarding the purchases, including basic

21  information that the board didn't have, and that the board made

22  an independent decision to pursue those transactions.

23      THE COURT:  Notwithstanding that the board was never

24  told the price at which the debt had been purchased?

25      MR. GIUFFRA:  I think, Your Honor, the board

1    ultimately went forward because it was clear that once they

2    made the offer, there was no conflict given the amount of the

3    offer that was made, the 2.2 billion.

4         Now the plaintiffs in Nevada have been arguing that

5    DISH should have received the benefit, but did not.

6         And that theory, the benefit of the debt purchases,

7    that theory is obviously contrary to the position in this

8    courtroom.

9         Now it's black letter law, and we haven't talked much

10    about the law so far, the other side hasn't -- let's put up

11    slide 13 -- that a principal is liable for tortious conduct of

12    the agent only when the agent acts within the scope of the

13    employment relationship.

14         They've got the burden of proving in this courtroom

15    that Messrs. Ergen and Kiser had authority to bind DISH or

16    EchoStar with respect to these specific transactions.

17         And all transactions, all agency transactions under

18    New York Law require manifestation ever consent by one person

19    to another.

20         And here they simply say all you've got to do is point

21    to positions in a company and say, well, we've got it, we've

22    got agency -- and they even go so far, we heard a little bit of

23    this morning, where they treat Mr. Ergen as both the principal

24    and the agent, a theory Your Honor rejected in the earlier

25    decision Your Honor wrote.

**LIGHTSQUARED, INC., ET AL.**

1          And the fact that --

2          THE COURT:  Well, I don't think I specifically

3    rejected it.  I think I made the observation that I didn't

4    really understand how as a matter of law it worked.

5          MR. GIUFFRA:  I don't think it works, Your Honor, and

6    they haven't cited a single case where it does work.

7          The mere fact that Mr. Ergen and Mr. Kiser performed

8    similar functions for DISH and engaged in these transactions

9    for Mr. Ergen's personal benefit where he bears all the risk,

10   that doesn't turn them into actions of, doesn't turn them into

11   actions of DISH.  Speculation about what Mr. Ergen had in his

12   mind, we've heard that, that's in the papers.  That was in

13   LightSquared's brief at page 18 -- what was in his mind -- that

14   means nothing.

15         They ultimately have to resort to this theory of,

16   like, what was in Mr. Ergen's mind as opposed to what did the

17   Board of Directors know and approve and do, and what did the

18   corporate rules that bind Mr. Ergen say.

19         Because that's the only way they can get past go.

20         Now the investment limits, set limits on Mr. Ergen and

21   Mr. Kiser's authority.  And this is not a case -- look, they'd

22   have a much better case if they can show that money from DISH

23   or EchoStar was used to buy this debt.  They'd have a much

24   better case if they could show there was an indemnity agreement

25   between DISH and EchoStar and Mr. Ergen.  They don't have it.

1        Every trade that was engaged in by Mr. -- the first

2   trade that closed, okay, the very first one, exceeded the 125

3   million-dollar threshold.

4        So they would have had to go back to the board,

5   because --

6        THE COURT:  I'm sorry.

7        MR. GIUFFRA:  Let me restate that.  The first trade

8   they did was more than 125 million.  The way the policy is

9   written --

10        THE COURT:  Where are you getting that fact from?

11        MR. GIUFFRA:  Let's go back to slide 10.

12        MS. STRICKLAND:  It was the second trade, not the

13   first.

14        MR. GIUFFRA:  Second trade, I'm sorry.

15        If Your Honor looks at the investment policy, it says

16   that unless otherwise permitted by the corporation's cash

17   management policy, and that's basically buying treasuries--

18        THE COURT:  Right.

19        MR. GIUFFRA:  -- you can't engage 125 million dollars

20   in a single transaction or series of related transactions

21   without approval by the board.

22        THE COURT:  Okay.

23        MR. GIUFFRA:  So once he does a transaction that's

24   more than 125 million --

25        THE COURT:  Right.

**LIGHTSQUARED, INC., ET AL.**

1           MR. GIUFFRA:  -- in this debt, they've got to go back

2      to the board.  They've got to go to the board --

3           THE COURT:  Right.  But that didn't happen until the

4      Icahn trade.  So I'm just, I'm just focusing on the fact that

5      you said the first trade.  That's not true.

6           MR. GIUFFRA:  I misspoke, Your Honor.

7           THE COURT:  Okay.  You hit that number when you

8      aggregate the first set of trades that occurred in April and

9      May prior to the Icahn trade, you don't get to that number.

10          MR. GIUFFRA:  Yes, that's correct, Your Honor.  But

11     still, Your Honor, all the rest of the trades --

12          THE COURT:  I understand.

13          MR. GIUFFRA:  There is no question about that.

14          THE COURT:  I was just focusing on what you said.

15          MR. GIUFFRA:  I'm trying to rush through.

16          THE COURT:  You don't have to rush through.  We can

17     pause and we can keep going, so.

18          MR. GIUFFRA:  Okay.  Now again, Your Honor, the

19     evidence will show that he disclosed the transactions after

20     they were completed in May of 2013.

21          The fact that Ergen acknowledged when asked by the

22     general counsel and by a second executive of the company there

23     was some truth to the rumor, that he was personally buying

24     debt, says nothing about whether DISH or EchoStar knew about

25     the transactions in advance, or were the beneficiaries of those

**LIGHTSQUARED, INC., ET AL.**

1  transactions.

2          These were personal trades, again, where he bore all

3  the risk.

4          THE COURT:  Let me ask you a question.  Is Mr. Kiser

5  an officer of DISH and EchoStar?

6          MR. GIUFFRA:  He's an officer of DISH.

7          THE COURT:  You have to help me with the corporate

8  governance technicalities.  Is he an executive officer?  In

9  other words, does he have fiduciary duties to the company?

10          MR. FRAWLEY:  We can assume for purposes, yes.

11          MR. GIUFFRA:  For purposes of this matter we'll assume

12  that.

13          THE COURT:  Okay, go ahead.

14          MR. GIUFFRA:  But again, Your Honor, we're not in a

15  Nevada courtroom where we are saying Mr. Ergen is using --

16          THE COURT:  I know we're not in a Nevada courtroom and

17  I -- don't anyone speculate what I mean by that statement.  And

18  I know that throughout and going forward you're going to

19  continue to draw a distinction between the issues that are

20  being raised in Nevada and here.

21          In my mind there is a nexus, though.  There is a

22  nexus, and it's not so much via the nine words that you've been

23  pointing me to, but it's more in the, as the case has

24  developed, more in the equation that the plaintiffs are urging

25  between Mr. Ergen on the one hand and DISH on the other hand.

**LIGHTSQUARED, INC., ET AL.**

1          So, therefore, it's of interest to me, how Mr. Kiser

2    functioned, what he viewed his responsibilities as, whether or

3    not when he is the recipient of a request by Mr. Ergen and he

4    puts on his personal friend/advisor hat, whether he was

5    obligated at that moment also to have the interest of the

6    corporation and its shareholders in mind.

7          And I'm interested in that not because I'm deciding

8    any dispute between the shareholders of DISH and Mr. Ergen and

9    the company, but because I believe that it's relevant to the

10   separation that you're urging me to find exists between Mr.

11   Ergen as chairman and as a DISH shareholder on the one hand and

12   DISH's corporate existence on the other hand.

13         MR. GIUFFRA:  Well, Your Honor, the testimony will

14   actually show that Mr. Kiser believed that his actions that he

15   was engaged in in assisting Mr. Ergen were not for DISH, were

16   not for EchoStar, and were not within the scope of what his

17   authority for DISH or EchoStar.

18         So he thought he was assisting Mr. Ergen in his

19   personal capacity.  In fact, the law and we cite a case from

20   the Bankruptcy Court In Re Motors 2013, and in looking at

21   agency the understanding of the purported agent is important.

22         And you'll hear testimony that Mr. Kiser believed that

23   he wasn't acting, to the extent he was working on these trades,

24   for DISH or EchoStar.

25         And again, they have absolutely no evidence that DISH

1   or EchoStar had any control over or could have had any control

2   over what was Mr. Ergen putting his own funds, his family's

3   funds, his daughter's funds, at risk to buy this debt.

4          Again, they'd have a better case if they could show an

5   indemnity agreement or some loan, or something, where you could

6   change the economics.  But the economics and the evidence will

7   show and the discovery they've gotten now, so we're not in

8   motion to dismiss-land anymore, it's Mr. Ergen's money and he

9   bears the risk.

10         Now the argument that was made that the unauthorized

11   actions of an agent can still be imputed to a principal is

12   wrong as a matter of law.

13         In fact, once the DISH board learned of the

14   investment, they formed a special transaction committee as

15   we've talked about.

16         Let's take a moment while you're pausing to pause and

17   figure out what we're going to do next, because it's now 12:25.

18         Is there anyone else who wants to make an opening

19   statement?

20         And do you folks wants to take your lunch break at

21   12:30 and then start with the witnesses after that?

22         MR. STONE:  We think that makes sense, Your Honor.

23         THE COURT:  All right.  Thank you, Mr. Stone.  And how

24   much time collectively do you think you'd like.  How much time

25   would you like?  Would you like an hour?

**LIGHTSQUARED, INC., ET AL.**

1          MR. STONE:  Yeah, one hour is fine.

2          THE COURT:  All right.  Then let's try to finish and

3     if I have to be a few minutes late, I'll get a demerit.

4          MR. GIUFFRA:  We will be done, Your Honor.

5          Now the breach of contract claim that they've put

6     forward against SPSO is premised on SPSO being a sub of DISH

7     and then Kiser and Ergen acting as agents of DISH.

8          Now if LightSquared were to prevail, there can't be a

9     tortious interference claim against DISH or EchoStar because

10    the agency and the imputation theories are entirely defeat the

11    tort claim.

12         The acts of an authorized agent are the acts of a

13    principal.  And if the acts of Ergen and Kiser, we don't think

14    they should be, imputed to DISH, there can't be a tort or

15    tortious interference because DISH couldn't have induced itself

16    to breach a contract, and a parent can't be liable in tort for

17    causing a subsidiary to breach a contract in furtherance of the

18    parent's financial interest.  We talked about that I think back

19    in December.

20         And so basically they have two theories that are in

21    conflict with one another, the agency theory and their

22    imputation theory, and then their tortious interference theory.

23         Two last points and then I'll be done.

24         There is -- one of the elements of a tortious

25    interference claim is you've got to show damages.  And they've

**LIGHTSQUARED, INC., ET AL.**

101

1    got to show actual damages, not speculative damages.  They

2    can't adopt a wait and see approach and see what happens in

3    plan confirmation.

4            THE COURT:  Why can't they wait and see what happens

5    in plan confirmation?

6            MR. GIUFFRA:  Because damages have to be, you have to

7    have the damages when you bring the claim.  And they don't

8    have --

9            THE COURT:  Well, they're alleging that they have

10   damages, they just can't quantify them yet.

11           MR. GIUFFRA:  Well, the damages they have are

12   speculative and you don't get the benefit of bringing a

13   tortious interference claim against the party based on

14   speculative damages.

15           And in fact, in this case, the allegation that they've

16   made is that the presence of SPSO in the capital structure in

17   some way damaged LightSquared.

18           Now, we know that for almost a year LightSquared knew

19   or assumed, let's just take even that inference, that Ergen was

20   behind SPSO.  They did nothing --

21           THE COURT:  All right, well, that's a different point,

22   though, that's a point about, you know, waiver, estoppel et

23   cetera -- I think that's a different pointed then whether or

24   not they've sustained damages that are not capable of final

25   calculation yet.

**LIGHTSQUARED, INC., ET AL.**

1          MR. GIUFFRA:  But they've got no evidence to support

2     that.

3          I think the Falcone -- we'll put up slide 15 again

4     because I think it's so telling -- where Mr. Falcone is

5     literally e-mailing with Reuters and saying and telling a

6     reporter that he thinks Ergen is the party that's buying the

7     debt, and he's hoping that that press story that might get

8     prompted will prompt strategic to step in.

9          That sort of belies, Your Honor, the notion that the

10    presence of Ergen is somehow going to, in the capital

11    structure, is going to in some way damage the debtor.  The guy

12    who actually was controlling this whole operation was telling

13    the press, you know, sort of tell the world Ergen is involved

14    and that must mean that other people will think it's a good

15    deal and they'll get in and we'll start a bidding war.

16         So you can't have it both ways.  You can't sort of say

17    the presence of Ergen is a bad thing, and then basically try to

18    basically put Ergen out there and say if Ergen thinks this is a

19    good investment, maybe some other rich person will come in or

20    some other rich hedge fund-type personality will come in.

21         So this e-mail under cuts the argument of any harm

22    whatsoever, and without harm they have no plan.

23         Now they have no evidence that LightSquared would have

24    succeeded in negotiating and confirming a plan during the

25    exclusivity period absent SPSO's debt acquisition.  Nothing.

1        And we have testimony which Your Honor will hear from

2   Steve Zelin of Blackstone who was the banker for the ad hoc

3   group, and that testimony will show that SPSO was not the

4   reason LightSquared failed to obtain financing from Jefferies.

5        And during his deposition, we got some deposition

6   clips, so these are ours, Mr. Zelin, a highly respected member

7   of the restructuring community said "the market was just not

8   receptive to the financing structure that was being put in

9   place, even though part of the structure was one where those

10  who committed would actually receive ticking fees and payments.

11  I think the market just looked at the overall situation and the

12  uncertainty and ultimately decided that the assets, even with

13  regulatory approval, were not attractive enough to provide two

14  and a half plus billion dollars of financing to take our

15  clients out."

16        And let's turn to slide 17.  And this is Mr. Zelin.

17  SPSO "did not interfere at all with our negotiations with

18  Harbinger."  He further went on to testify, a consensual deal

19  was not reached because "we couldn't agree to terms."  We, as

20  time went on and discussions continued, realized that -- and

21  I've added this -- Mr. Falcone was looking for far more

22  optionality and far greater economics.  He was not willing to

23  give up as much economics as our clients were comfortable

24  giving.  The perceived risk they were taking, the economic

25  terms that were available in the overall deal did not make

**LIGHTSQUARED, INC., ET AL.**

1    sense when compared to the alternatives.

2         And then Mr. Zelin at 104 of his transcript went on to

3    say SPSO's trading had "zero impact on why the deal with

4    Harbinger broke down."

5         They have no evidence, Your Honor, none, of damages

6    based on their Mr. Ergen is in the capital structure theory.

7    It's purely speculative.

8         This bankruptcy proceeding has not reached a

9    conclusion.  And any harm is pure speculation.  And Mr. Zelin's

10   testimony belies any theory that they've put forward.

11        Let me just say a word about the releases and I know

12   Your Honor asked about that the last time I was here.

13        It's not relevant to a tortious interference claim

14   against DISH and it's not --

15        THE COURT:  It's relevant to the breach of the credit

16   agreement claim.

17        MR. GIUFFRA:  And as Your Honor is aware, the release

18   provision is a general release that was included in the

19   agreement between LBAC and the ad hoc secured group.  It does

20   not require the allowances of any bankruptcy claim.  It's a

21   general release of the type a buyer would expect in any --

22        THE COURT:  That's contrary to the answer to that

23   question that Ms. Strickland gave me some weeks ago.  So we

24   don't have to resolve this now, but that answer is contrary to

25   what was put on the record some weeks ago.

1          MR. GIUFFRA:  Well, Your honor, I think Your Honor in

2    this case, there is a question as to why would LBAC want this

3    release.

4          Well, in asking the question, you know, we sort of

5    need to, can't look at the claims that are being brought right

6    now.  And they brought claims against DISH and EchoStar for

7    hundreds of millions of dollars based on SPSO's actions in this

8    case.

9          So this case is a poster child for why someone would

10   want a broad release.  Buyers typically ask for broad releases.

11   And I think they're trying to find something sinister in a

12   release that is limited to the seller, the LightSquared LP

13   debtors, it doesn't impact third parties such as Harbinger or

14   the debtors that are not released.

15         THE COURT:  But you're skirting over the question of

16   why it was that when the LBAC bid hit the special transaction

17   committee, they never peeled back the layers of the onion and

18   made any inquiry or determination as to how the price might

19   have been affected, in other words, been made more favorable to

20   DISH as the potential acquirer, ultimate acquirer as the

21   putative parent of LBAC, right?

22         If the price would go down, if SPSO was taken out of

23   the release.

24         I understand your point with respect to LBAC and

25   remember the timing, LBAC was born, being owned by Mr. Ergen

**LIGHTSQUARED, INC., ET AL.**

106

1 and then was sold to DISH for a dollar at a certain point, I

2 believe.

3          So that doesn't answer the question.  So the

4 recitation that, you know, this is always the way it's done and

5 of course the purchaser would want a release does not answer

6 the question of to what extent the special committee did or did

7 not and why it did or did not look into the release that

8 relates to Mr. Ergen, because if there is a true separation

9 then the special committee really shouldn't have cared whether

10 or not that debt got allowed.  It was making a determination

11 how much to pay for an asset, for the spectrum.

12          MR. GIUFFRA:  Yeah, but that release, Your Honor,

13 there is nothing specific in it to Ergen or an SPSO bankruptcy

14 claim.  This is an issue that may be relevant in the Nevada

15 litigation, but to say that it's relevant now in this

16 litigation when the parties normally ask for these kinds of

17 releases -- and in fact, LightSquared has never asked and has

18 never asked to negotiate the release or any other provision of

19 the asset purchase agreement.

20          So you know, if there was a negotiation, maybe we

21 discuss what the terms of the release would be, but that hasn't

22 happened, and obviously the court in Nevada has instructed how

23 that negotiation should be conducted in and when it ever

24 happened.  Our view, Your Honor, is that this release issue is

25 a red herring in this case.

**LIGHTSQUARED, INC., ET AL.**

1          Now to sum up, Your Honor, we believe that the suit

2    against DISH and EchoStar is a sideshow, that LightSquared

3    should have been concerned with protecting its creditors, not

4    Harbinger.  That instead of engaging in copycat lawsuits,

5    LightSquared should have been focused on engaging with LBAC and

6    building consensus behind a confirmable plan.

7          And, Your Honor, again, the plain language of these

8    transfer restrictions, the nine words that I've been harping

9    on, in settled principles of law, of contract interpretation,

10   and settle of law of agency relationships are fatal to the

11   claims that LightSquared had brought in this action.

12         Discovery has shown there is no evidence to support

13   the speculation.

14         Ultimately this is Mr. Ergen's transaction.  He bears

15   the risk.  His money was put at risk.  There is no secret deal.

16   It's speculation.

17         And again, Your Honor, the nine words control.  And if

18   Your Honor interprets those words and looks through the

19   drafting history and sees that the sophisticated lawyers who

20   were involved in drafting that provision could have drafted a

21   much broader provision, but did not do so -- and in fact the

22   proposal of Milbank was rejected for the language, the nine

23   words we have, lower case subsidiary, we are confident, Your

24   Honor, that after the plaintiff's case when I stand here again

25   asking for judgment that Your Honor will granted judgment to

**LIGHTSQUARED, INC., ET AL.**

1    DISH and EchoStar because they haven't pled the elements of a

2    tortious interference claim, everything from breach of contract

3    to no damages.

4          Thank you.

5          THE COURT:  All right.  Thank you very much.

6          All right.  Mr. Sussberg, did you have something?

7          MR. SUSSBERG:  Because I know you need to run.  Joshua

8    Sussberg from Kirkland & Ellis.  What was just said about the

9    release and the lack of discussion and involvement absolutely

10   one hundred percent false.

11         THE COURT:  Okay.  We've had a very excellent morning

12   of very thoughtful and well-done argument.  So let's leave it

13   at that and now I look forward to hear the facts when I come

14   back.  I'll see you in about an hour.

15         You're free to leave your things here.

16         MR. BARR:  Thank you, Your Honor.

17      (Recess from 12:36 p.m. until 1:44 p.m.)

18         THE CLERK:  All rise.

19         THE COURT:  Please have a seat.

20         All right.  Is everyone back who needs to be back?

21         Okay, Mr. Stone.

22         MR. STONE:  Good afternoon, Your Honor.  For the

23   record Alan Stone from Milbank here on behalf of the debtors.

24         Your Honor, I rise only to call our first witness and

25   to introduce the Court to Michael Hirschfeld, my partner who

**LIGHTSQUARED, INC., ET AL.**

1  has not yet appeared in this case --

2        THE COURT:  Okay.

3        MR. STONE:  -- and he will present our first witness.

4        THE COURT:  All right.

5        MR. STONE:  So with that the plaintiffs call Douglas

6  Smith.

7        THE COURT:  All right.

8        How are you, Mr. Smith?  Would you raise your right

9  hand, please?

10    (Witness sworn)

11        THE COURT:  Have a seat, please.

12        Ready when you are.

13        MR. HIRSCHFELD:  Thank you, Your Honor.

14  DIRECT EXAMINATION

15  BY MR. HIRSCHFELD:

16  Q.   Mr. Smith, for the record, could you tell the Court by

17  whom you are employed?

18  A.   LightSquared.

19  Q.   In what capacity are you currently employed by

20  LightSquared?

21  A.   I'm the chairman and chief executive officer.

22  Q.   And how long have you been employed by LightSquared?

23  A.   Since April of 2010.

24  Q.   And in what capacity did you, were you employed when you

25  joined LightSquared in April 2010?

**LIGHTSQUARED, INC., ET AL.**

110

1    A.    My initial role was chief network officer.

2    Q.    And could you explain to the Court what your functions

3    were for LightSquared as chief network officer?

4    A.    Sure.  As chief network officer, I was responsible for all

5    of our technical aspects of the business, building out the

6    terrestrial network itself and operating the satellite network.

7    Q.    And just briefly what's the difference between a satellite

8    network or the satellite as you referred to it and the

9    terrestrial network?

10   A.    So the satellite-based network is a network that provides

11   signal and coverage across our coverage area from a satellite

12   that's in orbit.

13        The terrestrial network itself is a network that is built

14   on the ground, so it's an earth-based network, we put antennas,

15   transmitters on towers that aren't visible on ground.

16             THE COURT:  Mr. Smith, if you would pull that

17   microphone a little bit closer to you, that's great.  Thank

18   you.

19   Q.    And after serving as chief network officer, did you have

20   another position with LightSquared?

21   A.    Yes, I did.  In February of 2012 the role changed to co-

22   chief operating officer.

23   Q.    And you were co-chief operating officer with whom?

24   A.    Marc Montagner who is our CFO.

25   Q.    And what were your responsibilities and duties as co-chief

**LIGHTSQUARED, INC., ET AL.**

1  operating officer of LightSquared?

2  A.    So at the time LightSquared did not have a chief executive

3  officer.  So between the two of us we filled that will role and

4  had overall responsibility for the business.

5  Q.    And when did you become the chief executive officer and

6  chairman of LightSquared?

7  A.    That would have been July of 2012.

8  Q.    As a result of your employment with LightSquared and the

9  positions that you've described, are you generally familiar

10  with the business of LightSquared?

11  A.    Yes, I am.

12  Q.    Could you trace for the Court please your educational

13  background beginning with college and indicate where you went

14  to school, what degrees you got, and when?

15  A.    Sure.  So I have a bachelor of science degree in

16  electrical engineering from Merrimack College.  I received that

17  in 1990.  I have a masters degree in the management of

18  technology from the University of Pennsylvania received in

19  2001.

20  Q.    And could you please trace for the Court your employment

21  history after graduation from college?

22  A.    Sure.  So after college, I joined GTE.  My -- initially I

23  joined that into a management-training program, got different

24  exposure to different business units within GTE.  GTE is now

25  part of Verizon.

**LIGHTSQUARED, INC., ET AL.**

1       During that experience one of my assignments was with GTE

2   mobile net.  That was their wireless division or their cellular

3   division at the time.  That's where I spent the rest of my

4   time.  I enjoyed it.  I stayed in that division for the three

5   years that I was at GTE.

6       When I left GTE, I went to Nextel in 1993.  And I joined

7   Nextel in a similar capacity doing network engineering and

8   planning, network design build-out and operations.

9   Q.   What was the business of Nextel when you joined it?

10  A.   At the time Nextel was a start-up business.  Its existing

11  operations were two-way radio-type communications, but had

12  plans to build out a cellular network to compete with the

13  cellular duopoly that existed at the time.

14  Q.   And during the time that you were with Nextel, did your

15  duties involve the build-out of the cellular network?

16  A.   Yes, it did.

17  Q.   For how long did you remain with Nextel?

18  A.   I stayed at Nextel and what became Sprint Nextel, I think

19  it was a total of sixteen or seventeen years.

20  Q.   And can you tell the Court what titles, if any, you had

21  during your tenure at Nextel or Sprint Nextel?

22  A.   Sure.  There were a number of different titles.  I think

23  initially I was a director of RF engineering.  RF engineering

24  stands for radio frequency engineering.  It's all of the

25  spectrum-based planning and engineering of the wireless

**LIGHTSQUARED, INC., ET AL.**

113

1  networks, essentially the wireless component of the wireless

2  networks.

3      Roles changed.  There were a number of different titles, I

4  think there was vice president of national technical support.

5      When I was promoted to take full responsibility for

6  national operations of the Nextel national network, I had a

7  role that was vice president of strategy and standards, still

8  doing all of the wireless RF planning for the company.

9      At that point I think that was post-merger with Sprint, so

10  that would have been for all of Sprint Nextel networks.

11      I was vice president of network engineering at Sprint

12  Nextel as well.  And in that role I had responsibility for all

13  of Sprint's national and international wire line and wireless

14  networks.

15      And the last role that I had at Sprint Nextel was chief

16  technical operations officer for a division of Sprint that was

17  building out Sprint's first 4G networks.  We were building on a

18  network which was a WiMAX-based network.  WiMAX, at the time,

19  was a competing technology with LTE.  It was a bit earlier than

20  LTE.  And Sprint embarked on building out a WiMAX network and I

21  was responsible for that program.

22      That ultimately led to a spinoff where Sprint spun off

23  this business unit that I was in, merged it with a company

24  called ClearWire, and I went with that spinoff and became a

25  ClearWire employee.  I was there just for a few months, and

**LIGHTSQUARED, INC., ET AL.**

1   then left the ClearWire company.

2   Q.   Okay, so that takes us, if I can do the math correctly,

3   into about 2009, is that correct?

4   A.   That's correct.

5   Q.   Okay.  And what did you do after you left ClearWire in

6   2009?

7   A.   So in 2009 I did independent consulting.  I had a few

8   clients, and which SkyTerra was one, SkyTerra was the

9   predecessor company to LightSquared.  Harbinger Capital was

10  another.  And it was through those engagements that I came to

11  join LightSquared as an employee in 2010.

12  Q.   Would it be accurate to say that you've spent your entire

13  working career working in the telecommunications industry?

14  A.   Yes, that's accurate.

15  Q.   And during your work within the telecommunications

16  industry, have you been primarily involved in activities that

17  require an understanding of wireless spectrum?

18  A.   Yes, absolutely.  In all of my roles the one thing that

19  has been consistent is I've continually had responsibility for

20  the spectrum deployment operations and design of the networks

21  for the companies that I've been employed at.

22  Q.   Let me ask you this.  Are you, do you have any level of

23  familiarity with the wireless spectrum that Dish Networks has?

24  A.   Yes, I do, more so with their terrestrial spectrum, not so

25  much with their satellite-based spectrum.

1   Q.   What's the basis for your familiarity with that component

2   of DISH's spectrum?

3   A.   Well, the basis would just be I generally keep abreast of

4   what is happening with spectrum in the industry and seek to see

5   what spectrum is being made available for wireless networks, as

6   that's the industry that I'm in.

7         So I have an understanding of generally spectrum just

8   generally I track it and follow it as part of the

9   responsibilities that I had in my job.

10         On the specific aspects of the spectrum that DISH has, the

11   terrestrial spectrum that they have, I follow that one closely

12   just because it's similarly situated spectrum and some of the

13   decisions that have been in front of the FCC are certainly

14   pertinent and relevant to what we do at LightSquared.  So from

15   that perspective I follow that very closely and then -- and

16   have spent a fair amount of time looking at that spectrum,

17   following those proceedings, and staying up to date with what

18   was happening.

19   Q.   Do you know what the term AWS-4 refers to?

20   A.   Yes, I do.

21   Q.   Can you tell the Court what that refers to?

22   A.   Sure.  It's the FCC's designation for forty megahertz of

23   spectrum that DISH has a license for.

24   Q.   So what are the numeric designations of spectrum that are

25   associated with the AWS-4?

**LIGHTSQUARED, INC., ET AL.**

1   A.   So AWS-4 is two blocks of twenty megahertz each.  The

2   first block starts at 2000 megahertz and extends from 2000

3   megahertz to 2020 megahertz.  And that, by the way, was

4   initially designated as the uplink block, uplink meaning that's

5   what the phone transmits back up to the network.

6        The second block is -- starts at 2180 megahertz and

7   extends to 2200 megahertz, and that block was designated as the

8   downlink block, or the transmitter that would be based on the

9   tower, so transmitting down from the network to the device

10  itself.

11  Q.   Are you familiar with how DISH came to hold the spectrum

12  assets in the AWS-4 band?

13  A.   Yes, I am.

14  Q.   Could you tell the Court how you understand them to have

15  acquired those?

16  A.   Sure.  Well, I think it appeared that DISH has had an

17  interest in that spectrum for some time.

18       Going back into the first year, as I was aware of DISH's

19  interest in broadband spectrum would have been and their

20  participation in what was a set of auctions for other AWS

21  spectrum blocks, that was an auction that took place in 2006.

22  It was a very robust auction, and at the time, DISH or EchoStar

23  had a kind of a partnership with DIRECTV and they were a bidder

24  in that spectrum auction, much like the cable companies formed

25  an alliance and a partnership and they also bid for some of the

**LIGHTSQUARED, INC., ET AL.**

1    spectrum.

2    Q.    Were they a successful bidder at that time, DISH or

3    EchoStar and DIRECTV?

4    A.    No, they were not; they were not.

5    Q.    What are you next aware of EchoStar and DISH attempting to

6    do with respect to spectrum?

7    A.    So after 2006 and after that auction where they did not --

8    where they left without any licenses, they started to make

9    investments in spectrum; more specifically it was in TerraStar

10   in DBSD.

11   Q.    And when, if you recall, did they make those investments

12   for the first time?

13   A.    I believe 2008 was the first investment in TerraStar.

14   Q.    And what was the business of TerraStar at the time

15   EchoStar made its investment?

16   A.    So at the time it was very similar to what LightSquared's

17   business was which was a satellite-based operator that was

18   seeking terrestrial rights to use its satellite spectrum to

19   build a terrestrial network.  And they were really -- the three

20   companies that were doing so was LightSquared, its predecessor

21   companies, TerraStar and ICO, or DBSD, as it's known.

22   Q.    Is ICO the predecessor to DBSD?

23   A.    Yes.

24   Q.    Now, is it true that DISH or EchoStar eventually acquired

25   DBSD and TerraStar?

**LIGHTSQUARED, INC., ET AL.**

118

1    A.    Yes, that's true.

2    Q.    Can you describe for the Court generally the history, the

3    regulatory history relating to those acquisitions of TerraStar

4    and DBSD by DISH?

5    A.    Sure.  So from a regulatory perspective, again these two

6    companies were following a very similar path that LightSquared

7    was following.  So there were, I believe their first ATC

8    licenses for the two companies were issued sometime in the

9    2008-2009 time frame.  Those licenses were further modified in

10   2010.  There was a notice of inquiry and a rule making that was

11   started in, I think it was July of 2010.

12   Q.    Just a point of clarification, what is an ATC license?

13   A.    Oh, I'm sorry.  ATC stands for ancillary terrestrial

14   component.  It's the terrestrial rights to use the spectrum.

15   Q.    And is that a permission that somebody operating a

16   satellite network would need to obtain from the FCC in order to

17   build out a terrestrial network?

18   A.    Yes.  It was an important permission.  Without it

19   satellite spectrum would be limited to satellite use only and

20   you would not have any regulatory approval to use it for a

21   terrestrial-based network.  So it was a very important

22   component for the license to be used it for terrestrial

23   services.

24   Q.    Okay, now, I'm sorry I interrupted you.  You were telling

25   us about an FCC development in July 2010.

**LIGHTSQUARED, INC., ET AL.**

119

1  A.    That's right.  So in July 2010, they started a notice of

2  inquiry and a notice of rule making.  And the purpose of that

3  was really to update the frequency table of allocations.  This

4  is a table that the FCC keeps to determine what uses are a

5  primary use for each and every spectrum band.

6       The purpose of this proceeding was simply to do similar

7  things that LightSquared had achieved, which is update the

8  rules for the spectrum so that it would have coprimary

9  authorization as a terrestrial spectrum, so it would

10  essentially be at equal footing with the satellite

11  authorizations that it had.

12       That started in the middle of 2010, if I recall, and it

13  was resolved with an update to the table sometime in early

14  2011.

15       In 2011, these two companies were in bankruptcy and there

16  was a bid by DISH to buy them out of bankruptcy, successful bid

17  for both of them.

18  Q.    Now, at the time that DISH made the bid to buy DBSD and

19  SkyTerra out of -- I'm sorry, TerraStar out of bankruptcy, had

20  they already, both of those companies already received the

21  approval for the construction of the build-out of a terrestrial

22  network?

23  A.    Well, they had -- they had the ATC licenses associated

24  with their spectrum.  However, there were some more

25  modifications that were asked for when -- as I recall, when

**LIGHTSQUARED, INC., ET AL.**

120

1   DISH applied for the transfer of the licenses with the FCC --

2   it's a step that the FCC -- that you have to go through to

3   transfer any license.  You need approval from the FCC in order

4   to make that happen.

5   Q.   And do you recall when, approximately, it was that DISH

6   asked for the approvals for the transfer of those licenses?

7   A.   I think that would have been, I think it was the end of

8   the summer of 2011.  So August 2011 that they filed for the

9   transfer and control with the FCC.

10       At the same time they had asked for similar conditions or

11  modifications to those licenses to something that LightSquared

12  had asked for and successfully received, which was a waiver of

13  the -- a requirement that every device have a satellite

14  capability.

15       At the time the LightSquared license and TerraStar and

16  DBSD's licenses, the ATC rules did state that every device had

17  to have -- every terrestrial device also needed to have

18  satellite capability.  It's something that LightSquared had

19  filed with the FCC in late 2010 to have a waiver of that

20  requirement.  It was awarded to us on a conditional basis.  So

21  we could have some devices that were terrestrial-only devices.

22       That was -- I believe that or something very similar to it

23  was requested by DISH when they filed for their change of

24  control approval.

25       The FCC did approve the transfer of the licenses.  I think

**LIGHTSQUARED, INC., ET AL.**

121

1    it was in the spring of 2012, maybe April.  But they didn't --

2    they didn't make any decisions about the changing the

3    terrestrial rules that were associated with the spectrum.

4    However, what they did was they initiated a new proceeding, a

5    new rule making at the same time, April 2012 that then

6    addressed how the terrestrial rules would be modified.

7    Q.    And was there, to your knowledge, a resolution of that

8    rule making process by the FCC at any point later in 2012 or

9    subsequently?

10   A.    Yes, there was.  There was a decision issued in December

11   of 2012.  And that decision essentially removed the requirement

12   to even need an ATC authorization.  What it did was it gave it

13   a terrestrial authorization, so it has a standalone terrestrial

14   authorization on that spectrum.

15   Q.    And were there any limitations or any peculiarities

16   associated with that FCC approval?

17   A.    Well, there were some limitations on the spectrum itself.

18   So throughout the process -- and this will really get into

19   where the spectrum sits in the band in its neighboring

20   spectrum -- so this AWS-4 spectrum that DISH has is immediately

21   adjacent to what we call the H block spectrum.

22        So the H block spectrum is spectrum that's not been

23   allocated yet.  It's the subject of, actually it's going to

24   auction very soon.  And the downlink component of the H block

25   resides between 1995 megahertz and 2000 megahertz.  So it abuts

**LIGHTSQUARED, INC., ET AL.**

1    the DISH spectrum.

2        The important piece here is that that piece of spectrum is

3    downlink spectrum.  So the downlink spectrum on the H block is

4    immediately adjacent to the uplink spectrum of DISH's spectrum.

5    That creates some technical concerns and issues that have to be

6    dealt with because whenever you change the use of spectrum,

7    neighboring spectrum from downlink to uplink, there's

8    typically, what you need is some protection, a transition zone

9    of spectrum, commonly referred to as a guard band.

10        So if you're going to have high-power downlink use on

11    spectrum next to low-power uplink use, there could be

12    interference, if you don't provide some transition zone or

13    guard band between them.  That's normally done by putting

14    spectrum between the two to isolate the two different uses.

15        Because of that, the FCC had to solve this question,

16    because they wanted to put the H block out to auction and they

17    wanted to sell it for as much as they could.  The proceeds from

18    the H block auction will go towards funding a public safety

19    network, FirstNet, for the government.  It's a high priority

20    for them.

21        So I believe one of their interests was they wanted to

22    make sure that the H block was protected.  In order to protect

23    the H block and make sure there wasn't an interference concern

24    between the H block and the neighboring AWS-4 block, they had

25    to essentially establish a guard band.  And the way they did

**LIGHTSQUARED, INC., ET AL.**

1   that was to impose restrictions on the DISH authorization that

2   really impact the first five megahertz of their spectrum.  So

3   from 2000 to 2005 megahertz, that spectrum, the way it's been

4   approved, is really not usable.

5         So of their forty megahertz of spectrum, perhaps the

6   easiest way to describe this is they received approval for

7   twenty megahertz of downlink and fifteen megahertz of uplink,

8   to thirty-five megahertz total, not forty, because of this

9   difference between uplink and downlink spectrum and the need

10  for this guard band.

11  Q.   Was one of the aspects of the FCC decision in December

12  2012 a requirement that DISH accept in that effective guard

13  band between 2000 and 2005 megahertz any and all interference

14  flowing into there from the H-band, from the H-band downlink?

15  A.   Yes, that is correct.  And that's really why the spectrum

16  is not usable.

17  Q.   Did there come a time when DISH made a proposal to the FCC

18  to try to resolve this problem or this issue that they were

19  having where they had effectively only thirty-five megahertz

20  rather than forty megahertz of usable spectrum?

21  A.   Yes, there was.

22  Q.   Could you tell the Court what that was.

23  A.   Sure.  In September of 2013, DISH made a filing that

24  addressed a number of items.  There was an agreement on some of

25  the use of their 700 megahertz spectrum that solved some fairly

**LIGHTSQUARED, INC., ET AL.**

1    difficult issues, something that the FCC I would say was very

2    pleased with.

3         They filed that agreement.  They also filed or made a

4    commitment that they would -- that DISH would provide the

5    opening bid for the H block auction, somewhere on the order of

6    1.5 billion dollars to start the auction.  They would make that

7    commitment.

8         And what they asked for in doing those two things was they

9    asked for approval from the FCC so that they could use all of

10   their AWS-4 spectrum as downlink spectrum.

11        So that was one thing they asked for, make everything

12   downlink spectrum.  The second thing they asked for was an

13   extension on some of their build-out requirements on the 700

14   megahertz as well as their AWS-4 spectrum.

15             THE COURT:  So by switching the use of the AWS-4 from

16   downlink, it would recapture that five bands and eliminate the

17   need for the guard band between the H block and that block of

18   their AWS-4?

19             THE WITNESS:  Yes, Your Honor, you're exactly right.

20             THE COURT:  Okay.

21   BY MR. HIRSCHFELD:

22   Q.   Now, as a result of that request that was made by DISH to

23   the FCC, the AWS-4 became one hundred percent downlink

24   spectrum, is that correct?

25   A.   So, yes, so that was approved, or the FCC approved this

**LIGHTSQUARED, INC., ET AL.**

1   and gave DISH what it was asking for in December of 2013, and

2   yes, that's right.  So now they can use all forty megahertz of

3   their spectrum as downlink spectrum.

4   Q.   In order to operate a terrestrial wireless network,

5   however, DISH needs uplink spectrum to pair with the downlink,

6   doesn't it?

7   A.   Yes, that's correct, they would need uplink spectrum.

8   Q.   Now, is there any correlation between LightSquared's

9   spectrum, particularly its uplink spectrum, and the AWS-4 that

10  DISH currently has?

11  A.   Yes, there is.  I think there's -- it's a very natural

12  pairing of spectrum.  So I think the LightSquared spectrum, we

13  have had issues with GPS that have centered around mostly the

14  downlink spectrum we have.  Our uplink spectrum is safe to use

15  as uplink spectrum.

16       So if you look at the two bands, the AWS-4 band that DISH

17  has and the LightSquared band, it really makes a lot of sense

18  to put the two together in terms of a pairing that way.

19       So seeing that all of the DISH spectrum is usable for

20  downlink spectrum, it became very obvious why DISH is

21  interested in the LightSquared spectrum.

22  Q.   Are you presently aware of any equivalent source of

23  available uplink spectrum that DISH might acquire?

24  A.   No, I'm not.  It is really -- most spectrum is paired.

25  And as I look at what's happening with spectrum auctions and

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 126 of 240
**LIGHTSQUARED, INC., ET AL.**

126

1   other spectrum that's available, I don't see other uplink-only

2   spectrum.

3   Q.   Okay.  Let me change topics for a moment.  Can you look at

4   the binder, the witness binder that you have in front of you,

5   which contains Plaintiff's Exhibit 161?  And I would draw your

6   attention specifically to the e-mail from Lucy DeFazio to a

7   number of addressees that begins at the bottom of the first

8   page and continues onto the second page.  And do you see that

9   you were listed as a person to whom a copy of this e-mail and

10  the attachments to it were sent?

11  A.   Yes, I do.

12  Q.   Do you recognize what this e-mail is dealing with and what

13  the attachments are?

14  A.   I'm just going to take a minute to review it.  I do

15  recognize this, yes.

16  Q.   And can you tell the Court what they are?

17  A.   Sure.  It's -- so it's an e-mail to the board of directors

18  at LightSquared.  There is -- attached to it there is an agenda

19  for a board meeting.  There is also a memo to the board from

20  our chief financial officer Marc Montanger.  And there is a

21  resolution.

22  Q.   And what is the subject matter of Mr. Montagner's memo to

23  the board of directors?

24  A.   So this is essentially addressing our list of disqualified

25  companies associated with our credit agreement.  What we're

**LIGHTSQUARED, INC., ET AL.**

1  doing here is amending the list of disqualified companies.

2  Q.   And do you recognize the resolution that is part of the

3  documentation attached to the e-mail?

4  A.   Yes, I do.

5  Q.   And is that the resolution that was adopted by the board

6  to amend the list of disqualified companies?

7  A.   Yes, it is.

8          MR. HIRSCHFELD:  At this point, I would move the

9  admission into evidence of Plaintiff's Exhibit 161, Your Honor.

10          THE COURT:  Any objections?

11          MR. GIUFFRA:  No objection, Your Honor.

12          THE COURT:  All right, thank you.

13  (E-mail from Lucy DeFazio to board of directors with agenda

14  attached was hereby received into evidence as Plaintiff's

15  Exhibit 161, as of this date.)

16  Q.   Mr. Smith, do you know why LightSquared was amending the

17  disqualified companies list on May 11, 2012?

18  A.   Yes, I do.  We were amending the list, this is just a few

19  days before we filed for bankruptcy, and here we were simply

20  amending the list to make sure that the list of disqualified

21  companies included all of our competitors, because we didn't

22  want competitors involved in the capital structure.  We thought

23  it was important as we were entering bankruptcy to make these

24  updates.

25  Q.   Okay.  Mr. Smith, did there come a time when you learned

**LIGHTSQUARED, INC., ET AL.**

1   that an entity known as Sound Point or affiliated with Sound

2   Point was purchasing LightSquared's debt?

3   A.   Yes, I did.

4   Q.   When do you recall becoming aware of that for the first

5   time?

6   A.   I believe it was May of 2012 when we had heard that there

7   was a company called Sound Point that had purchased the debt

8   that was held by Icahn.

9   Q.   And do you recall approximately how much that debt

10  purchase was?

11  A.   It was sizable.  I forget the exact number, but it was a

12  sizable position that they had.

13  Q.   Do you recall whether there were press accounts relating

14  to that debt purchase at the time?

15  A.   You know, I know there were press accounts on many of

16  these things.  I frankly forget which ones they were

17  specifically tied to.  I think there were press accounts

18  associated with the Icahn sale.

19  Q.   At the time you first heard of the sale by Icahn to Sound

20  Point, did you know who it was that was actually behind the

21  Sound Point purchasing who was providing the financing for it?

22  A.   No, I did not.  I actually never heard of Sound Point

23  prior to that.

24  Q.   Did you direct any steps to be taken to try to find out

25  the identity of Sound Point or the persons behind the Sound

**LIGHTSQUARED, INC., ET AL.**

129

1    Point purchases?

2    A.    Yes.  I asked folks on my team to find out who was behind

3    it.

4    Q.    Who did you ask?

5    A.    This would have been Marc Montagner, our chief financial

6    officer, as well as Mark Hootnick from Moelis.

7    Q.    And was anybody ever able to report to you in response to

8    that inquiry and that direction from you the identity of the

9    person that was making the purchases through Sound Point?

10   A.    No.  They tried a number of times and we could never

11   verify who was behind Sound Point.  In fact, we didn't have --

12   we didn't know for sure who was behind Sound Point until I

13   think it was almost a year later, May of 2013.

14   Q.    And how did you learn who was behind Sound Point in May of

15   2013?

16   A.    I had heard it from our legal advisors after there was a

17   hearing, a bankruptcy hearing, in court.  So it was disclosed

18   in court.

19   Q.    And you learned at that time, did you not, that it was Mr.

20   Ergen that was behind Sound Point?

21   A.    Yes, that's correct.

22   Q.    And had you ever been told prior to that time that Mr.

23   Ergen was, in fact, the person behind the Sound Point

24   purchases?

25   A.    No, never once.  There were press accounts and there were

**LIGHTSQUARED, INC., ET AL.**

130

1    rumors that he may have been behind it.  That's some of the --

2    some of what we were trying to verify.  We couldn't verify it.

3    Q.    Okay, I'd like you to focus on the period between January

4    and June 2013 and ask you if you recall being involved during

5    that period on behalf of LightSquared in efforts to reach a

6    consensual plan of reorganization between LightSquared and its

7    various constituents.

8    A.    Yes, I was.

9    Q.    What specifically can you recall your role being during

10   that period, that six-month period?

11   A.    Sure.  Well, during that period we sought to try and reach

12   a consensual agreement so that we could resolve the bankruptcy.

13   We were happy that it was actually mentioned in the exclusivity

14   stipulation that we would work with our lenders, had a

15   requirement to work in good faith with the lenders to see if we

16   could not reach some type of agreement.  We thought that was in

17   the best interests of the estate and we were motivated to do

18   that.

19        We struggled, however, to actually have substantive

20   conversations during the period of time.  It became very hard

21   and confusing.  A lot of the debt trades that were happening

22   created a situation for us where we weren't quite sure who we

23   were -- who we should be negotiating with.  Because the amount

24   of debt that was trading hands and at least the reported

25   positions of what we understood Sound Point to be buying

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 131 of 240
**LIGHTSQUARED, INC., ET AL.**

131

1   started to grow in a significant fashion to the point that we

2   weren't sure if the ad hoc group of lenders could even carry

3   the class and make a deal with us, make any commitments to us.

4       We -- so it was a difficult time.  It was a difficult

5   period for us to even try and get to any kind of term sheet

6   negotiation.

7   Q.   And during this time period you're not aware of any major

8   buyer or any substantial buyer of LightSquared debts other than

9   Sound Point, are you?

10  A.   No.  Sound Point was the only substantial buyer.  I think

11  there may have been some small trading that was happening as

12  well, but the only large trades were with Sound Point.

13  Q.   Okay.  Mr. Smith, are you familiar with the efforts that

14  were made by Jefferies to obtain exit financing for

15  LightSquared during the period that LightSquared had the

16  exclusive right to formulate a plan?

17  A.   Yes, I am.

18  Q.   What involvement, if any, did you have with Jefferies in

19  connection with that effort?

20  A.   So I was involved with the selection process of Jefferies,

21  as we went through a process looking at several banks and

22  ultimately engaged Jefferies; I was involved in that process.

23  I was also involved in the roadshow process that we ran with

24  Jefferies to raise the debt.

25  Q.   And what exactly was the roadshow process?

**LIGHTSQUARED, INC., ET AL.**

1   A.   So over the course of two to three weeks, we went and met

2   with about fifty accounts of Jefferies' trying to raise money,

3   making a management presentation, and Q and A.

4   Q.   When you say we went, are you referring to personnel from

5   Jefferies as well as yourself and others from LightSquared?

6   A.   Yes, yes, I am.

7   Q.   At any of the roadshow interviews that you had, did you

8   hear any comments from potential financers or potential lenders

9   with respect to Mr. Ergen's ownership?

10          MR. GIUFFRA:  Your Honor, objection.  Hearsay.

11          UNIDENTIFIED SPEAKER:  It's a yes or no question.

12          THE COURT:  Why don't you ask it a different way.

13   Q.   Did you have discussions during the roadshow on the

14   subject of Mr. Ergen's ownership?

15   A.   There were -- yes.  So the roadshow started right in the

16   middle of June, and by this time it was known and confirmed

17   that Mr. Ergen was behind Sound Point's debt purchases.

18          In addition to that, it was also broadly known that Mr.

19   Ergen had made a bid for some of LightSquared's assets.  So

20   this was absolutely a topic of discussion at these roadshows.

21   Q.   Can you recall any of the specifics of the discussion?

22   A.   Yes, actually there were --

23          THE COURT:  Go ahead.

24          MR. GIUFFRA:  Your Honor, same hearsay objection.

25          THE COURT:  All right, Mr. Hirschfeld?

**LIGHTSQUARED, INC., ET AL.**

1          MR. HIRSCHFELD:  Your Honor, I'm not offering it for

2   the truth -- I'm not offering it for the truth of whatever the

3   statements were.

4          THE COURT:  What are you offering it for?

5          MR. HIRSCHFELD:  Just so that Your Honor can

6   appreciate what it was that the personnel from Jefferies and

7   from LightSquared were encountering during the roadshow.

8   Whether that was, in fact, whether the comments were, in fact,

9   truthful statements by the perspective lenders is not what I'm

10  offering it for.

11         MR. GIUFFRA:  Your Honor --

12         THE COURT:  Mr. Giuffra?

13         MR. GIUFFRA:  -- if they like --

14         THE COURT:  Speak into your microphone so we can

15  record you.

16         MR. GIUFFRA:  Oh, I apologize.  Yeah.  If they wanted

17  to bring in the bankers and have the bankers say what the

18  bankers were saying, that's one thing.

19         THE COURT:  Well, if they wanted to bring in the

20  bankers to actually demonstrate that that is actually what the

21  bankers believed, they'd have to bring in the bankers.  But I

22  think that we have Mr. Smith at meetings and we have Mr. Smith

23  being asked what he was told.  And as long as it's not being

24  offered for the truth, that that's, in fact, in essence what

25  the bankers believed and what the cause was of the lack of

**LIGHTSQUARED, INC., ET AL.**

134

```
 1    ability to get the financing, then I think it comes in for that
 2    limited purpose.
 3              MR. GIUFFRA:  Thank you, Your Honor.
 4              THE COURT:  All right.
 5    BY MR. HIRSCHFELD:
 6    Q.   Do you need to have the question read back?
 7    A.   No, I think I'm fine.
 8         So one of the common statements that we came up against
 9    during this fundraising was why should I, why should we waste
10    our time with this; doesn't Charlie have this all sewn up.  He
11    has a blocking position in your debt.  He hasn't offered to buy
12    the company.  Why -- you know, doesn't he have you guys kind of
13    boxed in?  And why, you know, why should we really pursue this?
14    Q.   Did you hear that kind of comment more than once during
15    the roadshows?
16    A.   We heard it many, many times.  It was -- it was a very
17    common discussion.
18    Q.   And was that comment or the frequency of those comments a
19    source of disappointment or frustration for LightSquared and
20    its bankers?
21    A.   It absolutely was.
22    Q.   Did you also have communications during this time period
23    with strategics who might be interested in making a strategic
24    investment or acquisition with respect to LightSquared or its
25    spectrum?
```

**LIGHTSQUARED, INC., ET AL.**

135

1    A.   Yes, we did.

2    Q.   And who was it that participated in those discussions with

3    the strategics, if you recall?  Was that Jefferies that was

4    participating or someone else?

5    A.   No.  This was not part of the Jefferies fundraising.  So

6    this was LightSquared management and Moelis, our financial

7    advisor.

8    Q.   And did the topic of Mr. Ergen's ownership of LightSquared

9    debt and his offer through LBAC to purchase certain spectrum

10   come up during the meetings that you had with his strategics?

11             THE COURT:  Mr. Giuffra?

12             MR. GIUFFRA:  Objection, Your Honor.  This is becoming

13   pretty clear that he's trying to introduce hearsay evidence.

14   It's not even clear what the witness heard as opposed to what

15   Moelis heard or someone else in the company.

16             THE COURT:  Well, we're only going to hear what the

17   witness heard.  We're not going to have double layers.

18             Mr. Friedman, do you have something to say?

19             MR. FRIEDMAN:  Yes, Your Honor.  I think that the

20   state of mind of market participants with regard to

21   LightSquared is not hearsay.  It's the state of mind of a

22   mental condition of a participant.  It's not hearsay.  It's

23   803.3.  Then-existing mental state of mind of somebody on the

24   other side of a transaction.

25             MR. GIUFFRA:  Your Honor, it's the state of mind of

**LIGHTSQUARED, INC., ET AL.**

1   the witness.  That's basic rules of evidence of hearsay.

2           THE COURT:  I think --

3           MR. FRIEDMAN:  No.

4           THE COURT:  Mr. Friedman, he's right.

5           MR. FRIEDMAN:  I'm not going to argue.

6           THE COURT:  But I think that what's occurring here,

7   which is not going to be any great surprise to me is that we

8   have Mr. Smith who attended the series of meetings and we're

9   trying to get a sense of what occurred and what he heard.  And

10  I think that I'm interested in hearing that.  It is not coming

11  in, in my mind, for the truth of what is being asserted.  He's

12  telling me what he heard.

13          MR. GIUFFRA:  Your Honor, just one request, if

14  counsel could be --

15          THE COURT:  You can have a continuing objection; is

16  that your request?

17          MR. GIUFFRA:  No, it's a much more specific one, that

18  he just to be clear as to what he heard as opposed to the

19  double --

20          THE COURT:  That --

21          MR. FRIEDMAN:  -- the double hearsay problem is what

22  I'm concerned over.

23          THE COURT:  You are exactly right on that.  So we're

24  going to limit the questions, or please ask the questions so

25  that we get what Mr. Smith heard and not what somebody else --

**LIGHTSQUARED, INC., ET AL.**

1  were his report of what someone else may have heard.

2          MR. HIRSCHFELD:  Right, and that's what I had intended

3  to ask, Your Honor.

4          THE COURT:  Okay.

5          MR. HIRSCHFELD:  If I phrased it infelicitously, it's

6  my fault.

7          THE COURT:  All right.

8  BY MR. HIRSCHFELD:

9  Q.    Mr. Smith, could you tell us, at these meetings that you

10  and others from the company and Moelis had with the strategics,

11  what you heard on the subject of Mr. Ergen's ownership of the

12  debt and Mr. Ergen's sponsorship of the LBAC bid?

13  A.    Sure, and if I create any confusion, I was at -- in

14  person, I was present at all fifty meetings with the Jefferies

15  roadshow.  I was also in person at the four meetings with the

16  strategic wireless operators.

17  Q.    Okay.  So tell the Court what you heard during the

18  meetings with the strategics on that subject.

19  A.    Lots of things.  But there was one, there was also a very

20  similar thread when it came to the involvement of Mr. Ergen,

21  which was very -- almost the same thing that the potential

22  investors were saying, which is how can we get involved in this

23  because we were, with the strategics, offering, really

24  proposing that they make some type of investment in

25  LightSquared to help us with the reorganization plan that would

**LIGHTSQUARED, INC., ET AL.**

1   benefit them in the long run, meaning they could get access to

2   the spectrum in some way, essentially almost have an option to

3   the spectrum once it was approved because FCC approval was

4   obviously a very great concern for them.  We were trying to

5   pitch them on there is a low-cost option that you could

6   actually get yourself some advantage to having access to the

7   spectrum once it was approved.

8          The response was similar, which was, but is that really

9   going to work; why should we get involved where it looks

10  like -- it looks like -- it was almost a foregone conclusion

11  how this will resolve itself, again speaking specifically to

12  the blocking position that Mr. Ergen had and the offer that he

13  had made.

14             MR. HIRSCHFELD:  Your Honor, that concludes the direct

15  examination.

16             THE COURT:  All right.  Thank you.  Cross-examination?

17             MR. BARR:  Your Honor, just for housekeeping,

18  before --

19             THE COURT:  Yes.

20             MR. BARR:  You may remember that we have potential

21  confidentiality issues.  I don't know where the cross-exam is

22  going.

23             THE COURT:  All right.

24             MR. BARR:  I apologize now for jumping up --

25             THE COURT:  That's fine.

**LIGHTSQUARED, INC., ET AL.**

1              MR. BARR:  -- if it's going into that area.

2              THE COURT:  It's one area where I always want people

3    to jump up.  Why don't you take a moment to confer with counsel

4    and make sure that you have a clear understanding of the

5    parameters of that.

6         (Pause)

7              MR. FREIMUTH:  Your Honor, can I approach?

8              THE COURT:  Please.

9              MR. FREIMUTH:  I don't know that I'm going to use them

10   all, but --

11             THE COURT:  Okay.

12             Mr. Smith, if you need a break at any point, please

13   just let us know.

14             THE WITNESS:  Okay, thank you.

15             THE COURT:  All right?

16             THE WITNESS:  I'm fine.

17             MR. FREIMUTH:  Matthew Freimuth, Your Honor, from

18   Willkie Farr, for SPSO and Mr. Ergen.

19   CROSS-EXAMINATION

20   BY MR. FREIMUTH:

21   Q.   Good afternoon, Mr. Smith.

22   A.   Good afternoon.

23   Q.   It's nice to see you again.

24   A.   You to.

25   Q.   We met a couple of days ago, correct, at your deposition?

**LIGHTSQUARED, INC., ET AL.**

1    A.    That's correct.

2    Q.    Okay.  I just want to ask you a couple follow-up

3    questions.

4          Mr. Hirschfeld asked you about the time period in early

5    2013 where LightSquared was having negotiations with strategics

6    and discussing exit financing?

7    A.    That's correct.

8    Q.    You recall that?  Okay.  I'd like to start with your

9    discussions with strategics.  During the bankruptcy period and

10   during that time frame there came a time where LightSquared

11   reached out to four major wireless carriers, correct?

12   A.    That's correct.

13   Q.    And those four carriers were Sprint, correct?

14   A.    That's correct.

15   Q.    AT&T?

16   A.    That's correct.

17   Q.    T-Mobile?

18   A.    Yes.

19   Q.    Verizon?

20   A.    That's right.

21   Q.    Okay.  And when you met with AT&T, LightSquared proposed a

22   specific type of strategic partnership that I believe you

23   called the low-cost option?

24   A.    You know, I'd like to, if I -- maybe I could describe it

25   in more general terms just because I know this is public and

**LIGHTSQUARED, INC., ET AL.**

141

1    I'm sensitive to revealing specific discussion points with each

2    of these companies, just to maintain our relationship with

3    them.

4         However, we did, I can speak to the low-cost option, I

5    think, to answer your question, which is that we made the same

6    proposal to each of the wireless companies that we met with,

7    which was a low-cost option, as we were calling it.

8    Q.    And you did refer to that as the low-cost option, correct?

9    A.    Yes.

10   Q.    Okay.  And when you made that presentation to AT&T, one

11   aspect of the low-cost option was that you were asking AT&T to

12   consider making an equity investment in LightSquared, correct?

13   A.    Correct.

14   Q.    And in exchange for that equity investment, you would give

15   them a preference to use LightSquared spectrum once it was

16   approved by the FCC, correct?

17   A.    We weren't that -- we weren't that specific.  But the

18   nature of the construct that we had in mind was for an equity

19   investment we could reach some agreement that could essentially

20   give whoever took us up on this an option to have access to the

21   spectrum in some type of form or fashion.  We never got to any

22   details in terms of what that looked like.

23   Q.    And when you met with Sprint, you proposed appear similar

24   low-cost option, correct?

25   A.    We proposed a similar option to all of the wireless

**LIGHTSQUARED, INC., ET AL.**

142

1  carriers that we met with.

2  Q.   Okay.  And when you discussed the low-cost option with

3  Sprint, you were talking about an equity investment in the

4  ballpark of about 500 million dollars, correct?

5  A.   That's correct, with each of them actually.

6  Q.   Okay.  And the low-cost option that we've been discussing

7  was the only real proposal that LightSquared made when it met

8  with each of these four wireless carriers, correct?

9  A.   That was our proposal and we also were very open with them

10  to say if they had other ideas, we were certainly open to

11  anything.

12  Q.   But LightSquared made no other specific proposals?

13  A.   This was our specific proposal and only specific proposal,

14  yes.

15  Q.   And you reported on at least some of these conversations

16  to the LightSquared board of directors, correct?

17  A.   Yes, that's right.

18  Q.   Okay.  And you did so about July 1, 2013, does that sound

19  right?

20  A.   That sounds right.

21        MR. FREIMUTH:  Okay.  Can we ask the witness to take a

22  look at what I think is in his binder as Plaintiff's Exhibit

23  679, and Your Honor as well.

24  Q.   Are you there, Mr. Smith?

25  A.   Yes, I am.

**LIGHTSQUARED, INC., ET AL.**

143

1  Q.   Okay.  And these are minutes from a LightSquared July 1,

2  2013 board meeting, correct?

3  A    Correct.

4  Q.   You were there?

5  A.   I was there, yes.

6  Q.   Okay.  And these appear to be an accurate copy of the

7  exhibits or -- sorry, of the minutes that were recorded at that

8  meeting?

9  A.   Yes, these appear to be the minutes recorded at that

10  meeting, yes.

11       MR. FREIMUTH:  I would move their admission into

12  evidence.

13       THE COURT:  Any objection?

14       MR. HIRSCHFELD:  No objection.

15       THE COURT:  All right.

16  (Minutes from a LightSquared July 1, 2013 board meeting was

17  hereby received into evidence as Plaintiff's Exhibit 679, as of

18  this date.)

19  Q.   And Mr. Smith, I'd like you to turn to page 3 of the

20  minutes, which is at the Bates number ending 935?

21  A.   Okay, I'm there.

22  Q.   And you see in the minutes the second paragraph that

23  appears on the page?

24  A.   I see that.

25  Q.   And there is a sentence that reads "Mr. Smith noted that

**LIGHTSQUARED, INC., ET AL.**

1    there was some interest" -- sorry, excuse me.  This discussion

2    relates to your reporting to the board about your meetings with

3    at least three of the four wireless carriers, correct?

4    A.    Correct.

5    Q.    Okay.  And you see the sentence that reads "Mr. Smith

6    noted that there was some interest, but each of the operators

7    had expressed a common view that they might be interested in a

8    strategic partnership, but only after the conclusion of an FCC

9    approval process," correct?

10   A.    That's correct.

11   Q.    And that was your report to the board?

12   A.    That was my report.

13   Q.    And you believed that LightSquared endeavors to be

14   accurate and truthful when it records board minutes?

15   A.    Yes.

16   Q.    Okay.  And at the time that you were having these

17   discussions with these four wireless carriers, the FCC approval

18   process with respect to LightSquared's requests to use its

19   spectrum for terrestrial use had not been resolved, correct?

20   A.    That's correct.

21   Q.    And in fact it's not resolved today, correct?

22   A.    That is correct.

23   Q.    Okay.  And do you see anywhere in these minutes reflected

24   a discussion about Mr. Ergen in connection with LightSquared's

25   conversations with these strategics?

**LIGHTSQUARED, INC., ET AL.**

145

1    A.    I don't see that here, but there are many redacted

2    sections of the minutes.

3    Q.    Do you understand that those redacted sections is because

4    your counsel is claiming they're privileged?

5    A.    Yes.

6    Q.    You also testified about efforts that LightSquared made in

7    this early 2013 time frame regarding obtaining exit financing,

8    correct?

9    A.    Yes, that's correct.

10    Q.    Okay.  And LightSquared reached out to a number of banks

11    that could help it with those refinancing efforts during that

12    time frame, correct?

13    A.    That's correct.

14    Q.    And you, yourself, met with a few of those banks?

15    A.    Yes.

16    Q.    And do you recall a discussion at the April 8th, 2013

17    LightSquared board meeting about discussions with banks about

18    securing exit financing?

19    A.    You said April 8th?

20    Q.    April 8th, 2013.

21    A.    I don't recall.  Is there something I could look at that

22    could help me?

23    Q.    Sure, ask you to turn your attention to Plaintiff's

24    Exhibit 443.  Do you see that?

25    A.    Yes, I do.

**LIGHTSQUARED, INC., ET AL.**

1  Q.   Okay.  Exhibit 443 appears to be board meeting minutes

2  from the April 18, 2013 meeting on the LightSquared board,

3  correct?

4  A.   Yes.

5  Q.   And you were present at that meeting?

6  A.   I was present at that meeting, yes.

7  Q.   And this document appears to be an accurate copy of the

8  minutes that were recorded at that meeting?

9  A.   I would assume so.  I haven't reviewed it, but as you

10  pointed out we strive to make our meeting minutes accurate.

11       MR. FREIMUTH:  Okay.  I'd like to move this exhibit

12  into evidence.

13       THE COURT:  Let me, as a housekeeping matter, and to

14  keep the flow going, let's agree that at the end, that you

15  folks are going to keep track of everything that's offered and

16  at the end you're going to tell me if there are any objections

17  admissibility, but we're going to assume that everything that

18  you ask the witness about you're going to offer in.  That way

19  we can just keep going.

20       MR. FREIMUTH:  Sounds like a great plan to me, Your

21  Honor.

22       THE COURT:  Any problems anyone?  Okay.

23  BY MR. FREIMUTH:

24  Q.   And I'd like to focus your attention on the top paragraph

25  on page 3.  It reads, "Mr. Montagner reported that the company

**LIGHTSQUARED, INC., ET AL.**

1  had started discussions with a number of banks about

2  refinancing the company's debt."  Those are the discussions

3  that we've been just talking about?

4  A.   Correct.

5  Q.   Okay.  And the minutes go on to state, "While these

6  discussions are still preliminary in nature, most of the banks

7  had indicated that the company will need to have substantial

8  clarity on regulatory status for its request of a license

9  modification to ensure best possible execution."

10  A.   I see that.  That's correct.

11  Q.   And that was Mr. Montagner's report to the board?

12  A.   Yes, it was.

13  Q.   Okay.  And at the time, you viewed LightSquared's pending

14  applications as important to the possibility of refinancing

15  LightSquared's debt, correct?

16  A.   Yes.

17  Q.   And at the time those applications were not approved,

18  correct?

19  A.   That is correct.

20  Q.   And it remains the fact today that they're not approved,

21  correct?

22  A.   That is correct.

23  Q.   You also talked about some discussions that LightSquared

24  was having with the ad hoc group of secured creditors.  Do you

25  recall that?

**LIGHTSQUARED, INC., ET AL.**

1    A.    Yes.

2    Q.    Okay.  And I'd like to turn your attention to exhibit

3    Defendant's 340, which is also in your binder.  Do you see

4    that?

5    A.    Is that D-340?

6    Q.    D-340, yes.

7    A.    Yes, I see it.

8    Q.    And that is an e-mail you sent to Mr. Phil Falcone on May

9    18th, 2013, correct?

10    A.    That's correct.

11    Q.    Okay.  And the e-mail discusses negotiations that

12    LightSquared and Harbinger were having with the ad hoc group of

13    secured creditors, correct?

14    A.    Yes, that's correct.

15    Q.    Okay.  And I'd like to call your attention to the last

16    sentence in the first paragraph.  You say you view getting to a

17    deal on their term sheet a very low probability.  Do you see

18    that?

19    A.    I see that, yes.

20    Q.    And that is what you wrote to Mr. Falcone on May 18th,

21    2013, correct?

22    A.    That is correct.

23    Q.    And you viewed the probability of getting to an agreement

24    with the ad hoc group of secured creditors below probability in

25    part because they were asking for a very significant amount of

**LIGHTSQUARED, INC., ET AL.**

149

1   equity, correct?

2   A.    That was part of it, yes.

3   Q.    In part, because they were not willing to reduce their

4   debt substantially, correct?

5   A.    Correct.

6   Q.    In part, because they were asking Harbinger for additional

7   500 million dollars in equity, correct?

8   A.    Correct.

9   Q.    And in part, because they were seeking changes to

10  LightSquared's governance, correct?

11  A.    I believe that was part of the term sheet that is sent,

12  yes.

13  Q.    You testified at the start of today about DISH's AWS-4

14  spectrum, correct?

15  A.    Yes, I did.

16  Q.    And it's true that the FCC approved recently all forty of

17  the AWS-4 spectrum for downlink?

18  A.    That's true.

19  Q.    And that happened in December of 2013?

20  A.    Yes.

21  Q.    And the application by DISH was made in September of 2013,

22  correct?

23  A.    That's correct.

24        MR. FREIMUTH:  I don't have anything further, Your

25  Honor.

**LIGHTSQUARED, INC., ET AL.**

1        MR. GIUFFRA:  Just a couple of questions, Your Honor.

2        THE COURT:  All right.

3    CROSS-EXAMINATION

4    BY MR. GIUFFRA:

5    Q.   Hi, Mr. Smith.  Robert Giuffra.  I'm representing DISH and

6    EchoStar.  We haven't actually met before.  Just a handful of

7    questions.

8        You had no role in negotiation or drafting of the credit

9    agreement between LightSquared and its lenders, dated October

10   1, 2010, isn't that right?

11   A.   That's correct.

12   Q.   And you know nothing about that drafting history, right?

13   A.   I'm sorry, could you repeat?

14       MR. GIUFFRA:  I'll withdraw the question.

15   Q.   Now, Mr. Phil Falcone is a member of your board of

16   directors, right?

17   A.   That's correct.

18   Q.   And you've had a number of conversations with Mr. Falcone

19   since becoming the CEO of LightSquared, right?

20   A.   I have.

21   Q.   When was the last time you spoke to Mr. Falcone?

22   A.   A couple of days ago.

23   Q.   Did you speak to him about the fact that you'd be

24   testifying here today?

25   A.   Actually no, we didn't.

**LIGHTSQUARED, INC., ET AL.**

151

1  Q.    Okay, but you've spoken to him about the fact that this

2  litigation is occurring, right?

3  A.    I'm actually -- we may have.  I did not speak to him about

4  the litigation a couple of days ago.

5  Q.    You've never spoken to Mr. Falcone about this litigation

6  ever?

7  A.    I didn't say that.  I said when we spoke a couple of days

8  ago, I didn't speak to him about this litigation.

9  Q.    Have you ever spoken to Mr. Falcone about this litigation?

10 A.    I'm sure we have.  We've discussed this at board meetings.

11 Q.    And have you ever spoken to lawyers at Kasowitz Benson

12 about this litigation?

13 A.    I'm not sure that I have.  I know our lawyers have.  I've

14 spoken to my lawyers about this litigation.

15 Q.    Now, Mr. Falcone and his firm, Harbinger, owns a

16 substantial percentage of the equity in LightSquared, right?

17 A.    Yes, that's right.

18 Q.    And has Mr. Falcone discussed with you over the past

19 several years as you were heading into bankruptcy the fact that

20 he'd like Harbinger to keep as much of that equity as he

21 possibly can?

22 A.    Yes.  I mean obviously Mr. Falcone wants to recover as

23 much of his investment as he can.  I think -- I'm sure he's

24 said things like that.

25 Q.    And has maintaining his equity been an overriding

**LIGHTSQUARED, INC., ET AL.**

152

1   objective of Mr. Falcone in the course of the last several

2   years?

3   A.   Maintaining his equity?

4   Q.   The Harbinger's equity in LightSquared.

5   A.   Could you be more specific?  You mean all of it or some of

6   it?

7   Q.   As much of it as he possibly can keep.

8   A.   Sure, I think that's it's natural.  He'd like to keep as

9   much of it as he can.  But he's been -- I've also seen that

10  he's been very willing to negotiate and make concessions on

11  this to try and get to a consensual resolution.  That's been a

12  consistent theme of his since actually before we filed for

13  bankruptcy.

14  Q.   Isn't it a fact that the vast majority of the members of

15  your board are affiliated with Harbinger?

16  A.   Vast majority?

17  Q.   Yeah.

18  A.   They have a majority.  I would not call it a vast

19  majority.

20  Q.   But they have a majority of the directorships, right?

21  A.   There are eleven directors.  Six of those are associated

22  with Harbinger; five of those are not.

23  Q.   And Mr. Falcone was involved in the hiring of yourself as

24  CEO, right?  He approved that decision?

25  A.   Yes.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    Now, you testified before that in May 2013 you had no idea

2    who Sound Point was.  Do you remember that testimony?

3    A.    It was -- right, it was the first time I heard of Sound

4    Point.

5    Q.    Okay, I'd like to show you a document that's been marked

6    as Defendant's Trial Exhibit 36.  Now, in or about May 2006,

7    were you aware that Mr. Falcone was writing e-mails to various

8    persons saying that he thought that --

9            THE COURT:  You misspoke; you said May of 2006 and you

10    meant May of 2012.

11            MR. GIUFFRA:  2012.  It's been a long day, Your Honor.

12    BY MR. GIUFFRA:

13    Q.    -- May of 2012, that he thought that Mr. Ergen was buying

14    LightSquared debt?

15    A.    I'm sorry, could you repeat the question?

16    Q.    In or about May 2012, did Mr. Falcone ever say to you that

17    he thought that Mr. Ergen was buying LightSquared debt, yes or

18    no?

19    A.    There was speculation at the time that it could be Mr.

20    Ergen.  So I assume yes, Mr. Falcone would have said that.  But

21    there were also others that he suspected might have been behind

22    Sound Point.  It was not only Mr. Ergen.

23    Q.    My question was yes or no.  Did Mr. Falcone ever say to

24    you I think that Mr. Ergen is buying LightSquared debt --

25            THE COURT:  Mr. Giuffra, I'm going to get admonished

**LIGHTSQUARED, INC., ET AL.**

154

1   by the court reporter to keep you by the microphone.

2          MR. GIUFFRA:  I'm sorry, Your Honor.

3          THE COURT:  All right?

4          MR. GIUFFRA:  Okay.

5   A.   Could you repeat the question?

6   Q.   Did Mr. Falcone, in or about May 2012, ever say to you

7   that he believed that Mr. Ergen was buying LightSquared debt,

8   yes or no?

9   A.   I don't remember specifically.  I assume he would have

10  said something along those lines, as he said it about others as

11  well.

12  Q.   Now, this e-mail that I've handed you, Defendant's Trial

13  Exhibit 36, have you ever seen this e-mail before?

14  A.   I don't think I have.  I'm reviewing it.

15  Q.   Were you aware that in May 2012, Mr. Falcone was telling

16  Reuters definitively, with no limitation whatsoever, that Mr.

17  Ergen was buying LightSquared debt?

18  A.   No, I don't believe I was aware of that.

19          MR. GIUFFRA:  No further questions.

20          THE COURT:  Thank you.

21          Any redirect?

22          MR. HIRSCHFELD:  One question, Your Honor.

23  REDIRECT EXAMINATION

24  BY MR. HIRSCHFELD:

25  Q.   Mr. Smith, if you would look again in the volume of

**LIGHTSQUARED, INC., ET AL.**

1   exhibits that the defendants gave you, the document that is

2   Plaintiff's Exhibit 443.  And look at the second page of that

3   document.  Do you see in the second paragraph that appears on

4   that page, the last sentence of the paragraph reads, "Mr.

5   Hootnick reported that Moelis had a meeting with Sound Point,

6   but it would not disclose its investors or beneficial owners.

7   He also noted that the company had met with Providence,

8   Fortress and MAST to explore ideas about cooperating on a plan

9   of reorganization, but that further discussions were halted

10   after Sound Point agreed to purchase the LP preferred stock

11   from these three investors."  Do you see that language?

12   A.   Yes, I see that.

13   Q.   Is that an accurate reporting of the statements that were

14   made by Mr. Hootnick?

15   A.   Yes, I believe that to be accurate.

16           MR. HIRSCHFELD:  Thank you.  I have nothing further.

17           THE COURT:  All right.  Thank you, Mr. Smith.  You're

18   excused.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  Yes.

21           MR. MUNDIYA:  I don't see Mr. Stone in the courtroom

22   but --

23           THE COURT:  I don't either.

24           MR. MUNDIYA:  -- but we --

25           UNIDENTIFIED SPEAKER:  He's across the hall.

**LIGHTSQUARED, INC., ET AL.**

1              THE COURT:  Should we take a -- do you want to take a

2      five-minute break?

3              MR. FRIEDMAN:  We're gonna get him.  Take --

4              THE COURT:  Do you want to take a five-minute break?

5              MR. MUNDIYA:  That would be -- please, Your Honor.

6              THE COURT:  All right.

7              MR. MUNDIYA:  We may have a scheduling issue.

8              THE COURT:  Okay.

9              MR. MUNDIYA:  Which I think that the next witness is

10     going to be a short one.

11             THE COURT:  Okay.

12             MR. MUNDIYA:  And I think the cross is going to be

13     reasonably short, and then the next witness I understand is Mr.

14     Kiser.  Mr. Kiser is not here.  We were led to believe that

15     these two witnesses would take the balance of the afternoon and

16     Mr. Kiser would testify tomorrow morning.

17             THE COURT:  That's fine.

18             MR. MUNDIYA:  Okay, thank you.

19             THE COURT:  Okay, we'll come back in five minutes,

20     then.

21             MR. MUNDIYA:  Thank you.

22         (Recess from 2:55 p.m. until 3:07 p.m.)

23             THE CLERK:  All rise.

24             THE COURT:  Please have a seat.

25             All right.  Mr. Stone.

1          MR. STONE:  Yes, Your Honor, the plaintiffs call

2    William Derrough.

3          THE COURT:  Good afternoon, Mr. Derrough.  Would you

4    raise your right hand, please?

5       (Witness sworn)

6          THE COURT:  Thank you.  Please have a seat.

7    VOIR DIRE EXAMINATION

8    BY MR. STONE:

9    Q.   Mr. Derrough, by whom are you employed?

10   A.   Moelis & Company.

11   Q.   And how long have you been at Moelis?

12   A.   Five and a half years.

13   Q.   What's your position at Moelis?

14   A.   Managing director and global co-head of recapitalization

15   and restructuring.

16   Q.   What are your duties as managing director and co-head of

17   the recapitalization and restructuring group?

18   A.   It's sort of principally two areas, one being managerial

19   running the group or co-leading the group with Thane Carlston

20   and all the duties around that, you know, staffing,

21   supervising, things like that, and then actively leading

22   restructuring assignments.

23   Q.   Can you briefly walk the Court through your employment

24   history before coming to Moelis?

25   A.   Sure.  I started my career in banking at Solomon Brothers

**LIGHTSQUARED, INC., ET AL.**

1   in Los Angeles in the late '80s.

2       Then was at Chanin & Company in Los Angeles for about

3   seven years.  Where Solomon was general investment banking

4   corporate finance, Chanin was a firm focused on restructurings

5   and distressed companies.

6       I spent a year at a private equity firm focused on buying

7   stressed companies.

8       Then in 1998 joined Jefferies to start a restructuring

9   group there.  I was there for ten years.  I co-led the group

10  with Thane, and joined Moelis in July of 2008.

11  Q.   During the ten years you were at Jefferies, were you on

12  any committees there?

13  A.   Yes, I was.

14  Q.   And what committees were those?

15  A.   So I was on a number of the firm's oversight and

16  management committees.  I was on the investment banking

17  management committee, the fairness opinion committee, the

18  valuation committee, the marketing committee.

19  Q.   Have you testified as an expert witness at trial or

20  arbitration proceedings before?

21  A.   I have.

22  Q.   And how many times?

23  A.   You mean live testimony?

24  Q.   Yes.

25  A.   More than ten times, maybe more than twenty times.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    And how many of those were in bankruptcy proceedings?

2    A.    I think -- I think all of them in terms of live testimony.

3    Q.    And in what the subject matters has a court qualified you

4    to testify as an expert?

5    A.    I've testified as an expert on matters of valuation, on

6    matters of financing, capital markets.  I know I testified with

7    respect to distressed M&A processes in several cases.  I can't

8    recall specifically whether we went through the expert

9    qualification process or not.  I believe we did in Globalstar,

10   but I can't remember specifically.

11   Q.    In how many bankruptcy sales processes have you been

12   involved with?

13   A.    Dozens and dozens.

14   Q.    And how many out-of-court sales processes have you been

15   involved with?

16   A.    Probably -- certainly more than twenty.

17   Q.    And what type of companies or industries did those sales

18   processes involve?

19   A.    It really runs the gamut.  I would generally say probably

20   almost every industry from, you know, real estate to

21   healthcare, to airlines, retail companies, telecom companies,

22   satellite companies.

23   Q.    And in those sales processes in which you've been

24   involved, have you represented bidders?

25   A.    Yes.

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 160 of 240
**LIGHTSQUARED, INC., ET AL.**

160

1    Q.    Have you at times represented targets?

2    A.    Yes.

3    Q.    And have you represented other interested parties in

4    auctions?

5    A.    Yes.  And just, you say auctions, broadly --

6    Q.    Sales processes?

7    A.    Processes that may be auctions, or sale processes --

8    Q.    Right.

9    A.    -- or otherwise resulting in the change and control.

10         MR. STONE:  Your Honor, at this time I'd like to

11    proffer Mr. Derrough as an expert in distressed M&A.

12         MR. FRAWLEY:  Your Honor, I don't think we have a

13    fundamental objection to the expertise of Mr. Derrough.  We do

14    think that the topic of his testimony does not fit within that

15    expertise and is going to wander into pseudo-factual testimony

16    about absent third parties' mental states.  So we have an

17    objection to the nature of the testimony --

18         THE COURT:  I'm sorry, could you say that again a

19    little more loudly?

20         MR. FRAWLEY:  Our understanding is that Mr. Derrough

21    was going to testify as to the subjective perceptions of

22    putative bidders in this process here, which we don't think

23    fits within the expertise of any person.  So we don't have any

24    objection to Mr. Derrough's expertise as a restructuring

25    expert, but we don't think that expertise has an application to

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 161 of 240
**LIGHTSQUARED, INC., ET AL.**

161

1   the testimony we're going to hear today.

2          THE COURT:  All right.  So I'm going to qualify him as

3   an expert and we're going to see what happens.

4          Go ahead.

5   DIRECT EXAMINATION

6   BY MR. STONE:

7   Q.   Mr. Derrough, on what matters were you asked to testify

8   today?

9   A.   The topic that I've been asked to testify is -- involves

10  issues around a competitor or a strategic bidder acquiring a

11  blocking position or a significant amount of debt in a

12  company's capital structure.

13  Q.   And what opinions did you reach with respect to that

14  subject matter?

15  A.   It's my opinion that when a strategic buyer or competitor

16  does something like that, meaning buys a blocking position, or

17  a substantially significant position of the company's capital

18  structure, it most often results in some type of chilling of a

19  sale process or otherwise dissuading bidders from, potential

20  bidders, from wanting to participate.

21  Q.   And on what do you base your opinion?

22  A.   I've been in and around, run sale processes or similar

23  types of transactions in the distressed arena since 1991.  My

24  principal job in those activities is trying to induce bidders

25  to show up and bid, doing whatever we can without lying or

**LIGHTSQUARED, INC., ET AL.**

162

1   breaking the law to try to convince people to get in.  And so

2   based on my, you know, more than two decades of experience.

3   Q.   Can you explain generally what it means to have a blocking

4   position in a company's debt?

5   A.   A blocking position I think to most bankruptcy

6   practitioners means owning at least one-third of a class in a

7   company's capital structure.

8   Q.   Can you explain generally --

9   A.   So one-third in dollar amount of a class.

10  Q.   Can up explain what you mean by a company having a

11  position of significant influence in a company's debt?

12  A.   So that would be less than a blocking position.  It's a

13  little bit of, you know, in the eye of the beholder, but

14  something like twenty, twenty-five percent of a company's -- or

15  of a class could still have the same kind of influence in the

16  outcome of a case, and so it would be I consider it very

17  significant and reviewed by potential bidders as being a

18  significant player.

19  Q.   What effect, if any, does it have on a sales process if

20  someone has a blocking position or a position of significant

21  influence?

22  A.   Well, from a bidder's perspective, the decision to get

23  into an auction process or a sale process in bankruptcy is not

24  an easy one.  There are reputational issues and PR issues and

25  things like that.  There's also cost issues.  A decision to

**LIGHTSQUARED, INC., ET AL.**

163

1  enter into that means you probably need to hire a lawyer at a

2  minimum or a law firm, you need to hire probably a banker, an

3  accounting firm, spend a lot of money, put a lot of time and

4  effort into it.

5      And in my experience, potential bidders generally only go

6  to those efforts if they believe that there is a legitimate

7  opportunity or chance of winning in a process, the so-called

8  level-playing-field issue, also being convinced that there is,

9  you know, a willing seller at the end of the day.

10     And so in the case of a competitor or a strategic buyer

11 owning this type of position and capital structure, it becomes

12 harder and harder for a potential strategic buyer to convince

13 themselves that there is a level playing field or a real shot

14 at owning it or winning.

15 Q.   Why, when you have a strategic bidder sitting with a

16 blocking position or a position of significant influence, is it

17 particularly difficult for other bidders?

18 A.   Well, the general presumption is that that strategic

19 bidder has done that in order to ultimately own a hundred

20 percent of the company.  So as contrasted with maybe a

21 financial investor where they're really looking for financial

22 return and in many times are looking for a strategic to

23 ultimately take them out, the general assumption is that

24 strategic got in there to own the company, to own the assets.

25     And so from the outside, XYZ potential bidder would want

**LIGHTSQUARED, INC., ET AL.**

164

1    to take a look at it and they hired one of the law firms in

2    this room to take a look at it, they would most likely be told,

3    well, you know, this other party who is already in the capital

4    structure has the ability to drive a plan process potentially,

5    has the ability to go to court as a true party-in-interest and

6    get things changed, auctions processes changed, auctions

7    canceled.

8         And so it tends to afford that bidder who's inside the

9    capital structure significant actual influence, but in many

10   ways even greater perceived influence in the ultimate outcome.

11        It's sort of generally hard enough, and I think this Court

12   knows, you know, trying to convince people to show up into

13   auctions and making sure they believe that there is going to be

14   a fair process and level playing field, the average bidder is

15   not always, you know, familiar with the bankruptcy process.

16        Something like this just adds a whole nother layer of

17   complexity and, therefore, doubt in the mind of a potential

18   bidder.

19   Q.   What effect, if any, does it have on bidders if the

20   strategic bidder who has a blocking position or a position of

21   significant influence has purchased their debt at a discount?

22   A.   Well then, you know, then you also have the dynamic of a

23   bidder essentially having to pay a higher price than the

24   incumbent, the person who is already in the capital structure.

25   If that, I'll call it the inside bidder, the person who owns

**LIGHTSQUARED, INC., ET AL.**

1  this blocking position or significant position, has paid a

2  significant discount, then they're competing with cheaper

3  dollars effectively.  So it makes it more expensive on a

4  relative basis for an outside bidder to actually compete.

5       So someone who owns, you know, 100 million dollars' worth

6  of debt and paid 25 cents for it and, you know, wants to bid

7  125 million dollars, it's a lot cheaper for them than the guy

8  on the outside who has to show up with the 125 million-dollar

9  check.  And that, again, becomes sort of a dissuasive dynamic

10  from an outside bidder's perspective.

11            MR. STONE:  That's all I have, Your Honor.

12            THE COURT:  Thank you.  Mr. Mundiya?

13            MR. MUNDIYA:  Yes.  May I approach, Your Honor?

14            THE COURT:  Yes.  Thank you.

15  CROSS-EXAMINATION

16  BY MR. MUNDIYA:

17  Q.   Good afternoon, Mr. Derrough.  How are you?

18  A.   Good afternoon.  I'm good, thank you.  And you?

19  Q.   We met a few days ago at your deposition.  Do you remember

20  that?

21  A.   I do.

22  Q.   Good.  Mr. Derrough, you have only been involved in two

23  situations where a competitor has entered the capital structure

24  of a company, right?

25  A.   Two that I can recall.

**LIGHTSQUARED, INC., ET AL.**

166

1  Q.   Okay.  And one was the Global Ocean (sic) bankruptcy

2  thirteen years ago, right?

3  A.   Golden Ocean.

4  Q.   Golden Ocean, thirteen years ago.

5  A.   Yeah.

6  Q.   And the other one was the American Airlines bankruptcy

7  where the competitor was USAirways which owned a de minimis

8  amount of debt, is that right?

9  A.   Correct.

10  Q.   So other than those two situations you've not been

11  involved in any situations where a competitor has entered into

12  the capital structure of a debtor, correct?

13  A.   I wasn't able to recall any at the deposition nor can I

14  recall any right now.  I can't say for certain that I haven't

15  been, but I don't remember any as I sit here.

16  Q.   Okay.  And you didn't speak to any bidders involved in the

17  sales process in this case except for two entities, correct?

18  A.   Correct.

19  Q.   Okay.  And one of those entities was -- there may be a

20  confidentiality issue here.

21  A.   There is definitely.

22  Q.   And I just don't want to trip up the --

23       THE COURT:  All right, well, let's adopt a convention

24  and refer to them as party A --

25       MR. MUNDIYA:  Bidder A?

**LIGHTSQUARED, INC., ET AL.**

167

1       THE COURT:  -- or bidder A and let's figure out some
2   way to make sure that you and the witness --

3       MR. MUNDIYA:  Right.

4       THE COURT:  -- are on the same page in that regard.

5       MR. MUNDIYA:  Fine.

6       THE COURT:  All right?

7       MR. MUNDIYA:  Okay.

8       THE COURT:  Okay.

9       MR. MUNDIYA:  That's a good idea.

10  Q.   So let's talk about bidder A which begins with the
11  initials --

12      THE COURT:  Let's not do that.

13      MR. MUNDIYA:  All right, bidder A because there are
14  two bidders here.

15      THE COURT:  Let's not do that.

16      MR. MUNDIYA:  Okay.

17      THE COURT:  Let's figure out --

18      THE WITNESS:  Can we take a time out and he and I talk
19  in the courtroom?

20      THE COURT:  Let's figure out a way.  Mr. Mundiya, I'm
21  going to have you approach the witness --

22      MR. MUNDIYA:  I'm going to do that right now.

23      THE COURT:  -- and establish who bidder A is.

24      MR. MUNDIYA:  That was --

25      THE WITNESS:  I'll take the ham and Swiss.

**LIGHTSQUARED, INC., ET AL.**

168

1        MR. MUNDIYA:  And I'll see you later.  Okay.

2    Q.    Okay, Mr. Derrough --

3        THE COURT:  I just want to say this is my standard

4    announcement, all right.  And my standard announcement is as

5    follows:

6        From time to time in proceedings like this because so

7    much is at stake, there comes into the courtroom a bit of

8    humor, and those who have that much at stake, I want them to be

9    aware that it doesn't reflect that we're not taking it

10   seriously, neither the Court nor the participants.

11       MR. MUNDIYA:  Thank you, Your Honor.

12       THE COURT:  All right.  Thank you.

13   BY MR. MUNDIYA:

14   Q.    So let's talk about bidder A.  And you spoke to bidder A

15   sometime in 2013, right?

16   A.    Correct.

17   Q.    And bidder A did not ultimately make any proposal to make

18   an investment in LightSquared, right?

19   A.    Correct.

20   Q.    Okay.  And you don't know why bidder A did not make a

21   proposal to invest in LightSquared, correct?

22   A.    Correct, I do not know for sure, correct.

23   Q.    Right.  Well, they didn't tell you why they were not

24   making a proposal, right?

25   A.    Correct.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    Right, okay.  And with respect to bidder B, similarly

2    bidder B did not make the proposal to invest in LightSquared,

3    right?

4    A.    Correct.

5    Q.    Okay, and bidder B did not tell you why they were not

6    making a proposal for LightSquared, right?

7    A.    I don't believe so.

8    Q.    Okay.  Were you involved in the outreach to strategic

9    investors?

10   A.    No, not directly.

11         THE COURT:  Mr. Derrough, I'm going to need you to

12   keep your voice up.

13         THE WITNESS:  I'm sorry.

14         THE COURT:  That microphone moves.  Great.  Good.

15   Q.    You were not personally involved in any of those

16   discussions?

17   A.    No.

18   Q.    But LightSquared was talking to potential strategics,

19   correct?

20   A.    Correct.

21   Q.    Okay.  And did you know that the potential transactions

22   involving strategics involved minority investments in the

23   company?

24   A.    I don't remember the specific details of any of the

25   conversations around strategics.  So they might have involved

**LIGHTSQUARED, INC., ET AL.**

170

1   minority or majority, I just don't -- I don't recall.

2   Q.   So you don't know whether strategics were approached in

3   whole company bids or minority investments, no idea?

4   A.   I don't, no.

5   Q.   Okay.   You've talked about blocking positions.   Do you

6   remember that testimony?

7   A.   I do.

8   Q.   Okay.   And when a company adopts a blocking position, is

9   it the case that the blocking position has an impact in a 363

10  sale?

11  A.   Having that much of a capital structure has an impact, I

12  think, on the entire Chapter 11 process.   And so being that big

13  of a constituent of Chapter 11, means you have a say in a

14  courtroom, you have a say in terms of trying to convince the

15  Court and other constituents what to do.   So I think every

16  creditor who is significant has an impact on a Chapter 11 sale

17  process.

18  Q.   But that wasn't my question.   My question was, can a

19  blocking position be voted in a 363 sale?

20  A.   There is no voting opportunity for creditors in 363 sales.

21  Q.   Do you know if LightSquared pursued a 363 sale option in

22  this case?

23  A.   That was one of the potential avenues, yes.

24  Q.   But it was not the one you pursued, right?

25  A.   As of right now, we're not doing that right now, I think.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    And you understand there are many reasons why somebody

2    would adopt a blocking position, right?

3          THE COURT:  Mr. Mundiya, can I ask for a

4    clarification.  You're using the phraseology "adopt a blocking

5    position" --

6          MR. MUNDIYA:  Maybe obtain.

7          THE COURT:  -- and I don't know what that means.

8          MR. MUNDIYA:  Obtain, obtain.

9          THE COURT:  Obtain.

10         MR. MUNDIYA:  Obtain.

11         THE COURT:  Thank you.

12   Q.    There are many reasons a creditor would obtain a blocking

13   position, right?

14   A.    Probably not hundreds of reasons, maybe --

15   Q.    Right, but there are --

16   A.    Probably you can count it on your hand.

17   Q.    But there are reasons other than a reason to acquire the

18   debtor, right?

19   A.    Correct, but the reason for having a blocking position is

20   its significance in the bankruptcy process.

21   Q.    I understand that.  But if you have a blocking position,

22   you have significant rights with respect to cram down

23   provisions, correct?

24   A.    Correct.

25   Q.    All right, so a creditor could obtain a blocking position

**LIGHTSQUARED, INC., ET AL.**

1   to prevent or to ensure that it gets the protections of the

2   cram-down provisions, correct?

3   A.   The voting provisions often associated -- I mean, which

4   include the rules around cram-down, tend to turn on one-thirds,

5   two-thirds in terms of affirmative acceptance of a plan or

6   blocking a plan.

7   Q.   Right, but creditors do obtain blocking positions in order

8   to get the benefits of the cram-down provisions, right?

9   A.   I'm not sure if people think of it as cram-down versus

10   just blocking the affirmative approval of the plan.

11   Q.   Okay.  Now, you understand that in this case there was an

12   agreement or a plan support agreement that was entered into,

13   right?

14   A.   Yes, I'm aware of that.

15   Q.   Okay.  And have you reviewed the plan support agreement?

16   A.   I think I saw it at one point in time in the early summer,

17   but I haven't looked at it in -- since then.

18   Q.   Okay.  And you understand that SPSO and the ad hoc lenders

19   came to an agreement, right?

20   A.   That's my understanding.

21   Q.   Okay.  And did you, do you know whether SPSO was under any

22   contractual duty to support the plan pursuant to that

23   agreement?

24   A.   To support which plan?

25   Q.   The ad hoc lenders' plan.

**LIGHTSQUARED, INC., ET AL.**

1   A.    I believe so, but I don't recall.  I don't recall the

2   details of the plan support agreement.

3   Q.    Well, did you know that SPSO was under a contractual duty

4   to support the plan of the ad hoc lenders that involved the

5   LBAC bid.

6   A.    That would make sense.

7   Q.    Did you know that SPSO was under a contractual duty to

8   support the ad hoc lenders plan even if the LBAC bid was topped

9   by somebody else?

10  A.    Again, that could make some sense, but I don't remember

11  the details of the plan support agreement.

12  Q.    Okay.  So when you spoke to investors in 2013 about the

13  presence of competitors in the capital structure, did you lay

14  out for those investors the terms and conditions of the ad hoc

15  lenders plan and SPSO's rights with respect to that plan?

16  A.    No.  What I tried to do was to lay out a path or road map

17  for them to try to get into the process and be aware.

18  Q.    But you didn't explain to them that if they made a higher

19  and better bid than LBAC, that in some conditions SPSO would be

20  duty bound to support it, you didn't say that to them, did you?

21  A.    I think I laid out paths where they could try to be a

22  winner.

23  Q.    But did you explain to them that SPSO was contractually

24  bound to support a higher and better bid, even if it was other

25  than the LBAC bidder?

1  A.   I'm not sure it would have been relevant, because their

2  auction could have been canceled.  So my job was to try to

3  induce somebody to make a bid and to paint a path where they

4  could be a bidder.

5  Q.   But you've talked about a blocking position and you didn't

6  tell these potential investors that there was a path whereby if

7  they made a higher and better bid that SPSO had a contractual

8  duty to vote in favor of that, you didn't tell them that?

9  A.   No, because that would not have necessarily been exactly

10  the truth.  The auction could have been canceled at the last

11  minute.  The company could have decided to do something

12  different.  So I couldn't guarantee them that if XYZ happened,

13  they would win.

14  Q.   Did do you know that the plan support agreement in this

15  case was publicly filed in July, sometime in July?

16  A.   Sounds about right.

17  Q.   And do you know when the bid procedures order was entered

18  into?

19  A.   I don't know.

20  Q.   Okay.  Does October sound about right?

21  A.   It could be.  I just don't know.

22  Q.   Okay.  So there was a time or there was a period of time

23  between the public filing of the PSA and the bid procedures

24  order, right?

25  A.   There -- yeah, that sounds right.

**LIGHTSQUARED, INC., ET AL.**

175

1    Q.    And during that time period there were no termination fee

2    provisions that were out there, correct?

3    A.    That were no what?

4    Q.    Termination fee provisions, expense reimbursement

5    provisions, because those provisions were approved as part of

6    the bid procedures order, right?

7    A.    I don't know.

8    Q.    Okay.  Are you aware of any person who made a bid between

9    July and December other than LBAC?

10   A.    I think I testified at my deposition I'm aware of several

11   proposals that were made; because I was not the day-to-day

12   person in every board meeting or involved in every

13   conversation, I can't be positive as to who did exactly what,

14   but I think I told you about at least two, maybe three

15   potential proposals I was aware of.

16   Q.    Well, there was one was by -- was LBAC, right?

17   A.    Let's ignore that one.

18   Q.    Okay.  And the other one was Centerbridge, right?

19   A.    Correct.

20   Q.    Okay.  And Centerbridge arrived on the scene in November,

21   is that right?

22   A.    I don't remember when.  I mean I think we were talking to

23   Centerbridge as long as a year and a half ago.  So I'm not sure

24   they arrived as late as you think they arrived.

25   Q.    Okay.  And Centerbridge withdrew its proposal sometime in

**LIGHTSQUARED, INC., ET AL.**

1    December, right?

2    A.    I don't remember the timing, but it sounds fine.

3    Q.    Right.  And you have no idea why Centerbridge withdrew its

4    proposal, right?

5    A.    I don't know for sure why they produced -- why they

6    withdrew their proposal, correct.

7    Q.    And you don't know whether they withdrew their proposal

8    because there was a competitor in the capital structure of

9    LightSquared, right?

10   A.    I don't know.

11   Q.    Right.  Besides Centerbridge, what other proposals did the

12   debtor receive?

13   A.    I believe there is a proposal the debtor received from a

14   Harbinger-related process and I believe there is another

15   proposal that I think you characterized it as the Fortress bid

16   or Fortress proposal, which the debtor has been or has

17   considered.  So that would be three beyond the LBAC.

18   Q.    Bidder B, you spoke to them in the summer of 2013?

19   A.    That's my recollection, yeah.

20   Q.    And bidder B didn't make a proposal, did it?

21   A.    No.

22   Q.    Okay.  And you don't know why they didn't make a proposal,

23   do you?

24   A.    I do not.

25   Q.    Okay.  And you're not aware of any bidder, strategic or

**LIGHTSQUARED, INC., ET AL.**

1   financial, that failed to make a bid for LightSquared because

2   of the presence of a competitor in the capital structure,

3   correct?

4   A.   Correct.

5   Q.   Now, you testified to the fact that a competitor in the

6   capital structure can have a negative impact on the company,

7   right?

8   A.   Correct.

9   Q.   Okay.  Are there other factors that can have a negative

10  impact on a debtor besides the presence of a competitor in its

11  capital structure?

12  A.   You could probably list hundreds of things that could have

13  negative effect on companies.

14  Q.   Let's talk about LightSquared in particular.

15  A.   Okay.

16  Q.   Would the fact that it had significant FCC concerns, would

17  that have an impact on potential bidders for LightSquared?

18  A.   It would be a consideration.

19  Q.   In fact, FCC approval is a significant issue for

20  LightSquared, isn't it?

21  A.   FCC approval is a significant issue for anybody who holds

22  an FCC license and continuing FCC relationship.

23  Q.   But you were aware of bidders who were raising FCC issues

24  in the summer of 2013, weren't you?

25  A.   The question of the FCC relationship is one that any

1  investor is going to ask in this company or any other company

2  that has licenses.

3  Q.   Okay.  What about the presence of Mr. Falcone; wasn't that

4  raised by investors in the summer of 2013?

5  A.   The presence of Mr. Falcone?

6  Q.   Yes.

7  A.   I'm not sure --

8  Q.   Well, let me rephrase that.  Was the role of Mr. Falcone

9  in LightSquared a subject of discussion with potential bidders

10  in the summer of 2013?

11  A.   Yes, in my experience potential bidders always want to

12  know what the equity is going to do as part of a plan or sale

13  process.

14  Q.   And was the subject of Mr. Falcone's issues with respect

15  to SEC problems the subject of discussion with investors?

16  A.   I believe it was mentioned by one, at least one.

17  Q.   And what did that investor say about Mr. Falcone's SEC

18  issues?

19  A.   I don't know.

20  Q.   Did you have that conversation?

21  A.   I had the conversation with the two investors that we're

22  talking about, A and B, and I believe at least one of them

23  mentioned something about that in the overall conversation,

24  yes.

25  Q.   Okay.

**LIGHTSQUARED, INC., ET AL.**

1    A.    It was not the first, nor the second or third thing that

2    was probably discussed.

3    Q.    But you don't have any recollection of what you were told

4    about Mr. Falcone's SEC issues?

5    A.    I would have no expertise to say anything about that.

6    Q.    Well, what did the questioner say about Mr. Falcone's SEC

7    issues?

8    A.    I don't remember what they said.

9    Q.    Now, the auction in this case was canceled, wasn't it?

10   A.    I believe so.

11   Q.    Okay.  Who canceled it?

12   A.    Usually it's the debtors who cancel auctions.

13   Q.    Well, do you know what the purpose was for canceling the

14   auction?

15   A.    I do not know all the details, no.

16   Q.    Okay.  When's the last time you spoke to Mr. Falcone?

17   A.    It's probably been several months.

18   Q.    Okay.  And was that after SPSO made public its holdings in

19   LightSquared?

20   A.    Well, I think the Wall Street Journal article I want to

21   say was in May or June of 2013.  So I think in my math it was a

22   couple, three months ago; it would probably be after that.

23   Q.    Okay.

24   A.    I mean, when you say made public, I think it became

25   publicly known.

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 180 of 240
**LIGHTSQUARED, INC., ET AL.**

180

1    Q.    Right.  And what did Mr. Falcone tell you about Mr.

2    Ergen's, or SPSO's holdings in LightSquared, if anything?

3    A.    I don't remember talking specifically about that with him.

4    Q.    Do you believe a competitor in the capital structure of a

5    company can have positive impacts?

6    A.    I guess it's possible.

7    Q.    All right, and it can have positive impacts because it can

8    attract other strategic investors, right?

9    A.    I guess that's a possibility as well.

10   Q.    And did you know that Mr. Falcone was of the view or may

11   have suggested to others that having Mr. Ergen or SPSO in the

12   capital structure might have a strategic impact, a positive

13   impact on the company?

14          MR. FRIEDMAN:  Your Honor, object.  It assumes facts

15   not in evidence.

16          THE COURT:  I'm sorry, Mr. Friedman, say it again?

17          MR. FRIEDMAN:  It assumes facts not in evidence.  He's

18   making up a story and asking if he knows about it.

19          THE COURT:  He's asking him if he knows.

20          MR. MUNDIYA:  Yeah.

21   A.    Can you ask the question again?

22   Q.    Do you know --

23          MR. FRIEDMAN:  Well, the implication that it happened,

24   he's implying that something happened that didn't happen and

25   asking if he knows about it.

**LIGHTSQUARED, INC., ET AL.**

181

1            MR. MUNDIYA:  Okay, so let --

2            THE COURT:  All right, let's -- Mr. Mundiya, why don't

3   you do it another way.

4            MR. MUNDIYA:  I'll do it another way.

5            THE COURT:  Everybody --

6   Q.   Can up please turn to --

7            THE COURT:  Everyone relax.

8   Q.   If you could please turn to --

9            MR. MUNDIYA:  Right.  I got it.

10  Q.   Could you please turn --

11           MR. GIUFFRA:  Exhibit 36, Your Honor.

12  Q.   If you could please turn to tab 8 in your binder.

13  A.   Okay.

14  Q.   If you could just take a moment to review this document.

15  This is an e-mail, Mr. Derrough, from Mr. Falcone to Ara Cohen.

16  Do you know who Mr. Cohen is?

17  A.   I do.

18  Q.   Who is he?

19  A.   He is one of the main principals of Knighthead Capital,

20  which is a hedge fund and has been a holder of the company's

21  first lien debt for a very long time.

22  Q.   And you've spoken to him about LightSquared on and off,

23  right?

24  A.   Yes, I've spoken and met with Mr. Cohen a number of times

25  about LightSquared.

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 182 of 240
**LIGHTSQUARED, INC., ET AL.**

182

1    Q.    Okay.  And if you look at this e-mail dated May 5, 2012,

2    Mr. Falcone writes "I tried you.  Maybe we shouldn't file if he

3    is certain the wagons, though I think he's a positive, may

4    bring in another strategic."  Do you see that?

5    A.    I do.  What year is this?

6    Q.    It's 2012.

7    A.    Oh, okay.  Let me just see.  Okay, say again?  So what

8    were you saying?

9    Q.    Were you aware or do you have an understanding that Mr.

10   Falcone, with whom you have spoken, believed that having Mr.

11   Ergen in the capital structure be a positive for LightSquared?

12   A.    Well, actually, I'm not sure you can read that here

13   because I don't -- May 2012, I don't think that we, as the

14   debtor, knew at that point that Ergen or DISH had acquired

15   debt, and I don't know if something is missing here but it says

16   "I just exchanged e-mails with Ergen" -- so I don't know if --

17   it looks like there is an initial e-mail that is missing.

18   Q.    Okay.

19   A.    So I don't know if it says in the initial e-mail that they

20   think it's Verizon.  I don't know what it says in the e-mail.

21   Q.    Well, I think tab 9 will maybe clarify that.  Let's go to

22   tab 9, that's Defendant's Trial Exhibit 36.  And this is the

23   day after May 5.  And if you can read down to the e-mail

24   between Mr. Falcone and Matthew Goldstein -- do you see that?

25   A.    Where are you looking?

**LIGHTSQUARED, INC., ET AL.**

1    Q.    About halfway to the page.

2    A.    From Falcone to Goldstein, okay.

3    Q.    Re:  one-week extension.  And Mr. Falcone writes, "I can

4    sell these positions."  Do you see that?

5    A.    Yes.

6    Q.    And then Mr. Goldstein replies, "Really, to whom?"

7    A.    I see that.

8    Q.    And then Mr. Falcone replies, "Ergen will prompt more

9    strategics to step in."  See that?

10   A.    I do.

11   Q.    Okay.  Did you discuss with Mr. Falcone at any point that

12   having SPSO in the capital structure would "prompt more

13   strategics to step in"?

14   A.    Not that I recall.

15   Q.    Did you have any discussions with Mr. Falcone on the

16   benefits of having SPSO in the capital structure?

17   A.    Not that I recall.

18   Q.    Did you have any discussions with Mr. Falcone about how

19   strategics might react to having SPSO in the capital structure?

20   A.    Not that I recall.

21   Q.    Well, do you have an understanding here today whether

22   having SPSO in the capital structure might encourage other

23   strategics to step in?

24   A.    I think I've already told you my view on that.

25   Q.    Okay.

**LIGHTSQUARED, INC., ET AL.**

1          THE COURT:  I want to ask something of the parties

2     with respect to Defendant's Trial Exhibit be 39, which is at

3     tab 8.

4          MR. MUNDIYA:  Tab 8.

5          THE COURT:  Yes.  At the very top, it's from Mr.

6     Falcone sent Saturday, May 5 at 7:48.  I want to ask if you can

7     undertake to figure out whether this is an excerpt of a larger

8     chain of e-mails and I'd like you to produce, if it's not

9     subject to privilege, the entirety of what this is part of.

10          MR. FRIEDMAN:  It's not, Your Honor.  The e-mail

11     originated with Ara Cohen, and the reason there is nothing

12     there is because all Mr. Cohen said was I just exchanged e-

13     mails with Ergen, which was a joke, by the way, just so you

14     understand.

15          MR. MUNDIYA:  Now he's testifying.

16          THE COURT:  Well, he can get to that later.  My

17     question is whether or not this is the entirety of the

18     document.

19          MR. FRIEDMAN:  That is the entirety, yes, Your Honor.

20          THE COURT:  Thank you.  So it's one of those things

21     that happens when you send a text message times that when you

22     don't put in a subject, the subject, the type -- the text pops

23     into the subject line?

24          MR. FRIEDMAN:  I think the message was put into the re

25     line.  That's all there is, just a re line.

**LIGHTSQUARED, INC., ET AL.**

185

1              THE COURT:  I see.  Thank you.

2    BY MR. MUNDIYA:

3    Q.   Mr. Derrough, you filed a declaration in this case in May

4    of 2012, correct?

5    A.   I don't remember, but I'll take your word for it.

6    Q.   Well, take a look at tab 8.  make it easier.

7    A.   Okay.

8    Q.   You don't have to read the whole thing.  Does this look

9    familiar?

10   A.   It does.  You showed it to me at my deposition.

11   Q.   I did.  And this was a declaration you filed in this court

12   under penalty of perjury in support of Moelis' retention,

13   correct?

14   A.   Correct.

15   Q.   Okay.  And if you turn to the last page, which is -- the

16   last page, and it's Schedule 1, which is entitled "Potential

17   Parties-in-Interest", see that?

18   A.   I do.

19   Q.   Okay.  If you turn to the last page, there is a category

20   for "Other Parties-in-Interest".  That's page 3 of the

21   schedule.  Do you see that?

22   A.   Yes.

23   Q.   Okay.  And you identify in your declaration two of the

24   parties-in-interest, potential parties-in-interest in this case

25   as of May 2012 were Charles Ergen and DISH Network Corporation,

**LIGHTSQUARED, INC., ET AL.**

186

1  correct?

2  A.    Well, I'm not sure if I identified it.    I think what we

3  say in here is that we cross-checked based upon a list provided

4  to us by somebody, presumably the debtor's counsel.

5  Q.    Right, but you attached this to a declaration that you

6  filed under oath, right?

7  A.    Correct.

8  Q.    And did you --

9  A.    We said this -- we checked against this; we're not

10  representing that these are parties-in-interest.    We're saying

11  we checked it based upon what was given us.

12  Q.    And so the debtor gave you this?

13  A.    Presumably someone on -- yeah, probably debtor's counsel.

14  Q.    You were involved, in the summer of 2013, with others at

15  Moelis, right, on LightSquared?

16  A.    Summer of 2013?

17  Q.    2013, yep.

18  A.    I was involved, my colleagues, Mr. Hootnick and Mr. Holtz

19  are the principal day-to-day senior bankers on it, and I get

20  involved from time to time as is needed.

21  Q.    All right.    Did you attend meetings with the ad hoc

22  lenders in the summer of 2013?

23  A.    I don't remember.

24  Q.    Okay.    Well, take a look at tab 4.

25  A.    Okay.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    This is a long chain of e-mails involving Mr. Lauria and

2    others, including Mr. Hootnick.  And we don't have to go

3    through the entire chain, but there is an e-mail that I would

4    like to refer you to, which is on page 2.  It's the e-mail

5    dated Sunday, July 14th, 2013 at 8:34 p.m.  Do you see that?

6    It's a carry-over e-mail.

7    A.    Okay, so, well, it starts on the first page and then goes

8    onto the second page.

9    Q.    Yup.

10   A.    Okay.

11   Q.    It's from Mr. Lauria to Mr. Barr with a bunch of CC's.

12   And Mr. Lauria writes, "We reached an agreement that was

13   announced to the Court on the morning of July 10th that LP

14   would promptly engage in negotiations with LBAC."

15        And then it goes on to say that there is a need to get a

16   meeting scheduled and it has been scheduled.  Do you see Mr.

17   Lauria's e-mail there?

18   A.    I see his e-mail, yes.

19   Q.    All right.  Was it your understanding that in July of 2013

20   the ad hoc lenders were concerned that the debtors were

21   stonewalling them?

22   A.    There's been all kinds of accusations back and forth in

23   this case.  So I'm not sure what the ad hoc lenders thought

24   versus what counsel asserted, so.

25   Q.    Was it your understanding in the summer, on July 14th,

**LIGHTSQUARED, INC., ET AL.**

1    2013 that the ad hoc lenders believed that they were being

2    stonewalled?

3    A.    No, because I didn't talk to the ad hoc lenders

4    themselves.

5    Q.    Okay.

6           MR. STONE:  Your Honor.

7           THE COURT:  Yes, Mr. Stone.

8           MR. STONE:  I've let Mr. Mundiya wander all over the

9    place.  This is clearly beyond the scope of our direct

10   examination.  He's not really put on as a fact witness.

11          Yes, I'm sorry.

12          I think it goes well beyond the scope of his direct

13   testimony.  So I'm not sure where we're going with this.

14          THE COURT:  Mr. Mundiya?

15          MR. MUNDIYA:  He's a representative of Moelis.  They

16   filed fee applications in this case.  He's testified that he

17   had involvement in this process, and he clearly has some

18   knowledge as to what was going on in the July time frame which

19   goes to --

20          THE COURT:  But that's beyond the scope of what the

21   direct testimony was.

22          MR. MUNDIYA:  I think what this will show, what this

23   e-mail will show is lack of a factual basis for some of his

24   opinions, because you see in the e-mail that I'm about to get

25   to, which is the one above this one, where Mr. Hootnick

**LIGHTSQUARED, INC., ET AL.**

1  forwards this e-mail to him, Mr. Derrough says LBAC, question

2  mark.

3         So as of July 14, 2013, Mr. Derrough doesn't even know

4  who LBAC is.  So that goes to the underlying basis for his

5  opinions.

6         THE COURT:  I'm sorry, I'm just not connecting the

7  dots that you're asking me to connect.

8         MR. MUNDIYA:  I'll move on, Your Honor.

9         THE COURT:  Thank you.

10     (Pause)

11         MR. MUNDIYA:  I'm done, your Honor.  No further

12  questions.

13         THE COURT:  All right.

14         MR. FRAWLEY:  Your Honor --

15         THE COURT:  Yes, Mr. Frawley.

16         MR. FRAWLEY:  -- I'll be very brief.

17         For the record, it's Brian Frawley from Sullivan &

18  Cromwell for DISH and EchoStar.

19  CROSS-EXAMINATION

20  BY MR. FRAWLEY:

21  Q.   Good afternoon, Mr. Derrough.

22  A.   Good afternoon.

23  Q.   Mr. Mundiya went over with you some of the reasons why

24  buyers might have been dissuaded from participating in any

25  LightSquared process here apart from the assertions regarding

**LIGHTSQUARED, INC., ET AL.**

1   Mr. Ergen, and you touched upon FCC issues and you touched upon

2   Harbinger/Mr. Falcone.  I'd like to talk about perhaps some

3   other issues that might affect buyers' willingness to

4   participate.

5        In your experience does the mere presence of a bankruptcy

6   affect buyers' willingness to participate in a sale process?

7   A.   Well, since most of my sale processes are in bankruptcy --

8   well, strike that.

9        Bankruptcy is a different environment for buyers to

10  participate in.  So you don't always get the same subset of

11  buyers as you would get in a nonbankruptcy environment.

12  Q.   All right, one of the things you referred to this

13  afternoon was in the levelness of the playing field and that

14  having an effect on potential bidders' interest in

15  participating, right?

16  A.   Correct.

17  Q.   And in a bankruptcy you could never be assured of a level

18  playing field because of the circumstances in bankruptcy,

19  right?

20  A.   Things can always change in bankruptcy.

21  Q.   All right.  And when we --

22  A.   That doesn't mean people don't bid on bankruptcies.

23  Q.   And when we saw you for your deposition earlier this week,

24  we also talked about some other issues that could dissuade

25  buyers in respect of LightSquared, and I think one of the

**LIGHTSQUARED, INC., ET AL.**

1  things you mentioned was the size of the check or the size of

2  the investment required here, right?

3  A.   I must say the dissuades buy -- one kind of buy -- you

4  know, the kind of house you might want to buy is probably

5  different from the kind of house that the guy selling hot dogs

6  on the corner is going to buy.

7  Q.   Right.  He gets a much bigger one than me.

8  A.   A lot of hot dogs.

9  Q.   Right.

10 A.   So it's just different types of buyers.  As a banker, when

11 you have a situation, you try to size the situation to the

12 potential investor or lender or whatever, certain types of

13 buyers or investors or lenders participate in small companies,

14 other ones participate in mid-size companies, otherwise

15 participate in large companies.

16      So it might dissuade a specific investor if it's big, but

17 it might actually induce a different investor if it's big.

18 Q.   Right.  But it may affect the pool of interest one way or

19 the other?

20 A.   There is so much capital out there that it's really just

21 finding the right subset for the right size transaction.

22 Q.   Right.  And what about the --

23      THE COURT:  Can I just ask you a question about that

24 statement, there's so much capital out there.

25      THE WITNESS:  Yes, Your Honor.

**LIGHTSQUARED, INC., ET AL.**

192

1          THE COURT:  Are you aware that LBAC's bid -- I'm not

2     sure exactly when it was first characterized as such -- but

3     that LBAC's bid has been characterized as a low-ball bid?  Have

4     you ever heard that before?

5          THE WITNESS:  I'm not sure I heard those phrases used,

6     by I know that there are people who believe and I think that my

7     firm believes that the value ascribed under the LBAC bid does

8     not equate with what we think the company is worth

9     intrinsically.

10          THE COURT:  So would you connect up for me that view

11     and the statement that there is so much capital out there with

12     the observation that no one would be willing to come in and

13     bid?

14          THE WITNESS:  Sure.  So I think when we talk about

15     capital, you're really mostly referring to kind of, at least in

16     my mind when he's asking the questions, the financial investor

17     world, so private equity or hedge funds.  This particular

18     situation lends itself to, in terms of maximizing the value of

19     these assets, to a strategic buyer, to leveraging the spectrum,

20     to leveraging what you can do here, especially -- and I think

21     Your Honor saw what we filed initially on a cash collateral

22     motion, some information around the scarcity of spectrum.

23     people who can use spectrum are strategics, not financial

24     buyers; they're just going to hold it for somebody else to sell

25     it later.  So I think that was sort of what I meant about the

**LIGHTSQUARED, INC., ET AL.**

1    kind of availability of capital.

2            When we think about the price that DISH/Ergen is

3    offering here, and my belief is that it's a distinction without

4    a difference from the marketplace's perspective -- the

5    marketplace believes that this is a consolidated, you know,

6    effort -- it's -- it's a -- I'm not for sure I'd say low ball,

7    but it's a low offer relative to what we believe it is worth to

8    a strategic.  And when we think about availability of capital,

9    that's not really what we think about strategics per se,

10   because usually strategics are writing a check out of their own

11   coffers, or they're going to raise debt financing to pay for

12   it, or they're going to issue stock.

13           THE COURT:  The market understood, don't you think,

14   that the bid that was made was only enough to take out the LP

15   debt, in other words did not provide a recovery to the

16   preferreds, correct?

17           THE WITNESS:  I think the market can do that math,

18   Your Honor, and I think the hedge fund world probably knew that

19   and figured that out.  I think the, you know, bankruptcy

20   intricacies of this class getting something and that class not

21   getting something and who can really call the shots and who

22   can't call the shots is a whole layer of expertise and inside

23   baseball that is not very well known to strategics.  And so I

24   think counsel's comment was right in that not every strategic

25   will play in bankruptcies, as a general statement, and we saw

**LIGHTSQUARED, INC., ET AL.**

1    that in Innkeepers, Your Honor.

2              Although, in this industry, people like Verizon and

3    AT&T have bought companies in bankruptcy before in distress.

4    They are familiar enough -- I mean, it's not a foreign place to

5    them.  But you know -- I mean, I've run -- Paul Leek (ph.) ran

6    three auctions for Globalstar, we changed the rules every time,

7    and so people -- this is fifteen years ago.  People, I think,

8    know that the rules can be changed.  And with a strategic

9    investor in there who has such a significant stake, I think the

10   general perception, and frankly, I think accurately so, Your

11   Honor, is that they will be able to change the rules in a way

12   that will not favor me.

13             You know, if we're advising a strategic, I'd say buy

14   the debt, get a blocking position, because you're going to have

15   influence on the process -- I can't guarantee it, but very

16   likely you're going to have a lot of influence on the process.

17   You may even be able to cancel the auction and just negotiate

18   directly with creditors.

19             So I think you're right, Your Honor, that's the math

20   you can do and that's the math that we did with bidder A and

21   bidder C, and people I've tried to explain to them, well, if

22   you do this and, you know, they're -- they can only be paid one

23   hundred cents and then they don't have a stake, but you still

24   have a bankruptcy court that has uncertainty inherently in it

25   in terms of kind of what outcomes may be.

**LIGHTSQUARED, INC., ET AL.**

195

1          THE COURT:  Okay, thank you.  Sorry to interrupt.

2          MR. FRAWLEY:  Thank you, Your Honor; that's fine.

3   BY MR. FRAWLEY:

4   Q.   Just to follow up on some of the Court's questioning,

5   while you have suggested that this was a natural fit for

6   strategics, the two buyers that we talked -- you testified

7   about this afternoon, bidder A and bidder B, were not

8   strategics, correct?

9   A.   Correct.

10  Q.   And you've actually had never had any conversations with

11  potential strategic buyers of these assets; is that right?

12  A.   I have not, but in preparation for my cash collateral

13  testimony, I spent a lot of time with my telecom partners to

14  really understand the strategic landscape and who was capacity

15  constrained in terms of Spectrum.

16  Q.   And do you have an opinion today if the strategic was a

17  natural buyer of this company why LightSquared was out talking

18  to strategics about minority investments?

19  A.   Presumably because the -- some of the stakeholders wanted

20  to maintain some upside beyond whatever price might get paid,

21  because there's a fundamental belief that there's a lot of

22  value here.

23       Now, I'm not sure that what you say is accurate.  You'll

24  have to talk to one of my colleagues as to what we were asking

25  people to bid on.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    One of the matters you mentioned this afternoon in your

2    direct testimony was -- in terms of the ability to sell an

3    asset particularly in bankruptcy was finding a willing seller,

4    right?

5    A.    Correct.

6    Q.    And do you know whether we had a willing seller in the

7    case of LightSquared?

8    A.    I believe that the independent committee was very much

9    looking for a transaction to maximize the value of the estates

10   and was open to -- I was going to say any type of transaction,

11   I think that's generally the case -- that would serve to do so.

12   Q.    Okay.  And when was that committee formed?

13   A.    I don't remember.

14   Q.    All right.  We'll come back to that in a second.

15        I just want to finish out the list of potential items that

16   may have dissuaded bidders in respect of LightSquared.  I think

17   you testified at your deposition that the pendency of the GPS

18   litigation and interference issues might dissuade potential

19   buyers; is that right?

20   A.    It could.

21   Q.    I think you also testified earlier on in this process that

22   the presence of Mr. Icahn also might have dissuaded some

23   buyers; is that right?

24   A.    You said Mr. Icahn?

25   Q.    Yes.

**LIGHTSQUARED, INC., ET AL.**

1    A.    I think at my deposition we talked about Mr. Icahn.

2    Q.    The presence of Mr. Icahn was not a positive for

3    LightSquared either, was it?

4    A.    I think it's safe to say that.

5    Q.    In your testimony earlier this afternoon, you indicated

6    that the sale process might be chilled by the presence of this

7    significant competitor in the capital structure, right?

8    A.    I think competitor strategic bidder.

9    Q.    Okay.  Can you identify for the Court when, in the

10   chronology of events in respect of LightSquared, that that

11   chilling first arose?

12   A.    Well, I'm not going to be exactly certain.  I think from

13   my perspective when the Wall Street Journal article came out

14   that identified DISH/Ergen as being significant owners of the

15   debt, you know, it's one thing to read about something in

16   DebtWire, it's something very different to read about it in the

17   Wall Street Journal.  People tend to believe the Wall Street

18   Journal, not taking anything away from DebtWire but -- and so I

19   think that the marketplace in general believed at that point

20   that, based upon what was written, that the Ergen/DISH entities

21   had a significant control on the process.

22   Q.    And the Wall Street Journal article that you're referring

23   to in that testimony is the article that reported on the bid by

24   LBAC in late May of 2013; is that right?

25   A.    Yes.

**LIGHTSQUARED, INC., ET AL.**

1    Q.    And so in your testimony today, are you suggesting --

2    A.    Like I said, it could have been earlier when -- my

3    recollection, and since I was not the day-to-day person, what I

4    would identify as then, but it could have been earlier.  I just

5    don't know what other stories were out there when circulating

6    around.

7    Q.    Right.  Well, it's not possible that SPSO's debt ownership

8    dissuaded anybody unless their debt ownership was known, right?

9    A.    Right.  What I don't know is whether there's another

10   article a month before that in Bloomberg that talked about it.

11   I'm referring to what I'm not familiar with.

12   Q.    Right.  And I assume from your testimony earlier that you

13   and your colleagues from Moelis were not going out and telling

14   potential investors that Mr. Ergen was a substantial owner of

15   debt in LightSquared; is that right?

16   A.    I don't believe so.

17   Q.    Are you aware one way or the other as to whether or not

18   Mr. Falcone was telling the press that that was the case?

19   A.    I have no idea.

20   Q.    In your expert opinion, would telling the press that Mr.

21   Ergen was buying significant amounts of debt in LightSquared

22   potentially chill investor interest?

23   A.    It could if that then became reported out into the

24   marketplace as a fact as opposed to something that someone is

25   saying.

**LIGHTSQUARED, INC., ET AL.**

1  Q.   Okay.  The sale process that you have testified might have

2  been chilled by Mr. Ergen's presence in the capital structure.

3  When, in your mind, did that sale process start?

4  A.   I can't be sure.  I mean, I'd say to the extent that --

5  some people would say that when their company is in bankruptcy

6  the sale process has started.  I don't necessarily subscribe to

7  that view.  But it certainly does get people to pay attention

8  to a situation.  And I don't remember the sequence of events in

9  terms of what the company and the board were thinking about

10 doing at various points in time.

11      I know that there was an effort at one point by the

12 company, it started with Mr. Smith, to engage in conversations

13 with strategics.  I don't recall whether that happened before

14 May or after May.  I just don't recall.  But I'd say that would

15 probably be a good starting point, but we probably had

16 conversations with people along the way even before that.

17 Q.   And are you offering any opinion in this case about the

18 impact of having a strategic investor in the capital structure

19 on their ability to refinance?

20 A.   I had not.  If you want to ask me about it, I'm happy to

21 talk about it.

22 Q.   In fact, I don't.

23      MR. FRAWLEY:  I have no other questions.  Thank you.

24      THE COURT:  Mr. Stone?

25      MR. STONE:  No redirect, Your Honor.

**LIGHTSQUARED, INC., ET AL.**

1        THE COURT:  All right.  Mr. Derrough, thank you very

2    much.  Have a good afternoon.

3        THE WITNESS:  Thank you, Your Honor.

4        THE COURT:  Yes, Mr. Mundiya.

5        MR. MUNDIYA:  Mr. Kiser will be here tomorrow morning.

6        THE COURT:  Tomorrow morning, okay.  So that means

7    we're done for today?

8        MR. STONE:  Yes, Your Honor.

9        THE COURT:  Okay.

10        MS.  STRICKLAND:  Your Honor, what time would you like

11    to begin?

12        THE COURT:  Hold on one second, Ms. Strickland.

13        Mr. Barr, do you have anything you want to say?

14        MR. BARR:  Sure.

15        THE COURT:  Mr. Derrough, you can step down.  Thank

16    you.

17        MR. BARR:  For the record, Matt Barr of Milbank Tweed

18    on behalf of LightSquared.

19        Your Honor, my understanding is that -- well, let me

20    tell you, tomorrow the next witness would be Mr. Kiser.  You

21    heard from Willkie that he'll be here in the morning.

22        THE COURT:  Okay.

23        MR. BARR:  The next witness on our list is Mr. Ergen.

24    Mr. Ergen will be here on Monday morning.  So we could find

25    ourselves unfortunately with some time tomorrow afternoon not

**LIGHTSQUARED, INC., ET AL.**

1    in court.

2              THE COURT:  Okay.  There are worse things.

3              MR. BARR:  Understood, Your Honor.

4              THE COURT:  I was asking if you wanted to tell me

5    anything about any other matters that were noticed for today.

6              MR. BARR:  I do, yes.  So that was the first matter.

7              The second matter, Your Honor, you may recall we filed

8    a motion with respect to exit financing engagement letter for

9    JP Morgan.  We agreed to move that till tomorrow with an update

10   today.  We are still having discussions with JP Morgan and the

11   lenders, and the lenders have asked us to move that to Monday.

12   If it's okay with --

13             THE COURT:  And the LightSquared lenders.

14             MR. BARR:  Yes, the LightSquared lenders, yes.

15             If it's okay with Your Honor, I'd like to schedule

16   that for the first thing Monday morning --

17             THE COURT:  Okay.

18             MR. BARR:  -- so that we can get that out of the way.

19   I will tell you that I'm going to get back to my office and get

20   yelled at by JPM for moving it, but we're not prepared at this

21   point to go forward.

22             THE COURT:  All right.  Will you keep us apprised with

23   respect to whether or not I should be looking for objections to

24   read before Monday?

25             MR. BARR:  Yes, Your Honor.

**LIGHTSQUARED, INC., ET AL.**

202

1          THE COURT:  Okay.

2          MR. BARR:  Unless Your Honor disagrees, maybe what we

3 should do is -- by 5 o'clock tomorrow, we will either have an

4 agreement or we will just say we're going forward.  They can

5 file their objections.  If they're resolved between 5 o'clock

6 tomorrow and Monday morning, we will e-mail chambers to let you

7 know.

8          THE COURT:  That's fine with me, if it's fine with the

9 lenders.  Look, if you -- let me put in my two cents.  There's

10 nothing magic about 5 p.m. tomorrow from my perspective.  So if

11 it's useful to you to extend it out until you know 6 p.m. on

12 Sunday, that's fine with me.

13          MR. BARR:  It's a question I'll ask Ms. Gartenberg

14 because she'll be handling the hearing to prepare for the

15 objections.  But we'll figure it out, Your Honor.  We'll deal

16 with it.

17          THE COURT:  I'm willing to do whatever most

18 facilitates your process.  So just let us know.

19          MR. BARR:  Thank you, Your Honor.

20          THE COURT:  All right.

21          MR. BARR:  Your Honor may recall that the brief

22 deadline or the deadline to file the brief in connection with

23 confirmation of the MAST UBS Chapter 11 plan is -- U.S.

24 bank is tomorrow.  Your Honor, as Mr. Sussberg told you at the

25 beginning of the hearing, there's lots of discussions that are

**LIGHTSQUARED, INC., ET AL.**

1  going on.

2         THE COURT:  So why don't we extend that date?

3         MR. BARR:  We would extend -- the only thing I would

4  ask, Your Honor, is obviously that we have a period of time

5  between when they file their brief and when we actually start

6  confirmation --

7         THE COURT:  Right.

8         MR. BARR:  -- if it goes forward, for to us prepare.

9         THE COURT:  Right.  Well, since we don't know when

10 what we're doing here is going to end and we don't know yet if

11 there are going to be any additional developments, why don't we

12 just keep our eye on that and we can decide that later on.  All

13 right?

14         MR. BARR:  Thank you.

15         THE COURT:  All right.  Anything else, Mr. Sussberg?

16         MR. SUSSBERG:  One other point, Your Honor -- Joshua

17 Sussberg, Kirkland & Ellis -- there were some discovery issues

18 relating to the stand-alone plan of the debtors.

19         THE COURT:  Okay.

20         MR. SUSSBERG:  Same category as Mr. Barr referenced

21 with respect to Mr. Dublin, ongoing discussions, we're meeting

22 and conferring.  To the extent there is an issue, we'll bring

23 it up to Your Honor.

24         THE COURT:  That sounds good, okay.

25         Mr. Dublin?

**LIGHTSQUARED, INC., ET AL.**

1          MR. BARR:  I'm sorry, Your Honor, I tried.

2          THE COURT:  It's okay.

3          MR. DUBLIN:  Phil Dublin, Akin Gump, for MAST and U.S.

4    Bank.  They tried really hard for me not to talk.  We almost

5    got there.  I think we're probably going to have to bring up

6    some issues tomorrow if we can't get there unresolving these

7    discovery issues because we're going to get into some timing

8    concerns.

9          THE COURT:  All right.  Well, it sounds like, since

10   we're going to not have a full day of trial, then why don't we

11   plan on dealing with that after we conclude?  Do you folks

12   think that you're going to be done with the witness by

13   lunchtime tomorrow?

14         MR. MUNDIYA:  My direct will be maybe an hour and a

15   half, perhaps two.  No more than two.

16         THE COURT:  All right.

17         MR. STONE:  My cross will be shorter.

18         THE COURT:  All right.  So then that all works out.

19         Anything else?

20         MR. BARR:  Your Honor, just one other motion, but

21   we'll talk to Mr. Dublin about it tonight, is the motion he

22   filed in connection with the DIP motions that we filed.  We'll

23   ask if we can kind of push all dates out as well since we're

24   kind of keeping everything in abeyance.

25         THE COURT:  Okay.

**LIGHTSQUARED, INC., ET AL.**

205

1          MR. BARR:  Thank you.

2          THE COURT:  All right.  I think that's it.  Have a

3    good evening.

4          IN UNISON:  Thank you, Your Honor.

5          THE COURT:  Clean up after yourselves.  We'll lock up.

6    You're free to leave things here or bring them into your

7    breakout rooms, whatever you wish.

8          MS.  STRICKLAND:  10 a.m., Your Honor?

9          THE COURT:  10 a.m.

10       (Whereupon these proceedings were concluded at 4:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

206

1

2                              I N D E X

3

4    WITNESS                EXAMINATION BY         PAGE

5    Douglas Smith          Mr. Hirschfeld         109

6    Douglas Smith          Mr. Freimuth           139

7    Douglas Smith          Mr. Giuffra            150

8    Douglas Smith          Mr. Hirschfeld         154

9    William Derrough       Mr. Stone              157

10   William Derrough       Mr. Mundiya            165

11   William Derrough       Mr. Frawley            189

12

13                          E X H I B I T S

14   PLAINTIFF'S               DESCRIPTION         PAGE

15   161                    E-mail from Lucy       127

16                          DeFazio to board of

17                          directors with agenda

18                          attached

19   679                    Minutes from a         143

20                          LightSquared July 1,

21                          2013 board meeting

22

23

24

25

207

C E R T I F I C A T I O N

I, Dena Page, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

DENA PAGE

AAERT Certified Electronic Transcriber CET**D-629

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  January 10, 2014

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

**#**

**#607 (1)**
2:22

**A**

**abeyance (1)**
204:24
**ability (9)**
39:15,21;49:23;
54:1;134:1;164:4,5;
196:2;199:19
**able (6)**
52:8;72:1;129:7;
166:13;194:11,17
**above (4)**
33:22;38:9;64:17;
188:25
**abreast (1)**
115:3
**Abruzzi (1)**
56:25
**absent (2)**
102:25;160:16
**absolutely (18)**
39:18;46:11;50:4,
4;63:16;65:12;67:2;
73:2,18;74:21;75:8,
15;83:17;98:25;
108:9;114:18;
132:20;134:21
**abuts (1)**
121:25
**accept (2)**
74:5;123:12
**acceptance (1)**
172:5
**accepted (1)**
27:17
**access (5)**
55:1;90:21;138:1,
6;141:20
**accommodate (1)**
10:11
**accompli (1)**
71:4
**accomplish (2)**
22:11;25:8
**account (8)**
11:23;25:18;32:16;
33:17;56:22,23,23;
87:25
**accountants (1)**
37:1
**accounting (1)**
163:3
**accounts (6)**
60:25;128:13,15,
17;129:25;132:2
**accurate (10)**
66:7;114:12,14;

143:6;144:14;146:7,
10;155:13,15;195:23
**accurately (1)**
194:10
**accusation (1)**
50:2
**accusations (1)**
187:22
**accusing (1)**
50:2
**ACE (1)**
8:12
**achieve (2)**
56:14;62:19
**achieved (1)**
119:7
**acknowledged (1)**
96:21
**acquire (4)**
52:7;64:18;125:23;
171:17
**acquired (6)**
29:8;58:7;77:17;
116:15;117:24;
182:14
**acquirer (2)**
105:20,20
**acquiring (1)**
161:10
**Acquisition (12)**
6:13;26:2;29:15;
40:8,12,12;46:24;
47:8;91:14;92:3;
102:25;134:24
**acquisitions (3)**
64:23;65:1;118:3
**across (2)**
110:11;155:25
**act (3)**
46:2,3;87:24
**acting (8)**
37:18;44:10;49:1,
10;70:2,4;98:23;
100:7
**action (6)**
44:6,7;89:6,16;
90:13;107:11
**actions (8)**
45:7;81:24;90:15;
94:10,11;98:14;
99:11;105:7
**active (3)**
14:11,12;59:22
**actively (1)**
157:21
**activities (2)**
114:16;161:24
**acts (4)**
93:12;100:12,12,
13
**actual (4)**
48:10;75:25;101:1;
164:9

**actually (33)**
17:25;18:4,19;
49:2;51:13;54:20;
55:12;74:14;76:20;
80:22;81:17;98:14;
102:12;103:10;
121:23;128:20,22;
130:13,19;132:22;
133:20,20;138:6;
142:5;150:6,25;
151:3;152:12;165:4;
182:12;191:17;
195:10;203:5
**Ad (30)**
4:2,10;11:9;13:18;
14:11;16:14;19:1;
40:19,25;41:3;46:23;
50:21;70:20;72:19;
103:2;104:19;131:2;
147:24;148:12,24;
172:18,25;173:4,8,
14;186:21;187:20,
23;188:1,3
**ADAM (1)**
6:8
**add (2)**
86:14;87:24
**added (3)**
87:19,21;103:21
**addition (5)**
25:9;29:18;88:9;
90:7;132:18
**additional (2)**
149:6;203:11
**address (1)**
22:17
**addressed (2)**
121:6;123:24
**addressees (1)**
126:7
**addresses (2)**
23:1;33:14
**addressing (1)**
126:24
**adds (1)**
164:16
**adduce (1)**
75:12
**adjacent (1)**
121:21;122:4
**administration (1)**
55:17
**Administrative (2)**
5:3;83:22
**admissibility (1)**
146:17
**admission (2)**
127:9;143:11
**admits (2)**
24:11;29:20
**admitted (1)**
29:14
**admittedly (1)**

**29:12**
**admonished (1)**
153:25
**adopt (4)**
101:2;166:23;
171:2,4
**adopted (1)**
127:5
**adopts (1)**
170:8
**advance (4)**
55:6;72:13;85:24;
96:25
**advancement (1)**
31:13
**advantage (1)**
138:6
**Adversary (12)**
2:4;11:15,17;12:7,
8,10,25;13:5;14:10,
12;15:22;16:1
**adverse (1)**
62:5
**advice (1)**
32:9
**advised (1)**
32:12
**advising (1)**
194:13
**advisor (1)**
25:22;37:4;135:7
**advisors (7)**
14:7;31:25;36:24;
37:8;62:18;69:4;
129:16
**advocate (1)**
43:2
**affect (4)**
13:4;190:3,6;
191:18
**affected (2)**
42:11;105:19
**affects (1)**
55:17
**affiliate (5)**
58:7;69:23;86:19;
87:1,22
**affiliated (3)**
40:23;128:1;
152:15
**affiliates (4)**
20:18;56:15;81:15;
86:8
**affirmative (2)**
172:5,10
**affirmatively (1)**
87:17
**afford (1)**
164:8
**afternoon (15)**
108:22;139:21,22;
156:15;157:3;
165:17,18;189:21,22;

**190:13;195:7;196:1;**
**197:5;200:2,25**
**afterthought (1)**
73:19
**again (32)**
20:5;35:20;45:4;
46:10,14;50:23;
51:23;59:1;85:1;
87:10,10;89:5;92:6;
96:18;97:2,14;98:25;
99:4;102:3;107:7,17,
24;118:5;138:11;
139:23;154:25;
160:18;165:9;
173:10;180:16,21;
182:7
**against (19)**
16:5;20:7;48:11;
73:18;74:18;79:13;
88:17;89:6,16,23;
90:8;100:6,9;101:13;
104:14;105:6;107:2;
134:8;186:9
**agency (12)**
79:14,14,17;85:22,
25;90:14;93:17,22;
98:21;100:10,21;
107:10
**agenda (3)**
67:15;126:18;
127:13
**Agent (8)**
5:3;83:22;93:12,
12,24;98:21;99:11;
100:12
**agents (2)**
70:2;100:7
**aggregate (1)**
96:8
**aggressively (1)**
23:23
**ago (14)**
43:23;77:8;104:23,
25;139:25;150:22;
151:4,8;165:19;
166:2,4;175:23;
179:22;194:7
**agree (9)**
11:16;16:11,16;
63:7;82:17;87:1,1;
103:19;146:14
**agreed (2)**
155:10;201:9
**agreement (50)**
11:4;13:4,9,23,25;
16:23;20:20;22:2;
23:9;29:25;41:4,5,6,
9,9,15;70:15;76:2;
79:2,16;80:6,7;
82:11;84:22;86:4;
88:2;90:5;94:24;
99:5;104:16,19;
106:19;123:24;

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 209 of 240

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                                                    January 9, 2014

124:3;126:25;
130:12,16;141:19;
148:23;150:9;
172:12,12,15,19,23;
173:2,11;174:14;
187:12;202:4
**agreements (1)**
24:15
**agrees (2)**
64:19;81:7
**ahead (7)**
15:16;33:5;58:11;
69:3;97:13;132:23;
161:4
**airlines (2)**
159:21;166:6
**AKIN (2)**
5:2;204:3
**al (2)**
2:5,5
**Alan (2)**
17:11;108:23
**align (1)**
23:25
**allegation (1)**
101:15
**allegations (1)**
74:5
**allege (1)**
88:22
**alleging (1)**
101:9
**alliance (1)**
116:25
**allocated (1)**
121:23
**allocations (1)**
119:3
**allow (3)**
21:9;26:3;29:16
**allowances (1)**
104:20
**allowed (4)**
21:10;57:9,10;
106:10
**almost (7)**
101:18;129:13;
137:21;138:2,10;
159:20;204:4
**alone (1)**
39:4
**along (8)**
41:24;42:8;53:8;
60:21;66:10;73:11;
154:10;199:16
**alter (1)**
56:15
**alternatives (2)**
14:5;104:1
**although (4)**
25:16;60:1;64:11;
194:2
**always (9)**

12:23,24;54:21;
106:4;139:2;164:15;
178:11;190:10,20
**amass (1)**
46:22
**amassed (2)**
39:24;48:3
**ambiguity (1)**
14:22;16:14
**AMBRUOSO (1)**
4:16
**amend (1)**
127:6
**amended (1)**
16:18
**amending (4)**
127:1,16,18,20
**America (1)**
8:3
**American (2)**
8:12;166:6
**Americas (1)**
4:11
**AMISH (1)**
8:8
**among (2)**
52:21;63:20
**amount (11)**
29:20;62:6;71:12,
15;93:2;115:16;
130:23;148:25;
161:11;162:9;166:8
**amounts (2)**
198:21
**analog (1)**
38:20
**analysis (1)**
12:23
**analyzed (1)**
24:11
**analyzing (1)**
11:12
**ancillary (1)**
118:13
**ANDREW (1)**
4:16
**Angeles (3)**
7:13;158:1,2
**announced (1)**
187:13
**announcement (3)**
52:24;168:4,4
**answered (1)**
22:7
**antagonistic (1)**
62:5
**antennas (1)**
110:14
**anti- (1)**
88:15
**anymore (2)**
72:15;99:8
**apart (3)**

68:2,3;189:25
**apologize (3)**
15:16;133:16;
138:24
**appear (4)**
19:11;141:23;
143:6,9
**appearance (1)**
54:10
**appeared (2)**
109:1;116:16
**appears (6)**
51:3;86:24;143:23;
146:1,7;155:3
**application (2)**
149:21;160:25
**applications (3)**
147:14,17;188:16
**applied (1)**
120:1
**applies (3)**
17:14;88:10,19
**apply (4)**
19:2;84:10;87:5;
88:12
**applying (1)**
60:20
**appointed (4)**
66:17,18;78:18;
92:7
**appointment (1)**
92:10
**appreciate (3)**
69:10;74:2;133:6
**apprised (1)**
201:22
**approach (5)**
73:14;101:2;139:7;
165:13;167:21
**approached (1)**
170:2
**appropriate (2)**
58:19;61:19
**approval (18)**
41:16;72:21;91:24;
95:21;103:13;
118:20;119:21;
120:3,24;121:16;
123:6;124:9;138:3;
144:9,17;172:10;
177:19,21
**approvals (3)**
60:17;64:10;120:6
**approve (4)**
66:2;78:8;94:17;
120:25
**approved (13)**
41:8;91:21;123:4;
124:25,25;138:3,7;
141:16;147:17,20;
149:16;152:24;175:5
**approximately (2)**
120:5;128:9

April (10)
49:12;96:8;109:23,
25;121:1,5;145:16,
19,20;146:2
**Ara (2)**
181:15;184:11
**A-rated (2)**
36:1,6
**arbitration (1)**
158:20
**area (3)**
110:11;139:1,2
**areas (2)**
23:15;157:18
**arena (1)**
161:23
**argue (2)**
53:6;136:5
**arguing (1)**
93:4
**argument (5)**
53:4;69:20;99:10;
102:21;108:12
**arms (1)**
87:15
**arm's-length (1)**
84:1
**arose (1)**
197:11
**ARPS (1)**
4:1
**arrived (3)**
175:20,24,24
**article (6)**
47:25;179:20;
197:13,22,23;198:10
**articulate (1)**
16:13
**ascertain (1)**
88:24
**ascribed (1)**
192:7
**aside (1)**
70:1
**aspect (1)**
141:11
**aspects (3)**
110:5;115:10;
123:11
**asserted (2)**
136:11;187:24
**assertions (1)**
189:25
**assessing (1)**
13:21
**asset (8)**
20:24,24;29:4;

34:20;41:5;106:11,
19;196:3
**assets (18)**
21:2;25:23;26:2,
18;28:2;29:16;35:8;
36:6;39:19;61:1,4;
67:21;103:12;
116:12;132:19;
163:24;192:19;
195:11
**assignee (5)**
84:25;86:17;88:18,
20,25
**assignees (2)**
83:25;86:7
**assignment (1)**
88:16
**assignments (3)**
88:12;112:1;
157:22
**assignor (6)**
88:16,17,20;89:7,
16,24
**assisted (1)**
91:1
**assisting (2)**
98:15,18
**associated (8)**
115:25;119:23;
121:3,16;126:25;
128:18;152:21;172:3
**assume (7)**
97:10,11;146:9,17;
153:20;154:9;198:12
**assumed (1)**
101:19
**assumes (2)**
180:14,17
**assumption (1)**
163:23
**assured (2)**
75:9;190:17
**AT&T (9)**
51:12,16,17,22;
140:15,21;141:10,11;
194:3
**AT&T's (1)**
56:5
**ATC (6)**
118:7,12,13;
119:23;120:16;
121:12
**attached (6)**
41:4;69:17;126:18;
127:3,14;186:5
**attachments (2)**
126:10,13
**attacking (1)**
72:19
**attempt (2)**
23:9;30:6
**attempting (1)**
117:5

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

**attend (1)**
186:21
**attended (1)**
136:8
**attention (7)**
79:10;126:6;
145:23;146:24;
148:2,15;199:7
**Attorneys (13)**
4:2,10,21;5:3,12,
21;6:3,13;7:3,11,19;
8:3,12
**attract (1)**
180:8
**attractive (4)**
12:11;68:8;83:24;
103:13
**attribute (1)**
63:1
**auction (16)**
65:18;116:21,22,
24;117:7;121:24;
122:16,18;124:5,6;
162:23;174:2,10;
179:9,14;194:17
**auctions (10)**
116:20;125:25;
160:4,5,7;164:6,6,13;
179:12;194:6
**August (1)**
120:8
**authority (5)**
26:22;27:12;93:15;
94:21;98:17
**authorization (5)**
119:9;121:12,13,
14;123:1
**authorizations (1)**
119:11
**authorize (1)**
45:1
**authorized (5)**
23:19;26:20;45:3;
77:11;100:12
**authorizes (1)**
45:7
**availability (2)**
193:1,8
**available (4)**
103:25;115:5;
125:23;126:1
**Avenue (5)**
4:11,22;5:14;6:14;
9:3
**avenues (1)**
170:23
**average (1)**
164:14
**avoid (1)**
88:8
**awarded (1)**
120:20
**aware (23)**

12:5;24:14;58:1;
104:17;116:18;
117:5;125:22;128:4;
131:7;153:7;154:15,
18;168:9;172:14;
173:17;175:8,10,15;
176:25;177:23;
182:9;192:1;198:17
**away (5)**
24:24;46:8;68:4;
80:12;197:18
**AWS (1)**
116:20
**AWS-4 (15)**
115:19,25;116:1,
12;121:20;122:24;
124:10,14,15,18,23;
125:9,16;149:13,17

**B**

**bachelor (1)**
111:15
**back (36)**
18:13;32:24;33:2;
34:13;36:20;48:5;
50:16,18,20;51:11,
12;52:2,2,3,3;58:18;
62:6;81:20;86:22,23;
91:15;95:4,11;96:1;
100:18;105:17;
108:14,20,20;116:5,
18;134:6;156:19;
187:22;196:14;
201:19
**backdrop (2)**
66:13;68:23
**background (2)**
10:13;111:13
**backing (1)**
51:5
**backstopping (1)**
70:13
**bad (5)**
49:6;57:14;59:8;
70:12;102:17
**Bal (2)**
22:12,15
**balance (1)**
156:15
**ball (1)**
193:6
**ballpark (1)**
142:4
**band (11)**
116:12;119:5;
121:19;122:9,13,25;
123:10,13;124:17;
125:16,17
**bands (2)**
124:16;125:16
**bandwidth (1)**
67:8

**bandwidths (1)**
67:8
**Bank (6)**
4:21;5:3;54:11;
58:14;202:24;204:4
**banker (3)**
103:2;163:2;
191:10
**bankers (10)**
55:25;133:17,17,
18,20,21,21,25;
134:20;186:19
**banking (3)**
157:25;158:3,16
**bankruptcies (2)**
190:22;193:25
**bankruptcy (45)**
36:10;45:20;53:20,
24;54:12;55:3;56:13;
59:2;61:20;64:24;
79:8;89:15;98:20;
104:8,20;106:13;
119:15,16,19;127:19,
23;129:17;130:12;
140:9;151:19;
152:13;159:1,11;
162:5,23;164:15;
166:1,6;171:20;
190:5,7,9,17,18,20;
193:19;194:3,24;
196:3;199:5
**banks (6)**
131:21;145:10,14,
17;147:1,6
**Barr (47)**
17:19,20,20;18:1,5,
18,20,22;19:17,20,
23;20:4;31:6,18;
40:10;52:12;70:23;
71:1,14;74:13;
108:16;138:17,20,24;
139:1;187:11;
200:13,14,17,17,23;
201:3,6,14,18,25;
202:2,13,19,21;
203:3,8,14,20;204:1,
20;205:1
**Barry (1)**
52:12
**BARTLETT (1)**
4:20
**base (1)**
161:21
**baseball (1)**
193:23
**based (10)**
55:7;79:16;101:13;
104:6;105:7;116:8;
162:2;186:3,11;
197:20
**basic (4)**
21:16;44:8;92:20;
136:1

**basically (5)**
27:15;95:17;
100:20;102:17,18
**basis (12)**
32:11;43:15,23;
73:18;79:15;89:17;
115:1,3;120:20;
165:4;188:23;189:4
**Bates (1)**
143:20
**bearing (1)**
78:14
**bears (3)**
76:19;77:7;92:13;
94:9;99:9;107:14
**became (11)**
11:13;31:23;48:10;
68:13;112:18;
113:24;124:23;
125:20;130:20;
179:24;198:23
**become (3)**
18:11;68:8;111:5
**becomes (3)**
62:2;163:11;165:9
**becoming (3)**
128:4;135:12;
150:19
**began (5)**
21:19;61:18;64:3,
5;92:2
**begin (3)**
10:24;18:19;
200:11
**beginning (5)**
42:8;50:7,12;
111:13;202:25
**begins (4)**
81:3;84:18;126:7;
167:10
**behalf (11)**
17:12,21;18:25;
26:8;30:25;45:2;
53:18;86:22;108:23;
130:5;200:18
**behind (14)**
47:14;101:20;
107:6;128:20,25;
129:2,11,12,14,20,
23;130:1;132:17;
153:21
**beholder (1)**
162:13
**belief (2)**
193:3;195:21
**belies (2)**
102:9;104:10
**believes (2)**
192:7;193:5
**below (1)**
148:24
**beneficial (1)**
155:6

**beneficiaries (1)**
96:25
**beneficiary (3)**
22:24;26:15;89:4
**benefit (8)**
37:18;74:11;82:8;
93:5,6;94:9;101:12;
138:1
**benefits (3)**
27:17;172:8;
183:16
**BENSON (2)**
6:2;151:11
**BERGMAN (1)**
6:9
**BERKOFF (1)**
5:25
**Besides (2)**
176:11;177:10
**best (7)**
15:21;21:11,12;
31:17;56:2;130:17;
147:9
**bet (2)**
51:24;60:9
**better (9)**
54:16;67:4,18;
94:22,24;99:4;
173:19,24;174:7
**betting (1)**
52:13
**beyond (5)**
176:17;188:9,12,
20;195:20
**bid (46)**
16:16;27:21,22;
28:2;30:12,15;36:19;
40:21;42:12;59:10;
64:13;66:3;68:10,11;
78:8;105:16;116:25;
119:16,16,18;124:5;
132:19;137:12;
161:25;165:6;173:5,
8,19,24;174:3,7,17,
23;175:6,8;176:15;
177:1;190:22;192:1,
3,3,7,13;193:14;
195:25;197:23
**bidder (35)**
116:23;117:2;
161:10;163:15,19,25;
164:8,14,18,20,23,
25;165:4;166:25;
167:1,10,13,23;
168:14,14,17,20;
169:1,2,5;173:25;
174:4;176:18,20,25;
194:20,21;195:7,7;
197:8
**bidders (16)**
159:24;160:22;
161:19,20,24;162:17;
163:5,17;164:19;

LIGHTSQUARED INC., et al.

Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

166:16;167:14;
177:17,23;178:9,11;
196:16
**bidders' (1)**
190:14
**bidder's (2)**
162:22;165:10
**bidding (3)**
44:11;55:9;102:15
**bids (3)**
67:6,7;170:3
**big (6)**
64:21;72:25;77:2;
170:12;191:16,17
**bigger (1)**
191:7
**billion (9)**
37:20,22;38:9;
39:24;40:18;48:3;
93:3;103:14;124:6
**billionaire (1)**
51:7
**billion-plus (1)**
37:19
**billions (5)**
55:21;56:7;62:22;
63:2,9
**bills (2)**
34:4;47:4
**bind (2)**
93:15;94:18
**binder (5)**
126:4,4;142:22;
148:3;181:12
**binding (2)**
41:7,8
**BINGHAM (1)**
5:11
**bit (5)**
93:22;110:17;
113:19;162:13;168:7
**black (1)**
93:9
**Black's (1)**
85:7
**Blackstone (3)**
9:12;15:14;103:2
**blame (1)**
79:6
**Block (22)**
54:13,21,22;68:10;
116:2,4,6,7,8;121:21,
22,24;122:3,16,18,
22,23,24,24;124:5,
17,17
**Blockbuster (1)**
64:22
**blocked (1)**
69:11
**blocking (31)**
23:11;26:10;65:14;
69:23,23;134:11;
138:12;161:11,16;

162:3,5,12,20;
163:16;164:20;
165:1;170:5,8,9,19;
171:2,4,12,19,21,25;
172:6,7,10;174:5;
194:14
**Blocks (3)**
54:22;116:1,21
**blog (1)**
51:3
**Bloomberg (1)**
198:10
**blue (1)**
47:4
**bluffing (2)**
62:18,18
**board (69)**
25:25;26:1,24;
27:19;29:14,15,22;
39:25;41:8,12,13,16;
44:24;45:1,6,9,10,11,
16;64:9,25;66:19;
67:8;76:11,13;78:1,8,
10,17;90:21,22;91:7,
8,15,21,25;92:4,12,
21,21,23,25;94:17;
95:4,21;96:2,2;
99:13;126:17,19,19,
23;127:5,13;142:16;
143:2,16;144:2,11,
14;145:17;146:1,2;
147:11;150:15;
151:10;152:15;
175:12;199:9
**boards (6)**
27:9;69:2;76:8;
77:11,15;91:5
**board's (1)**
27:6
**boils (1)**
53:22
**bonds (2)**
49:17;52:19
**book (1)**
86:3
**booked (2)**
37:19;38:9
**bore (1)**
97:2
**born (1)**
105:25
**borne (1)**
78:15
**borrower (1)**
86:7
**boss (1)**
61:6
**both (9)**
21:19;35:20;55:23;
56:17;69:2;93:23;
102:16;119:17,20
**bothered (1)**
56:4

**bottom (5)**
50:14,22;51:14;
81:25;126:7
**bought (22)**
27:23;31:16,20;
33:17;34:19,22;
38:11,14;39:3;49:17;
50:3;52:19;64:13,17,
22,24,24;70:3;76:16;
77:7;91:25;194:3
**bound (2)**
173:20,24
**boxed (1)**
134:13
**breach (30)**
44:6,7,13;70:6;
75:24,25;81:10,11;
84:20,22,23;88:21,
22,22;89:5,17,20,21,
22,23;90:1,5,11,11,
13;100:5,16,17;
104:15;108:2
**breached (2)**
43:20;44:15
**breaches (1)**
44:14
**break (9)**
18:8,11,13,15,16;
99:20;139:12;156:2,
4
**breaking (1)**
162:1
**breakout (1)**
205:7
**BRIAN (5)**
7:23,24;73:12,12;
189:17
**brief (12)**
11:1;20:1;31:18;
67:12;73:22,24;
81:22;94:13;189:16;
202:21,22;203:5
**briefly (4)**
11:20;91:10;110:7;
157:23
**briefs (1)**
64:23
**bring (10)**
30:21;53:1;101:7;
133:17,19,21;182:4;
203:22;204:5;205:6
**bringing (1)**
101:12
**brink (2)**
30:21;36:9
**Broad (5)**
7:20;85:22;105:10,
10
**broadband (1)**
116:19
**broader (5)**
80:9;83:25;85:19;
87:17;107:21

**broadly (2)**
132:18;160:5
**Broadway (1)**
6:4
**broke (1)**
104:4
**broker (2)**
55:22;56:2
**brokers (2)**
55:24;61:2,4
**Brothers (1)**
157:25
**brought (4)**
16:5;105:5,6;
107:11
**Brown (1)**
15:9
**Bryant (1)**
5:4
**build (5)**
24:1;29:12;112:12;
117:19;118:17
**building (5)**
107:6;110:5;
113:17,17,20
**build-out (4)**
112:8,15;119:21;
124:13
**built (1)**
110:13
**bunch (5)**
38:16;64:13;66:9,
14;187:11
**burden (6)**
31:4;53:6;74:11,
17;75:19;93:14
**burdens (1)**
61:16
**Business (24)**
5:13;30:23;36:25;
37:1,1;56:24;60:6,13,
14,15,15,16,18;61:8;
69:25;110:5;111:4,
10,24;112:9,10;
113:23;117:14,17
**busy (3)**
60:12;64:9;67:20
**buy (46)**
21:23;22:1,4,8;
24:18;25:6;30:19;
32:6,13,20;33:7,12;
36:2;40:1,2,6;45:2;
46:17;48:18;51:25;
54:3;55:9;57:15,20;
58:16,18,19;61:1,23;
64:5,15;65:15,24;
69:22,24;77:11;
94:23;99:3;119:16,
18;134:11;191:3,3,4,
6;194:13
**buyer (14)**
32:17;33:12;34:17;
49:13,15;104:21;

131:8,8,10;161:15;
163:10,12;192:19;
195:17
**Buyers (12)**
105:10;189:24;
190:9,11,25;191:10,
13;192:24;195:6,11;
196:19,23
**buyers' (2)**
190:3,6
**buying (20)**
24:12,16;25:23;
27:3;32:16;34:10;
47:19;62:17;64:1;
95:17;96:23;102:6;
130:25;153:13,17,24;
154:7,17;158:6;
198:21
**buys (1)**
161:16

## C

**CA (1)**
7:13
**cable (1)**
116:24
**Cablevision (1)**
50:20
**calculation (1)**
101:25
**call (14)**
39:11,11;55:25;
56:4;72:23;108:24;
109:5;121:21;
148:15;152:18;
157:1;164:25;
193:21,22
**called (5)**
61:3;63:5;113:24;
147:3;140:23
**Calling (2)**
56:2;141:7
**calls (3)**
55:22;56:19;72:16
**came (18)**
21:5;28:14;35:18;
45:24;51:7;58:18;
71:1,18,25;72:2;
87:16;114:10;
116:11;134:8;
137:20;140:10;
172:19;197:13
**camera (1)**
40:4
**can (108)**
10:7;12:10;13:1,2;
15:4,6,21;18:10,10,
12,19,20,23;24:18,
24;30:16;32:20;33:7;
41:14,20;47:17;54:3,
3,10;55:15,16;56:21;
23;57:20;58:16,18;

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

61:9,10;64:5;65:16,
17,17;67:9;74:14;
75:12;78:21;83:15;
87:25;94:19,22;
96:16,17;97:10;
99:11;112:20;114:2;
115:21;118:2;125:2;
126:3,16;130:9;
132:21;133:5,14;
136:15;137:22;
139:7;141:4;142:21;
146:19;151:21,23;
152:7,9;157:23;
161:25;162:3,8,10;
165:25;166:13;
167:18;170:18;
171:3,16;177:6,9;
180:5,7,7,21;181:6;
182:12,23;183:3;
184:6,16;190:20;
191:23;192:20,23;
193:17,21;194:8,20,
22;197:9;200:15;
201:18;202:4;
203:12;204:23

**cancel (2)**
179:12;194:17

**canceled (5)**
164:7;174:2,10;
179:9,11

**canceling (1)**
179:13

**candid (1)**
33:23

**capabilities (1)**
67:10

**capability (2)**
120:14,18

**capable (1)**
101:24

**capacity (9)**
37:6,21;85:15;
91:1;98:19;109:19,
24;112:7;195:14

**CAPITAL (51)**
2:4;5:12;6:3;
15:10;20:18,22;
22:10;24:16;31:9;
38:5;62:22;63:3;
75:2;101:16;102:10;
104:6;114:9;127:22;
159:6;161:12,17;
162:7;163:11;164:3,
9,24;165:23;166:12;
170:11;173:13;
176:8;177:2,6,11;
180:4,12;181:19;
182:11;183:12,16,19,
22;191:20,24;192:11,
15;193:1,8;197:7;
199:2,18

**capitalized (2)**
22:13,21

**capture (1)**
58:11

**care (1)**
57:12

**cared (1)**
106:9

**career (2)**
114:13;157:25

**careful (1)**
16:7

**carefully (1)**
68:17

**Carl (1)**
51:6

**Carlos (5)**
50:16;51:1,7;
52:25;56:4

**Carlston (1)**
157:19

**carriers (6)**
140:11,13;142:1,8;
144:3,17

**carry (1)**
131:2

**carry-over (1)**
187:6

**CASE (83)**
4:9;12:24;13:18;
15:10,15;16:8;18:25;
20:15;23:5;24:23;
29:7;44:7;53:22;
54:9,20;55:15;59:16,
17;62:20;68:22;
69:25;72:2;73:17;
74:2;75:18;76:3,12,
14,15;79:6,13,23;
80:13,23;81:3,5,8,10,
20,25;82:5,6;83:14;
84:13,15,18;85:10;
87:11;88:13,14;
90:12;91:20;94:6,21,
22,24;97:23;98:19;
99:4;101:15;105:2,8,
9;106:25;107:23,24;
109:1;162:16;
163:10;166:17;
170:9,22;172:11;
174:15;179:9;185:3,
24;187:23;188:16;
196:7,11;198:18;
199:17

**cases (21)**
11:16;20:8,10;
26:4;27:20;28:1,12,
13;29:17;30:13;40:9;
45:6;54:25;55:5,11;
59:22;63:19;70:20;
71:12;85:4;159:7

**cash (11)**
25:19;30:21;55:8,
10;59:9;66:3;69:25;
78:8;95:16;192:21;
195:12

**Castle (1)**
5:21

**catalog (1)**
63:23

**catch (1)**
33:4

**category (2)**
185:19;203:20

**cause (11)**
56:10;72:24;78:8,
21,22;89:6,15;90:10,
11,13;133:25

**caused (4)**
28:11,13;62:22;
63:2

**causing (1)**
100:17

**CC's (1)**
187:11

**cellular (4)**
112:2,12,13,15

**Centaurus (1)**
5:12

**center (1)**
80:23

**Centerbridge (6)**
175:18,20,23,25;
176:3,11

**centered (1)**
125:13

**cents (3)**
165:6;194:23;
202:9

**Century (1)**
7:12

**CEO (3)**
72:18;150:19;
152:24

**certain (10)**
24:7,8;51:2;75:10;
106:1;135:9;166:14;
182:3;191:12;197:12

**certainly (7)**
58:1;59:22;88:22;
115:13;142:10;
159:16;199:7

**certainty (1)**
63:8

**cetera (3)**
23:3;58:3;101:23

**CFO (1)**
110:24

**chain (3)**
184:8;187:1,3

**chairman (10)**
21:18;25:11;57:8,
17;58:10;60:10;61:8;
98:11;109:21;111:6

**challenges (1)**
79:8

**challenging (1)**
83:8

**chambers (1)**

202:6

**chance (1)**
163:7

**change (9)**
44:15;86:13;99:6;
120:23;122:6;126:3;
160:9;190:20;194:11

**changed (14)**
23:1;24:2;59:3;
67:23,24;68:12,12;
72:14;110:21;113:3;
164:6,6;194:6,8

**changes (4)**
24:22;68:1;70:9;
149:9

**changing (2)**
79:12;121:2

**Chanin (2)**
158:2,4

**channels (1)**
60:17

**Chapter (17)**
20:8;24:23;26:4;
27:20;28:1,12,13;
29:17;30:13;40:9;
54:2,25;66:8;170:12,
13,16;202:23

**characterization (1)**
39:7

**characterize (1)**
66:5

**characterized (4)**
53:20;176:15;
192:2,3

**charade (1)**
67:12

**Charles (10)**
31:15;39:18;40:23;
41:1;45:2;46:16;
53:18;70:10,14;
185:25

**Charlie (17)**
32:5;38:22,23;
45:19;46:2,4;50:14,
15,17,19;51:5;60:22,
23;61:5,6,13;134:10

**Charlie's (3)**
60:25;61:1,4

**Chase (1)**
4:21

**cheaper (1)**
165:2,7

**check (5)**
21:22;58:24;165:9;
191:1;193:10

**checked (5)**
21:24;24:21;57:14;
186:9,11

**checks (1)**
57:19

**cheek (1)**
31:12

**chief (11)**

109:21;110:1,3,4,
19,22;111:2,5;
113:15;126:20;129:5

**child (1)**
105:9

**chill (1)**
198:22

**chilled (2)**
197:6;199:2

**chilling (2)**
161:18;197:11

**chip (1)**
47:4

**choice (2)**
27:6;68:3

**choices (2)**
68:4,4

**choose (1)**
55:2

**chronology (1)**
197:10

**Circuit (2)**
88:14,15

**circulating (1)**
198:5

**circumstances (3)**
21:11,12;190:18

**cite (3)**
85:4;88:13;98:19

**cited (1)**
94:6

**Citibank (1)**
88:14

**citing (1)**
81:2

**City (2)**
5:22,23

**claim (26)**
16:2,6,10;73:20,
24;74:1,25;76:5;
77:21;84:20;88:6,23;
89:18,23;90:6;100:5,
9,11,25;101:7,13;
104:13,16,20;106:14;
108:2

**claiming (1)**
145:4

**claims (8)**
16:4;29:21;73:18;
88:6;90:8;105:5,6;
107:11

**CLAPP (1)**
9:6

**clarification (3)**
18:23;118:12;
171:4

**clarify (1)**
182:21

**clarity (1)**
147:8

**class (10)**
33:10;54:19,22;
70:17;131:3;162:6,9,

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 213 of 240
LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

15;193:20,20
**Clause (1)**
88:16
**clean (2)**
48:12;205:5
**clear (16)**
11:13;28:7;35:10;
48:8;76:23;79:21;
84:5;85:20;88:21;
89:2;92:19;93:1;
135:13,14;136:18;
139:4
**Clearly (4)**
51:12;84:7;188:9,
17
**ClearPar (1)**
71:11
**ClearWire (11)**
52:5,7;67:6,11,20;
68:3;92:4;113:24,25;
114:1,5
**CLERK (2)**
108:18;156:23
**client (1)**
49:9
**clients (5)**
55:25;70:21;
103:15,23;114:8
**clips (1)**
103:6
**close (8)**
22:15;51:10;61:11;
71:4,16,16,17,17
**closed (5)**
29:25;63:17,21;
70:25;95:2
**closely (2)**
115:11,15
**closer (1)**
110:17
**closing (2)**
23:20;25:11
**co- (1)**
110:21
**coat (1)**
10:14
**co-chief (2)**
110:23,25
**codified (1)**
55:10
**coffers (1)**
193:11
**co-head (2)**
157:14,16
**Cohen (5)**
181:15,16,24;
184:11,12
**cold (1)**
55:25
**co-leading (1)**
157:19
**co-led (1)**
158:9

**collateral (3)**
26:12;192:21;
195:12
**colleagues (3)**
186:18;195:24;
198:13
**collectively (2)**
31:21;99:24
**college (5)**
60:20;111:13,16,
21,22
**combination (1)**
28:16
**combine (1)**
39:21
**comfortable (2)**
10:8;103:23
**coming (6)**
19:10;63:14;72:11,
11;136:10;157:24
**comment (3)**
134:14,18;193:24
**comments (3)**
132:8;133:8;
134:18
**commitment (2)**
124:4,7
**commitments (1)**
131:3
**committed (2)**
41:10;103:10
**committee (32)**
11:7,13;12:14;
30:18;45:23;46:23;
48:16,21;68:21,22;
72:4,7,14,19;78:1,18,
19;90:23;92:7,10,14,
19;99:14;105:17;
106:6,9;158:17,17,
18,18;196:8,12
**committees (7)**
66:17,18;78:24,24;
158:12,14,16
**common (3)**
134:8,17;144:7
**commonly (1)**
122:9
**communicated (1)**
47:20
**communications (2)**
112:11;134:22
**community (1)**
103:7
**companies (49)**
14:7;20:8;23:24;
29:9;32:6;33:19;
40:24;56:7;57:8,9,
11;58:19;60:11;61:9;
64:22;67:4;69:22,22,
24,24;76:8,10;87:20;
114:21;116:24;
117:20,21;118:6,8;
119:15,20;126:25;

127:1,6,17,21;141:2,
6;158:5,7;159:17,21,
21,22;177:13;191:13,
14,15;194:3
**company (84)**
25:4;26:9;27:21,
23;32:8,10,20;33:7;
34:2,4,5,22,25;38:6,
11,15,17,22,24,24;
39:2,4,5,21;40:11;
44:23;46:17;55:2,4,
9;59:2;60:15,16;
62:5,6;64:18,21;
65:15;67:7;72:12;
78:23;79:7,16;81:18;
85:2;87:2,7;88:3;
91:13;93:21;96:22;
97:9;98:9;113:8,23;
114:1,9;128:7;
134:12;135:15;
137:10;146:25;
147:7;155:7;157:10;
158:2;162:10;
163:20,24;165:24;
169:23;170:3,8;
174:11;177:6;178:1,
1;180:5,13;192:8;
195:17;199:5,9,12
**company's (9)**
72:24;147:2;
161:12,17;162:4,7,
11,14;181:20
**compared (1)**
104:1
**compelled (1)**
56:1
**compensation (2)**
37:23,24
**compete (2)**
112:12;165:4
**competing (2)**
113:19;165:2
**competitor (22)**
30:20,22;34:23;
62:21;63:3;86:14,16,
17,25;161:10,15;
163:10;165:23;
166:7,11;176:8;
177:2,5,10;180:4;
197:7,8
**competitors (6)**
20:19,21;24:16;
127:21,22;173:13
**complaining (1)**
71:2
**complaint (4)**
16:3,18,19;74:6
**completed (1)**
96:20
**completely (4)**
14:23;36:2;49:7;
80:1
**complexity (1)**

164:17
**complies (1)**
83:18
**compliment (2)**
26:1;27:19
**complimented (2)**
26:17;29:15
**compliments (1)**
40:8
**comply (2)**
76:9;83:19
**component (5)**
113:1;115:1;
118:14,22;121:24
**comport (1)**
66:21
**Conaway (1)**
15:11
**conceal (1)**
88:7
**concepts (1)**
79:17
**concern (2)**
122:23;138:4
**concerned (3)**
107:3;136:22;
187:20
**concerns (3)**
122:5;177:16;
204:8
**concerted (1)**
52:21
**concessions (1)**
152:10
**conclude (2)**
36:14;204:11
**concluded (2)**
51:5;205:10
**concludes (1)**
138:14
**conclusion (3)**
104:9;138:10;
144:8
**condition (1)**
135:22
**conditional (1)**
120:20
**conditions (3)**
120:10;173:14,19
**conduct (11)**
11:18,20,24;13:7;
21:9;30:3;59:10,17;
73:3;90:2;93:11
**conducted (2)**
58:6;106:23
**conducts (1)**
60:15
**confer (1)**
139:3
**conference (2)**
39:10,11
**conferring (1)**
203:22

**confident (1)**
107:23
**confidential (2)**
61:21;62:9
**confidentiality (2)**
138:21;166:20
**confidentially (1)**
62:2
**confirmable (1)**
107:6
**Confirmation (7)**
2:2;12:5;30:14;
101:3,5;202:23;
203:6
**confirmed (4)**
19:1;62:25;76:10;
132:16
**confirming (1)**
102:24
**confirms (1)**
87:22
**conflict (3)**
92:9;93:2;100:21
**confuse (1)**
30:5
**confused (1)**
71:10
**confusing (1)**
130:21
**confusion (2)**
28:12;137:13
**congratulating (1)**
26:8
**congratulations (1)**
26:6
**connect (2)**
189:7;192:10
**connecting (1)**
189:6
**connection (11)**
14:12;25:14;26:16;
45:20;48:15;77:9;
88:8;131:19;144:24;
202:22;204:22
**consensual (4)**
103:18;130:6,12;
152:11
**consensus (1)**
107:6
**consent (1)**
93:18
**consequence (1)**
73:1
**consequences (1)**
14:9
**conservatively (1)**
35:25;36:6
**consider (7)**
32:16;34:23;35:1,
16;92:8;141:12;
162:16
**consideration (2)**
76:11;177:18

LIGHTSQUARED INC., et al.

Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

considered (2)
41:7;176:17
considering (2)
14:4;92:2
consistent (2)
114:19;152:12
consolidated (1)
193:5
consolidation (1)
56:13
conspiracy (4)
68:17;70:1;83:3;
91:7
constantly (1)
79:12
constituent (1)
170:13
constituents (6)
11:9;12:13,17,19;
130:7;170:15
constrained (1)
195:15
construct (1)
141:18
construction (1)
119:21
consultant (4)
50:15,15,18;52:13
consulting (1)
114:7
contact (1)
82:19
contained (1)
71:20
contains (1)
126:5
contemplate (1)
12:6
contemplated (1)
12:8
context (1)
56:13
continually (2)
24:20;114:19
continue (2)
25:2;97:19
continued (2)
25:6;103:20
continues (3)
59:18;76:17;126:8
continuing (3)
14:3;136:15;
177:22
contract (44)
20:12;44:6,7,9,14,
16;70:8;75:21,22,24,
25;79:15,18;80:16,
25;81:10,23,25,25;
82:3,18,24,25;83:6,
12,16;84:9,20,25;
85:1,21;86:1,24;
87:24;88:1,19;89:9,
14,21;100:5,16,17;

107:9;108:2
contracted (1)
40:18
contracts (1)
83:11
contractual (6)
46:22;80:2;172:22;
173:3,7;174:7
contractually (1)
173:23
contrary (4)
75:13;93:7;104:22,
24
contrasted (1)
163:20
control (18)
21:2;25:12;27:20;
28:1;38:17,18;45:10,
14;65:16;66:2;87:22;
99:1,1;107:17;120:9,
24;160:9;197:21
controlled (7)
20:7,16;27:15;
36:18;40:23;84:8;
85:5
controlling (5)
20:9;25:3;85:7,9;
102:12
controls (3)
29:5;45:9,11
convention (1)
166:23
conversation (4)
175:13;178:20,21,
23
conversations (10)
56:24;57:2;130:20;
142:15;144:25;
150:18;169:25;
195:10;199:12,16
conversing (1)
11:8
convince (6)
23:18;28:6;162:1;
163:12;164:12;
170:14
convinced (1)
163:8
cooperating (1)
155:8
coprimary (1)
119:8
copy (3)
126:9;143:6;146:7
copycat (1)
107:4
corner (1)
191:6
corporate (18)
20:20;21:21;22:16;
27:1;36:9;56:14;
58:2;59:5,11,14;
60:13,15;79:10;

90:16;94:18;97:7;
98:12;158:4
corporation (3)
85:5;98:6;185:25
corporations (1)
45:7
corporation's (1)
95:16
correctly (1)
114:2
correlation (1)
125:8
correspondence (1)
82:8
cost (1)
162:25
costs (1)
39:1
counsel (15)
19:2;21:25;26:25;
47:16;58:22;62:15;
87:16;92:15;96:22;
136:14;139:3;145:4;
186:4,13;187:24
counsel's (1)
193:24
count (2)
71:5;171:16
counted (1)
80:22
counter-facts (1)
78:13
counter-inference (1)
78:13
counterparty (1)
71:15
country (1)
78:23
couple (14)
28:20,24;40:21;
43:16;49:13,16,24;
139:25;140:2;150:1,
22;151:4,7;179:22
coupon (1)
26:11
course (11)
32:1;33:18;56:1;
57:4,23;60:4;67:24;
77:6;106:5;132:1;
152:1
COURT (300)
10:2,17,20,23,25;
12:16;13:2,12,15,17,
22;14:1,14,16,21,24;
15:3,6,20,23;16:9,11,
13,21,24;17:1,4,7,18,
25;18:2,6,19,21,24;
19:4,7,9,13,16,19,22,
25;28:25;31:6;32:21;
33:2;41:20,23;42:1,4,
7,10,18,21;43:4,6,9,
11,25;44:4,19;51:13;
53:13,16;55:14;

57:16,19,22;58:1,5,
21,25;63:14,15;65:4,
21;68:19;69:6,9,19;
71:18;73:6,9,15;
74:19,22;75:4,9,17;
77:23;79:19,21;80:5,
7,8,15;81:4;82:1,2,3,
4,24,25;83:9;84:4;
87:25;89:3,12,22;
90:1,25;92:18,23;
94:2;95:6,10,18,22,
25;96:3,7,12,14,16;
97:4,7,13,16;98:20;
99:23;100:2;101:4,9,
21;104:15,22;
105:15;106:22;
108:5,11,19,25;
109:2,4,7,11,16;
110:2,16;111:12,20;
112:20;115:21;
116:14;118:2;
123:22;124:15,20;
126:16;127:10,12;
129:17,18;132:12,23,
25;133:4,12,14,19;
134:4;135:11,16;
136:2,4,6,15,20,23;
137:4,7,17;138:16,
19,23,25;139:2,8,11,
15;143:13,15;146:13,
22;150:2;153:9,25;
154:1,3,20;155:17,
20,23;156:1,4,6,8,11,
17,19,24;157:3,6,23;
159:3;160:18;161:2;
164:5,11;165:12,14;
166:23;167:1,4,6,8,
12,15,17,20,23;
168:3,10,12;169:11,
14;170:15;171:3,7,9,
11;180:16,19;181:2,
5,7;184:1,5,16,20;
185:1,11;187:13;
188:7,14,20;189:6,9,
13,15;191:23;192:1,
10;193:13;194:24;
195:1;197:9;199:24;
200:1,4,6,9,12,15,22;
201:1,2,4,13,17,22;
202:1,8,17,20;203:2,
7,9,15,19,24;204:2,9,
16,18,25;205:2,5,9
courthouses (1)
78:23
courtroom (9)
40:15;93:8,14;
97:15,16;155:21;
167:19;168:7;170:14
courts (2)
83:10,10
Court's (2)
13:20;195:4
coverage (2)

110:11,11
cram (1)
171:22
cram-down (4)
172:2,4,8,9
crammed (1)
65:17
crazy (1)
52:20
create (4)
24:8;48:24;49:6;
137:13
created (2)
30:1;130:22
creates (2)
53:5;122:5
credibility (2)
53:7;60:1
credible (3)
28:17;36:4;46:15
credit (17)
20:20;22:1;23:9;
24:15;29:24;55:9;
76:2;80:6,7;82:11;
84:22;86:4;88:2;
90:5;104:15;126:25;
150:8
creditor (6)
54:16,19;63:3;
170:16;171:12,25
creditors (11)
54:8,15,19;76:23;
107:3;147:24;
148:13,24;170:20;
172:7;194:18
creditor's (1)
54:16
critical (1)
11:16
critically (1)
28:23
CROMWELL (11)
7:18;15:18;21:24;
22:4,6;32:2,5,9,12;
73:10;189:18
cross (2)
156:12;204:17
cross-checked (1)
186:3
cross-exam (1)
138:21
cross-examination (6)
46:13;138:16;
139:19;150:3;
165:15;189:19
Crown (1)
5:21
crux (1)
44:7
crystal-clear (1)
78:3
Cullen (2)
26:25;78:4

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

**curious (1)**
47:15
**current (2)**
42:11;85:21
**currently (4)**
12:11;71:9;109:19;
125:10
**cut (1)**
73:5
**cuts (1)**
102:21

# D

**D-340 (2)**
148:5,6
**Daigle (1)**
15:10
**damage (3)**
56:10;75:1;102:11
**damaged (2)**
55:20;101:17
**damages (16)**
56:8;63:2,10;76:4;
88:17;100:25;101:1,
1,6,7,10,11,14,24;
104:5;108:3
**dark (1)**
52:9
**data (1)**
39:16
**date (7)**
44:13;71:13,15;
115:17;127:15;
143:18;203:2
**dated (3)**
150:9;182:1;187:5
**dates (2)**
64:3;204:23
**daughter (3)**
35:23;77:3;78:15
**daughter's (7)**
35:19;36:7,16,20;
47:1,2;99:3
**DAVID (3)**
6:7;9:9;31:8
**day (14)**
41:3;49:11;50:21;
51:2;52:10,17,23,24;
61:14;83:20;153:11;
163:9;182:23;204:10
**days (10)**
28:20;40:20;49:14;
50:13;127:19;
139:25;150:22;
151:4,7;165:19
**day-to-day (3)**
175:11;186:19;
198:3
**DBSD (13)**
64:11,12,13,20,22;
67:1;91:20;117:10,
21,22,25;118:4;

119:18
**DBSD's (1)**
120:16
**De (2)**
87:9;166:7
**deadline (2)**
202:22,22
**deal (21)**
37:3;43:2;54:5;
63:11;72:20,25;
76:25;77:10;78:16;
79:1;84:12,12;92:11;
102:15;103:18,25;
104:3;107:15;131:3;
148:17;202:15
**dealing (2)**
126:12;204:11
**deals (1)**
92:5
**dealt (2)**
23:18;122:6
**DEBORAH (1)**
5:8
**Debt (142)**
15:12;20:9,14,17;
21:4,19,23;22:1,4,8,
14;23:13,17,23;25:3;
26:1,3,10,15,17,19,
22;27:3,18,19;29:15;
30:5,8,11,12;31:16,
20,23;32:13,16;34:8,
19,22;35:13;36:2,8;
37:20,23;38:10,25;
39:24;40:7,11,18;
42:13;45:2;46:21,23;
47:19;48:3,19;50:3;
51:4;54:10,11;57:15,
20;58:8,14;61:23;
63:22,24;64:14,15,
17;65:9,15,24;66:3,
17;69:23;70:3;71:22;
72:9;76:16,17;77:7,
12,17,18;78:2,7,11;
79:3;83:24;87:5,6,6;
88:11;90:25;91:3,25;
92:12,24;93:6;94:23;
96:1,24;99:3;102:7,
25;106:10;128:2,7,9,
14;130:21,24;
131:24;132:17;
134:11;135:9;
137:12;147:2,15;
149:4;153:14,17,24;
154:7,17;161:11;
162:4,11;164:21;
165:6;166:8;181:21;
182:15;193:11,15;
194:14;197:15;
198:7,8,15,21
**debtor (11)**
54:5,16;102:11;
166:12;171:18;
176:12,13,16;177:10;

182:14;186:12
**debtors (13)**
11:7,18;17:12,22;
19:2;28:13;53:25;
105:13,14;108:23;
179:12;187:20;
203:18
**debtors' (2)**
11:22;12:4
**debtor's (3)**
55:17;186:4,13
**debts (1)**
131:8
**DebtWire (2)**
197:16,18
**decades (1)**
162:2
**December (8)**
80:14;100:19;
121:10;123:11;
125:1;149:19;175:9;
176:1
**decide (3)**
82:2,3;203:12
**decided (6)**
68:10,11;69:3,5;
103:12;174:11
**deciding (1)**
98:7
**decision (11)**
27:16;87:23;92:16,
22;93:25;121:10,11;
123:11;152:24;
162:22,25
**decisions (2)**
115:13;121:2
**declaration (4)**
185:3,11,23;186:5
**decline (1)**
55:23
**default (1)**
33:12
**DeFazio (2)**
126:6;127:13
**defeat (1)**
100:10
**defend (1)**
48:25
**defendants (5)**
22:6;23:18;26:13;
27:11;155:1
**defendant's (7)**
75:22,23;148:3;
153:6;154:12;
182:22;184:2
**defined (1)**
81:20
**defines (1)**
61:14
**defining (1)**
86:17
**definitely (3)**
50:17;51:23;

166:21
**definition (1)**
79:16
**definitively (2)**
55:19;154:16
**degree (2)**
111:15,17
**degrees (1)**
111:14
**delay (2)**
23:20;28:11
**delayed (2)**
28:3,5
**demerit (1)**
100:3
**demonstrably (1)**
31:13
**demonstrate (2)**
75:2;133:20
**demonstration (1)**
11:18
**Dena (1)**
2:20
**depending (1)**
14:12
**depleted (1)**
36:2
**deploying (1)**
43:1
**deployment (1)**
114:20
**deposition (14)**
45:18;48:1;74:10;
92:7;103:5,5;139:25;
165:19;166:13;
175:10;185:10;
190:23;196:17;197:1
**depositions (2)**
69:13;90:22
**Derrough (20)**
19:13,14;157:2,3,
9;160:11,13,20;
161:7;165:17,22;
168:2;169:11;
181:15;185:3;189:1,
3,21;200:1,15
**Derrough's (1)**
160:24
**describe (3)**
118:2;123:6;
140:24
**described (1)**
111:9
**deserves (2)**
70:16,16
**design (2)**
112:8;114:20
**designated (2)**
116:4,7
**designation (1)**
115:22
**designations (1)**
115:24

**desire (2)**
24:1;62:8
**desired (1)**
12:7
**despite (1)**
62:8
**detailing (1)**
71:14
**details (5)**
141:22;169:24;
173:2,11;179:15
**determination (2)**
105:18;106:10
**determine (2)**
55:19;119:4
**determined (1)**
65:8
**developed (2)**
66:9;97:24
**development (3)**
21:21;27:1;118:25
**developments (1)**
203:11
**device (4)**
116:9;120:13,16,
17
**devices (2)**
120:21,21
**dictionary (2)**
70:9;85:7
**difference (6)**
65:25;74:20;77:24;
110:7;123:9;193:4
**different (24)**
21:13;22:20;44:1;
53:10;65:5,24;68:5;
75:4;83:19;90:19;
101:21,23;111:23,24;
112:22;113:3;
122:14;132:12;
174:12;190:9;191:5,
10,17;197:16
**differentiation (1)**
11:25
**difficult (6)**
56:14;59:18;124:1;
131:4,4;163:17
**DIP (1)**
204:22
**DIRE (1)**
157:7
**direct (12)**
20:19,21;78:3;
109:14;128:24;
138:14;161:5;188:9,
12,21;196:2;204:14
**direction (2)**
58:17;129:8
**directly (5)**
21:4;24:24;82:12;
169:10;194:18
**director (5)**
26:25;45:17;

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
LIGHTSQUARED INC., et al.
Pg 216 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

112:23;157:14,16
**directors (16)**
 27:10;37:2;41:16;
 44:24;45:13;47:15;
 64:25;78:17;92:8;
 94:17;126:17,23;
 127:13;142:16;
 150:16;152:21
**directorships (1)**
 152:20
**DIRECTV (2)**
 116:23;117:3
**dirty (1)**
 54:14
**disagrees (1)**
 202:2
**disappointment (1)**
 134:19
**disclose (1)**
 155:6
**disclosed (3)**
 29:21;96:19;
 129:17
**disclosure (5)**
 54:7,8;57:12;
 60:17;64:14
**disconnects (1)**
 53:22
**discount (2)**
 164:21;165:2
**discovered (1)**
 77:5
**discovery (15)**
 23:5;69:12;74:9,
 10,10;76:10,23;77:6;
 80:17;85:13;90:17;
 99:7;107:12;203:17;
 204:7
**discuss (4)**
 57:5;60:23;106:21;
 183:11
**discussed (4)**
 142:2;151:10,18;
 179:2
**discusses (1)**
 148:11
**discussing (2)**
 140:6;142:6
**discussion (13)**
 27:16;35:6;50:22;
 108:9;132:20,21;
 134:17;141:1;144:1,
 24;145:16;178:9,15
**discussions (19)**
 14:4,7;103:20;
 132:13;135:2;140:9;
 144:17;145:17;
 147:1,2,6,23;155:9;
 169:16;183:15,18;
 201:10;202:25;
 203:21
**Dish (222)**
 7:19;11:18;14:4;

15:18;16:5;20:7,16,
 24;21:3,19,21,22,25;
 22:16,18,23;23:6,19,
 23;24:1,4,8,9,12,14,
 17,23;25:4,10,12,19,
 22,25;26:3,16,20,22,
 25;27:1,9,17,22;29:5,
 8,9,12,13,14,22,25;
 30:15,25;31:25;32:1,
 11,13,17;33:13;34:2,
 13,14,23;35:1;36:18,
 19;37:16,16,16,24;
 39:11,12,14,17,22,22,
 25;40:6,12;41:1;
 44:9,10,23;45:2,17,
 20;46:7,18,24;47:16;
 48:12,18;49:1,3,4,11,
 17;51:25;57:20;58:7,
 10,11,22;59:8;60:11;
 61:12;62:14;64:7,9,
 12,13,13,14,14,17,21,
 25,25;65:10,10;66:2,
 14,15;67:1,4,18,22;
 68:10,15,22;70:2;
 73:11,18;74:18;76:7,
 12,15,25;77:11,15,
 21;79:3,13;81:24;
 82:10,20;85:8,10;
 86:10;87:9,19,24;
 88:5;90:10,12,16;
 91:4;92:2,7,11;93:5,
 15;94:8,11,22,25;
 96:24;97:5,6,25;98:8,
 11,15,17,24,25;
 99:13;100:6,7,9,14,
 15;104:14;105:6,20;
 106:1;107:2;108:1;
 114:23;115:10,23;
 116:11,16,22;117:2,
 5,24;118:4;119:16,
 18;120:1,5,23;
 121:20;122:1;123:1,
 12,17,23;124:4,22;
 125:1,5,10,16,19,20,
 23;149:21;150:5;
 182:14;185:25;
 189:18
**DISH/EchoStar (3)**
 23:2,3,8
**DISH/Ergen (2)**
 193:2;197:14
**DISH's (19)**
 21:24;25:7,13,13,
 14;26:25;27:25;
 44:11,11;65:1;67:7,
 10,25;82:8;98:12;
 115:2;116:18;122:4;
 149:13
**dismiss (7)**
 74:1,3,4,5;76:7;
 80:14;90:19
**dismiss-land (1)**
 99:8

**disposal (2)**
 18:14;63:10
**dispute (1)**
 16:25;23:16;98:8
**disqualified (15)**
 32:8,10;79:16;
 81:5,18;85:2;87:2,7,
 19;88:3;126:24;
 127:1,6,17,20
**dissuade (3)**
 190:24;191:16;
 196:18
**dissuaded (4)**
 189:24;196:16,22;
 198:8
**dissuades (1)**
 191:3
**dissuading (1)**
 161:19
**dissuasive (1)**
 165:9
**distinction (2)**
 97:19;193:3
**distract (2)**
 30:12;32:23
**distress (1)**
 194:3
**distressed (11)**
 20:8;24:13;25:23;
 27:14;34:19,22;36:8;
 158:5;159:7;160:11;
 161:23
**district (1)**
 21:10
**diversified (3)**
 36:1,6;47:5
**divert (1)**
 79:10
**division (4)**
 112:2,3,4;113:16
**doctrines (1)**
 58:2
**document (9)**
 41:7,8;74:10;
 146:7;153:5;155:1,3;
 181:14;184:18
**documentation (1)**
 127:3
**documents (7)**
 22:16;24:15;28:8;
 64:2;76:24;80:21;
 90:20
**Dodge (3)**
 47:16,18;78:4
**dogs (2)**
 191:5,8
**Dolan (1)**
 50:16
**Dolan's (1)**
 56:5
**dollar (6)**
 27:23;29:20;41:1,
 10;106:1;162:9

**dollars (33)**
 22:13,21;27:14;
 29:3,19;33:23;34:1,
 10;35:18;36:5;37:19,
 20,22;38:10;39:24;
 40:18;42:13;48:3;
 55:21;56:8;62:22;
 63:2,10;76:14,14;
 95:19;103:14;105:7;
 124:6;142:4;149:7;
 165:3,7
**dollars' (1)**
 165:5
**dominated (1)**
 27:9
**done (24)**
 20:12;31:2;35:22;
 36:15;37:15,15;39:3;
 65:6,6,10,10;72:20;
 77:13;81:3;91:2,10;
 100:4,23;106:4;
 122:13;163:19;
 189:11;200:7;204:12
**DONTZIN (2)**
 9:2,7
**door (2)**
 29:25;54:4
**doorstep (1)**
 22:19
**do-over (2)**
 14:18;15:2
**DOSHI (1)**
 8:8
**dots (1)**
 189:7
**double (3)**
 135:17;136:19,21
**doubt (1)**
 164:17
**Doug (1)**
 52:12
**Douglas (1)**
 109:5
**down (14)**
 53:22;54:4;55:5;
 59:25;64:16;84:5;
 85:12;92:13;104:4;
 105:22;116:9;
 171:22;182:23;
 200:15
**downlink (18)**
 116:8;121:24;
 122:3,3,7,10;123:7,9,
 14;124:10,12,16,23;
 125:3,5,14,20;149:17
**downside (5)**
 70:13;76:19;77:4,
 4,6
**dozens (1)**
 159:13,13
**draft (5)**
 41:5;82:23;83:15;
 86:4,15

**drafted (2)**
 84:6;107:20
**drafting (10)**
 80:21,25;83:16;
 84:5;85:16,20;
 107:19,20;150:8,12
**dragon (1)**
 71:9
**drastic (1)**
 90:4
**draw (8)**
 74:6,23;75:13;
 77:25;78:5,10;97:19;
 126:5
**drawn (1)**
 68:24
**drive (1)**
 164:4
**DUBLIN (6)**
 5:7;203:21,25;
 204:3,3,21
**due (1)**
 15:24
**duopoly (1)**
 112:13
**during (29)**
 21:17;54:2;67:14,
 23;76:1;102:24;
 103:5;112:1,14,21;
 114:15;130:4,9,11,
 20;131:7,15;132:13;
 133:7;134:9,14,22;
 135:10;137:17;
 140:9,10;145:11;
 158:11;175:1
**dust (1)**
 65:2
**duties (8)**
 57:11;58:2,3;97:9;
 110:25;112:15;
 157:16,20
**duty (10)**
 54:9;55:21;57:12,
 12;88:24;172:22;
 173:3,7,20;174:8
**dynamic (2)**
 164:22;165:9

## E

**e- (1)**
 184:12
**earlier (13)**
 10:5;38:13;40:22;
 42:7;49:12;93:24;
 113:19;190:23;
 196:21;197:5;198:2,
 4,12
**early (6)**
 49:25;65:8;119:13;
 140:4;145:7;172:16
**earth-based (1)**
 110:14

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

**ease (1)**
59:19
**easier (1)**
185:6
**easiest (1)**
123:6
**East (1)**
7:12
**easy (1)**
162:24
**EchoStar (73)**
7:19;15:18;16:5;
20:7,16,25;21:3,19,
22,25;22:23;23:6;
24:9,18,24;25:4,10,
13,25;29:14;32:8,8,
11,13;34:2;57:19;
59:9;60:11;70:3;
73:11,19;74:18;76:7,
14,16;77:1,11,16,21;
79:3,13;81:24;85:8,
11;86:10;87:9,20;
90:10,13,16;91:4,8,
15;93:16;94:23,25;
96:24;97:5;98:16,17,
24;99:1;100:9;105:6;
107:2;108:1;116:22;
117:3,5,15,24;150:6;
189:18
**EchoStar's (4)**
22:16,18;25:19;
27:9
**economic (3)**
28:6;85:11;103:24
**economics (4)**
99:6,6;103:22,23
**educational (1)**
111:12
**effect (4)**
162:19;164:19;
177:13;190:14
**effective (2)**
13:25;123:12
**effectively (2)**
123:19;165:3
**effort (6)**
23:20;52:21;
131:19;163:4;193:6;
199:11
**efforts (5)**
130:5;131:13;
145:6,11;163:6
**ego (1)**
56:15
**egregious (1)**
73:3
**Ehmer (1)**
15:10
**eight (3)**
39:25;42:2;56:7
**either (8)**
18:11;30:22;36:9;
59:10;69:18;155:23;

197:3;202:3
**ELBERG (1)**
4:6
**electrical (1)**
111:16
**element (2)**
84:20;90:7
**elements (5)**
75:20;76:5;90:8;
100:24;108:1
**elephant (1)**
80:3
**eleven (1)**
152:21
**eligible (3)**
83:25;86:7,17
**eliminate (1)**
124:16
**Ellis (2)**
108:8;203:17
**else (19)**
17:8;18:3;19:3;
30:11;46:1,3;49:11;
59:7;64:2;91:13;
99:18;135:4,15;
136:25;137:1;173:9;
192:24;203:15;
204:19
**e-mail (39)**
38:12,13,13,16;
47:25;49:16,18;
50:13,21,25;71:14;
72:17;102:21;126:6,
9,12,17;127:3,13;
148:8,11;154:12,13;
181:15;182:1,17,19,
20,23;184:10;187:3,
4,6,17,18;188:23,24;
189:1;202:6
**e-mailing (3)**
49:14;56:22;102:5
**e-mails (18)**
23:3;25:13;37:16;
49:16,24;50:1,4,8,9;
51:13;52:17;56:21;
62:16;70:24;153:7;
182:16;184:8;187:1
**embarked (1)**
113:20
**emphasis (1)**
41:19
**employ (1)**
20:7
**employed (7)**
25:10;109:17,19,
22,24;114:21;157:9
**employee (2)**
113:25;114:11
**employment (4)**
93:13;111:8,20;
157:23
**encompassing (1)**
12:18

**encountering (1)**
133:7
**encourage (2)**
10:6;183:22
**end (9)**
14:17;42:4;52:23;
79:22;120:7;146:14,
16;163:9;203:10
**endeavors (1)**
144:13
**ending (2)**
78:6;143:20
**ends (2)**
81:3;84:18
**engage (6)**
14:3;54:9;79:1;
95:19;187:14;199:12
**engaged (4)**
94:8;95:1;98:15;
131:22
**engagement (2)**
18:14;201:8
**engagements (1)**
114:10
**engaging (2)**
107:4,5
**engineering (7)**
111:16;112:7,23,
23,24,25;113:11
**enjoin (1)**
71:3
**enjoyed (1)**
112:4
**Enos (1)**
15:11
**enough (9)**
46:13,22;54:18;
60:23;85:22;103:13;
164:11;193:14;194:4
**ensure (3)**
76:11;147:9;172:1
**enter (1)**
163:1
**entered (4)**
165:23;166:11;
172:12;174:17
**entering (1)**
127:23
**entire (3)**
114:12;170:12;
187:3
**entirely (4)**
59:7;70:4,4;100:10
**entirety (3)**
184:9,17,19
**entities (8)**
20:7,13,16;22:23;
24:9;166:17,19;
197:20
**entitled (1)**
185:16
**entitlements (1)**
54:6

**entity (8)**
27:14;29:5;40:22;
54:12;55:11,15;84:8;
128:1
**environment (3)**
42:14;190:9,11
**episode (3)**
17:24;20:6;47:13
**equal (1)**
119:10
**equate (1)**
192:8
**equation (1)**
97:24
**equitable (4)**
11:25;16:4;89:18;
90:2
**equity (19)**
20:17;30:5;38:7;
51:25;54:20;141:12,
14,18;142:3;149:1,7;
151:16,20,25;152:3,
4;158:6;178:12;
192:17
**equivalent (1)**
125:22
**ERGEN (215)**
2:5;20:2,6,15,25;
21:5,13,18;22:4,7,11;
23:11;24:10,13;25:2,
5,11,25;26:6,8,12,17,
21,24;27:3,6,10,18,
23;28:19,25;29:2,14,
18,20,25;30:4;31:15,
20,22;32:6,10,12,18;
33:6,11,16,21;34:3;
36:5,14;37:6,17,21;
38:9,22,23;39:8,10,
18,23;40:23;41:1,14;
42:12,25;44:8;45:2,
9,11,11,14;46:6,7,9,
16;47:14,18,20;49:1,
11,13,15,16,18,20,23,
25;50:1,3,13,23;51:5,
9,11,17,18,21,22,24,
24;52:6,7,11,17,18;
53:18;57:14;59:8,12;
60:5,10,19;61:10,18,
24;62:8,25;63:25;
64:7;66:1;68:11;
69:1;70:2,4,7,10,14;
71:7,22;72:19;75:1,
7;76:15,17,18;77:1,1,
16,21;78:15;79:1,3,4;
81:24;82:7,9;84:7,8;
85:12;86:19;90:15,
25;91:8,12,22;92:12,
20;93:15,23;94:7,11,
18,20,25;96:21;
97:15,25;98:3,8,11,
15,18;99:2;100:7,13;
101:19;102:6,10,13,
17,18,18;104:6;

105:25;106:8,13;
129:20,23;132:17,19;
137:20;138:12;
139:18;144:24;
153:13,17,20,22,24;
154:7,17;180:11;
182:11,14,16;183:8;
184:13;185:25;
190:1;198:14,21;
200:23,24
**Ergen/DISH (1)**
197:20
**Ergen's (27)**
25:18;27:4,18;
28:17;30:25;32:14;
35:17,19;37:21;40:7;
46:25;49:21;62:12;
77:7;91:4;92:12;
94:9,16;99:8;107:14;
132:9,14;135:8;
137:11,12;180:2;
199:2
**ergonomics (3)**
31:12,12;43:11
**eScribers (1)**
2:21
**especially (5)**
12:11;26:16;55:1;
57:4;192:20
**ESQ (27)**
4:6,14,15,16,17,25;
5:7,8,17,25;6:7,8,9,
17,18,19;7:7,15,23,
24,25;8:8,17;9:6,7,8,
9
**essence (1)**
133:24
**essentially (10)**
45:19;90:15;113:1;
119:10;121:11;
122:25;126:24;
138:2;141:19;164:23
**establish (4)**
27:24;54:23;
122:25;167:23
**established (3)**
23:8;35:19,22
**establishes (1)**
28:16
**estate (6)**
37:4;55:17,20;
60:25;130:17;159:20
**estates (3)**
11:22;21:8;196:9
**estoppel (1)**
101:22
**et (5)**
2:5,5;23:3;58:3;
101:22
**evade (1)**
46:22
**evaluate (1)**
66:20

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
LIGHTSQUARED INC., et al.                                          Pg 218 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                                         January 9, 2014

evaluated (1)
84:15
evaluation (1)
92:15
eve (1)
30:14
even (43)
20:11;23:1;32:11;
35:15,24;37:17;39:3;
40:24;48:23;49:21,
22;51:4,25;53:3;
54:20;57:3;59:20;
68:6;70:24;71:24;
72:10,10;77:16;
80:25;81:22;82:25;
83:19;87:20;88:4;
93:22;101:19;103:9,
12;121:12;131:2,5;
135:14;164:10;
173:8,24;189:3;
194:17;199:16
evening (1)
205:3
event (2)
30:24;69:19
events (4)
13:8;40:16;197:10;
199:8
eventually (2)
23:12;117:24
everybody (4)
49:11;52:10,21;
181:5
Everybody's (1)
74:22
everyone (5)
10:4;64:19;72:4;
108:20;181:7
evidence (73)
15:25;16:1;20:23;
22:22;23:7,22;24:3,
19;25:7,17;26:5,20,
22;28:4,7;29:24;
31:3,14;36:3;38:23;
57:23;59:24;60:3;
66:24;73:17;74:16,
22,23;75:3,12,20;
76:15,25;77:10,15,
19;79:2,10;80:20;
81:2;82:7,13,19;83:2,
4,8;85:10,13;87:8,18;
88:4;90:10,12;91:17,
24;92:1,18;96:19;
98:25;99:6;102:1,23;
104:5;107:12;127:9,
14;135:13;136:1;
143:12,17;146:12;
180:15,17
exact (2)
70:16;128:11
exactly (13)
21:15;45:9,10;
76:20;80:7;84:4;

124:19;131:25;
136:23;174:9;
175:13;192:2;197:12
examination (8)
17:17;55:15;
109:14;138:15;
154:23;157:7;161:5;
188:10
example (4)
24:22;58:7,22;
74:25
exceeded (1)
95:2
Excellent (2)
20:4;108:11
Except (2)
53:25;166:17
exception (1)
19:10
excerpt (1)
184:7
exchange (1)
141:14
exchanged (3)
38:6;182:16;
184:12
exclusive (1)
131:16
exclusivity (4)
54:2;71:5;102:25;
130:13
excuse (1)
144:1
excused (1)
155:18
executed (3)
22:9;26:7;37:20
executing (2)
27:25;68:16
execution (1)
147:9
executive (11)
21:18;25:9,11;
37:2;58:10;60:10;
96:22;97:8;109:21;
111:2,5
executives (1)
23:2
Exhibit (15)
126:5;127:9,15;
142:22;143:17;
145:24;146:1,11;
148:2;153:6;154:13;
155:2;181:11;
182:22;184:2
exhibits (2)
143:7;155:1
exist (3)
76:24;77:14,22
existed (2)
59:21;112:13
existence (1)
98:12

existing (2)
39:13;112:10
exists (1)
98:10
exit (5)
131:14;140:6;
145:7,18;201:8
expand (1)
79:15
expect (2)
67:6;104:21
expectation (1)
38:7
expected (1)
11:6
expedition (2)
50:6;55:16
expense (1)
175:4
expensive (1)
165:3
experience (5)
112:1;162:2;163:5;
178:11;190:5
expert (8)
158:19;159:4,5,8;
160:11,25;161:3;
198:20
expertise (7)
160:13,15,23,24,
25;179:5;193:22
experts (1)
19:3
explain (9)
28:25;59:17;110:2;
162:3,8,10;173:18,
23;194:21
explained (2)
38:3;76:7
explore (2)
69:13;155:8
explored (1)
29:10
exposure (1)
111:24
expressed (1)
144:7
extend (3)
202:11;203:2,3
extends (2)
116:2,7
extension (1)
124:13;183:3
extent (6)
31:18;76:22;98:23;
106:6;199:4;203:22
extra (1)
58:9
extrinsic (1)
81:2;83:8
eye (4)
18:17;47:11;
162:13;203:12

eyes (1)
14:21

**F**

face (3)
20:12;83:2,4
faces (1)
79:8
facet (1)
61:13
facilitates (1)
202:18
facilities (2)
23:3;25:14
facing (1)
16:14
fact (57)
27:11;32:15;35:21;
39:10;45:22;55:20;
61:15;62:20;67:20;
69:11;71:1;73:22;
74:13;75:1;77:25;
78:10;79:25;80:8;
82:7,16;85:10,20;
88:6,7,23;89:8;91:5,
8,20;92:14;94:1,7;
95:10;96:4,21;98:19;
99:13;101:15;
106:17;107:21;
129:11,23;133:8,8,
24;144:21;147:20;
150:23;151:1,19;
152:14;177:5,16,19;
188:10;198:24;
199:22
factors (1)
177:9
facts (21)
21:16;23:15;27:24;
29:6;42:11;49:6;
59:25;60:3;66:11,22;
73:2,2;74:7,16;
75:12;78:25;85:25;
90:24;108:13;
180:14,17
factual (4)
31:13,15;79:20;
188:23
failed (5)
22:23;23:9;31:1;
103:4;177:1
failing (1)
43:15
failsafe (1)
70:15
failure (1)
79:7
fair (5)
33:25;70:18;72:1;
115:16;164:14
fairly (1)
123:25

Fairness (3)
66:18;69:5;158:17
fait (1)
71:4
faith (1)
130:15
Falcone (66)
48:1;49:9,25;50:1,
11,14,17;51:9,11,22;
52:2,2,3,11,16,25;
56:17,24;60:8;62:9,
12,15;63:6;72:17,23;
82:15;102:3,4;
103:21;148:8,20;
150:15,18,21;151:5,
9,15,18,22;152:1,23;
153:7,16,20,23;
154:6,15;178:3,5,8;
179:16;180:1,10;
181:15;182:2,10,24;
183:2,3,8,11,15,18;
184:6;190:2;198:18
Falcone's (8)
52:5;56:19,21;
67:9;178:14,17;
179:4,6
fall (3)
24:24;64:1,4
falls (1)
46:8
false (1)
108:10
familiar (8)
60:24;111:9;
116:11;131:13;
164:15;185:9;194:4;
198:11
familiarity (2)
114:23;115:1
families (1)
60:22
family (5)
25:18;29:19,23;
37:6,7
family's (1)
99:2
fan (1)
43:1
far (10)
68:4,16,16,16;
69:24;81:22;93:10,
22;103:21,22
FARR (3)
6:12;53:18;139:18
fashion (1)
131:1;141:21
fashioned (1)
12:10
fashioning (2)
11:21,24
fast (1)
51:8
faster (1)

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

63:18

**fatal (2)**
80:12;107:10

**fault (1)**
137:6

**favor (3)**
74:8;174:8;194:12

**favorable (1)**
105:19

**FCC (37)**
67:9;68:2,6;72:21;
79:8;115:13;118:16,
25;119:4;120:1,2,3,9,
19,25;121:8,16;
122:15;123:11,17;
124:1,9,23,25;138:3;
141:16;144:8,17;
149:16;177:16,19,21,
22,22,23,25;190:1

**FCC's (1)**
115:22

**February (1)**
110:21

**fee (3)**
175:1,4;188:16

**feel (1)**
20:2

**fees (1)**
103:10

**FELD (1)**
5:2

**fell (3)**
68:2,3,4

**fellow (1)**
66:3

**few (14)**
50:13;53:21;60:12;
61:25;62:1,10,14;
84:19;100:3;113:25;
114:7;127:18;
145:14;165:19

**fiction (1)**
46:6

**fiduciaries (1)**
57:12

**fiduciary (4)**
58:2;59:3,10;97:9

**field (4)**
163:13;164:14;
190:13,18

**fifteen (3)**
18:7;123:7;194:7

**fifteen- (1)**
18:12

**fifty (4)**
76:14;91:15;132:2;
137:14

**fighting (1)**
71:9

**figure (10)**
14:8;17:2;58:9;
83:2;99:17;167:1,17,
20;184:7;202:15

**figured (1)**
193:19

**file (7)**
54:10;55:3,4;
182:2;202:5,22;
203:5

**filed (18)**
59:2;61:20;120:8,
19,23;124:3,3;
127:19;152:12;
174:15;185:3,11;
186:6;188:16;
192:21;201:7;
204:22,22

**filing (3)**
24:22;123:23;
174:23

**filings (1)**
69:18

**filled (2)**
64:23;111:3

**final (3)**
38:9;87:10;101:24

**Finally (1)**
52:9

**Finance (2)**
5:13;158:4

**financers (1)**
132:8

**financial (16)**
31:25;37:4,7;57:6;
60:24;69:4;91:2;
100:18;126:20;
129:5;135:6;163:21,
21;177:1;192:16,23

**financially (1)**
68:7

**financing (14)**
67:10;72:21;103:4,
8,14;128:21;131:14;
134:1;140:6;145:7,
18;159:6;193:11;
201:8

**find (17)**
14:11,16;24:17;
47:17;50:19;52:23;
56:3;57:19;58:16,17;
63:11;89:19;98:10;
105:11;128:24;
129:2;200:24

**finding (3)**
23:24;191:21;
196:3

**fine (12)**
44:19;100:1;134:7;
138:25;139:16;
156:17;167:5;176:2;
195:2;202:8,8,12

**finish (2)**
100:2;196:15

**finished (1)**
27:7

**fire (1)**

67:15

**firm (7)**
25:19;151:15;
158:4,6;163:2,3;
192:7

**firms (3)**
69:4;84:2;164:1

**firm's (1)**
158:15

**first (54)**
12:16;22:14;24:11;
30:4;31:23;33:21;
40:5,17;42:17,18;
43:12;49:13;53:24;
58:10;60:12,20;
62:15;64:4,5;65:14;
68:3;70:20;74:3;
77:12;81:17;84:10,
20;95:1,2,7,13;96:5,
8;108:24;109:3;
113:17;116:2,18;
117:12,13;118:7;
123:2;126:7;128:4,
19;148:16;153:3;
179:1;181:21;187:7;
192:2;197:11;201:6,
16

**FirstNet (1)**
122:19

**fishing (4)**
50:6,6;52:20;55:15

**fit (4)**
39:13;67:18;
160:14;195:5

**fits (2)**
67:4;160:23

**five (10)**
33:9;37:13;54:25;
75:20;76:5;123:2;
124:16;152:22;
156:19;157:12

**five-minute (2)**
156:2,4

**fix (1)**
59:23

**fixed (1)**
18:8

**flashing (1)**
32:22

**flaw (1)**
80:12

**flawed (2)**
79:14;90:14

**FLEISSIG (2)**
9:2,9

**FLOM (1)**
4:1

**Floor (1)**
8:14

**flow (1)**
146:14

**flowing (1)**
123:14

**fluid (1)**
12:23

**flying (1)**
49:12

**focus (2)**
130:3;146:24

**focused (6)**
16:9;31:11;68:15;
107:5;158:4,6

**focusing (2)**
96:4,14

**folks (12)**
10:3;15:7;18:6;
40:1;64:14,16;66:5,
15;99:20;129:2;
146:15;204:11

**follow (4)**
115:8,11,15;195:4

**followed (2)**
91:18,18

**following (7)**
29:6;38:15,16;
44:25;115:17;118:6,
7

**follows (2)**
60:4;168:5

**follow-up (2)**
45:25;140:2

**foolproof (2)**
63:10,14

**footing (1)**
119:10

**force (2)**
30:17;36:19

**forces (1)**
36:13

**foregone (1)**
138:10

**foreign (1)**
194:4

**forget (2)**
128:11,16

**form (1)**
141:21

**formality (1)**
27:15

**formed (3)**
99:14;116:24;
196:12

**forms (1)**
22:16

**formulate (1)**
131:16

**forth (1)**
187:22

**Fortress (6)**
7:3,11;15:11;
155:8;176:15,16

**forty (6)**
115:22;123:5,8,20;
125:2;149:16

**forty-eight (1)**
11:8

**forty-five-minute (1)**
18:11

**forward (15)**
11:15;12:5,25;
15:8;51:8;83:7;
92:16;93:1;97:18;
100:6;104:10;
108:13;201:21;
202:4;203:8

**forwards (1)**
189:1

**found (2)**
89:17,17

**Four (9)**
4:3;36:22;54:18;
137:15;140:11,13;
142:8;144:3,17

**frame (5)**
118:9;140:10;
145:7,12;188:18

**FRANK (1)**
7:15

**frankly (3)**
46:15;128:16;
194:10

**Fraser (1)**
15:11

**FRAWLEY (5)**
7:23;19:6;73:12;
97:10;160:12,20;
189:14,15,16,17,20;
195:2,3;199:23

**free (2)**
108:15;205:6

**FREIMUTH (12)**
6:17;139:7,9,17,17,
20;142:21;143:11;
146:11,20,23;149:24

**frequency (3)**
112:24;119:3;
134:18

**Friday (1)**
13:25

**FRIEDMAN (42)**
6:2,7;19:20;31:7,8,
8;32:21,25;33:6;
41:20,22,25;42:3,6,9,
16,20,22;43:5,8,10,
12;44:2,5,20;51:15;
53:13;63:7;135:18,
19;136:3,4,5,21;
156:3;180:14,16,17,
23;184:10,19,24

**friend (2)**
51:18;58:21

**friend/advisor (1)**
98:4

**friends (1)**
21:14

**front (7)**
72:3;82:14,15,19;
83:3;115:13;126:4

**fronting (1)**

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
LIGHTSQUARED INC., et al.    Pg 220 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                                    January 9, 2014

62:25
**frustrate (1)**
30:5
**frustration (1)**
134:19
**fulcrum (1)**
40:12
**fulfilled (1)**
25:5
**full (5)**
54:19;66:4,5;
113:5;204:10
**fully (2)**
31:3;36:1
**functioned (1)**
98:2
**functions (3)**
45:16;94:8;110:2
**fund (5)**
36:16,21;47:2;
181:20;193:18
**fundamental (4)**
81:9;84:9;160:13;
195:21
**fundamentals (2)**
53:23;59:15
**funded (1)**
70:4
**funding (2)**
51:6;122:18
**fundraising (2)**
134:9;135:5
**funds (10)**
35:17;36:20;47:7;
91:3,4,4;99:2,3,3;
192:17
**fund-type (1)**
102:20
**further (8)**
58:6;103:18;118:9;
149:24;154:19;
155:9,16;189:11
**furtherance (1)**
100:17
**Furthermore (1)**
26:5
**future (3)**
16:2,9;44:13

**G**

**gain (3)**
20:9;21:1;28:1
**GALLAGHER (2)**
6:12;53:18
**game (1)**
42:4
**gamut (1)**
159:19
**Garden (2)**
5:22,23
**Gartenberg (1)**
202:13

**Gary (1)**
90:22
**gave (6)**
45:23;104:23;
121:12;125:1;155:1;
186:12
**general (12)**
47:16;58:22;96:22;
104:18,21;140:25;
158:3;163:18,23;
193:25;194:10;
197:19
**generally (11)**
111:9;115:3,7,8;
118:2;159:19;162:3,
8;163:5;164:11;
196:11
**gentleman (1)**
33:2
**get-go (1)**
66:1
**gets (3)**
57:20;172:1;191:7
**gist (1)**
48:17
**GIUFFRA (75)**
7:25;15:4,17,17,21,
24;16:12,20;48:22;
73:7,8,10,10,16;
74:21,25;75:8,15,18;
78:12;82:21;83:7,10;
89:8,19,25;90:3;
92:25;94:5;95:7,11,
14,19,23;96:1,6,10,
13,15,18;97:6,11,14;
98:13;100:4;101:6,
11;102:1;104:17;
105:1;106:12;
127:11;132:10,24;
133:11,12,13,16;
134:3;135:11,12,25;
136:13,17;150:1,4,5,
14;153:11,12,25;
154:2,4,19;181:11
**given (8)**
17:16;38:5;48:20;
61:16;78:3;86:3;
93:2;186:11
**gives (1)**
88:17
**giving (3)**
69:20;73:16;
103:24
**GLENN (2)**
4:17;18:25
**global (3)**
27:25;157:14;
166:1
**Globalstar (2)**
159:9;194:6
**GLUECKSTEIN (2)**
7:24;73:12
**Gmail (1)**

56:22
**goal (1)**
13:5
**goes (9)**
39:25;62:25;81:22;
187:7,15;188:12,19;
189:4;203:8
**go-forward (1)**
14:22
**Golden (2)**
166:3,4
**Goldstein (4)**
62:24;182:24;
183:2,6
**gonna (1)**
156:3
**Good (49)**
10:2,3,16,17;13:16,
17;15:3;17:5,7,10,11,
18,20;19:9,16;24:12;
46:12;50:18;53:15;
55:6;59:5;60:8;61:9;
64:8;65:1;67:17;
70:1,12;73:8,9;
102:14,19;108:22;
130:15;139:21,22;
157:3;165:17,18,18,
22;167:9;169:14;
189:21,22;199:15;
200:2;203:24;205:3
**Goodbarn (5)**
45:14,17,18;48:8,9
**governance (3)**
20:20;97:8;149:10
**governed (1)**
57:11
**Government (2)**
34:3;122:19
**GPS (2)**
125:13;196:17
**graduation (1)**
111:21
**grand (2)**
55:6;68:16
**grant (1)**
79:21
**granted (1)**
107:25
**Great (9)**
18:18;24:4;55:18;
61:15;110:17;136:7;
138:4;146:20;169:14
**greater (2)**
103:22;164:10
**Green (1)**
8:4
**grew (1)**
60:21
**ground (4)**
42:11;49:6;110:14,
15
**Group (24)**
4:2,10;9:12;11:9;

13:19;14:11;16:14;
19:1;40:19,25;41:3;
50:22;71:22;103:3;
104:19;131:2;
147:24;148:12,24;
157:17,19,19;158:9,9
**grow (1)**
131:1
**GTE (6)**
111:22,24,24;
112:1,5,6
**guarantee (2)**
174:12;194:15
**guard (6)**
122:9,13,25;
123:10,12;124:17
**guess (4)**
44:20;72:4;180:6,9
**guessing (1)**
59:16
**guidelines (3)**
27:12;44:24;60:17
**gum (1)**
48:13
**GUMP (2)**
5:2;204:3
**guy (9)**
33:12;48:2;49:3,4;
51:10,21;102:11;
165:7;191:5
**guys (5)**
49:21;51:20;52:4,
6;134:12

**H**

**Hadley (2)**
17:12,21
**hair (1)**
70:22
**half (6)**
23:12;73:23;
103:14;157:12;
175:23;204:15
**halfway (1)**
183:1
**hall (1)**
155:25
**halt (1)**
54:1
**halted (1)**
155:9
**ham (1)**
167:25
**HAMROFF (1)**
5:20
**hand (12)**
12:1,2;46:7,7;
68:15;97:25,25;
98:11,12;109:9;
157:4;171:16
**handed (1)**
154:12

**handful (1)**
150:6
**handling (1)**
202:14
**handouts (1)**
73:13
**hands (2)**
20:24;130:24
**HANSEN (1)**
7:7
**happen (5)**
65:25;74:15;96:3;
120:4;180:24
**happened (10)**
39:23;45:3;83:21;
106:22,24;149:19;
174:12;180:23,24;
199:13
**happening (5)**
115:4,18;125:25;
130:21;131:11
**happens (6)**
53:24;86:21;101:2,
4;161:3;184:21
**happy (3)**
70:22;130:13;
199:20
**HARBINGER (31)**
2:4;6:3;31:9;48:11,
15;51:4;52:22;53:19;
54:20;55:18;56:16,
17;57:1,3;74:4;76:6;
80:1,5;81:22;82:14;
103:18;104:4;
105:13;107:4;114:9;
148:12;149:6;
151:15,20;152:15,22
**Harbinger/Mr (1)**
190:2
**Harbingercom (1)**
56:22
**Harbinger-related (1)**
176:14
**Harbinger's (3)**
56:19;77:20;152:4
**Harbor (2)**
22:13,15
**hard (4)**
54:4;130:20;
164:11;204:4
**harder (2)**
163:12,12
**harm (7)**
28:13;30:2;31:1;
56:10;102:21,22;
104:9
**harmed (2)**
21:8;62:22
**harping (1)**
107:8
**hat (1)**
98:4
**hatched (2)**

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 221 of 240

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

55:6;68:17
**hate (1)**
69:7
**hats (1)**
57:7
**HAUER (1)**
5:2
**H-band (2)**
123:14,14
**head (1)**
53:21
**heading (1)**
151:19
**headquarters (1)**
22:17
**healthcare (1)**
159:21
**hear (39)**
21:17;22:3;23:17;
28:20,23,25;29:2,18;
30:24;44:22;53:11;
58:5,8,13;60:3,5,10,
19;61:12,18;62:8;
63:13,17,18,25;65:2,
4;67:5,17;69:1;75:6,
6;98:22;103:1;
108:13;132:8;
134:14;135:16;161:1
**heard (25)**
15:4;30:14;43:16;
76:1;93:22;94:12;
128:6,19,22;129:16;
134:16;135:14,15,17;
136:9,12,18,25;
137:1,11,17;153:3;
192:4,5;200:21
**Hearing (10)**
2:2;11:2,6;13:6;
16:8;129:17,17;
136:10;202:14,25
**Hearsay (7)**
132:10,24;135:13,
21,22;136:1,21
**heart (1)**
44:15
**heavy (1)**
73:1
**hedge (4)**
102:20;181:20;
192:17;193:18
**heels (1)**
11:6
**held (5)**
71:10,23;84:11;
88:15;128:8
**help (8)**
27:19;54:23;61:2,
9;97:7;137:25;
145:11,22
**helped (1)**
60:25
**helpful (2)**
55:13;71:8

**helps (1)**
61:5
**hence (1)**
45:1
**hereby (2)**
127:14;143:17
**here's (1)**
42:23
**herring (1)**
106:25
**herself (1)**
40:15
**hey (1)**
86:6
**Hi (1)**
150:5
**hide (1)**
22:24
**high (1)**
122:19
**higher (5)**
53:5;164:23;
173:18,24;174:7
**highly (1)**
103:6
**high-power (1)**
122:10
**himself (1)**
24:10
**hire (2)**
163:1,2
**hired (2)**
92:14;164:1
**hiring (1)**
152:23
**Hirschfeld (18)**
108:25;109:13,15;
124:21;127:8;
132:25;133:1,5;
134:5;137:2,5,8;
138:14;140:4;
143:14;154:22,24;
155:16
**history (11)**
50:10;83:16;84:5;
85:17,20;107:19;
111:21;118:2,3;
150:12;157:24
**hit (3)**
76:20;96:7;105:16
**Hoc (30)**
4:2,10;11:9;13:19;
14:11;16:14;19:1;
40:19,25;41:3;46:23;
50:21;70:20;72:19;
103:2;104:19;131:2;
147:24;148:12,24;
172:18,25;173:4,8,
14;186:21;187:20,
23;188:1,3
**HOCK (1)**
5:20
**hold (12)**

15:7;32:21;33:4;
42:2,4;54:10;57:1;
69:6;83:13;116:11;
192:24;200:12
**holder (2)**
87:5;181:20
**Holders (3)**
4:2;51:4;66:4
**Holding (1)**
23:24
**Holdings (7)**
22:20;54:9;70:24;
71:2;72:7;179:18;
180:2
**holds (1)**
177:21
**holistic (2)**
28:1;43:7
**Holtz (1)**
186:18
**home (2)**
37:2;60:15
**honest (1)**
45:16
**honestly (1)**
64:16
**honey (1)**
35:7
**Honor (228)**
10:16;11:1,7,11,14,
17,20;12:4,9,14,21;
13:10,16;15:4,17;
16:4,8,12,20,22;
17:11,13,20,23;18:5,
22,23;19:6,8,17;20:4,
5,11;21:9,13,16;23:4,
8,16,22;24:19;25:17;
26:11,14,16,20,23;
27:8;28:3,10,11,15,
17,22;30:2,15,17,19,
23;31:5,8,10,15,22;
32:14;33:14,21;34:7;
35:3,15;36:3,11,13,
22;37:25;39:1;40:4,
14,14;41:18;43:16;
46:5,14,20;47:6,9,10,
12,23;48:6;52:15;
53:1,7,9,12;58:14;
59:15;69:7;71:1;
73:8,14,17,20,25;
74:2,5,21,25;75:15;
76:20;77:13;78:12;
80:11;81:7,19;82:21;
83:7,21;85:16;86:4;
88:9,13;89:8,19;
90:17;91:8,10;92:25;
93:24,25;94:5;95:15;
96:6,10,11,18;97:14;
98:13;99:22;100:4;
102:9;103:1;104:5,
12,17;105:1,1;
106:12,24;107:1,7,
17,18,24,25;108:16,

22,24;109:13;
124:19;127:9,11;
132:10,24;133:1,5,
11;134:3;135:12,19,
25;136:13;137:3;
138:14,17;139:7,17;
142:23;146:21;
149:25;150:1;
153:11;154:2,22;
155:19;156:5;157:1;
160:10,12;165:11,13;
168:11;180:14;
181:11;184:10,19;
188:6;189:8,11,14;
191:25;192:21;
193:18;194:1,11,19;
195:2;199:25;200:3,
8,10,19;201:3,7,15,
25;202:2,15,19,21,
24;203:4,16,23;
204:1,20;205:4,8
**Honor's (1)**
87:13
**Hootnick (12)**
19:11;52:20;56:3;
70:22;72:14,15;
129:6;155:5,14;
186:18;187:2;188:25
**hope (1)**
55:23
**hopefully (1)**
28:19
**hopes (1)**
23:24
**hoping (2)**
52:19;102:7
**hot (2)**
191:5,8
**hour (4)**
99:25;100:1;
108:14;204:14
**hour-long (1)**
18:11
**hours (2)**
11:8;14:18
**house (2)**
191:4,5
**housekeeping (3)**
17:9;138:17;
146:13
**Howard (1)**
90:22
**Howard's (1)**
92:6
**humor (1)**
168:8
**hunch (1)**
53:4
**hunches (1)**
52:15
**hundred (8)**
27:13;33:22;36:5;
76:19;108:10;

124:23;163:19;
194:23
**hundreds (3)**
105:7;171:14;
177:12
**hung (4)**
28:4,14,15;30:7
**Huntington (1)**
8:6
**husbands (1)**
35:4
**hypothetical (1)**
83:9
**hypothetically (3)**
82:5,9;89:5

**I**

**Iacob (1)**
15:12
**Icahn (11)**
51:6;62:25;96:4,9;
128:8,18,19;196:22,
24;197:1,2
**ICO (2)**
117:21,22
**idea (8)**
29:10;43:21;55:2;
153:1;167:9;170:3;
176:3;198:19
**ideas (2)**
142:10;155:8
**identified (4)**
40:22,24;186:2;
197:14
**identify (4)**
30:7;185:23;197:9;
198:4
**identities (3)**
56:12,15;58:9
**identity (5)**
22:17;56:16,17;
128:25;129:8
**idly (1)**
27:6
**ignore (3)**
80:7,8;175:17
**ignored (2)**
68:23;80:1
**ill (2)**
24:2;29:13
**illegal (1)**
62:4
**illusion (1)**
48:24
**immaterial (1)**
63:20
**immediately (2)**
121:20;122:4
**impact (12)**
104:3;105:13;
123:2;170:9,11,16;
177:6,10,17;180:12,

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 222 of 240

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

13;199:18

**impacts (2)**
180:5,7

**impermissible (1)**
62:3

**implication (1)**
180:23

**implying (1)**
180:24

**importance (1)**
11:16

**important (17)**
11:14;12:24;13:22;
23:15;64:20,20;
67:19;72:9;76:18;
85:17;90:18;98:21;
118:18;21;122:2;
127:23;147:14

**importantly (4)**
12:19;29:22,23;
62:5

**impose (2)**
18:8;123:1

**impossible (2)**
30:7,9

**improper (1)**
30:4

**imputation (2)**
100:10,22

**impute (2)**
81:23;90:15

**imputed (2)**
99:11;100:14

**inappropriate (2)**
69:14,16

**Inc (2)**
5:21;8:3

**incentives (1)**
83:23

**inclination (1)**
36:19

**include (8)**
13:7;80:24;81:18;
85:2,22;86:7;87:2;
172:4

**included (2)**
104:18;127:21

**including (7)**
11:9;20:1;26:24;
66:4;90:22;92:20;
187:2

**inconsistent (1)**
92:11

**increase (1)**
33:8

**incredible (1)**
35:15

**incredibly (1)**
12:23

**incumbent (1)**
164:24

**indeed (3)**
38:8;39:23;63:17

**indemnify (1)**
77:1

**indemnity (3)**
79:2;94:24;99:5

**independent (8)**
46:2,3;69:4;90:23;
92:8,22;114:7;196:8

**indicate (2)**
32:15;111:13

**indicated (3)**
80:16;147:7;197:5

**indications (2)**
68:5;78:2

**indirect (3)**
81:14;85:23,25

**indirectly (1)**
82:11

**induce (3)**
161:24;174:3;
191:17

**induced (1)**
100:15

**indulge (1)**
35:11

**industries (1)**
159:17

**industry (7)**
24:6;114:13,16;
115:4,6;159:20;
194:2

**ineligible (1)**
84:25

**inequitable (4)**
11:18,20,24;13:7

**infelicitously (1)**
137:5

**infer (1)**
57:2

**inference (9)**
59:25;60:2;73:4;
77:24,25;78:5,9,12;
101:19

**inferences (9)**
23:15;61:16;66:24;
68:24;74:7,12,20,23;
75:13

**inferring (1)**
59:17

**inflicting (1)**
56:10

**influence (12)**
26:3;29:17;40:9;
162:11,15,21;163:16;
164:9,10,21;194:15,
16

**information (7)**
48:20;55:2,19;
56:3;66:16;92:21;
192:22

**informed (2)**
17:16;78:10

**inherently (1)**
194:24

**in-house (2)**
26:25;47:23

**initial (3)**
110:1;182:17,19

**initially (4)**
111:22;112:23;
116:4;192:21

**initials (1)**
167:11

**initiate (1)**
64:6

**initiated (1)**
121:4

**Innkeepers (1)**
194:1

**innuendo (5)**
59:25;60:2;74:13;
77:20;87:12

**inquire (2)**
33:17;88:24

**inquiries (1)**
58:6

**inquiring (1)**
21:3

**inquiry (4)**
105:18;118:10;
119:2;129:8

**inside (4)**
27:9;164:8,25;
193:22

**instance (2)**
43:12;58:10

**instead (2)**
51:6;107:4

**instructed (1)**
106:22

**instructs (1)**
32:18

**insulate (1)**
22:23

**Insurance (1)**
8:12

**intended (6)**
26:15;82:7;84:14;
87:4;88:12;137:2

**intent (1)**
64:17

**intentional (2)**
75:23;90:13

**intentionally (3)**
28:3,4;90:10

**interest (14)**
24:4;66:4;72:12;
85:11;98:1,5;100:18;
116:17,19;144:1,6;
190:14;191:18;
198:22

**interested (9)**
31:23;33:8;72:15;
98:7;125:21;134:23;
136:10;144:7;160:3

**interesting (6)**
20:11;39:12;42:16;

66:12;68:13;74:13

**Interestingly (1)**
56:3

**interests (3)**
40:7;122:21;
130:17

**interfere (3)**
61:21;63:19;
103:17

**interference (21)**
16:6;73:21,24;
74:18;75:18;81:9;
84:21,23;88:23;90:6;
100:9,15,22,25;
101:13;104:13;
108:2;122:12,23;
123:13;196:18

**internal (2)**
39:6;50:1

**international (1)**
113:13

**interpret (1)**
83:6

**interpretation (6)**
65:5;79:15;81:7;
82:1;87:13;107:9

**interpreting (1)**
87:25

**interprets (1)**
107:18

**interrupt (2)**
69:7;195:1

**interrupted (1)**
118:24

**intervention (1)**
19:21

**interviewed (1)**
60:19

**interviews (1)**
132:7

**into (40)**
21:3;40:12;41:10;
60:12;69:12,12;72:2;
82:24;87:25;94:10,
10;106:7;111:23;
114:3;116:18;
121:18;123:14;
127:9,14;133:14;
139:1;143:11,17;
146:12;151:19;
160:15;162:23;
163:1,4;164:12;
166:11;168:7;
172:12;173:17;
174:18;184:23,24;
198:23;204:7;205:6

**intricacies (1)**
193:20

**intrinsically (1)**
192:9

**introduce (2)**
108:25;135:13

**introducing (1)**

15:25

**invalidate (1)**
71:5

**Invalidating (1)**
72:25

**invest (2)**
168:21;169:2

**invested (5)**
29:21;34:25;58:12;
59:12;79:5

**investing (6)**
20:17;54:11;61:18,
24;62:2;70:11

**investment (52)**
25:21;26:13;27:12;
33:22;34:1,5;35:1,4,
5;36:8;37:10;38:2,3;
44:24;46:11;48:47:5,
12;59:21;60:7;62:12;
64:7,8;70:11,12,12;
72:25;75:7;76:10,12;
77:2;78:20;91:9,12;
92:12;94:20;95:15;
99:14;102:19;
117:13,15;134:24;
137:24;141:12,14,19;
142:3;151:23;158:3,
16;168:18;191:2

**investments (17)**
23:17,22;25:20;
28:18;33:19,20;
36:23;57:8,9;61:25;
62:2;76:11;117:9,11;
169:22;170:3;195:18

**investor (13)**
55:1,3;63:22;
163:21;178:1,17;
191:12,16,17;192:16;
194:9;198:22;199:18

**investors (18)**
38:5;54:13;61:25;
62:13;72:9;137:22;
155:6,11;169:9;
173:12,14;174:6;
178:4,15,21;180:8;
191:13;198:14

**invoked (2)**
17:13;22:6

**invokes (1)**
44:8

**invoking (1)**
19:2

**involve (2)**
112:15;159:18

**involved (31)**
20:21;30:13;59:11;
80:25;81:1;102:13;
107:20;114:16;
127:22;130:4;
131:20,22,23;137:22;
138:9;152:23;
159:12,15,24;165:22;
166:11,16;169:8,15,

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

22,25;173:4;175:12;
186:14,18,20
**involvement (4)**
108:9;131:18;
137:20;188:17
**involves (2)**
60:16;161:9
**involving (5)**
83:11;84:2;88:14;
169:22;187:1
**ironclad (1)**
82:23
**irons (1)**
67:15
**irrelevant (1)**
54:22
**irrespective (1)**
28:10
**isolate (1)**
122:14
**issue (15)**
19:4;31:11,11;
53:8;82:1;106:14,24;
123:18;156:7;163:8;
166:20;177:19,21;
193:12;203:22
**issued (2)**
118:8;121:10
**issuer (1)**
36:9
**issues (26)**
37:3;43:17,18;
69:13;90:24;97:19;
122:5;124:1;125:13;
138:21;161:10;
162:24,24,25;177:23;
178:14,18;179:4,7;
190:1,3,24;196:18;
203:17;204:6,7
**items (2)**
123:24;196:15

## J

**January (3)**
12:6;51:20;130:3
**Jason (9)**
21:20;37:9;60:19,
20,23,23,24;61:5,12
**Jay (1)**
33:7
**JED (1)**
6:9
**Jefferies (14)**
51:9;103:4;131:14,
18,20,22,24;132:5;
133:6;135:3,5;
137:14;158:8,11
**Jefferies' (1)**
132:2
**JEFFREY (1)**
5:17
**Jeffries (3)**

49:18;51:20,23
**job (7)**
27:7;55:24;60:20;
73:4;115:9;161:24;
174:2
**JOHN (1)**
9:12
**join (4)**
46:23;72:4,7;
114:11
**joined (12)**
40:25;72:10,11,11,
13;109:25;111:22,
23;112:6,9;158:8,10
**joining (1)**
72:17
**joins (1)**
40:19
**joint (1)**
40:11
**joke (1)**
184:13
**Joshua (2)**
108:7;203:16
**Journal (5)**
179:20;197:13,17,
18,22
**JP (2)**
201:9,10
**JPM (1)**
201:20
**JPMorgan (1)**
4:21
**JR (1)**
9:8
**judges (1)**
21:10
**judge's (1)**
18:7
**judgment (5)**
79:20,21,22;
107:25,25
**JULIA (1)**
4:15
**July (19)**
41:1;66:21;111:7;
118:11,25;119:1;
142:18;143:1,16;
158:10;174:15,15;
175:9;187:5,13,19,
25;188:18;189:3
**jump (1)**
139:3
**jumping (3)**
15:1,1;138:24
**June (5)**
40:19;71:1;130:4;
132:16;179:21
**junior (1)**
54:19
**justifiable (1)**
62:4
**justification (1)**

75:24
**justify (1)**
63:23

## K

**Kaiser (26)**
21:5,20,24;22:3,9,
15,19;24:17,21;25:2,
5;26:8,21;32:2,4,12,
19;33:7;37:9,18,18,
23,24;38:11,14,18
**KAREL (1)**
8:17
**KARPE (2)**
8:11,17
**KASOWITZ (2)**
6:2;151:11
**keep (17)**
18:13,15,17;59:4;
61:20;96:17;115:3;
146:14,15,19;151:20;
152:7,8;154:1;
169:12;201:22;
203:12
**keeping (3)**
62:9;72:5;204:24
**keeps (1)**
119:4
**kept (1)**
67:11
**Ketchum (14)**
22:19;26:6,6;
37:10;38:1,3,10,12,
14,15,18;49:21,22,23
**Ketchum/Ergen (1)**
39:7
**key (1)**
37:25
**kind (15)**
14:14;77:5;116:23;
131:5;134:12,14;
162:15;191:3,4,5;
192:15;193:1;
194:25;204:23,24
**kinds (4)**
45:4;57:5;106:16;
187:22
**Kirkland (2)**
108:8;203:17
**Kirschner (1)**
45:5
**Kiser (24)**
57:24;58:22,23,24,
24;60:19;70:2;82:9;
90:15;91:1,1;93:15;
94:7;97:4;98:1,14,
22;100:7,13;156:14,
14,16;200:5,20
**Kiser's (1)**
94:21
**knew (15)**
49:11;50:11;53:3;

63:6,6,8;71:21;
77:16;78:6,7;88:4;
96:24;101:18;
182:14;193:18
**Knighthead (1)**
181:19
**knowing (1)**
60:8
**knowledge (4)**
61:23;75:22;121:7;
188:18
**known (18)**
24:6;61:7;81:18;
85:2,3;87:2,3,6,8;
88:3;89:9;117:21;
128:1;132:16,18;
179:25;193:23;198:8
**knows (12)**
39:1;59:16;60:5;
61:1;73:20;76:22;
81:19;82:1;164:12;
180:18,19,25
**KRISTOPHER (1)**
7:7
**KURTZ (5)**
4:17;18:23,24,25,
25
**KYE (1)**
8:2

## L

**L2 (1)**
40:7
**L2's (1)**
40:9
**labels (2)**
74:13;83:4
**lack (5)**
108:9;133:25;
188:23
**laid (1)**
173:21
**land (1)**
59:25
**landscape (1)**
195:14
**Lane (1)**
7:4
**language (21)**
79:17;80:1;81:4,
13,23;82:3;83:10;
84:6,16,24;85:1,21;
86:14,23,25;87:1,17;
89:8;107:7,22;
155:11
**large (6)**
60:7;63:21;71:22;
76:11;131:12;191:15
**largely (2)**
40:15;69:12
**larger (1)**
184:7

**largest (5)**
25:12;29:20;33:25;
34:1,5
**last (28)**
11:8;16:8;41:18;
43:16;44:20,21,22;
48:5,6;49:7;52:4;
57:4;73:22,25;80:14,
22;100:23;104:12;
113:15;148:15;
150:21;152:1;155:4;
174:10;179:16;
185:15,16,19
**late (6)**
72:2;100:3;120:19;
158:1;175:24;197:24
**later (7)**
40:20;121:8;
129:13;168:1;
184:16;192:25;
204:2
**Latham (4)**
83:14,22;86:5,21
**LAURIA (16)**
4:14;11:3;13:11,
16,18,18;14:2,15,20,
23,25;16:22,25;17:2,
6;70:21;187:1,11,12
**Lauria's (1)**
187:17
**LAVAN (2)**
7:2,10
**LAW (24)**
8:11;45:4;55:15;
62:3;69:4;70:18;
74:6;79:14;82:18;
84:2,10;85:7;88:15;
93:9,10,18;94:4;
98:19;99:12;107:9,
10;162:1;163:2;
164:1
**laws (1)**
57:11
**lawsuit (5)**
17:23;20:5;48:15,
25;59:6
**lawsuits (2)**
59:7;107:4
**lawyer (6)**
37:3;47:23;55:22;
56:2;58:24;163:1
**lawyers (14)**
31:24;55:18,24;
61:2,4;80:9;82:22;
83:14,20;84:6;
107:19;151:11,13,14
**lay (3)**
10:21;173:13,16
**layer (2)**
164:16;193:22
**layers (2)**
105:17;135:17
**LBAC (37)**

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

11:3;14:4;15:21;
16:1,16;27:20,23;
40:20,21,22,25;41:4,
10;47:7;66:20;92:16;
104:19;105:2,16,21,
24,25;107:5;135:9;
137:12;173:5,8,19,
25;175:9,16;176:17;
187:14;189:1,4;
192:7;197:24
**LBAC's (5)**
29:15;30:12;59:9;
192:1,3
**L-Band (1)**
6:13
**lead (6)**
11:21,24;12:2;
14:1;22:18;63:20
**leading (2)**
23:22;157:21
**learn (2)**
49:23;129:14
**learned (6)**
11:2;35:16;91:5;
99:13;127:25;129:19
**least (13)**
25:22;33:9;41:7;
71:20;85:6;130:24;
142:15;144:3;162:6;
175:14;178:16,22;
192:15
**leave (4)**
59:24;108:12,15;
205:6
**Leblanc (1)**
34:18
**led (2)**
113:22;156:14
**Lee (1)**
15:12
**Leek (1)**
194:5
**left (6)**
39:2;58:17;112:6;
114:1,5;117:8
**legal (6)**
56:1,12;57:6;
73:20;82:1;129:16
**legitimate (1)**
163:6
**lender (8)**
50:21;71:20;72:8;
88:3,4,10,10;191:12
**Lenders (27)**
4:10;11:10;12:1;
13:19;70:21;88:12;
130:14,15;131:2;
132:8;133:9;150:9;
172:18;173:4,8,15;
186:22;187:20,23;
188:1,3;191:13;
201:11,11,13,14;
202:9

**lenders' (1)**
172:25
**lends (1)**
192:18
**length (1)**
87:15
**LESLIE (1)**
5:25
**Less (4)**
29:9;78:3;84:17;
162:12
**letter (3)**
43:14;93:9;201:8
**letters (1)**
70:23
**level (8)**
33:9,10;46:23;
66:3;114:22;163:13;
164:14;190:17
**levelness (1)**
190:13
**level-playing-field (1)**
163:8
**lever (1)**
46:23
**leveraging (2)**
192:19,20
**levered (1)**
40:12
**Lexington (1)**
4:22
**liable (2)**
93:11;100:16
**license (7)**
115:23;118:12,22;
120:3,15;147:8;
177:22
**licenses (10)**
117:8;118:8,9;
119:23;120:1,6,11,
16,25;178:2
**lie (1)**
51:21
**lien (1)**
181:21
**life (2)**
56:20;60:6
**light (4)**
13:3;16:15;68:25;
87:24
**LightSquared (189)**
17:21;19:18;20:23;
21:19,23;22:14;24:3,
7,12;26:1,2,15;29:4,
8,11,16;30:2;31:1,16,
23;33:25;34:11;38:4,
10,19;39:11,12;40:1,
3,6;45:20;46:19,21;
51:4;52:8,22;53:19;
55:18;56:16,18,20,
23;57:1,3;59:21;
61:19,19,22;62:13,
23;63:6;64:1,4,6;

67:3,15,17;68:7,12,
13;70:3,11,19;71:10;
72:19,20,21;74:11,
17;75:19;77:17;79:6,
25;80:4,8,15,20,24;
82:22;85:18,23;
87:19;88:6;92:3,13;
100:8;101:17,18;
102:23;103:4;
105:12;106:17;
107:2,5,11;109:18,
20,22,25;110:3,20;
111:1,2,6,8,10;114:9,
11;115:14;117:20;
118:6;119:7;120:11,
15,18;125:12,17,21;
126:18;127:16;
130:5,6;131:8,15,15;
132:5;133:7;134:19,
24;135:6,8,21;
137:25;140:5,10,21;
141:12,15;142:7,12,
16;143:1,16;144:13;
145:6,10,17;146:2;
147:23;148:12;
150:9,19;151:16;
152:4;153:14,17,24;
154:7,17;168:18,21;
169:2,6,18;170:21;
176:9;177:1,14,17,
20;178:9;179:19;
180:2;181:22,25;
182:11;186:15;
189:25;190:25;
195:17;196:7,16;
197:3,10;198:15,21;
200:18;201:13,14
**LightSquared's (16)**
20:17;27:3;30:6;
31:4;72:9;73:22;
94:13;117:16;125:8;
128:2;132:19;
144:18,24;147:13,15;
149:10
**likely (4)**
38:6;61:24;164:2;
194:16
**likes (1)**
26:12
**liking (1)**
54:16
**limit (1)**
136:24
**limitation (1)**
154:16
**limitations (2)**
121:15,17
**limited (3)**
105:12;118:19;
134:2
**limits (4)**
41:13,14;94:20,20
**line (4)**

113:13;184:23,25,
25
**lines (2)**
66:10;154:10
**liquidate (1)**
30:22
**liquidated (1)**
36:5
**liquidity (1)**
59:20
**list (14)**
80:24;87:19,20;
126:24;127:1,6,17,
18,20,20;177:12;
186:3;196:15;200:23
**listed (5)**
22:16;86:9,11,18;
126:9
**listen (1)**
36:3
**literally (2)**
11:11;102:5
**litigation (22)**
45:23;48:7,10,24;
49:5;66:18;68:22;
70:19;78:19,24;79:9;
80:4;106:15,16;
151:2,4,5,8,9,12,14;
196:18
**little (5)**
27:13;93:22;
110:17;160:19;
162:13
**live (2)**
158:23;159:2
**lives (1)**
37:5
**LLC (3)**
2:5,21;6:3
**LLP (13)**
4:1,9,20;5:2,11,20;
6:2,12;7:2,10,18;8:2;
9:2
**loads (2)**
66:13,13
**loan (4)**
38:6;39:7;79:16;
99:5
**loan-to-own (10)**
30:24,25;38:2,4,8;
39:6,8,8,22,22
**lock (1)**
205:5
**locked (1)**
46:11
**long (18)**
10:10;18:15;39:14;
46:22;60:2;67:14,21;
74:3;80:22;109:22;
112:17;133:23;
138:1;153:11;
157:11;175:23;
181:21;187:1

**longest (1)**
63:20
**look (24)**
32:25;47:11;72:22;
79:17;83:11;84:10;
94:21;105:5;106:7;
108:13;125:16,25;
126:3;142:22;
145:21;154:25;
155:2;164:1,2;182:1;
185:6,8;186:24;
202:9
**looked (5)**
90:23;92:5;103:11;
141:22;172:17
**looking (15)**
21:19;32:22,24;
33:3;79:6;84:14;
98:20;103:21;
115:16;131:21;
163:21,22;182:25;
196:9;201:23
**looks (5)**
82:10;95:15;
107:18;138:9,10;
182:17
**loosely (1)**
65:9
**Los (3)**
7:13;158:1,2
**lost (1)**
79:4
**lot (29)**
39:16,17;44:2;
46:20,21;55:5;60:5,8,
13,16;61:17;66:23,
23,24;67:23,24;
68:24;70:10,19;
89:11;125:17;
130:21;163:3,3;
165:7;191:8;194:16;
195:13,21
**lots (9)**
55:19;56:25;64:6;
73:2,2;74:9,9;
137:19;202:25
**loud (1)**
72:13
**loudly (1)**
160:19
**low (3)**
148:17;193:6,7
**low-ball (1)**
192:3
**low-cost (9)**
138:5;140:23;
141:4,7,8,11,24;
142:2,6
**lower (3)**
30:19;81:20;
107:23
**lowest (1)**
61:23

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

**low-power (1)**
122:11
**loyalty (2)**
57:13;58:3
**LP (11)**
4:2;11:9;13:19;
23:12,13,23;26:10;
105:12;155:10;
187:13;193:14
**LTE (2)**
113:19,20
**Lucy (2)**
126:6;127:13
**lumps (1)**
54:5
**lunch (4)**
18:11;70:23;72:15;
99:20
**lunchtime (1)**
204:13
**lying (3)**
51:11,18;161:25

# M

**M&A (2)**
159:7;160:11
**mad (1)**
77:3
**Madison (1)**
9:3
**magic (1)**
202:10
**magnitude (1)**
33:20
**MAGNOZZI (1)**
8:2
**Maiden (1)**
7:4
**mails (1)**
184:13
**main (2)**
44:21;181:19
**maintain (3)**
72:10;141:2;
195:20
**maintaining (2)**
151:25;152:3
**maintains (1)**
39:15
**major (2)**
131:7;140:11
**majority (10)**
23:13;31:10;34:13;
85:6;152:14,16,18,
19,20;170:1
**makes (10)**
39:16,17,18;46:15,
16;85:20;89:1;99:22;
125:17;165:3
**making (18)**
33:22;50:2,3;55:8;
92:19;106:10;

118:10;119:2;121:5,
8;129:9;132:3;
134:23;141:12;
164:13;168:24;
169:6;180:18
**man (1)**
52:13
**manage (3)**
38:17,19;79:7
**managed (3)**
25:18;35:25;36:6
**Management (11)**
22:10;25:19;35:17;
45:8;67:8;95:17;
111:17;132:3;135:6;
158:16,17
**management-training (1)**
111:23
**managerial (1)**
157:18
**managers (2)**
61:1,4
**manages (1)**
25:19
**Managing (2)**
157:14,16
**mandatory (1)**
18:9
**manifestation (1)**
93:18
**many (15)**
19:23;51:3;67:10;
128:15;134:16,16;
145:1;158:22;159:1,
11,14;163:22;164:9;
171:1,12
**map (1)**
173:16
**Marc (3)**
110:24;126:20;
129:5
**March (1)**
40:17
**marital (1)**
35:6
**Mark (2)**
129:6;189:2
**marked (1)**
153:5
**Market (11)**
61:23;62:7,21;
63:2;83:24;88:8;
103:7,11;135:20;
193:13,17
**marketing (1)**
158:18
**marketplace (3)**
193:5;197:19;
198:24
**marketplace's (1)**
193:4
**markets (1)**
159:6

**MAST (4)**
11:10;155:8;
202:23;204:3
**master (2)**
55:6;68:16
**masters (1)**
111:17
**match (2)**
67:18,22
**math (5)**
114:2;179:21;
193:17;194:19,20
**Matt (2)**
52:12;200:17
**matter (18)**
33:18;55:16;56:12;
62:6;63:7;65:19;
69:17;78:22;81:23;
82:18;94:4;97:11;
99:12;126:22;
146:13;161:14;
201:6,7
**matters (14)**
17:9;53:2,3;57:5;
60:24;69:12;91:2,21;
159:3,5,6;161:7;
196:1;201:5
**MATTHEW (6)**
6:17;9:7;17:20;
62:24;139:17;182:24
**maximize (1)**
196:9
**maximizing (2)**
13:1;192:18
**may (87)**
14:9,11;19:11;
24:14;25:25;27:4;
35:11,12;38:16;
47:14;49:10,12,14;
50:10,10,12,12,20,
25;51:2,2;52:9,10,23,
24;55:2,2,4,10,14;
66:21;68:11,15,19,
20;69:2;70:17;77:3,
17;87:18,23;91:6;
92:4;96:9,20;106:14;
127:17;128:6;
129:13,14;130:1;
131:11;137:1;
138:20;148:8,20;
151:3;153:1,6,9,10,
13,16;154:6,15;
156:7;160:7;165:13;
166:19;179:21;
180:10;182:1,3,13,
23;184:6;185:3,25;
191:18;194:17,25;
196:16;197:24;
199:14,14;201:7;
202:21
**Maybe (15)**
41:7;72:23;102:19;
106:20;121:1;

140:24;158:25;
163:20;171:6,14;
175:14;182:2,21;
202:2;204:14
**McCloy (2)**
17:12,21
**MCCUTCHEN (1)**
5:11
**MEAGHER (1)**
4:1
**mean (29)**
12:16,17,19;14:9;
34:12;40:15;44:7,17;
48:14,19;52:21;53:2;
83:2,6;86:18;89:16;
97:17;102:14;
151:22;152:5;
158:23;162:10;
172:3;175:22;
179:24;190:22;
194:4,5;199:4
**meaning (6)**
25:4;34:3;84:13;
116:4;138:1;161:16
**means (13)**
36:19;52:1;54:2;
59:24;60:12;85:4;
94:14;162:3,6;163:1;
170:13;171:7;200:6
**meant (3)**
48:19;153:10;
192:25
**measure (2)**
44:12,13
**mediators (1)**
45:6
**meet (2)**
43:15;54:17
**meeting (18)**
18:7;9;126:19;
143:2,8,10,16;
145:17;146:1,2,5,6,8,
10;155:5;175:12;
187:16;203:21
**meetings (10)**
133:22;135:10;
136:8;137:9,14,15,
18;144:2;151:10;
186:21
**megahertz (21)**
115:22;116:1,2,3,3,
6,7;121:25,25;123:2,
3,5,7,7,8,13,19,20,25;
124:14;125:2
**Melody (1)**
5:13
**member (6)**
25:12;29:22;90:22,
23;103:6;150:15
**members (4)**
10:5,7;26:24;
152:14
**memo (2)**

126:19,22
**mental (3)**
135:22,23;160:16
**mentioned (10)**
10:5;25:13;27:18;
59:15;91:19;130:13;
178:16,23;191:1;
196:1
**mere (3)**
27:15;94:7;190:5
**merged (1)**
113:23
**merited (1)**
43:19
**MEROLA (1)**
7:15
**Merrimack (1)**
111:16
**message (2)**
184:21,24
**Messrs (1)**
93:15
**met (14)**
43:21;61:13;132:1;
139:25;140:21;
141:6,23;142:1,7;
145:14;150:6;155:7;
165:19;181:24
**MetroPCS (2)**
67:5;68:3
**Michael (1)**
108:25
**microphone (4)**
110:17;133:14;
154:1;169:14
**middle (2)**
119:12;132:16
**mid-size (1)**
191:14
**midst (1)**
64:10
**might (30)**
42:1;47:21,21;
48:3;49:5,13;52:16;
59:19;65:23;84:14;
102:7;105:18;
125:23;134:23;
144:7;153:21;
169:25;180:12;
183:19,22;189:24;
190:3;191:4,16,17;
195:20;196:18,22;
197:6;199:1
**Milbank (9)**
15:12;17:12,21;
81:1;83:15;86:12;
107:22;108:23;
200:17
**mile (1)**
58:9
**milestone (2)**
11:4;43:22
**milestones (4)**

13-01390-scc Doc 126 Filed 01/10/14 Entered 01/29/14 11:37:05 Main Document

LIGHTSQUARED INC., et al. Pg 226 of 240

Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

43:15,19,20,20
**million (19)**
27:13;29:3,19;
33:23;34:10;35:18;
36:5;42:13;76:13,14;
91:14,16;95:8,19,24;
142:4;149:7;165:5,7
**million-dollar (2)**
95:3;165:8
**millions (1)**
105:7
**mind (16)**
42:5;49:5;94:12,
13,16;97:21;98:6;
135:20,21,23,25;
136:11;141:18;
164:17;192:16;199:3
**mindful (1)**
54:13
**minimis (1)**
166:7
**minimum (1)**
163:2
**minority (4)**
169:22;170:1,3;
195:18
**minute (5)**
18:13;41:13;84:4;
126:14;174:11
**minutes (19)**
18:7;53:21;90:21;
92:4;100:3;143:1,7,9,
16,20,22;144:14,23;
145:2;146:1,8,10;
147:5;156:19
**mirror (1)**
72:23
**missing (2)**
182:15,17
**mission (1)**
30:25
**misspoke (2)**
96:6;153:9
**mobile (1)**
112:2
**mode (1)**
40:12
**modification (1)**
147:9
**modifications (2)**
119:25;120:11
**modified (2)**
118:9;121:6
**Moelis (13)**
129:6;135:6,15;
137:10;155:5;
157:10,11,13,24;
158:10;186:15;
188:15;198:13
**Moelis' (1)**
185:12
**moment (11)**
19:10,11;31:1;

41:21;61:14;69:6;
98:5;99:16;126:3;
139:3;181:14
**Monday (5)**
200:24;201:11,16,
24;202:6
**monetize (1)**
36:20
**money (29)**
25:16;29:3;34:8,8,
11,12,13,14,15;35:8,
18,21;36:15,16;39:2;
46:25;47:1,3;54:21;
58:12;70:10;77:7;
78:13;79:4;94:22;
99:8;107:15;132:2;
163:3
**Montagner (4)**
110:24;126:20;
129:5;146:25
**Montagner's (1)**
126:22;147:11
**month (5)**
43:21,23;73:25;
77:8;198:10
**months (6)**
40:21;66:19;69:3;
113:25;179:17,22
**more (44)**
12:11,19;14:12;
20:11;23:12;27:7,13,
13;35:15;41:18;44:8;
55:5;56:10;61:17;
63:21;68:8;70:22;
76:13;77:8;84:2,16;
91:14;95:8,24;97:23,
24;103:21;105:19;
114:24;117:9;
119:24;134:14;
136:17;140:25;
152:5;158:25;
159:16;160:19;
162:2;165:3;183:8,
12;204:15
**Morgan (2)**
201:9,10
**MORITT (1)**
5:20
**morning (30)**
10:2,3,16,17;13:16,
17;15:3,9;17:10,11,
20;20:2;53:15,16;
59:19;73:8,9;76:2;
79:25;81:18;93:23;
108:11;156:16;
187:13;200:5,6,21,
24;201:16;202:6
**most (23)**
11:8,13;12:18;
34:11,14;36:25;37:4;
38:4;41:16;48:2;
55:11;59:20;62:4;
63:19;64:12;69:18;

125:24;147:6;
161:18;162:5;164:2;
190:7;202:17
**mostly (2)**
125:13;192:15
**motion (1)**
55:14;74:3,4,4;
76:6;90:19;99:8;
192:22;201:8;
204:20,21
**motions (1)**
204:22
**motivated (2)**
24:1;130:17
**motivation (2)**
28:10;63:23
**motivations (3)**
42:25;59:17;72:12
**Motors (1)**
98:20
**move (10)**
12:24;15:8;41:24;
79:22;127:8;143:11;
146:11;189:8;201:9,
11
**moved (3)**
42:8;79:19;80:14
**moves (2)**
64:21;169:14
**moving (3)**
11:15;13:5;201:20
**much (39)**
12:11;16:20;53:5,
5;54:16;63:21;64:11;
67:1,4,11;76:1;93:9;
94:22,23;97:22;
99:24,24;103:23;
106:11;107:21;
108:5;114:25;
116:24;122:17;
128:9;136:17;
151:20,23;152:7,9;
168:7,8;170:11;
191:7,20,24;192:11;
196:8;200:2
**multi-billion (1)**
41:10
**multiple (1)**
57:6
**multitude (1)**
11:12
**MUNDIYA (49)**
6:19;19:7,8;
155:21,24;156:5,7,9,
12,18,21;165:12,13,
16;166:25;167:3,5,7,
9,13,16,20,22,24;
168:1,11,13;171:3,6,
4,9;180:20;181:1,2,
4,9;184:4,15;185:2;
188:8,14,15,22;
189:8,11,23;200:4,5;
204:14

**Murgio (1)**
56:25
**must (4)**
81:10;82:3;102:14;
191:3
**myriad (1)**
67:3
**myself (1)**
14:16

# N

**NA (2)**
4:21;5:3
**nada (1)**
87:9
**NAGY (2)**
9:2,8
**name (3)**
22:12;35:19;45:17
**narrow (1)**
84:2
**narrower (2)**
83:23;86:22
**national (4)**
113:4,6,6,13
**natural (7)**
70:5,7;86:8;
125:11;152:8;195:5,
17
**nature (6)**
17:8;18:3;26:21;
141:18;147:6;160:17
**neat (1)**
28:21
**necessarily (3)**
57:3;174:9;199:6
**necessary (1)**
21:1
**need (28)**
14:18;16:7;17:3;
18:6,6;28:22;42:24;
50:19;59:23;61:17;
70:20;78:6;105:5;
108:7;118:16;120:3;
121:12;122:8;123:9;
124:17;125:7;134:6;
139:12;147:7;163:1,
2;169:11;187:15
**needed (5)**
29:12;46:23;80:17;
120:17;186:20
**needs (4)**
10:14;63:22;
108:20;125:5
**negative (3)**
177:6,9,13
**neglected (1)**
15:6
**negotiate (5)**
30:6;86:2;106:18;
152:10;194:17
**negotiated (2)**

37:19;80:9
**negotiating (4)**
55:4;80:25;102:24;
130:23
**negotiation (6)**
80:21;84:1;106:20,
23;131:6;150:8
**negotiations (5)**
87:16;103:17;
140:5;148:11;187:14
**neighboring (3)**
121:19;122:7,24
**neither (2)**
32:13;168:10
**net (1)**
112:2
**network (34)**
24:1;29:13;110:1,
3,4,6,6,8,9,10,10,13,
13,14,19;112:7,8,12,
15;113:6,11,18,18,
20;116:5,9;117:19;
118:16,17,21;119:22;
122:19;125:4;185:25
**networks (8)**
113:1,2,10,14,17;
114:20,23;115:5
**Nevada (10)**
66:12;68:23;69:12,
18;93:4;97:15,16,20;
106:14,22
**New (22)**
2:23;4:4,12,23;5:5,
15;6:5,15;7:5,21;
8:15;9:4;22:22;54:3;
62:3;64:19;83:11;
84:9;88:15;93:18;
121:4,5
**newest (1)**
70:5
**NEWMAN (1)**
5:8
**newspaper (1)**
41:17
**next (15)**
28:19;35:3;37:13;
41:3;53:14;60:4;
86:21;89:13;99:17;
117:5;122:11;156:9,
13;200:20,23
**Nextel (5)**
112:6,7,9,10,14,17,
18,18,21,21;113:6,
10,12,15
**nexus (2)**
97:21,22
**nice (2)**
28:20;139:23
**night (3)**
13:24;73:22;80:23
**nine (3)**
40:14,20;56:12;
80:22;81:8,11;84:24;

13-01390-scc   Doc 126   Filed 01/10/14   Entered 01/29/14 11:37:05   Main Document
Pg 227 of 240

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

87:11,14;97:22;
107:8,17,22
**nobody (3)**
46:1,3;56:4
**nobody'll (1)**
80:3
**nod (1)**
27:8
**NOL (1)**
53:25
**nonbankruptcy (1)**
190:11
**non-constituents (2)**
12:12,17
**non-DISH (1)**
34:8
**None (2)**
56:6;104:5
**nonetheless (1)**
83:5
**non-public (1)**
55:1
**non-SPSO (1)**
12:1
**nor (5)**
32:13;44:21;
166:13;168:10;179:1
**norm (2)**
63:21,22
**normal (1)**
65:22
**normally (2)**
106:16;122:13
**notable (1)**
64:12
**notch (1)**
65:21
**note (4)**
12:15,21;62:14;
64:2
**noted (5)**
16:8;67:9;143:25;
144:6;155:7
**nother (1)**
164:16
**notice (6)**
11:3;13:23;54:10;
118:10;119:1,2
**noticed (1)**
201:5
**notion (6)**
31:20,21;41:12,19;
48:7;102:9
**notwithstanding (1)**
91:12;92:23
**November (1)**
175:20
**number (19)**
32:14;42:24;45:24;
47:15;54:25;96:7,9;
112:22;113:3;
123:24;126:7;
128:11;129:10;

143:20;145:10;
147:1;150:18;
158:15;181:24
**numeric (1)**
115:24
**numerosity (1)**
54:24
**NY (14)**
2:23;4:4,12,23;5:5,
15,23;6:5,15;7:5,21;
8:6,15;9:4

## O

**oath (1)**
186:6
**object (1)**
180:14
**objection (13)**
19:3,5,8;127:11;
132:10,24;135:12;
136:15;143:13,14;
160:13,17,24
**objections (5)**
127:10;146:16;
201:23;202:5,15
**objective (1)**
152:1
**obligated (2)**
20:2;98:5
**obligation (2)**
41:11;54:8
**observation (5)**
42:10;65:11;66:7;
94:3;192:12
**obtain (11)**
103:4;118:16;
131:14;171:6,8,8,9,
10,12,25;172:7
**obtained (2)**
66:19
**obtaining (3)**
64:10;65:14;145:7
**obtains (1)**
88:11
**obvious (4)**
16:14;20:22;33:15;
125:20
**obviously (7)**
48:19;83:1;93:7;
106:22;138:4;
151:22;203:4
**occurred (3)**
47:13;96:8;136:9
**occurring (2)**
136:6;151:2
**Ocean (3)**
166:1,3,4
**o'clock (2)**
202:3,5
**October (8)**
32:18;33:6;51:8;
76:7;81:20;92:9;

150:9;174:20
**odds (1)**
31:14
**off (4)**
32:23;54:16;
113:22;181:22
**offer (8)**
55:9,10;93:2,3;
135:9;138:12;
146:18;193:7
**offered (4)**
59:8;133:24;
134:11;146:15
**offering (8)**
80:20;133:1,2,4,
10;137:23;193:3;
199:17
**office (6)**
37:6,7;60:13,14,
22;201:19
**officer (16)**
97:5,6,8;109:21;
110:1,3,4,19,22,23;
111:1,3,5;113:16;
126:20;129:6
**offices (3)**
23:2;37:16;56:19
**official (1)**
60:16
**often (3)**
63:21;161:18;
172:3
**old (1)**
54:3
**once (13)**
18:17;24:19;25:23;
29:3,21;93:1;95:23;
99:13;129:25;
134:14;138:3,7;
141:15
**One (110)**
5:4;12:1;13:2;
15:7;18:23;19:10;
27:13;30:16;31:19,
22;32:9;33:16;34:2;
38:1;39:21;40:23;
41:1,23;42:1,24;44:1,
21;46:7;48:5,6;49:7;
54:5;55:1;57:16;
58:16;59:12;60:25;
61:15;64:1;65:4,5,
21;67:6;70:13,14;
71:20;74:14;76:2,19,
22;77:21;79:24;85:8;
90:7;93:18;95:2;
97:25;98:11;100:1,
21,24;103:9;108:10;
112:1;114:8,18;
115:11;122:21;
123:11;124:11,23;
133:18;134:8;
136:13,17;137:19;
139:2;141:10;

154:22;156:10;
157:18;162:24;
164:1;166:1,6,19;
170:23,24;172:16;
175:16,17,18;177:25;
178:16,16,22;181:19;
184:20;188:25,25;
190:12,25;191:3,7,
18;192:12;194:22;
195:24;196:1;
197:15;198:17;
199:11;200:12;
203:16;204:20
**ones (3)**
72:10;128:16;
191:14
**one-third (2)**
162:6,9
**one-thirds (1)**
172:4
**one-week (1)**
183:3
**ongoing (1)**
203:21
**onion (1)**
105:17
**only (49)**
16:5;17:13;19:10;
30:16;32:8,9,10,15,
17;33:13;36:13,14,
15;37:24;39:22;40:5;
45:15,16;49:4;58:21;
61:13;62:3;67:9;
68:2,4,5;69:24;
74:14;88:17,19;
89:15;92:2;93:12;
94:19;108:24;
118:19;123:19;
131:10,12;135:16;
142:7,13;144:8;
153:22;163:5;
165:22;193:14;
194:22;203:3
**onto (2)**
126:8;187:8
**open (9)**
14:21;64:21,24;
65:6,7,11;142:9,10;
196:10
**opening (10)**
10:19,24;17:14;
19:18,20;69:8;80:12;
90:9;99:18;124:5
**openings (2)**
17:16;79:25
**openly (1)**
71:7
**operate (1)**
125:4
**operating (5)**
110:6,22,23;111:1;
118:15
**operation (1)**

102:12
**operations (5)**
112:8,11;113:6,16;
114:20
**operations@escribersnet (1)**
2:25
**operator (1)**
117:17
**operators (2)**
137:16;144:6
**opinion (8)**
74:3;92:15;158:17;
161:15,21;195:16;
198:20;199:17
**opinions (5)**
66:18;69:5;161:13;
188:24;189:5
**opportunities (1)**
59:14
**opportunity (11)**
58:2,11;59:5,9,11;
66:20;69:2;92:8,17;
163:7;170:20
**opposed (6)**
65:7;77:19;94:16;
135:14;136:18;
198:24
**opposite (2)**
45:10;88:6
**option (14)**
54:21;138:2,5;
140:23;141:4,7,8,11,
20,24,25;142:2,6;
170:21
**optionality (1)**
103:22
**options (1)**
13:21
**Oracle (1)**
8:3
**orbit (1)**
110:12
**order (12)**
55:14;63:24;
118:16;120:3;
122:22;124:5;125:4;
163:19;172:7;
174:17,24;175:6
**orders (2)**
25:5;53:25
**Ordinarily (1)**
18:8
**original (2)**
38:13;77:20
**originated (1)**
184:11
**others (14)**
12:20;20:25;21:5;
30:13;63:18,20;
67:18;132:5;137:10;
153:21;154:10;
180:11;186:14;187:2
**Otherwise (5)**

LIGHTSQUARED INC., et al.                                                                January 9, 2014
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

84:12;95:16;160:9;
161:19;191:14
**ours (1)**
103:6
**ourselves (1)**
200:25
**out (107)**
14:8,13;17:2;23:2,
11;24:1,17;29:12;
30:23;31:17;35:5;
37:19;40:15;44:11;
47:17;49:15;50:19;
51:3;52:11,17,23,24;
53:2;56:3,21;57:19;
58:9,16,17;60:20;
61:2,10;62:16,17;
63:4,11;64:21,24,24;
65:6,7,10;67:6;
68:17;70:12,21;
72:13;73:16;76:22;
77:1,2,11;78:18;79:4,
7;83:2,16;85:13,17;
86:25;92:2,14;99:17;
102:18;103:15;
105:22;110:5;
112:12;113:17,20;
118:17;119:16,19,19;
122:16;128:24;
129:2;140:11;
145:10;146:10;
163:23;167:1,17,18,
20;173:14,16,21;
175:2;184:7;191:20,
24;192:11;193:10,14,
19;195:17;196:15;
197:13;198:5,13,23;
201:18;202:11,15;
204:18,23
**outbidded (1)**
65:17
**outcome (7)**
12:7,7;20:10;
27:15;66:2;162:16;
164:10
**outcomes (2)**
66:7;194:25
**out-of-court (1)**
159:14
**outreach (1)**
169:8
**outside (8)**
21:25;34:14;45:16;
60:22;163:25;165:4,
8,10
**over (22)**
13:11;18:20;37:19,
20;40:18;43:16,21,
23;47:18;57:4;60:3;
68:17;81:6,8;99:1,2;
105:15;132:1;
136:22;151:18;
188:8;189:23
**overall (6)**

12:2;13:1;103:11,
25;111:4;178:23
**overflow (2)**
10:3,6
**overlap (1)**
31:18
**overriding (1)**
151:25
**oversight (1)**
158:15
**overwhelmingly (2)**
31:14,21
**owe (1)**
57:12
**own (25)**
24:2;29:3,13;
32:14;38:22,24;
39:17,18;47:23;48:2;
58:12;62:13,18;
67:25;70:10;76:17;
80:6;85:8;91:3,23;
99:2;163:19,24,24;
193:10
**owned (7)**
38:23;39:4;40:23;
70:4;71:7;105:25;
166:7
**owner (2)**
30:7;198:14
**owners (2)**
155:6;197:14
**ownership (9)**
33:9;85:5;91:13;
132:9,14;135:8;
137:11;198:7,8
**owning (3)**
162:6;163:11,14
**owns (4)**
85:14;151:15;
164:25;165:5

**P**

**package (2)**
26:12;28:21
**Page (20)**
2:20;40:5;48:5;
94:13;126:8,8;
143:19,23;146:25;
155:2,4;167:4;183:1;
185:15,16,19,20;
187:4,7,8
**pages (2)**
32:22;73:23
**paid (8)**
62:7;66:16;76:23;
83:20;165:1,6;
194:22;195:20
**paint (1)**
174:3
**pair (2)**
68:1;125:5
**paired (2)**

24:7;125:24
**pairing (3)**
29:10;125:12,18
**papers (3)**
85:5;88:14;94:12
**par (1)**
64:17
**paragraph (5)**
143:22;146:24;
148:16;155:3,4
**parameters (1)**
139:5
**parent (2)**
100:16;105:21
**parent's (1)**
100:18
**Park (3)**
5:4,14;7:12
**parking (2)**
46:20,21
**part (21)**
12:10;13:6;30:20;
48:11;59:13;62:20;
66:12;103:9;111:25;
115:8;127:2;135:5;
148:25;149:2,3,6,9,
11;175:5;178:12;
184:9
**participant (1)**
135:22
**participants (2)**
135:20;168:10
**participate (7)**
161:20;190:4,6,10;
191:13,14,15
**participated (1)**
135:2
**participating (3)**
135:4;189:24;
190:15
**participation (1)**
116:20
**particular (5)**
20:8;24:4;44:23;
177:14;192:17
**particularly (4)**
83:11;125:9;
163:17;196:3
**parties (19)**
21:11;30:9;54:3,3;
59:16;71:19;72:12;
73:15;75:9,12;83:12,
13,17;84:11;87:24;
105:13;106:16;
160:3;184:1
**parties' (1)**
160:16
**Parties-in-Interest (5)**
185:17,20,24,24;
186:10
**partner (2)**
23:24;24:5;29:12;
108:25

**PARTNERS (5)**
2:4;6:3;31:9;
73:12;195:13
**partnership (4)**
116:23,25;140:22;
144:8
**party (9)**
15:21;16:1;26:7;
56:9;75:21;101:13;
102:6;164:3;166:24
**party-in-interest (2)**
55:14;164:5
**party's (1)**
75:24
**pass-through (1)**
83:3
**past (5)**
24:14;25:22;91:19;
94:19;151:18
**path (4)**
118:6;173:16;
174:3,6
**paths (1)**
173:21
**pattern (2)**
17:24;20:6
**Paul (1)**
194:5
**pause (4)**
96:17;99:16;139:6;
189:10
**pausing (1)**
99:16
**pay (9)**
37:22,22;54:18;
62:6;66:3;106:11;
164:23;193:11;199:7
**payments (1)**
103:10
**peculiarities (1)**
121:15
**peeled (1)**
105:17
**penalty (1)**
185:12
**pendency (1)**
196:17
**pending (2)**
30:10;147:13
**Pennsylvania (1)**
111:18
**penny (1)**
70:14
**people (37)**
22:18;36:22,25;
37:2,4;48:23;49:14;
50:2,24;56:25;57:6;
61:9,14;62:1,1,16;
67:9;84:14;86:10;
87:5;102:14;139:2;
162:1;164:12;172:9;
190:22;192:6,23;
194:2,7,7,21;195:25;

197:17;199:5,7,16
**per (1)**
193:9
**perceived (2)**
103:24;164:10
**percent (6)**
33:9;76:19;108:10;
124:23;162:14;
163:20
**percentage (1)**
151:16
**perception (4)**
62:21;63:2;67:25;
194:10
**perceptions (1)**
160:21
**Perella (1)**
92:15
**performed (1)**
94:7
**perhaps (4)**
51:4;123:5;190:2;
204:15
**period (18)**
67:14,21;102:25;
130:3,5,10,10,11,20;
131:5,7,15;134:22;
140:4,9;174:22;
175:1;203:4
**perjury (1)**
185:12
**permission (2)**
118:15,18
**permitted (4)**
22:1;55:10;65:9;
95:16
**person (27)**
13:3;27:1;45:15;
55:11;62:23;70:5,7,
7;81:17;86:8,8,18,19;
88:11;93:18;102:19;
126:9;129:9,23;
137:14,15;160:23;
164:24,25;175:8,12;
198:3
**personal (51)**
23:17,21;26:5,12;
28:18;31:24,24;
32:16;33:17,19,20,
22;34:1,1,5,12,16;
35:4,5;36:8,22,24;
37:3,3,3,7,18,21;
38:25;46:10,25;47:1,
9,12;56:20;57:5,8;
58:12;60:7,14,17,24;
75:7;85:14;88:16;
90:25;91:2;94:9;
97:2;98:4,19
**personality (1)**
102:20
**personally (15)**
22:4;29:21;31:16,
21;34:19,25;35:13;

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

39:3,9,19;43:17;
46:17;76:16;96:23;
169:15
**personnel (2)**
132:4;133:6
**persons (2)**
128:25;153:8
**perspective (8)**
115:15;118:5;
133:9;162:22;
165:10;193:4;
197:13;202:10
**persuade (1)**
73:25
**pertinent (1)**
115:14
**ph (2)**
52:12;194:5
**Phil (5)**
49:14;51:9;148:8;
150:15;204:3
**PHILIP (2)**
5:7;49:9
**phone (4)**
15:7,9;56:19;116:5
**phones (3)**
23:3;25:13;37:16
**phrased (1)**
137:5
**phraseology (1)**
171:4
**phrases (1)**
192:5
**picked (2)**
84:7;86:19
**piece (2)**
122:2,2
**piercing (1)**
56:14
**pin (1)**
54:4
**pitch (1)**
138:5
**place (5)**
72:5;103:9;116:21;
188:9;194:4
**placed (3)**
22:9;25:21;46:21
**places (1)**
41:14
**plain (6)**
46:20;80:1;84:24;
85:1,21;107:7
**plaintiff (2)**
17:22;75:21
**plaintiffs (8)**
19:18;61:16;68:9,
24;93:4;97:24;109:5;
157:1
**plaintiff's (11)**
62:20;74:8;79:22;
107:24;126:5;127:9,
14;142:22;143:17;

145:23;155:2
**plan (50)**
11:4;12:4,11,12,
13;13:4,8,22,24;28:1;
41:4,6,9,9,15;54:17;
64:15,16;68:17;
79:22;101:3,5;
102:22,24;107:6;
130:6;131:16;
137:25;146:20;
155:8;164:4;172:5,6,
10,12,15,22,24,25;
173:2,4,8,11,15,15;
174:14;178:12;
202:23;203:18;
204:11
**planner (1)**
37:4
**planning (4)**
72:18;112:8,25;
113:8
**plans (3)**
55:4,6;112:12
**play (1)**
193:25
**played (2)**
40:15;67:6
**player (1)**
162:18
**playing (4)**
163:13;164:14;
190:13,18
**Plaza (1)**
5:22
**pleadings (2)**
53:20;55:7
**Please (19)**
10:2;71:17;91:11;
108:19;109:9,11;
111:12,20;136:24;
139:8,12;156:5,24;
157:4,6;181:6,8,10,
12
**pleased (1)**
124:2
**pled (3)**
16:2;74:7;108:1
**plot (1)**
66:14
**plotted (1)**
68:17
**plus (1)**
103:14
**pm (8)**
108:17,17;156:22,
22;187:5;202:10,11;
205:10
**podium (1)**
13:10
**point (95)**
13:21;15:1,11;
20:3;22:10;25:22;
26:7;30:16;31:17,22;

32:7,14;33:11,14,21;
34:7;35:3,15;36:22;
37:13,13,25;38:20,
20;39:25;40:14,20,
22;41:18;42:2,2,7;
44:21;46:7;47:15;
48:5,6;49:8;51:6;
52:14,15;53:1,7,8;
58:5;65:8;68:5;72:8;
76:19;78:4;81:20;
89:3,12;93:20;
101:21,22;105:24;
106:1;113:9;118:12;
121:8;127:8;128:1,2,
7,20,21,22,25;129:1,
9,11,12,14,20,23;
130:25;131:1,9,10,
12;139:12;153:2,4,
22;155:5,10;172:16;
182:14;183:11;
197:19;199:11,15;
201:21;203:16
**pointed (4)**
78:18;92:2;101:23;
146:10
**pointing (1)**
97:23
**points (9)**
15:19;28:24;31:19,
19;42:1;63:24;
100:23;141:1;199:10
**Point's (1)**
132:17
**pole (2)**
21:1;65:16
**policies (3)**
76:11;91:9,17
**policy (5)**
76:12;91:12;95:8,
15,17
**polished (1)**
28:20
**pool (1)**
191:18
**poor (1)**
30:21
**pops (1)**
184:22
**portfolio (1)**
47:5
**posed (1)**
55:24
**position (48)**
14:22;21:1;23:11;
25:3;26:10;30:12,22;
33:8;36:12;39:24;
46:15;65:14,16;90:3;
91:12;93:7;110:20;
128:12;134:11;
138:12;157:13;
161:11,16,17;162:4,
5,11,12,20,20;
163:11,16,16;164:20,

20;165:1,1;170:8,9,
19;171:2,5,13,19,21,
25;174:5;194:14
**positions (12)**
20:9;26:21;57:1;
69:23,24;90:16;
93:21;111:9;130:25;
170:5;172:7;183:4
**positive (7)**
175:13;180:5,7,12;
182:3,11;197:2
**possibilities (2)**
11:12;12:22
**possibility (4)**
24:11;68:8;147:14;
180:9
**possible (5)**
48:12;61:23;147:9;
180:6;198:7
**possibly (3)**
32:15;151:21;
152:7
**post (1)**
13:5
**poster (1)**
105:9
**post-merger (1)**
113:9
**post-petition (1)**
66:4
**potential (32)**
24:10;48:10;54:15;
88:17;92:3;105:20;
132:8,8;137:21;
138:20;161:19;
162:17;163:5,12,25;
164:17;169:18,21;
170:23;174:6;
175:15;177:17;
178:9,11;185:16,24;
190:14;191:12;
195:11;196:15,18;
198:14
**potentially (4)**
12:25;39:13;164:4;
198:22
**power (3)**
36:18;47:7;85:11
**PowerPoint (2)**
40:3,4
**PR (1)**
162:24
**practitioners (1)**
162:6
**prearranged (1)**
92:11
**precedent (1)**
64:19
**predecessor (3)**
114:9;117:20,22
**predicates (1)**
10:22
**predictions (1)**

20:165:1,1;170:8,9,
52:16
**prefer (1)**
32:25
**preference (1)**
141:15
**Preferred (4)**
4:2;23:14;40:7;
155:10
**preferreds (1)**
193:16
**preliminary (2)**
18:3;147:6
**premise (2)**
45:8,8
**premised (1)**
100:6
**preparation (1)**
195:12
**prepare (2)**
202:14;203:8
**prepared (3)**
24:2;29:13;201:20
**preponderance (2)**
75:19;90:9
**presence (13)**
101:16;102:10,17;
173:13;177:2,10;
178:3,5;190:5;
196:22;197:2,6;
199:2
**PRESENT (5)**
9:11;109:3;137:14;
146:5,6
**presentation (3)**
25:24;132:3;
141:10
**presentations (1)**
76:1
**presented (3)**
31:3;69:1;92:18
**presently (1)**
125:22
**president (4)**
25:10;113:4,7,11
**press (14)**
10:6;38:16;47:25;
62:14,18;63:5;102:7,
13;128:13,15,17;
129:25;198:18,20
**presumably (4)**
89:21;186:4,13;
195:19
**presumption (1)**
163:18
**pretty (3)**
84:5;88:21;135:13
**prevail (1)**
100:8
**prevent (2)**
20:21;172:1
**prevented (1)**
21:15
**preventing (1)**

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
LIGHTSQUARED INC., et al.                                    Pg 230 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                    January 9, 2014

24:16
**preverbal (1)**
  27:7
**preview (1)**
  28:24
**previewed (2)**
  11:2;82:6
**previously (1)**
  68:14;91:1
**price (11)**
  30:19;55:9;61:23,
  24;62:7;92:24;
  105:18,22;164:23;
  193:2;195:20
**prices (1)**
  66:16
**primarily (2)**
  45:5;114:16
**primary (1)**
  119:5
**primed (1)**
  71:23
**principal (7)**
  49:9;93:11,23;
  99:11;100:13;
  161:24;186:19
**principally (1)**
  157:18
**principals (1)**
  181:19
**principle (1)**
  84:9
**principles (1)**
  107:9
**Prior (5)**
  29:8;37:11;96:9;
  128:23;129:22
**priority (1)**
  122:19
**private (3)**
  62:2;158:6;192:17
**privilege (3)**
  22:6;73:11;184:9
**privileged (1)**
  145:4
**privy (1)**
  72:10
**probability (3)**
  148:17,23,24
**Probably (16)**
  159:16,19;163:1,2;
  171:14,16;177:12;
  179:2,17,22;186:13;
  191:4;193:18;
  199:15,15;204:5
**problem (4)**
  15:25;45:13;
  123:18;136:21
**problems (3)**
  59:21;146:22;
  178:15
**procedural (1)**
  10:22

**procedures (3)**
  174:17,23;175:6
**Proceeding (12)**
  2:4;11:15,17;12:8,
  10,25;15:22;16:1;
  81:17;104:8;119:6;
  121:4
**proceedings (6)**
  31:4;115:17;
  158:20;159:1;168:6;
  205:10
**proceeds (1)**
  122:17
**process (42)**
  15:25;53:20;54:23;
  56:1;121:8,18;
  131:20,21,22,23,25;
  144:9,18;159:9;
  160:22;161:19;
  162:19,23,23;163:7;
  164:4,14,15;166:17;
  170:12,17;171:20;
  173:17;176:14;
  178:13;188:17;
  189:25;190:6;
  194:15,16;196:21;
  197:6,21;199:1,3,6;
  202:18
**processes (11)**
  159:7,11,14,18,23;
  160:6,7,7;161:22;
  164:6;190:7
**procurement (1)**
  75:23
**produce (1)**
  184:8
**produced (3)**
  23:5;90:20;176:5
**professionals (1)**
  62:13
**proffer (1)**
  160:11
**profits (2)**
  11:22,22
**program (2)**
  111:23;113:21
**prohibited (1)**
  20:16
**prohibition (1)**
  55:8
**promise (2)**
  88:16;91:10
**promoted (1)**
  113:5
**prompt (3)**
  102:8;183:8,12
**prompted (1)**
  102:8
**promptly (1)**
  187:14
**proof (3)**
  31:4;74:12,15
**proper (1)**

59:10
**properly (1)**
  16:8
**proponent (1)**
  54:17
**proposal (22)**
  86:12;107:22;
  123:17;141:6;142:7,
  9,13,13;168:17,21,
  24;169:2,6;175:25;
  176:4,6,7,13,15,16,
  20,22
**proposals (4)**
  142:12;175:11,15;
  176:11
**propose (2)**
  64:15;86:17
**proposed (4)**
  54:15;140:21;
  141:23,25
**proposing (1)**
  137:24
**propositions (1)**
  84:19
**protect (3)**
  22:17;54:14;
  122:22
**protected (1)**
  122:22
**protecting (1)**
  107:3
**protection (5)**
  77:4,5,6;78:19;
  122:8
**protections (5)**
  54:14;71:20;72:5,
  8;172:1
**protocols (1)**
  45:1
**prove (3)**
  66:11;73:2;90:9
**provide (5)**
  26:23;103:13;
  122:12;124:4;193:15
**provided (2)**
  11:3;186:3
**Providence (1)**
  155:7
**provides (2)**
  86:6;110:10
**providing (1)**
  128:21
**proving (4)**
  56:15;74:17;75:19;
  93:14
**provision (11)**
  71:21;80:2,22;
  86:6,11;88:12;89:14;
  104:18;106:18;
  107:20,21
**provisions (11)**
  20:13;71:6,24;
  171:23;172:2,3,8;

175:2,4,5,5
**proximate (1)**
  90:11
**proxy (1)**
  27:25
**PSA (2)**
  30:15;174:23
**pseudo-factual (1)**
  160:15
**public (20)**
  44:23;54:8;57:9,
  11;60:11;61:8;64:21;
  67:7;69:17,17,18;
  71:21;76:8;78:17,23;
  122:18;140:25;
  174:23;179:18,24
**publicize (1)**
  61:25
**publicly (3)**
  67:6;174:15;
  179:25
**pull (1)**
  110:16
**pulled (1)**
  23:6
**punish (1)**
  59:23
**purchase (22)**
  23:11,13;24:24;
  25:3,3;26:10,19,22;
  27:13;30:18;38:9;
  40:11;41:5;51:6;
  77:9;83:6;91:3;
  106:19;128:10,14;
  135:9;155:10
**purchased (8)**
  23:12;24:13;34:4;
  35:13;90:25;92:24;
  128:7;164:21
**purchaser (5)**
  22:18;81:5;85:23;
  86:1;106:5
**purchases (26)**
  11:23;21:4;23:16,
  18;26:1,3,15,17;
  27:18,19;29:15;30:4;
  34:9;65:9;77:16;
  78:2,11;81:14,15;
  91:5;92:20;93:6;
  129:1,9,24;132:17
**purchasing (5)**
  20:13;26:9,18;
  128:2,21
**pure (2)**
  75:3;104:9
**purely (1)**
  104:7
**purported (1)**
  98:21
**purportedly (1)**
  37:21
**purpose (7)**
  22:12,20;72:5;

119:2,6;134:2;
  179:13
**purposes (5)**
  14:19;20:10;28:7;
  97:10,11
**pursuant (2)**
  13:22;172:22
**pursue (4)**
  92:13,16,22;
  134:13
**pursued (2)**
  170:21,24
**pursuing (2)**
  23:23;29:8
**push (1)**
  204:23
**put (35)**
  21:1;28:8;30:22;
  33:24;43:11;46:5;
  47:4,5;74:22;77:13,
  19;82:16;83:4,7;
  86:1,3,13;89:14;
  91:11;93:10;100:5;
  102:3,18;103:8;
  104:10,25;107:15;
  110:14;122:16;
  125:18;163:3;
  184:22,24;188:10;
  202:9
**putative (2)**
  105:21;160:22
**puts (1)**
  98:4
**putting (4)**
  39:14;74:3;99:2;
  122:13

---

## Q

**qualification (1)**
  159:9
**qualified (2)**
  34:3;159:3
**qualify (1)**
  161:2
**quantify (1)**
  101:10
**questioner (1)**
  179:6
**quickly (3)**
  15:19;22:19;63:21
**quite (6)**
  16:16;33:23;37:17;
  79:21;89:2;130:22
**quote (1)**
  32:19
**quoting (2)**
  47:20;48:10
**QUSBA (1)**
  4:25

---

## R

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 231 of 240
LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                                                              January 9, 2014

**RACHEL (3)**
6:18;9:6;53:17
**radio (1)**
112:24
**radio-type (1)**
112:11
**raided (1)**
47:2
**raise (5)**
109:8;131:24;
132:2;157:4;193:11
**raised (2)**
97:20;178:4
**raising (1)**
177:23
**ramped (1)**
66:19
**ran (2)**
131:23;194:5
**ranch (1)**
61:1
**rather (2)**
47:1;123:20
**rational (1)**
70:8
**rationale (1)**
62:4
**Re (4)**
98:20;183:3;
184:24,25
**reach (6)**
52:22;130:5,11,16;
141:19;161:13
**reached (6)**
72:8;103:19;104:8;
140:11;145:10;
187:12
**react (1)**
183:19
**read (13)**
19:25;41:16;51:14;
67:12;81:17;82:25;
134:6;182:12,23;
185:8;197:15,16;
201:24
**reading (1)**
70:8
**reads (4)**
143:25;144:5;
146:25;155:4
**Ready (1)**
109:12
**real (6)**
17:4;60:20,25;
142:7;159:20;163:13
**reality (1)**
55:7
**realized (3)**
11:23;22:15;
103:20
**really (46)**
10:11;18:15;23:7;
33:16;38:20,21;

42:24;44:6,21;45:15;
47:3;50:22;60:1,12;
62:16,17;63:9;69:13,
15;75:4;76:3,18;
85:17;94:4;106:9;
117:19;119:3;
121:18;123:2,4,15;
125:17,24;134:13;
137:23;138:8;
159:19;163:21;
183:6;188:10;
191:20;192:15;
193:9,21;195:14;
204:4
**realm (2)**
85:14;89:15
**reason (15)**
32:15;36:13,14,15;
40:2;44:14,15;48:20;
65:5,19;68:9;103:4;
171:17,19;184:11
**reasonable (1)**
74:7
**reasonably (1)**
156:13
**reasons (11)**
20:22;28:9;40:6;
45:24;64:6;65:13;
171:1,12,14,17;
189:23
**rebut (1)**
31:21
**recall (29)**
117:11;119:12,25;
120:5;128:4,9,13;
130:4,9;132:21;
135:3;140:8;145:16,
21;147:25;159:8;
165:25;166:13,14;
170:1;173:1,1;
183:14,17,20;199:13,
14;201:7;202:21
**recalled (1)**
33:22
**recapitalization (2)**
157:14,17
**recapture (1)**
124:16
**receive (3)**
70:16;103:10;
176:12
**received (10)**
13:24;93:5;111:16,
18;119:20;120:12;
123:6;127:14;
143:17;176:13
**recent (2)**
13:7;64:10
**recently (1)**
149:16
**receptive (1)**
103:8
**Recess (2)**

108:17;156:22
**recipient (2)**
17:15;98:3
**recitation (1)**
106:4
**recognize (3)**
126:12,15;127:2
**recognized (2)**
24:10;49:5
**recollection (3)**
176:19;179:3;
198:3
**record (10)**
25:24;53:17;69:17;
79:20;104:25;
108:23;109:16;
133:15;189:17;
200:17
**recorded (3)**
143:7,9;146:8
**records (1)**
144:14
**recover (2)**
42:14;151:22
**recovery (2)**
70:17;193:15
**recycle (2)**
36:20;47:7
**red (1)**
106:25
**redacted (3)**
71:25;145:1,3
**redirect (3)**
154:21,23;199:25
**reduce (1)**
149:3
**refer (5)**
31:11;47:12;141:8;
166:24;187:4
**referenced (3)**
11:14;14:6;203:20
**referred (3)**
110:8;122:9;
190:12
**referring (4)**
132:4;192:15;
197:22;198:11
**refers (2)**
115:19,21
**refinance (1)**
199:19
**refinancing (3)**
145:11;147:2,14
**reflect (1)**
168:9
**reflected (2)**
13:23;144:23
**refused (1)**
45:23
**refute (1)**
31:20
**regard (5)**
48:12;54:6;75:10;

135:20;167:4
**regarding (3)**
92:20;145:7;
189:25
**registration (1)**
22:15
**regulatory (9)**
52:3,4,6;67:9;
103:13;118:3,5,20;
147:8
**reimbursement (1)**
175:4
**reimbursing (1)**
70:13
**rejected (4)**
87:17;93:24;94:3;
107:22
**relate (1)**
55:16
**related (1)**
95:20
**relates (3)**
38:13;106:8;144:2
**relating (5)**
13:8;32:10;118:3;
128:13;203:18
**relationship (6)**
37:11;60:21;93:13;
141:2;177:22,25
**relationships (1)**
107:10
**relative (2)**
165:4;193:7
**relax (1)**
181:7
**relayed (1)**
32:12
**release (14)**
104:17,18,21;
105:3,10,12,23;
106:5,7,12,18,21,24;
108:9
**released (1)**
105:14
**releases (3)**
104:11;105:10;
106:17
**relegate (1)**
73:23
**relevant (9)**
80:1,21;98:9;
104:13,15;106:14,15;
115:14;174:1
**relied (1)**
90:14
**relief (1)**
63:15
**relies (1)**
62:20
**remain (1)**
112:17
**remains (1)**
147:20

**remarks (1)**
31:10
**remedies (1)**
11:19
**remedy (5)**
11:21,25;12:9;
59:19;90:4
**remember (20)**
40:21;43:1;105:25;
138:20;153:2;154:9;
159:10;165:19;
166:15;169:24;
170:6;173:10;
175:22;176:2;179:8;
180:3;185:5;186:23;
196:13;199:8
**remind (1)**
28:22
**remotely (1)**
36:4
**removed (1)**
121:11
**Reorg (1)**
15:13
**reorganization (3)**
130:6;137:25;
155:9
**repaid (2)**
63:24;78:7
**repeat (3)**
150:13;153:15;
154:5
**rephrase (1)**
178:8
**replies (2)**
183:6,8
**report (5)**
129:7;137:1;
144:11,12;147:11
**reported (7)**
43:14;130:24;
142:15;146:25;
155:5;197:23;198:23
**reporter (2)**
102:6;154:1
**reporting (3)**
76:9;144:2;155:13
**represent (1)**
73:11
**representative (1)**
188:15
**representatives (3)**
56:5,5,6
**represented (4)**
83:22;159:24;
160:1,3
**representing (3)**
86:5;150:5;186:10
**reputational (1)**
162:24
**request (5)**
98:3;124:22;
136:13,16;147:8

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
LIGHTSQUARED INC., et al.    Pg 232 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc                                                                    January 9, 2014

requested (2)
79:19;120:23
requests (1)
144:18
require (4)
12:6;93:18;104:20;
114:17
required (5)
54:7;67:7;191:2
requirement (5)
120:13,20;121:11;
123:12;130:15
requirements (2)
76:9;124:13
requires (2)
76:12;88:2
Research (2)
15:10,13
reserve (1)
56:8
reserved (1)
63:11
resides (1)
121:25
resolution (5)
121:7;126:21;
127:2,5;152:11
resolve (4)
104:24;123:18;
130:12;138:11
resolved (4)
119:13;144:19,21;
202:5
resort (1)
94:15
resources (1)
25:7
respect (28)
12:7;14:18;16:15;
23:21;26:19;27:25;
67:24;75:11;89:3;
93:16;105:24;117:6;
132:9;134:24;
144:18;159:7;
161:13;169:1;
171:22;173:15;
178:14;184:2;
190:25;196:16;
197:10;201:8,23;
203:21
respected (1)
103:6
responded (1)
25:2
response (12)
27:4;45:22;47:24,
25;48:1;49:15;52:19;
65:11,13;66:6;129:7;
138:8
responsibilities (3)
98:2;110:25;115:9
responsibility (4)
111:4;113:5,12;

114:19
responsible (4)
27:1;45:19;110:4;
113:21
rest (3)
70:17;96:11;112:3
restate (1)
95:7
restrict (2)
20:13,20
restricted (1)
20:19
restriction (11)
81:4,12,13,16;
83:19,23;84:3,16;
85:19,22;86:23
restrictions (18)
21:6,14;23:10;
24:15,23;46:22;
48:18;58:15;76:3;
80:2,6,10,18;82:23;
87:4;89:20;107:8;
123:1
restricts (1)
88:10
restructuring (7)
12:2;103:7;157:15,
17,22;158:8;160:24
restructurings (1)
158:4
rests (1)
79:13
result (5)
11:19;30:2;84:1;
111:8;124:22
resulting (1)
160:9
results (3)
11:21;54:3;161:18
retail (1)
159:21
retention (1)
185:12
return (1)
163:22
returning (1)
72:16
Reuters (2)
102:5;154:16
revealed (1)
45:22
revealing (1)
141:1
review (3)
40:4;126:14;
181:14
reviewed (3)
146:9;162:17;
172:15
reviewing (1)
154:14
revitalize (1)
30:18

revolving (1)
54:4
rewrite (1)
80:5;82:24
RF (3)
112:23,23;113:8
rich (2)
102:19,20
Richard (1)
38:12
Ridings (1)
52:12
right (200)
10:3,10,15;13:3;
14:1,2,2,15,20,22,23;
15:3,16;16:11,22;
17:1,6,6,8,18;19:4,9,
16,25;34:4;35:13;
39:25;40:25;42:3,6,9,
16,20,21;43:9,12;
44:4,18;51:15;53:13,
14;57:17,18,21;58:3;
73:16;74:20,24;75:4,
14;76:21,21;77:8;
78:11;89:6,22;95:18,
25;96:3;99:23;100:2;
101:21;105:5,21;
108:5,6,20;109:4,7,8;
119:1;124:19;125:2;
127:12;131:16;
132:15,25;134:4;
136:4,23;137:2,7;
138:16,23;139:15;
140:20;142:17,19,20;
143:15;150:2,10,12,
16,19;151:2,16,17;
152:20,24;153:3;
154:3;155:17;156:6,
25;157:4;160:8;
161:2;165:24;166:2,
8,14,23;167:3,6,13,
22;168:4,12,15,18,
23,24;169:1,3,6;
170:24,25,25;171:2,
13,15,18,25;172:7,8,
13,19;174:16,20,24,
25;175:6,16,18,21;
176:1,3,4,9,11;177:7;
180:1,7,8;181:2,9,23;
186:5,6,15,21;
187:19;189:13;
190:12,15,19,21;
191:2,7,9,18,21,21,
22;193:24;194:19;
195:11;196:4,14,19,
23;197:7,24;198:7,8,
9,12,15;200:1;
201:22;202:20;
203:7,9,13,15;204:9,
16,18;205:2
right-hand (1)
51:10
rights (8)

54:6;56:8;63:12;
89:4;117:18;118:14;
171:22;173:15
rise (5)
17:13;88:17;
108:18,24;156:23
risk (19)
36:16,17;47:1,3,6;
65:24;70:14;77:7,8;
78:14,15;92:13;94:9;
97:3;99:3,9;103:24;
107:15,15
risk-free (1)
79:1
road (2)
55:5;173:16
roadshow (7)
131:23,25;132:7,
13,15;133:7;137:15
roadshows (2)
132:20;134:15
ROBERT (4)
7:25;15:17;73:10;
150:5
robust (1)
116:22
role (14)
14:11,12;15:7;
21:22;59:22;110:1,
21;111:3;113:7,12,
15;130:9;150:8;
178:8
Roles (2)
113:3;114:18
Romeo (1)
51:22
room (10)
10:4,4,6,7,8;11:9;
12:20;19:1;80:3;
164:2
rooms (1)
205:7
Rule (9)
17:14;19:2;54:7;
55:13;80:15;118:10;
119:2;121:5,8
rules (15)
18:14;55:16;57:11;
59:3;81:5;94:18;
119:8;120:16;121:3,
6;136:1;172:4;194:6,
8,11
rumor (1)
96:23
rumors (4)
27:3;47:14;49:12;
130:1
run (9)
23:1,2;30:18;37:5;
39:1;108:7;138:1;
161:22;194:5
running (1)
157:19

runs (1)
159:19
rush (2)
96:15,16

# S

SABIN (1)
5:17
safe (2)
125:14;197:4
safety (1)
122:18
sale (19)
30:10;54:23;
128:18,19;160:7;
161:19,22;162:23;
170:10,16,19,21;
178:12;190:6,7;
197:6;199:1,3,6
sales (8)
159:11,14,17,23;
160:6;162:19;
166:17;170:20
same (20)
21:11;25:19,21;
39:15;49:11;50:21;
51:2,20;62:6;70:16;
77:22;120:10;121:5;
132:24;137:21;
141:5;162:15;167:4;
190:10;203:20
SANDY (1)
4:25
Sanjana (1)
15:12
satellite (14)
26:9;39:16;110:6,
7,8,11;117:18;
118:16,19,19;119:10;
120:13,18;159:22
satellite-based (3)
110:10;114:25;
117:17
satisfied (1)
11:5
satisfy (2)
31:3;74:17
sats (1)
51:25
Saturday (1)
184:6
saw (6)
40:4,14;172:16;
190:23;192:21;
193:25
saying (23)
33:23;37:17;44:3;
46:12,13;48:25;
49:17,18;50:13;63:1;
66:13;67:12;73:1;
89:6,23;97:15;102:5;
133:18;137:22;

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
LIGHTSQUARED INC., et al.    Pg 233 of 240
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc    January 9, 2014

153:8;182:8;186:10;
198:25
**scarcity (1)**
192:22
**scenarios (1)**
65:24
**scene (1)**
175:20
**schedule (5)**
86:9,18;185:16,21;
201:15
**scheduled (3)**
12:5;187:16,16
**scheduling (1)**
156:7
**scheme (3)**
21:14;23:8;30:20
**school (1)**
111:14
**Schwartz (1)**
10:13
**science (1)**
111:15
**scooping (1)**
51:24
**scope (6)**
80:18;93:12;98:16;
188:9,12,20
**scratching (1)**
53:21
**screen (6)**
32:19,22;33:1,24;
62:10;77:13
**screens (1)**
64:2
**se (1)**
193:9
**Seaport (1)**
15:14
**searched (1)**
23:6
**seat (6)**
10:2,14;108:19;
109:11;156:24;157:6
**SEC (5)**
76:9;178:15,17;
179:4,6
**second (26)**
15:5,7;16:4,18;
34:7;44:5;65:19;
68:4;83:16;88:14,15;
90:7;95:12,14;96:22;
116:6;124:12;126:8;
143:22;155:2,3;
179:1;187:8;196:14;
200:12;201:7
**secondary (1)**
62:7
**secret (4)**
76:25;77:10;78:16;
107:15
**Section (3)**
88:2,9;89:1

**sections (2)**
145:2,3
**Secured (8)**
4:10;13:19;54:19;
65:15;104:19;
147:24;148:13,24
**securing (1)**
145:18
**securities (17)**
20:9,17;21:4,23;
23:14;24:14,18,25;
25:6;27:14;30:5,8,
10;36:1;38:7;39:4;
54:12
**seeing (2)**
10:9;125:19
**seek (1)**
115:4
**seeking (3)**
63:15;117:18;
149:9
**seem (1)**
51:4
**seemed (1)**
16:13
**seems (1)**
59:16
**sees (1)**
107:19
**selection (1)**
131:20
**sell (6)**
54:3;87:6;122:17;
183:4;192:24;196:2
**seller (4)**
105:12;163:9;
196:3,6
**selling (2)**
87:5;191:5
**send (2)**
52:17;184:21
**senior (3)**
54:18;65:15;
186:19
**sense (21)**
13:5;28:24;38:4;
39:16,17,18;46:15,
16;62:23;64:7;68:1,
6,23,25;69:25;99:22;
104:1;125:17;136:9;
173:6,10
**sensitive (1)**
141:1
**sent (9)**
26:6;49:16,17;
71:14;72:17;126:10;
148:8;149:11;184:6
**sentence (4)**
143:25;144:5;
148:16;155:4
**separate (8)**
48:23,23;56:12,15,
16,17;58:9;69:4

**separated (2)**
56:21,23
**separateness (3)**
46:6;48:7,25
**separation (2)**
98:10;106:8
**September (4)**
86:4,15;123:23;
149:21
**sequence (2)**
40:16;199:8
**series (2)**
95:20;136:8
**seriously (1)**
168:10
**serve (3)**
35:20;36:7;196:11
**servers (1)**
23:6
**serves (1)**
21:21
**services (1)**
118:23
**serving (1)**
110:19
**set (9)**
22:11,19;23:11;
67:2,3;72:13;94:20;
96:8;116:20
**setting (1)**
70:6
**settle (1)**
107:10
**settled (2)**
24:6;107:9
**settlement (1)**
50:22
**settles (1)**
65:2
**seven (5)**
38:20;42:2;50:9;
55:13;158:3
**seventeen (1)**
112:19
**Seventh (1)**
6:14
**seventy- (1)**
33:8
**seventy-two (1)**
14:17
**several (7)**
36:5;131:21;
151:19;152:1;159:7;
175:10;179:17
**sewn (1)**
134:10
**shall (1)**
86:7
**sham (1)**
83:3
**SHANA (1)**
4:6
**share (3)**

85:7,8,9
**shareholder (2)**
25:12;98:11
**shareholders (5)**
65:1;70:1;76:8;
98:6,8
**shares (1)**
85:6
**sharing (1)**
48:20
**sheet (3)**
131:5;148:17;
149:11
**SHIFF (1)**
6:8
**shocked (2)**
51:10,18
**shoes (1)**
59:9
**short (4)**
10:18;60:3;156:10,
13
**shorten (1)**
45:25
**shorter (1)**
204:17
**shortfall (1)**
59:20
**shot (1)**
163:13
**shots (2)**
193:21,22
**show (49)**
20:23;22:22;23:7,
22;24:3,20;25:7,24;
26:5,20;28:4;29:6,
24;49:24;50:7,8,10;
52:9;73:17;74:16;
75:20,22,23,25;76:4,
5,15,17,18;83:15;
85:10;87:18;90:25;
92:1;94:22,24;96:19;
98:14;99:4,7;100:25;
101:1;103:3;153:5;
161:25;164:12;
165:8;188:22,23
**showed (1)**
185:10
**shown (1)**
107:12
**shows (1)**
25:17
**sic (1)**
166:1
**side (9)**
19:24;47:24;53:10;
65:22;85:12,12;
92:13;93:10;135:24
**sideshow (1)**
107:2
**Siegel (1)**
15:13
**sight (1)**

67:2
**sights (1)**
67:3
**signal (1)**
110:11
**signed (1)**
41:15
**significance (1)**
171:20
**significant (29)**
28:12;30:3;40:8;
41:11;54:11;79:8;
131:1;148:25;
161:11,17;162:11,17,
18,20;163:16;164:9,
21;165:1,2;170:16;
171:22;177:16,19,21;
194:9;197:7,14,21;
198:21
**signs (1)**
41:3
**Silver (1)**
15:10
**similar (17)**
21:11,12,22;53:25;
60:9;94:8;112:7;
117:16;118:6;119:6;
120:10,22;137:20;
138:8;141:23,25;
161:22
**similarly (3)**
22:21;115:12;
169:1
**simple (1)**
46:20
**simply (15)**
12:15,21;16:13;
18:12;29:7;33:3;
36:11;44:10,25;
77:19;78:8;81:16;
93:20;119:6;127:19
**SIMPSON (1)**
4:20
**single (11)**
16:6;20:3;31:11;
36:8;47:5;70:6;
73:20,24;91:14;94:6;
95:20
**sinister (1)**
105:11
**sit (3)**
27:6;43:2;45:23;
46:9;49:2;56:11;
166:15
**sits (1)**
121:19
**sitting (4)**
42:13;73:3;78:14;
163:15
**situated (1)**
115:12
**situation (11)**
12:23;14:17;20:11;

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

65:23;87:15;103:11;
130:22;191:11,11;
192:18;199:8
**situations**
165:23;166:10,11
**six (3)**
38:20;55:8;152:21
**six-month (1)**
130:10
**sixteen (1)**
112:19
**sixth (1)**
37:25
**sizable (2)**
128:11,12
**size (5)**
72:25;191:1,1,11,
21
**SKADDEN (2)**
4:1;15:14
**skeptical (1)**
29:1
**skirting (1)**
105:15
**skullduggery (1)**
79:11
**SkyTerra (3)**
114:8,8;119:19
**SLATE (1)**
4:1
**slay (1)**
71:9
**slide (11)**
86:3,13,21;87:10;
88:10;91:11,11;
93:11;95:11;102:3;
103:16
**Slim (4)**
51:1,7;52:14,25
**Slim's (1)**
56:5
**small (2)**
131:11;191:13
**smallest (1)**
63:19
**Smalley (1)**
15:13
**smattering (1)**
62:11
**Smith (27)**
52:12,20;70:23;
72:18,18;109:6,8,16;
110:16;127:16,25;
131:13;133:22,22;
136:8,25;137:9;
139:12,21;142:24;
143:19,25;144:5;
150:5;154:25;
155:17;199:12
**smoke (2)**
49:14;63:4
**smokescreen (1)**
79:9

**smoking (1)**
62:16
**so-called (3)**
13:6;62:21;163:7
**socialize (1)**
60:21
**sold (4)**
41:1;52:18;71:12;
106:1
**solely (2)**
72:5;85:14
**Solomon (2)**
157:25;158:3
**solution (2)**
12:3;13:1
**solutions (3)**
11:12,19;13:1
**solve (1)**
122:15
**solved (1)**
123:25
**somebody (15)**
30:11;44:14;47:24;
49:17,18;53:3;59:23;
118:15;135:23;
136:25;171:1;173:9;
174:3;186:4;192:24
**somehow (5)**
41:13;45:9;53:5;
78:25;102:10
**someone (12)**
47:11;55:22;79:7;
87:5;105:9;135:4,15;
137:1;162:20;165:5;
186:13;198:24
**sometime (5)**
118:8;119:13;
168:15;174:15;
175:25
**sometimes (2)**
58:15;64:17
**somewhere (2)**
29:2;124:5
**soon (2)**
39:23;121:24
**sophisticated (9)**
80:9;82:22;83:12,
13,14;84:6,11;87:16;
107:19
**sorry (20)**
18:1;32:21;51:15;
95:6,14;118:13,24;
119:19;143:7;144:1;
150:13;153:15;
154:2;160:18;
169:13;180:16;
188:11;189:6;195:1;
204:1
**sort (15)**
33:14;44:18;45:15;
80:16;84:14;87:22;
91:22;102:9,13,16;
105:4;157:18;

164:11;165:9;192:25
**sought (5)**
32:9;88:7;90:10;
91:25;130:11
**Sound (34)**
22:10;25:22;26:7,
11;46:6;47:14;51:5;
52:13;128:1,1,7,19,
21,22,25,25;129:9,
11,12,14,20,23;
130:25;131:9,10,12;
132:17;142:18;
153:2,3,22;155:5,10;
174:20
**sounds (7)**
142:20;146:20;
174:16,25;176:2;
203:24;204:9
**source (2)**
125:22;134:19
**sources (1)**
52:22
**SP (1)**
22:20
**speak (12)**
26:14;31:23,24;
35:4;36:23;48:13;
133:14;141:4;
150:23;151:3,8;
166:16
**SPEAKER (2)**
132:11;155:25
**speaking (2)**
32:4;138:11
**special (23)**
11:7,13;12:14;
22:12,20;30:17;
45:23;48:16;66:17,
17;68:21,22;78:1,18,
23,24;92:7,10,19;
99:14;105:16;106:6,
9
**specific (14)**
12:6;93:16;106:13;
115:10;136:17;
140:22;141:1,17;
142:12,13,13;152:5;
169:24;191:16
**specifically (10)**
94:2;117:9;126:6;
128:17;130:9;
138:11;154:9;159:8,
10;180:3
**specifics (1)**
132:21
**Spectrum (131)**
20:23;23:23;24:4,
7,8;26:9;27:2;29:4,
10,11;33:19;34:17;
35:8;38:11,15,22,23,
24;39:1,4,5,11,13,13,
14,17,19,19,21;
46:17;51:24;59:12;

60:6;67:21,25;
106:11;114:17,20,23,
24,25;115:2,4,5,7,10,
11,12,16,23,24;
116:11,17,19,21,24;
117:1,6,9,18;118:14,
19;119:5,8,9,24;
121:3,14,17,19,20,20,
21,22,22;122:1,2,3,3,
4,4,6,7,9,11,14;123:2,
3,5,9,15,20,25;
124:10,10,12,14,24;
125:3,3,5,7,9,9,12,12,
14,14,15,19,20,21,23,
24,25;126:1,2;
134:25;135:9;138:2,
3,7;141:15,21;
144:19;149:14,17;
192:19,22,23;195:15
**spectrum-based (1)**
112:25
**spectrum-owning (1)**
34:19
**speculate (4)**
30:16;74:14;78:21;
97:17
**speculation (19)**
74:12,15,20,24;
75:3,11;77:20,24;
78:25;79:11,12;
85:14;87:13;88:8;
94:11;104:9;107:13,
16;153:19
**speculative (5)**
16:9;101:1,12,14;
104:7
**spend (3)**
35:8;53:21;163:3
**spent (17)**
11:7;29:2,19;34:7,
8,10,11,14;38:25;
60:6;70:10;74:2;
112:3;114:12;
115:16;158:6;195:13
**sphere (1)**
50:2
**spinoff (2)**
113:22,24
**spoke (8)**
32:1,2;150:21;
151:7;168:14;
173:12;176:18;
179:16
**spoken (11)**
49:20,20,21;151:1,
5,9,11,14;181:22,24;
182:10
**sponsorship (1)**
137:12
**spring (1)**
121:1
**Sprint (19)**
67:5,11,18,20;68:2,

16;92:4;112:18,21;
113:9,10,11,15,16,20,
22;140:13;141:23;
142:3
**Sprint's (2)**
113:13,17
**SPSO (72)**
11:19,23;12:1;
20:2;22:8,20;23:1,5,
7,12;26:10;27:24;
28:18;29:25;40:17,
19,25;41:4;42:12;
44:8;9;46:20;49:10;
53:18;59:21;64:5;
68:10;70:3,4,5;71:7,
16,17,18,23;72:7,24;
73:3;81:5;84:22,24;
85:8,9,14;86:20;
87:8;88:5,7,25;90:6;
100:6,6;101:16,20;
103:3,17;105:22;
106:13;139:18;
172:18,21;173:3,7,
19,23;174:7;179:18;
180:11;183:12,16,19,
22
**SPSO's (11)**
38:3;61:20;63:17;
70:24;71:2;102:25;
104:3;105:7;173:15;
182:3;198:7
**spun (1)**
113:22
**Square (1)**
4:3
**staffing (1)**
157:20
**stake (4)**
168:7,8;194:9,23
**stakeholders (3)**
14:8;30:6;195:19
**stand (9)**
11:11;12:21;18:17;
21:10;28:19;46:9;
49:3;59:9;107:24
**standalone (3)**
12:4,11;121:13
**stand-alone (1)**
203:18
**standard (2)**
168:3,4
**standards (3)**
54:13,17;113:7
**standby (1)**
21:11
**standing (1)**
10:13
**standpoint (2)**
10:22;24:5
**stands (3)**
12:14;112:24;
118:13
**Stanton (1)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

13-01390-scc    Doc 126    Filed 01/10/14    Entered 01/29/14 11:37:05    Main Document
Pg 235 of 240

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

47:16

**start (14)**
15:25;18:4,20;
19:17;84:13,19;
99:21;102:15;124:6;
140:8;149:13;158:8;
199:3;203:5

**started (15)**
17:9;22:8;47:14;
49:12,20;117:8;
118:11;119:1,12;
131:1;132:15;147:1;
157:25;199:6,12

**starting (4)**
14:19;17:25;20:5;
199:15

**starts (4)**
59:24;116:2,6;
187:7

**start-up (1)**
112:10

**State (7)**
83:11;120:16;
135:20,21,23,25;
147:5

**stated (1)**
57:24

**statement (9)**
10:18;50:3;82:17;
88:24;97:17;99:19;
191:24;192:11;
193:25

**statements (7)**
10:19,24;17:15;
133:3,9;134:8;
155:13

**states (1)**
160:16

**status (1)**
147:8

**stay (1)**
46:10

**stayed (2)**
112:4,18

**staying (1)**
115:17

**steer (1)**
20:10

**stems (2)**
17:23;20:6

**step (6)**
102:8;120:2;183:9,
13,23;200:15

**steps (1)**
128:24

**Steve (2)**
19:1;103:2

**Steven (2)**
37:10;45:17

**still (12)**
41:8;44:15;47:9;
52:25;68:15;96:11;
99:11;113:7;147:6;

162:15;194:23;
201:10

**stipulated (1)**
82:16

**stipulation (4)**
71:5,20;72:3;
130:14

**stock (5)**
40:7;48:19;91:13;
155:10;193:12

**stocks (1)**
47:4

**Stone (31)**
10:21;17:10,11,11;
19:11,14;69:7,9,10;
99:22,23;100:1;
108:21,22,23;109:3,
5;155:21;156:25;
157:1,8;160:10;
161:6;165:11;188:6,
7,8;199:24,25;200:8;
204:17

**stonewalled (1)**
188:2

**stonewalling (1)**
187:21

**stop (5)**
41:20;46:12,13;
56:11;89:3

**stopped (1)**
72:16

**stories (3)**
47:19;66:24;198:5

**story (9)**
28:17,20;47:21,22;
48:4;53:10;78:7;
102:7;180:18

**strategic (35)**
20:9,24;24:5,5;
29:4;35:1;102:8;
134:23;137:16;
140:22;144:8;
161:10,15;163:10,12,
15,18,22,24;164:20;
169:8;176:25;180:8,
12;182:4;192:19;
193:8,24;194:8,13;
195:11,14,16;197:8;
199:18

**strategically (1)**
68:7

**strategics (25)**
134:23;135:3,10;
137:10,18,23;140:5,
9;144:25;169:18,22,
25;170:2;183:9,13,
19,23;192:23;193:9,
10,23;195:6,8,18;
199:13

**strategies (1)**
42:25

**strategy (11)**
26:2,17;27:2;

29:16;40:8,11;48:7,
24;63:18;64:15;
113:7

**STRAUSS (1)**
5:2

**Street (9)**
2:22;7:20;8:4,13;
179:20;197:13,17,17,
22

**stressed (1)**
158:7

**STRICKLAND (26)**
6:18;53:15,17,17;
57:18,21,25;58:4,13,
23;59:1;63:16;65:12;
66:9;68:20;69:15,21;
73:6;75:5;78:17;
92:1;95:12;104:23;
200:10,12;205:8

**Strickland's (1)**
69:11

**strident (1)**
37:17

**strike (1)**
190:8

**strive (1)**
146:10

**strong (1)**
63:8

**strongly (1)**
10:6

**STROOCK (5)**
7:2,2,10,10;15:13

**struck (2)**
79:24;84:12

**structure (39)**
20:18,22;24:16;
38:5;58:20;62:22;
63:3;75:2;101:16;
102:11;103:8,9;
104:6;127:22;
161:12,18;162:7;
163:11;164:4,9,24;
165:23;166:12;
170:11;173:13;
176:8;177:2,6,11;
180:4,12;182:11;
183:12,16,19,22;
197:7;199:2,18

**structuring (1)**
83:18

**struggled (1)**
130:19

**stuck (1)**
45:7

**stuff (1)**
74:15

**stunningly (1)**
36:11

**stymie (1)**
54:1

**sub (1)**
100:6

**subject (14)**
121:23;126:22;
132:14;137:11,18;
159:3;161:14;178:9,
14,15;184:9,22,22,23

**subjective (1)**
160:21

**submit (1)**
28:12

**submitted (4)**
20:1,1;55:10;73:22

**subordination (3)**
11:25;89:18;90:2

**subscribe (1)**
199:6

**subsequently (1)**
121:9

**subset (2)**
190:10;191:21

**subsidiaries (3)**
20:18;86:8;89:9

**subsidiary (14)**
70:8;81:19,20,21;
85:2,3,4;87:2,3,6,8;
88:5;100:17;107:23

**substance (1)**
49:2

**substantial (7)**
23:13;40:7;131:8,
10;147:7;151:16;
198:14

**substantially (2)**
149:4;161:17

**Substantive (2)**
56:13;130:19

**subvert (1)**
70:6

**succeed (1)**
92:5

**succeeded (1)**
102:24

**successful (3)**
62:9;117:2;119:16

**successfully (2)**
24:7;120:12

**suggest (1)**
47:10

**suggested (3)**
59:19;180:11;
195:5

**suggesting (1)**
198:1

**suggests (1)**
43:24

**suit (3)**
48:13,17;107:1

**suitable (1)**
23:24

**Suite (2)**
2:22;8:5

**SULLIVAN (11)**
7:18;15:18;21:24;
22:3,5;32:2,5,9,11;

73:10;189:17

**sum (1)**
107:1

**summary (1)**
79:20

**summer (10)**
120:8;172:16;
176:18;177:24;
178:4,10;186:14,16,
22;187:25

**sums (1)**
54:11

**Sunday (2)**
187:5;202:12

**super (1)**
55:13

**super-seeker (1)**
66:14

**supervising (1)**
157:21

**support (31)**
11:4;12:19;13:4,8,
23,24;41:4,6,9,9,15;
66:25;75:3;77:20;
78:25;90:2;102:1;
107:12;113:4;
172:12,15,22,24;
173:2,4,8,11,20,24;
174:14;185:12

**supported (1)**
73:1

**supporting (3)**
12:12,13;82:13

**supportive (1)**
89:10

**suppose (2)**
32:25;82:16

**supposed (2)**
32:22;33:3

**Sure (54)**
10:23;32:19;33:7;
41:25;43:8,10;51:21,
25;52:19;63:4;73:15;
110:4;111:15,22;
112:22;115:22;
116:16;118:5;
122:22,23;123:23;
126:17;127:20;
129:12;130:11,22;
131:2;137:13;139:4;
145:23;151:10,13,23;
152:8;157:25;
164:13;167:2;
168:22;172:9;174:1;
175:23;176:5;178:7;
182:12;186:2;
187:23;188:13;
192:2,5,14;193:6;
195:23;199:4;200:14

**surprise (1)**
136:7

**surprised (1)**
57:4

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

*January 9, 2014*

**surrogates (1)**
44:10
**suspect (2)**
28:15;56:9
**suspected (2)**
88:5;153:21
**suspicion (1)**
63:9
**suss (1)**
62:17
**Sussberg (20)**
10:15,16,18,21,24;
11:1;12:18;13:10,13;
14:6;43:13;59:19;
108:6,7,8;202:24;
203:15,16,17,20
**sustained (2)**
73:21;101:24
**Swiss (1)**
167:25
**switching (1)**
124:15
**sworn (2)**
109:10;157:5
**synergies (3)**
24:10;39:20;46:18

**T**

**tab (7)**
181:12;182:21,22;
184:3,4;185:6;
186:24
**table (4)**
60:2;119:3,4,13
**talk (20)**
30:9;45:4;49:3,4;
62:1;71:2;80:3;
88:11;90:18;167:10,
18;168:14;177:14;
188:3;190:2;192:14;
195:24;199:21;
204:4,21
**talked (15)**
68:21;76:2;89:1;
90:8;92:9;93:9;
99:15;100:18;
147:23;170:5;174:5;
190:24;195:6;197:1;
198:10
**talking (10)**
14:7;62:24;77:23;
142:3;147:3;169:18;
175:22;178:22;
180:3;195:17
**talks (2)**
85:7;89:9
**tallying (1)**
70:24
**target (1)**
92:3
**targets (2)**
67:2;160:1

**TARIQ (1)**
6:19
**team (2)**
39:7;129:2
**teams (1)**
10:7
**technical (6)**
43:17,18;110:5;
113:4,16;122:5
**technicalities (1)**
97:8
**technically (2)**
67:17;68:7
**technology (2)**
111:18;113:19
**telecom (2)**
159:21;195:13
**telecommunications (2)**
114:13,15
**TELEPHONICALLY (1)**
9:11
**telling (13)**
18:2;27:11;47:13;
80:19;102:4,5,12;
118:24;136:12;
154:15;198:13,18,20
**tells (1)**
62:15
**Telmex (1)**
51:7
**ten (8)**
22:13,21;31:19;
53:23;57:8;158:9,11,
25
**tend (2)**
172:4;197:17
**tends (1)**
164:8
**tenure (1)**
112:21
**term (7)**
38:6;39:14;81:21;
115:19;131:5;
148:17;149:11
**terminated (5)**
30:15;42:12;43:1,
13,23
**termination (9)**
11:4;13:4,8,24;
16:15;43:19,22;
175:1,4
**terms (20)**
22:1;34:1,14;
84:19;88:19;103:19,
25;106:21;125:18;
140:25;141:22;
159:2;170:14;172:5;
173:14;192:18;
194:25;195:15;
196:2;199:9
**TERRASTAR (1)**
64:11,22;67:1;
91:20;117:9,13,14,

21,25;118:3;119:19;
120:15
**terrestrial (20)**
110:6,9,13;114:24;
115:11;117:18,19;
118:13,14,17,22;
119:9,21;120:17;
121:3,6,13,13;125:4;
144:19
**terrestrial-based (1)**
118:21
**terrestrial-only (1)**
120:21
**test (1)**
33:16
**testified (16)**
32:4;34:10;64:16;
145:6;149:13;153:1;
158:19;159:5,6;
175:10;177:5;
188:16;195:6;
196:17,21;199:1
**testify (8)**
17:17;56:4;103:18;
156:16;159:4;
160:21;161:7,9
**testifying (3)**
69:19;150:24;
184:15
**testimony (33)**
19:15;28:23;29:2,
18;30:25;37:11,15;
46:11;66:13;69:11;
75:7,14;98:13,22;
103:1,3;104:10;
153:2;158:23;159:2;
160:14,15,17;161:1;
170:6;188:13,21;
195:13;196:2;197:5,
23;198:1,12
**testing (1)**
33:3
**THACHER (1)**
4:20
**Thane (2)**
157:19;158:10
**Thanks (1)**
17:6
**theme (1)**
152:12
**Then-existing (1)**
135:23
**theories (7)**
52:16;66:10,23;
70:1;85:23;100:10,
20
**theory (19)**
31:13,15;42:10;
43:9;52:5;70:5;
79:14;82:14;89:10;
90:14;93:6,7,24;
94:15;100:21,22,22;
104:6,10

**therefore (4)**
65:10;89:15;98:1;
164:17
**thereof (3)**
81:19;85:2;87:2
**thesis (1)**
46:18
**thinking (5)**
29:4;58:16;63:25;
64:3;199:9
**third (6)**
68:4;75:21,24;
105:13;160:16;179:1
**thirteen (3)**
90:21;166:2,4
**thirty-five (2)**
123:8,19
**thirty-five-page (1)**
73:23
**thirty-three (1)**
33:9
**THOMAS (1)**
4:14
**thomsonreuterscom (1)**
62:24
**though (12)**
23:1;37:17;59:20;
75:11,11;81:1;82:25;
87:20;97:21;101:22;
103:9;182:3
**thought (15)**
18:2;28:24;47:3;
52:6,25;63:23;64:7,
25;98:18;127:22;
130:16;153:8,13,17;
187:23
**thoughtful (1)**
108:12
**thoughts (1)**
44:18
**thousand (1)**
76:8
**Thousands (1)**
90:20
**thread (1)**
137:20
**three (16)**
15:19;23:15;33:14;
54:11;66:19;69:3;
73:23;112:4;117:19;
132:1;144:3;155:11;
175:14;176:17;
179:22;194:6
**three-day (1)**
14:1
**threshold (1)**
95:3
**throes (1)**
11:12
**throughout (3)**
71:12;97:18;
121:18
**thus (2)**

23:8;68:1
**TIBOR (1)**
9:8
**ticking (1)**
103:10
**tied (1)**
128:17
**ties (1)**
28:21
**till (1)**
201:9
**timeline (1)**
67:19
**Times (12)**
4:3;28:11;63:20;
129:10;134:16;
158:22,25,25;160:1;
163:22;181:24;
184:21
**timing (4)**
28:14;105:25;
176:2;204:7
**title (1)**
73:4
**titles (5)**
61:15,17;112:20,
22;113:3
**T-Mobile (1)**
140:17
**today (20)**
11:11;12:14;18:7;
41:7;45:17,18;59:24;
78:14;144:21;
147:20;149:13;
150:24;161:1,8;
183:21;195:16;
198:1;200:7;201:5,
10
**together (6)**
38:21;39:15;46:5;
60:22;82:17;125:18
**told (21)**
21:25;25:1,17,25;
27:18;32:5,5;35:11,
12,23;57:20;75:5;
80:15;92:24;129:22;
133:23;164:2;
175:14;179:3;
183:24;202:24
**Tom (2)**
13:18;26:25
**tomorrow (13)**
13:25;156:16;
200:5,6,20,25;201:9;
202:3,6,10,24;204:6,
13
**tongue (1)**
31:12
**tonight (1)**
204:21
**took (7)**
35:1;36:16;66:19;
90:13;92:6;116:21;

LIGHTSQUARED INC., et al.,
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

141:20

**tool (4)**
55:13;63:10,14;
79:14

**top (4)**
35:21;84:2;146:24;
184:5

**topic (4)**
132:20;135:8;
160:14;161:9

**topics (1)**
126:3

**topped (1)**
173:8

**TORRES (1)**
6:2

**tort (3)**
100:11,14,16

**tortious (18)**
16:6;73:21,24;
74:17;75:18;81:9;
84:21,23;88:23;90:6;
93:11;100:9,15,22,
24;101:13;104:13;
108:2

**total (2)**
112:19;123:8

**totally (1)**
90:14

**touched (2)**
190:1,1

**tough (1)**
52:5

**towards (1)**
122:18

**tower (1)**
116:9

**towers (1)**
110:15

**trace (2)**
111:12,20

**track (2)**
115:8;146:15

**tracking (1)**
71:11

**trade (11)**
22:14;25:15;73:4;
95:1,2,7,12,14;96:4,
5,9

**trades (36)**
20:12;22:9,11,23,
25;23:20,21,23;25:8,
11,16,21;26:8;27:25;
28:3,4,14,15;30:7;
37:20,23;40:17;
48:20;61:20;63:17,
20,22;64:6;71:4,15;
96:8,11;97:2;98:23;
130:21;131:12

**trading (5)**
53:24;54:1;104:3;
130:24;131:11

**transaction (25)**

41:10;43:13;65:7;
66:17;68:21;76:13,
20;78:18,24;83:18,
19;91:15;92:7,10,14,
19;95:20,23;99:14;
105:16;107:14;
135:24;191:21;
196:9,10

**transactional (2)**
65:8;90:24

**transactions (17)**
57:10;64:10;65:3;
67:10;91:21,22;
92:22;93:16,17,17;
94:8;95:20;96:19,25;
97:1;161:23;169:21

**Transcribed (1)**
2:20

**transcript (1)**
104:2

**transcripts (2)**
17:16;69:16

**transfer (23)**
76:3;80:2,6,10,18;
81:4,12,13,16;82:23;
83:18,23;84:2,16;
85:19,21;89:20;
107:8;120:1,3,6,9,25

**transition (2)**
122:8,12

**translates (1)**
60:11

**transmits (1)**
116:5

**transmitter (1)**
116:8

**transmitters (1)**
110:15

**transmitting (1)**
116:9

**treasurer (2)**
21:20;25:10

**treasuries- (1)**
95:17

**Treasury (2)**
34:4;47:4

**treat (1)**
93:23

**treatment (1)**
54:15

**tremendous (1)**
24:8

**TRIAL (17)**
2:7;10:7;14:9;
19:12;21:17;31:3;
74:10,12;75:2;80:19;
90:19;153:6;154:12;
158:19;182:22;
184:2;204:10

**tried (9)**
23:13;73:25;85:18;
129:10;173:16;
182:2;194:21;204:1,

4

**trigger (2)**
43:22;72:8

**trip (1)**
166:22

**true (17)**
18:12;26:14;45:8;
47:19;48:23;59:11;
65:23;69:16;74:6;
83:5;96:5;106:8;
117:24;118:1;
149:16,18;164:5

**trust (11)**
25:18;29:19,23;
35:19,20,22,25;36:7,
16,21;47:2

**trustee (2)**
29:23;35:23

**trustees (2)**
35:20;36:7

**trusts (4)**
60:23,23;61:7;
78:16

**truth (11)**
27:2,4;47:21,21;
48:4;96:23;133:2,2,
24;136:11;174:10

**truthful (2)**
133:9;144:14

**try (19)**
10:11;23:18;28:6;
30:18;47:10;52:22;
56:4;100:2;102:17;
123:18;128:24;
130:11;131:5;
152:11;162:1;
173:17,21;174:2;
191:11

**trying (19)**
14:8;16:18;30:19;
43:6;49:14;52:7;
62:16;63:4;71:3;
96:15;105:11;130:2;
132:2;135:13;136:9;
138:4;161:24;
164:12;170:14

**types (4)**
44:25;161:23;
191:10,12

**Tuesday (3)**
11:2,15;13:24

**Tuesday's (1)**
11:6

**tune (1)**
55:21

**turn (17)**
13:10;32:24;76:22;
86:21;94:10,10;
103:16;143:19;
145:23;148:2;172:4;
181:6,8,10,12;
185:15,19

**turned (3)**
32:23;37:9,10

**turnover (1)**
11:22

**turns (5)**
55:5;70:11;77:1,2;
79:3

**Tweed (4)**
17:12,21;83:15;
200:17

**twenty (5)**
116:1;123:7;
158:25;159:16;
162:14

**twenty-five (1)**
162:14

**twenty-seven (1)**
61:7

**twists (1)**
55:5

**two (41)**
22:11,19;29:9,9;
32:14;52:17;54:7;
60:11;61:8;64:10;
65:12;78:23;100:20,
23;103:13;111:3;
116:1;118:5,8;
119:15;122:14,14;
124:8;125:16,18;
132:1;156:15;
157:18;162:2;
165:22,25;166:10,17;
167:14;175:14;
178:21;185:23;
195:6;202:9;204:15,
15

**two-thirds (1)**
172:5

**two-way (1)**
112:11

**type (13)**
21:9;82:23;90:2;
104:21;130:16;
137:24;140:22;
141:21;159:17;
161:18;163:11;
184:22;196:10

**types (4)**
44:25;161:23;
191:10,12

**typically (3)**
83:10;105:10;
122:8

**U**

**UBS (7)**
83:21;86:5,22;
88:22,23,23;202:23

**ultimate (4)**
22:18,24;105:20;
164:10

**ultimately (20)**
27:17,22;29:24;
67:23;69:5;76:4;
79:13;80:11,23;
86:24;87:11;93:1;

94:15;103:12;
107:14;113:22;
131:22;163:19,23;
168:17

**unauthorized (1)**
99:10

**unbelievable (1)**
36:11

**uncertain (3)**
42:14;66:7;76:21

**uncertainty (1)**
103:12;194:24

**under (10)**
12:22;19:10;21:11,
12;22:1;27:12;45:14;
88:15;93:17;102:21;
172:21;173:3,7;
185:12;186:6;192:7

**underlying (2)**
81:10;189:4

**understood (3)**
130:25;193:13;
201:3

**undertake (1)**
184:7

**undisputed (4)**
21:16;29:6;37:12,
14

**Unfortunately (2)**
20:15;200:25

**unhappy (1)**
66:15

**UNIDENTIFIED (2)**
132:11;155:25

**unimpaired (2)**
54:22;65:17

**unimpairment (1)**
54:21

**UNISON (1)**
205:4

**unit (2)**
35:7;113:23

**unitary (4)**
40:10;42:2,4;43:9

**units (1)**
111:24

**University (1)**
111:18

**unless (5)**
53:12;55:25;95:16;
198:8;202:2

**unlock (1)**
12:25

**unpredictable (1)**
54:25

**unrelated (1)**
49:8

**unresolving (1)**
204:6

**unsolicited (1)**
40:21

**unsuccessful (2)**
74:1;85:18

LIGHTSQUARED INC., et al.,
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

**unusual (1)**
54:12
**up (58)**
21:5,14;22:11,19;
23:22;28:21;33:4,9,
24;38:9;40:20;45:24;
48:5,13,22;50:14;
51:14,24;53:1;57:16;
61:25;65:21;66:19;
70:6,24;84:7;85:12;
86:3,13,13,19;91:11;
93:10;102:3;103:23;
107:1;115:17;116:5;
134:8,10;135:10;
138:24;139:3;
141:20;161:25;
162:10;164:12;
165:8;166:22;
169:12;180:18;
181:6;192:10;195:4;
203:23;204:5;205:5,
5
**update (4)**
119:3,7,13;201:9
**updates (1)**
127:24
**upfront (1)**
72:3
**uplink (14)**
68:8;116:4,4;
122:4,7,11;123:7,9;
125:5,7,9,14,15,23
**uplink-only (1)**
126:1
**upon (7)**
26:9;87:16;186:3,
11;190:1,1;197:20
**upside (1)**
195:20
**urge (1)**
10:11
**urging (2)**
97:24;98:10
**USA (1)**
5:21
**usable (4)**
123:4,16,20;
125:19
**USAirways (1)**
166:7
**use (22)**
10:6;39:15;67:25;
92:12;117:18;
118:14,19,20;119:5;
122:6,10,11;123:25;
124:9,15;125:2,14;
139:9;141:15;
144:18,19;192:23
**used (17)**
23:3;25:8,10,14,16,
22;30:4,12;74:14;
78:14;82:14,15;91:3,
4;94:23;118:22;

192:5
**useful (1)**
202:11
**uses (2)**
119:4;122:14
**using (5)**
25:21;43:19;65:8;
97:15;171:4
**Usually (2)**
179:12;193:10

## V

**valid (1)**
75:20
**valuable (1)**
20:24
**valuation (2)**
158:18;159:5
**value (7)**
13:1;24:8;54:18;
192:7,18;195:22;
196:9
**variation (1)**
22:12
**various (4)**
12:22;130:7;153:7;
199:10
**vast (5)**
31:10;34:13;
152:14,16,18
**vehicle (2)**
61:19;70:6
**vehicles (2)**
22:12,20
**veil (1)**
56:14
**verify (3)**
129:11;130:2,2
**Verizon (4)**
111:25;140:19;
182:20;194:2
**versus (2)**
172:9;187:24
**via (1)**
97:22
**vice (3)**
113:4,7,11
**vice- (1)**
25:9
**vice-president (1)**
21:21
**view (15)**
15:24;28:17;45:19;
46:1,3;68:12;83:5;
84:18;106:24;144:7;
148:16;180:10;
183:24;192:10;199:7
**viewed (3)**
98:2;147:13;
148:23
**violate (2)**
44:9,9

**violates (1)**
82:10
**violation (1)**
89:17
**virtually (1)**
30:7
**virtue (1)**
90:15
**visible (1)**
110:15
**voice (2)**
39:16;169:12
**Voight (3)**
51:8,17,23
**VOIR (1)**
157:7
**volume (1)**
154:25
**volumes (1)**
26:14
**volunteers (1)**
10:9
**vote (3)**
64:16;70:16;174:8
**voted (1)**
170:19
**votes (1)**
54:22
**voting (5)**
25:12;54:13;85:11;
170:20;172:3

## W

**wagons (1)**
182:3
**wait (4)**
56:8,9;101:2,4
**waited (1)**
69:3
**waiting (4)**
67:11;72:22,22,22
**waiver (5)**
53:5,6;101:22;
120:12,19
**walk (1)**
157:23
**Wall (6)**
8:13;179:20;
197:13,17,17,22
**WANDER (4)**
9:12;15:14;160:15;
188:8
**wants (7)**
10:21;85:23;86:22;
99:18,20;151:22;
165:6
**war (1)**
102:15
**waste (1)**
134:9
**watch (2)**
56:11;64:3

**watching (1)**
73:3
**Watkins (4)**
83:14,22;86:5,22
**way (40)**
23:19;32:7;41:6;
43:7;45:12,13;46:2,
3;49:19;52:20;53:2,
19;56:2;68:13;69:18;
79:9;84:7;94:19;
95:8;101:17;102:11;
106:4;116:3;122:25;
123:3,6;125:18;
132:12;138:2;
146:18;167:2,20;
181:3,4;184:13;
191:18;194:11;
198:17;199:16;
201:18
**ways (4)**
33:16;55:19;
102:16;164:10
**wealth (1)**
38:25
**wear (1)**
57:6
**week (4)**
10:5;56:9;60:4;
190:23
**weekly (1)**
71:11
**weeks (4)**
43:16;104:23,25;
132:1
**Weinberg (1)**
92:15
**welcome (2)**
55:12;60:1
**well-done (1)**
108:12
**weren't (8)**
70:2;91:18,18;
130:22;131:2;
141:17,17;177:24
**West (1)**
2:22
**what's (13)**
16:9;40:2;48:15;
52:23;64:20;65:25;
72:2;80:18;110:7;
115:1;125:25;136:6;
157:13
**whatsoever (2)**
102:22;154:16
**whenever (1)**
122:6
**When's (1)**
179:16
**whereby (1)**
174:6
**Whereupon (1)**
205:10
**WHITE (5)**

4:9;13:18;15:9,15;
18:25
**whole (14)**
40:4,10;41:19;
46:6,17;48:6;66:9;
67:14;78:9;102:12;
164:16;170:3;185:8;
193:22
**who's (3)**
78:14;89:4;164:8
**whose (1)**
78:13
**wide (1)**
14:21
**wife (6)**
29:22;35:20,23;
36:7;77:3;78:16
**William (1)**
157:2
**willing (8)**
103:22;149:3;
152:10;163:9;
192:12;196:3,6;
202:17
**willingness (2)**
190:3,6
**WILLKIE (4)**
6:12;53:18;139:18;
200:21
**Wilson (1)**
15:14
**WiMAX (2)**
113:18,20
**WiMAX-based (1)**
113:18
**win (2)**
82:21;174:13
**window (1)**
30:1
**wink (1)**
27:7
**winner (1)**
173:22
**winning (2)**
163:7,14
**wins (1)**
82:20
**WINTERS (1)**
4:15
**Wire (2)**
15:12;113:13
**wireless (17)**
112:2,25;113:1,1,8,
13;114:17,23;115:5;
125:4;137:16;
140:11;141:6,25;
142:8;144:3,17
**wish (1)**
205:7
**withdraw (1)**
150:14
**withdrew (5)**
30:15;175:25;

LIGHTSQUARED INC., et al.
Case No. 12-12080-scc; Adv. Proc. No. 13-01390-scc

January 9, 2014

176:3,6,7

**within (8)**
35:6;50:1;93:12;
98:16;111:24;
114:15;160:14,23

**without (16)**
18:15;29:3;41:15;
44:25;55:1;75:24;
84:23;88:22;90:5;
91:15;95:21;102:22;
117:8;118:18;
161:25;193:3

**witness (34)**
46:9;49:3;80:24;
108:24;109:3,10;
124:19;126:4;
135:14,17;136:1;
139:14,16;142:21;
146:18;155:19;
156:9,13;157:5;
158:19;167:2,18,21,
25;169:13;188:10;
191:25;192:5,14;
193:17;200:3,20,23;
204:12

**witnesses (5)**
17:15;18:17;80:20;
99:21;156:15

**wives (1)**
35:5

**woes (1)**
72:24

**wondered (1)**
59:2

**word (8)**
52:11;54:14;82:14,
15;85:4;86:14;
104:11;185:5

**words (31)**
13:7;32:14;38:1;
58:8;74:14;80:22;
81:8,11;82:13,18;
83:1,12,13;84:10,10,
12,24;85:25,25;
87:10,11,14,16;97:9,
22;105:19;107:8,17,
18,23;193:15

**work (13)**
21:6,7,7;44:11;
57:1;61:15;62:1;
87:23;94:6;114:15;
130:14,15;138:9

**worked (3)**
27:10;83:16;94:4

**working (6)**
48:12,17,18;98:23;
114:13,13

**works (8)**
49:22;60:13,13,14,
14;61:12;94:5;
204:18

**world (5)**
68:12;76:24;

102:13;192:17;
193:18

**worried (4)**
56:7;63:9;71:18,19

**worry (1)**
59:4

**worse (2)**
81:22;201:2

**worth (7)**
37:20,22;77:2;
79:4;165:5;192:8;
193:7

**worthy (1)**
37:14

**write (1)**
38:10

**writes (24)**
38:11;40:3;50:13,
14,15,16,17,18,19,21,
23,25;51:9,11,12,16,
17;52:2,2,3,11;182:2;
183:3;187:12

**writing (3)**
70:23;153:7;
193:10

**written (4)**
11:3;91:17;95:9;
197:20

**wrong (4)**
45:9;70:15;83:17;
99:12

**wrote (5)**
38:15;50:4;62:12;
93:25;148:20

**X**

**XYZ (2)**
163:25;174:12

**Y**

**year (15)**
49:12;55:4;56:8;
57:4;63:12;66:21;
68:11;71:2;73:4;
101:18;116:18;
129:13;158:6;
175:23;182:5

**years (15)**
29:9;55:6;61:7;
68:18;112:5,19;
151:19;152:2;
157:12;158:3,9,11;
166:2,4;194:7

**yelled (1)**
201:20

**yep (1)**
186:17

**yesterday (2)**
11:3;35:16

**yield (2)**
11:19;13:1

**York (16)**
2:23;4:4,12,23;5:5,
15;6:5,15;7:5,21;
8:15;9:4;83:11;84:9;
88:15;93:18

**Young (1)**
15:11

**Yup (1)**
187:9

**Z**

**Zatz (1)**
15:15

**Zelin (4)**
103:2,6,16;104:2

**Zelin's (1)**
104:9

**Zell (1)**
19:1

**Zero (3)**
85:8;87:9;104:3

**zone (2)**
122:8,12

**1**

**1 (5)**
142:18;143:1,16;
150:10;185:16

**1.5 (1)**
124:6

**1:44 (1)**
108:17

**10 (4)**
91:11;95:11;205:8,
9

**10.04 (1)**
88:2

**10.04B (1)**
88:9

**100 (1)**
165:5

**10004 (1)**
7:21

**10005 (1)**
8:15

**10017 (1)**
4:23

**10019 (2)**
6:5,15

**10022 (1)**
5:15

**10036 (3)**
4:4,12;5:5

**10038 (1)**
7:5

**10040 (1)**
2:23

**10075 (1)**
9:4

**101 (1)**
86:9

**104 (1)**
104:2

**10th (1)**
187:13

**11 (18)**
20:8;24:23;26:4;
27:20;28:1,12,13;
29:17;30:13;40:9;
54:2,25;66:8;127:17;
170:12,13,16;202:23

**11:59 (1)**
13:25

**1129b (2)**
54:14,17

**11530 (1)**
5:23

**1155 (1)**
4:11

**11743 (1)**
8:6

**11th (2)**
50:12,20

**12:25 (1)**
99:17

**12:30 (4)**
18:7,10;91:10;
99:21

**12:36 (1)**
108:17

**125 (9)**
7:20;76:13;91:14;
95:2,8,19,24;165:7,8

**12th (1)**
8:14

**13 (2)**
40:19;93:11

**13-01390-scc (1)**
2:4

**14 (1)**
189:3

**14th (2)**
187:5,25

**15 (1)**
102:3

**161 (3)**
126:5;127:9,15

**1633 (1)**
6:4

**17 (1)**
103:16

**18 (3)**
86:4;94:13;146:2

**180 (1)**
7:4

**18th (2)**
148:9,20

**19 (1)**
86:15

**192nd (1)**
2:22

**1983 (1)**
88:14

**1990 (1)**

111:17

**1991 (1)**
161:23

**1993 (1)**
112:6

**1995 (1)**
121:25

**1998 (1)**
158:8

**2**

**2 (1)**
187:4

**2.2 (1)**
93:3

**2:55 (1)**
156:22

**2000 (5)**
116:2,2;121:25;
123:3,13

**2001 (1)**
111:19

**2004 (1)**
55:13

**2005 (2)**
123:3,13

**2006 (4)**
116:21;117:7;
153:6,9

**2008 (2)**
117:13;158:10

**2008-2009 (1)**
118:9

**2009 (3)**
114:3,6,7

**2010 (12)**
86:4,15;109:23,25;
114:11;118:10,11,25;
119:1,12;120:19;
150:10

**2011 (11)**
21:18;24:11;32:3,
7;64:1,4;68:17;
119:14,15;120:8,8

**2012 (34)**
32:18;33:6;47:13;
49:13,14,25;50:10,
12;51:8;52:24;64:5;
68:19;87:19,23;
110:21;111:7;121:1,
5,8,11;123:12;
127:17;128:6;
153:10,11,13,16;
154:6,15;182:1,6,13;
185:4,25

**2013 (50)**
25:25;40:18,19;
41:2;49:10;50:10;
51:20;52:24;67:24;
68:19,20;69:2;77:17;
92:4;96:20;98:20;
123:23;125:1;

129:13,15;130:4;
140:5;142:18;143:2,
16;145:7,16,20;
146:2;148:9,21;
149:19,21;153:1;
168:15;173:12;
176:18;177:24;
178:4,10;179:21;
186:14,16,17,22;
187:5,19;188:1;
189:3;197:24
**2019 (1)**
54:7
**2020 (1)**
116:3
**2039 (1)**
7:12
**2180 (1)**
116:6
**21st (3)**
12:6;52:9,10
**22 (1)**
41:2
**2200 (1)**
116:7
**22nd (1)**
66:21
**23 (1)**
8:4
**24th (3)**
50:25;51:2,2
**25 (1)**
165:6
**28th (1)**
40:17

**3**

**3 (3)**
143:19;146:25;
185:20
**3:07 (1)**
156:22
**302 (1)**
8:5
**340 (1)**
148:3
**36 (4)**
153:6;154:13;
181:11;182:22
**363 (5)**
65:18;170:9,19,20,
21
**39 (1)**
184:2
**399 (1)**
5:14

**4**

**4 (2)**
86:3;186:24
**4:15 (1)**

205:10
**400 (1)**
5:22
**425 (1)**
4:22
**44 (1)**
8:13
**443 (3)**
145:24;146:1;
155:2
**4G (1)**
113:17
**4th (1)**
32:18

**5**

**5 (7)**
86:13;182:1,23;
184:6;202:3,5,10
**500 (2)**
142:4;149:7

**6**

**6 (2)**
86:21;202:11
**679 (2)**
142:23;143:17

**7**

**7 (1)**
87:10
**7:48 (1)**
184:6
**700 (7)**
2:22;29:3,19;
35:18;42:13;123:25;
124:13
**787 (1)**
6:14

**8**

**8 (5)**
88:10;181:12;
184:3,4;185:6
**8:34 (1)**
187:5
**800 (2)**
34:10;42:13
**803.3 (1)**
135:23
**80s (1)**
158:1
**8th (4)**
51:20;145:16,19,
20

**9**

**9 (2)**

182:21,22
**9.03 (1)**
89:1
**90067 (1)**
7:13
**930 (1)**
9:3
**935 (1)**
143:20
**973406-2250 (1)**
2:24

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net