Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Plaintiff-Intervenors and Debtors and Debtors in Possession*

Marc E. Kasowitz
David M. Friedman
Jed I. Bergman
Christine A. Montenegro
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X
                                                    :
In re:                                              :    Chapter 11
                                                    :
LIGHTSQUARED INC., *et al.*,                        :    Case No. 12-12080 (SCC)
                                                    :
                                                    :    Jointly Administered
                                                    :
                                      Debtors.      :
                                                    :    Adv. Proc. No. 13-01390 (SCC)
-----------------------------------------------------------------------X
                                                    :
LIGHTSQUARED LP, LIGHTSQUARED INC.,                 :
LIGHTSQUARED INVESTORS HOLDINGS INC.                :
TMI COMMUNICATIONS DELAWARE,                        :
LIMITED PARTNERSHIP, LIGHTSQUARED GP INC.,          :
ATC TECHNOLOGIES, LLC, LIGHTSQUARED CORP.,          :
LIGHTSQUARED INC. OF VIRGINIA,                      :
LIGHTSQUARED SUBSIDIARY LLC,                        :
SKYTERRA HOLDINGS (CANADA) INC., AND                :
SKYTERRA (CANADA) INC.,                             :
                                                    :
                          Plaintiff-Intervenors,    :
                                                    :

|                              |   |
|------------------------------|---|
|     - against-                     | : |
|                              | : |
| SP SPECIAL OPPORTUNITIES LLC, | : |
| DISH NETWORK CORPORATION,    | : |
| ECHOSTAR CORPORATION,        | : |
| AND CHARLES W. ERGEN,        | : |
| Defendants.     | : |

----------------------------------------------------------------------X

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

## <u>TABLE OF CONTENTS</u>

**Page**

I.    BACKGROUND AND PROCEDURAL POSTURE ........................................................ 1

    A.    The Parties And Relevant Third Parties................................................................ 1

        1)    Parties.................................................................................................... 1

        2)    Relevant Third Parties.......................................................................... 3

    B.    Jurisdictional Facts And Nature Of Proceedings ................................................. 5

II.    THE LIGHTSQUARED LP CREDIT AGREEMENT UNAMBIGUOUSLY
BARS COMPETITORS AND NATURAL PERSONS FROM ACQUIRING LP
DEBT ............................................................................................................................ 7

    A.    The Provisions Of The Credit Agreement Are Clearly Intended To Prevent
LightSquared's Competitors From Entering The LightSquared Capital
Structure As Lenders Under The Credit Agreement............................................. 8

    B.    Natural Persons Are Not Eligible Assignees, And Are Prohibited From
Acquiring LP Debt By Assignment Or Transfer Of A Participation................... 13

    C.    The Meaning Of "Subsidiary" Encompasses A Controlled Company ............... 14

    D.    DISH And EchoStar Are Both Disqualified Companies ..................................... 15

    E.    The Standard Terms And Conditions For Assignment And Assumption
Requires Each Purchaser Of LP Debt To Represent To UBS That It Was
An Eligible Assignee. ......................................................................................... 16

III.    SPSO'S ACQUISITION WAS A STRATEGIC INVESTMENT FOR DISH .............. 18

    A.    DISH And EchoStar's Past Acquisitions Of Spectrum Assets........................... 18

    B.    LightSquared's Spectrum Assets Furthered Ergen's Strategic Goals................. 20

    C.    In Any Event, DISH Simultaneously Pursued Sprint, Clearwire, and
LightSquared To Preserve Optionality ............................................................... 24

IV.    BECAUSE DISH AND ECHOSTAR COULD NOT DIRECTLY PURCHASE
THE LP DEBT, ERGEN AND KISER CREATED SPSO TO MAKE THE
PURCHASES, AND CONCEAL THE TRUE IDENTITY OF THE BUYER.............. 25

    A.    Ergen And Kiser Investigate Whether DISH Or EchoStar Can Purchase
The LP Debt, And Determine That Neither Company Can Purchase LP
Debt..................................................................................................................... 25

    B.    Ergen And Kiser Determine That Ergen Personally Cannot Purchase The
LP Debt And Create Bal Harbour, And Then SPSO, To Evade The Credit
Agreement's Transfer Restrictions ..................................................................... 29

    C.    SPSO And Ketchum Concealed That Ergen Was Behind The LP Debt
Purchases............................................................................................................. 32

i

**TABLE OF CONTENTS**
(continued)

V.      SPSO PURCHASES LP DEBT ON BEHALF OF DISH AND ECHOSTAR ............... 33

    A.      Ergen And Kiser Carry Out SPSO's LP Debt Purchases .................................... 33

    B.      Ergen And Kiser's Focus On Building A Blocking Position Is Consistent
        With A Strategic Acquisition Strategy ................................................................ 35

VI.     ERGEN AND KISER ACTED ON BEHALF OF DISH AND ECHOSTAR
    WHEN THEY PURCHASED THE LP DEBT ................................................................ 38

    A.      Ergen Acted Within The Scope Of His Authority In Purchasing The LP
        Debt ...................................................................................................................... 39

    B.      Kiser Acted Within The Scope Of His Authority In Purchasing the LP
        Debt ...................................................................................................................... 41

    C.      Ergen Used DISH Employees, Resources And Legal Counsel To Facilitate
        The LP Debt Purchases. ...................................................................................... 43

    D.      DISH Board Members And Management Turned A Blind Eye To The
        Corporate Opportunity Presented By The Purchases Because They Knew
        Ergen Was In Fact Acting For DISH. .................................................................. 44

    E.      Ergen Controls The Boards Of DISH And EchoStar .......................................... 49

        1)      Through His Roles As DISH And EchoStar's Executive Chairman,
            Majority Shareholder Of The Board, And Holder Of The Majority
            Of The Stock For Both Companies, Ergen Controls DISH And
            EchoStar ................................................................................................ 49

        2)      After Acquiring A Blocking Position In The LP Debt, DISH
            Raises Capital For A Strategic Acquisition Without Board
            Approval ................................................................................................ 49

        3)      Soon After Acquiring A Blocking Position, Ergen Makes
            Presentations To The DISH Board That Contemplates An
            Immediate DISH Bid And Funding Of The Bid .................................... 51

VII.    ERGEN'S ASSERTION THAT HE WAS MAKING A PERSONAL
    INVESTMENT IS BELIED BY THE EVIDENCE ........................................................ 52

    A.      The Purchase Of LP Debt Was Inconsistent With Ergen's Personal Past
        Investment Strategy ............................................................................................ 53

    B.      The Prices Ergen Paid For The LP Debt And Offered For The LP
        Preferred Are Inconsistent With A For-Profit Personal Investment .................... 55

    C.      Other Interested Parties Likewise Viewed The LP Debt Trades As A Dish
        And Echostar Investment .................................................................................... 57

VIII.   DISH, THROUGH LBAC, BIDS FOR LIGHTSQUARED'S ASSETS AT
    ERGEN'S BEHEST ...................................................................................................... 58

## TABLE OF CONTENTS
(continued)

Page

A.    DISH Forms A Special Committee To Evaluate The Propriety Of Ergen's LP Debt Purchases And A DISH Bid .................................................. 58

B.    Ergen Makes A Bid That Sets The Floor And Ensures He Would Be Repaid In Full ................................................................................ 58

C.    DISH Approves The Bid And Disbands The Special Committee Without Regard To The Special Committee's Conditional Recommendation.................. 60

D.    The Bid Was Made Without DISH And The Special Committee's Participation In Crucial Aspects ........................................................ 62

IX.    SPSO IS IDENTICAL TO AND INDISTINGUISHABLE FROM ERGEN ................. 63

A.    The SPSO Entity Was Undercapitalized And Funded Solely At Ergen's Discretion ................................................................................ 64

X.    DEFENDANTS MAKE A STRATEGIC DECISION TO LEAVE HUNDREDS OF MILLIONS OF DOLLARS IN LP DEBT TRADES OPEN FOR SEVERAL MONTHS ............................................................................... 66

A.    Kiser, With Sound Point's Assistance, Delayed The Closing Of The LP Debt Trades ............................................................................. 67

B.    There Was No True Economic Benefit For Ergen and Kiser To Keep The LP Debt Trades Open ...................................................................... 71

C.    Trades Were Not Left Open Due To Liquidity Concerns.................................... 74

D.    Defendants' Testimony Is Inconsistent On Why The Trades Were Open........... 74

XI.    LIGHTSQUARED AND ITS CREDITORS WERE INJURED BY DEFENDANTS' CONDUCT ...................................................................... 76

A.    Negotiations With The Ad Hoc Secured Group Were Chilled By Ergen's Improper Entry Into LightSquared's Capital Structure. ...................................... 77

B.    Once SPSO Announced Ergen's Blocking Position and Joined The Ad Hoc Secured, Negotiations Derailed................................................................ 79

C.    Within Weeks Of Ergen Joining The Ad Hoc Secured Group, The LBAC Bid Is Adopted ........................................................................ 81

D.    LightSquared's Negotiations With The Creditors Came To An End After The Filing Of The Ad Hoc Secured Group Plan.................................... 84

E.    Ergen And His Entities Seek To Obtain A Broad Release In The Ad Hoc Secured Group Plan. ................................................................. 85

XII.    LIGHTSQUARED AND HARBINGER INQUIRED—BUT COULD NOT DISCERN—WHETHER ERGEN WAS IN THE CAPITAL STRUCTURE ............... 87

A.    SPSO Intentionally Concealed Its LP Debt Purchases ........................................ 87

-iii-

**TABLE OF CONTENTS**
(continued)

**Page**

B.    Public Information Provided No Certainty As To Who Was Behind Sound
       Point's Purchases ............................................................................................... 87

C.    LightSquared and Harbinger Made Diligent Inquiries To Determine Who
       Was Behind Sound Point's LP Debt Purchases. .................................................. 90

D.    LightSquared And Harbinger Learned That Ergen Was Behind SPSO On
       May 21, 2013 ....................................................................................................... 93

**PROPOSED FINDINGS OF FACT**

Plaintiffs LightSquared LP, LightSquared Inc., LightSquared Investors Holdings Inc., TMI Communications Delaware Limited Partnership, LightSquared GP Inc., ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as debtors and debtors in possession (collectively, with certain of their affiliate debtors and debtors in possession, "LightSquared") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") and plaintiff-intervenors in this adversary proceeding, and Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger," and with LightSquared, "Plaintiffs"), respectfully submit the following proposed findings of fact.

## I.   BACKGROUND AND PROCEDURAL POSTURE

### A.   The Parties And Relevant Third Parties

#### 1)   Parties

1.      LightSquared provides wholesale mobile satellite communications and broadband services throughout North America.  Through its ownership of several satellites and licenses to use mobile satellite service spectrum issued by the Federal Communications Commission ("FCC"), LightSquared delivers voice and data services to mobile devices used by the military, first responders and other safety professionals, and individuals throughout North America.  (*See In re LightSquared Inc.*, Case No. 12-12080-scc [Docket No. 3] ¶¶ 18-31.)

2.      Harbinger owns in excess of 82% of LightSquared and holds a general unsecured claim against LightSquared LP and claims against LightSquared Inc.  (*See* Adv. Docket No. 1 ¶ 17.)

1

3.      Defendant DISH Network Corporation ("DISH") is a public corporation organized and existing under the laws of the State of Nevada with its principal place of business in Englewood, Colorado.  DISH provides broadband and satellite television services and aims to expand its broadband offerings, including by building a terrestrial broadband network.  (PX0781 ¶¶ 30, 43.)  In addition to its satellite broadcast business, DISH owns significant spectrum assets, including mobile satellite spectrum.  (Id.)  DISH is a direct competitor of LightSquared.  (Id. ¶ 30; Jan. 13 Tr. (Ergen) 14:13-18; Jan. 10 Tr. (Kiser) 70:24-71:1; PX0013 at 10; Montagner Dep. 72:13-74:7; PX0159 at L2AP0007578.)[1]

4.      Defendant EchoStar Corporation ("EchoStar") is a public corporation organized and existing under the laws of the State of Nevada with its principal place of business in Englewood, Colorado.  EchoStar is a satellite communications company that currently operates, leases, or manages a number of satellites, including the satellites that provide services to DISH. EchoStar is a direct competitor of LightSquared.  (PX0781 ¶ 31; Jan. 10 Tr. (Kiser) 15:15-21; Jan. 13 Tr. (Ergen) 15:8-12.)

5.      Defendant SP Special Opportunities LLC ("SPSO") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business nominally in New York, New York.  SPSO's sole member and managing member is Special Opportunities Holdings LLC ("SO Holdings").  SO Holdings is a Delaware limited liability company whose sole member and managing member is Defendant Charles W. Ergen ("Ergen").  SPSO was formed by non-party Sound Point (defined below) for the exclusive purpose to serve as the investment vehicle through which Ergen made trades for LightSquared's

---

[1]      Citations to the trial transcripts of the adversary proceeding, No. 13-1390 (SCC) dated January 9 through January 17 will be referenced as "Jan. __ Tr. (witness) [page:line]."  Citations to deposition testimony will be referenced as "Witness Dep. [page:line]."

LP Debt (PX0162; PX0171; PX0183; PX0224; Jan. 10 Tr. (Kiser) 30:16-21, 31:20-32:14;

PX0700 ¶¶ 1-2), without those purchases being traceable to Ergen (*see* Jan. 10 Tr. (Kiser) 30:16-

21, 31:20-22, 32:2-14, 90:6-12, 90:25-91:20; Jan. 13 Tr. (Ergen) 36:13-37:4, 49:20-50:25;

PX0117; PX0290 at LSQ-SPCD-000006771; PX0298).

6.      Defendant Ergen, a natural person, is the founder, Chairman of the board of

directors, Executive Chairman, and majority owner of both DISH and EchoStar ("Ergen").

Ergen—personally and through his family trusts—beneficially owns and controls over 88% of

DISH's voting shares and over 80% of EchoStar's voting shares.  Ergen also wholly owns and

controls SO Holdings and SPSO.  (PX0700 ¶¶ 1-2; Jan. 13 Tr. (Ergen) 94:19-95:2, 208:18-

211:20; Howard Dep. 37:25-38:16; PX0372 at 2, 5; PX0371 at 2.)

7.      Ergen, as the holder of a majority share of voting rights (approximately 88% and

79.4% of the total voting power in DISH and EchoStar, respectively), has the ability to elect a

majority of the directors for his companies, and control all other matters requiring the approval

of their stockholders.  (Jan. 13 Tr. (Ergen) 94:19-95:2, 208:18-211:20; Howard Dep. 37:25-

38:16; PX0372 at 2, 5; PX0371 at 2.)  Thus, Ergen voted for each of the current DISH board

members, and testified that he does not know whether it is possible for someone to be a director

of DISH without his vote.  (Ergen Dep. 18:5-16, 26:19-25; Jan. 13 Tr. (Ergen) 95:3-5.)  As a

result of Ergen's dominance, both DISH and EchoStar are "controlled compan[ies] as defined in

the Nasdaq listing rules."  (PX0349 at 39-40; PX0350 at 34.)

### 2)      Relevant Third Parties

8.      Thomas Cullen ("Cullen") is the Executive Vice President of Corporate

Development at DISH, a position he has held since June 2011.  (Jan. 17 Tr. (Cullen) 98:19-20,

101:3-5.)

3

9.      Philip Falcone ("<u>Falcone</u>") is the portfolio manager of Harbinger Capital Partners

LLC. (Jan. 16 Tr. (Falcone) 12:3-13.)  Falcone has been trading high yield distressed debt for

over 20 years.  (Jan. 16 Tr. (Falcone) 13:13-18.)  Although Falcone is a member of

LightSquared's board of directors, in September 2013 this Court ordered the appointment of a

special committee of independent directors to direct many of LightSquared's significant actions

with respect to these bankruptcy cases.  (Docket No. 866; PX0755; PX0789; Jan. 16 Tr.

(Falcone) 17:25-18:3; 18:8-18.)

10.     Stephen Ketchum ("<u>Ketchum</u>") is the founder and sole managing partner of

Sound Point Capital Management LP ("<u>Sound Point</u>").  (Jan. 15 Tr. (Ketchum) 13:13-19.)

Sound Point is an investment management and advisory firm that served as trading manager and

investment advisor for SPSO and executed SPSO's purchases of LightSquared's debt ("<u>LP</u>

<u>Debt</u>").  (Jan. 15 Tr. (Ketchum) 20:14-17.)  Kiser and Ketchum had a 20-year long relationship

that involved work related to both EchoStar and DISH.  Ketchum served as the point of contact

between Sound Point and Kiser and Ergen.  (Jan. 15 Tr. (Ketchum) 14:19-22, 93:23-94:3; Jan. 10

Tr. (Kiser) 24:10-25:8.)

11.     Jason Kiser ("<u>Kiser</u>") is the Treasurer of DISH and Vice President of Corporate

Development at DISH and EchoStar, and, together with Ergen and Cullen, is part of the

corporate development team at DISH and EchoStar.  (Jan. 10 Tr. (Kiser) 15:25-16:6, 68:24-69:2,

69:20-22.)  Kiser facilitated and managed Ergen's trades in LightSquared debt (the "<u>LP Debt</u>")

through SPSO.  (Jan. 10 Tr. (Kiser) 25:6-8.)

12.     Steven R. Goodbarn ("<u>Goodbarn</u>") is a member of the DISH board of directors

and was a member of the special committee of independent directors of DISH that was formed to

evaluate and make recommendations regarding a possible bid by DISH for LightSquared's assets (the "Special Committee").  (PX0768 ¶ 2.)

13.      Gary S. Howard ("Howard") is a former member of the DISH board of directors and was a member of the Special Committee.  (PX0768 ¶¶ 2, 53.)

**B.      Jurisdictional Facts And Nature Of Proceedings**

14.      On May 14, 2012, LightSquared commenced a voluntary bankruptcy case pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  (*In re LightSquared Inc.*, Case No. 12-12080-scc [Docket No. 1].)

15.      On August 6, 2013, Harbinger commenced this adversary proceeding against Ergen, DISH, EchoStar, L-Band Acquisition, LLC ("LBAC"), SPSO, SO Holdings, Sound Point, and Ketchum, alleging inequitable conduct, fraud, aiding and abetting fraud, tortious interference with prospective economic advantage, tortious interference with contractual relationship, unfair competition, and civil conspiracy, and seeking equitable disallowance of claims, compensatory and punitive damages, costs and fees, interest, and other appropriate relief.  (*See* Adv. Docket No. 1.)  On September 30, 2013, Harbinger amended its complaint as of right (the "Harbinger Amended Complaint").  (Adv. Docket No. 43.)

16.      On August 22, 2013, LightSquared intervened in the Adversary Proceeding on limited grounds.  (Adv. Docket No. 15.)  U.S. Bank National Association ("U.S. Bank"), Mast Capital Management LLC ("Mast"), and the Ad Hoc Secured Group of LightSquared LP Lenders ("Ad Hoc Secured Group") also intervened on the same day.  (Adv. Docket Nos. 12, 14.)

17.      By Order dated November 14, 2013 ("November Order"), this Court granted Defendants' motions to dismiss the Harbinger Amended Complaint.  (PX0770.)  The Court also

granted Harbinger leave to file a second amended complaint that did not assert claims on Harbinger's own behalf, but merely set forth an objection, pursuant to Section 502 of the Bankruptcy Code, to SPSO's claim. (*Id.*) The Court also authorized LightSquared to file a complaint setting forth the basis for its intervention. (*Id.*)

18.    On November 15, 2013, LightSquared filed a Complaint-in-Intervention (the "LightSquared Complaint") against SPSO, DISH, EchoStar, and Ergen (collectively, "Defendants") seeking: (i) a declaration that SPSO is not an "Eligible Assignee" under LightSquared's October 10, 2010 Credit Agreement, as amended, modified, and restated (the "Credit Agreement") (PX0004), (ii) to disallow SPSO's claim under 11 U.S.C. § 502(b), and (iii) to equitably disallow SPSO's claim. (PX0771.) The LightSquared Complaint further alleges breach of contract against SPSO, as well as tortious interference with contractual relations against all Defendants. (*Id.*) The LightSquared Complaint also seeks equitable subordination as a remedy. (*Id.*)

19.    On December 2, 2013, Harbinger filed a Second Amended Complaint (the "Harbinger SAC"), seeking a declaration that SPSO is not an "Eligible Assignee" under the Credit Agreement, to disallow SPSO's claim under 11 U.S.C. § 502(b), to equitably disallow SPSO's claim, and to equitably subordinate SPSO's claim under 11 U.S.C. § 510. The Harbinger SAC further alleges breach of contract against SPSO. (PX0781.)

20.    By Order dated December 12, 2013 (the "December Order"), the Court granted in part and denied in part Defendants' motions to dismiss the LightSquared Complaint and the Harbinger SAC. (PX0784.) The December Order dismissed all of the claims in the Harbinger SAC, except for Harbinger's claim seeking disallowance of SPSO's claim under 11 U.S.C. § 502(b). (*Id.* ¶ 3.) With respect to the LightSquared Complaint, the Court granted Defendants'

motions only as to LightSquared's equitable disallowance claim against SPSO and its tortious

interference claim against SPSO.  (*Id.* ¶ 2.)  The Court retained jurisdiction to hear and determine

all matters arising from the interpretation, implementation and enforcement of the December

Order.  (*Id.* ¶ 4.)

21.    Following expedited discovery, on January 9, 2014, the Court commenced a trial

and heard live testimony from eight witnesses.  The parties also submitted additional evidence

consisting of over 300 exhibits and excerpts from the deposition transcripts of six witnesses in

lieu of live testimony.  The Court requested that proposed findings of fact and post-trial briefs be

submitted by Plaintiffs on February 24, 2014, and by Defendants on March 10, 2014.

22.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.  Pursuant to 28 U.S.C. §§ 157 and 1334(b), the Court has jurisdiction to

consider this matter a "core" proceeding.  Venue is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

## II.    THE LIGHTSQUARED LP CREDIT AGREEMENT UNAMBIGUOUSLY BARS COMPETITORS AND NATURAL PERSONS FROM ACQUIRING LP DEBT

23.    In 2010, LightSquared obtained authorization from the FCC to build an ancillary

terrestrial network ("ATC Network") that would integrate its satellite service with terrestrial

satellite ground stations to provide fourth generation long term evolution ("4G-LTE") broadband

mobile services throughout the United States.  (DX054 ¶¶ 5-7, 29-30, 33.)  To finance the

buildout of its ATC Network, on October 1, 2010, LightSquared LP and certain of its affiliates

entered into a Credit Agreement with UBS AG, Stamford Branch ("UBS"), as Administrative

Agent, and entities that were, or would serve as, "Lenders" under the Credit Agreement.  (*Id.*

¶ 37.)  The Credit Agreement is governed by New York law.  (PX0004 at HARBAP00004158, §

10.09(a).)

7

**A.    The Provisions Of The Credit Agreement Are Clearly Intended To Prevent LightSquared's Competitors From Entering The LightSquared Capital Structure As Lenders Under The Credit Agreement**

24.    The Credit Agreement prominently restricts transfers of the LP Debt, with the plain objective of excluding LightSquared's competitors from entering the LightSquared capital structure as Lenders under the Credit Agreement.  Thus, Section 10.04(a) of the Credit Agreement provides, in pertinent part:

> [N]o Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this <u>Section 10.04</u>, (ii) by way of participation in accordance with the provisions of paragraph (d) of this <u>Section 10.04</u> or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by Borrower shall be null and void).

(PX0004 at HARBAP00004153.)

25.    Section 10.04(b) states that assignments are permitted only to Eligible Assignees: "Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement . . ."  (PX0004 at HARBAP00004154.)  Section 10.04(b) provides that "[a]ny assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph [relating to assignments] shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations *in accordance with Section 10.04(d)*."  The term "Eligible Assignee" is defined in Section 1.01 of the Credit Agreement as follows:  "[A]ny person to whom it is permitted to assign Loans and Commitments pursuant to Section 10.04(b)(i); *provided* that 'Eligible Assignee' shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person or any Disqualified Company."  (*Id.* at HARBAP0004058 (emphasis in original); Jan. 10 Tr. (Kiser) 30:4-21, 119:16-22, 120:11-24; PX0144.)

8

26.     In turn, "Disqualified Company" is defined in Section 1.01 as follows:

> [A]ny operating company which is a direct competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon the consent of the Administrative Agent . . . such additional bona fide operating companies which are direct competitors of the Borrower as may be identified to the Administrative Agent from time to time and notified to the Lenders. A Disqualified Company will include any known subsidiary thereof.

