Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & M[C]CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Plaintiff-Intervenors and Debtors and Debtors in Possession*

Marc E. Kasowitz
David M. Friedman
Jed I. Bergman
Christine A. Montenegro
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| LIGHTSQUARED INC., *et al.*, | : | Case No. 12-12080 (SCC) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Adv. Proc. No. 13-01390 (SCC) |

-----------------------------------------------------------------------X

|  |  |
|---|---|
| LIGHTSQUARED LP, LIGHTSQUARED INC., | : |
| LIGHTSQUARED INVESTORS HOLDINGS INC. | : |
| TMI COMMUNICATIONS DELAWARE, | : |
| LIMITED PARTNERSHIP, LIGHTSQUARED GP INC., | : |
| ATC TECHNOLOGIES, LLC, LIGHTSQUARED CORP., | : |
| LIGHTSQUARED INC. OF VIRGINIA, | : |
| LIGHTSQUARED SUBSIDIARY LLC, | : |
| SKYTERRA HOLDINGS (CANADA) INC., AND | : |
| SKYTERRA (CANADA) INC. | : |
| | : |
| Plaintiff-Intervenors, | : |

|                                          |     |
|------------------------------------------|-----|
| - against-                               | :   |
|                                          | :   |
| SP SPECIAL OPPORTUNITIES LLC,            | :   |
| DISH NETWORK CORPORATION,                | :   |
| ECHOSTAR CORPORATION,                    | :   |
| AND CHARLES W. ERGEN,                    | :   |
|                           Defendants.    | :   |

----------------------------------------------------------------------X

## **PLAINTIFFS' POST-TRIAL BRIEF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 6

I.   SPSO IS LIABLE FOR BREACH OF THE EXPRESS TERMS OF THE CREDIT
     AGREEMENT.................................................................................................................. 8

     A.   The Credit Agreement Provides that Lenders May Assign Their Rights Under
          the Credit Agreement Only to Eligible Assignees .......................................... 9

     B.   SPSO is not an Eligible Assignee Because at All Relevant Times it Was
          Acting on Behalf of DISH and EchoStar.................................................. 11

     C.   SPSO is Not an Eligible Assignee Because it is Ergen's *Alter Ego*, and Must
          be Regarded as a Natural Person ................................................................ 32

     D.   Because SPSO is Not An Eligible Assignee, Its Claim Should Be Disallowed
          Pursuant to 11 U.S.C. § 502(**b**).................................................................. 35

II.  SPSO ALSO BREACHED THE COVENANT OF GOOD FAITH AND FAIR
     DEALING IMPLIED IN THE CREDIT AGREEMENT BY NEW YORK LAW ........... 37

III. DEFENDANTS' MISCONDUCT HARMED LIGHTSQUARED .................................... 46

IV.  LIGHTSQUARED IS ENTITLED TO ADDITIONAL REMEDIES................................ 51

     E.   LightSquared Would Be Entitled to The Additional Remedy of Vote
          Designation Under its Plan of Reorganization........................................... 62

     F.   LightSquared is Entitled to Monetary Damages......................................... 64

II.  ERGEN, DISH, AND ECHOSTAR TORTIOUSLY INTERFERED WITH
     LIGHTSQUARED'S RIGHTS UNDER THE CREDIT AGREEMENT .......................... 65

     A.   Ergen, DISH, and EchoStar Knew of the Credit Agreement...................... 66

     B.   Ergen, DISH, and EchoStar Intentionally Procured The Breach................ 67

CONCLUSION...................................................................................................................... 68

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*16 Casa Duse, LLC v. Merkin*,
No. 12 CIV. 3492 (RJS), 2013 WL 5510770 (S.D.N.Y. Sept. 27, 2013) ................................ 15

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
773 N.E. 2d 496 (N.Y. 2002) ................................................................................................... 39

*A.N. Deringer, Inc. v. Strough*,
103 F.3d 243 (2d Cir. 1996) .................................................................................................... 39

*AIG Ret. Servs., Inc. v. Altus Fin. S.A.*,
365 F. App'x 756 (9th Cir. 2010) ............................................................................................ 41

*Ali v. Fed. Ins. Co.*,
719 F.3d 83 (2d Cir. 2013) ...................................................................................................... 20

*Amusement Indus. Inc. v. Citigroup Global Mkts. Realty Corp.* (*In re First Republic Grp. Realty, LLC*),
421 B.R. 659 (Bankr. S.D.N.Y. 2009) ............................................................... 16, 17, 18, 19

*Anilao v. Spota*,
774 F. Supp. 2d 457 (E.D.N.Y. 2011) .................................................................................... 20

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009) ...................................................................................... 7

*Banco Multiple Santa Cruz, S.A. v. Moreno*,
888 F. Supp. 2d 356 (E.D.N.Y. 2012) .................................................................................... 38

*Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*),
529 F.3d 432 (2d Cir. 2008) ...................................................................................................... 6

*Big V Supermarkets, Inc. v. Wakefern Food Corp.* (*In re Big V Holding Corp.*),
267 B.R. 71 (Bankr. D. Del. 2001) ......................................................................................... 42

*Breeden v. Kirkpatrick & Lockhart, LLP*,
268 B.R. 704 (S.D.N.Y. 2001), *aff'd sub nom., Breeden v. Kirkpatrick & Lockhart LLP* (*In re The Bennett Funding Grp. Inc.*), 336 F.3d 94 (2d Cir. 2003) ............................... 23

*Burdo v. Metro. Life Ins. Co.*,
4 N.Y.S. 2d 819 (N.Y. App. Div. 3d Dep't 1938) ................................................................. 24

*C.U. Annuity Service Corporation v. Young*,
281 A.D. 2d 292 (N.Y. App. Div. 1st Dep't 2001) ................................................................ 37

*Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust* (*In re 604 Columbus Ave. Realty Trust*),
968 F.2d 1332 (1st Cir. 1992) ........................................................................52, 53

*Carr v. Marietta Corp.*,
211 F.3d 724 (2d Cir. 2000) ........................................................................15

*Christie's Inc. v. Sherlock*,
No. 602515/06, 2009 WL 3161209 (N.Y. Sup. Ct. July 14, 2009) ........................................26

*Citibank, N.A. v. Nyland*
(*CF8*) ........................................................................20

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
323 F.3d 228 (3d Cir. 2003) ........................................................................51

*Clarke v. Commc'ns Workers of Am.*,
318 F. Supp. 2d 48 (E.D.N.Y. 2004) ........................................................................49, 50

*Cole v. Metro. Life Ins. Co.*,
708 N.Y.S.2d 789 (App. Div. 2000) ........................................................................36

*Coleman Clearing Corp. v. Siclari* (*In re Adler, Coleman Clearing Corp.*),
277 B.R. 520 (Bankr. S.D.N.Y. 2002) ........................................................................52

*Curley v. AMR Corp.*,
153 F.3d 5 (2d Cir. 1998) ........................................................................20

*Dalton v. Educ. Testing Serv.*,
663 N.E. 2d 289 (N.Y. 1995) ........................................................................39

*Debary v. Harrah's Operating Co.*,
465 F. Supp. 2d 250 (S.D.N.Y. 2006), *aff'd sub nom.*, *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008) ........................................................................65, 66

*Dee v. Rakower*,
112 A.D. 3d 204, 976 N.Y.S. 2d 470 (N.Y. App. Div. 2013) ........................................................................8

*DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*),
634 F.3d 79 (2d Cir. 2011) ("*DBSD*") ........................................................................5, 8, 62, 63

*Doctors Health, Inc. v. Nylcare Health Plans of the Mid-Atl., Inc.* (*In re Doctors Health, Inc.*),
335 B.R. 95 (Bankr. D. Md. 2005) ........................................................................36

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
893 F. Supp. 2d 395 (E.D.N.Y. 2012) ........................................................................41

*Durante Bros. Constr. Corp. v. St. John's Cemetery*,
   285 A.D.2d 578 (2d Dep't 2001) .......................................................................26

*EIG Global Energy Partners, LLC v. TCW Asset Mgmt. Co.*,
   No. CV 12-7173 (CAS), 2012 WL 5990113 (C.D. Cal. Nov. 30, 2012) ...................40, 41, 46

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
   680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd in relevant part*, 381 F. App'x 117 (2d
   Cir. 2010) ("*Cablevision*") .............................................................. passim

*Estes v. N&D Props., Inc. (In re N & D Properties, Inc.)*,
   799 F.2d 726 (11th Cir. 1986) .......................................................................52

*Eureka VIII LLC v. Niagara Falls Holdings LLC*,
   899 A.2d 95 (Del. Ch. 2006)......................................................................47, 48

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
   597 F.2d 814 (2d Cir. 1979)...........................................................................46

*Fantozzi v. Axsys Technologies., Inc.*,
   No. 07 Civ. 02667 (LMM), 2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) .............................38

*Fils-Aime v. Ryder TRS, Inc.*,
   837 N.Y.S. 2d 199 (2d Dep't 2007)...................................................................24

*First Nat'l Bank of Gatlinburg v. Charles Blalock & Sons, Inc. (In re Just for the Fun of
   It of Tennessee, Inc.)*,
   7 B.R. 166 (Bankr. E.D. Tenn. 1980) .................................................................52

*Fisher v. First Stamford Bank & Trust Co.*,
   751 F.2d 519 (2d Cir. 1984).................................................................15, 22, 47

*Gestetner Holdings, PLC v. Nashua Corp.*,
   784 F. Supp. 78 (S.D.N.Y. 1992).....................................................................27

*Grubin v. Sallie Mae Servicing Corp., LP. (In re Grubin)*,
   476 B.R. 699 (Bankr. E.D.N.Y. 2012)...............................................................15

*Hard Rock Cafe Int'l (USA), Inc. v. Hard Rock Hotel Holdings, LLC*,
   808 F. Supp. 2d 552 (S.D.N.Y. 2011)................................................................38

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983).....................................................................................6

*In re 1031 Tax Grp., LLC*,
   420 B.R. ...............................................................................................23

*In re Applied Theory Corp.*,
    345 B.R. 56 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007).............................61

*In re Auto. Professionals, Inc.*,
    398 B.R. 256 (Bankr. N.D. Ill. 2008) ....................................................................61

*In re Bentley-Russell, Inc.*,
    201 B.R. 354 (Bankr. W.D.N.Y. 1996) ................................................................51

*In re Calpine Corp.*,
    2007 Bankr. LEXIS 3420 (Bankr. S.D.N.Y. Oct. 4, 2007) ...................................57

*In re Casse*,
    219 B.R. 657 (Bankr. E.D.N.Y. 1998), *aff'd*, 198 F.3d 327 (2d Cir. 1999) .............8

*In re Cutty's-Gurnee, Inc.*,
    133 B.R. 934 (Bankr. N.D. Ill. 1991) ...................................................53, 54, 55, 60

*In re Estate of Brandon*,
    433 N.E. 2d 501 (N.Y. 1982).................................................................................8

*In re Fairmont Commc'ns Corp.*,
    1993 WL 428710 (Bankr. S.D.N.Y. Oct. 12, 1993) .............................................57

*In re Four Seasons Marine & Cycle, Inc.*,
    263 B.R. 764 (Bankr. E.D. Tex. 2001) .................................................................15

*In re Gercke*,
    122 B.R. 621 (Bankr. D.C. 1991) ...................................................................58, 59

*In re Global Western Dev. Corp.*,
    759 F.2d 724 (9th Cir. 1985) ...............................................................................51

*In re Kelton Motors Inc.*,
    121 B.R. 166 (Bankr. D. Vt. 1990).......................................................................53

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MD 2262(NBR), 2013 WL 4504769 (S.D.N.Y. Aug. 23, 2013)................41

*In re Lois/USA, Inc.*,
    264 B.R. 69 (Bankr. S.D.N.Y. 2001) ...................................................................53

*In re McFarlin's, Inc.*,
    49 B.R. 550 (Bankr. W.D.N.Y. 1985) ..................................................................52

*In re Model Imperial, Inc.*,
    250 B.R. 776 (Bankr. S.D. Fla. 2000) ......................................................6, 54, 56

*In re Model Imperial, Inc.*,
　　250 BR 776 (Bankr. S.D. Fla. 2000)....................................................................53

*In re Monahan Ford Corp. of Flushing*,
　　340 B.R. 1 (Bankr. E.D.N.Y. 2006)..............................................................53, 56

*In re Papercraft Corp.*,
　　CIV.A. 00-2181, 2002 WL 34702177 (W.D. Pa. Feb. 20, 2002), *aff'd sub nom.*,
　　*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323
　　F.3d 228 (3d Cir. 2003) ("*Papercraft*") ........................................................ passim

*In re Pub. Serv. Co. of N. H.*,
　　116 B.R. 347 (Bankr. D.N.H. 1990) ...................................................................57

*In re Refco Inc. Sec. Litig.*,
　　826 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................................................65

*In re S. Beach Sec., Inc.*,
　　421 B.R. 456 (N.D. Ill. 2009), *aff'd*, 606 F.3d 366 (7th Cir. 2010)..........................6

*In re Sepco, Inc.*,
　　36 B.R. 279 (Bankr. D.S.D. 1984)......................................................................53

*In re Taranto*,
　　No. 10-76041-ast, 2012 WL 1066300 (Bankr. E.D.N.Y. Mar. 27, 2012) ..............36

*In re Ticketplanet.com*,
　　313 B.R. 46 (Bankr. S.D.N.Y. 2004)...................................................................60

*InterDigital Commc'ns Corp. v. Nokia Corp.*,
　　407 F. Supp. 2d 522 (S.D.N.Y. 2005)..................................................................38

*Island Two LLC v. Island One, Inc.*,
　　No. 13 Civ. 02121 (LGS), 2013 WL 5380216 (S.D.N.Y. Sept. 26, 2013)...........65

*J.P. Endeavors v. Dushaj*,
　　8 A.D.3d 440 (2d Dep't 2004) ...........................................................................25

*Kahn v. Dodds (In re AMERCO Derivative Litig.)*,
　　252 P.3d 681 (Nev. 2011) .................................................................................23

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
　　8 F.3d 130 (2d Cir. 1993) .................................................................................32

*Kirschner v. KPMG LLP*,
　　938 N.E. 2d 941 (N.Y. 2010)..................................................................20, 21, 24

*Machinery Rental, Inc. v. Herpel* (*In re Multiponics, Inc.*),
    622 F.2d 709 (5th Cir. 1980) ................................................................................51

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
    244 F.R.D. 204 (S.D.N.Y. 2007) ................................................................42, 43, 44

*Maxim Group LLC v. Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010).................................................................50

*McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*,
    439 B.R. 47 ........................................................................................................20

*Metro. Cos. v. Fowora*,
    No. 603407/2007, 2008 WL 4903873 (N.Y. Sup. Ct. Nov. 7, 2008)......................25

*MIG Invs. LLC v. Aetrex Worldwide, Inc.*,
    852 F. Supp. 2d 493 (D. Del. 2012)..........................................................33, 34, 35

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994)...............................................................................51

*N.L.R.B. v. Dinion Coil Co.*,
    201 F.2d 484 (2d Cir. 1952)..................................................................................7

*Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*,
    930 F.2d 240 (2d Cir. 1991)............................................................................24, 25

*Nesbitt v. Cherry Creek Irr. Co.*,
    145 P. 929 (Nev. 1915) .......................................................................................24

*New York Credit Men's Adjustment Bureau, Inc. v. Adler*,
    2 B.R. 752 (S.D.N.Y. 1980)..................................................................................7

*Norwest Bank Minnesota NA v. E.M.V. Realty Corp.*,
    943 N.Y.S.2d 113 (2d Dep't 2012), *leave to appeal dismissed*, 19 N.Y.3d 1085
    (2012)............................................................................................................36, 37

*Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*,
    743 F.2d 85 (2d Cir. 1984)..................................................................................28

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,
LLP*,
    322 F.3d 147 (2d Cir. 2003).................................................................................23

*Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd.*,
    840 F. Supp. 770 (D. Or. 1993), *aff'd*, 76 F.3d 1003 (9th Cir. 1996).....................41

*Pepper v. Litton*,
   308 U.S. 295 (1939)...........................................................................51

*Raymond v. Marks*,
   No. 96-9337, 1997 WL 345984 (2d Cir. June 24, 1997) .............................6

*Rickel & Assocs., Inc. v. Smith* (*In re Rickel & Assocs., Inc.*),
   272 B.R. 74 (Bankr. S.D.N.Y. 2002) ....................................................15

*RLI Ins. Co. v. Athan Contracting Corp.*,
   667 F. Supp. 2d 229 (E.D.N.Y. 2009) ...................................................16

*Rosenzweig v. Givens*,
   62 A.D.3d 1 (1st Dep't 2009)...............................................................50

*Russell v. Republic Prod. Co.*,
   112 F.2d 663 (5th Cir. 1940) ...............................................................24

*Schron v. Troutman Sanders LLP*,
   986 N.E.2d 430 (N.Y. 2013)...........................................................27, 30

*Sieger v. Zak*,
   No. 06-CV-3313 (DRH) (EBT), 2007 WL 2362348 (E.D.N.Y. Aug. 15, 2007) ...................23

*Siewe v. Gonzales*,
   480 F.3d 160 (2d Cir. 2007)...................................................................7

*Singer Asset Finance Co., LLC v. Bachus*,
   294 A.D. 2d 818 (N.Y. App. Div. 4th Dep't 2002) ...................................37

*Standard Chartered Bank v. AWB (USA) Ltd.*,
   No. 05 Civ. 2013 (AKH), 2010 WL 532515 (S.D.N.Y. Feb. 16, 2010)................................42

*Stevens Linen Assocs., Inc. v. Mastercraft Corp.*,
   656 F.2d 11 (2d Cir. 1981).....................................................................39

*Stream SICAV v. Wang*,
   12 CIV. 6682 PAE, 2013 WL 5526289 (S.D.N.Y. Oct. 7, 2013)...........................20

*Swartout v. Grover Collins Drilling Mud Eng'rs & Materials*,
   75 Nev. 297 (Sup. Ct. Nev. 1959)..........................................................26

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d Cir. 2000)...........................................................8, 9, 10

*Thalrose v. United States*,
   CV-85-0142, 1991 WL 148502 (E.D.N.Y. July 17, 1991)....................................8

*Tu-Vu Drive-In Corp. v. Ashkins*,
  287, 391 P.2d 828 (Cal. 1964) .......................................................................44, 45

*U.S. Lines, Inc. v. U.S. Lines Reorganization Trust*,
  262 B.R. 223 (S.D.N.Y. 2001), *aff'd sub nom. In re U.S. Lines, Inc*., 318 F.3d 432 (2d
  Cir. 2003) .................................................................................................................36

*Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc.*,
  152 F. Supp. 903 (S.D.N.Y. 1957).............................................................................7

*USACM Liquidating Trust v. Deloitte & Touche*,
  LLP, 764 F. Supp.2d 1210 (D. Nev. 2011)...................................................20, 23

*Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C. (In re Vargas Realty Enters.,
  Inc.)*,
  440 B.R. 224 (S.D.N.Y. 2010)..............................................................................15

*Warshaw v. Mendelow*,
  No. 6521732010, 2011 WL 11100990 (Sup. Ct. N.Y. Cnty. Dec. 13, 2011)...................21, 22

*Weinman v. Morgan Stanley Senior Funding, Inc. (In re Adam Aircraft Indus. Inc.)*,
  Adv. No. 11-1156 MER, 2012 WL 646273 (Bankr. D. Colo. Feb. 28, 2012) .......................36

*Westmoreland Coal Co. v. Entech, Inc.*,
  794 N.E.2d 667 (N.Y. 2003)..................................................................................28

STATUTES

11 U.S.C. § 502(b) .......................................................................5, 35, 36, 37, 51

11 U.S.C. § 510(c) .......................................................................5, 51, 60

11 U.S.C. § 1129(b) ....................................................................................5

12 U.S.C. § 371c (b)(1)(C)-(D) ...............................................................32

15 U.S.C. § 80a-2(a)(2)...............................................................................31

11 U.S.C.A § 1126(e) ..........................................................................62, 63

Federal Reserve Act § 23A .....................................................................31

Plaintiffs LightSquared LP, LightSquared Inc., LightSquared Investors Holdings

Inc., TMI Communications Delaware Limited Partnership, LightSquared GP Inc., ATC

Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared

Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as debtors and

debtors in possession (collectively, with certain of their affiliate debtors and debtors in

possession, "LightSquared")[1] in the above-captioned chapter 11 cases (the "Chapter 11 Cases")[2]

and plaintiff-intervenors in this adversary proceeding (the "Adversary Proceeding"), and

Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and

Harbinger Capital Partners SP, Inc. (collectively, "Harbinger" and with LightSquared

("Plaintiffs")), respectfully submit this Post-Trial Brief.