(PX0004 at HARBAP0004057-58.) The Credit Agreement thus prohibits assignment or other transfer of the LP Debt to a LightSquared competitor named in Schedule 1.01(a) or a subsidiary of such a competitor.

27.     Section 10.04(d) contains a similar restriction with respect to participations, *inter alia*, barring the sale of a participation to a Disqualified Company or a natural person: "Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent sell participations to any person (other than a natural person, Borrower or any of its Affiliates or any Disqualified Company) . . . ." The provision further prohibits the sale by a participant of any sub-participation to, *inter alia*, any Disqualified Company or any natural person: "Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that (i) the relevant participant shall not be permitted to sell sub-participations to any natural person, Borrower or any of its Affiliates or any Disqualified Company . . . ." (PX0004 at HARBAP00004155.)

28.     Section 10.04(a) of the Credit Agreement specifically states that only those transferees permitted under the terms of the Credit Agreement receive any rights, remedies, or claims thereunder:

> Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other

Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(PX0004 at HARBAP0004153-54.)

29.    Finally, with respect to pledges, Section 10.04(f) provides:

Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(PX0004 at HARBAP0004156.)  Thus, a pledgee acquires no rights under the Credit Agreement.

30.    While the foregoing provisions directly addressing assignments and transfers by Lenders plainly indicate LightSquared's purpose to keep competitors out of its capital structure, that purpose is reflected elsewhere in the Credit Agreement as well.  For example, there are circumstances in which the "Borrower may . . . require [a] Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interest, rights and obligations under this Agreement and the other Loan Documents *to an Eligible Assignee* . . . ."  (PX0004 at HARBAP0004088, § 2.16(b) (emphasis added).)

31.    Similarly, the Borrower may, by written notice to the Administrative Agent, establish "new term loan commitments (the '**Incremental Loan Commitments**')" for additional borrowings, and must set forth in such notice "the identity of each Lender or other Person *that is an Eligible Assignee* (each, an '**Incremental Loan Lender**', as applicable) to whom the Borrower proposes any portion of such Incremental Loan Commitments, as applicable, be allocated and the amounts of such allocations . . . ."  (PX0004 at HARBAP0004089-90, § 2.20(a) (emphasis added).)

10

32.     Further, competitors like DISH are not interested in maximizing value for the company:  "the general assumption is that [the] strategic got in there to own the company, to own the assets."  (Jan. 9 Tr. (Derrough) 162:19-164:18; 170:11-17; *see also* Jan. 16 Tr. (Falcone) 102:24-103:6 (a competitor in a debtors' capital structure is not beneficial when the competitor "buy[s] the debt and tr[ies] to take control of the company and derail a consensual plan"); Jan. 17 Tr. (Hootnick) 32:14-33:2; 33:19-34:14 ("The difference between [having] a Charlie Ergen DISH [invest as opposed to Icahn] is they had a very public . . . process where they were acquiring and amassing large spectrum blocks. . . . [T]he large aggressive hedge fund guy at a financial return is willing to exit. . . . [Ergen] was acquiring this not for a financial return, but to warehouse the spectrum.").

33.     Persons holding LP Debt are entitled to receive substantial non-public information about LightSquared and are granted access to LightSquared's officers and employees for information regarding LightSquared's ongoing business and operations.  Prior to initial funding, LightSquared provided to the Lenders, among other things, multiple years of financial statements, plus current forecasts of anticipated financial performance (PX0004 at HARBAP00004092-93, § 3.04); a listing of all interests in real property owned or leased by Borrower, together with representations regarding title, etc. (*id.* at HARBAP00004093-94, § 3.05); a listing of all copyrights, patents and trademarks owned or licensed by Borrower, together with representations regarding same (*id.* at HARBAP00004094, § 3.06); and copies of all material agreements relating to the business operated by the Borrower (*id.* at HARBAP00004095-96, § 3.09).  Under the Credit Agreement, these disclosures must be updated regularly by the Borrower.

11

34.     To meet this obligation, the Borrower must furnish to Lenders the type of

information that would be included in annual and quarterly reports on SEC Forms 10-K and 10-

Q (PX0004 at HARBAP00004108-9, §§ 5.01(a)-(b)), annual and quarterly budgets (*id.* at

HARBAP00004110, § 5.01(h)), and "such other information regarding the operations, business

affairs and financial condition of [Borrower, its parents and its subsidiaries] . . . as . . . any

Lender may reasonably request, including, without limitation, updates on the Network build-

out." (*Id.* at HARBAP00004110, § 5.01(j).) Each Lender also has the right to inspect and make

copies of Borrower's financial records; to inspect Borrower's properties; and to "discuss the

affairs, finances, accounts and condition of [Borrower, its parents and its affiliates] with the

officers and employees thereof and advisors therefor (including independent accountants)." (*Id.*

at HARBAP00004113-14, § 5.07(a).)

35.     The Credit Agreement includes provisions designed to ensure a Lender's access

to material non-public information about the Borrower. Each Lender must "designate at least

one individual to receive Private Side Communications [*i.e.*, communications containing

material non-public information] on its behalf . . . and identify such designee (including such

designee's contact information) on such Lender's Administrative Questionnaire." (PX0004 at

HARBAP00004149, § 10.01(d).) A Lender may elect not to receive material non-public

information, but must, if so electing, waive "any and all claims based on or arising out of, not

having access to Private Side Communications." (*Id.*)

36.     SPSO did ***not*** waive its right to receive confidential information about SPSO. To

the contrary, SPSO specifically identified in the several Lender Questionnaires it provided to the

Administrative Agent one or more persons to whom such information was to be delivered.

(PX0198; PX0227; PX0282; PX0317; PX0362; PX0363;  PX0365; PX0367; PX0411; PX0563;

12

PX0618; PX0638; PX0658; PX0672; PX0728; PX0733; PX0849; PX0851.) Those individuals had access to information on LightSquared. (*See, e.g.*, PX0919-922.)

37. LightSquared's rights under the Credit Agreement cannot be waived under the express terms of the Credit Agreement. Section 10.02(b) explicitly requires written consent by the parties before a party may be found to have waived the terms of the Credit Agreement:

> Required Consents. Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Trustee (in the Case of any Security Document) and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders . . . .

(PX0004 at HARBAP00004149-50.)

**B. Natural Persons Are Not Eligible Assignees, And Are Prohibited From Acquiring LP Debt By Assignment Or Transfer Of A Participation**

38. The term "Eligible Assignee" also excludes "any natural person." (PX0004 at HARBAP0004058, §1.01.) Thus, pursuant to Section 10.04(b)(i), a natural person may not take an assignment of LP Debt ("Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement . . ."). (PX0004 at HARBAP00004154.) Pursuant to Section 10.04(d), a natural person may not receive a Participation in LP Debt ("Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent sell participations to any person (other than a natural person, Borrower or any of its Affiliates or any Disqualified Company . . ."). (*Id.* at HARBAP00004155.)

39. Defendants concede that Ergen, as a natural person, is not an Eligible Assignee and is not permitted to own the LP Debt. (Jan. 10 Tr. (Kiser) 120:20-24.)

C.    **The Meaning Of "Subsidiary" Encompasses A Controlled Company**

40.    As noted, a "Disqualified Company" under the Credit Agreement includes "any known subsidiary thereof."  The word "Subsidiary" in the definition section of the Credit Agreement is defined, "with respect to any person (the 'parent')," as including, "any other person that is otherwise Controlled by the parent. . . ."  (PX0004 at HARBAP0004073, § 1.01.) "Controlled" is defined to mean "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise. . . ."  (*Id.* at HARBAP0004056, § 1.01.)  Reading these definitions together makes clear that the defined term "Subsidiary" extends beyond the concept of majority ownership to include one entity that is controlled, directly or indirectly, by another.

41.    Employing control as the test for a parent-subsidiary relationship is consistent with the ordinary meaning of the term.  For example, *Oxford Dictionaries* defines a subsidiary as "a company **controlled** by a holding company."  And *Merriam-Webster* defines subsidiary as "a company that is owned **or controlled** by another company."  *See Oxford Dictionaries*, at http://www.oxforddictionaries.com/definition/american_english/subsidiary; *Merriam-Webster*, *at* http://www.merriam-webster.com/dictionary/subsidiary (emphasis added).  This common understanding of the term "subsidiary" is also evidenced by Ketchum's understanding of the Credit Agreement, as amended, stating that "any known subsidiary thereof . . . indicates other corporate entities controlled by those names. . . .  Corporate entities controlled by DISH and EchoStar."  (Jan. 15 Tr. (Ketchum) 52:7-53:16.)

42.    During the negotiations of the relevant language in September 2010, UBS's counsel originally defined the term "Eligible Assignee" so as to exclude "any natural person or any person listed on Schedule 1.01(a)."  (PX0001.)  In response, counsel for LightSquared

circulated a revised draft changing the definition of "Eligible Assignee" to also exclude a

"Competitor" from purchasing LP Debt. (PX0002.) The word "Competitor" was defined as "(i)

any person listed on Schedule 1.01(a), (ii) any other competitor of the Borrower that is

designated as such in writing to the Administrative Agent by the Borrower from time to time,

and (iii) any Affiliate of any such person." (*Id.*) Counsel for UBS then responded with edits that

effectively substituted the word "subsidiary" for "Affiliate." The edits deleted the proposed new

term "Competitor" and added a different term, "Disqualified Company," defined as "any

operating company which is a direct competitor of the Borrower identified to the Administrative

Agent in writing before the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon

the consent of the Administrative Agent (such consent not to be unreasonably withheld or

delayed), such additional bona fide operating companies which are direct competitors of the

Borrower as may be identified to the Administrative Agent from time to time and notified to the

Lenders. ***A Disqualified Company will include any known subsidiary thereof***." (PX0003

(emphasis added).) This language survived in the executed version of the Credit Agreement.

### D. <u>DISH And EchoStar Are Both Disqualified Companies</u>

43.     Schedule 1.01(a) annexed to the Credit Agreement at its effective date, October 1,

2010, identifies the initial list of Disqualified Companies. EchoStar is included on this initial

version of Schedule 1.01(a) and, accordingly, has been a Disqualified Company since the

inception of the Credit Agreement. (PX0004 at HARBAP00004166; Jan. 9 Tr. (Smith) 126:22-

127:1.)

44.     On May 9, 2012, LightSquared amended the Disqualified Company list to add

additional LightSquared competitors, including, among others, DISH. (PX0142.) On May 12,

2012, LightSquared again amended the Disqualified Company list to add Cablevision. (Jan. 16

Tr. (Falcone) 49:17-19; PX0901 at HARBAP00011331; *see also* PX0190.)

45.     LightSquared amended the Disqualified Company (pre-bankruptcy) list "to make sure that the list of disqualified companies included all of [LightSquared's] competitors, because we didn't want competitors involved in the capital structure.  We thought it was important as we were entering bankruptcy to make these updates."  (Jan. 9 Tr. (Smith) 126:22-127:24; PX0161.)

46.     Each of DISH and EchoStar is thus a Disqualified Company under the Credit Agreement.

### E.    The Standard Terms And Conditions For Assignment And Assumption Requires Each Purchaser Of LP Debt To Represent To UBS That It Was An Eligible Assignee.

47.     Pursuant to the Credit Agreement, in order to finalize an assignment of LP Debt an Eligible Assignee must execute an "Assignment and Assumption," attesting to meeting the requirements of an "Eligible Assignee."  (PX0004 at HARBAP00004154, § 10.04(b)(ii)(c).)  An "Assignment and Assumption" is defined as "an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B, or any other form approved by the Administrative Agent. . . ."  (Id. at HARBAP00004051, §1.01.)

48.     Each Assignment and Assumption executed by an Eligible Assignee, which was counter executed by UBS, contained "Standard Terms And Conditions For Assignment and Assumption," and the assignee represented and warranted that it was an Eligible Assignee under the Credit Agreement:

> Assignee.  The Assignee (a) represents and warrants that . . . (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder . . . ."

(E.g., PX0201 at LSQ-SPCD-00008716,  § 1.2.)

16

49.    Under section 10.05 of the Credit Agreement,

"[a]ll covenants, agreements, representations and warranties made by the Loan
Parties in the Loan Documents and in the certificates or other instruments
delivered in connection with or pursuant to this Agreement or any other Loan
Document shall be considered to have been relied upon by the other parties hereto
and shall survive the execution and delivery of the Loan Documents and the
making of any Loans, regardless of any investigation made by any such other
party or on its behalf and notwithstanding that the Administrative Agent or any
Lender may have had notice or knowledge of any Default or incorrect
representation or warranty at the time any credit is extended hereunder, and shall
continue in full force and effect as long as the principal of or any accrued interest
on any Loan or any fee or any other amount payable under this Agreement is
outstanding and unpaid…"

(PX0004, § 10.05.)

50.    The term "Loan Documents" means "[the Credit Agreement], the Notes (if any),

the Security Documents, and any other instrument or agreement now or hereinafter executed and

delivered in connection herewith…" (*Id.* at HARBAP00004065, § 1.01)

51.    Under Section 10.04 of the Credit Agreement, UBS, as Administrative Agent,

was required to approve assignments of the LP Debt based on a representation from a purchaser

that it was an Eligible Assignee pursuant to the terms of the Credit Agreement.  (*See* PX0004 at

HARBAP00004154, § 10.04(b)(i).)  Acting as agent of the Borrower, UBS was also required to

maintain a copy of each Assignment and Assumption and to record the names of each lender in a

register.  (*Id.* at HARBAP00004155, § 10.04(c).)

52.    SPSO repeatedly made representations and warranties that it was an "Eligible

Assignee" in each Assignment and Assumption agreement that SPSO submitted to UBS in

connection with its LP Debt purchases.  (PX0198; PX0227; PX0282; PX0296; PX0313;

PX0317; PX0336; PX0362; PX0363; PX0365; PX0367; PX0411; PX0434; PX0563; PX0618;

PX0638; PX0658; PX0672; PX0728; PX0733; PX0849; PX0851.)  As set forth below, these

repeated representations were false because SPSO was not an "Eligible Assignee."  SPSO made

17

the LP Debt purchases on behalf of DISH and EchoStar and those purchasers are properly

imputed to DISH and Echostar, two "Disqualified Companies." (*See supra* Section II.D.)

Moreover, because SPSO is controlled by DISH and EchoStar through their agents, Ergen and

Kiser, SPSO is a "subsidiary" of a Disqualified Company. Alternatively, SPSO is a "natural

person" because it is identical to and indistinguishable from Ergen.

## III.    SPSO'S ACQUISITION WAS A STRATEGIC INVESTMENT FOR DISH

### A.    DISH And EchoStar's Past Acquisitions Of Spectrum Assets

53.    DISH is diversifying away from its core Pay-TV business and expanding into the

terrestrial wireless business. (PX0349 at ii.) Led by Ergen, DISH's strategic goal is to compete

in the wireless space with telecommunications giants like AT&T and Verizon, which requires a

great deal of spectrum. (Jan. 13 Tr. (Ergen) 26:18-20, 96:18-98:22, 100:25-101:4.) As Ergen

acknowledged, spectrum is a limited resource that currently suffers from a shortage, with the

amount of data flowing over available spectrum doubling every year. (Jan. 13 Tr. (Ergen) 47:3-

48:10, 96:5-14; PX0747 at SPSO-00012492.) Accordingly, Ergen and DISH regularly monitor

mobile satellite service ("MSS") companies that hold spectrum, and in particular, DBSD North

America, Inc. ("DBSD"), TerreStar Corp. ("TerreStar"), and LightSquared. (Jan. 10 Tr. (Kiser)

27:19-24; Jan. 17 Tr. (Cullen) 111:13-112:1, 134:9-14.)

54.    DISH and EchoStar, with Ergen at the helm, for years have been attempting to

acquire, or merge with, numerous spectrum-owning companies, including actual and potential

transactions involving DBSD, TerreStar, Sirius XM Holdings, Inc. ("Sirius"), Clearwire Corp.

("Clearwire"), Sprint Corp. ("Sprint"), and Immarsat plc ("Immarsat"). (Jan. 13 Tr. (Ergen)

95:6-96:4, 101:5-103:5, 105:11-108:10.)

55.    To this end, DISH and EchoStar, at Ergen's direction, have a history of

purchasing distressed or discounted debt of their targets as a step toward an eventual acquisition,

18

including acquiring a blocking position in distressed satellite companies in bankruptcy, such as

DBSD and TerreStar, so as to acquire the companies' spectrum assets at a discount. (Jan. 13 Tr.

(Ergen) 100:25-103:9; Jan. 10 Tr. (Kiser) 108:21-109:6, 106:24-107:3; Howard Dep. 285:15-24.)

56.    In DISH's acquisition of TerreStar through bankruptcy, Ergen and DISH

employed a three-step strategy—similar to the strategy employed here for LightSquared. *First*,

EchoStar became the largest secured creditor of TerreStar Networks and the second-biggest

shareholder in the parent, TerreStar Corp., to gain influence over the process. (PX0012

(EchoStar 10-Q Jun. 30, 2011 at 14).) *Second*, DISH became the ultimate purchaser of TerreStar

as a stalking horse bidder, repaying EchoStar in full. (DX008 (DISH 8-K Jun. 16, 2011 at 2).)

*Third*, DISH entered into a purchase agreement with TerreStar whereby both the debt-buyer

(EchoStar) *and* the acquirer (DISH)—both represented by SPSO's counsel, Willkie Farr &

Gallagher LLP ("Willkie")—obtained broad releases that ensured EchoStar's claims would be

paid in full. (Jan. 13 Tr. *(*Ergen) 105:14-17; PX0011 at 1, 5, 9 fn.4, 61.)

57.    DISH's acquisition of DBSD through the bankruptcy process, in which Ergen was

also intimately involved, employed a similar strategy. (Jan. 13 Tr. (Ergen) 106:7-10.) DISH

acquired a blocking position in DBSD's first lien debt and attempted to acquire a blocking

position in DBSD's second lien debt to facilitate its acquisition. (Jan. 13 Tr. (Ergen) 104:4-10,

105:11-13, 106:2-10; PX0831 (*In re DBSD North America, Inc*., 634 F.3d 79, 104 (2d Cir. 2011)

("DISH purchased the claims as votes it could use as levers to bend the bankruptcy process

toward its own strategic objective of acquiring DBSD's spectrum rights, not protecting its

claim")); PX0864 (*In re DBSD North America, Inc*., 421 B.R. 133, 136 (Bankr. S.D.N.Y. 2009)

(quoting DISH document stating that DISH "believe[d] there is a strategic opportunity to obtain

a blocking position in the 2nd Priority Convertible Notes and control the bankruptcy process for

this potentially strategic asset.").)  Despite the bankruptcy court designating DISH's votes, DISH

ultimately acquired DBSD's spectrum assets and was repaid in full on its debt holdings.

(PX0864, 421 B.R. at 143 (designating DISH votes).)

58.    In March 2012, DISH gained control of DBSD and TerreStar's spectrum, now

known as AWS-4 spectrum, which, as of at least January 17, 2014, DISH has still not deployed.

(Jan. 13 Tr. (Ergen) 101:5-14, 147:22-25; Jan. 17 Tr. (Cullen) 111:21-24; DX024; Jan. 10 Tr.

(Kiser) 109:7-9; Jan. 17 Tr. (Cullen) 139:2-9.)

### B.    LightSquared's Spectrum Assets Furthered Ergen's Strategic Goals

59.    There is little doubt that the purpose of Ergen's purchase of LP Debt through

SPSO was to acquire LightSquared's spectrum for DISH and EchoStar.  Ketchum candidly

informed his investors, right after executing SPSO's first major acquisition of LP Debt, that this

was a "loan-to-own" investment (Jan. 15 Tr. (Ketchum) 46:14-47:4; PX0116), the purpose of

which was to gain control over LightSquared and its valuable spectrum.  With similar candor,

Ketchum congratulated Kiser, when they mistakenly believed they had acquired a blocking

position in the LP Debt, "You just bought a spectrum company."  (PX0385.)  There is no

evidence that Kiser responded challenging Ketchum's assertion.

60.    Ergen testified that in 2011, he considered, for at least a second time, a DISH

investment in LightSquared.[2]  (Jan. 13 Tr. (Ergen) 109:3-9.)  Ergen believed that LightSquared

was "very similar" to DBSD and TerreStar—companies DISH had recently acquired—and that

its spectrum "could fit with the existing spectrum [that DISH owns] in the long-term."[3]  (Jan. 13

---

[2]    Many years earlier, EchoStar had been interested in LightSquared's predecessor company, SkyTerra, prior
to Harbinger's own investment.  (Jan. 13 Tr. (Ergen) 111:23-112:9; Jan. 16 Tr. (Falcone) 15:12-16:11.)

[3]    Ergen recognized the value in LightSquared's spectrum, testifying that it is "great collateral."  (Jan. 13 Tr.
(Ergen) 214:25-215:9.)  Had DISH been able to directly purchase the LP Debt, which constituted
discounted notes supported by oversecured collateral, it would have realized the same economic benefits as
Ergen.  (*Id.* 215:13-17, 215:25-216:8; *see also* PX0587.)

Tr. (Ergen) 109:10-16, 111:5-16; PX747.)  Ergen further believed that he could "clean up"

LightSquared's spectrum, *i.e.*, obtain the necessary FCC approvals.  (Jan. 13 Tr. (Ergen) 245:17-

246:21.)  Indeed, Ergen testified that DISH was able to gain favorable regulatory rulings from

the FCC—colorfully stated "the FCC did us a great favor"—with respect to DBSD and Terrestar,

which resulted in his estimate of making DISH "billions of dollars"  (Jan 13. Tr. (Ergen) 142:18-

144:23.)

61.     LightSquared's spectrum provides a natural fit with DISH's existing spectrum.  In

order for DISH to operate a terrestrial wireless network, it needs uplink spectrum to pair with its

downlink spectrum; because LightSquared has clean uplink spectrum (the interference issues

raised before the FCC relate primarily to LightSquared's downlink spectrum), this creates a

natural synergy.  (Jan. 9 Tr. (Smith) 125:4-21.)  LightSquared's spectrum could be repurposed as

uplink-only spectrum and paired with the spectrum DISH acquired with TerreStar and DBSD,

which can be converted to downlink—thereby avoiding known interference problems with the

uplink portion of that spectrum.  (PX0154; PX0195; Jan. 13 Tr. (Ergen) 151:18-25.)

62.     Specifically, DISH needs uplink spectrum to pair with the downlink spectrum it

acquired with DBSD and TerreStar.  After DISH acquired 40 MHz of AWS-4 spectrum from

DBSD and TerreStar, it applied for a waiver of the ATC requirement.  The waiver would allow

DISH to build out a terrestrial-only wireless network.  In December of 2012, the FCC issued a

decision that authorized DISH to use its AWS-4 spectrum on a standalone terrestrial

basis.  However, the FCC's authorization came with a restriction:  because DISH's AWS-4

uplink spectrum is immediately adjacent to downlink H-block spectrum—and the presence of

uplink and downlink spectrum immediately adjacent to one another results in interference

between the bands—there was a need for a "guard band" or transition zone, in between the two

spectrum bands.  Accordingly, the FCC imposed strict power limitations of 5mW EIRP on

mobile transmissions at 2000-2005Mhz and a requirement that DISH accept all interference

flowing from the H-block into the this 5 MHz of DISH's AWS-4 spectrum.  This requirement

meant that 5 MHz of DISH's acquired spectrum became largely unusable, and DISH only had 35

MHz usable spectrum of the 40 MHz that it acquired from DBSD and TerreStar.  To maximize

the full value of the 40MHz of its newly acquired AWS-4 spectrum, DISH would have to

convert all of the AWS-4 spectrum to downlink spectrum (which it requested in September 2013

and obtained approval for in December 2013) and find uplink spectrum elsewhere.  (DX411

(October 21, 2013 DISH letter summarizing meetings requesting waiver from FCC); DX339

(December 20, 2013 FCC order granting waiver).)  LightSquared has significant blocks of

useable uplink spectrum.  Indeed, LightSquared is presently, and has been for some time, the

only significant source of available uplink spectrum to acquire.   (*See* PX0195 ("one potentially

logical technical solution that could combine LightSquared's spectrum (as uplinks) with the

TerreStar and DBSD spectrum (if that was all converted to downlinks)").)  LightSquared's L-

Band spectrum was a "natural pairing" for DISH, given that LightSquared's uplink spectrum is

"safe to use as uplink spectrum."  (Jan. 9 Tr. (Smith) 114:22-126:2.)