## PRELIMINARY STATEMENT

In late 2011, after DISH completed its acquisition of mobile satellite companies

and Chapter 11 debtors DBSD and TerreStar and their 40MHz of broadband spectrum, DISH,

through its controlling shareholder, Ergen, turned its attention to LightSquared—a company with

assets similar to DISH's newest acquisitions.  Intending to repeat the strategy that had

successfully brought DBSD and TerreStar within DISH's grasp—buying up debt to exchange for

ownership—Ergen sought to have DISH acquire LightSquared's LP Debt as the first step in a

---

[1]     The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2]     Capitalized terms used but not otherwise defined herein shall have the same meaning as set forth in Plaintiffs' Proposed Findings of Fact ("FOF") filed concurrently herewith.

plan to acquire LightSquared's spectrum.  But Ergen, DISH, EchoStar and their helpers found themselves thwarted by the transfer restrictions in the Credit Agreement designed specifically to keep competitors, such as DISH and EchoStar, out of LightSquared's capital structure.  They were frustrated further when their fallback plan—to have Ergen purchase the LP Debt—ran afoul of the transfer restrictions, which also prohibit "natural persons" from owning the LP Debt.

Undaunted, Defendants resolved to accomplish by indirection and deception what the Credit Agreement prevented them from doing directly.  Seeking legal advice from DISH's outside counsel—and DISH's counsel only—they concluded that if neither DISH, EchoStar, nor Ergen could buy the LP Debt, Ergen and his helpers would create a "special purpose vehicle"— defendant SPSO—funded entirely by Ergen, through which Ergen, on behalf of DISH and EchoStar, would buy the LP Debt.  Unlike most special purpose vehicles, which have a genuine economic rationale and a bona fide economic existence, SPSO had neither; *its sole purpose was to deceive*.  It masked Ergen's identity and concealed from LightSquared and its constituencies that DISH and EchoStar were tunneling into LightSquared's capital structure, in violation of transfer restrictions plainly intended to prevent that from happening.

As soon as their first purchases of LP Debt in April and May 2012 got them "in"—indeed, *before any of these trades had even settled*—Defendants began to wreak havoc on LightSquared's efforts to achieve a consensual plan of reorganization:

- On May 4, 2012, without bothering to look at the forbearance terms or discuss them with any other Lender, Ergen directed Carl Icahn, who had just agreed to sell $247 million of LP Debt to SPSO, to vote against the forbearance, so as to cut off LightSquared's ongoing negotiations for a possible consensual arrangement with the Lenders and, instead, force a bankruptcy filing by LightSquared.  Ergen did so despite being told that Icahn—hardly a pushover—was inclined to support the short forbearance.

- From October 2012 through June 2013, SPSO increased its ownership of LP Debt to more than $1 billion in an express effort to gain a "blocking position," while

2

leaving hundreds of millions of dollars of trades—entered into to amass this position— in limbo for three to four months or longer.  By so doing, Defendants mortally compromised LightSquared's ability to negotiate a consensual reorganization plan.  Thus, without Ergen actually spending the cash necessary to close the trades, Ergen rendered the composition of the Ad Hoc Secured Group uncertain at best, and caused counterparties to plan negotiations to disappear, without warning, from one day to the next.

- In May 2013, when LightSquared and Jefferies were about to kick off the roadshow to support Jefferies' effort to raise new capital for LightSquared's reorganization, Ergen emerged from the shadows with an unsolicited bid for LightSquared's spectrum.  And shortly thereafter, when the initial buzz caused by his bid had begun to subside, Ergen dropped his second bomb, disclosing that he controlled SPSO, which held a blocking position in the LP Debt.  Interest in LightSquared's capital raise evaporated, as potential new lenders, including strategic investors, concluded the LightSquared spectrum de facto belonged to DISH, which had effectively reprised the acquisition strategy it used to acquire DBSD and TerreStar.

- Then in January 2014, DISH withdrew its bid, neatly cutting the legs out from under stockholder derivative litigation that had been filed against DISH and its directors attacking the bid, but also untethering the Ad Hoc Secured Group's plan of reorganization and positioning DISH to return in the future with a lower bid for LightSquared's prized spectrum.

The trail of breach and deceit Defendants have left in their wake is unprecedented.

The attempted deception, moreover, continued during the trial, where, among other things, Ergen and his helpers, Kiser and Ketchum, nonsensically sought to persuade the Court that the $800 million in cash Ergen spent to buy the LP Debt—described by Ergen as constituting almost all of his non-DISH, non-EchoStar assets—was a ***personal*** investment, so he could open a wireless broadband business in direct competition with DISH.  Where, despite clear documentary proof and testimony from Kiser confirming that he and Ergen were solely responsible for the delayed timing of payments to settle SPSO's trades, Defendants falsely (and shamelessly) sought to blame the hundreds of millions of dollars of intentionally "hung trades" on Ketchum and a purported failure to "complete the upstreams."  Where Defendants—using the type of "non-denial denials" the Nixon White House offered when confronted by the Watergate break-in—

3

sought to mask the DISH Board of Directors' knowledge of and acquiescence in the scheme.

Where Defendants sought to imply that DISH's corporate governance requirements precluded

Ergen from causing DISH to buy LP Debt without first obtaining Board approval, a stance

directly contradicted by the unrebutted testimony of Stephen Goodbarn—DISH's only

independent director—who stated that Ergen alone was responsible for what DISH did in

connection with LightSquared and that no DISH director could be independent of Ergen.  Where

even Defendants' counsel furthered the strategy of denial by "stipulating" that DISH was not

involved in the LP Debt trades when **DISH's treasurer** was responsible for their execution.

Inconvenient as it may be for Defendants, Goodbarn's testimony about the acquiescence and lack

of independence of the DISH Board is in fact supported by Ergen's testimony that, in separate

conversations, he told both DISH's General Counsel and its head of Corporate Development that

"there may be some truth to the story" that he had "personally" bought hundreds of millions of

dollars of LightSquared debt, yet neither gentleman probed any further.

        The truth, as revealed at trial, is that Defendants launched a hostile takeover of

LightSquared they knew was in violation of the Credit Agreement.  Ergen is a shrewd and highly

experienced businessman.  He is familiar with debt financing in general and LightSquared's

financing in particular.  He knew that competitors such as DISH and EchoStar were not allowed

to own LightSquared's bank debt.  And while he may have considered the SPSO charade to be

clever, he knew—because the alternative is absurd—that the parties to the Credit Agreement

never could have intended that the Executive Chairman of a competitor, any more than a

competitor itself, could form a sham SPV and permissibly enter LightSquared's capital structure.

And the proof is in Ergen's extraordinary efforts to conceal his conduct.  If what he was doing

was legal, why hide it?  His answer—"to keep the price down"—doesn't cut it.  Ergen's secrecy

only prompted more rumors in the marketplace of numerous deep-pocket buyers, from

Cablevision, to Carlos Slim, to AT&T, pushing up prices even higher.  Indeed, Ketchum was so

concerned by the rising, rumor-fed prices, he proposed an attempted market manipulation to try

to drive the price down.  Ergen has candidly admitted, "[w]hen I talk to lawyers its . . . more

about, you know, how can I do this, as opposed to what the law says," and here, as in the past,

Ergen viewed himself as above the law.  (FOF ¶ 83.)  He presumed that his big "bag of cash," as

facetiously referred to by his counsel throughout the Chapter 11 Cases, would win the day.

As a court of equity, this Court should not permit Defendants to evade the

consequences of, let alone profit from, this type of behavior.  As is more fully set out in this

memorandum of law, the Court has a substantial remedial menu from which to choose.  SPSO's

breaches of the Credit Agreement, its brazen violations of the implied covenant of good faith and

fair dealing, its fraud and deception—all shown in painstaking detail below and in the

accompanying Proposed Findings of Fact—warrant, *inter alia*:

- claim disallowance under 11 U.S.C. § 502(b) and *Cablevision*, because the Credit Agreement provides that persons who acquire LP Debt in violation of the transfer restrictions, as SPSO did, do not acquire any rights under the Credit Agreement.

- equitable subordination pursuant to 11 U.S.C. § 510(c) and *Papercraft*;

- vote designation pursuant to 11 U.S.C. § 1129(b) and *DBSD*; and

- damages sufficient to compensate LightSquared for the harm suffered by reason of Defendants' wrongdoing.

Under the facts established at trial, there is ample precedent to support awarding

each form of relief listed above.  LightSquared seeks to obtain compensation for the estates and

creditors for the costs and delays incurred in the bankruptcy process, and to restore to

LightSquared and its Lenders their benefit of the bargain under the Credit Agreement.  Indeed,

the equitable subordination remedy that LightSquared seeks in its proposed Chapter 11 plan is

stunning in its modesty relative to Defendants' egregious misconduct: SPSO is asked only to

wait for full payment (for a shorter period than the new money lenders), while earning interest at

a very high rate (higher than all other lenders)—indeed, a rate that Ergen testified he found

attractive and at a cost by no means a windfall to LightSquared's estates. The facts established at

trial certainly support this modest sanction, as well as claim reduction and disallowance.

## ARGUMENT

Three key principles guide the Court's analysis of the evidence adduced at trial.

First, Plaintiffs need only prove their claims by a "preponderance of the evidence." *See, e.g.,*

*Raymond v. Marks*, No. 96-9337, 1997 WL 345984, at *1 (2d Cir. June 24, 1997) (citation

omitted) ("Under New York law, the party asserting a breach of contract claim has the burden of

proving the material allegations in the complaint by a fair preponderance of the evidence."); *In re*

*Model Imperial, Inc.*, 250 B.R. 776, 790-91, 800, 804-05 (Bankr. S.D. Fla. 2000) (finding

plaintiff proved equitable subordination claim by a preponderance of the evidence). This means

the Court must find liability if Plaintiffs present evidence establishing that each element of their

claims "is more likely true than not true." *Herman & MacLean v. Huddleston*, 459 U.S. 375,

390 (1983) (declining to depart from preponderance-of-the-evidence standard generally

applicable in civil actions and holding that if plaintiffs proved that their case "is more likely than

not" then they should prevail).

Second, because ***direct*** evidence of a party's motive and intent—which would

require a party to admit an intention to do wrong—is so rare, the Court is permitted to make

inferences concerning a party's intent, purpose, and motive. *See Bankr. Servs., Inc. v. Ernst &*

*Young* (*In re CBI Holding Co.*), 529 F.3d 432, 450-53 (2d Cir. 2008) (finding that, in absence of

"direct evidence," trial court's motive findings drawn by inferences from conduct were not

clearly erroneous); *see also In re S. Beach Sec., Inc.*, 421 B.R. 456, 466 (N.D. Ill. 2009) ("[T]he

evidence supports the bankruptcy judge's inference that the only purpose of the plan was to avoid taxes"), *aff'd*, 606 F.3d 366 (7th Cir. 2010).

When drawing inferences, and particularly when assessing Defendants' explanations of their conduct, the Court should be guided by a common sense appreciation for what is plausible and what is implausible and draw on its own experience and understanding of human nature. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009) (when evaluating plausibility of claim, "court [must] draw on its judicial experience and common sense"); *see Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc.*, 152 F. Supp. 903, 920 (S.D.N.Y. 1957) ("As fact-finder, the Court is . . . required to select from the entire record those logical inferences which accord with common sense and experience  .  .  .  ."). Rational inferences drawn from circumstantial evidence are neither "speculative [n]or conjectural," and the Second Circuit has long "reject[ed] the view that circumstantial evidence is probatively inferior to direct evidence." *Universe Tankships, Inc.*, 152 F. Supp. at 920 (citations omitted); *see also Siewe v. Gonzales*, 480 F.3d 160, 168-69 (2d Cir. 2007) ("Speculation that inheres in inference is not 'bald' if the inference is made . . . by record facts, or even a single fact, viewed in the light of common sense and ordinary experience.").

Importantly, this Court—having carefully observed each witness during trial—may similarly draw inferences based on a witness's credibility. When faced with opposing explanations and contradictory evidence, this Court is entitled to rely on "demeanor evidence" in selecting one witness's account over another's. *See, e.g.*, *New York Credit Men's Adjustment Bureau, Inc. v. Adler*, 2 B.R. 752, 753 (S.D.N.Y. 1980) (affirming bankruptcy court's inferences based in part on an "appraisal of the credibility of witnesses, and their demeanor"); *see also N.L.R.B. v. Dinion Coil Co.*, 201 F.2d 484, 487 (2d Cir. 1952) (acknowledging the value of

"demeanor evidence" which "our courts regard . . . as an excellent clue to the trustworthiness of testimony."); *see also Thalrose v. United States*, CV-85-0142, 1991 WL 148502, at *4 (E.D.N.Y. July 17, 1991) (drawing inferences against witness whose testimony upon cross examination lacked credibility).

Third, the Court can—and should—properly consider evidence of Defendants' own past practices in determining whether Defendants acted with wrongful intent, motive, and bad faith. *See In re Estate of Brandon*, 433 N.E. 2d 501, 503 (N.Y. 1982); *In re Casse*, 219 B.R. 657, 661 (Bankr. E.D.N.Y. 1998), *aff'd*, 198 F.3d 327 (2d Cir. 1999). Defendants have a practice of purchasing the debt of distressed satellite companies in bankruptcy, such as DBSD North America, Inc. ("DBSD") and TerreStar Corporation ("TerreStar"), to acquire spectrum assets and, in the case of DBSD, thereby "bending the bankruptcy process toward its own strategic objective." *DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 104 (2d Cir. 2011) ("*DBSD*"). That past practice supports the conclusion that Defendants acted with similar motive and intent in buying the LP Debt. As shown below, Plaintiffs have more than met their burden.

## I. SPSO IS LIABLE FOR BREACH OF THE EXPRESS TERMS OF THE CREDIT AGREEMENT

Under New York law,[3] a plaintiff is entitled to judgment on a breach of contract claim when it proves (a) the existence of a contract between plaintiff and defendant, (b) plaintiff's performance, (c) defendant's non-performance, and (d) resulting damage. *Dee v. Rakower*, 112 A.D. 3d 204, 976 N.Y.S. 2d 470, 474 (N.Y. App. Div. 2013); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000). There is no dispute that SPSO purported to

---

[3]     The Credit Agreement is governed by New York law. (FOF ¶ 23.)

become a party to the Credit Agreement or that LightSquared performed thereunder.   And, as

discussed below, the requirement of damage is easily satisfied here—indeed, the Credit

Agreement itself provides a remedy for breach of the Eligible Assignee representation, by

providing that an improper assignee has no rights under the contract.  Thus, LightSquared's

breach of contract claim turns on the third element—whether SPSO breached its obligations

under the Credit Agreement.

       The evidence and testimony at trial establish that SPSO breached the Credit

Agreement in one of three ways:  either (1) SPSO's actions were entirely on behalf of, and are

imputed to, DISH and EchoStar such that SPSO is a Disqualified Company to the same extent as

DISH and EchoStar, (2) SPSO is a "Disqualified Company," and thus not an Eligible Assignee

under the Credit Agreement, because it is a "subsidiary" of DISH and EchoStar within the

meaning of the Credit Agreement, controlled by DISH and EchoStar through their agents, Ergen

and Kiser, or (3) SPSO is not an Eligible Assignee because it is Ergen's alter ego, and hence a

prohibited "natural person."  As shown below, any one of these three conclusions suffices to

establish SPSO's breach.

### A. The Credit Agreement Provides that Lenders May Assign Their Rights Under the Credit Agreement Only to Eligible Assignees

       Section 10.04(b) of the Credit Agreement mandates, among other things, that

"Lenders" can assign their rights only to third parties that are "Eligible Assignees."  (FOF ¶¶ 24-

26.)  An "Eligible Assignee" "shall not include […] any natural person or any Disqualified

Company."  (*Id.* ¶ 25.)  A "Disqualified Company" is "any operating company that is a direct

competitor of the Borrower [identified on Schedule 1.01 and] will include any known subsidiary

thereof."  (*Id.* ¶ 26.)  Section 10.04(b) requires every assignee to execute and deliver to the

Administrative Agent an "Assignment and Assumption," in which the assignee represents and

9

warrants that "it meets all the requirements of an Eligible Assignee under the Credit Agreement." (*Id.* ¶¶ 47-48.)  Each "Assignment and Assumption" is a "Loan Document" under the Credit Agreement.  The term "Loan Documents" means "[the Credit Agreement], the Notes (if any), the Security Documents, and any other instrument or agreement now or hereinafter executed and delivered in connection herewith…"  (*Id.* ¶ 50.)  Therefore, a breach of a representation and warranty in the Assignment and Assumption constitutes a breach of the Credit Agreement.[4]

Section 10.04(a) of the Credit Agreement provides a precise consequence for a violation of the transfer restrictions:  "Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (***other than*** the parties hereto, their respective successors and ***assigns permitted hereby,*** Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnitees) ***any legal or equitable right, remedy or claim under or by reason of this Agreement.***"  (*Id.* ¶ 28.) (emphasis added).) Notwithstanding this unambiguous statement, Defendants have attempted to seize upon the language of Section 10.04(b) to argue that if SPSO is not an Eligible Assignee, the transfers of LP Debt to SPSO should be treated as participations and recognized as valid.  Their argument does not work.  Section 10.04(b) provides that "[a]ny assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph [relating to assignments] shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations ***in accordance with Section 10.04(d)***."  (*Id.* ¶ 25 (emphasis added).)  But Section 10.04(d) specifically prohibits, without exception, transfers of participations to natural persons and Disqualified Companies:  "Any Lender may at any time,

---

[4]        Furthermore, under section 10.05, the representation and warranty that SPSO meets all the requirements of an Eligible Assignee is continuing and SPSO must at all times remain an Eligible Assignee to comply with its obligations under the Credit Agreement. (*Id.* ¶ 49.)

without the consent of, or notice to, Borrower or the Administrative Agent sell participations to any person (*other than a natural person, Borrower or any of its Affiliates or any Disqualified Company*)" (*Id.* ¶¶ 27-28.)