      63.     Ergen himself testified that had he acquired LightSquared, his plan would entail

"two or three years to clean up LightSquared['s spectrum]" and that he believed "at the end of

the process, there would be . . . twenty megahertz of uplink spectrum." (Jan. 13 Tr. (Ergen)

246:9-21.)  Thus, as Kiser testified, DISH and EchoStar were interested in LightSquared's

spectrum in the fall of 2011.  (Jan. 10 Tr. (Kiser) 78:4-14.)

      64.     DISH was interested in LightSquared's spectrum assets:

(a)      During 2012, Ergen repeatedly tried to have DISH make the purchases of LP Debt.  He effected purchases through SPSO only because he was told it was not clear that DISH could make the purchases directly.  (Jan. 13 Tr. (Ergen) 35:4-39:1.)

(b)      The interference issues affecting uplink spectrum DISH had acquired through TerreStar and DBSD were known at the time.  (Jan. 13 Tr. (Ergen) 139:3-140:15; PX0038 at ¶¶ 34-36.)

(c)      DISH pursued a bid for LightSquared's spectrum in May 2013, despite knowing that the spectrum continued to have the same regulatory difficulties it had in April 2012, when SPSO began purchasing the LP Debt.  (PX0283; PX0286; PX0316; PX0756 at 18-19; PX0747 at SPSO-00012486.)

(d)      In fact, DISH did not even condition its bid for LightSquared's spectrum on FCC approval of the license transfers.  (PX510.)  Ergen believed he could "clean up" LightSquared's spectrum (Jan. 13 Tr. (Ergen) 246:9-16); PX0747 at SPSO-00012486.)

(e)      DISH was well aware of the FCC's intent to remove regulatory barriers— the FCC stated in a March 2, 2012 FCC ruling in connection with DISH's application for a change of control of TerreStar and DBSD, in which DISH sought certain waivers, "the Commission has been clear about its intent to remove regulatory barriers in this band through a rule-making to unleash more spectrum for mobile broadband."  (PX0861 ¶ 29; Jan. 13 Tr. (Ergen) 135:14-136:25.)

(f)      On March 21, 2012—a few weeks before Ergen's first purchases of LP Debt (PX0859 at 4)— the FCC issued a notice of proposed rulemaking and notice of inquiry to address, among other things, potential interference issues with the DBSD and TerreStar spectrum.  (PX0038 at ¶¶ 34-36; Jan. 13 Tr. (Ergen) 137:24-140:23.)  On

December 17, 2012, the FCC released its report and order of proposed modification, in

which it established restrictions on the use of the lower 5 MHz of DISH's spectrum to

guard against these interference issues.  (PX0862; Jan. 13 Tr. (Ergen) 140:24-142:6.)

(g)     Ergen publicly acknowledged during a DISH earnings call on August 6,

2013 that LightSquared's spectrum would be beneficial to DISH:  LightSquared is

"interesting to [DISH]" because the spectrum "potentially could fit with the existing

spectrum that [DISH has] in long term. . . .  So putting all that spectrum together at the

same time maintaining the ability to use the satellite for voice and data . . . makes a lot of

sense."  (PX0747 at SPSO-00012486.)

(h)     Similarly, the DISH Special Committee concluded in June 2013 that the

purchase of LightSquared's spectrum assets "would be an attractive opportunity for the

Corporation's shareholders, given that such an acquisition could enhance the value of the

spectrum already owned by the Corporation."  (PX0716 at GH_L2_000972.)

The foregoing conclusively establishes that DISH and Ergen were aware at all times of the inherent

value in LightSquared's spectrum and its actual and potential synergies with DISH's spectrum.

## C.     In Any Event, DISH Simultaneously Pursued Sprint, Clearwire, and LightSquared To Preserve Optionality

65.     At the same time that DISH was ostensibly pursuing the Sprint and Clearwire

transactions,[4] Ergen was simultaneously pursuing LightSquared's assets to preserve optionality

for DISH in case DISH's bids for Sprint and Clearwire fell through.  Ergen has stated publicly

that: "I like, strategically, to have a lot of optionality and it's easier to make good choices when

you have options."  (PX0839 at 7.)  Thus, he pursued LightSquared as an alternative for DISH if

---

[4]     On January 8, 2013, DISH made an unsolicited and non-binding bid for Clearwire, (DX106; PX0315).
DISH ultimately withdrew its tender offer on June 26, 2013.  (DX257.)  On April 15, 2013, DISH made a
bid for Sprint (DX153) but abandoned its bid for Sprint on June 21, 2013.  (DX250.)

the Sprint and Clearwire acquisitions fell through—as they ultimately did.  (PX0832 at 135:23-136:3 (DISH's bid for LightSquared was a "Plan B" to potential deal with Sprint and Clearwire), 140:22-141:23 (Ergen made the bid for LightSquared's spectrum to preserve DISH and EchoStar's "optionality" to participate); Jan. 13 Tr. (Ergen) 186:25-187:20 (the bid "opened up the optionality for DISH to the extent they lost Sprint"); PX0908 at 10 ("we realize [SoftBank is] a formidable competitor and we have to be prepared to win and we have to be prepared to lose").)

## IV.    BECAUSE DISH AND ECHOSTAR COULD NOT DIRECTLY PURCHASE THE LP DEBT, ERGEN AND KISER CREATED SPSO TO MAKE THE PURCHASES, AND CONCEAL THE TRUE IDENTITY OF THE BUYER

### A.    Ergen And Kiser Investigate Whether DISH Or EchoStar Can Purchase The LP Debt, And Determine That Neither Company Can Purchase LP Debt

66.    In the Fall of 2011, Ergen believed the spectrum and satellites of LightSquared might be an attractive investment opportunity for DISH and therefore began looking into acquiring LightSquared's LP Debt.  (Jan. 13 Tr. (Ergen) 109:3-9; Jan. 10 Tr. (Kiser) 27:12-18.)

67.    Ergen asked Kiser, the Treasurer of DISH and a Vice President of Corporate Development at DISH and EchoStar, to provide him with information concerning a potential purchase by DISH of LightSquared's LP Debt.  (Jan. 10 Tr. (Kiser) 27:19-28:5, 32:25-33:11, 77:7-18; Jan. 13 Tr. (Ergen) 25:4-18, 32:15-33:14, 112:10-113:23, 129:21-130:24.)  Ergen admitted that when Kiser was first asked to check whether DISH could own the LP Debt, Kiser was acting in his capacity as Treasurer of DISH.  (Jan. 13 Tr. (Ergen) 112:10-113:13; PX0832 at 88-89.)  Kiser testified that when he initially inquired into who could purchase the LP Debt, until it was clear that the companies could not purchase the debt, the LightSquared investment was considered a corporate opportunity for DISH and EchoStar.  (Jan. 10. Tr. (Kiser) 32:25-34:7.)

25

68.    Indeed, at the time when Ergen and Kiser investigated purchasing the LP Debt, both of their roles at DISH and EchoStar consisted of identifying potential investments and acquisitions for both companies.  (Jan. 10 Tr. (Kiser) 68:24-69:9; Jan. 13 Tr. (Ergen) 95:6-24.)

69.    Upon Ergen's initial request to determine whether the company could purchase the LP Debt, Kiser compiled information on LightSquared's spectrum and capital structure, which he shared with Ergen.  (Jan. 10 Tr. (Kiser) 28:6-17.)

70.    After providing this information to and discussing this information with Ergen, Kiser continued his examination into whether DISH and EchoStar could buy the LP Debt.  (Jan. 10 Tr. (Kiser) 28:18-21.)  To that end, Kiser sought and obtained Ergen's permission to retain Sound Point to facilitate purchases of the LP Debt and asked Sound Point's founder, Ketchum— a long-standing investment banker for EchoStar, who had worked with Kiser over twenty years on EchoStar and DISH-related transactions—if DISH was permitted to purchase the LP Debt. (Jan. 15 Tr. (Ketchum) 14:19-22; PX0116 at LSQ-SPCD-000000904; Jan. 13 Tr. (Ergen) 32:15-25; Jan. 10 Tr. (Kiser) 25:19-22.)

71.    Ketchum acknowledged that the LightSquared business was the first time in twenty years of working with Kiser on behalf of DISH and EchoStar that he was to handle a purportedly personal investment of Ergen.  (Jan. 15 Tr. (Ketchum) 13:22-25, 14:19-22, 94:4-7.)

72.    After forming his own asset management company Sound Point, in 2009, Ketchum tried—unsuccessfully—to drum up business from DISH and EchoStar.  (Jan. 15. Tr. (Ketchum) 13:22-25; PX0116 at LSQ-SPCD-00000904.)

73.    Ketchum viewed his relationship with Ergen to be "important" and wanted to further his business relationship with Ergen and help Sound Point grow its business, because he knew that Ergen had a lot of money that Sound Point could potentially manage.  (Jan. 15 Tr.

(Ketchum) 94:17-23, 100:4-22, 118:20-119:7; PX0116 at LSQ-SPCD-000010904 ("[w]e have

been pitching both Charlie and EchoStar for several years and view this as a first step in the

relationship."); PX0118 at LSQ-SPCD-00011965; Jan. 15 Tr. (Ketchum) 43:22-44:6; PX0180

(discussing how SPSO's purchases of LP Debt resulted in a "[n]ice % increase in [Sound

Point's] AUM [assets under management]," "not including the capital appreciation"); PX0228

(discussing need to "add value with Charlie Ergen" by monitoring the bankruptcy proceedings

and LightSquared business).)

74.    Ketchum reviewed the Credit Agreement and determined that neither EchoStar

nor DISH was eligible to purchase the LP Debt.  (Jan. 10 Tr. (Kiser) 28:18-29:9, 78:18-79:1; Jan.

13 Tr. (Ergen) 32:22-25; Jan. 15 Tr. (Ketchum) 49:23-50:19, 53:6-16, 95:10-14.)

75.    Subsequently, Kiser consulted with Sullivan and Cromwell LLP ("S&C"), DISH

and EchoStar's outside counsel that handles their securities work, to determine whether DISH

could purchase the LP Debt, providing S&C with excerpts from the Credit Agreement.  (Jan. 10

Tr. (Kiser) 29:10-30:3, 118:14-18, 120:2-4; Jan. 13 Tr. (Ergen) 32:15-33:5.)  No counsel other

than S&C, including counsel for Ergen and SPSO, were consulted on this issue.  (Jan. 13 Tr.

(Ergen) 32:15-33:3, 114:17-23, 180:23-181:2, 198:17-21; Jan. 10 Tr. (Kiser) 28:18-29:19, 78:24-

79:22.)

76.    After reviewing the Credit Agreement and consulting with Sound Point and S&C,

Kiser determined that *both* DISH and EchoStar were restricted from buying the LP Debt, and

communicated this to Ergen.  (Jan. 10 Tr. (Kiser) 29:10-15, 30:4-9, 78:24-80:3, 121:8-22.)

77.    However, in the Fall of 2011 when Kiser, Ketchum, and S&C initially determined

that *both* DISH and EchoStar were prohibited from purchasing the LP Debt under the terms of

the Credit Agreement, only EchoStar—not DISH—was listed as a Disqualified Company.

27

(PX0004 at HARBAP00004166; PX0144; PX0151; Jan. 15 Tr. (Ketchum) 50:9-51:2.)  These

individuals nevertheless concluded that DISH was prohibited as well.  Indeed, the relationship

between EchoStar and DISH at the time was, at most, one of common control via Ergen, who in

late 2011 and 2012 held over 50% of the voting rights in the equity of DISH and EchoStar and

was the majority shareholder of both companies.  (Jan. 13 Tr. (Ergen) 209:10-22, 210:7-

16.)  Accordingly, a reasonable inference may be drawn that S&C, Ketchum, Ergen and Kiser—

individuals knowledgeable about debt agreements—understood that DISH was a "subsidiary" of

EchoStar, and could not purchase the LP Debt.  (PX0134 at 17-18, 31; PX0897 at 6, F-41, F-58.)

DISH was subsequently added to the list of Disqualified Companies under the Credit Agreement

in May 2012.  (PX0142.)

78.    On November 14, 2011, Kiser had Mark Jackson, the President of EchoStar

Technologies L.L.C. since 2004, sign a non-disclosure agreement with Jefferies.[5]  (PX0015;

PX0917.)  After mailing the signed non-disclosure agreement, Jefferies asked if they could set up

a date to "stop by to talk Clearwire and LightSquared with Charlie" and Kiser confirmed his and

Ergen's availability later that week.[6]  (PX0015.)

79.    Although Ergen and Kiser both claimed at trial that Ergen was only interested in

LightSquared personally (Jan. 10 Tr. (Kiser) 33:9-15, 77:11-18; Jan. 13 Tr. (Ergen) 48:24-49:2,

153:13-16), whereas Clearwire was of interest to DISH, the email draws no such distinctions.

Moreover, given the choice between two competing inferences—that Ergen and Kiser were

meeting with Jefferies with regard to LightSquared on behalf of DISH, or that Ergen or Kiser

---

[5]    "Jefferies" refers to the investment bank Jefferies LLC, and its subsidiaries and affiliates.

[6]    By signing the non-disclosure agreement with Jefferies, EchoStar was able to obtain access to confidential, non-public information.  In 2012, Sound Point signed a similar non-disclosure agreement with Jefferies with respect to SPSO's purchases of the LP Debt.  (PX0027; Jan. 15 Tr. (Ketchum) 29:20-30:25.)

28

were improperly exploiting EchoStar's non-disclosure agreement with Jefferies in order to advance Ergen's personal investment agenda—the former is more consistent with the weight of the evidence.  (Jan. 13 Tr. (Ergen) 128:12-129:20; *see supra* Section III*; see also infra* ¶ 114 (LodgeNet debt was sought for DISH).)

### B. Ergen And Kiser Determine That Ergen Personally Cannot Purchase The LP Debt And Create Bal Harbour, And Then SPSO, To Evade The Credit Agreement's Transfer Restrictions

80.    After learning DISH was restricted under the Credit Agreement from purchasing the LP Debt, Ergen and Kiser investigated alternative means to purchase the LP Debt.  Indeed, despite the transfer restrictions, Kiser still asked Sound Point to monitor the prices and volume of the LP Debt.  (Jan. 10 Tr. (Kiser) 30:4-9.)

81.    Both Ergen and Kiser, as well as Ketchum, were well aware that the Credit Agreement prohibited competitors such as DISH and EchoStar—as well as entities they control—from purchasing the LP Debt.  Ketchum and Kiser both reviewed relevant portions of the Credit Agreement before making the first purchase of LP Debt (Jan. 15 Tr. (Ketchum) 95:6-14; Jan. 10 Tr. (Kiser) 28:18-30:3; PX0016), and, as noted above, had the benefit of consultation with DISH's outside counsel, S&C.  In a May 9, 2012 email, Ketchum reported to Kiser that "[a]n amendment was just created whereby DISH Network Corp., DBSD, Clearwire, DirecTV, XM Satellite Radio Inc. were named as disqualified buyers."  Notably, Ketchum pointed out that "Charlie is not named."  (PX0144.)  The following day, Ketchum sent Kiser the original list of Disqualified Companies, as well as the exact language of the amendment.  (PX0151; PX0155; *cf.* PX0190.)  The copy of the amendment Ketchum sent to Kiser included a handwritten note circling the term "Disqualified Company," explaining that this term "includes any known subsidiary thereof."  (PX0155 at SPSO-00001608.)  As discussed above, Ketchum understood

29

the term "subsidiary" to include any company controlled by a designated Disqualified Company. (Jan. 15 Tr. (Ketchum) 52:18-53:16; PX0155.)

82.     Given the transfer restrictions in the Credit Agreement, one alternative that was considered to acquire the LP Debt was for Ergen to "personally" make the purchase.  (Jan 10 Tr. (Kiser) 33:9-15, 77:11-18.)  Accordingly, Kiser consulted with S&C to determine whether Ergen could buy the LP Debt and communicated to Ergen that this would not work either, because the Credit Agreement barred Ergen and all other "natural persons" from buying the LP Debt.  (Jan. 10 Tr. (Kiser) 30:16-21, 80:4-6, 120:20-24.)

83.     Kiser further inquired of S&C in 2011 whether there were other ways for DISH or EchoStar to take advantage of "the LightSquared opportunity."  (Jan. 10 Tr. (Kiser) 81:18-82:5.) Kiser discussed with S&C whether an investment vehicle could buy the LP Debt.  (Jan. 10 Tr. (Kiser) 30:10-12.)  This would accomplish indirectly what Ergen, Kiser, and Ketchum, knew they were prohibited from doing directly, and would do so discretely.  Ergen admits, "[w]hen I talk to lawyers it's . . . more about, you know, how can I do this, as opposed to what the law says."  (PX0866; Jan. 13 Tr. (Ergen) 199:4-7.)

84.     Eager to take advantage of the "LightSquared opportunity," Kiser structured the purchases through a special purpose vehicle ("SPV"), initially directing the creation of two companies, Bal Harbour Capital Management LLC ("Bal Harbour Capital") and Bal Harbour Holdings, LLC ("Bal Harbour Holdings," and together with Bal Harbour Capital, "Bal Harbour").  (Jan. 10 Tr. (Kiser) 30:16-31:4, 87:3-8.)

85.     On December 21, 2011, Sound Point set up Bal Harbour Capital and its sole Managing Member and holding company, Bal Harbour Holdings, so that Ergen could begin to

purchase the LP Debt without alerting UBS and LightSquared that it was not an "Eligible

Assignee."  (PX0147; PX0896; PX0048; PX0058; PX0086; PX0088; PX0089; PX0090.)

86.     After Bal Harbour had been formed, Kiser realized that a Littleton, Colorado

(where Ergen resides, and next door to Englewood, where DISH and EchoStar are

headquartered) address had been used in its formation documents.  (Jan. 10 Tr. (Kiser) 32:2-14,

35:21-24; Jan. 13 Tr. (Ergen) 36:13-20.)  Concerned that the Colorado address would permit the

public to track the LP Debt purchases back to their source, Kiser directed Sound Point to create

new SPVs to replace Bal Harbour.  (Jan. 10 Tr. (Kiser) 32:2-14, 90:6-12, 91:12-20; Jan. 13 Tr.

(Ergen) 35:24-36:6, 36:21-37:4, 49:20-50:25; PX0117.)

87.     It was important to Ergen and Kiser that the public not know they were behind

Sound Point's purchases.  (Jan. 10 Tr. (Kiser) 30:16-21, 31:20-22, 32:2-14, 90:25-91:20; Jan. 13

Tr. (Ergen) 36:13-20; PX0171; PX0183; PX0224; PX0290 at LSQ-SPCD-000006771; PX0298.)

88.     On May 11, 2012, Ketchum suggested to Kiser that the new entity's name be SP

Special Opportunities, LLC—a name suggesting Sound Point ownership.  (PX0165.)  Following

Ketchum's suggestion, Ergen formed two entities on May 16, 2012: SO Holdings and SPSO.[7]

(PX0221; PX0183.)

89.     Rather than list a Colorado address, the SO Holdings and SPSO formation

documents listed a Delaware address.  (PX0183 at SPSO-00000512, SPSO-00000514.)  As Kiser

testified, SPSO's address was specifically chosen to deflect any possible connection between

Ergen and Sound Point's purchases of the LP Debt.  (Jan. 10 Tr. (Kiser) 32:2-14.)

90.     Even after creating Bal Harbour and SPSO and purchasing large quantities of LP

Debt, Ergen and Kiser continued to monitor whether DISH or EchoStar could purchase the LP

---

[7]     The capital structure of SPSO and SO Holdings was set up to mirror that of the Bal Harbour entities.
(PX0224; PX0221; PX0058.)

31

Debt directly.  (PX0243.)  On October 4, 2012, Kiser wrote to Ergen, "I still can't get

confirmation the restricted list [LightSquared] had in place that prevented the company from

buying them has fallen away due to the BK."  (*Id.*)  The same day, Ergen responded, "[i]f we

can't be sure the company can buy them, then I am interested to increase my position at the 75

level at least up to a 33% ownership level of the class."  (*Id.*; *see also* PX0190.)  Ergen was

seeking to purchase up to the 33% ownership level in order to obtain a blocking position and

checked the restrictions because he believed that this could be a corporate opportunity for DISH.

(Jan. 10 Tr. (Kiser) 183:7-12; Jan. 13 Tr. (Ergen) 240:23-241:14.)  Nevertheless, Ergen believed

that it was not worth contacting the banks and potentially breaching confidentiality to determine

whether the transfer restriction had in fact fallen away.  (Jan. 13 Tr. (Ergen) 49:14-50:13.)

### C.    SPSO And Ketchum Concealed That Ergen Was Behind The LP Debt Purchases

91.    Concealing SPSO's true identity was of paramount importance to Sound Point.

For example, on May 2, 2012, Ketchum advised a Sound Point employee that "Echostar wants

up to $50mm LightSquared," but directed him that "we can't tip our hand," and to reach out to

Seaport Capital— "riskless principal" that acted as a middleman on certain trades—"to protect

[the] identity of the buyer."  The employee replied, "yeah, i haven't indicated anything to

anyone."  (PX0088.)  The following day, the employee reported that he spoke with Seaport and

noted that Kevin Gerlitz, another Sound Point employee, was concerned that the trade would

show Bal Harbour as the buyer in the documentation.  The employee asked, "Will this create

problems?"  Ketchum responded, "Possibly.  Sh*t."  (PX0089.)  Indeed, Sound Point was not

even willing to disclose the identity of the buyer to Jefferies as the middleman, even if Jefferies

created an ethical wall.  (PX0100.)

92.     A few days later on May 5, 2012, Ketchum sent an email to Kiser describing a voicemail he received from a Wall Street Journal reporter regarding Sound Point, stating he was "obviously" not going to call the reporter back, even though he "clearly didn't understand what Sound Point is."  (PX0119.)  Ketchum further noted that the reporter "did not mention Charlie or EchoStar" in his voicemail.  (PX0119.)  Kiser forwarded Ketchum's email to Ergen explaining that Kiser had spoken to Ketchum about the issue and that "[t]here might just be a lot of people fishing all over the place based on speculation (they're [sic] weren't a lot of other logical buyers)."  (PX0119.)

93.     Similarly, on May 7, 2012, after receiving a press inquiry, Ketchum reached out to Kiser and asked whether they should "employ a more strenuous strategy around" denying that Ergen was behind SPSO to the press.  (PX0124.)  Additionally, email exchanges demonstrate Ketchum and Kiser making light of the fact that there were rumors in the press indicating that Carlos Slim ("Slim") was behind Sound Point's purchases of the LP Debt, noting that Ketchum would "continue to get looks" because he's "Carlos Slim's main man" and that a news report suggesting it was Slim and, not Ergen, was "[m]aybe [] right."[8]  (*See* PX0271; PX0216; Jan. 15 Tr. (Ketchum) 91:20-92:3.)

## V.     SPSO PURCHASES LP DEBT ON BEHALF OF DISH AND ECHOSTAR

### A.     Ergen And Kiser Carry Out SPSO's LP Debt Purchases

94.     Between April 13, 2012 and April 26, 2013, SPSO contracted to purchase over $1 billion in par value of LP Debt, of which it actually closed trades for $844,323,097.83 in par value.  When a trade was scheduled to close, Kiser would contact Ergen's asset manager, Bear

---

[8]     Carlos Slim is the principal of the Mexican telecommunications companies, Telmex Internacional and America Movil (PX0895 (Cellular News, *America Movil, Telmex to Invest $880 Mn in Peru Through 2012*, (Apr. 18, 2010), *available at* http://www.cellular-news.com/story/42891.php (last visited Feb. 24, 2014)).)

Creek Asset Management LLC ("Bear Creek")—which serves as an asset manager for DISH,

EchoStar and Ergen, personally—and tell them how much money was needed to close the trade.

(Jan. 10 Tr. (Kiser) 21:23-22:13; 57:7-17.)  Ergen would then authorize the wire transfer and

Bear Creek would liquidate investments to fund the transfer.  (Jan. 10 Tr. (Kiser) 21:23-22:13,

57:7-17.)