Read together, these provisions confirm that under no circumstances may an entity that is not an "Eligible Assignee" hold any rights in the LP Debt, whether through assignment or participation. And that is exactly what Section 10.04(a), quoted above, provides: the Participants who acquire rights are specifically limited to "Participants to the extent provided in paragraph (d) of this Section," and Section 10.04(d) provides the Participant cannot be a natural person or a Disqualified Company. As shown in this Point I, SPSO is either one or the other of these impermissible "participants" and accordingly has no rights.

**B.    SPSO is not an Eligible Assignee Because at All Relevant Times it Was Acting on Behalf of DISH and EchoStar**

**1.    SPSO's Purchases Were for DISH and EchoStar**

The evidence before the Court overwhelmingly establishes that SPSO's purchases of LP Debt were purchases by and for the benefit of DISH and EchoStar. (FOF ¶¶ 94-103.)

**a.    DISH and EchoStar Had an Interest in Acquiring LightSquared's Spectrum Assets**

Ergen, the controlling shareholder and Chairman of DISH and EchoStar, was clear that LightSquared's spectrum was an attractive investment for DISH and EchoStar, and for DISH in particular. (*Id.* ¶¶ 64, 66.) DISH has announced a spectrum-intensive corporate strategy to operate a terrestrial-based wireless network in competition with larger telecommunications firms, such as AT&T and Verizon. (*Id.* ¶¶ 53, 105.) DISH needs *a lot* of additional spectrum. In fact, in April and May of 2013, DISH attempted to purchase Sprint and Clearwire—two multi-billion dollar telecommunications service providers with significant wireless spectrum holdings. (*Id.* ¶ 65.)

11

Specifically, DISH needs uplink spectrum to pair with the downlink spectrum it acquired with DBSD and TerreStar. (*Id.* ¶ 62.) As Doug Smith testified in detail, after DISH acquired 40 MHz of AWS-4 spectrum from DBSD and TerreStar, it applied for a waiver of the ATC requirement. (*Id.*) The waiver would allow DISH to build out a terrestrial-only wireless network. (*Id.*) In December of 2012, the FCC issued a decision that authorized DISH to use its AWS-4 spectrum on a standalone terrestrial basis. (*Id.*) However, the FCC's authorization came with a restriction: because DISH's AWS-4 uplink spectrum is immediately adjacent to downlink H-block spectrum—and the presence of uplink and downlink spectrum immediately adjacent to one another results in interference between the bands—there was a need for a "guard band" or transition zone, in between the two spectrum bands. (*Id.*) Accordingly, the FCC imposed strict power limitations of 5mW EIRP on mobile transmissions at 2000-2005Mhz and a requirement that DISH accept all interference flowing from the H-block into this 5 MHz of DISH's AWS-4 spectrum. (*Id.*) This requirement meant that 5 MHz of DISH's acquired spectrum became largely unusable, and DISH had only 35 MHz usable spectrum of the 40 MHz that it acquired from DBSD and TerreStar. (*Id.*) To maximize the full value of the 40MHz of its newly acquired AWS-4 spectrum, DISH would have to convert all of the AWS-4 spectrum to downlink spectrum (for which it requested approval in September 2013 and obtained approval in December 2013) and find uplink spectrum elsewhere. (*Id.*)

LightSquared has significant blocks of useable uplink spectrum. (*Id.*) Indeed, LightSquared is presently, and has been for some time, the ***only*** significant source of available uplink spectrum to acquire. (*Id.*) As Smith testified, LightSquared's L-Band spectrum was a "natural pairing" for DISH, given that LightSquared's uplink spectrum is "safe to use as uplink spectrum." (*Id.*)

Thus, as early as 2011, Ergen believed that LightSquared's spectrum "could fit with [DISH's] existing spectrum in the long term." (*Id.* ¶ 60, 64.) As Kiser admitted at trial, DISH and EchoStar were interested in LightSquared's spectrum. (*Id.* ¶ 63.)

### b. DISH or EchoStar Was Always the Preferred Purchaser of the LP Debt

From the outset, Ergen and Kiser sought to have DISH or EchoStar buy the LP Debt directly, repeatedly checking with Ketchum and outside counsel to see if that was possible. For instance, Kiser and Ergen testified that in 2011they consulted with Ketchum, who reviewed the Credit Agreement, and determined that neither EchoStar nor DISH was eligible to purchase LP Debt. (*Id.* ¶¶ 70, 74.) After consulting with Ketchum, Kiser—in his capacity as Treasurer for DISH and Vice President of Corporate Development for DISH and EchoStar—also consulted with DISH's and EchoStar's outside counsel, Sullivan and Cromwell LLP, to determine whether the companies could purchase the LP Debt. (*Id.* ¶¶ 67, 75-76.) And, on October 4, 2012, Ergen asked Kiser again whether "the company" could buy the LP Debt directly. (*Id.* ¶ 90.) Ergen also testified that he asked Kiser from time to time to check if DISH or EchoStar were permitted to purchase the LP Debt. (*Id.* ¶¶ 75, 90.) It was only after Kiser said he could not get confirmation that the transfer restrictions were no longer applicable due to LightSquared's bankruptcy that Ergen responded, "If we can't be sure the company can buy them, then I am interested to increase my position at the 75 level at least up to a 33% ownership level of the class." (*Id.* ¶¶ 90, 101.) The repeated inquiries from DISH and EchoStar officers about whether DISH or EchoStar could purchase the LP Debt confirms that the LP Debt purchases were in fact meant for those companies, not Ergen personally.[5]

---

[5]    Defendants would have this Court believe that these repeated requests about whether the companies could purchase the LP Debt were Ergen's attempt to present the corporate opportunity to DISH and EchoStar. This explanation is not credible. Had he been truly concerned about this, he would have discussed the

### c.    DISH's Board Either Acquiesced in or Was Willfully Blind to Ergen's Purchases

In May 2012, a DISH Board member wrote to Stanton Dodge, DISH's General Counsel, and others, calling their attention to a news article "indicat[ing] that Charlie had bought $350 million [of] light squared bonds." (*Id.* ¶ 122.)  The Board member requested that Dodge confirm the accuracy of the story.  (*Id.*)  Given the recently completed acquisitions of DBSD and TerreStar, the Board member—indeed, the entire Boards of DISH and EchoStar—must have been fully aware that purchases of distressed debt had been the opening step in those acquisitions, and that the purchase of the LP Debt looked and smelled like more of the same.

In response to the Board member's email, Dodge, rather than addressing whether Ergen was purchasing the debt, wrote an email to the entire DISH Board, including Ergen, stating: "[F]urther to gary's email below and since another board member inquired about the recent press reports regarding LightSquared bonds, I wanted to send a brief note to the full board. ***[T]he company [DISH] did not buy any LightSquared bonds.***"  (*Id.* ¶¶ 123, 150 (emphasis added).)  Certainly, the Board must have concluded from Dodge's email that it was Ergen buying the LightSquared debt.  Yet, contrary to their fiduciary duties to DISH, there is no evidence any Board member ever followed up with Dodge or Ergen or inquired further into the circumstances surrounding Ergen's debt purchases to ascertain Ergen's intentions with respect to LightSquared and whether they might be in conflict with the corporation's interests.  (Indeed, for an entire year, it took no action to investigate these reports of Ergen's activities.)  The clear implication is that the DISH Board sanctioned the purchases by giving Ergen the proverbial wink and nod.

---

opportunity to invest in the LP Debt directly with the Boards of DISH or EchoStar before he made these purchases.  He did not.  In fact, he equivocated and spoke in half-truths when asked about whether he was purchasing the LP Debt at all.  If these were truly "personal" purchases, this information would have been highly material to the Board's analysis of whether LP Debt was a corporate opportunity.  Howard, of DISH's Special Committee, testified that he was interested in determining whether there was a way that DISH could have bought LP Debt notwithstanding the transfer restrictions.  (*Id.* ¶ 165.)

Another reasonable inference is that the Board deliberately abstained from further inquiry with the intent to later claim ignorance.  These inferences also extend to Dodge and Cullen, both of whom had a fiduciary duty to insist on a clear answer from Ergen about his purchases as part of an investigation into whether this was a corporate opportunity that Ergen was preempting, but who instead buried their heads in the sand.  But New York law does not regard willful blindness as a defense.  *See Carr v. Marietta Corp.*, 211 F.3d 724, 732 (2d Cir. 2000) (stating that under New York law, "a party does not act in good faith if she acts with knowledge and disregard of suspicious circumstances"); *see also 16 Casa Duse, LLC v. Merkin*, No. 12 CIV. 3492 (RJS), 2013 WL 5510770, at *13 (S.D.N.Y. Sept. 27, 2013); *In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 772 (Bankr. E.D. Tex. 2001).  After idly sitting by and permitting the improper trading to take place, DISH and EchoStar cannot now seek a pass from this Court based on their failure to formally approve Ergen's trading activity.

### d.      DISH and EchoStar Ratified SPSO's Purchases

Ratification occurs when the principal accepts the benefits of the agent's acts.  *See Rickel & Assocs., Inc. v. Smith* (*In re Rickel & Assocs., Inc.*), 272 B.R. 74, 95 (Bankr. S.D.N.Y. 2002); *Grubin v. Sallie Mae Servicing Corp., LP.* (*In re Grubin*), 476 B.R. 699, 709 (Bankr. E.D.N.Y. 2012).  Ratification is also found where "a principal fails to object to the unauthorized act of [an agent], despite an opportunity to do so."  *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C., (In re Vargas Realty Enters., Inc.)*, 440 B.R. 224, 235 (S.D.N.Y. 2010).  In either case, where a board of directors ratifies the actions of its officers or directors, that act is binding upon the corporation, even if the board did not previously authorize the action.  *See Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 552 (2d Cir. 1984).

At no time has DISH or EchoStar objected to or challenged Ergen's purchases of LP Debt.  Instead, DISH and EchoStar, with full knowledge that their Executive Chairman and

DISH's Treasurer had acquired the LP Debt through SPSO, accepted Ergen and Kiser's wrongdoing by accepting the benefits that flowed from those acts.  For example, in Ergen's May 2013 presentation to the boards of directors for DISH and EchoStar, he made clear to them that SPSO's "substantial interests in L2 debt and preferred stock compliment[sic] any acquisition strategy and could have significant influence in L2's chapter 11 cases."  (FOF ¶ 142.)  He also made clear that he would make the bid for LightSquared to preserve "optionality" for either company to participate in the bid if the proposed Clearwire and Sprint acquisitions fell through. (*Id.* ¶ 65.)  Neither DISH nor EchoStar objected when Ergen made the LBAC Bid on May 15, 2013.  In fact, once the Sprint and Clearwire transactions failed, and with Board approval, DISH acquired LBAC for $1.  (*Id.* ¶ 163.)  The very next day, the Ad Hoc Secured Group proposed a plan of reorganization backed by SPSO that contemplated that LBAC would serve as a stalking horse bidder for LightSquared's assets.  (*Id.* ¶ 169.)

Ergen, through his counsel, ensured that the Ad Hoc Secured Group's plan incorporated an APA and PSA containing broad releases that would have immunized Ergen, SPSO, DISH, and EchoStar from any liability arising out of Ergen's LP Debt purchases.  In short, DISH and EchoStar ratified Ergen and Kiser's conduct.  *See, e.g.*, *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 236 (E.D.N.Y. 2009) (explaining that defendant's "expressions of willingness to move forward with the Project constituted an 'acceptance of benefits'" for the purpose of ratification); *Amusement Indus. Inc. v. Citigroup Global Mkts. Realty Corp.* (*In re First Republic Grp. Realty, LLC*), 421 B.R. 659, 684 (Bankr. S.D.N.Y. 2009) ("Amusement's attempt to cash in on the potential windfall associated with the transaction constituted a ratification of the transaction.").  (*See* FOF ¶¶ 170, 230-36.)  By accepting these

16

benefits and proceeding without objection, DISH and EchoStar ratified and are bound by SPSO's

conduct.

> **e.** **The Purchase of LightSquared Debt Reprised the Strategy DISH and EchoStar Had Used to Acquire Assets in Bankruptcy**

Purchasing distressed debt of competitors and then leveraging their position as

creditors to obtain the competitors' assets at a significant discount is a strategy that DISH and

EchoStar have pursued before.  Ergen (the companies' Executive Chairman in charge of

corporate strategy) and Kiser (the companies' Vice President of Corporate Development and

DISH's Treasurer) have been the individuals who, in the past, executed this "loan-to-own"

strategy on the companies' behalf (FOF ¶¶ 55-57, 59, 100.)  Indeed, only a few weeks before

SPSO commenced its purchases of the LP Debt, DISH was granted change of control

authorization from the FCC to complete its acquisition of both DBSD and TerreStar.  (*Id.* ¶¶

58,67.)  Both DBSD and TerreStar were purchased by DISH out of bankruptcy after DISH (in

the case of DBSD) and EchoStar (in the case of TerreStar) had acquired a "blocking position" in

certain of the securities of the debtors.  The strategy deployed by DISH and EchoStar with

respect to DBSD and TerreStar is indistinguishable from the strategy deployed by SPSO, DISH

and EchoStar in this case.  (*Id.* ¶¶ 55-57.)

> **f.** **Ergen—From The Outset of His Trading Activity Through Submission of the LBAC Bid—Intended to Benefit DISH**

By no later than October 4, 2012, Ergen expressed to Kiser his desire to gain a

blocking position in the LP Debt.  Shortly after gaining that blocking position, Ergen disclosed

his purchases to the Boards of DISH and EchoStar in the May 1 and May 2, 2013 presentations

referenced above, wherein he explained that SPSO's blocking position would benefit DISH

and/or EchoStar to the extent they sought to purchase LightSquared's assets in the context of its

bankruptcy case.  (*Id.* ¶¶ 141-42.)

Consistent with the Ergen's promise to the board to "preserve optionality" for

DISH and EchoStar, noted above, on May 15, 2013, he made a bid through LBAC to purchase

certain of LightSquared's assets.  Significantly, he had already put in place the mechanism for

DISH to pay for LightSquared's assets.  On April 3, just ***days*** after he had obtained a blocking

position, DISH announced a capital raise of $2.3 billion for general corporate purposes,

***including spectrum acquisitions***.  There is nothing in the record to show that the DISH Board

approved this capital raise, which has not been redeemed, and the capital remains on DISH's

balance sheet to this day.

Even after DISH bought LBAC (for only $1) and assumed the bid, the

interrelatedness of SPSO and DISH continued.  DISH, through LBAC, used SPSO's blocking

position to push, through the Ad Hoc Secured Group, a plan premised on LBAC serving as a

stalking horse bidder for LightSquared's assets.  That same plan contemplated a release of DISH,

EchoStar, SPSO, and Ergen from all liability and would have allowed SPSO's claims.  Although

LBAC terminated its stalking horse bid, the scheme clearly showed that SPSO's and DISH's

efforts were aligned.  That SPSO now apparently seeks to acquire LightSquared's spectrum

itself—a little over one month after DISH withdrew its bid—further demonstrates the concerted

nature of this scheme.

g.      **Ergen Never Contemplated Owning LightSquared's Assets
        Personally**

Ergen told the Court under oath that SPSO's purchases of the LP Debt were

personal investments for him in a distressed company because he liked the return.  That

contention is not credible, particularly because (1) for many of the purchases he paid close to par

(*id.* ¶¶ 95, 146, 153), and (2) LightSquared entered bankruptcy scant days after SPSO's first

purchases and, as such, was not paying a coupon. Contrary to Ergen's testimony, an investment

in LP Debt was only a play to be part of a reorganization—the most likely outcome of which

would be equitization of the debt in whole or in part.

The evidence demonstrates that before the LP Debt purchases, Ergen had never

made a personal investment of anything close to this magnitude in distressed debt, nor had he

ever made such a personal investment in a competitor of DISH or EchoStar or any company

owning spectrum assets. (*Id.* ¶¶ 147-49.) Rather, before his LP Debt purchases, Ergen had

generally invested his non-DISH, non-EchoStar holdings in very conservative, highly liquid

investments. According to Ergen, he did not even discuss the almost $1 billion investment with

his wife, also the co-trustee of the trust that allegedly funded the purchases. (*Id.* ¶¶ 147, 150.)

This evidence further demonstrates that Ergen's investment was for the benefit of DISH.

Incredibly, in response to the Court's questioning, Ergen testified that if he

personally purchased LightSquared's spectrum assets, he could own and operate a spectrum

business that would compete with DISH without breaching his fiduciary duties. (*Id.* ¶¶ 151,

163.) This makes no sense. The only logical inference the Court can draw is that SPSO's

purchases were entirely consistent with the conduct of a strategic investor seeking control over

the underlying asset. That strategic investor is not Ergen, but rather, DISH and EchoStar.

### 2.    SPSO's Purchases Should be Imputed to DISH and EchoStar Under Black-Letter Principles of Agency Law

#### a.    The Evidence Supports a Finding of Imputation

The strongly supported inference that the LP Debt purchases were actually

intended to benefit DISH and EchoStar is matched by an equally strong inference that the

persons who orchestrated those purchases, Kiser and Ergen, were acting as agents of DISH and

EchoStar when they purchased the LP Debt.  Accordingly, their purchases can be imputed to

DISH and Echostar.  *See Kirschner v. KPMG LLP*, 938 N.E. 2d 941, 950-53 (N.Y. 2010); *see*

*also Anilao v. Spota*, 774 F. Supp. 2d 457, 500 n. 29 (E.D.N.Y. 2011) ("Under the fundamental

principles of agency law, the misconduct of managers within the scope of their employment will

normally be imputed to the corporation.") (internal quotation marks omitted).