95.    The following chart sets forth SPSO's trades in LP Debt, including the trade and

closing dates, paramount, purchase price, cost, broker, and settlement status:

| Trade Date | Closing Date | Par | Price | Cost | Counterparty | Status |
|---|---|---|---|---|---|---|
| 04/13/12 | 09/06/12 | 5,000,000.00 | 48.750 | 2,437,500 | UBS | Settled |
| 05/03/12 | 07/23/12 | 4,545,500.00 | 59.00 | 2,681,845 | Jefferies | Settled |
| 05/03/12 | 07/26/12 | 20,000,000.00 | 59.250 | 11,850,000 | Seaport | Settled |
| 05/03/12 | 09/06/12 | 3,000,000.00 | 58.750 | 1,762,500 | UBS | Settled |
| 05/03/12 | 09/06/12 | 2,000,000.00 | 58.500 | 1,170,000 | UBS | Settled |
| 05/03/12 | 07/23/12 | 5,000,000.00 | 59.000 | 2,950,000 | Jefferies | Settled |
| 05/04/12 | 05/31/12 | 247,259,046.62 | 60.250 | 148,973,576 | Jefferies | Settled |
| 10/04/12 | 11/30/12 | 19,417,287.99 | 78.500 | 15,242,571 | Jefferies | Settled |
| 10/23/12 | 02/06/13 | 3,000,000.00 | 83.750 | 2,512,500 | UBS | Settled |
| 11/15/12 | 01/08/13 | 7,997,057.00 | 81.750 | 6,537,594 | Jefferies | Settled |
| 12/12/12 | 6/11/13 | 2,000,000.00 | 84.000 | 1,680,000 | Goldman Sachs | Settled |
| 12/13/12 | 03/12/13 | 7,000,000.00 | 86.000 | 6,020,000 | Jefferies | Settled |
| 12/20/12 | 04/09/13 | 14,782,302.32 | 85.500 | 12,934,515 | UBS | Settled |
| 12/28/12 | 03/13/13 | 15,000,000.00 | 88,500 | 13,275,000 | Jefferies | Settled |
| 01/02/13 | 03/07/13 | 20,000,000.00 | 89.125 | 17,825,000 | Jefferies | Settled |
| 01/02/13 | 04/05/13 | 6,000,000.00 | 89.125 | 5,347,500 | Jefferies | Settled |
| 01/03/13 | 03/07/13 | 17,999,999.97 | 89.250 | 16,065,000 | Jefferies | Settled |
| 01/07/13 | 05/24/13 | 7,000,000.00 | 89.500 | 6,265,000 | Jefferies | Settled |
| 01/14/13 | 05/24/13 | 9,410,420.00 | 91.500 | 8,610,534 | Jefferies | Settled |
| 02/01/13 | 07/23/13 | 20,000,000.00 | 91.875 | 18,375,000 | JPM | Settled |
| 03/25/13 | 05/24/13 | 88,262,536.00 | 93.375 | 84,180,394 | Jefferies | Settled |
| 03/28/13 | - | 168,759,227.85 | 96.000 | 162,008,859 | Jefferies | Unsettled |
| 04/01/13 | 6/25/13 | 5,500,000.00 | 96.000 | 5,280,000 | Seaport | Settled |
| 04/19/13 | 6/14/13 | 122,250,172.79 | 96.000 | 117,360,166 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 145,712,408.57 | 96.000 | 139,883,912 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 46,186,366.57 | 96.00 | 44,338,912 | Jefferies | Settled |
|  |  |  |  |  |  |  |
| Total |  | 1,013,082,326. | 84.45 | 855,567,877 |  | Settled |

| Trade Date | Closing Date | Par | Price | Cost | Counterparty | Status |
|---|---|---|---|---|---|---|
| Purchased |  | 30 |  |  |  |  |
| Total Settled |  | 844,323,097.83 |  |  |  | Settled |
| Total Unsettled |  | 168,759,227.85 |  |  |  | Settled |

(*See* PX0859 at 4.)

**B.      Ergen And Kiser's Focus On Building A Blocking Position Is Consistent With A Strategic Acquisition Strategy**

96.      From the outset, Ergen's strategy in acquiring LP Debt was to establish a blocking position from which he could establish DISH as the stalking horse bidder for LightSquared. Both Kiser and Ergen testified that 33% would provide SPSO, and therefore Ergen, with a "blocking" position such that SPSO could enforce "certain rights" during the bankruptcy proceeding.[9] (Jan. 10 Tr. (Kiser) 47:22-48:10, 56:11-14; Jan. 13 Tr. (Ergen) 172:10-174:2; DX047.)  In early 2012, both Ergen and Kiser knew that there was a strong possibility that LightSquared would file for bankruptcy.  (*See, e.g.*, PX0033 (February 20, 2012 email from Cullen to Ergen and Kiser enclosing article on LightSquared's default on $56 million payment to Inmarsat); PX0075 (April 27, 2012 email from Cullen to Kiser enclosing Wall Street Journal article discussing bankruptcy as an imminent possibility); PX0078 (April 30, 2012 email from Kiser to Ergen enclosing Wall Street Journal article discussing Falcone's attempt to get a one week "extension on default"); PX0121 (May 7, 2012 email from Cullen to Ergen and Kiser enclosing Reuters story noting LightSquared's "uncertain future" and the possibility of a default); PX0163 (May 11, 2012 email from Kiser to Ergen enclosing Debtwire article suggesting LightSquared could file for bankruptcy).)

---

[9]      In fact, Ergen was so intent on acquiring a large position in LP Debt that he was not even willing to share a small position with Sound Point.  (PX0384.)

97.     Throughout early 2012, Ketchum kept Kiser apprised as he monitored LightSquared's ebb towards bankruptcy.  (PX0031; PX0039; PX0044; PX0064; PX0074.)  On May 4, 2012—prior to LightSquared's bankruptcy filing—SPSO was notified that, in connection with LP Debt that SPSO had agreed to purchase but not yet closed on, it had the right to vote on a proposed amendment to the Credit Agreement that would give LightSquared the ability to reach an agreement with the LP Lenders.  In a May 4, 2012 email, Kiser wrote to Ergen, in part, that "[t]he seller is inclined to vote to approve this one week extension of time to continue negotiations, and so if the buyer does not direct the seller to the contrary, that is how the seller will vote."  (Jan. 10 Tr. (Kiser) 111:13-112:5; PX0111.)  Ergen replied to Kiser's email, "I would have them vote no."  (Jan. 10 Tr. (Kiser) 113:13-15, 113:23-25; Jan. 13 Tr. (Ergen) 166:1-167:16, PX0111.)  Following Ergen's direction, Kiser directed Sound Point to vote no on the amendment.  (Jan. 10 Tr. (Kiser) 116:18-117:21; PX0097; PX0109.)  A Sound Point employee relayed these instructions to Ketchum, commenting "[n]o extension, so they want it to file bankruptcy," Ketchum replied, "[n]o surprise there."  (PX0096.)

98.     While Ergen testified that he made that decision because he did not have the documents necessary to decide how to vote (Jan. 13 Tr. (Ergen) 166:1-167:16, 261:13-262:12), the facts show that Ergen made no attempt to obtain the necessary documentation.  (Jan. 13 Tr. (Ergen) 261:13-263:8.)  In fact, when Sound Point told Kiser that "I might have figured out a way to get the docs…please stand by," Kiser simply responded "[w]e'll vote no."  (PX0097; PX0096.)  Kiser also conceded that before voting no, he made no effort to discuss with any of the LP Lenders why they wanted to extend the default deadline.  (Jan. 10 Tr. (Kiser) 118:10-13; PX0097.)  After seeing the email exchanges between Kiser and Ketchum concerning the availability of the amendment documents, Ergen testified, "I'm disappointed that [Kiser]

36

answered no. . .   That's not the way I would have done it…"  (Jan. 13 Tr. (Ergen) 262:13-263:8.)

99.    Ketchum professed not to recall the details surrounding the decision to vote "no" and whether the amendment was actually available, but at his deposition weeks earlier, Ketchum explained that he "would not have granted an extension," explaining that in his opinion "the sooner that [LightSquared] entered the Chapter 11 process the better."  (Jan. 15 Tr. (Ketchum) 40:9-42:15.)

100.    Ketchum and others at Sound Point understood Ergen and Kiser's strategy was to purchase the LP Debt to acquire LightSquared for DISH through leverage gained through the bankruptcy process.  Ketchum described Ergen's initial SPV, Bal Harbour, as "focused primarily on . . . loan-to-own situations" (PX0116).  LightSquared was a "loan to own" investment, Ketchum testified, in that "most investors believed that given the capital structure of the company, that the term loan B . . . was likely to be exchanged for equity securities."  (Jan. 15 Tr. (Ketchum) 46:14-47:24, 45:19:46:1; PX0238 (September 11, 2012 Bloomberg message from Seaport to Ketchum requesting attempt to "start drumming up L2 as it unfolds according to plan.").)

101.    Ultimately on May 14, 2012, LightSquared filed for bankruptcy protection. Consistent with Ergen's strategy, a few months after LightSquared's bankruptcy filing, on October 4, 2012, as noted above, Ergen instructed Kiser that "[i]f we can't be sure [DISH] can buy [the LP Debt], then I am interested to increase my position at the 75 level at least up to a 33% ownership level of the class"—*i.e.*, up to a level that would establish a blocking position. (PX0243.)  At Ergen's direction, Kiser regularly monitored through Sound Point how close SPSO came to reaching a blocking position and kept a close eye on developments in the

bankruptcy itself.  (*See* PX0244; PX0264; PX0276; PX0288; PX0289; PX0375; PX0379;

PX0306; Jan. 15 Tr. (Ketchum) 102:7-10; *see also* PX0064; PX0096; PX0413; PX0239;

PX0344; PX0262.)[10]

102.    On March 28, 2013—the date Ergen and Kiser achieved their intended goal of

obtaining a blocking position—Ketchum sent an email to Kiser, stating "You just bought a

spectrum company."  Later in that same email, Ketchum said internally to his colleague "we now

control the company."  (PX0385.)

103.    Another Sound Point employee emailed to Ketchum on two occasions--on

February 12, 2013, and then again on April 4, 2013—to remind Ketchum that "we need to try

and get the stalking horse bid should it be an option as advisory fees are paid by the debtor."

(PX0413.)

## VI.    ERGEN AND KISER ACTED ON BEHALF OF DISH AND ECHOSTAR WHEN THEY PURCHASED THE LP DEBT

104.    Ergen and Kiser acted on behalf of DISH and EchoStar when purchasing the LP

Debt.  The responsibilities of both Ergen and Kiser as officers of DISH and EchoStar encompass

strategic acquisitions, and the purchase of the LP Debt in furtherance of the acquisition of

LightSquared was within the scope of Ergen and Kiser's authority at those companies.  Thus, in

the course of amassing a substantial position in LP Debt, Ergen used DISH's employees,

resources, facilities, and counsel.  Members of the DISH and EchoStar boards and DISH's

management also knew of Ergen's purchases, but turned a blind eye to them, because they knew

that Ergen was acting on behalf of DISH and EchoStar and not co-opting a corporate

---

[10]    Although Ketchum initially testified that he did not recall discussing acquiring a blocking position with Kiser, he later admitted that Kiser told him "he was very interested in tracking whether or not SPSO had a blocking position with respect to LightSquared."  (Jan. 15 Tr. (Ketchum) 25:5-10, 26:1-18, 48:6-18, 102:7-10, 103:4-104:21.)

opportunity.  Indeed, since he controlled the boards of DISH and EchoStar through his voting

rights as controlling shareholder (Jan. 13 Tr. (Ergen) 94:19-24, 209:6-210:21, 211:13-20;

PX0349 at 44/179-45/179), Ergen had no concerns about whether DISH and EchoStar would

ultimately approve the acquisition of LightSquared once he had obtained a blocking position in

LP Debt.

### A.    Ergen Acted Within The Scope Of His Authority In Purchasing The LP Debt

105.    It is within the scope of Ergen's broad authority to lead DISH and EchoStar's

strategic acquisitions of spectrum assets.  (Jan. 10 Tr. (Kiser) 69:3-6, 69:23-70:9; Jan. 13 Tr.

(Ergen) 95:6-16, 96:15-24; Howard Dep. 33:25-34:12; *see also* PX0010.)  Ergen, as the

Executive Chairman of the Boards of DISH and EchoStar, is an officer and full-time, salaried

employee of DISH and EchoStar.  (Jan. 13 Tr. (Ergen) 11:13-14, 94:4-18, 94:8-18; PX0349 at

20, 31; PX0350 at 17, 34.)  In that capacity, Ergen "focus[es] on [the] strategic direction of the

company" which includes acquisitions and strategic investments.  (Jan. 13 Tr. (Ergen) 95:6-16;

Jan. 10 Tr. (Kiser) 69:3-9; Howard Dep. 33:25-34:11; *see also* PX0010.)  His responsibilities

include the strategic pursuit of spectrum assets, which Ergen sees as necessary to compete with

the large wireless carriers, to further DISH's strategic goal of diversifying away from its core

Pay-TV business.  (Jan. 10 Tr. (Kiser) 70:10-19; Jan. 13 Tr. (Ergen) 96:15-24, 100:25-101:4;

Howard Dep. 30:15-31:13, 33:10-35:13; PX349 at ii.)

106.    Ergen's role in managing the strategic direction of DISH and EchoStar, thus,

includes the companies' attempts to acquire, or merge with, numerous spectrum-owning

companies.  (Jan. 13 Tr. (Ergen) 101:5-103:5.)  Ergen is "responsible for what DISH does in

connection with the LightSquared bankruptcy" and he "leads bids of this nature" as part of his

responsibilities for DISH.  (PX0767 at 186:2-9, 232:12-17.)

107.    Kiser testified that Ergen "typically" is involved in strategic investments, and Kiser could not point to a single strategic investment made by DISH and EchoStar that Ergen had opposed.  (Jan. 10 Tr. (Kiser) 69:23-70:9.)  Further, Ergen, who achieves board consensus before bringing issues to vote, has not voted against a single board resolution in the past five years.  (Jan. 13 Tr. (Ergen) 236:3-8.)

108.    DISH's investment policy authorizes investments for DISH of up to $200 million in the aggregate per calendar quarter) without first seeking Board approval:  "[a]ny investment not otherwise permitted by the Corporation's cash management policy shall not exceed *$125 million in any single transaction* or . . . *$200 million in aggregate in any calendar quarter* without approval of the Board of Directors."  (PX00828.)

109.    Consistent with his authority at DISH and EchoStar, Ergen identified LightSquared's spectrum assets as a target for strategic acquisition.  (Jan. 13 Tr. (Ergen) 31:24-32:14.)  He next ordered an analysis of LightSquared's Credit Agreement.  (Jan. 13 Tr. (Ergen) 32:15-19, 249:2-11.)  Ergen then formulated an acquisition strategy involving the purchase of LP Debt to obtain a blocking position in the bankruptcy proceeding.  (PX0243.)  In fact, Ergen was responsible for DISH's actions in connection with the LightSquared bankruptcy proceedings. (PX0767 at 232:12-17.)  He approved the creation of the SPVs to carry out the acquisition of the LP Debt, and he directed and supervised DISH Treasurer Jason Kiser's actions in furtherance of the purchase of the debt.  (Jan. 10 Tr. (Kiser) 30:16-31:4, 87:3-8; Kiser Dep. 62:5-63:5.)  Once a blocking position was achieved that complemented DISH's strategic acquisition of LightSquared's spectrum assets, Ergen presented the transaction to the DISH and EchoStar boards for approval.  (PX0767 at 21:1-18; Howard Dep. 56:24-57:13, 87:11-88:3, 141:13-20; Jan. 13 Tr. (Ergen) 77:3-7, 77:21-78:2, 78:17-79:9, 80:11-13; PX0480; PX0867.)

**B.     Kiser Acted Within The Scope Of His Authority In
        Purchasing the LP Debt**

110.    Kiser has been employed by DISH and its predecessor companies for twenty-seven years.  (Jan. 10 Tr. (Kiser) 14:4-9, 15:25-16:1, 69:10-22; Jan. 13 Tr. (Ergen) 21:12-14.)  As DISH's Treasurer, he focuses on corporate development, including capital-raising, investor relations, strategic acquisitions and investments, and the purchase of marketable securities.  (Jan. 10 Tr. (Kiser) 16:2-6, 108:16-20, 140:6-18; Jan. 17 Tr. (Cullen) 139:18-140:5.)  Kiser also performs corporate development services for EchoStar pursuant to a management services agreement between DISH and EchoStar.  (Jan. 10 Tr. (Kiser) 69:10-22.)

111.    As Treasurer of DISH, Kiser reports directly to Ergen.  Under DISH's bylaws, Kiser must "perform all duties commonly incident to his office and such other duties as may, from time to time, be assigned to him by . . . the Chairman of the Board of Directors."  (PX0821 at § 5.2(f).)  Accordingly, Kiser receives authorization from Ergen in making strategic investments for DISH's portfolio.  (Jan. 10 Tr. (Kiser) 69:3-9.)

112.    In the course of his duties, Kiser likewise has been involved in numerous proposed or actual transactions on DISH or EchoStar's behalf, including Clearwire, Sprint, Blockbuster Inc. ("Blockbuster"), DBSD, and TerreStar.  (Jan. 17 Tr. (Cullen) 139:16-140:9; Kiser Dep. 117:23-118:6, 173:18-21.)  Ergen refers to Kiser as the expert at DISH in evaluating restrictions on debt purchases, or, as Ergen testified, "Kiser, in his role at DISH over the years, had been involved in a number of transactions and was familiar with looking at capital structures and interpreting those capital structures and determining things such as who could buy debt or if—and if there were any restrictions."  (Jan. 13 Tr. (Ergen) 162:9-16.)

113.   The scope of Kiser's employment and authority extends to transacting and monitoring trades on behalf of DISH, including purchases of other companies' debt and interacting with Bear Creek.  (Jan. 10 Tr. (Kiser) 21:23-22:18.)

114.   For example, when DISH made a decision sometime in early 2012 to make a strategic investment in LodgeNet, a company that provides pay-per-view movie services to hotel rooms, Ergen authorized Kiser to acquire LodgeNet debt on behalf of DISH, and Kiser -- without authorization from the board—worked with Sound Point to execute the trades.  (Jan. 13 Tr. (Ergen) 128:12-129:20; Jan. 15 Tr. (Ketchum) 14:11-18.)  Similarly, when DISH acquired DBSD, Kiser checked for restrictions on competitors purchasing debt and then executed the trades of distressed debt.  (Jan. 10 Tr. (Kiser) 106:21-107:16, 108:8-15.)

115.   The evidence supports that Kiser acted within the scope of his authority when he took direction from Ergen to purchase the LP Debt, interacted with Bear Creek, and oversaw and monitored the LP Debt trades—precisely the same functions Kiser performs for DISH and EchoStar.  (*See, e.g.*, Jan. 10. Tr. (Kiser) 84:13-22, 86:18-88:17; PX0031; PX0037; PX0064; PX0068; PX0078; PX0096; PX0136; PX0239; PX0344; PX0422; PX0295; PX0331; PX0390.)

116.   Indeed, even after Ergen began purchasing the LP Debt, there were times when it was ambiguous to Kiser whether he was working for Ergen personally or for DISH.  When he investigated whether the restrictions on DISH purchases had fallen away in the bankruptcy, he "asked a question for the company . . . I think I've also got an obligation to the company just as he does.  I'm a fiduciary for the company."  (Jan. 10 Tr. (Kiser) 83:19-84:24.)  Further illustrating these overlapping and conflicting roles, Kiser testified that "I think I took one hat off and put the other hat on."  (Jan. 10 Tr. (Kiser) 84:23-24.)

42

C.     **Ergen Used DISH Employees, Resources And
Legal Counsel To Facilitate The LP Debt Purchases.**

117.     Prior to and throughout the period that Ergen and Kiser were amassing LP Debt,

other DISH employees, including Cullen—another member of DISH's corporate development

group—closely monitored news relating to LightSquared and reported on those events to Ergen

and Kiser.  (PX0018; PX0033; PX0075; PX0187; PX0223; PX0195; PX0393; PX0407; PX0408;

PX0438.)  Moreover, SPSO went so far as to use DISH's physical address as its own in a

Trading Management Agreement with Sound Point and in correspondence with Sound Point.

(PX0055 at LSQ-SPCD-000000757; PX0284.)

118.     Kiser transacted business on behalf of SPSO from his DISH office,[11] using

DISH's computers, phone lines, and email and outside investment bankers during general

business hours.[12]  (Jan. 10 Tr. (Kiser) 42:4-8; PX0042.)  Although the purchases were

purportedly done on Ergen's behalf, Kiser received no compensation for directing nearly $1

billion in LP Debt trades apart from his salary at DISH.  Compensation was allegedly

unnecessary because Kiser (a twenty-seven year veteran of DISH/EchoStar) performed the trades

"for the experience" and because, as Ergen testified, "he gets to spend time with me and I think

he likes that."  (Jan. 10 Tr. (Kiser) 26:13-19, 74:25-75:7; Jan. 13 Tr. (Ergen) 23:15-24:1, 133:7-

10.)

119.     Ergen has a family office, a personal asset manager (Bear Creek), and stock

brokers that he uses regularly.  (Jan. 13 Tr. (Ergen) 23:3-4, 26:15-17, 126:15-21, 127:2-3; Jan. 10

Tr. (Kiser) 21:6-12.)  He has also made personal investments through a hedge fund, GSO.  (Jan.

---

[11]     Ergen also used his assistant at DISH to assist with SPSO matters.  (PX0560; PX0059.)

[12]     Kiser kept no log of the amount of time he spent working for Ergen personally compared to how much time
he was working for DISH.  (Jan. 10 Tr. (Kiser) 103:9-17.)

13 Tr. (Ergen) 126:22-127:3.)  Yet, Ergen used DISH employees and facilities to execute his

strategy of acquiring LightSquared's LP Debt.  (Jan. 13 Tr. (Ergen) 127:4-13.)

120.    Kiser consulted DISH's outside counsel at S&C (whom Ergen never retained as

personal counsel), to initially determine whether DISH and later Ergen was prohibited from

purchasing the LP Debt.  (Jan. 10 Tr. (Kiser) 29:10-30:9, 33:9-34:7, 77:11-18, 80:4-6, 119:16-

120:4, 120:11-24; PX0144.)  Ergen relied on this advice for months, and did not retain personal

counsel until Spring 2013, after SPSO gained its blocking position.  (Jan. 13 Tr. (Ergen) 67:1-

11.)

### D.    DISH Board Members And Management Turned A Blind Eye To The Corporate Opportunity Presented By The Purchases Because They Knew Ergen Was In Fact Acting For DISH.

121.    In May 2012, news reports began speculating that Ergen was behind Sound

Point's purchases of LP Debt.  (PX0121; PX0898.)  Despite the fiduciary obligations DISH and

EchoStar's board members and management owed to determine whether a corporate opportunity

was being usurped when news reports came to light, Ergen testified that no DISH or EchoStar

board members asked him about his purchases prior to his May 2, 2013 presentation to the DISH

board.  (Jan. 13 Tr. (Ergen) 119:20-120:3; Jan. 10 Tr. (Kiser) 37:10-24.)  In response to

questioning from the Court, Ergen testified that once he learned that he could purchase the LP

Debt personally, he did not apprise the DISH board, its general counsel, or Cullen that he was

acquiring the LP Debt because he did not believe that he had a fiduciary obligation to do so once

he confirmed it was not a corporate opportunity for DISH.  (Jan. 13 Tr. (Ergen) 37:17-38:9.)

DISH board members and management apparently turned a blind eye because Ergen's LP Debt

purchases would ultimately benefit DISH.

122.    On May 10, 2012, the Denver Post reported that Charlie Ergen "has snatched up

$350 million worth of debt in LightSquared."  (PX0898.)  A DISH spokesman declined to

comment on the article.  After reading the Denver Post article, DISH board member Howard sent

an email that same day to Stanton Dodge (DISH General Counsel, "Dodge"), Tom Ortolf (DISH

and EchoStar board member, "Ortolf") and Goodbarn (DISH board member) asking if the article

was accurate.  (DX397.)

123.    In response to Howard's email, Dodge sent an email on May 16, 2012 to the

entire DISH Board, including Ergen and DISH's associate counsel, Brandon Ehrhart ("Ehrhart"),

stating:

> further to [G]ary's email below and since another board member
> inquired about the recent press reports regarding LightSquared
> bonds, [I] wanted to send a brief note to the full board.  [T]he
> company did not buy any LightSquared bonds.

(DX397.)  What follows in the email is redacted.