   The New York Court of Appeals has made clear that "a corporation is represented

by its officers and agents, and their fraud in the course of . . . corporate dealings[] is ***in law*** the

fraud of the corporation." *Kirschner*, 938 N. E. 2d at 951 (citations omitted) (emphasis added);

*see also Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir. 1989).[6]  An agent can

be presumed to act on behalf of the principal—even without prior authorization by the

company's board or an agreement—by virtue of the agent's position and/or its past dealings with

the company.  *Kirschner*, 938 N. E. 2d at 950-51.  ("A corporation must . . . be responsible for

the acts of its authorized agents even if particular acts were unauthorized . . . . The risk of loss

from the unauthorized acts of a dishonest agent falls on the principal that selected the agent")

(citations omitted; emphasis added).    In addition, ***an agent's unauthorized and fraudulent acts***

***are imputed to the corporation***, even if the agent derives some personal benefit as well.  *See Id.*

---

[6]  Because there has been no showing of an actual conflict between New York and Nevada agency laws, New York law should govern here.  "[C]ourts only engage in a choice of law analysis when there is an actual conflict between the possible applicable laws."  *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 439 B.R. 47, 58-59, supplemented, 439 B.R. 78 (Bankr. S.D.N.Y. 2010) (applying New York law); *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998); *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 n.12 (2d Cir. 2013).  Indeed, the Nevada courts have indicated a predisposition to follow New York law on the issue of imputation and to adopt it as the law of Nevada.  *See USACM Liquidating Trust v. Deloitte & Touche*, LLP, 764 F. Supp.2d 1210, 1218 (D. Nev. 2011) (citing decisions of New York courts as Nevada law regarding imputation and, in considering a possible exception to the law of imputation, holding that based on the New York authorities, "Nevada would adopt a similar rule."); see also *Stream SICAV v. Wang*, 12 CIV. 6682 PAE, 2013 WL 5526289 at *9, n.5 (S.D.N.Y. Oct. 7, 2013) (stating that New York law on exceptions to imputation are similarly narrow in Nevada).

This "legal presumption" operates to impute an agent's conduct to the principal *regardless of the agent's subjective intent*.  For instance, in *Kirschner*, the Court of Appeals considered and rejected the notion that "intent is the touchstone."  938 N.E. 2d at 954.

Accordingly, even crediting Ergen's self-serving claim that his $1 billion LP Debt purchases were a personal investment, imputation still applies as long as the corporation benefits as well.  *Id.* at 955 ("Fraudsters are presumably not, as a general rule, motivated by charitable impulses.").  The fact that Ergen also stood to benefit personally from his discounted purchase likewise does not defeat imputation.  *Id.* at 952 (the fact that an agent acts in his own interests as well as those of corporation is not enough to overcome presumption of imputation).  The same is true of any benefit received by SPSO.  *See Warshaw v. Mendelow*, No. 6521732010, 2011 WL 11100990, at *7 (Sup. Ct. N.Y. Cnty. Dec. 13, 2011) ("Acts are within the scope of employment for purposes of vicarious liability if they further the interests of the employer in some way, and are not done solely to benefit the employee.").

These principles warrant imputing SPSO's debt purchases to DISH and EchoStar.  In addition to the facts forth in Point I(B)(1), above, demonstrating that Ergen and Kiser intended to benefit DISH, the evidence that they acted within the scope of their agency is overwhelming:

- Ergen is the Executive Chairman of DISH and EchoStar, in charge of corporate strategy and investments for both entities. (FOF ¶ 105.)  Kiser is the Treasurer of DISH and the Vice President of Corporate Opportunities for both DISH and EchoStar.  His positions at the companies involved making investments and acquisitions on the companies' behalf. (*Id.* ¶¶ 67-68.)

- Ergen's and Kiser's purchases of LP Debt in furtherance of a strategic acquisition are consistent with these responsibilities.  (*Id.* ¶¶ 109, 146.)

- DISH's investment policy authorizes Ergen personally to make investments for DISH (of up to $200 million in the aggregate per calendar quarter) without first seeking Board approval.  (*Id.* ¶ 108.)

- Kiser was not separately compensated for purchasing the LP Debt, and used DISH and EchoStar counsel, resources, employees, computers, phone lines and emails during regular business hours to execute the LP Debt trades . (*Id.* ¶ 118.)

- Ergen negotiated the PSA and APA that would facilitate the LightSquared acquisition even though DISH's Board never gave him express authority to do so.  Nor did DISH's Board object to Ergen making the LBAC Bid on May 15, 2013.  (*Id.* ¶ 169.)

As detailed above, SPSO's LP Debt purchases inured to the benefit of DISH and EchoStar.  Most tellingly, Ergen's presentations to the Boards of DISH and EchoStar stated explicitly that SPSO's blocking position in the LP Debt "compliment[sic] any acquisition strategy and could have significant influence in L2's chapter 11."  (*Id.* ¶ 142.)  Indeed, that blocking position allowed DISH, through LBAC, to serve as a stalking horse bidder behind a plan that SPSO could direct due to its ability to control the vote of a significant creditor class.  (*Id.* ¶¶ 143, 169.)  Ergen's lawyers even admitted to the Nevada court, where a derivative shareholder lawsuit arising out of SPSO's purchases is pending, that "[Ergen's] personal interests [in SPSO] are aligned with DISH's interests . . ." (*Id.* ¶ 152.)

### b.    Defendants' Arguments Against Imputation Lack Merit

Defendants' efforts to avoid imputation fly in the face of the settled agency principles described *supra* Section I(B)(2)(a). *First*, Defendants contend that Ergen cannot be considered an agent of DISH because he is a controlling shareholder.  Specifically, Defendants argue that if Ergen can define the scope of his agency as a controlling shareholder, then he would be a principal and agent at the same time, and therefore could never be deemed to be an agent.  That is a straw man:  the evidence is clear that while Ergen's shareholders give him significant, but not wholly unfettered control over his authority, he also serves as an employee and officer of the Company.[7]  And, in any event, an officer's status as a controlling shareholder does not

---

[7]    The argument that Ergen is both principal and agent necessarily assumes that Ergen and DISH are identical. In effect, this pierces the corporate veil between DISH and Ergen—something Defendants vehemently

prevent a finding that the officer was acting for the company within the scope of his agency. *See Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 709 (S.D.N.Y. 2001) ("The sole actor rule applies where the corporate principal and its agent are indistinguishable, such as where the agent is a corporation's sole shareholder . . . or where the corporation bestows upon its agent unfettered control and allows the agent to operate without meaningful supervision with respect to a particular type of transaction") (citation omitted), *aff'd sub nom., Breeden v. Kirkpatrick & Lockhart LLP* (*In re The Bennett Funding Grp. Inc.*), 336 F.3d 94 (2d Cir. 2003); *see also Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003) ("[T]he agent's knowledge [is imputed] to the principal notwithstanding . . . because the party that should have been informed was the agent itself albeit in its capacity as principal."); *In re 1031 Tax Grp., LLC*, 420 B.R. at 202 ("[W]hen the principal and the agent are essentially the same entity . . . the agent's knowledge must be imputed to the principal"); *Sieger v. Zak*, No. 06-CV-3313 (DRH) (EBT), 2007 WL 2362348, at *3-5 (E.D.N.Y. Aug. 15, 2007) (actions of officer, director and controlling shareholder in furtherance of fraud could be imputed to company).[8]

    *Second*, throughout this Adversary Proceeding, Defendants have contended that because Ergen allegedly used his personal funds to make the LP Debt purchases, he could not be deemed to be acting as an agent of DISH and EchoStar. But the source of funding does not

---

argue that Plaintiffs have not established a basis for, and that Plaintiffs in any event are not seeking to do. But if Defendants' argument is followed to its logical conclusion that DISH and Ergen are one and the same, then SPSO is undeniably a subsidiary of DISH, because ownership by Ergen is ownership by DISH.

[8]    The law is the same in Nevada. *See, e.g.*, *Kahn v. Dodds (In re AMERCO Derivative Litig.)*, 252 P.3d 681, 695 (Nev. 2011) (an officer or director's acts are imputed to the corporation even "if the agent is the sole agent or sole shareholder of a corporation"); *USACM*, 764 F. Supp. 2d at 1222 (majority shareholders were acting within scope of their employment and authority because "[t]he movement of corporate assets and decisions about which investments to make, which creditors to pay, and what information to disclose are ordinary functions of management which typically would be attributed to the company").

determine whether an agent is acting within the scope of his agency. *Kirschner*, 938 N. E. 2d at

952; *see e.g. Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S. 2d 199, 200 (2d Dep't 2007) (principal

was liable for tort of agent where agent was acting as a volunteer and rented car involved in tort

with his own funds); *Burdo v. Metro. Life Ins. Co.*, 4 N.Y.S. 2d 819, 821 (N.Y. App. Div. 3d

Dep't 1938) (principal was liable for tort of employee who used his own car in commission of

the tort); *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir. 1991)

(finding agency relationship even though agent "posted letters of credit in its own name to

purchase [] cargo" and "issued a performance bond in its own name").[9]

 In any event, the fact that Ergen may have laid out his own money in the first

instance is hardly the end of the story. As the controlling shareholder of DISH and EchoStar,

Ergen was always in a position to drive the Board of either company toward supporting a bid for

LightSquared that would repay Ergen's outlays in full—indeed, at a handsome profit—as would

have been the outcome under the LBAC bid; that he approached both Boards with the

opportunity to acquire LightSquared proves his influence over them. (FOF ¶¶ 141-45.) Under

these circumstances, the source of funds is not dispositive.

 *Third,* Defendants contend that the investment policies of DISH and EchoStar

required Ergen and Kiser to obtain Board approval before making purchases over a certain

threshold and because Kiser and Ergen did not obtain board approval, they could not have been

acting within the scope of their agency. But on closer examination, most of the LP Debt trades

fall below the threshold set by the terms of DISH's investment policy. DISH's investment policy

---

[9] Once again, Nevada and New York law are consistent. In *Nesbitt v. Cherry Creek Irr. Co.*, 145 P. 929 (Nev. 1915), the court held that an officer of an irrigation company was acting within the scope of his agency when he purchased supplies even though he used his own funds because his day-to-day role encompassed purchasing supplies from vendors. *Id.* at 931; *see also Russell v. Republic Prod. Co.*, 112 F.2d 663 (5th Cir. 1940) (holding that despite the fact that officer purchased oil options against an express company prohibition and using his own funds, officer was acting within the scope of his agency because purchasing oil options was within his role at company).

provides that "[a]ny investment not otherwise permitted by the Corporation's cash management policy shall not exceed ***$125 million in any single transaction*** or . . . ***$200 million in aggregate in any calendar quarter*** without approval of the Board of Directors." (*Id.* ¶ 108 (emphasis added).) Significantly, only ***three*** of the twenty-six trades executed by SPSO exceeded $125 million. (*Id.* )[10] Further, the sum of the trades executed in the last quarter of 2012 is far below the $200 million threshold requiring board approval. Defendants cannot rely on an investment policy that grants Ergen and Kiser authority to execute investments of a magnitude comparable to the size of the LP Debt trades to establish that the scope of their agency was exceeded. Accordingly, the investment policies do not shield Defendants from liability. In any event, as DISH board member Stephen Goodbarn confirmed, no DISH director was independent of Ergen, and Ergen would make the final call as to what strategy DISH would pursue in connection with LightSquared.

*Finally*, DISH has argued that "the law of agency is not a tool of contract construction," and therefore Ergen and Kiser's acts cannot be imputed as agents of DISH. (*DISH Network Corporation's and EchoStar Corporation's Trial Brief*, dated Jan. 8, 2014 [Docket No. 119] at 22.) This is incorrect as a matter of law and common sense. Corporations can *only* act through their agents, and thus an analysis of whether a corporation has breached a contract necessarily implicates the law of agency. Indeed, the rule under both New York and Nevada law is that an undisclosed principal is bound by contracts entered into "by an agent acting within his [or her] authority." (Restatement (Second) of Agency § 186); *J.P. Endeavors v. Dushaj*, 8 A.D.3d 440, 442 (2d Dep't 2004) (finding both agent and undisclosed principal liable under brokerage agreement); *Metro. Cos. v. Fowora*, No.

---

[10]    Because the hung trades took up to four months to close, it is difficult definitively to determine compliance with DISH's investment policy.

603407/2007, 2008 WL 4903873, at *4 (N.Y. Sup. Ct. Nov. 7, 2008) (citation omitted)

("[W]here a principal was undisclosed, a plaintiff is allowed to proceed against the agent or the

principal, or both."). Thus, principals are routinely held liable for breaches of contract effected

by their agents. *See Durante Bros. Constr. Corp. v. St. John's Cemetery*, 285 A.D.2d 578, 580

(2d Dep't 2001); *Christie's Inc. v. Sherlock*, No. 602515/06, 2009 WL 3161209, at *10-14 (N.Y.

Sup. Ct. July 14, 2009); *Swartout v. Grover Collins Drilling Mud Eng'rs & Materials*, 75 Nev.

297, 299-300 (Sup. Ct. Nev. 1959).

### 3.    SPSO is a "subsidiary" of DISH and EchoStar and Therefore a Disqualified Company Prohibited from Buying LP Debt

According to Defendants, the entire case stands or falls on nine words: "A

Disqualified Company will include any known subsidiary thereof." As shown above, this Court

need not construe nine words to find liability here because Ergen and Kiser's debt purchases

were for DISH or EchoStar or should be deemed purchases by DISH and EchoStar under basic

principles of agency and imputation. However, as an alternative, the evidence at trial also

demonstrated that SPSO is a "subsidiary" of DISH and EchoStar under the Credit Agreement,

and therefore a Disqualified Company. Defendants urge a narrow meaning of the word

"subsidiary," one that would not reach SPSO. According to Defendants, "subsidiary" can have

only one meaning: a corporation that is majority or entirely owned by another. This

interpretation is contrary to the plain meaning of the word "subsidiary."

### a.    Plaintiffs' construction of "subsidiary" is consistent with the purposes of the Credit Agreement as a whole.

Defendants' narrow ownership-based argument ignores the equally accepted

meaning of "subsidiary," which refers more generally to an entity controlled by another. For

example, *Oxford Dictionaries* define "subsidiary" as "a company ***controlled*** by a holding

company."[11] Similarly, *Merriam-Webster* defines "subsidiary" as "a company that is owned **or controlled** by another company."  *Merriam-Webster*, at http://www.merriam-webster.com/dictionary/subsidiary (emphasis added).  Plaintiffs' usage thus comports with authoritative and accepted definitions, and the analysis of the meaning of "subsidiary" should stop there.  *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013).

Not surprisingly, all of the securities professionals acting for DISH, EchoStar, and Ergen understood the term "subsidiary," as Plaintiffs do, in a manner consistent with the dictionary definitions above.  Ketchum, for example, testified that he understood the term "subsidiary" as it appears in the Credit Agreement to mean "other corporate entities controlled by those names. . . .  Corporate entities controlled by DISH and EchoStar."  (FOF ¶ 41.)  Similarly, in the fall of 2011, when Kiser asked outside counsel for DISH and EchoStar whether DISH could buy the LP Debt, counsel concluded that DISH could not, even though, at that time, EchoStar—but **not** DISH—was listed on the Disqualified Companies list.  Counsel necessarily concluded that the nine words, including "subsidiary," meant that listing EchoStar captured DISH because the two companies share executives and officers, have common Board members, and operate as sister companies in a symbiotic relationship.  (*Id.* ¶¶ 6,11.)

Moreover, the fact that Ergen, Kiser and DISH all interpreted the term "subsidiary" to include DISH is compelling evidence as to the reasonable interpretation of the Credit Agreement.  *See Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 82-83 (S.D.N.Y. 1992) (noting that respondent's attempt to rebut the meaning of an arbitration provision was "undercut by [respondent]'s own behavior prior to litigation" because its "conduct demonstrates that it shared [petitioner]'s understanding that this dispute is within the arbitration

---

[11]    *See Oxford Dictionaries*, at http://www.oxforddictionaries.com/definition/american_english/subsidiary (emphasis added).

agreement"); *see, e.g., Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90-91 (2d Cir. 1984) (explaining that "[t]he parties' interpretation of the contract in practice, prior to litigation, is compelling evidence"). In short, the plain meaning of "subsidiary" encompasses an entity under the direct or indirect control of another.

Most importantly, in pushing the Court to focus myopically on "nine words," Defendants violate a fundamental rule of contract construction, which is that all words in a contract must be interpreted ***with reference to the contract as a whole.*** A contract "must be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose. . . . [This is because] [t]he meaning of a writing may be distorted where undue force is given to single words or phrases." *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003).

Accordingly, far from accepting Defendants' invitation to limit its examination to "nine words," the Court should analyze the Credit Agreement as a whole to determine the parties' intent and to ensure that the meaning accorded the phrase at issue comports with the overall purpose of the contracting parties. A full reading of the Credit Agreement makes clear that the parties' purpose and intent was to keep competitors out of LightSquared's capital structure. This purpose is reflected in the definitions of Eligible Assignee and Disqualified Company, and its importance is revealed by the many ways in which those definitions are used in the Credit Agreement to limit ownership of the LP Debt. (*See, e.g.*, Credit Agreement §10.04(b) (prohibiting assignment), §10.04(d) (prohibiting transfer of participation or sub-participation), §2.16(b) (limiting selection of replacement Lenders), §2.20(a) (limiting potential lenders of additional borrowings under new term loan commitments).)

This careful exclusion of competitors was undoubtedly prompted by the substantial obligations the Credit Agreement imposes on LightSquared to make the Company's management available to, and share confidential information with, the Lenders.  (*See*, *e.g.*, Credit Agreement §3.04 (requiring LightSquared to provide several years of financial statements and projections), §3.05 (listing all real property owned or leased), §3.06 (listing all intellectual property owned or licensed), §3.09 (all material agreements relating to LightSquared's business), §5.01(a) and §5.01(b) (requiring annual and quarterly updates containing information that would be included on SEC Forms 10-K and 10-Q), §5.01(h) (annual and quarterly budgets), and §5.01(j) (a general catchall for information reasonably requested by a Lender).  And, under Section 5.07 (a), each Lender also has the right to inspect LightSquared's properties and "discuss the affairs, finances accounts and condition" of LightSquared with its officers, employees, accountants and advisors.

The risks of affording a competitor access to LightSquared's confidential information are obvious, as is the contracting parties' desire to prevent such access.  When construing the meaning of "subsidiary," the Court must do so against the background of these clearly manifested contractual concerns and purposes.  And when so construed, it becomes clear that Defendants' reading—under which DISH's Executive Chairman, cloaked as an SPV, or any entity acting for, although not majority or wholly owned by DISH, could subvert the broader purposes of the parties by simply waltzing into the LightSquared capital structure through a special purpose vehicle—is not tenable.  None of the transfer restrictions would make any sense if they left room for this invasion of capital structure by a Disqualified Company.  The most logical interpretation of "subsidiary" is the broader definition advanced by Plaintiffs.