124.    Dodge's email has two glaring omissions.  *First*, he did not answer the board

members' pointed question whether Ergen was buying the LP Debt.  *Second*, Dodge, who had

fiduciary obligations to DISH, did not inform the DISH board whether a corporate opportunity

was being usurped by Ergen's LP Debt purchases.  (PX0832 (Ergen (Nevada) Tr.) 222:11-

224:7.)  When Dodge confronted Ergen about the news report, Ergen responded that there

"might be some truth" to the report.  (Jan. 13 Tr. (Ergen) 116:3-22, 118:23-119:19.)  At no point

during his full day of trial testimony, despite his use of the phrase "some truth" (Jan. 13 Tr.

(Ergen) at 116:12-15), did Ergen explain what he meant by "some truth," or how this differed, if

at all, from the whole truth.  There is also no evidence in the record that Ergen ever told

Dodge—DISH's general counsel—that in Fall 2011 Kiser had investigated whether DISH could

purchase the debt and consulted on that topic with S&C.

125.    Shortly thereafter, on July 23, 2012, Ehrhart attended a call with DISH's outside

counsel, Scott Miller ("Miller") of S&C, to discuss "LightSquared debt."  (PX0892.)  Miller

previously handled DISH's mergers and acquisition work, including with respect to Sling Media, Sirius and TerreStar. (PX0918.)

126.    Carl Vogel, a DISH board member ("Vogel"), asked Kiser, as well as others, if the news reports about Ergen's purchases were true. Although Kiser testified that he never responded to Vogel's email, Vogel's subsequent communications suggest he knew others were involved in Ergen's purchases. (Jan. 10 Tr. (Kiser) 37:16-38:4.) Indeed, when Vogel received an email on August 9, 2012 from Jim Millstein ("Millstein"), of Millstein & Co., L.P., a restructuring firm, inquiring whether DISH was purchasing LightSquared's debt, he did not deny DISH's involvement. Rather, he forwarded the email to Cullen and advised Millstein to "contact Tom Cullen or Charlie to discuss." (PX0232.) Similarly, Ehrhart received an email from Brendan O'Neill of Canadian law firm Goodmans LLP, stating, "[n]ot sure if DISH is involved at all from the press, but thought I might just reach out in case any assistance was required from us." Like Vogel, Ehrhart did not deny DISH's involvement, only replying "[h]ope you are well too Brendan." (PX0420.)

127.    Also, according to an internal document that DISH spokesman Bob Toevs ("Toevs"), head of Corporate Communications, sent on June 4, 2012 to DISH co-founder and board member Jim DeFranco ("DeFranco") and his assistant, DISH's senior management— including Joe Clayton (DISH's board member, Chief Executive Officer and President, "Clayton"), Cullen (Executive Vice President of Corporate Development) and Vivek Khemka (Senior Vice President of Product Management)—were scheduled to have a meeting with a Wall Street Journal reporter to discuss, *inter alia*, "[c]onfirmation of/motivation behind reported moves to acquire LightSquared debt." (PX0893; PX0203 at DISH_NY0000000093.) The record discloses no response questioning this assertion.

46

128.    In April 2013, Toevs also sent several emails to Ergen and several senior officers, including Cullen, Dodge, Clayton, and Jeff Blum (a Senior Vice President and Deputy General Counsel), about a news article discussing DISH amassing LightSquared debt through Sound Point, and noting that Toevs "has not commented." (PX0393; PX0407; PX0408.) Toevs' April 2, 2013 email referred to past coverage on the very same issue and had links to news stories dating back to May 2012. (PX0393; PX0408.) None of these top DISH executives responded to the e-mail to inquire whether Ergen in fact was buying the LP Debt, and Ergen testified that apart from Kiser, he did not speak to anyone regarding his purchases until the May 2nd board presentation other than Kiser, Cullen, and Dodge. (Jan. 13 Tr. (Ergen) 116:3-22, 119:20-24, 213:12-15; Jan. 17 Tr. (Cullen) 117:8-22.)

129.    Cullen, a 30(b)(6) representative for DISH, testified that Kiser was the only person at DISH who knew about Ergen LP Debt purchases prior to May 2013. (Jan. 17 Tr. (Cullen) 121:21-122:9.) Cullen testified that he reached this conclusion without speaking to any DISH board members or senior management, other than Robert Olson (DISH's Chief Financial Officer, "Olson") and Kiser. (*Id.* 122:12-123:4.)

130.    Cullen works closely with Ergen in the corporate development group, is considered to be "Ergen's closest confidante on all things wireless, with an office next to Ergen's," and leads DISH's strategic acquisitions (PX0890). When news stories surfaced in the second quarter of 2012 about Ergen's activities, Cullen testified in response to questioning by the Court that Ergen simply confirmed that there either "is" or "might be" "some truth" to the reports and said nothing else, strikingly similar to what Ergen testified he told Dodge. (Jan. 17 Tr. (Cullen) 117:8-18; Jan. 13 Tr. (Ergen) 116:3-22.) Cullen also acknowledged that he, Ergen, and Kiser discussed LightSquared "continuously," among other companies, throughout 2012. (Jan.

17 Tr. (Cullen) 134:9-18.)  While Cullen testified that he did not know that Kiser was assisting

Ergen with his acquisitions, he repeatedly sent emails to Ergen and Kiser about LightSquared

during the period the purchases were made.  (Jan. 17 Tr. (Cullen) 110:22-111:7, 112:2-13,

119:12-120:12, 133:7-134:8; PX0075; PX0195; PX0223; PX0393.)  Although Cullen testified

that it was routine practice for him to send updates about MSS companies to the corporate

development group, he generally did not include any of the other group members on the emails

concerning LightSquared.  (Jan. 17 Tr. (Cullen) 134:4-135:8; PX0075; PX0195; PX0393;

PX0438.)  In fact, when Toevs forwarded an article regarding an inquiry from the Wall Street

Journal related to the Sound Point purchases to Cullen, Cullen forwarded that email only to

Kiser.  (PX0393.)

131.    Cullen acknowledged, as an executive, that he owed fiduciary obligations to

DISH.  Nevertheless, Cullen testified that when he learned that Ergen was buying the LP Debt:

(i) he did not ask Ergen why DISH was not buying the debt, (ii) he did not ask in-house counsel

whether there was an issue with Ergen making a personal investment in the debt, and (iii) he did

not take any steps to determine whether Ergen's purchases were a corporate opportunity.  (Jan.

17 Tr. (Cullen) 143:1-20.)

132.    Further, when Cullen learned through news reports in May 2013 that Ergen's

entity, LBAC, made a bid for LightSquared's spectrum assets, he did not ask Ergen if he was

usurping a corporate opportunity.  (Jan. 17 Tr. (Cullen) 143:25-145:16.)  Indeed, Cullen, who

typically is involved in DISH's acquisition process, claimed that he did not know LBAC's bid

had been presented to DISH as an opportunity for over two months, despite being Ergen's

wireless "closest confidante" and sitting practically next door to him.  (Jan. 17 Tr. (Cullen)

144:3-146:19; PX0890.)

48

133.    The inference is that Cullen, a DISH fiduciary (Jan. 17 Tr. (Cullen) 142:12-14),

was unconcerned about Ergen's "personal" LightSquared LP Debt purchases and LBAC Bid

because he understood that the entire strategy was for the benefit of DISH.

**E.      Ergen Controls The Boards Of DISH And EchoStar**

**1)      Through His Roles As DISH And EchoStar's Executive Chairman, Majority Shareholder Of The Board, And Holder Of The Majority Of The Stock For Both Companies, Ergen Controls DISH And EchoStar**

134.    As detailed above (*see supra* Section I.A.1), Ergen, as the holder of a majority

share of voting rights (approximately 88% and 79.4% of the total voting power in DISH and

EchoStar, respectively), has the ability to elect a majority of the directors for his companies, and

control all other matters requiring the approval of their stockholders.

135.    DISH's independent director, Goodbarn, acknowledged Ergen's domination of

DISH's board.  When asked if "[i]t was [his] view that nobody else could act in an independent

way of Charlie," Goodbarn responded, "[t]hat is correct."  (PX0767 at 233:25-234:3.)

136.    Further, DISH and EchoStar believe that their "future success will depend to a

significant extent upon the performance of Charles W. Ergen," the loss of whom "could have a

material adverse effect [on the companies'] business, financial condition and results of

operation," and "place substantial weight on Mr. Ergen's recommendations in light of his role as

Chairman and as co-founder and controlling shareholder of DISH Network."  (PX0349 at 32;

PX0350 at 27; PX0372 at 24; PX0371 at 21.)

**2)      After Acquiring A Blocking Position In The LP Debt, DISH Raises Capital For A Strategic Acquisition Without Board Approval**

137.    Determined to make a play for LightSquared's assets, Ergen directed Kiser to

track the LP Debt trades to ensure they reached a blocking position.  (Jan. 15 Tr. (Ketchum)

25:11-26:18, 29:2-13, 54:1-55:7, 56:11-21, 102:7-12; PX0244; PX0305; PX0379; PX0432.)  As

noted, by March 28, 2013, Ergen achieved a blocking position, purchasing $168 million in LP

Debt.  (Jan. 13 Tr. (Ergen) 174:20-178:3; PX0379; PX0859.)  Given the risk that a consensual

plan of reorganization would be negotiated before exclusivity expired, Ergen had to act quickly

if he wanted to acquire LightSquared's assets for DISH.  (Jan. 13 Tr. (Ergen) 77:8-20.)

138.    Only six days after SPSO established a blocking position, at the very same time

that Ergen was purportedly contemplating making a "personal" bid for LightSquared's assets,

DISH issued a series of notes that raised $2.3 billion in capital (the "April 3rd Capital Raise"),

approximately the same amount as DISH's ultimate bid for LightSquared.  (Jan. 13 Tr. (Ergen)

260:24-263:1.)  DISH's press release for the April 3rd Capital Raise specifically stated the "net

proceeds of the offering are intended to be used for general corporate purposes, which may

include wireless and spectrum-related strategic transactions."  (PX0847; Jan. 13 Tr. (Ergen)

178:4-179:2; PX0904; PX0906.)  No board minutes produced or introduced into evidence by

DISH indicate that DISH's board ever approved this $2.3 billion capital raise.

139.    Although DISH was simultaneously pursuing a merger with Sprint during this

time, the April 3rd Capital Raise was not intended for the Sprint merger.  DISH did a separate

bond offering on May 16, 2013 for $2.6 billion to finance the Sprint merger (the "Sprint Raise"),

which was approved by the DISH board on May 13, 2013.  Unlike the April 3rd Capital Raise,

the Sprint Raise was approved by the DISH board—and the minutes from the board meeting

approving it do not even mention the April 3rd Capital Raise, which presumably would have

been part of the discussion if the April 3rd Capital Raise related to Sprint and the Sprint Raise

was the *second* capital raise for a potential Sprint transaction.  (PX0909 at

DISH_NY000002813-14.)  Moreover, contrary to DISH's press release for the April 3rd Capital

Raise, the press release for the Sprint Raise specifically stated the "net proceeds" from the Sprint

50

Raise "will be released from escrow to make cash distribution to DISH Network to finance a

portion of the cash consideration for DISH Network's proposed merger with Sprint."  (PX0865.)

When the Sprint deal fell through, the notes for the Sprint Raise were redeemed on June 21,

2013, while the notes for the April 3rd Capital Raise remained outstanding.  (Jan. 13 Tr. (Ergen)

178:24-179:2, 180:2-22; PX0865; PX0909; PX0756.)

> **3)** **Soon After Acquiring A Blocking Position, Ergen Makes Presentations To The DISH Board That Contemplates An Immediate DISH Bid And Funding Of The Bid**

140.    In April 2013, Ergen hired Willkie, who had represented DISH in the TerreStar

bankruptcy, to serve as his bankruptcy counsel.. (Jan. 13 Tr. (Ergen 180:23-181:2.)

141.    On May 1 and 2, 2013—shortly over a month after obtaining a blocking position,

and less than a month after the April 3rd Capital Raise—Ergen made presentations to the boards

of EchoStar and DISH, respectively, informing them about his acquisition of LightSquared debt

and his desire for DISH and/or EchoStar to acquire LightSquared's assets for $2 to $2.1 billion

(the "Ergen Presentation").  (PX0767 at 21:1-18; Howard Dep. 55:3-15, 56:24-57:13, 87:11-

88:3, 141:13-20; Jan. 13 Tr. (Ergen) 77:3-7, 77:21-78:2, 78:17-79:9, 80:11-13; PX0480;

PX0492.)

142.    The Ergen Presentation informed the board that Ergen's blocking position in the

LP Debt would benefit DISH:

> **[Ergen's] substantial interests in L2 debt and preferred stock compliment any acquisition strategy and could have significant influence in L2's chapter 11 cases.**

(PX0867 (emphasis added); Jan. 13 Tr. (Ergen) 182:11-183:11.)

143.    The DISH board—which gained a tactical advantage by virtue of Ergen's

blocking position—did not object to Ergen's LP Debt acquisition as exceeding the scope of his

authority.  (Jan. 13 Tr. (Ergen) 206:19-208:3.)

144.    Ergen set extremely tight deadlines by which the DISH and EchoStar boards were to approve a bid.[13]  Ergen requested the DISH and EchoStar boards to decide whether to expend approximately $2 billion dollars almost immediately after his presentation.  According to the Ergen's Presentation:  (i) DISH was to submit a bid "now" that would be accepted by May 15, 2013 "before [LightSquared's] marketing process get[s] underway,"— *i.e.,* before LightSquared raised exit financing; (ii) the purchase agreement would be executed by May 31; and (iii) early funding would occur on August 15.  (PX0867 at SPSO-00011828.)  That the timing of the LightSquared acquisition was critical is of little doubt:  LightSquared's exclusivity period ended on July 15 and Ergen believed LightSquared would begin exploring strategic alternatives in early June if there was no restructuring or sales strategy.  (Jan. 13 Tr. (Ergen) 77:10-17.)

145.    At the time of Ergen's presentation, he understood that the DISH board had not performed any analysis of LightSquared.  (Jan. 13 Tr. (Ergen) 207:15-17.)  And when asked what would have happened if the DISH board had wished to offer a lower price than Ergen's, Ergen stated that "[a]ll they needed to say was, Charlie, don't do it."  (Jan. 13 Tr. (Ergen) 207:18-20.)  Ergen further conceded that the DISH board had not authorized a DISH bid in May 2013, and similarly had not passed a resolution authorizing him to make a bid personally.  (Jan. 13 Tr. (Ergen) 208:4-13.)

## VII.    ERGEN'S ASSERTION THAT HE WAS MAKING A PERSONAL INVESTMENT IS BELIED BY THE EVIDENCE

146.    While Ergen's actions in furtherance of the acquisition of LightSquared are consistent with the scope of his authority at DISH and EchoStar, his substantial purchases of LP Debt are not consistent with a personal investment.  As set forth below, Ergen has a history of

---

[13]    Indeed, the L-Band Acquisition, LLC vehicle was not legally formed until weeks after the bid was made. (PX0578.)

investing in low-risk, diversified, liquid assets—not investing substantially all of his liquid assets in the distressed debt of a single company. (*See infra* Section VII.A.) Moreover, while Ergen's willingness to pay near par for the distressed LP Debt is consistent with a plan to obtain a blocking position in order to acquire the underlying company, it is not consistent with a personal investment to make a profit on the distressed debt by buying low and selling high. (*See infra* Section VII.B.) Finally, other parties, including Sound Point, repeatedly recognized that the LP Debt was being purchased for DISH and EchoStar's benefit. (*See infra* Section VII.C.)

## A.    The Purchase Of LP Debt Was Inconsistent With Ergen's Personal Past Investment Strategy

147.    Bear Creek manages investments for Ergen in a trust account known as the Lindsey Revocable Trust (the "Trust"). (Roddy Dep. 18:3-8.) Ordinarily, the Trust—in the name of both Ergen and his wife, Cantey—contains "almost all of [Ergen's personal liquid] assets." (Jan. 13 Tr. (Ergen) 61:13-21.) The Trust account is conservatively managed, with most securities rated "A" or better, and diversified across "[m]unicipal taxable securities, [and] commercial paper." (Roddy Dep. 57:9-58:3, 58:20-22, 59:6-12; Jan. 13 Tr. (Ergen) 168:4-14.) Ergen had never directed Bear Creek to invest in distressed debt, and Bear Creek has never invested more than 50% of Ergen's funds in the stock of a single issuer. (Roddy Dep. 60:20-61:5.) Indeed, no more than ten percent of Ergen's funds could be invested in any single issuer, and the only distressed debt investment that Kiser could recall Ergen investing in was an indirect investment through the portfolio of a hedge fund, GSO. (Roddy Dep. 74:5-13.) Moreover, prior to investing in the LP Debt, Ergen had never invested his personal funds in a competitor of DISH or a company he considered to be a strategic opportunity for DISH, nor had he previously invested in spectrum assets or bought distressed debt in a company that owned spectrum assets. (Jan. 10 Tr. (Kiser) 100:2-21; Jan. 13 Tr. (Ergen) 122:18-123:4, 154:16-155:12, 156:11-14.)

53

148.    When it came to LightSquared, however, Ergen deviated from his past investment practices, and invested nearly all of his non-DISH/EchoStar assets to acquire the LP Debt. (Jan. 13 Tr. (Ergen) 170:20-172:9; PX0832 (Ergen Nev. Dep.) 105:19-106:10.) Apart from his ownership of DISH and EchoStar, Ergen's investment in LightSquared is by far his largest personal investment. (Jan. 10 Tr. (Kiser) 102:2-14; Jan. 13 Tr. (Ergen) 153:17-21.) Bear Creek's managing director testified that in all, Ergen transferred "probably" over $700 million from the Trust to Bal Harbour and SPSO, and that Bear Creek had never seen Ergen pull out that much money in a period of 13 months for the benefit of the same beneficiary or beneficiaries. (Roddy Dep. 95:16-96:6; *see also* PX0814 at BC001351-68; PX0811 at BC00428-497; PX0809; Jan. 13 Tr. (Ergen) 169:4-170:19.)[14]

149.    According to Ergen, if the LBAC plan had been accepted, he would not only be repaid in full but receive approximately $140 million in profits plus a "significant" amount in interest. (Jan. 13 Tr. (Ergen) 132:22-133:6, 134:6-15, 233:20-234:7.)

150.    Ergen testified that although he withdrew $700 million from a family trust, he never even informed his wife—a co-trustee of the Trust—that he had used the money to invest in the LP Debt. (Jan. 13 Tr. (Ergen) 120:8-21, 252:8-20.) Indeed, although Ergen's wife is a DISH board member (and a co-founder of DISH and EchoStar), she purportedly never asked him whether he was purchasing the LP Debt prior to the May 2, 2013 board meeting. (Jan. 10 Tr. (Kiser) 15:5-21; Jan. 13 Tr. (Ergen) 119:20-120:7; PX0302 at 20.) Notably, Mrs. Ergen was among the recipients of the May 2012 email DISH's general counsel sent stating, in response to a question over whether "charlie had bought $350 million light squared bonds," that "the company did not buy any LightSquared bonds." (DX397.)

---

[14]    Around that time, Bear Creek managed between $626 million and likely $750 million dollars for Ergen. (Roddy Dep. 71:11-18.) Today, it manages under $100 million. (Roddy Dep. 72:22-73:5.)

151.    Further, although Ergen testified that he was interested in purchasing the LightSquared assets personally if DISH declined to bid, he had not made critical decisions essential to the acquisition of a company, such as who would run the business, where key employees would be officed, or how he would resolve the conflict of interest inherent in owning a DISH competitor.  (Jan. 13 Tr. (Ergen) 244:11-245:12.)  Clearly, this was no "personal investment."

152.    Finally, while SPSO was owned by Ergen, it served as an instrumentality of DISH, not as a "personal-investment vehicle" for Ergen.  For example, a December 23, 2013 presentation to the DISH board of directors illustrates DISH's control of SPSO.  (PX924; *see also* PX0923 and PX0925.)  It sets forth "strategic alternatives" available to DISH with respect to the LightSquared bankruptcy.  In the presentation, DISH, among other things, considered proposing new alternative plan support agreements ("PSA"), including potential new PSAs with MAST, LightSquared, the Ad Hoc Group, or some combination of them.  (PX0924.)  Since DISH is not a creditor, it could only put forth a new PSA by directing SPSO to do so, revealing DISH's control of SPSO.  As Ergen admitted, "[his] personal interests [in SPSO] are aligned with DISH's interests. . ."  (PX0773.)

**B.    The Prices Ergen Paid For The LP Debt And Offered For The LP Preferred Are Inconsistent With A For-Profit Personal Investment**

153.    The prices Ergen was willing to pay for the LP Debt are also more consistent with DISH's past practices of paying at or close to par for strategic purposes, rather than a personal investment.  (PX0864 (*In re DBSD North America, Inc.*, 421 B.R. 133, 140 (Bankr. S.D.N.Y. 2009)) (discussing DISH paying par for debt); Jan. 13 Tr. (Ergen) 106:2-17.)  Ergen claimed that in 2013, he felt the LP Debt was even more valuable because of changes in the industry and at

the FCC, so he raised his limit up to nearly par—96 cents on the dollar—and bought whatever

people would sell at that level.  (Jan. 13 Tr. (Ergen) 66:16-25.)

154.    As set forth above, in October 2012, Ergen instructed Kiser to increase his

position in the LP Debt up to a level that would establish a blocking position.  (PX0243.)  By

March 25, 2013, Ergen needed to purchase another $112 million in the debt to reach that goal.

(Jan. 13 Tr. (Ergen) 175:7-176:14; PX0379.)  Intent on amassing a blocking position, Ergen

initiated a trade for $168 million in LP Debt at 96 cents on the dollar -- which was 50% more

than he initially paid in April 2012.  (Jan. 13 Tr. (Ergen) 176:17-178:3; PX0859.)  In fact, Ergen

also sought to purchase the Preferred Stock of LightSquared LP ("LP Preferred") that was

bundled with that 96 cents on the dollar LP Debt and offered to pay between 92 and 95 cents on

the dollar for that—or approximately $122 million, just so, as Kiser testified, he could have the

privilege of obtaining that LP Debt.  (Jan. 10 Tr. (Kiser) 136:7-14.)  Further, Ketchum testified

that SPSO had been offered LP Preferred numerous times in the past, but only pursued the offer

when it was bundled with the $168 million in LP Debt.  (Jan. 15 Tr. (Ketchum) 108:12-22; *see

also* PX0412 (April 4, 2013 e-mail from Kiser telling Ketchum "We're only interested in the

term loan.").)  Yet Ergen denied the fact that he was willing to pay that price because he wanted

to get a blocking position.  (Jan. 13 Tr. (Ergen) 174:3-18.)

155.    Ergen's testimony is inconsistent with Ketchum's testimony that Sound Point,

Ergen, and Kiser shared the goal of obtaining a blocking position.  (Jan. 15 Tr. (Ketchum) 54:19-

22; PX0305.)  Sound Point—at Kiser's direction—had a responsibility to track whether SPSO

had reached a blocking position in the LP Debt and supply Kiser with the information about and

the calculation of a blocking position.  (Jan. 15 Tr. (Ketchum) 25:11-26:18, 48:19-25, 102:7-12,

104:16-21; PX0244; PX0144.)

### C. Other Interested Parties Likewise Viewed The LP Debt Trades As A Dish And Echostar Investment

156.   Even third parties recognized that SPSO's LP Debt purchases were not Ergen's personal investment. Sound Point, which handled the LP Debt trades, repeatedly referred to Ergen, Kiser, and SPSO as "EchoStar" in its internal communications. (PX0036; PX0046; PX0088; PX0240; PX0249; PX0347; PX0387; PX0328; PX0325.) For instance, on May 2, 2012, Ketchum wrote: "Echostar wants up to $50mm LightSquared at [Redacted]." (PX0088.) On October 4, 2012, Ketchum wrote: "Echostar needs to know exactly what percentage they own of the overall size of the issue." (PX0240.) Additionally in a January-February 2013 email chain, Ketchum stated: "I forwarded this to Echostar" and another Sound Point employee replied: "would you mind following up with EchoStar." (PX0347 at SPSO-00002739.) Ketchum testified that he used the term "EchoStar" interchangeably as shorthand for SPSO, Charlie Ergen's family office, EchoStar, and DISH. (Jan. 15 Tr. (Ketchum) 55:17-25.)

157.   Cyrus Capital Partners, LP ("Cyrus"), a major holder of LP Debt, also reached out to DISH or EchoStar, understanding them to potentially be the true party behind SPSO's purchases of LP Debt. Kiser, understanding that the LP Debt was for "the company," Dish and EchoStar, wrote to Ketchum that Cyrus had "reached out to us (the company) as a potential seller of L2 at various times in the past. We have not responded . . . makes sense for you guys to reach out in a generic way and see if there's anything available." (PX0298 (emphasis added).)