       **b.**     **There is no basis for recourse to parol evidence, and the "drafting history" Defendants invite the Court to review is, in any event, not dispositive.**

Defendants also invite the Court to make recourse to parol evidence, which Defendants, mistakenly, argue supports their reading.  Notably, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. . . . Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract."  *Schron*, 986 N.E.2d at 433 (citations and internal quotation marks omitted).  Only if the Court finds the Credit Agreement is ambiguous may it entertain parol evidence.

For the reasons set forth above, Plaintiffs believe there is no basis here to resort to parol evidence.  But were the Court to evaluate the parol evidence, the "drafting history" invoked by Defendants does not support their cramped and limited reading of "subsidiary."

During the negotiations of the relevant language in September 2010, UBS's counsel originally defined the term "Eligible Assignee" so as to exclude "any natural person or any person listed on Schedule 1.01(a)."  (FOF ¶ 25.)  In response, counsel for LightSquared circulated a revised draft changing the definition of "Eligible Assignee" to also exclude a "Competitor" from purchasing LP Debt.  (*Id.* ¶ 26.)  The word "Competitor" was defined as "(i) any person listed on Schedule 1.01(a), (ii) any other competitor of the Borrower that is designated as such in writing to the Administrative Agent by the Borrower from time to time, and (iii) any Affiliate of any such person."  (*Id.*)  Counsel for UBS then responded with edits that effectively substituted the word "subsidiary" for "Affiliate".  The edits deleted the proposed new term "Competitor" and added a different term, "Disqualified Company," defined as "any operating company which is a direct competitor of the Borrower identified to the Administrative Agent in writing before the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon

the consent of the Administrative Agent (such consent not to be unreasonably withheld or

delayed), such additional bona fide operating companies which are direct competitors of the

Borrower as may be identified to the Administrative Agent from time to time and notified to the

Lenders.  ***A Disqualified Company will include any known subsidiary thereof***."  (*Id.* at ¶ 26.)

(emphasis added).)  This language survived in the executed version of the Credit Agreement.

Defendants claim the parties' decision not to use the term "Affiliate" establishes

that the parties adopted a permissive approach to assignments, by which anyone or any entity

that is an "Affiliate" of a competitor ***other than the narrowly-construed "subsidiary"*** is an

Eligible Assignee.  There is no logical compulsion at all to this contention.  Stated differently,

the decision not to use the word "Affiliates" in no way mandates a narrow and restrictive reading

of "subsidiary"—particularly where (1) the Credit Agreement as a whole reveals an intent to

exclude competitors, and (2) there is a readily discernible reason for the decision not to use

"Affiliate" that is consistent with a broad reading of "subsidiary."

Specifically, certain statutory and regulatory definitions of "affiliate" are

sufficiently broad to ensnare a passive, institutional investor, such as a private equity firm, hedge

fund, or bank, notwithstanding a relatively small investment in a competitor or even without any

direct investment in the competitor, because of investment advisory activities.  For example,

Section 2 of the Investment Company Act of 1940, among other things, sets a 5% threshold for

affiliate status,[12] and Section 23A of the Federal Reserve Act defines "affiliate" in part on the

---

[12]    The section defines "[a]ffiliated company" as "a company which is an affiliated person."  15 U.S.C. § 80a-2(a)(2).  In turn, the Act defines "'[a]ffiliated person' of another person" to include "(A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; . . . [and] (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof . . . ."  *Id.* § 80a-2(a)(3).  Accordingly, a passive investor owning, controlling or holding as little as five percent of a company's shares could be considered an affiliate of that company.  And even if the investor holds less than five percent of the shares, or even no

basis of the investment activities of a bank that serves as an investment advisor.[13]  Using the term

"Affiliate" potentially could have prevented institutional investors such as Fortress and Capital

Research Management—actual Lenders under the Credit Agreement—from acquiring the LP

Debt because of loan syndications or other interests they own or manage in their respective

funds, thereby adversely affecting the liquidity of the LP Debt in a manner contrary to the

interests of LightSquared and its Lenders.  This was ample reason for the parties to favor the use

of "subsidiary" over "Affiliate," but it does not support the construction Defendants have urged.

Thus, not only is Defendants' suggestion that the drafting history supports their

narrow reading of "subsidiary" a meaningless *ipse dixit*, the broad reading urged by Plaintiffs is

entirely consistent with the objectives of the parties to the Credit Agreement: ensuring that

competitors, broadly defined, are not allowed to enter the company's capital structure.

### C.    SPSO is Not an Eligible Assignee Because it is Ergen's *Alter Ego*, and Must be Regarded as a Natural Person

Alternatively, if SPSO is not found to be a subsidiary of DISH or EchoStar under

the definition of "Disqualified Company," and if its purchases are not imputed to DISH or

EchoStar through Ergen and Kiser, the evidence developed at trial shows that SPSO and Ergen

were *alter egos* of one another.  If SPSO is Ergen, a natural person, it is not entitled to hold the

LP Debt.

Under New York law, "[t]he law of the state of incorporation determines when

the corporate form will be disregarded . . ."  *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130,

---

shares at all, it will be considered an affiliate if it is acting as an investment adviser to an investment company (or if the other company is acting as the investor's investment adviser).

[13]    Specifically, "affiliate" is defined to include "any company that is controlled directly or indirectly, by a trust or otherwise, by or for the benefit of shareholders who beneficially or otherwise control, directly or indirectly, by trust or otherwise, the member bank or any company that controls the member bank" and "any investment fund with respect to which a member bank or affiliate thereof is an investment adviser." 12 U.S.C. § 371c (b)(1)(C)-(D).

132 (2d Cir. 1993).  Because SPSO is incorporated in Delaware, Delaware law determines whether SPSO is Ergen's *alter ego*.  In Delaware, to disregard the corporate form, a party must show that (1) the parent and the subsidiary operated as a single economic entity, and (2) "an overall element of injustice or unfairness is present."  *See MIG Invs. LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 514 (D. Del. 2012) (quoting *Trevino v. Merscorp., Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008)).

Here, SPSO and Ergen plainly operated as one economic enterprise.  SPSO was woefully undercapitalized for its purported business purpose to acquire hundreds of millions of dollars of LightSquared debt.  (FOF ¶¶ 174-76.)  The operating agreements for both SPSO and SO Holdings required that the Managing Member—ultimately Ergen—only make an initial capital contribution of ***ten dollars*** for each entity.  (*Id.* ¶ 174.)  Ergen and Ketchum readily admitted that this initial contribution to SPSO was insufficient to buy a significant amount of LP Debt, (*id.* ¶¶ 174, 177, 180, 183), and the operating agreements of SPSO and SO Holdings neither required nor enabled the entities to compel additional capital contributions from Ergen as Managing Member.  (*Id.* ¶ 175.)  Not only was Ergen the managing member; he was the only member of each entity.  Consequently, if SPSO had been unable to close any of its purchases of LP Debt, the sellers would have had no recourse against SPSO unless they could pierce the corporate veil to impose liability on Ergen directly.

In addition, Ergen only funded SPSO when it became absolutely essential that trades had to close.  (*Id.* ¶ 182.)  Each time Sound Point entered into a trade for LP Debt, Kiser would have to provide liquidity necessary to fund the purchase and would wire the funds to SPSO's accounts.  (*Id.*)  Ergen was the only person who could make the decision to transfer funds from his Bear Creek account to SPSO to settle trades.  (*Id.* ¶ 175.)

Sound Point likewise treated SPSO as nothing more than Ergen's alter ego. Although Ketchum knew that SPSO did not have sufficient funds in its accounts to cover the purchases of LP Debt prior to the closing of the trades, Ketchum did not investigate SPSO's creditworthiness because Sound Point was "comfortable" that Ergen would pay for SPSO's LP Debt purchases as "[i]t was implicit that if we executed a trade, SPSO would pay to settle the trade." (*Id.* ¶ 180.)  Further evidencing Ketchum's understanding that SPSO was indistinguishable from Ergen, Ketchum caused Sound Point to enter into a Trading Management Agreement with SPSO a month before SPSO was even formed.  (*Id.* ¶ 117.)[14]

Defendants' behavior also clearly satisfies the element of injustice or unfairness. Ergen did not create SPSO as a pure investment vehicle—the whole point of SPSO was to circumvent the transfer restrictions and to hide Ergen's identity.  There was no need for a new investment vehicle at all—Ergen had investment accounts at Bear Creek and in other places. The purpose of setting up SPSO was for Ergen to be able to represent falsely that the purchases were not on behalf of DISH, EchoStar, or their "subsidiary" and, thereby, trick third parties into selling to SPSO their interests in the LP Debt.  On December 21, 2011, at Kiser's direction, Bal Harbour Capital and its sole Managing Member and holding company Bal Harbour Holdings were set up, so that Ergen could begin to purchase LP Debt without alerting UBS and LightSquared that it was being purchased by an entity other than an "Eligible Assignee."  (*Id.* ¶ 85)  While Sound Point initially executed trades on behalf of Bal Harbour Capital, due to concerns that these trades could ultimately be linked back to Ergen or DISH through the

---

[14]     The lack of any independent significance in SPSO is underscored by the kerfluffle with Bal Harbour that preceded SPSO's formation.  Like SPSO, Bal Harbour was an assetless shell, entirely reliant on voluntary contributions from Ergen, and with no way to force those contributions to be made.  As with SPSO, the only point to Bal Harbour was to conceal the identity of the real buyer of the LP Debt, but it was deemed defective even to accomplish this one purpose, and so SPSO was formed as the "fix."  (FOF ¶¶ 85-89.)

Colorado address shown on the formation documents, Ergen and Kiser authorized the creation of SPSO.  (*Id*. ¶¶ 86, 89.)

The point of these special purpose vehicles was to hide the identity of the real buyer and circumvent a prohibition in the Credit Agreement.  The switch from Bal Harbour to SPSO itself evinces an intent to defraud.  If Ergen's use of a special purpose vehicle was not meant to deceive, the address of the entity would have been irrelevant.  This is precisely the kind of injustice and unfairness that the *alter ego* doctrine is designed to remedy.

All of this evidence—none of which was controverted at trial—proves that SPSO and Ergen are *alter egos*.  SPSO must be viewed as a natural person and, as such, is not an "Eligible Assignee" of the LP Debt.

**D.    Because SPSO is Not An Eligible Assignee, Its Claim Should Be Disallowed Pursuant to 11 U.S.C. § 502(b)**

Given that SPSO is not an Eligible Assignee under the terms of the Credit Agreement, under any (indeed all) of the theories satisfied by the record and discussed above, its claim should be disallowed in its entirety under Section 502.  Simply put, the Credit Agreement provides that a purported transferee who is not an Eligible Assignee acquires no rights under the Credit Agreement.  Having acquired no rights under the Credit Agreement, SPSO cannot assert a claim against LightSquared.

Section 10.04(a) of the Credit Agreement unambiguously states:  "Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and ***assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section*** and, to the extent expressly contemplated hereby, the other Indemnitees) ***any legal or equitable right, remedy or claim under or by reason***

*of this Agreement*."[15] (FOF ¶ 28.) (emphasis added).  This Court must disallow any claim "to the

extent that— (1) such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Because Section 10.04(a) makes clear

that SPSO has no right, remedy, or claim under the Credit Agreement, any claim asserted by

SPSO under the Credit Agreement must be disallowed.  *See U.S. Lines, Inc. v. U.S. Lines*

*Reorganization Trust*, 262 B.R. 223, 235, n.9 (S.D.N.Y. 2001) (citation omitted) (A claim may

be disallowed under Section 502(b) "[t]o the extent that applicable law, including state law,

would afford the debtor a defense to the claim of a creditor absent bankruptcy."), *aff'd sub nom.*

*In re U.S. Lines, Inc.*, 318 F.3d 432 (2d Cir. 2003).  Where—as here—a party is not an eligible

assignee under the clear terms of a contract, it cannot enforce the terms thereunder.[16]

     *Norwest Bank Minnesota NA v. E.M.V. Realty Corp.*, 943 N.Y.S.2d 113 (2d Dep't

2012), *leave to appeal dismissed*, 19 N.Y.3d 1085 (2012), is instructive here.  In *Norwest*, the

court affirmed a ruling denying the assignee of a commercial mortgage any recovery beyond its

cost basis, and reversed the lower court to the extent it allowed the assignee to recover post-

---

[15]    Defendants cannot avoid this outcome by contending that even if the assignment is invalid, they should be deemed participants entitled to claims under the Credit Agreement.  Section 10.04(d) imposes the same transfer restrictions on participations as are imposed on assignments.  Participations can be transferred *only* to Eligible Assignees.  Nor can Defendants find shelter in Sections 10.16(b) or (f).  While those provisions may stand for the general premise that the debt may not be offset by defenses or counterclaims, neither would overrule the specific provisions of Section 10.04 denying rights of any kind to an ineligible purported transferee.  SPSO will undoubtedly contend that disallowing its claim would result in a windfall for LightSquared and its other stakeholders.  That argument is both untrue and of no moment in this proceeding—the only issue is whether SPSO has a valid and enforceable claim against LightSquared.

[16]    *See, e.g.*, *In re Taranto*, No. 10-76041-ast, 2012 WL 1066300, at *8-9 (Bankr. E.D.N.Y. Mar. 27, 2012) (disallowing claim under § 502(b)(1) where the court determined claimant could not assert claim under New York law); *Cole v. Metro. Life Ins. Co.*, 708 N.Y.S.2d 789, 790 (App. Div. 2000) (finding that assignments made in contravention of contract clause containing clear prohibition language did not confer standing on wrongful assignees); *Weinman v. Morgan Stanley Senior Funding, Inc. (In re Adam Aircraft Indus. Inc.)*, Adv. No. 11-1156 MER, 2012 WL 646273, at *2-3, *5 (Bankr. D. Colo. Feb. 28, 2012) (upholding action for claim disallowance under Section 502 on motion to dismiss, where action was based on breach of the covenant of good faith and fair dealing); *Doctors Health, Inc. v. Nylcare Health Plans of the Mid-Atl., Inc. (In re Doctors Health, Inc.)*, 335 B.R. 95, 115, 118-19 (Bankr. D. Md. 2005) (disallowing creditor's claim and awarding damages where the creditor breached the implied duty of good faith and fair dealing).

default interest.  *Id.* at 115.  The court did so upon finding that the defendant's "deliberate course

of conduct" in failing to make mortgage payments in lieu of rent and repeatedly thwarting efforts

to compromise a judgment had triggered the default.  *Id.* (declining to allow "a wrongdoer . . . to

profit from his or her wrongdoing.").  Here, just as in *Norwest*, SPSO's deliberate course of

conduct warrants a reduction in its potential recovery.  Because SPSO is not an Eligible Assignee

based on either the express or implied terms of the Credit Agreement, SPSO's claims should be

disallowed under 11 U.S.C. § 502(b).[17]

## II.   SPSO ALSO BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING IMPLIED IN THE CREDIT AGREEMENT BY NEW YORK LAW

As discussed above, the Credit Agreement clearly manifests the parties' intent to

prohibit competitors from purchasing the LP Debt.  Under New York law, every contract

contains an implied covenant of good faith and fair dealing in the course of performance.  *See*

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631

(S.D.N.Y. 2010), *aff'd in relevant part*, 381 F. App'x 117 (2d Cir. 2010) ("*Cablevision*").  This

covenant encompasses a pledge that no party will take action that "will have the effect of

destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.*

(citations omitted) (internal quotation marks omitted).[18]

---

[17]     Defendants have nevertheless argued that because LightSquared is obligated to pay a proper Lender and section 10.04(a) does not use the word "void", LightSquared cannot disavow payment to SPSO.  But no provision of the Credit Agreement nor the absence of the word "void" allow SPSO to reap the benefits of its improper assignment.  Under New York law, there is "no need for the non-assignment clause to also contain talismanic language or magic words describing the effect of any attempt by the payee to make an assignment [for the assignor to have no rights under the agreement]."  *C.U. Annuity Service Corporation v. Young*, 281 A.D. 2d 292, 293 (N.Y. App. Div. 1st Dep't 2001) (holding that transfer in violation of anti-assignment clause was invalid where "[assignor] had no power to assign and [assignee] had no basis upon which to expect it could derive benefits from such a transaction"); *Singer Asset Finance Co., LLC v. Bachus*, 294 A.D. 2d 818, 820 (N.Y. App. Div. 4th Dep't 2002) (holding invalid transfer where non-assignment clause barred assignments).

[18]     SPSO has argued that the implied covenant claim is duplicative of the breach of contract claim.  (*Trial Brief of Defendants SP Special Opportunities, LLC and Charles W. Ergen*, dated Jan. 8, 2014 [Adv. Docket No. 121] at 23-24.)  This is a plain misapplication of the law.  The rule SPSO cites only instructs that "[a]

"Subterfuges and evasions violate the obligation of good faith in performance *even though the actor believes his conduct to be justified* . . . [where the actor evades] the spirit of the bargain . . . ." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981) (emphasis added); *see also InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005) (quoting Restatement). As then-Judge Cardozo explained in the seminal case of *Wood v. Lucy, Lady Duff-Gordon*, the implied covenant exists to safeguard the parties' reasonable expectations from the effects of acts that were unanticipated at the time of contracting:

> The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be instinct with an obligation, imperfectly expressed. . . . *Without an implied promise, the transaction cannot have such business efficacy, as both parties must have intended that at all events it should have.*

118 N.E. 214 (N.Y. 1917) (Cardozo, J.) (emphasis added) (internal quotations omitted); *see also Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F. Supp. 2d 356, 365 n.13 (E.D.N.Y. 2012) (quoting same). Accordingly, the scope of the implied covenant is determined objectively by the expectations of the *promisee*—here, with respect to the transfer provision, LightSquared—and encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E. 2d 496, 500-01 (N.Y. 2002) (internal quotation marks omitted); *see also Dalton v.*

---

party is . . . precluded from recovering on both theories at the same time." *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) (holding that a party may present breach of the implied covenant as an alternative theory where "the contract meaning of the contract is in doubt"). On the other hand, where—as here—"the contract meaning is yet to be determined, a party can continue in both a claim for breach of contract and one for breach of the covenant of good faith and fair dealing. . . . [T]he plaintiff is not conceptually precluded from presenting both equitable and contract theories to the fact finder." *Fantozzi v. Axsys Technologies., Inc.*, No. 07 Civ. 02667 (LMM), 2008 WL 4866054, at *7-8 (S.D.N.Y. Nov. 6, 2008). Because LightSquared asserts a single claim for recovery where the meaning of the Credit Agreement is in doubt, it may present the alternative theory of breach of the implied covenant of good faith and fair dealing.