158.   Similarly, in early May 2013, a LP Lender learned based on a meeting with Ergen and Cullen that Ergen had acquired a controlling position in the LP Debt. Recognizing that Ergen was just a parking lot for the LP Debt, the LP Lender stated: "[s]o is this an elegant way to transfer the asset from Ergen's balance sheet to DISH's?" (PX0526.)

## VIII.    DISH, THROUGH LBAC, BIDS FOR LIGHTSQUARED'S ASSETS AT ERGEN'S BEHEST

### A.    DISH Forms A Special Committee To Evaluate The Propriety Of Ergen's LP Debt Purchases And A DISH Bid

159.    Shortly after Ergen made his presentation to the board to acquire LightSquared's assets, on May 8, 2013, the DISH board formed a special committee consisting of two directors purportedly independent of Ergen—Goodbarn and Howard—to examine the propriety of Ergen's purchases of the LP Debt and the prospect of a bid for LightSquared's assets.  Pursuant to resolutions in DISH's May 8, 2013 board minutes, the Special Committee was vested with the power and authority to:  (i) review and evaluate a potential bid, (including any potential conflicts of interest) and engage in discussions and/or negotiations; (ii) negotiate definitive agreements with the parties concerning the terms and conditions of the potential bid; and (iii) determine whether such terms and conditions are fair to DISH.  (PX0768 (Howard Decl.) ¶¶ 8-10; PX0491 at DISH_NY000000002-4.)  The board formally resolved that the Special Committee's authority would expire *only* upon the Special Committee's "determination, in its sole and absolute discretion, as set forth in its written notice to the Chairman of the Board of Directors" as long as a bid for LightSquared remains viable.  (PX0491 at DISH_NY0000000005.)

### B.    Ergen Makes A Bid That Sets The Floor And Ensures He Would Be Repaid In Full

160.    Yet, without consulting the newly-formed Special Committee, on May 15, 2013, on behalf of the as-yet unformed LBAC, Ergen had his counsel, Willkie, submitted an unsolicited bid for LightSquared's spectrum for $2 billion (the "LBAC Bid").  (PX0768 (Howard Decl.) ¶ 14; PX0504; PX0513; Jan. 13 Tr. (Ergen) 80:11-19.)  LBAC did not exist at the time the

offer was made and was not formed until six weeks later, on May 28, 2013.  (PX0837-838; Jan. 13 Tr. (Ergen) 191:8-192:25.)[15]

161.    The LBAC Bid expressly stated the buyer of the LightSquared assets would be "owned by one or more of Charles Ergen, affiliated companies and/or other third parties." (PX0504 at GH_L2_00450.)  As detailed in the Ergen Presentation, Ergen priced the bid at $2 billion, approximately the total amount of the outstanding LP Debt, in what he characterized as an effort to induce serious consideration by LightSquared's LP Debt creditors.  (PX0504; PX0867.)

162.    A key feature of the LBAC Bid, which was non-binding and expired on May 31, 2013, was LBAC's apparent "willingness to fund the Purchase Prices, on a non-refundable basis," prior to receipt of FCC and Industry Canada approvals and authorizations.  (Jan. 13 Tr. (Ergen) 80:20-81:7; PX0504.)  The LBAC Bid, however, was well below fair market value.  As Falcone testified, from a "comp perspective," LightSquared's spectrum could be valued in excess of $10 billion when taking into account FCC approval for the spectrum's intended use.  (Jan. 16 Tr. (Falcone) 70:13-71:23; Jan. 9 Tr. (Derrough) 192:1-9; PX0522.)  Ergen's $2 billion bid did, however, ensure that he would be repaid in full and receive $140 million in profits as well as "significant" interest.  (Jan. 13 Tr. (Ergen) 132:20-133:6, 134:6-15, 233:20-234:7.)

163.    Although Ergen testified that he was prepared to proceed with the LBAC Bid as a "personal investment," the evidence does not support such an inference.  (Jan. 13 Tr. (Ergen) 245:17-247:9.)  At the time of the LBAC Bid, Ergen did not have any financing agreements lined up with investors and had not even received a term sheet related to a possible financing of the "acquisition."  He did not receive as much as a term sheet until July 18, 2013—two months *after*

_____

[15]        At the time LightSquared received the bid, it still did not know Ergen was behind the LP Debt purchases. (Jan. 16 Tr. (Falcone) 69:22-25, 71:24-72:2.)

his bid would have expired.  (Jan. 13 Tr. (Ergen) 185:20-186:7, 193:15-25, 195:23-196:13;

DX285.)  Even then, under the term sheet, Ergen would have had to provide over a billion

dollars in cash.  (Jan. 13 Tr. (Ergen) 87:3-88:20.)  To obtain that enormous sum, Ergen testified

that he would have used $300-$500 million of his personal liquid cash and borrowed the rest

against his EchoStar stock.  (Jan. 13 Tr. (Ergen) 88:21-89:1.)  Further, when Ergen did receive

the term sheet, the fees and expenses were listed as "TBD," showing that the offer was not final

and no deal had been reached.  (Jan. 13 Tr. (Ergen) 196:14-197:8; DX285.)  In fact, the date that

Ergen received the term sheet was just a few days before the DISH Special Committee gave a

conditional approval of the bid, Ergen sold LBAC to DISH for a dollar, and DISH entered into

the Plan Support Agreement ("PSA").  (Jan. 13 Tr. (Ergen) 194:11-195:12.)

### C.    DISH Approves The Bid And Disbands The Special Committee Without Regard To The Special Committee's Conditional Recommendation

164.    On or about May 17, 2013, the Special Committee set out to engage independent

counsel and independent financial advisors, as authorized by the DISH board's resolutions.

(PX0910; PX0534; PX0491 at DISH_NY000000004; PX0768 (Howard Decl.) ¶ 11.)  However,

the Special Committee was pressured to quickly give a stamp of approval to DISH's

participation in the LBAC Bid.  When Ergen—who claimed he was initially unaware of the

Special Committee's formation—learned that the Special Committee was to engage counsel, he

was furious, emailing "[w]hy would we have special committee counsel.  You are way ahead of

your skis here."  (DX188; PX832 at 154:15-155:18; *see also* PX0550.)  As a result, the Special

Committee, following Ergen's direction, delayed the engagement of independent advisors.

(PX0768 ¶¶ 22, 25, 26.)  When Ergen later believed it was time for the Special Committee to act

it was rooted in his belief that LightSquared was "going to get [the financing] done," which

60

"might effect strategy" and the ability to run out the clock on the exclusivity period.  (PX0702;

Jan. 13 Tr. (Ergen) 77:13-17.)

165.    As part of its analysis, the Special Committee made repeated requests for

information from Ergen regarding his LP Debt trades.  Howard testified that the Special

Committee was interested in determining whether there was a way that DISH could have bought

LP Debt notwithstanding the transfer restrictions.  (Howard Dep. 204:14-205:15.)  Ergen never

provided the Special Committee with the requested information.  (PX0767 at 92:10-93:15,

128:16-129:12, 129:21-130:5; PX0768 (Howard Decl.) ¶¶ 27, 28, 30; PX0605; PX0663; DX224;

PX0654.)  Goodbarn testified that Ergen did not share information regarding his trades with the

Special Committee as a ploy to insulate himself from this adversary proceeding.  (PX0767 at

104:23-105:6.)

166.    Under intense time pressures, on July 21, 2013, the Special Committee presented

its conclusions to the board, recommending that Dish pursue the LBAC Bid for $2.2 billion, but

subject to five express conditions, four of which implicated further review and decision making

by the Special Committee:

> (i)     that any material changes to the terms of the bid and/or APA would be subject to
>         the review and approval of the Committee;
>
> (ii)    that the Corporation would acquire one hundred percent (100% of the L-Band
>         Acquisition Vehicle, to the exclusion of EchoStar Communications Inc. . . .;
>
> (iii)   that the Committee and its legal and financial advisors would remain involved in
>         all negotiations regarding the proposed transaction going forward . . .;
>
> (iv)    that the Committee would review and approve the terms of the acquisition by the
>         Corporation of Mr. Ergen's interest in the L-Band Acquisition Vehicle . . . .; and
>
> (v)     that the Committee . . . expressly reserved[] the right to obtain all of the requested
>         information [regarding Ergen's acquisition of debt and/or other securities issued
>         by LightSquared] as well as the right to evaluate potential corporate opportunity
>         issues.

(PX0716 at GH_L2_000973-74.)

167.    Immediately after the Special Committee delivered its conditional approval of the

LBAC Bid, the DISH board abruptly disbanded the Special Committee without advance notice.

Other than Howard and Goodbarn, who abstained, the board's vote was unanimous.  (PX0768

(Howard Decl.) ¶¶ 49-52; DX400.)  This was despite the fact that the conditions had not been

satisfied (PX0736) and that the resolutions creating the Special Committee allowed disbandment

only upon the Special Committee's decision with the bid remaining viable.  (PX0491 at

DISH_NY0000000005.)

168.    Two days later, on July 23, 2013, DISH announced its intention to bid through

LBAC for LightSquared's spectrum.  Howard learned of the bid through the "wires" and did not

even know whether the bid was submitted by DISH or by Ergen.  (PX0725.)  On July 24, 2013,

the Special Committee wrote a letter to DISH's board expressing its surprise at its disbandment

and noting that the five conditions remained unsatisfied.  (PX0736.)  On July 25, 2013, Howard

resigned from the board, an action taken so suddenly that DISH risked delisting from the

NASDAQ.  (PX0746; *see also* PX0741; DX313.)

## D.    The Bid Was Made Without DISH And The Special
##       Committee's Participation In Crucial Aspects

169.    On July 23, 2013, DISH announced that it had signed on to a PSA in which it

would act as the stalking horse bidder in the Ad Hoc Secured Group's plan.  (PX0730.)  Ergen

had unilaterally negotiated the PSA with the Ad Hoc Secured Group, as well as the Asset

Purchase Agreement ("APA").  (PX0767 at 141:2-19, 170:9-171:14.)  Similarly, after the Special

Committee was already disbanded, on July 22, 2013, DISH agreed to buy LBAC from Ergen for

a single dollar without the Special Committee ever reviewing the terms of the acquisition

agreement.  (Howard Dep. 315:10-316:3; Jan. 13 Tr. (Ergen) 195:6-8.)  Thus, the Special

Committee was absent from the negotiations of two documents that were critical to the

LightSquared acquisition strategy—the PSA and APA—as well as DISH's purchase of LBAC

from Ergen.

170.    The APA, incorporated by reference into the PSA, contained a broad release for

all claims against Ergen, DISH, EchoStar and SPSO—an entity which purportedly has no ties or

relationship with DISH.  (PX0823 § 7.6; PX0841 at 11, n.9, 70, 88; 17 C.F.R. § 240.12b-2.)

## IX.    SPSO IS IDENTICAL TO AND INDISTINGUISHABLE FROM ERGEN

171.    The evidence shows that SPSO and SO Holdings were really stand-ins for Ergen

based on, among other things:  (i) the entities' corporate structure; (ii) the minimal funding for

the entities; and (iii) Sound Point's willingness to execute hundreds of millions of dollars in LP

Debt trades without fully understanding SPSO's financial wherewithal.  (Jan. 15 Tr. (Ketchum)

18:5-21, 19:18-25, 20:18-22:8, 120:13-16; Jan. 10 Tr. (Kiser) 26:5-6, 31:15-19, 56:22-59:5; Jan.

13 Tr. (Ergen) 127:20-25; PX0221 at LSQ-SPCD-000005552, 5553, 5557, 5558, 5560, 5561,

5565, 5566.)

172.    Further evidencing that Sound Point viewed SPSO as identical to Ergen, Sound

Point entered into a Trading Management Agreement with SPSO on April 15, 2012—a month

before SPSO and SO Holdings were even formed.[16]  (PX0055 at LSQ-SPCD-00000750; Jan. 15

Tr. (Ketchum) 18:22-25, 99:9-19; PX0221.)  Ketchum could not recall another instance where he

---

[16]    On April 5, 2012, Bal Harbour Capital entered into a trading management agreement with Sound Point,
granting Sound Point non-discretionary authority to execute trades on its behalf. (PX0131 at LSQ-SPCD-
000011949; Jan. 15 Tr. (Ketchum) 15:5-14.)  Bal Harbour Capital was initially capitalized with one dollar
($1.00) and itself had no right to secure additional funding. (Jan. 15 Tr. (Ketchum) 19:18-25; PX0058 at
LSQ-SPCD-000012134; PX0147 at SPSO-00001602; Ergen Dep. 120:2-10.) Under Bal Harbour Capital's
Limited Liability Company Agreement, Ergen had no obligation to make further capital contributions
beyond the initial one dollar capital contribution (PX0058 at LSQ-SPCD-000012127 ("[T]he Managing
Member shall have no right or obligation to make any further capital contributions in the Company.").)

entered into a Trading Management Agreement with an entity that had not yet been formed.

(Jan. 15 Tr. (Ketchum) 19:5-10; PX0049; PX0083; PX0084; PX0087; PX0088; PX0224.)

### A.   The SPSO Entity Was Undercapitalized And Funded Solely At Ergen's Discretion

173.    SPSO is wholly owned by its one Managing Member, SO Holdings, and Ergen

wholly owns and is the sole Managing Member of SO Holdings.[17]  (PX0221 at LSQ-SPCD-

000005552, 5557, 5560, 5565; Jan. 10 Tr. (Kiser) 31:15-19.)

174.    SPSO—the vehicle by which most of the LP Debt trades were initiated and all of

the trades closed—was formed with a *de minimus* amount of funding.  (Jan. 10 Tr. (Kiser) 56:22-

57:6; Jan. 13 Tr. (Ergen) 127:20-25; PX0529; PX0530; PX0560; PX0859.)  The operating

agreements for both SPSO and SO Holdings required that the Managing Member—Ergen—

make an initial capital contribution of  only ten dollars ($10.00) for each entity.  (PX0221 at

LSQ-SPCD-000005553, 5558, 5561, 5566; Jan. 15 Tr. (Ketchum) 18:5-21.)  Ergen admitted that

this initial contribution to SPSO "wasn't very much," (Jan. 10 Tr. (Ergen) 127:18-25), and

ignored Ketchum's recommendation—based on advice from Sound Point's CFO, that Ergen's

other SPV, Bal Harbour, be capitalized with $500,000.  (Jan. 10 Tr. (Kiser) 87:24-88:3.)

175.    Moreover, neither the SPSO nor SO Holdings operating agreements required

additional capital contributions from Ergen as Managing Member.  (PX0221 at LSQ-SPCD-

000005553, 5561 ("[t]he Managing Member is entitled, but not required, to make additional

contributions to the capital of the Company").)

176.    Ergen was the only person who could make the decision to transfer funds from the

account at Bear Creek—the asset manager for Ergen, DISH and EchoStar—to Bal Harbour or

---

[17]     Both Bal Harbour entities were solely owned by Ergen.  (PX0058 at LSQ-SPCD-000012124; PX0059 at SPSO-00000396.)

SPSO for settlement of the LightSquared trades.  (Jan. 10 Tr. (Kiser) 57:7-58:12, 87:13-19; Jan.

15 Tr. (Ketchum) 99:9-19; PX0046; PX0055; PX0116 at LSQ-SPCD-000000905 (Ergen had

"full discretion over the investment decisions" in his accounts at Sound Point); Jan. 10 Tr.

(Kiser) 24:6-9 (Ergen "makes his own decision" with respect to his investments).)

177.    As Ketchum admitted, the initial capital contribution amounts for SPSO and SO

Holdings were insufficient to buy a significant amount of LP Debt.  (Jan. 15 Tr. (Ketchum) 18:8-

21, 20:4-13.)

178.    Although Ketchum knew that Bal Harbour and SPSO did not have sufficient

funds in their accounts to cover the purchases of LP Debt prior to the closing of the trades,

Ketchum did not perform a credit check with respect to SPSO and did not have an understanding

of SPSO's financial resources or wherewithal.  (Jan. 15 Tr. (Ketchum) 20:18-25; PX0062;

PX0066; PX0070.)

179.    Sound Point nevertheless traded on behalf of Ergen's minimally-funded entities

because Ketchum understood that the entities were backstopped by Ergen.  (PX0023; PX0024;

PX0046; PX0048; PX0052; PX0056; PX0058; PX0059; PX0074.)  For instance, on April 13,

2012, Sound Point initiated a $5 million LP Debt trade for Bal Harbour, even though at that time

the Bal Harbour Holdings account had not yet been funded.  (PX0859; PX0066; PX0049;

PX0050; PX0062; PX0070.)  On April 17, 2012, Ketchum wrote to Kiser that, "[w]e need to get

the Citi account open for BH Holdings and get $500,000 in the account before we do any more

LightSquared trades."  (PX0066 (emphasis added).)

180.    Ketchum testified that Sound Point was "comfortable" that Ergen would pay for

SPSO's LightSquared debt purchases because "[i]t was implicit that if we executed a trade,

SPSO would pay to settle the trade."  Sound Point understood that this money would come from

Ergen—whom he estimated had a net worth of upward of $8 billion—and Ketchum admitted that

Sound Point was satisfied that the trades would be settled based on Ergen's credit rather than

SPSO's.  (Jan. 15 Tr. (Ketchum) 21:1-22:8, 120:13-16; Jan. 10 Tr. (Kiser) 57:7-59:5, 61:5-9,

74:11-19; DX229; PX0041; PX0052 at LSQ-SPCD-000005238 (documentation for Bal Harbour

BNP Paribas account stated that Ergen had "$100 million +" of liquid net worth); PX0091;

PX0116 at LSQ-SPCD-00000904.)

## X.   DEFENDANTS MAKE A STRATEGIC DECISION TO LEAVE HUNDREDS OF MILLIONS OF DOLLARS IN LP DEBT TRADES OPEN FOR SEVERAL MONTHS

181.   Ergen and Kiser testified that there were "economic" reasons for them leaving the

LP Debt trades open for as long as possible and they never intended to delay the settlement of the

trades.  (Jan. 10 Tr. (Kiser) 64:5-25, 128:20-23; Jan. 13 Tr. (Ergen) 63:7-9; PX0583 (trading

summary listing trades that have not settled with suggested closing dates).)  However, the

evidence presented at trial shows an intentional delay to settle the LP Debt trades in that:  (i)

Ergen was insistent on holding on to his money for as long as possible; (ii) Ketchum—at Kiser's

direction—gave false excuses to SPSO's counterparties to delay the closing of the trades; (iii)

Ergen had no incentive to close the LP Debt trades because he could direct the vote on the trades

even before they settled; (iv) there is no evidence in the record that a decision to settle the LP

Debt trades was driven by a return Ergen received on his assets held at Bear Creek; (v) a delay in

settling the LP Debt trades was not due to liquidity concerns because the Bear Creek investments

could have been liquidated in a matter of days; and (vi) inconsistent and contradictory testimony

was given regarding the reasons why settlement was delayed.  (*See, e.g.*, PX0204; PX0481;

PX0466; PX0498; PX0495; Jan. 10 Tr. (Kiser) 64:5-25, 95:20-23, 128:24-131:23; Roddy Dep.

66:7-25, 85:17-86:4, 87:9-16.)

A.    **Kiser, With Sound Point's Assistance,
Delayed The Closing Of The LP Debt Trades**

182.    Ergen delayed closing hundreds of millions of dollars in LP Debt trades because

he was insistent on holding onto his capital for as long as possible and would only fund trades

when they needed to close.  (Jan. 10 Tr. (Kiser) 57:4-6; Jan. 13 Tr. (Ergen) 59:13-22.)  Thus,

when Sound Point entered into a trade for LP Debt, Kiser would have to create liquidity

necessary to fund the purchases and wire the funds to the accounts set up for SPSO.  (Jan. 10 Tr.

(Kiser) 87:13-23.)  Prior to closing a trade, Kiser and Ergen provided Bear Creek—the financial

manager for DISH, EchoStar and Ergen—with a wire transfer authorization and Bear Creek

would liquidate assets to fund the trades.  (Jan. 10 Tr. (Kiser) 21:23-22:18, 57:7-58:12; Jan. 10

Tr. (Ergen) 57:7-15; Roddy Dep. 42:18-43:14, 45:3-19.)

183.    As Ergen testified, he typically put "the smallest amount [he] could" in his SPVs

because he "didn't want to tie up capital."  (Jan. 15 Tr. (Ketchum) 19:18-25; PX0058 at LSQ-

SPCD-000012134; PX0147 at SPSO-00001602.)  Similarly, Kiser told Ketchum that he did not

want to wire even "a nominal amount of money" to open a BNP Paribas account to fund the LP

Debt trades, stating:  "It'll be a lot easier if we don't have to fund $$ until we have a trade to

settle . . . [Ergen] won't be a big fan of just putting $$ out for opening an account."  (PX0041;

Jan. 10 Tr. (Kiser) 87:24-88:17.)

184.    The delay in funding caused the LP Debt trades to take two to over four months to

settle after the initiation of the trade.  SPSO's counterparties to the hundreds of millions of

dollars in open LP Debt trades grew anxious and repeatedly reached out to Sound Point to settle

the trades.  (Jan. 15 Tr. (Ketchum) 80:23-81:6, 85:15-25, 105:4-16, 109:8-111:12; PX0279;

PX0495 at SPSO-00003025; PX0859; PX0204; PX0209; PX0270; PX0308; PX0319; PX0328;

PX0339.)  To assuage the concerns of SPSO's counterparties, Sound Point conjured up varying

67

excuses even though Ketchum admitted that he did not know specifically why SPSO was unable to timely close the LP Debt trades and only knew Kiser wanted to delay.  (Jan. 15 Tr. (Ketchum) 69:3-16; *see*, *e.g.*, PX0204 (Sound Point employee emailing Ketchum on June 4, 2012 regarding a LightSquared trade entered into on May 3, 2012 and stating, "Jefferies is looking to settle the other two trades.  Do you want to?  Or delay?"); PX0481; PX0523.)

185.    For example, on January 14, 2013, UBS sought to close a trade with SPSO that had been pending for months.  Ketchum, in an email to his colleague, said he "forwarded this to EchoStar."  Three days later, the colleague asked Ketchum, "would you mind following up with EchoStar [because] UBS has asked to close again."  By January 24, 2013, UBS again was pressuring Sound Point to close the trades, "emailing to close daily," and Sound Point continued to delay.  "Try and hold them off for another day," another Sound Point employee responded. (PX0348; *see also* PX0319 (Sound Point on January 14, 2013, replying "[s]orry but we are not able to settle that one right now" in response to weekly inquiries from UBS); PX0328 (Sound Point internally discussing following up with "Echostar" regarding UBS trade); PX0364 (March 7, 2013 Sound Point email stating it would be able to settle "next week" in response to repeated inquiries since February 2013 regarding a December 2012 trade).)

186.    On February 19, 2013, a Sound Point employee asked Ketchum to follow up with Kiser regarding ongoing email and telephone requests from Jefferies (the executing brokers for the LP Debt trades) to close multiple trades, with trade dates going back as early as October 23, 2012.  (PX0347; PX0859.)  As evidence of Sound Point's ongoing delay, the employee reminded Ketchum that "[w]e have been pushing Jefferies off for nearly 3 weeks."  (PX0347.)

187.    Then, on April 23, 2013, Ketchum wrote Kiser, "Kevin [of Sound Point] thinks we can hold [Jefferies] off on any payments until at least May 15" in connection with over $289

million in LP Debt that had not settled.  (PX0458; PX0441; PX0859.)  Jefferies followed up with

Sound Point on April 25, 2013, seeking to close $88 million of the open LP Debt purchases.

(PX0466.)  Ketchum inquired whether he could plausibly blame SPSO's delay on the

"upstreams," *i.e.*, the work required to trace back the chain of ownership to original lenders, but

was told by Sound Point personnel that the work had already been completed.  (PX0466; Jan. 15

Tr. (Ketchum) 76:9-77:8.)

188.    When a Sound Point employee sought from Ketchum a "reason and an eta" to

give Jefferies, another employee suggested telling Jefferies "we are waiting on funding from our

investor."  Ketchum rejected that idea, and proposed a different excuse:  "Let's not say that.

Let's just say we are in the process of exiting some other large positions we have to pay for this

and that I have spoken with Steve Sander (head of sales) [at Jefferies] about this."  (PX0466; *see

also* PX0468 (Ketchum stating that they should tell Sound Point that "our LP wants time to

dispose of other assets"); PX0308 (Jefferies repeatedly inquiring whether funds are available);

PX0341 (Sound Point writing to Jefferies that they are "still waiting on the funds"); Jan. 10 Tr.