*Educ. Testing Serv.*, 663 N.E. 2d 289, 291 (N.Y. 1995) (same). Courts routinely apply these standards to find breaches of the implied covenant in factually analogous situations and make the injured party whole.

*Cablevision* illustrates in a remarkably similar context that conduct technically "permitted" by an agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve something specifically forbidden by the agreement. *Cablevision* involved a credit agreement that prohibited lenders from assigning their positions as lenders without the consent of the borrower, Cablevision.[19] *Cablevision*, 680 F. Supp. 2d at 627. The credit agreement did not require Cablevision's consent for the sale of a participation interest in the loan. *Id.* To avoid the transfer restriction, one of the lenders purported to transfer a "participation" to a bank owned by a Cablevision competitor. *Id.* at 627-28. The transfer of the participation was undertaken without the approval of Cablevision, such approval not being required under the terms of the credit agreement. *Id.* at 627. The rights purportedly transferred with the participation, however, were, in the court's view, unusually extensive, constituting a virtual assignment of the debt. *Id.* at 632.

Judge Rakoff enjoined the transfer, finding that the lender violated the implied covenant of good faith and fair dealing by attempting, through indirect methods, to effectuate a

---

[19]    SPSO has previously attempted to distinguish *Cablevision* on the irrelevant basis that there, the bank under common ownership with the borrower's competitor bargained for non-standard provisions, whereas here SPSO used a standard form. However, the key to Judge Rakoff's holding was the strikingly similar fact that the competitor sought to acquire rights by using a vehicle as an end-run around a credit agreement, not the manner in which the end-run was sought. Nor is it of any significance to the good faith and fair dealing legal analysis that *Cablevision* was at the preliminary injunction stage, because the *legal* analysis remains intact. Courts recognize that injunctive relief and legal damages are not mutually exclusive remedies. *See, e.g., A.N. Deringer, Inc. v. Strough*, 103 F.3d 243, 246 (2d Cir. 1996) (stating that where the court imposed a preliminary injunction damages should be awarded on the same basis); *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 16 (2d Cir. 1981). In fact, the "likelihood of success" standard approaches the preponderance standard for damages. Moreover, as explained *supra,* LightSquared did not even uncover SPSO's end-run until *after* SPSO had already effectuated most of the transfers and Plaintiffs had been harmed; therefore LightSquared could not have stopped the harm, which persists to this day.

prohibited assignment the lender could not have implemented directly.  *Id.* at 631.  The court

reasoned that although the defendant's conduct was "[s]uperficially" proper, in the sense that the

transfer was in the form of a participation for which Cablevision's approval was not required, it

was nevertheless impermissible because it "effectuate[d] what is in substance a forbidden

assignment" that the transfer restrictions in the credit agreement were designed to prevent, thus

"emasculating" Cablevision's veto rights under the agreement.  *Id.* at 631, 633.  Judge Rakoff

emphasized that allowing the transfer would prevent Cablevision from excluding its competitors

from gaining access to confidential information, which was one of the benefits of its original

bargain.  *Id.* at 632.

       The parallels of *Cablevision* to the facts proven here are remarkable.  Having

asked repeatedly, and having been informed each time that DISH and EchoStar could not

purchase the LP Debt, and having been told that he could not purchase the debt himself, Ergen

and his helpers sought to do indirectly what they knew the Credit Agreement did not allow them

to do directly.  As in *Cablevision*, although the purchases by SPSO may have appeared

"superficially" permissible, those purchases, attributable to DISH and Ergen, were intended to

circumvent the Credit Agreement's restrictions on transfers to competitors.

       Other courts faced with similar attempts by parties to circumvent transfer

restrictions have enjoined transfers that violate the spirit, even if not the letter, of anti-assignment

prohibitions.  In *EIG Global Energy Partners, LLC v. TCW Asset Mgmt. Co.*, No. CV 12-7173

(CAS) (MANX), 2012 WL 5990113, at *3 (C.D. Cal. Nov. 30, 2012), for example, the LLC

agreement prohibited assignments without the consent of a supermajority of the members of the

LLC.  One member sought to sell a subsidiary that held an interest in the LLC to an investment

fund ultimately controlled by a competitor of the LLC, without submitting the sale of the

subsidiary for supermajority approval of the LLC members. *Id.* at *1. Relying on *Cablevision*, the court enjoined the proposed sale of the subsidiary at the request of another LLC member, reasoning that the sale would cause the objecting LLC member to lose the protections afforded by the supermajority consent requirement. *Id.* at *9.

Similarly, in *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd.*, 840 F. Supp. 770 (D. Or. 1993), *aff'd*, 76 F.3d 1003 (9th Cir. 1996), the court found, based on the plain language of a partnership agreement, that a sale of an interest **in a partner** impermissibly evaded a right of first refusal applicable if a partner sought to sell its interest **in the partnership.** *Id.* at 773-74. Although the right of first refusal was technically inapplicable to the sale, applying it was consistent with the purpose of the restriction, which—like the competitor restrictions in LightSquared's Credit Agreement—"is commonly used to prevent the intrusion of an uninvited outsider." *Id.* at 774-75. Thus, the sale was the precise type of "subterfuge[] and attempt[] to evade the spirit of the bargain" that falls within the "particular evils that violate the obligation of good faith in performance even though the actor believes his conduct to be justified by a strict interpretation of the contractual language." *Id.* at 775, 776.[20]

---

[20]    *See also AIG Ret. Servs., Inc. v. Altus Fin. S.A.*, 365 F. App'x 756, 759 (9th Cir. 2010) (holding that a transfer of equity to a party that was technically a "permitted transferee" under a Stockholders Agreement nonetheless breached implied covenant where transferor was aware that transferee could not lawfully obtain regulatory approval to hold the shares).   Numerous other courts have also found breaches of the implied covenant of good faith and fair dealing where a party attempts an end-run around a contractual restriction and frustrates the reasonable expectations of the promisee. *See, e.g., In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262(NBR), 2013 WL 4504769, at *21 (S.D.N.Y. Aug. 23, 2013) (finding "implied duty not to manipulate LIBOR . . . in connection with plaintiffs' explicit contractual right to receive a LIBOR-based rate."); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 409-10 (E.D.N.Y. 2012) (upholding claim for breach of implied covenant in contract between grocery cooperative and creator of a merchandising program where cooperative created a competing merchandising program, which, although not expressly prohibited, "deprived the Plaintiff of the benefits of the Agreements."); *Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 80-81, 85, 110-11 (Bankr. D. Del. 2001) (finding that shareholder would breach implied covenant in a Stockholders' Agreement and Bylaws requiring shareholders to make payments upon withdrawal from a cooperative if shareholder tendered its shares prior to withdrawal, even if not specifically identified as an event of withdrawal.).

The implied covenant of good faith and fair dealing also operates more generally to protect a promise from a party employing "stratagems" to do through an affiliate what it cannot contractually do itself. *See Standard Chartered Bank v. AWB (USA) Ltd.*, No. 05 Civ. 2013 (AKH), 2010 WL 532515, at *14 (S.D.N.Y. Feb. 16, 2010) ("[T]hat which [defendant] was contractually unable to do itself, it could not accomplish by interposing a sister company . . .  It is not a matter of piercing corporate veils. . . . It is a matter of requiring a party to a contract to honor the contract and its covenants and not attempt to defeat assigned rights by interjecting an affiliated company.").  And the implied covenant is used to prevent the intrusion of competitors on a plaintiff's rights, even where there is no express restriction in the contract. *See Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 218 (S.D.N.Y. 2007) (holding that even though dealer agreement was "silent on the issues of exclusivity and territory," term "could be fairly implied" where its exclusion would deny dealer of fruits of its agreement by allowing a competitor to operate nearby).

The same principles apply here.  Had LightSquared imagined the Chairman of the board of a direct competitor would set up an SPV to buy the debt, through the SPV, for the benefit of the competing entity, LightSquared never would have allowed that.  (FOF ¶ 247.) Indeed, once rumors began to swirl about the unknown purchaser of the debt, LightSquared acted promptly by adding DISH and other companies to the restricted list.  But the notion that Ergen would be buying ***personally*** as a means to evade the anti-competitor restriction was, not, in the words of Falcone, a possibility "in his wildest dreams." (*Id.*)  However, by virtue of SPSO holding the LP Debt, DISH and EchoStar, direct competitors of LightSquared, gained potential access to LightSquared's confidential business information and had the power to act as a lender to LightSquared, contrary to the intent of all parties.

The trial testimony of William Derrough and Mark Hootnick made clear the reasons why a corporate borrower like LightSquared would seek to prevent its competitors from infiltrating its capital structure by becoming secured lenders.  Derrough testified that competitors are not interested in maximizing value for the company, but instead seek control over the company's assets:  "[t]he general assumption is that [the] strategic got in there to own the company, to own the assets."  (*Id.* ¶ 32.)  Hootnick further explained, "the difference between [having] a Charlie Ergen DISH [invest as opposed to Icahn] is they had a very public  . . .  process where they were acquiring and amassing large spectrum blocks. . . .  [T]he large aggressive hedge fund guy at a financial return is willing to exit. . . .  [Ergen] was acquiring this not for a financial return, but to warehouse the spectrum."  (*Id.*)

Gaining control of LightSquared's assets was always Ergen's goal.  From the outset, Ergen's strategy in acquiring LP Debt was to establish a blocking position from which he could establish DISH or EchoStar as the stalking horse bidder for LightSquared's assets.  Both Kiser and Ergen testified that 33% would provide SPSO, and therefore Ergen, with a "blocking" position such that SPSO could enforce "certain rights" during the bankruptcy proceeding.  (*Id.* ¶ 96.)

Moreover, Ketchum described Ergen's initial SPV as "focused primarily on . . . loan-to-own situations" where "the loan term . . . was likely to be exchanged for equity securities."  (*Id.* ¶ 100.)  Consistent with this goal, Ergen instructed Kiser on October 4, 2012—a few months after LightSquared filed for Bankruptcy—that "[i]f we can't be sure [DISH] can buy [the LP Debt], then I am interested to increase my position at the 75 level at least up to a 33% ownership level of the class"—*i.e.*, up to a level that would establish a blocking position.  (*Id.* ¶¶ 90, 101, 154.)  In addition, at Ergen's direction, Kiser, through Sound Point, regularly monitored

43

LightSquared's bankruptcy proceedings as well as SPSO's holdings in connection with the blocking position threshold. (*Id.* ¶ 101.)  On March 28, 2013, when the blocking position was obtained, Ketchum emailed Kiser saying: "You just bought a spectrum company," and immediately thereafter emailed a colleague saying: "we now control the company."  (*Id.* ¶ 102.) Both were declarations that Ergen's true plans had come to fruition.

Courts and commentators recognize that transfer restrictions are designed to keep a capital structure free from competitor-lenders whose interests and agendas are not aligned with those of ordinary commercial lender creditors.  *See, e.g.,* Jon Kibbe, *Participations in Commercial Bank Loans*, 65 CONSUMER FIN. L.Q. REP. 272, 273 (2011) ("A current trend is to specifically exclude a borrower's 'competitors' from the definition of 'eligible assignee.'  This exclusion is often based on the rationale that a borrower's competitors should not have access to the borrower's confidential information or the right to vote on key economic issues arising under a borrower's credit agreement"); 12 Fletcher Cyc. Corp. § 5454 (2013) ("[T]ransfer restrictions . . . typically serve as an important device to . . . prevent outsiders from 'invading the business.'"); *Tu-Vu Drive-In Corp. v. Ashkins*, 287, 391 P.2d 828, 830 (Cal. 1964) (transfer restrictions necessary to protect against "rivals in business or others who might purchase its shares for the purpose of acquiring information which might thereafter be used against the interests of the company").  As previously noted, given the substantial access to confidential information that such competitor-lenders would have here, this general concern is heightened.

Moreover, being a Lender under the Credit Agreement provides a right to vote on certain material matters, including waivers, exercises of remedies and other similar matters.  The parties could reasonably expect that a competitor with an interest in seeing LightSquared fail or be liquidated would take a different view than a non-competitor lender.  Again, as noted earlier,

this problem is not just hypothetical.  On May 4, 2012, after agreeing to purchase $247 million of

the LP Debt from Carl Icahn, Ergen was presented with the option of directing the seller's vote

with respect to a proposed forbearance from enforcing remedies under the Credit Agreement,

which would have allowed LightSquared to continue ongoing negotiations with its creditors and

potentially avoid a bankruptcy filing.  Ergen was informed that, absent contrary instructions,

Icahn, who was still owner of record, intended to vote in favor of the forbearance.  But Ergen

was eager to have DISH get its hands on LightSquared's spectrum assets, and, with that unique

competitor's perspective, issued instructions to vote against the forbearance, so as to force a

bankruptcy and accelerate a possible sale of the spectrum.  When Kiser wrote to Ergen on May

4, 2012, "[t]he seller is inclined to vote to approve this one-week extension of time to continue

negotiations, and so if the buyer does not direct the seller to the contrary, that is how the seller

will vote,"  Ergen replied:  "I would have them vote no."  (FOF ¶ 97.)  And that direction to vote

"no" was communicated by Sound Point.  (*Id.*)[21]

This is exactly the type of harm that the Lenders and LightSquared reasonably

sought to avoid in agreeing to exclude competitors, and that the implied covenant of good faith

and fair dealing is intended to address.  Ergen's use of SPSO to evade the terms of the Credit

Agreement that prevented him, DISH, and EchoStar from buying the LP Debt therefore deprived

LightSquared of the fruits of those restrictions, regardless of whether Ergen believed his actions

were justified.  As a result of SPSO's attempted end-run, LightSquared now has a competitor in

its capital structure, which has eviscerated the very protections it bargained for.

---

[21]    Defendants have suggested that the reason Ergen voted 'no' on the forbearance was because he had not
seen the proposed amendment.  This fairy tale cannot be reconciled with either the fact that neither Ergen
nor anyone acting on his behalf made any effort to speak with another Lender about the terms of the
proposed forbearance or the evidence showing that Sound Point had access to the proposed amendment and
was in the position to provide it to Ergen long before the voting deadline.  (*Id.* ¶ 98-99.)  When confronted
with this evidence at trial, all Ergen could do was throw Kiser, the "friend" he trusted to execute his trades
in LightSquared debt, under the bus and express his disappointment.  (*Id.*)

SPSO's breach of the covenant of good faith and fair dealing is a breach of contract no less severe and consequential than its breach of Section 10.04 of the Credit Agreement, and the appropriate remedies—claim disallowance, subordination and damages—are equally warranted.

## III.    DEFENDANTS' MISCONDUCT HARMED LIGHTSQUARED

LightSquared has suffered significant harm as a result of Defendants' conduct, which was Ergen's goal.  Ergen's plan all along—by purchasing the LP Debt, obtaining a blocking position and concealing his misdeeds—was to sow confusion and have the bankruptcy process collapse, so that he could swoop in and pick up the pieces.  Significantly, in Ergen's May 2013 presentation to the DISH and EchoStar Boards, he proposed to submit the LBAC Bid before LightSquared's marketing efforts began.  At that time he informed the Boards of DISH and EchoStar that his "substantial interests in L2 debt and preferred stock compliment[sic] any acquisition strategy and could have significant influence in L2's chapter 11 cases."

As recognized in *Cablevision*, a plaintiff suffers harm *per se* when its competitor infiltrates its capital structure if the competitor would have rights to direct its affairs or have access to confidential information about the plaintiff's business.  *Cablevision*, 680 F. Supp. 2d at 628, 633; *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 818 (2d Cir. 1979) (irreparable harm where "[defendant] would have access to the confidential trade information of one of its leading competitors, including its marketing, pricing, advertising, and new product plans…"); *see also EIG*, 2012 WL 5990113, at *8-9 (defendant-competitor's access to confidential information in violation of agreement contributed to irreparable harm finding); *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 113-14 (Del. Ch. 2006) (finding harm from breach of transfer provisions in LLC agreement by granting control and security interest to conflicted party).

46

In addition, Derrough, Hootnick, Smith, and Falcone identified a number of harms that Defendants LP Debt purchases caused to LightSquared. *First*, SPSO's purchases of the LP Debt, its failure to close trades timely, and its refusal to identify itself interfered with LightSquared's negotiations with its stakeholders throughout the bankruptcy proceedings, especially during LightSquared's exclusive period to file a plan. This was because LightSquared could not identify with whom to negotiate, as it became unclear whether the Ad Hoc Secured Group had sufficient holdings to carry a class such that it could enter into a binding commitment with respect to a consensual plan, as different members of the group sold their interests to SPSO. (FOF ¶¶ 209-13, 221-26.) As Falcone testified, being unable to determine if LightSquared's largest creditor is "either with you or against you, it's kind of tough to cut a deal. So it kind of defeats the whole purpose." (*Id.* ¶ 212.) For example, after SPSO purchased debt owned by two investors, both entities immediately withdrew from plan negotiations. (*Id.* ¶ 210.) As noted in an April 18, 2013 meeting of the LightSquared Board of Directors, LightSquared's CFO, Marc Montagner, reported that LightSquared had met with several large holders of the LP Debt to explore ideas for a consensual plan of reorganization. However, "further discussions were halted after Sound Point agreed to purchase the LP preferred stock from these investors." (*Id.*)

*Second,* the combination of Ergen's blocking position in LP Debt and his offer to purchase LightSquared through LBAC torpedoed LightSquared's efforts to reorganize through investments from strategic partners or a robust auction for LightSquared's assets. As Derrough testified, the presence of a competitor that owns a blocking position or a position of significant influence in a capital structure chills a debtor's sales process by dissuading potential bidders from participating in a debtor's sales because those potential bidders believe that the competitor

has an unfair advantage. (*Id.* ¶¶ 215, 231-32.)  Ergen's blocking position did in fact create such a

chilling effect.

Hootnick testified that in May 2013, Moelis contacted over ninety parties to

discuss joint ventures or strategic partnerships with LightSquared.   (*Id.* ¶ 216.)  During meetings

with Sprint, AT&T, and T-Mobile, "one of the main reactions was doesn't Charlie already own

this." (*Id.* ¶ 217.)  As Hootnick explained, the strategics were also concerned that Ergen was not

involved in LightSquared for a "financial return," as a typical lender would be, but was more

interested in warehousing LightSquared's spectrum assets for DISH which, in Derrough's

opinion, would be perceived to be willing to bid more aggressively for LightSquared's assets.

(*Id.* ¶  32.)  By June 2013, in Hootnick's view "the ad hoc group changes ha[d] chilled"

LightSquared's ability to pursue financing and engage in productive discussions with strategics.

(*Id.* 220.)  Hootnick received the same message from strategics when he contacted them to

encourage them to participate in LightSquared's auction later in the year.  (*Id.* ¶¶ 216-17.)