(Kiser) 63:15-20.)

189.    On May 9, 2013, Jefferies emailed Sound Point again, imploring Ketchum to

address the open trades.  (PX0498.)  As of that date, SPSO had seven open trades with Jefferies,

totaling approximately $588 million in LP Debt from trades dating back as far as January 2013.

(PX0859.)  Sanders of Jefferies pleaded:  "this is a big problem for me. I would like to come

down and talk to you this afternoon around 4 or 5pm mano a mano[.]  Is this

possible?"  Ketchum replied, offering the party line established the day before that he was

waiting for other "trades to settle."  Ketchum went on to state that he had "already pushed

extremely hard to get to where we are now in terms of closing."  (PX0498.)  Notwithstanding the

intense pressure from Jefferies, none of the open trades closed for another several weeks.

(PX0859.)

190.     Aware that the volume of unsettled LP Debt trades was substantial, Sound Point

worked with Kiser to come up with dates when the trades could feasibly settle -- selecting dates

up to four months or more after the initiation of the trade as illustrated by the below email

exchanged between Ketchum and Kiser on May 8, 2013:

**Proposed Settlement Dates**

| Trade Date | Cost | Type | Desk | Settlement Date | Cumulative |
|------------|------|------|------|-----------------|------------|
| 01/07/13 |  | TLB | JEFF | 05/17/13 |  |
| 01/14/13 |  | TLB | JEFF | 05/17/13 |  |
| 12/12/12 |  | TLB | GS | 06/01/13 |  |
| 03/25/13 |  | TLB | JEFF | 06/01/13 |  |
| 02/01/13 |  | TLB | JPM | 07/01/13 |  |
| 03/28/13 |  | TLB | JEFF | 07/01/13 |  |
| 04/01/13 |  | TLB | SEAPORT | 07/01/13 |  |
| 03/28/13 |  | Pref | JEFF | 07/15/13 |  |
| 04/19/13 |  | TLB | JEFF | 08/01/13 |  |
| 04/26/13 |  | TLB | JEFF | 08/15/13 |  |

(PX0495 at SPSO-00003025; *see also* PX0460; PX0461; PX0474; PX0497; PX0454 (April 22,

2013 internal Sound Point email noting that the amount of unsettled trades had "jumped to

almost $404 [million]"); Jan. 15 Tr. (Ketchum) 109:1-111:12.)  Sound Point provided the

proposed settlement dates to Jefferies to give assurance (even though there was none) that the LP

Debt trades would close.  (Jan. 15 Tr. (Ketchum) 123:12-124:1.)

191.     Sound Point also performed an internal analysis on May 8, 2013 that showed the

LP Debt trades with Jefferies took an average of 69 days to settle after the trade date, and 38

days after the "contractual settlement date" of "T+20," or 20 days after the trade date.  (PX0493.)

Indeed, trade counterparties were keenly aware of SPSO's failure to adhere to the industry norms

for the timing of settlements.  For example, Jefferies emailed Sound Point, "[w]e are past the

T+20 date and would really like to get this off our books."  (PX0205; *see also* PX0209; PX0270;

PX0234.)

192.    Frustrated with the unprecedented delay in closing the trades, Jefferies

complained internally that "[w]hat the buyer has done is not market protocol" and separately to

its immediate counterparty that "we remain beholden to [Sound Point] as far as continuing to

make progress."  (PX0538; PX0880.)

## B.    There Was No True Economic Benefit For Ergen and Kiser To Keep The LP Debt Trades Open

193.    Kiser and Ergen consistently testified that they were "in no rush to close" because

it was to Ergen's economic benefit to wait as long as possible before closing on the trades.  (Jan.

10 Tr. (Kiser) 97:23-99:14; Jan. 13 Tr. (Ergen) 157:16-158:6.)  As Kiser testified, Ergen "was

getting a return on his capital and his investments.  So if he didn't have to pay for it and he can

make money on another end where his money was invested, that seemed like a smart move."

(Jan. 10 Tr. (Kiser) 98:3-6.)  But the bank statements that Bear Creek produced show that Ergen

earned a relatively low rate of interest on the funds in his trust accounts.  (PX0796-818.)  By

May 20, 2013, SPSO had contracted for, but refused to close, approximately $593,757,031.76 in

LP Debt trades (and closer to $610,019,568.01 counting trades held by brokers on that date)—

more than 33% of the ***total outstanding*** LP Debt obligations—and kept open a number of trades

that it had entered into as far back as December 12, 2012.  (PX0859.)

194.    On July 9, 2013, SPSO submitted a filing, along with a stipulation ("SPSO

Stipulation"), to this Court stating that "the timing of closing of each of SPSO's acquisitions of

Prepetition LP Obligations was primarily driven by the sellers of such claims."  (PX0699 ¶ 16.)

The July 3, 2013 stipulation, which was modified by the SPSO Stipulation, had stated, "SPSO's

trade counterparties did not request that SPSO settle or close the trades for several months" and

that "SPSO and Ergen took no action to delay" the closing of any of the trades. (PX0699;

PX0858.) These statements by SPSO's counsel were contradicted by Ergen, Kiser, and

Ketchum's testimony.

195.    Ergen understood that he did not need to "rush" to close the trades because he

could direct the vote of the LP Debt without settling on the trade. (Jan. 13 Tr. (Ergen) 163:1-10;

Jan. 10 Tr. (Kiser) 64:17, 97:25, 129:7-13; PX0111.) As discussed above in Section V.B, it was

common practice for the seller of the LP Debt to give the buyer the option to vote on matters

relating to the LP Debt.

196.    There were economic costs associated with leaving the LP Debt trades open for

extended periods of time that were not taken into account. If SPSO failed to close certain LP

Debt trades within the closing date specified in the purchase agreement, it was charged a penalty

"cost of carry fee" and in some instances had to forgo receiving a share of Adequate Protection

Payments[18] for the unsettled trade. (*See Agreed Final Order (A) Authorizing Debtors to Use*

*Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C)*

*Modifying Automatic Stay* [Docket No. 136] at 18 (granting adequate protection for Lenders);

Jan. 15, 2014 (Ketchum) 81:1-82:3; PX0493; *see, e.g.*, DX104 at LSQ-SPCD-000000176

(imposing "AP Payment" and "cost of carry" fees from T+20 to settlement date); DX109 at

LSQ-SPCD-000000285; PX0851 at SPSO-00000072; PX0650 at LSQ-SPCD-000000073.)[19]

---

[18]    "Adequate Protection Payments" refer to the payments of $6,250,000, made on the first business day of
each month, and distributed as interest payments to holders of LP Debt after the payment of
nonprofessional and professional fees pursuant to the *Agreed Final Order (A) Authorizing Debtors to Use Cash
Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying
Automatic Stay* (Bankr. Docket No. 136 at 18), and the *Amended Final Order Authorizing Debtors to Use
Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying
Automatic Stay.* (Bankr. Docket No. 136 at 19; Bankr. Docket No. 544 at 18-19.)

[19]    Defendants redacted the amounts paid in fees.

Despite these economic costs, Sound Point only closed one LP Debt trade--the May 4, 2012

purchase of $247 million in LP Debt from Carl Icahn's company Icahn Enterprises LP

("Icahn")— within the contractual settlement period.  (Jan. 15, 2014 Tr. (Ketchum) 82:7-15;

PX0493; PX0859.)

197.    Neither Kiser nor Ergen monitored the interest earned on the specific assets

selected for liquidation, and they had no involvement in the selection of those assets.  (Jan. 10

Tr. (Kiser) 128:24-131:23.)

198.    Bear Creek, at its sole discretion, decided which assets to liquidate from the Trust,

and Ergen and Kiser both testified that they had no knowledge of how the assets were liquidated.

(Jan. 13 Tr. (Ergen) 159:20-24.)  Bear Creek's corporate representative testified that he selected

assets for liquidation based on "which ones are the easiest to liquidate closest to the market

value," and generally selected assets with low interest rates, consistent with the overall

conservative nature of the Trust.  (Roddy Dep. 57:9-58:3, 58:20-22, 59:6-12, 69:7-11; Jan. 13 Tr.

(Ergen) 168:4-14.)  The Bear Creek representative was not aware that SPSO had to pay cost of

carry fees and forego Adequate Protection Payments if the LP Debt trades were not closed by a

certain date and, therefore, this had no impact on asset selection.  (Roddy Dep. 67:15-69:22,

86:5-87:3.)  Indeed, Ergen and Kiser—not the Bear Creek representatives—were aware that

SPSO was accruing (and possibly missing out on) Adequate Protection Payments.  (PX0258;

PX0256; PX0259.)

199.    Thus, delaying the closing of the LP Debt trades came with real economic costs to

SPSO, and neither Ergen, Kiser, nor Bear Creek did any analysis to determine the returns in

deciding what assets to liquidate for closing.

### C.     Trades Were Not Left Open Due To Liquidity Concerns

200.     Contrary to Kiser and Ketchum's testimony (Jan. 10 Tr. (Kiser) 129:23-131:18;

Jan. 15 Tr. (Ketchum) 84:10-14), a lack of available liquidity cannot account for the significant

delays in closing. As set forth above (*see supra* Section V.A), SPSO's LP Debt purchases were

funded by Ergen's assets held in the Trust. When SPSO was ready to close a trade, Ergen would

authorize a wire transfer from the Trust, which Bear Creek made available for transfer within

several days. (Roddy Dep. 66:12-25, 85:17-86:4, 87:9-16; PX0091; PX0273; PX0353; PX0519.)

As the Court itself noted, "[i]f [Ergen] held municipal bonds, you could liquidate those in

twenty-four to seventy-two hours maybe." (Jan. 15 Tr. (Ketchum) 113:21-22.) Ergen, himself,

testified: "As far as I know, I don't believe, other than several days, or perhaps a Friday where it

didn't make economic sense to wire money, that there was any delays because of that reason."

(Jan. 13 Tr. (Ergen) 159:13-19.)

201.     In fact, neither Kiser nor Ergen could identify a single instance in which

liquidating assets to free up funds for SPSO took longer than a few days. (Jan. 10 Tr. (Kiser)

132:10-20; Jan. 13 Tr. (Ergen) 158:7-159:19 (Ergen believed that assets in the Bear Creek

account could be liquidated in several days, and that there were no delays in closing due to

liquidity concerns).) In at least one case, liquid funds were readily available, but Kiser instructed

Bear Creek to hold off on wiring funds. (*See* PX0530 (Kiser instructs Bear Creek on May 20,

2013 to "[w]ait for the green light from me prior [to] sending. Obviously it's not going today so

just check with me each morning.").)

### D.     Defendants' Testimony Is Inconsistent On Why The Trades Were Open

202.     Ergen, Kiser and Ketchum inconsistently offered two explanations to account for

the lengthy delays between the trade and settlement dates: (1) Ergen did not have immediate

liquid funds available (Jan. 10 Tr. (Kiser) 129:23-131:18; Jan. 15 Tr. (Ketchum) 69:3-25); and

74

(2) the necessary paperwork or "upstreams" were not complete. (Jan. 10 Tr. (Kiser) 62:1-17, 128:24-129:22.) The inconsistencies in this testimony undermine its credibility.

203. Ketchum testified that he had no conversations with Kiser as to why funds were not available for closing, and had no understanding of Ergen's liquidity at that time. (Jan. 15 Tr. (Ketchum) 70:7-15.) When funds did not arrive timely, Ergen assumed, based on remarks "from Mr. Kiser that things had to be sold, cash had to be raised to settle those trades, and so informed counterparties." (Jan. 15 Tr. (Ketchum) 84:10-14.)

204. Kiser gave inconsistent testimony as to the role of liquidity in the settlement delays. At trial, Kiser denied that liquidity caused any delays. (Jan. 10 Tr. (Kiser) 128:24-129:13.) When reminded that he stated otherwise at his deposition, Kiser conceded that he "gave that as an example of one thing" that caused delays. (Jan. 10 Tr. (Kiser) 129:23-130:1.) But the "example" thus offered at deposition was, according to Kiser's trial testimony, utterly misleading, at best.

205. Further, despite acknowledging that he had testified at his deposition that liquidity issues were the sole cause for delay, at trial, Kiser testified that delays were primarily caused by the amount of time it took to complete the necessary paperwork, and that he waited until Ketchum advised him that a LightSquared trade needed to close and then arranged for the necessary liquidity. (Jan. 10 Tr. (Kiser) 62:1-17, 95:20-96:4, 129:23-130:1.) Yet, Kiser admitted that even when provided with notice that counterparties were ready to close, he sought to defer settlement as long as possible. (Jan. 10 Tr. (Kiser) 64:5-25, 97:23-98:6.) Indeed, on one occasion when funds were not forthcoming from Ergen, Ketchum asked his team whether he could tell the impatient seller that the upstreams were the source of the delay, and was told that he could not say that, because the upstreams had been completed days before. (PX0466 at LSQ-

SPCD-000008170-71, 73.)  As detailed above (*supra* Section X.A), there were numerous

instances in which SPSO's counterparties repeatedly badgered Sound Point to settle hundreds of

millions in open trades over a course of months before Kiser and Ergen finally arranged for

settlement.  (*See e.g.*, Jan. 15 Tr. (Ketchum) 85:2-13; PX0859.)

## XI.   LIGHTSQUARED AND ITS CREDITORS WERE INJURED BY DEFENDANTS' CONDUCT

206.     At various points during LightSquared's bankruptcy, LightSquared, Harbinger

and the Ad Hoc Secured Group made a commitment to work together to come to a consensual

resolution.  (Jan. 17 Tr. (Hootnick) 21:24-22:24; Jan. 9 Tr. (Smith) 130:3-18; Montagner Dep.

75:21-76:5.)  As discussed below, Defendants' conduct disrupted those negotiations and injured

both LightSquared and its creditors.  A delay in a consensual plan not only came at a cost to the

company, but the creditors as well.  Ergen's presence in the capital structure created tremendous

uncertainty to LightSquared's ability to reach a global plan that enabled LightSquared to emerge

from bankruptcy with the creditors paid out in full.

207.     On January 17, 2013, LightSquared filed a motion to further extend its exclusive

period to file a chapter 11 plan to July 20, 2013.  (Docket Nos. 485-88; DX352.)  LightSquared

negotiated a Stipulation Between Parties in Interest Regarding Entry of Order Pursuant to 11

U.S.C. § 1121(d) Further Extending LightSquared's Exclusive Periods To File a Plan of

Reorganization and Solicit Acceptances Thereof (the "Exclusivity Stipulation").  On February

13, 2013, this Court entered the Second Exclusivity Extension Order, incorporating the terms of

the Exclusivity Stipulation.  (Docket No. 522; PX0852.)

208.     The Exclusivity Stipulation extended LightSquared's exclusivity period to July

15, 2013, and required the parties to engage in good faith negotiations regarding the terms of a

consensual chapter 11 plan.  (PX0852 at 3-4; Jan. 13 Tr. (Ergen) 77:3-20.)  If a consensual plan

was not reached by July 15, a sales process of LightSquared's assets would begin.  (PX0852 at

Ex. A ¶6.)[20]  The Exclusivity Stipulation also provided that it could be terminated if the Ad Hoc

Secured Group, collectively, ceased to be the largest holders of the LP Debt.  (*Id*. at ¶ 15.)  The

negotiating window opened by the Exclusivity Stipulation was soon closed, however, as a result

of Ergen's conduct.

### A.    Negotiations With The Ad Hoc Secured Group Were Chilled By Ergen's Improper Entry Into LightSquared's Capital Structure.

209.    The evidence supports a finding that even before SPSO disclosed its true identity

on May 21, 2013, Ergen's behind-the-scene purchases of LP Debt through SPSO poisoned the

environment such that LightSquared was unable to achieve a consensual plan during the

exclusivity period that maximized the value of the estate for the creditors.

210.    In late March 2013, Sound Point entered into trades with Fortress Investment

Group, LLC ("Fortress") and Providence Capital LLC ("Providence") to purchase their

significant LP Debt holdings, as well as their LP Preferred.  (DX136; DX139.)  As a result,

Fortress and Providence—significant holders of the LP Debt—immediately ceased participating

in negotiations with respect to a consensual plan of reorganization.  (Jan. 17 Tr. (Hootnick) 21:4-

17, 22:4-23:7; Jan. 16 Tr. (Falcone) 75:13-76:8; PX0611; *see also* PX0617.)  As noted in an

April 18, 2013 meeting of the LightSquared board of directors, Marc Montanger, LightSquared's

Chief Financial Officer ("Montagner") reported that LightSquared had met with several large

holders of the LP Debt to explore ideas for a consensual plan of reorganization.  However,

"further discussions were halted after Sound Point agreed to purchase the LP preferred stock

from these investors."  (PX0443 at L2AP0000924.)

---

[20]    During Falcone's trial testimony, the signatories to the Exclusivity Stipulation agreed that the redacted portions of the Exclusivity Stipulation, specifically paragraphs 7 and 8, could be made public.  (Jan. 16 Tr. 137:6-138:6.)

211.    Further inhibiting LightSquared's ability to negotiate with the major stakeholders was the refusal of Sound Point to disclose the identity of its client—SPSO—during active negotiations between the LP Debt lenders and LightSquared. Given Sound Point's anonymity, certain LP Debt lenders became concerned that Sound Point's interest was adverse to their interest. For instance, on April 11, 2013, a member of the Ad Hoc Secured Group reached out to Montagner to ask for a face-to-face meeting, explaining "[w]e've been lenders and pref holders since original issue and are inclined to see this through to the end, but are cautious of potential adverse actions by this alleged activist lender." (PX0436.) The Ad Hoc Secured Group member noted that Sound Point was "clearly trying to scare [him] into selling [their] pref LP position" even though he did not understand why it would need the remaining 15% when it already held 85%. (*Id.*)

212.    Falcone, who has experience negotiating reorganization plans with respect to his investments in bankrupt companies, could not recall ever being involved in negotiations where the debtor's largest secured creditor refused to disclose its identity. (Jan. 16 Tr. (Falcone) 14:3-14.) As Falcone explained, without knowing if the largest secured creditor is "either with you or against you, it's kind of tough to cut a deal. So it kind of defeats the whole purpose." (Jan. 16 Tr. (Falcone) 14:9-20.) No other large LP Debt lenders in LightSquared concealed their identity from LightSquared. (Jan. 16 Tr. (Falcone) 19:1-8, 20:7-16.) Despite these roadblocks, LightSquared continued to try to reach a consensual plan. (PX0410; PX0505; Jan. 17 Tr. (Hootnick) 21:24-22:24.)

213.    However, as Sound Point continued to amass large quantities of the LP Debt and intentionally delayed the closing of large blocks of LP Debt trades, LightSquared was not sure which lenders to negotiate with and whether the Ad Hoc Secured Group was able to carry a class

such that it could enter into a binding commitment with respect to a plan.  (Jan. 9 Tr. (Smith) 130:3-131:12; Jan. 17. Tr. (Hootnick) 69:1-12; Jan. 16 Tr. (Falcone) 14:9-20, 22:15-21, 145:5-15, 151:24-152:2; PX0465; PX0486.)

### B.    Once SPSO Announced Ergen's Blocking Position and Joined The Ad Hoc Secured, Negotiations Derailed

214.    Shortly after Ergen placed the trade with Fortress and Providence on March 28, 2013, noted above, *pro forma* giving Ergen a blocking position in the LP Debt and influence over the bankruptcy proceeding to acquire LightSquared's spectrum assets, Ergen made his LBAC Bid on May 15, 2013 and announced his LP Debt holdings on May 21, 2013.  The LBAC Bid and Ergen's announcement were made at a time when LightSquared's board and management team were exploring whether a joint venture or strategic partnership would allow LightSquared to raise capital and form the basis for a plan to emerge from bankruptcy.  (Jan. 17 Tr. (Hootnick) 27:11-22; Jan. 9 Tr. (Smith) 134:22-135:1.)

215.    As LightSquared's expert, William Derrough ("Derrough"), testified, when a strategic investor or competitor acquires a blocking position or a position of significant influence in a debtor's capital structure, it routinely results in a chilling of a debtor's sale process or otherwise dissuades potential bidders from participating in a debtors' sale process.  (Jan. 9 Tr. (Derrough) 161:7-20.)  Ergen's blocking position in the LP Debt did in fact create a chilling effect.

216.    During its efforts beginning in late May 2013 and continuing thereafter, LightSquared's financial adviser Moelis & Company ("Moelis") contacted over ninety parties to discuss a joint venture or strategic partnership.  (Jan. 17 Tr. (Hootnick) 28:6-16.)  Parties that were specifically approached included the "existing telecom parties with wireless operations in the United States:  AT&T, Verizon, Sprint and T-Mobile."  (Jan. 17 Tr. (Hootnick) 28:17-23,

77:16-18.)  LightSquared and Moelis proposed a low-cost option for an equity investment by the strategics, but advised that LightSquared was "certainly open to anything."  (Jan. 9 Tr. (Smith) 140:21-142:11.)

217.    During meetings with Sprint, AT&T, and T-Mobile, as Mark Hootnick, a managing director at Moelis ("Hootnick") explained "there was a lot of interest in the L-Band . . . [b]ut one of the main reactions was doesn't Charlie Ergen already own this."  While Moelis went to "great lengths" to assure potential partners that Ergen did not own LightSquared, "it was somewhat challenging" in light of a Bloomberg article reporting that Ergen was "on his way to acquiring LightSquared."  (Jan. 17 Tr. (Hootnick) 28:17-23, 29:21-30:22, 77:13-78:1.)

218.    Similarly, Douglas Smith, Chairman and Chief Executive Officer of LightSquared ("Smith") who attended the meetings with Sprint, AT&T, T-Mobile, and Verizon, testified that the strategics questioned whether they should get involved in light of Ergen's blocking position and the LBAC Bid; strategics believed that LightSquared's ownership was a "foregone conclusion."  (Jan. 9 Tr. (Smith) 137:9-138:13.)

219.    As Hootnick explained at trial, the strategics were also concerned about Ergen's involvement because they believed that he was acquiring spectrum for warehousing and "not for a financial return."  (Jan. 17 Tr. (Hootnick) 32:4-34:14.)  These concerns were validated by Cullen's testimony that, despite the fact that DISH has not yet deployed DBSD and TerreStar's spectrum assets that it acquired in March 2012, it continues to pursue additional spectrum, and intends to participate in upcoming auctions for H Block and AWS-3 spectrum assets.  Indeed, Cullen testified that DISH intends to wait until it can "understand the totality of spectrum" that it can "partner or pair[,] before you start deploying on any towers."  (Jan. 17 Tr. (Cullen) 149:5-150:3.)

220.    The question of Ergen's involvement in LightSquared was a "similar thread" in meetings with other strategics.  (Jan. 9 Tr. (Smith) 137:17-138:13.)  On June 15, 2013, Hootnick advised Falcone that Moelis was "pushing forward with some strategic discussions and [we']re reviewing smaller capital raises" but "[c]learly the ad hoc group changes have chilled that avenue."  (PX0645; PX0659; PX0877; PX0625; PX0633.)  Ultimately, Ergen's involvement "created so much uncertainty" that a strategic pairing was unlikely.  (Jan. 16 Tr. (Falcone) 74:10-75:12.)

### C.    Within Weeks Of Ergen Joining The Ad Hoc Secured Group, The LBAC Bid Is Adopted

221.    On June 13, 2013, SPSO joined the Ad Hoc Secured Group to (i) keep the Exclusivity Stipulation in effect and (ii) disrupt ongoing negotiations between LightSquared and the Ad Hoc Secured Group to force a sale of the company pursuant to paragraphs 7 and 8 of the Exclusivity Stipulation.  (PX0858 at ¶ 13; PX0852 at Ex. A ¶¶ 7, 8; *see supra* ¶¶ 206-213.)  Within days of joining the Ad Hoc Secured Group, several hundreds of millions of dollars in "hung" trades closed, making SPSO the controlling member by virtue of the size of its holdings.  (PX0649 at L2AP0008732; PX0625; PX0859.)

222.    SPSO's known presence in LightSquared's capital structure and membership in the Ad Hoc Secured Group stymied LightSquared's ability to negotiate with the largest consortium of creditors and put SPSO in a position to "run out the clock" on the exclusivity period.  (Jan. 16. Tr. (Falcone) 76:9-23, 132:23-133:4, 145:9-15, 182:17-183:2; Jan. 9 Tr. (Smith) 137:9-138:13; PX0858.)