Similarly, Smith, LightSquared's CEO, testified that he attended meetings with Sprint, AT&T,

T-Mobile, and Verizon in May and June 2013. (*Id.* ¶ 218.)  In each of those meeting, the

strategics questioned whether they should get involved in LightSquared in light of Ergen's

blocking position and the LBAC Bid.  (*Id.*¶ 217-19.)  The end result was an unsuccessful capital

raise and a limited number of potential bidders at LightSquared's sales process.

*Third*, SPSO's improper LP Debt purchases have derailed these Chapter 11 Cases

and caused LightSquared to incur significant additional costs.  With the Exclusivity Stipulation,

the parties, under this Court's supervision, developed an orderly process to resolve these Chapter

11 Cases:  (i) LightSquared and its stakeholders would have a limited amount of time to continue

negotiating a consensual plan of reorganization while LightSquared resolved its FCC regulatory

issues, or, failing that, (ii) LightSquared would commence a sales process.  SPSO's involvement

prevented this process from unfolding as the parties intended.  As discussed above, SPSO's

purchases of LP Debt, illicit delays in trade closings, and concealment of its true identity

deprived LightSquared of the opportunity to negotiate fully with its stakeholders.  SPSO's

involvement also chilled bidding at the auction, resulting in a process that would not maximize

value for LightSquared's estates.  The upshot is that SPSO caused the Court-designed process to

fail, while costing LightSquared significant sums in interest expense, administrative costs, and

costs to prosecute this very Adversary Proceeding against SPSO and its allies.  LightSquared

should be compensated for all of these harms.

Defendants' primary response to the disruption and harm they have caused has

been to blame the victims, contending that LightSquared knew as early as May 2012 that Ergen

was behind the LP Debt purchases but did nothing to stop him.  As a result, according to

Defendants, it would be inequitable for LightSquared now to challenge the trades and recover for

its harm.  On its face, Defendants' contention that "LightSquared knew" is problematic given all

the steps that Ergen and his helpers took to dissociate SPSO from Ergen and conceal his

involvement, including the "more strenuous strategy around denial" Ergen and his helpers sought

to employ with the press.  (*Id.* ¶ 93.)  A court will reject a defendant's defense of laches where

defendant has contributed to the delay in taking action.  *Clarke v. Commc'ns Workers of Am.*,

318 F. Supp. 2d 48, 58 (E.D.N.Y. 2004) (rejecting laches defense where defendants own delay

was "inexcusable" and left it with "unclean hands.")

Moreover, the evidence adduced at trial simply does not support a claim that

LightSquared knew Ergen was behind SPSO.  LightSquared and its advisors and Harbinger and

its advisors made repeated efforts to identify the ultimate beneficiary of Sound Point's purchases,

to no avail:

- LightSquared's Treasurer, Kurt Haufler, reached out to UBS, the Administrative Agent. (FOF ¶ 250.) Haufler was unable to confirm through UBS who was behind Sound Point.

- LightSquared's CFO, Marc Montagner, who knew Ketchum from past experience, attempted to contact Ketchum by phone on multiple occasions. Ketchum admitted that he intentionally avoided speaking with Montagner, only returning one call at an "odd hour" to ensure they would not speak. (*Id.* ¶ 252.)

- Stan Holtz and Hootnick (of Moelis) met with Ketchum several times, but Ketchum refused to identify Sound Point's investors in the LP Debt.

- Hootnick even reached out to Ergen's counsel (whom he knew had represented Ergen in the TerreStar bankruptcy) in more than six phone calls and multiple lunch meetings, but she would not confirm whether Ergen was involved. (*Id.* ¶ 256.)

- Falcone instructed Harbinger employees and its advisors at Lazard to gather information to determine the ultimate purchaser of the LP Debt, but they were unsuccessful in these efforts. (*Id.* ¶ 249.)

- Falcone also reached out to members of the press, industry experts, and even Cullen of DISH to confirm the identity of the purchaser of the LP Debt, with no success. (*Id.* ¶ 257.)

Throughout the trading period, press reports speculated that everyone from Carlos Slim to

members of the Dolan family were behind the LP Debt purchases. At no time were

LightSquared, its advisors, or anyone at Harbinger able to learn the identity of the person behind

SPSO until SPSO's counsel confirmed it on May 21, 2013. Even if there was a legal basis to

argue laches, estoppel, or waiver, which there is not, the factual record conclusively defeats it.

*Rosenzweig v. Givens*, 62 A.D.3d 1, 7 (1st Dep't 2009); *Maxim Group LLC v. Life Partners*

*Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y. 2010).

## IV.    LIGHTSQUARED IS ENTITLED TO ADDITIONAL REMEDIES

As discussed in Section I(D) above, because, *inter alia*, SPSO is not an Eligible Assignee under the Credit Agreement, its claim should be disallowed pursuant to 11 U.S.C. § 502(b) in whole, or at least in substantial part.  To the extent, however, that SPSO is allowed any claim against LightSquared, LightSquared is entitled to each of the remedies set forth below.

### A.    SPSO's Claims Against the Bankruptcy Estates Should be Equitably Subordinated, Pursuant to Section 11 U.S.C. § 510(c) of the Bankruptcy Code

Bankruptcy courts are courts of equity and it is well settled that they are "empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."  *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also Pepper v. Litton*, 308 U.S. 295, 304-05 (1939); *In re Global Western Dev. Corp.*, 759 F.2d 724, 727 (9th Cir. 1985).

The Court's broad equity powers include the remedy of equitable subordination codified in Section 510(c) of the Bankruptcy Code.  *Machinery Rental, Inc. v. Herpel* (*In re Multiponics, Inc.*), 622 F.2d 709, 713 (5th Cir. 1980);  *In re Bentley-Russell, Inc.*, 201 B.R. 354, 355 (Bankr. W.D.N.Y. 1996) (holding "[t]he subordination of claims has long been recognized as an appropriate exercise of the equitable powers of bankruptcy") (citation omitted).  Section 510(c) provides, in relevant part, that the court may "(1) . . . subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C.A § 510(c).  *See also Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003) (The bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate.)

51

(internal quotation marks and citations omitted).   Courts have not been reluctant, in a proper

case, to invoke 510(c) to equitably subordinate a secured creditor's claim and "strip" his lien.

*See, e.g.*, *Winstar Commc'ns.*, 554 F.3d 382; *Estes v. N&D Props.*, *Inc.* (*In re N & D Properties,*

*Inc.*), 799 F.2d 726 (11th Cir. 1986); *see also* 4-510 COLLIER ON BANKRUPTCY ¶ 510.05 ("Under

subsection (c)(2), when a claim that is subordinated is secured by a lien, the lien is transferred to

the debtor's estate under Section 541.   In essence, the subordinated claim becomes unsecured

and the property securing such claim becomes part of the debtor's estate").

Consistent with their broad equity powers, bankruptcy courts have employed the

remedy of equitable subordination as a means to "rearrange the priorities of creditors' interests,

and to place all or part of the wrongdoer's claim in an inferior status."   *Capitol Bank & Trust Co.*

*v. 604 Columbus Ave. Realty Trust* (*In re 604 Columbus Ave. Realty Trust*), 968 F.2d 1332, 1353

(1st Cir. 1992); *First Nat'l Bank of Gatlinburg v. Charles Blalock & Sons, Inc.* (*In re Just for the*

*Fun of It of Tennessee, Inc.*), 7 B.R. 166, 180-81 (Bankr. E.D. Tenn. 1980); *In re McFarlin's,*

*Inc.*, 49 B.R. 550, 554 (Bankr. W.D.N.Y. 1985).

In *In re Mobile Steel Corp.*, the Fifth Circuit articulated three-prong test for

determining whether equitable subordination is warranted: (1) the claimant must have engaged in

some type of inequitable conduct; (2) the inequitable conduct must have caused injury to the

creditors of the bankruptcy or conferred an unfair advantage on the claimant, and (3) application

of the remedy of equitable subordination must be consistent with the provisions of the

Bankruptcy Code.   563 F.2d 692, 700 (5th Cir. 1977).   Courts in the Southern District of New

York have adopted and follow the *Mobile Steel* test.   *See Coleman Clearing Corp. v. Siclari* (*In*

*re Adler, Coleman Clearing Corp.*), 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).

1.    **SPSO Engaged in Inequitable Conduct**

Inequitable conduct supporting equitable subordination includes fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of other duties that arise in law. *See, e.g., In re Lois/USA, Inc.*, 264 B.R. 69 (Bankr. S.D.N.Y. 2001) (equitable subordination claim against a non-insider could be supported by showing fraud, illegality or breach of some other legal duty owed by non-insider to debtor or other creditors, ***including breach of the implied covenant of good faith and fair dealing***) (emphasis added); *In re Cutty's-Gurnee, Inc.*, 133 B.R. 934, 959 (Bankr. N.D. Ill. 1991) ("Equity dictates that negligence or the failure to act may also constitute grounds for subordination."); *In re Kelton Motors Inc.*, 121 B.R. 166, 190-92 (Bankr. D. Vt. 1990) (noting equitable subordination claim may stand even in absence of fraud); *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1361 (1st Cir. 1992) (explaining that fraud or misrepresentation is not required for an equitable subordination claim). Thus, the court in *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 44 (Bankr. E.D.N.Y. 2006), considering, *inter alia*, a claim for equitable subordination, remarked that "a non-insider or non-fiduciary creditor's actions will be deemed inequitable if that creditor…has breached '***an existing, legally recognized duty arising under contract***, tort or other area of law.'" (emphasis added). *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1362 (1st Cir. 1992) (finding non-insider claimant's actions rose to the level of inequitable conduct because they constituted a "substantial breach of the loan agreements."); *In re Sepco, Inc.*, 36 B.R. 279, 286 (Bankr. D.S.D. 1984) (equitably subordinating non-insider creditor who concealed ramifications of a clause in a contract).

Courts granting equitable subordination have routinely found inequitable conduct in connection with contractual obligations. *See*, *e.g.*, *In re Model Imperial, Inc.,* 250 BR 776 at 804-05 (Bankr. S.D. Fla. 2000) (creditor's creation of a ***scheme to circumvent contract***

*restrictions* satisfied the inequitable conduct element for equitable subordination) (emphasis added); *In re Cutty's-Gurnee*, 133 B.R. 934 (Bankr. N.D. Ill 1991) (holding equitable subordination of a non-insider creditor's claim appropriate where there was actual notice of the plaintiff's *rights under a restructuring agreement* and defendant disregarded those rights) (emphasis added).

SPSO's inequitable conduct is palpable and long-running. As has been described at length, SPSO was formed for the sole purpose of concealing the fact that Ergen, DISH and EchoStar were behind its purchases of LP Debt. Indeed, SPSO was formed only after it became clear that the transfer restrictions in the Credit Agreement precluded DISH, EchoStar and Ergen from buying LP Debt, for the specific purpose of evading those contractual restrictions—every bit the sort of scheme punished in *Model Imperial*. In furtherance of this deception, SPSO repeatedly misrepresented, in every Assignment and Assumption that it executed to consummate a purchase of LP Debt, that it was an Eligible Assignee. These are willful breaches of the Credit Agreement, and readily support application of equitable subordination.

SPSO's inequitable conduct was not limited to the misrepresentations and breaches relating to its falsely claimed status as an Eligible Assignee under the Credit Agreement. On May 4, 2012, acting to advance the interests of LightSquared's competitors DISH and EchoStar, SPSO took action to defeat a mere one-week forbearance that would have allowed negotiations among LightSquared and its Lenders to continue. The Sound Point personnel (other than Ketchum), who were not initially aware of Ergen's objectives, were surprised that SPSO would vote to precipitate a bankruptcy filing. (FOF ¶ 97.) But SPSO and its allies wanted a bankruptcy so they could force a sale of the spectrum.

SPSO caused chaos and uncertainty among LightSquared and its Lenders by purposely "hanging" trades for three and four months, and longer, making it difficult, and at times impossible, for LightSquared to pursue negotiation of a consensual plan of reorganization. As the period of LightSquared's exclusive right to file a plan wound down, LightSquared could not identify the creditors with whom it needed to negotiate. (*See* Point III, *supra*; FOF ¶¶ 212-13.) Ergen's belatedly concocted excuse that he refused to close trades timely so he could earn interest on his trust fund money in Bear Creek does not align with reality. The bank statements that Bear Creek produced show that Ergen earned a miniscule rate of interest on the funds in his trust accounts. (FOF ¶ 193.) And when the absurdity of their contention was made clear, Ergen and Kiser sought at trial to falsely blame Ketchum—who simply followed their instructions—for the delays. The only inference plausibly supported by the evidence is that Ergen and SPSO deliberately delayed closing trades to disrupt LightSquared's negotiations with its lenders.

SPSO and Ergen also targeted LightSquared's attempts to raise capital to support a plan of reorganization. As LightSquared was about to begin its long-planned roadshow, Ergen announced an unsolicited bid for LightSquared's spectrum assets by the yet-to-be formed LBAC and, one week later, disclosed that he owned SPSO, which, by then, held a blocking position in the LP Debt. (*Id.* ¶ 160.) As set forth above, the effect on LightSquared's efforts to raise new capital was crippling. SPSO then joined the Ad Hoc Secured Group and offered the LBAC bid (after selling LBAC to DISH for $1) as the stalking horse bid in the Ad Hoc Group's plan of reorganization, pursued in opposition to LightSquared's plan. And, after the LBAC bid and the Ad Hoc Group's plan of reorganization had effectively torpedoed LightSquared's planned auction for its spectrum assets, DISH withdrew its bid, leaving still more uncertainty and confusion. (*Id.* ¶ 232.) In a very real way, nearly all of 2013 was lost to Debtors and the

Lenders because of the deception and mischief visited on them by SPSO and the other

Defendants.

> ### 2.        As *Papercraft* Makes Clear, the Inequitable Conduct Injured Other Creditors and Conferred an Unfair Advantage on SPSO

The second prong of the *Mobile Steel* test requires that the creditor's misconduct

result in injury to the creditors of the bankruptcy estate or confer an unfair advantage on the

claimant. *Mobile Steel*, 563 F.2d at 700. When evaluating this prong, courts have held that it is

sufficient to allege that general unsecured creditors are less likely to collect their debts as a result

of the alleged inequitable conduct. *Monahan*, 340 B.R. at 45; *KDI Holdings*, 277 B.R. at

509. Moreover, "[i]f the misconduct results in harm to the entire creditor body, the trustee need

not identify the injured creditors or quantify their injury, but need only show that the creditors

were harmed in some general, concrete manner." *Monahan*, 340 B.R. at 45. Furthermore, where

the creditor employs a scheme to violate contract covenants, a creditor may gain an unfair

advantage over other creditors resulting in harm. *See Model Imperial, Inc.*, 250 B.R. at 804

("Nonetheless, as detailed herein, Hamilton facilitated Model's scheme to borrow money in

derogation of the Bank Group's rights, thereby giving Hamilton an unfair advantage.").

The decision in *In re Papercraft Corp.*, CIV.A. 00-2181, 2002 WL 34702177

(W.D. Pa. Feb. 20, 2002), *aff'd sub nom.*, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors

Holding Unsecured Claims*, 323 F.3d 228 (3d Cir. 2003) ("*Papercraft*") provides a template for

assessing the existence of unfair advantage and injury here, and its findings of injury—inflicted

in multiple ways and warranting equitable subordination—could almost have been written

specifically for this case.

First, *Papercraft* recognized that a creditor who wrongfully acquires claims—in

that case, in breach of an insider's fiduciary duty; here by virtue of misrepresentation and breach

of contract—is not permitted to profit from his actions.  Accordingly, the *Papercraft* court began

by holding that the creditor's misconduct in wrongfully acquiring the claims justified equitable

subordination to ensure that, in the **best** case, the wrongdoing creditor recovered no more than

what it had paid to acquire the claims.  *Papercraft,* 2002 WL 34702177, at *5-7.

        Importantly, *Papercraft* recognized that the wrongdoer's treatment under a plan

of reorganization should be fully subordinated to other clams if his actions caused particular

injuries to the other creditors or the debtor's estate.  *Papercraft* identified three categories of

harm that creditors may suffer that warrant such subordinated treatment: (i) interference by the

wrongdoer with the debtor's negotiations with its constituents regarding a plan of reorganization,

(ii) delays in the confirmation process attributable to the wrongdoer's conduct, thus increasing

the amount of time that the creditors must wait to recover on their claims and potentially

reducing that recovery because of increased costs incurred in a prolonged bankruptcy

proceeding, and (iii) the incurrence by the estate of additional administrative expenses to

prosecute an adversary proceeding against the wrongdoer.  *Id.* at *10-11, 17, 23.

        Similarly, courts have recognized that creditors are harmed when there is a delay

in receiving payment under a plan, a disruption in the orderly determination of a claim, and/or

uncertainty whether a plan can be implemented under current market conditions.  *In re Calpine

Corp.*, 2007 Bankr. LEXIS 3420, at *5 (Bankr. S.D.N.Y. Oct. 4, 2007) (balancing of harms

favored creditors where continued delay could jeopardize debtors' ability to obtain same amount

of exit financing required for plan or obtain similar financing terms under current market

conditions); *In re Pub. Serv. Co. of N. H.*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("the delay

caused to creditors receiving their payments is . . . a significant harm"); *In re Fairmont

Commc'ns Corp.*, 1993 WL 428710, at *4 (Bankr. S.D.N.Y. Oct. 12, 1993) ("delay caused to

creditors receiving their payment is also a significant harm warranting denial of a stay."); *In re Gercke*, 122 B.R. 621, 626 (Bankr. D.C. 1991) (recognizing harm to estate and resultant harm to creditors from disruption of an orderly determination of claims).