223.    For instance, on April 4, 2013, the Ad Hoc Secured Group submitted a proposed plan term sheet to LightSquared and indicated their willingness to commence discussions with respect thereto.  (PX0410.)  The term sheet contemplated a plan in which all creditor and

preferred equity classes would receive a full recovery and LightSquared would emerge from bankruptcy with its spectrum assets intact. (*Id*. at HARBAP00015399-400; *see also* Jan. 17 Tr. (Hootnick) 21:24-22:24.)[21] Also, on May 15, 2013—the same day that Ergen's LBAC submitted its bid for LightSquared's assets—the parties exchanged a revised term sheet for a consensual plan of negotiation. (PX0505; DX335; DX174.) The revised term sheet provided for an infusion of new capital to be obtained by Harbinger and/or LightSquared, and reorganization, such that a sale of LightSquared's assets would be avoided. (PX0505 at HARBAP00005107-13.)

224.    And on May 21, 2013—after Ergen unmasked himself—the parties continued to negotiate towards a consensual plan that bifurcated the class of creditors holding LP Debt by providing a different recovery scheme for SPSO and non-SPSO lenders. For example, a term sheet exchanged with the Ad Hoc Secured Group on May 24, 2013 envisioned that SPSO would receive full cash recovery while non-SPSO lenders would receive cash recovery and warrants. (PX0561.) However, once SPSO joined the Ad Hoc Secured Group, its positions increasingly favored that dominant stakeholder.[22] (PX0877.)

225.    Indeed, with Ergen at the helm of the Ad Hoc Secured Group, negotiations quickly shifted to consideration of a sale of LightSquared's assets instead of a reorganization. (DX281; DX196.) On June 18, 2013, a member of the Ad Hoc Secured Group as of LightSquared's petition date described the change in the negotiations between LightSquared and the Ad Hoc Secured Group upon Ergen's emergence: "From my perspective this is simple; *until*

---

[21]    While a sale of LightSquared's assets was a possible resolution, it was not the primary goal the parties contemplated. Indeed, prior to the summer of 2013, Moelis did not engage in any discussions regarding a sale. (Jan. 17 Tr. (Hootnick) 83:15-23.)

[22]    As noted by the Ad Hoc Secured Group's counsel, "[It's] pretty major that Ergen has joined our group." (PX0632.)

*the filing of the latest 2019 there was an exchange of drafts and a dialogue with Lauria*." [23]

(PX0912 (emphasis added).)

226.    With SPSO being the largest LP Debt holder of the Ad Hoc Secured Group, there was a concern whether the Ad Hoc Secured Group could engage in fruitful, good faith negotiations with LightSquared and Harbinger on a bifurcated-class plan.  (PX0659.)  As such, LightSquared and Harbinger were left with no legitimate party with which to negotiate. (PX0617 ("[Ergen] has made an absolute shambles of our BK process and his unauthorized presence made it impossible to get anything done in a cooperative manner with our pref holders and our debt holders."); PX0665 ("We really want to try and work out a deal with the 'real' ad hoc group but [the Ad Hoc Secured Group's attorney] is Ergen's lawyer so it unfortunately will not work.  Ergen is a competitor. . . ."); PX0667 ("The problem is SP.  They are not a permitted holder and are a competitor.").)

227.    Thus, once SPSO had acquired a blocking position and joined the Ad Hoc Secured Group, it was effectively impossible for LightSquared to reach a consensual deal with the Ad Hoc Secured Group.  (Jan. 16 Tr. (Falcone) 182:23-183:2; 226:4-16.)  As Kiser and Ketchum understood, SPSO's presence on the Ad Hoc Secured Group would alter the course of negotiations.  Ketchum had noted to Kiser back in February 2013:  "[o]bviously, if we join the Ad Hoc group, White & Case is then working for us."  (PX0344.)  As Ketchum predicted, White & Case ultimately worked in conjunction with SPSO's counsel to negotiate the terms for a competing plan of reorganization.  (PX0661; PX0718; PX0720.)

---

[23]    The "latest 2019" referenced was a 2019 filed on June 13, 2013 by the Ad Hoc Secured Group, which listed SPSO as a member.  (PX0625 at HARBAP00015345, 15351.)

D.    **LightSquared's Negotiations With The Creditors Came To An End After The Filing Of The Ad Hoc Secured Group Plan**

228.    Approximately a month after SPSO joined the Ad Hoc Secured Group, on July 23, 2013, the Ad Hoc Secured Group filed the PSA, seeking approval of the Ergen-turned-DISH LBAC Bid.  (PX0823.)  Negotiations towards a plan in which LightSquared would continue as a going concern came to an end.  (Jan. 16 Tr. (Falcone) 76:9-25, 225:14-20; PX0823.)

229.    The PSA bound the Ad Hoc Secured Group to support LBAC's bid, stating that parties "[s]hall not directly or indirectly seek, solicit, support, or vote in favor of any other plan, sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Debtors other than the Plan[.]"  (PX0823 at 1.1(a)(6).)

230.    In essence, negotiations with the LP Debt lenders were rendered a "moot point" once the Ad Hoc Secured Group signed the PSA.  (Jan. 17 Tr. (Hootnick) 53:18-23.) Specifically citing negotiations with a large lender,  Hootnick testified that outstanding terms for a consensual deal "became irrelevant . . . he was no longer permitted to talk to us" after signing the PSA.  (Jan. 17 Tr. (Hootnick) 53:9-23.)

231.    Furthermore, strategic investors did not believe there was a level playing field for an auction process because they perceived Ergen's blocking position gave DISH an advantage over the other bidders.  As Derrough testified, given that a party holding a blocking position is a "true party in interest," they potentially have the power to drive the plan and auction processes. Further, other bidders will have to pay *a higher* price than a party within the capital structure who established a significant position in the underlying debt at a discount, and, thus, it is more expensive for an outside bidder to compete.  (Jan. 9 Tr. (Derrough) 162:19-165:10.)

232.    Moreover, win or lose, participation in the auction process can be very expensive, and bidders often have to hire law firms, accountants, bankers and other professionals.  Potential

bidders will undertake the reputational and financial risk of participating in the auction process only if there is a "level-playing field" and a "legitimate opportunity or chance of winning." However, where a competitor holds the strategic advantage of a blocking position, the playing field will appear skewed towards the competitor and potential bidders will perceive little chance of winning.  (Jan. 9 Tr. (Derrough) 162:19-163:14, 193:17-194:25.)

233.    Thus, Ergen's involvement and influence over the bankruptcy process impeded LightSquared's ability to file a consensual plan that maximized the value for the estate and delayed the time in which the creditors would receive distributions from the Debtors' estates. Further, once DISH withdrew its stalking horse bid on January 10, 2014, there was uncertainty about the creditors' prospects of receiving a full recovery as opposed to LightSquared being forced into liquidation.  (PX0863; Jan. 13 Tr. (Ergen) 234:14-235:19.)

**E.    Ergen And His Entities Seek To Obtain A Broad Release In
        The Ad Hoc Secured Group Plan.**

234.    The Ad Hoc Secured Group Plan and the APA filed therewith included a broad release for LBAC and its affiliates, including DISH, EchoStar, and Ergen, and Ergen's affiliates, including SPSO.  (*See First Amended Joint Chapter 11 Plan for LightSquared LP, et al., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Docket No. 970, Ex. A] § 13.1; Stalking Horse Agreement, filed October 28, 2013, [Docket No. 970, Ex. F] § 3.2(a)(ii) & n.9; *supra* ¶¶ 180, 181.)  The releases were intended to fully insulate DISH from liability for its misconduct and prevent SPSO's claim from being subordinated or disallowed in the bankruptcy, thereby ensuring that Ergen would be repaid and avoid any liability for his actions.

235. On multiple occasions, Defendants represented to this Court that the LBAC Bid and SPSO's LP Debt purchases were separate and independent transactions. [24] (PX0731 at 29:18-31:4; PX0766 at 9:4-24.)  These representations were made even though Defendants were unable to explain to this Court why, if Ergen and SPSO were not acting for DISH, the APA— which was between DISH and LightSquared—included a release for Ergen personally as well as SPSO.  (PX0765; Dec. 10 Tr. 137:16-21.)

236. The Court in the Nevada Action also recognized the conflict of interest inherent in a DISH release that benefits Ergen personally.  In granting a limited preliminary injunction, the Nevada Court found that "the U.S. Bankruptcy Trustee has made an objection to the scope of the release in the bankruptcy plans, including the Ad Hoc Secured Group's plan," and that while "DISH has a significant interest in exploring the possibility of . . . modifying the release and carving out claims against SPSO and Ergen," it was also the case that "DISH is unable to explore this option so long as DISH's actions in the LightSquared bankruptcy relating to the release provisions are controlled by Ergen."  (PX0780 at 15.)  Accordingly, the Nevada Court enjoined "Ergen or anyone acting on his behalf . . . from participation, including any review, comment, or negotiations related to the release . . . for any conduct which was outside the scope of his activities related to DISH and LBAC."  (*Id.*)

---

[24] In further support of its purported independence, SPSO, through its counsel, attested in the SPSO Stipulation that "Ergen has not disclosed to DISH or EchoStar the amounts, prices or dates of SPSO's purchases of Prepetition LP Obligations" and "Ergen and SPSO have no agreement of any kind, formal or informal, with DISH, EchoStar, or any of their subsidiaries concerning any debt or equity securities issued by the Debtors."  (DX272 at SPSO-00012462, ¶¶ 4-5.)  However, contrary to the SPSO Stipulation, DISH and EchoStar were aware of the amounts, prices and dates of SPSO's LP Debt purchases as they were executed by Ergen and Kiser, high-ranking executives of both companies, using DISH's resources, including DISH's offices and support staff.  (*Supra* Section VI.C.)  Also, on May 2, 2013—prior to the date of the SPSO Stipulation—Ergen disclosed to the DISH Board the "amount" of SPSO's LP Debt purchases. (PX0867 at SPSO-00011830.)

## XII.    LIGHTSQUARED AND HARBINGER INQUIRED—BUT COULD NOT DISCERN—WHETHER ERGEN WAS IN THE CAPITAL STRUCTURE

### A.    SPSO Intentionally Concealed Its LP Debt Purchases

237.    As set forth in Section IV above, Ergen, Kiser, and Ketchum actively sought to conceal Ergen's involvement in Sound Point purchasing the LP Debt.  Additionally, Sound Point, at Ergen and Kiser's direction, engaged in a campaign of misdirection regarding the identity behind SPSO and Sound Point, repeatedly rebuffing good faith inquiries to discern the ultimate buyer behind Sound Point's LP Debt acquisitions.  (*See, e.g.*, Jan. 9 Tr. (Smith) 154:25-155:15; Jan.10 Tr. (Kiser) 38:10-39:11, 90:6-12; Jan. 15 Tr. (Ketchum) 88:22-89:14, 89:18-22; Jan. 17 Tr. (Hootnick) 17:16-18:13, 19:8-21:3, 23:13-24, 59:14-60:20, 64:3-11; Montagner Dep. 51:18-53:24, 53:25-54:21; DX039; PX0119; PX0128; PX0138.)

### B.    Public Information Provided No Certainty As To Who Was Behind Sound Point's Purchases

238.    The information available to LightSquared and Harbinger further added speculation as to who was in fact behind Sound Point's purchases.  Initial public reports identified "Sound Point" as purchasing large quantities of LP Debt.  (PX0121; PX0122; PX0128.)  However, given that Sound Point reportedly only had approximately $178 million in assets under management but was capable of purchasing over $200 million of LP Debt, it prompted suspicion that Sound Point was masking the identity of the ultimate purchaser.  (Jan. 17 Tr. (Hootnick) 17:21-18:6; PX0122.)

239.    The identity of the buyer behind Sound Point was the subject of widespread speculation in the media.  News reports and blogs at varying times connected Ketchum and Sound Point to Ergen, Carlos Slim, and the Dolan family, which controlled Cablevision, but not a single article provided certainty or confirmation as to who was actually behind Sound Point.  (*See e.g.*, PX0095; PX0121; PX0122; PX0154; PX0195; DX144.)

87

240.    On May 4, 2012, Ian Estus, an analyst-trader at Harbinger Capital ("Estus"),
investigated Sound Point and forwarded a November 2, 2011 article to Falcone noting that
Ketchum had a relationship with the Dolan family.  Estus noted, "This is the guy running Sound
Point.  An old article, but looks like the guy has close ties with the Dolan family."  (PX0095.)

241.    On May 7, 2012, Reuters published an article about the recent trade to Ketchum
of a position formerly held by Carl Icahn, noting that Ketchum had previously worked as an
investment banker and "one of his clients was Charlie Ergen's satellite company."  The article
did not speculate that Ergen was involved in Sound Point's purchase, noting only that Ketchum
was not available for comment.  (PX0121; *see also* PX0122.)  Similarly, on May 10, 2012, a
*Wall Street Journal* blog noted that the counterparty on the Icahn trade was a "small hedge fund
with ties to Ergen" and speculated that DISH's then-recent sale of $1.9 billion worth of high
yield bonds could be used to buy the LP Debt.  However, the article, with the aid of DISH,
refuted its own claim stating that "[t]he official line out of Dish is that the proceeds from the
bond sale will go to pay down debt maturing in 2013 and 2014."  (DX396.)

242.    On May 10, 2012, a Harbinger Capital employee  advised Falcone that he had
"heard from a couple of people that [E]rgen may not be the guy behind [K]etchum.  Some
rumors are that it might be the [D]olans, who like [E]rgen are close to [K]etchum."  Falcone did
not believe the employee was referring to the Dolans personally, but rather to Cablevision, which
the Dolans control.  (Jan. 16 Tr. (Falcone) 45:18-46:20; PX0149.)

243.    On July 9, 2012, Forbes cast further doubt that Ergen was involved with Sound
Point, noting that while speculation following the Icahn trade had focused on Ergen, "holes have
appeared in the thesis that Ergen is backing Sound Point" and "people involved have begun to
speculate it might be Carlos Slim or others behind the purchase.  Sources have speculated that

Cablevision, owned by the Dolan family and one of the country's largest telecom and media

company [*sic*], could be a potential suitor as well." (PX0304 at KCM0013841; *see also* PX0195

(Tim Farrar, *How many billionaires does it take to screw in a LightSquared?*).)[25]

244.    On October 10, 2012, Falcone was even assured by an employee at Jefferies, who

said he was "very close to [Ergen's] right hand guy," that he would be "shocked if he is lying"

about Ergen not being behind Sound Point's purchases of LP Debt. (PX0254.)

245.    Although rumors persisted throughout 2012 and into 2013 that Ergen and DISH

were behind Sound Point's LP Debt acquisitions, no press article confirmed Ergen's

involvement. Indeed, an April 4, 2013 *Wall Street Journal* article noted, "[i]t is unclear whether

Mr. Ergen or his company, satellite-television operator Dish Network Corp. . . . has played a role

in Sound Point's trading. Mr. Ergen hasn't addressed the trades, and the company declined to

comment." (DX144.) The same day, an individual working in the telecommunications industry

forwarded Falcone the article, telling him that Carlos Slim was "with Charlie on the debt." The

individual explained that he "was in Mexico and was told by [Slim's] investment guy . . . that

Carlos and Charlie are very tight and Carlos owns Dish Mexico." (PX0409.) The next day,

confusion and speculation continued in the press when the TMF blog again reported speculation

that Ergen was involved in Sound Point, possibly together with Slim, but explained "it remains

an intriguing question as to whether Carlos Slim has any involvement" given certain Mexican

regulatory issues. (PX0426.)

246.    Although representatives of LightSquared had, at times in the Spring of 2012,

speculated that Ergen, Slim, Cablevision, Telephonica, or SK Telecom were purchasing

LightSquared debt through SPSO, as Montagner testified, "[i]t was all speculation at the time.

---

[25]    TMF Associates MSS blog ("TMF blog") is a blog written by Tim Farrar, who DISH proffered in the
DBSD case as an expert in MSS spectrum. (Jan. 13 Tr. (Ergen) 151:3-10.)

No one knew." (Montagner Dep. 64:20-65:10.) Similarly, depending on the day and the information he received or the rumors that were circulating, Falcone suspected that anyone from Ergen on behalf of DISH or EchoStar, Sprint, James Dolan on behalf of Cablevision, Carlos Slim, AT&T, or one of the "big PE shops" was behind Sound Point's purchases. (Jan. 16 Tr. (Falcone) 23:24-24:10, 48:21-49:19, 51:2-21, 62:16-63:24, 72:25-74:9; *see also* PX0095; PX0167; PX0158; PX0312; PX0537; PX0540; PX0356.)

247.    Falcone, however, never suspected that Ergen was perhaps purchasing the LP Debt for his personal use and benefit. As Falcone testified, "[n]ot in [his] wildest dreams" did he believe Ergen was purchasing LP Debt personally. (Jan. 16 Tr. (Falcone) 37:21-38:5.)

### C.    LightSquared and Harbinger Made Diligent Inquiries To Determine Who Was Behind Sound Point's LP Debt Purchases.

248.    LightSquared and Harbinger made efforts before and after LightSquared's bankruptcy filing to uncover the identity behind Sound Point's purchases. (Jan. 16 Tr. (Falcone) 23:12-15, 24:20-24.) In early May 2012, Ichan, a substantial holder of the LP Debt, sold a large block of LP Debt to Sound Point, spawning press speculation. (Jan. 9 Tr. (Smith) 127:25-128:18; Jan. 17 Tr. (Hootnick 19:8-11; PX0121).) Given the rumors that Ergen was potentially linked to Sound Point, it was a "major issue" for LightSquared whether Ergen or DISH was purchasing the LP Debt. (Jan. 17 Tr. (Hootnick) 54:18-23.)

249.    Upon learning of Sound Point's purchase, Smith, having never heard of Sound Point, asked Montagner and Hootnick to find out who was behind Sound Point's purchases. (Jan. 9 Tr. (Smith) 127:16-129:3.) Similarly, Harbinger instructed Barry Ridings of Lazard Freres & Co LLC ("Lazard") to reach out to Ergen. (PX0899.) Despite trying "a number of times" they "could never verify who was behind Sound Point." (Jan. 9. Tr. (Smith) 129:4-13; *see also* Jan. 16 Tr. (Falcone) 47:4-9.) As Hootnick of Moelis testified, "[t]here were a lot of

suspicions that that was the case, but we could not get confirmation on that topic." (Jan. 17 Tr. (Hootnick) 54:18-55:10.)

250.    Montagner also asked Kurt Haufler, Treasurer of LightSquared ("Haufler"), to reach out to UBS to obtain information regarding LightSquared's debt trading activity. Haufler was not able to confirm through UBS who was behind Sound Point. (Montagner Dep. 49:9-50:17, 51:6-17.)

251.    Further, both Montagner and Stan Holtz ("Holtz") of Moelis reached out directly to Ketchum to inquire who was behind SPSO. (Jan. 17 Tr. (Hootnick) 17:16-18:13, 59:14-60:20.) Ketchum intentionally rebuffed their inquiries. (*See supra* ¶ 238; *infra* ¶ 253; Jan. 15. Tr. (Ketchum) 88:22-89:14, 89:18-22.)

252.    Indeed, Montagner left multiple voicemails for Ketchum in May 2012 around the time press reports surfaced connecting Ergen to the LP Debt purchases. Ketchum returned one call "late one night" and left a voicemail. That voicemail was the only direct communication Montagner had with Ketchum. (Jan. 15 Tr. (Ketchum) 88:22-89:14.) As Ketchum admitted, Montagner contacted him seeking information about Sound Point and SPSO, but Ketchum intentionally avoided speaking with Montagner, only returning one call at an "odd hour" because he did not want to speak to him. (Jan. 15 Tr. (Ketchum) 88:22-89:14.)

253.    Montagner also asked Holtz to schedule a meeting with Ketchum. Holtz told Montagner that Ketchum did not want to meet with LightSquared at that time. Holtz did not get any further information. (Montagner Dep. 53:25-54:21.) Ketchum admitted to receiving Holtz's inquiries, but refused to give information about the LP Debt purchases. (Jan. 15 Tr. (Ketchum) 89:18-22.)

254.    LightSquared's investigation continued in 2013.  As demonstrated in

LightSquared board of director meeting minutes dated April 18, 2013, Moelis and Sound Point

had a meeting, but Sound Point would not disclose its investors or beneficial owners.  (Jan. 9 Tr.

(Smith) 154:25-155:15; PX0443.)

255.    Undeterred by Sound Point rebuffing its inquiries, Moelis persisted in its efforts,

calling "Mr. Ketchum regularly and meet[ing] with him regularly, and . . . continu[ing] during

that period [*i.e.*, spring 2013] to try and find out who Sound Point—if they were representing

somebody and what their intention was."  Ketchum continued to refuse to identify its investors or

intentions.  (Jan. 17 Tr. (Hootnick) 23:13-24; Jan. 15 Tr. (Ketchum) 88:22-89:22; PX0443.)

256.    Further, Hootnick directly "ask[ed] Mr. Ketchum if he was working with Mr.

Ergen . . . but [Ketchum] refused to answer any of those questions."  (Jan. 17. Tr. (Hootnick)

19:8-20; *see supra* ¶¶ 238, 253; Jan. 15 Tr. (Ketchum) 88:22-89:14; 89:18-22.)  Hootnick also

reached out to Rachel Strickland of Willkie, who had represented Ergen in the TerreStar

bankruptcy, to see whether she would shed light on whether Ergen was involved in SPSO's LP

Debt purchases.  (Jan. 17 Tr. (Hootnick) 19:21-21:3, 64:3-9.)  Despite more than six phone calls

and "a couple" of lunch meetings, Ergen's counsel would not confirm whether he was involved.

(Jan. 17 Tr. (Hootnick) 20:22-21:3.)

257.    Aside from relying on LightSquared and its financial advisor to discern for whom

Sound Point was purchasing the LP Debt, Falcone undertook his own extensive efforts to

ascertain who was behind SPSO, "turn[ing] over every rock," including enlisting the help of

LightSquared management and reaching out to "people on the street," reporters, Cullen of DISH,

and representatives of AT&T and Sprint.  (Jan. 16 Tr. (Falcone) 22:1-11.)  Falcone further

utilized Harbinger employees and advisors, as well as colleagues and acquaintances, to gather

information.  (Jan. 16 Tr. (Falcone) 36:17-37:15, 38:6-22, 39:3-10, 39:18-40:7, 40:8-12, 41:8-19,

43:23-44:2, 44:21-45:17, 47:4-9, 53:11-54:22, 55:14-56:1, 56:3-57:8, 59:11-20, 59:21-60:22;

DX037; DX097; PX0142; DX358; DX378; DX386.)

### D.    LightSquared And Harbinger Learned That Ergen Was Behind SPSO On May 21, 2013

258.    It was not until May 21, 2013, when Willkie for the first time disclosed to

Matthew Barr ("Barr"), counsel for LightSquared, that Ergen was the sole investor in SPSO, that

LightSquared and Harbinger learned Ergen was behind SPSO.  (PX0539; Jan. 9 Tr. (Smith)

129:14-18; Jan. 16 Tr. (Falcone) 24:11-19; Jan. 17 Tr. (Hootnick) 15:25-16:12.)

259.    That LightSquared and Harbinger had no certainty until that moment is illustrated

by Falcone's response to the news.  Hours before receiving confirmation, Harbinger and

LightSquared were speculating about who was Sound Point's client.  During the discussion, at

2:52 p.m., Falcone advised representatives and advisors for Harbinger and LightSquared that

"[i]f I were a betting man I would say that Soundpoint is Slim."  (Jan. 16 Tr. (Falcone) 72:25-

73:18; PX0540.)  Upon receipt of Barr's email confirming Ergen was in fact the ultimate buyer

of Sound Point's LP Debt purchases, Falcone responded "[f]ortunately, I'm not a betting man."

(Jan. 16 Tr. (Falcone) 73:19-74:9; PX0537.)

New York, New York

Dated: February 24, 2014                    Respectfully submitted,

                                            /s/ Alan J. Stone
                                            Matthew S. Barr
                                            Alan J. Stone
                                            Michael L. Hirschfeld
                                            Andrew M. Leblanc
                                            MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
                                            One Chase Manhattan Plaza
                                            New York, NY 10005-1413
                                            (212) 530-5000

*Attorneys for Plaintiff-Intervenors*
*and Debtors and Debtors in Possession*

*/s/ David M. Friedman*

Marc E. Kasowitz
David M. Friedman
Jed I. Bergman
Christine A. Montenegro
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*

94