The harms to creditors noted in *Papercraft* are the exact harms that LightSquared's creditors have suffered at the hands of SPSO and its allies in this case. As shown in Point III, the proof of injury in *each* of the *Papercraft* categories is overwhelming. Indeed, the facts here are even more compelling. As Smith, Derrough, Hootnick, and Falcone all testified at length, SPSO's purchases of the debt, in both their timing and their clandestine nature, severely prejudiced LightSquared's ability to negotiate a plan of reorganization. (FOF ¶¶ 206, 208-13.) Hootnick and Falcone both testified that negotiations with creditors broke down and it became impossible to identify with whom to negotiate a consensual plan of reorganization as different stakeholders sold their positions to SPSO. (*Id.*) As set forth in Point III, *supra*, discussions with preferred holders were also impacted by SPSO's attempt, albeit unsuccessful, to purchase the LP preferred stock from other stakeholders because they became wary that an "activist lender" would harm their interests. (*Id.* ¶ 211.) For instance, on April 11, 2013, a holder of LP preferred shares expressed concerns to Montagner, stating: "[w]e've been lenders and pref holders since original issue and are inclined to see this through to the end, but are cautious of potential adverse actions by this alleged activist lender." (*Id.*)

This problem was exacerbated when LBAC submitted a bid for LightSquared's assets and SPSO joined the Ad Hoc Secured Group. On May 24, 2013—just prior to SPSO's joining the Ad Hoc Secured Group—the parties exchanged a term sheet that envisioned that SPSO would receive a full cash recovery while non-SPSO lenders would receive cash recovery and warrants. (*Id.* ¶ 224.) However, once SPSO joined it, the Ad Hoc Secured Group

increasingly pushed for a sale of LightSquared's assets to LBAC.  (*Id.*)  Indeed, as the parties'

contemporaneous writings unambiguously show, the presence of SPSO frustrated the negotiation

efforts.  (*Id.* ¶¶ 225-26.)  SPSO's involvement in the formulation of a competing plan of

reorganization finds a direct parallel in *Papercraft*, which specifically cited the wrongdoer's

competing plan as grounds for equitable subordination.  As discussed earlier, the conveniently

timed confluence of the announcement of the unsolicited LBAC bid followed by Ergen's

disclosure that he owned SPSO, put paid to LightSquared's efforts, with the assistance of

Jefferies, to raise capital to fund the Debtors' plan of reorganization.

      As was the case in *Papercraft*, SPSO's involvement caused significant delays in

the Chapter 11 Cases and uncertainty about the creditors' ability to receive a full payout on their

claims, particularly after LBAC withdrew its stalking horse bid on January 10, 2014.  Indeed, as

a result of the delays in the bankruptcy schedule occasioned by SPSO's involvement in the

proceedings—including as a result of the Adversary Proceeding and the extended negotiations

that LightSquared had to have with its creditors anew—LightSquared has incurred significant

costs, including added interest expense and professional fees, and there has been a delay in

distributions to LightSquared's creditors.

      And, finally, as in *Papercraft*, LightSquared has suffered significant economic

harm in the form of the costs and distraction arising from seeking redress for Defendants'

conduct through this Adversary Proceeding.  Thus, all three types of additional injury recognized

in *Papercraft* are present here, and equitable subordination of SPSO's entire claim is warranted.

### 3.  Equitable Subordination Is Consistent With the Bankruptcy Code

      The final prong of the *Mobile Steel* test requires that the imposition of equitable

subordination not be inconsistent with the provisions of the Bankruptcy Code.  *Mobile Steel*, 563

F.2d at 700.  This element is perhaps the easiest to satisfy because it is "likely to be moot" given

the fact that the Bankruptcy Code now expressly authorizes the remedy of equitable

subordination under Section 510(c).  *KDI Holdings*, 277 B.R. at 509.  Subordinating SPSO's

claims does not run counter to any provisions of the Bankruptcy Code.  *In re Ticketplanet.com*,

313 B.R. 46, 66 (Bankr. S.D.N.Y. 2004) (finding the third prong of *Mobile Steel* did not

"undercut" its equitable subordination determination because "bankruptcy policy is not furthered

where creditors are permitted to use inequitable means to further their recovery."); *In re Cutty's-*

*Gurnee*, 133 B.R. at 959-60 (holding that "such equitable subordination is not inconsistent with

other provisions of the Bankruptcy Code" and operates to "produce[] . . . equitable result[s].").

Hence, equitable subordination is an apt remedy.

        If this Court does not grant disallowance of SPSO's claim, equitable

subordination is the only remedy that can alleviate some of the harm suffered by LightSquared

and its creditors caused by having a competitor in the capital structure.[22]  SPSO acted inequitably

by circumventing restrictions in the Credit Agreement that were intended to keep competitors

from having control or access to LightSquared.  As a result, SPSO's position in LightSquared's

capital structure made reorganization significantly more difficult to achieve.  First, SPSO's

involvement and subsequent joining in the Ad Hoc Secured Group interfered with negotiations

between LightSquared and a significant creditor group.  (FOF ¶¶ 225-27.)  Second, SPSO

foreclosed the Ad Hoc secured group from further negotiations with LightSquared and all other

parties through the Plan Support Agreement ("PSA").  (*Id.* ¶¶ 228-30.)[23]  Equitable

---

[22]    *See In re Cutty's-Gurnee, Inc.*, 133 B.R. 934, 961-62 (Bankr. N.D. Ill. 1991) ("It may appear a harsh
        remedy to remove Great American's first priority of record, but when such position was obtained by
        deliberate disregard of [an agreement], it is not inequitable to place Great American in the position it would
        have been in if the MorAmerica mortgage had been fully concluded.")

[23]    That SPSO was the catalyst that negatively impacted the reorganization negotiations is made clear by the
        fact that once the PSA restrictions were lifted, negotiations between the parties were restored and within a
        short time new reorganization options were on the table.

subordination would permit LightSquared to provide SPSO with treatment different from other creditors holding LP debt and limit SPSO's rights, access and control over reorganized LightSquared.  This remedy—which could still provide for payment in full of SPSO's claim—would provide LightSquared and its other creditors with relief that is proportional to SPSO's inequitable conduct.

Here, under the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code [Docket No. 1308] ("Third Amended Plan"), LightSquared seeks to place SPSO in its own class of creditors that will receive a replacement promissory note (and third lien on LightSquared's assets if SPSO votes in favor of the Plan), and would earn interest at a rate higher than that earned by all other lenders in the reorganized entity.  (Third Amended Plan § Article I.A. 300-303; Article III.B.8.)  This treatment would provide SPSO full payment (to the extent of its allowable claim) in a shorter amount of time than other classes of creditors—the higher in priority second lien holders who would be investing new money in LightSquared.  (*Id.; Notice of Filing Plan Supplement Documents for Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*, dated Feb. 17, 2014 [Docket No. 1312])[24]

---

[24]    SPSO argues that Plaintiffs are not entitled to equitable subordination because LightSquared sought to obtain a benefit from the open trades.  (*Trial Brief of Defendants SP Special Opportunities, LLC and Charles W. Ergen*, dated January 8, 2014 [Docket No. 121]) at 34-36.)  Even if this were true—and the evidence shows that it is not—LightSquared's actions have no bearing on whether SPSO's claim should be equitably subordinated.   To the contrary, subject to limited exceptions, "[c]ourts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code."  *In re Auto. Professionals, Inc.*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008).  With respect to "equitable subordination, [the test] focuses only on the actions of guilty creditors and the resulting impact on innocent creditors."  *Id.* at 260.  "Inequitable conduct by the debtor is noticeably absent from the list of relevant considerations."  *Id.*  Thus, consideration of the debtor's conduct, as opposed to the guilty creditor, and allowing the unclean hands defense "would be inconsistent with the traditional test for equitable subordination, the substantial case law allowing subordination despite debtors' participation in wrongdoing, and the purpose of equitable subordination. *Id.*; *accord In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors."), *aff'd*, 493 F.3d 82 (2d Cir. 2007).

**E.    LightSquared Would Be Entitled to The Additional Remedy of Vote
Designation Under its Plan of Reorganization**

In addition to equitable subordination of SPSO's claims (to the extent such claims
are allowable) to the class designated in LightSquared's Third Amended Plan.  LightSquared will
likely seek further relief pursuant to 11 U.S.C.A § 1126(e) to designate SPSO's vote in favor of
LightSquared's plan in the event SPSO votes against the plan.

A bankruptcy court may designate the votes of "any entity whose acceptance or
rejection of [a] plan was not in good faith."  11 U.S.C.A § 1126(e); *DBSD,* 634 F.3d at 101.
"Section 1126(e) comes into play when voters venture beyond mere self-interested promotion of
their claims.  The section was intended to apply to persons and entities acting in bad faith and
seeking to obtain "some benefit ***to which they were not entitled***." *DBSD*, 634 F.3d at 102
(citations and internal quotation marks omitted) (emphasis added).

For example, in *DBSD*, DISH's bad faith conduct in connection with its purchase
of the assets of DBSD North America led to designation of its votes.  *See id.* at 104. There,
"DISH, although not a creditor of DBSD [(the debtor)] before its filing, had purchased the claims
of various creditors with an eye toward DBSD's spectrum rights." *Id.* at 87.  After the debtor
filed its plan disclosure, DISH purchased all of DBSD's first lien debt and a portion of the
second lien debt. *Id.*  DISH did so "not just to acquire a 'market piece of paper' but also to 'be in
a position to take advantage of [its claim] if things didn't go well in a restructuring.'" *Id.*

After DISH voted against the plan, DBSD moved pursuant to 11 U.S.C. §1126(e)
for a determination that DISH's "rejection of [the] plan was not in good faith." *Id.*  The
bankruptcy court agreed, and found that DISH, as a competitor to DSDB, was voting against the
plan "not as a traditional creditor seeking to maximize its return on the debt it holds, but . . . 'to
establish control over this strategic asset." *Id.* at 87-88.  The bankruptcy court therefore

designated DISH's vote and deemed DISH's wholly-owned class of First Lien Debt as an

accepting class for the purposes of determining plan acceptance.  *Id.* at 88.  Both the district

court and the Second Circuit affirmed this determination.  *Id.*  In affirming, the Second Circuit

held that a creditor's vote may properly be designated where "***a competitor bought claims with***

***the intent of voting against any plan that did not give it a strategic interest in the reorganized***

***company***."  *Id.* at 104 (emphasis added).  The court noted that "[i]n effect, DISH purchased the

claims as votes it could use as levers to bend the bankruptcy process toward its own strategic

objective of acquiring DBSD's spectrum rights, not toward protecting its claim."  *Id.*  This, the

court held, was a circumstance that called for designation, especially where the purchaser of the

debt "was less interested in maximizing the return on its claim than in diverting the progress of

the proceedings to achieve an outside benefit."  *Id.*  The court further noted that its ruling

"should deter . . . attempts to '*obtain* a blocking position' and thereby 'control the bankruptcy

process for [a] potentially strategic asset.'"  *Id.* at 105 (emphasis in original).

        The present case is on all fours with *DBSD*, strikingly enough, with even the

same bad actor.  SPSO purchased the LP Debt not as a traditional creditor seeking to maximize

its return on distressed debt, but rather, to obtain control over the debtor's spectrum assets for

DISH and EchoStar.  In the same manner as DISH in *DBSD*, SPSO, acting at the behest of

DISH and EchoStar's Executive Chairman and controlling stockholder and for the benefit of

DISH and EchoStar, both LightSquared competitors, purchased claims "with the intent of

voting against any plan that did not give it a strategic interest in the reorganized company."  *Id.*

at 104.  SPSO obtained a blocking position and is expected to vote its claims against the value-

maximizing LightSquared plan with the ulterior motive of trying to paralyze the Chapter 11

process, so that DISH can purchase LightSquared's assets in a liquidation.  These actions are

entirely inconsistent with the reorganization process, and reveal that SPSO is motivated by more than mere creditor self-interest.  This is precisely the sort of conduct the Second Circuit sought to deter in *DBSD*.  *Id.* at 105.  SPSO seeks to use its votes, which it obtained in breach the Credit Agreement, "as levers to bend the bankruptcy process toward its own strategic objective of acquiring [LightSquared's] spectrum rights, not toward protecting its claim."  *Id.* at 104.

Coupled with the bad faith conduct undertaken during the course of the bankruptcy case to derail LightSquared's attempts to negotiate a consensual plan with its Lenders and to discourage outside investors from providing new money to LightSquared in its ongoing efforts to emerge from bankruptcy, this case cries out for the remedy of vote designation.

### F.      LightSquared is Entitled to Monetary Damages

While the extent of LightSquared's monetary damages are to be determined in a subsequent phase of these proceedings, LightSquared is entitled to monetary damages in the form of compensatory damages, punitive damages,[25] attorneys' fees and costs, and pre- and post-judgment interest, to be proven at the next phase of the trial.  In addition, DISH and EchoStar, as principals, are liable to LightSquared for punitive damages as a result of Ergen and SPSO's tortious conduct resulting in in breach of the Credit Agreement.  *Int'l Minerals & Res., S.A. v. Bomar Res., Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001).

---

[25]      This Court should award punitive damages against Ergen, DISH, and EchoStar for tortious interference with contract.  Under New York law, punitive damages are appropriate when tortious conduct involves "a wanton or reckless disregard of the plaintiff's rights."  *Bomar Res., Inc.*, 5 F. App'x at 9 (citing *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir.1986)).

## II.    ERGEN, DISH, AND ECHOSTAR TORTIOUSLY INTERFERED WITH LIGHTSQUARED'S RIGHTS UNDER THE CREDIT AGREEMENT

Ergen, DISH, and EchoStar are liable for actively participating in the wrongful conduct designed to frustrate LightSquared's rights under the Credit Agreement, subjecting them to liability for tortious interference with contractual relations. To prevail on a claim for tortious interference with contractual relations under New York law,[26] a plaintiff must prove: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Island Two LLC v. Island One, Inc.*, No. 13 Civ. 02121 (LGS), 2013 WL 5380216, at *2 (S.D.N.Y. Sept. 26, 2013) (citing *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401 (2d Cir. 2006)). LightSquared has proven each of these elements against each Defendant.

As discussed in Point I(A) above, the Credit Agreement is a valid and enforceable contract between LightSquared and its Lenders, incorporating by reference, all "Loan Documents," including the "Assignment and Assumption" documents executed by SPSO with each purchase. Even had this not been the case, LightSquared would nonetheless have standing to assert tortious interference as the intended beneficiary of the Assignment and Assumption. *See Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 253 (S.D.N.Y. 2006) ("New York law permits recovery by third-party beneficiaries for tortious interference with contract"), *aff'd sub nom.*, *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008).

As further discussed in Point I(A), SPSO breached the representation and warranty in each Assignment and Assumption that it is an Eligible Assignee and caused each

---

[26]    New York, not Nevada law, applies to Plaintiff's tortious interference claim and the internal affairs doctrine is inapplicable. The tortious interference claim does not implicate duties owed between Ergen and Kiser to the corporation, nor the standard governing such duties, and thus New York courts apply an interest analysis. *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 501-02 (S.D.N.Y. 2011).

Assignor to SPSO to breach the transfer restrictions of section 10.04 of the Credit Agreement by assigning their interests to SPSO.

Thus, to impose liability on Ergen, DISH, and EchoStar under this theory, Plaintiffs need only to demonstrate that the Defendants (a) knew of the Credit Agreement, (b) intentionally procured the breaches, and (c) caused harm to LightSquared as a result of the breaches.

### A.    Ergen, DISH, and EchoStar Knew of the Credit Agreement

Defendants were well aware of the Credit Agreement and its restrictions.  In the fall of 2011, Ergen instructed Kiser to investigate whether DISH or EchoStar could acquire LP Debt.  Pursuant to Ergen's instructions, Kiser repeatedly consulted with Ketchum and outside counsel for DISH and EchoStar.  (FOF ¶¶ 70, 75.)  In addition, Kiser reviewed the Credit Agreement himself.  (*Id.* ¶ 74.)  In each instance, it was confirmed that neither DISH nor EchoStar could purchase the debt.  Defendants cannot dispute that at this stage Ergen and Kiser were acting for DISH and EchoStar.  Their knowledge of the existence of the Credit Agreement must be imputed to DISH and EchoStar.  Kiser even admitted that he acquired knowledge as to who could purchase LP Debt as an officer of DISH and EchoStar.  Specifically, when probed by the Court to confirm whether he was acting for Ergen, DISH, or EchoStar when he initially inquired into who could purchase the LP Debt, Kiser responded that until it was clear that the companies could not purchase the debt, the LightSquared investment was considered a corporate opportunity for DISH and EchoStar.  (*Id.* ¶ 67.)  As discussed in Point I(B) above, any information Kiser obtained while investigating whether DISH and/or EchoStar could own LP Debt was acquired in his capacity as a DISH/EchoStar officer and is imputed to both entities.[27]

---

[27]    In addition to Ergen and Kiser, other senior executives at DISH and EchoStar knew about the relevant provisions of the Credit Agreement.  Ergen testified that he discussed the Credit Agreement with Stanton

B.    **Ergen, DISH, and EchoStar Intentionally Procured The Breach**

Ergen and Kiser, acting for DISH and EchoStar, intentionally and improperly induced breach of the Credit Agreement.  As discussed above, both were aware of the Credit Agreement's transfer restrictions.  Ergen nonetheless instructed Kiser to form a special purpose vehicle—first Bal Harbor and then SPSO—to circumvent these restrictions.  Kiser, in collaboration with Sound Point, took great care to ensure that the trading activity could not be linked to Ergen, DISH, or EchoStar.  And, in connection with each trade, SPSO executed an Assignment and Assumption, certifying that it was an Eligible Assignee that was rightfully entitled to own LP Debt.

Other than arguing there was no breach of the Credit Agreement (discussed at Point I above), Defendants maintain that neither DISH nor EchoStar had any involvement in Ergen's purchases of the LP Debt.  Each of these assertions fails for a number of reasons.

As discussed in I(B)(2), *supra*, Defendants' reliance on DISH's investment policy as precluding Ergen from trading in the LP Debt are misplaced as the trades largely are below the threshold for which Board approval is required.

Second, as discussed *supra* I(B)(1), the record clearly shows that DISH's Board sanctioned Ergen's LP Debt trades, including the May 2012 email exchange between Dodge, DISH's General Counsel, and DISH's Board, in which Dodge suggested to DISH's Board that Ergen might be buying the LP Debt—and following which the DISH Board made no further inquiries.

DISH and EchoStar maintain that they had no other involvement with Ergen's purchases but this simply is not true.  After Ergen transferred LBAC to DISH, in connection with

Dodge, in-house counsel for DISH.  (FOF ¶ 126.)  It cannot be reasonably disputed that each of the Defendants knew of the restrictions of the Credit Agreement.

a plan of reorganization that SPSO backed and DISH sponsored, DISH sought a broad release

that would extinguish all claims LightSquared's estates may have against DISH, EchoStar,

SPSO, and Ergen, and that would allow SPSO's claim in these Chapter 11 Cases to be paid in

full.  There would have been no need for such a broad release had Ergen's purchases not been

part of a scheme of which DISH were a part.  In sum, the evidence proves that Ergen, DISH, and

EchoStar intentionally procured breaches of the Credit Agreement.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, LightSquared requests that the Court enter an

order in its favor on all claims asserted in the Adversary Proceeding.

New York, New York

Dated: February 24, 2014                         Respectfully submitted,

*/s/ Alan J. Stone*
Matthew S. Barr
Alan J. Stone
Michael L. Hirschfeld
Andrew M. Leblanc
MILBANK, TWEED, HADLEY & M$^C$CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Attorneys for Plaintiff-Intervenors*
*and Debtors and Debtors in Possession*

*/s/ David M. Friedman*
Marc E. Kasowitz
David M. Friedman
Jed I. Bergman
Christine A. Montenegro
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiffs*