**<u>FOR PUBLICATION</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
                                                :

In re:                                :    Chapter 11
                                     :

LIGHTSQUARED INC., *et al.*,       :    Case No. 12-12080 (SCC)
                                   :

                                   :    Jointly Administered
                     Debtors.     :
                                   :
-----------------------------------------------------------------------X
                                                :

LIGHTSQUARED LP, LIGHTSQUARED INC.,   :
LIGHTSQUARED INVESTORS HOLDINGS INC.  :
TMI COMMUNICATIONS DELAWARE,       :
LIMITED PARTNERSHIP, LIGHTSQUARED GP INC., :
ATC TECHNOLOGIES, LLC, LIGHTSQUARED CORP., :
LIGHTSQUARED INC. OF VIRGINIA,     :    Adv. Pro. No. 13-01390 (SCC)
LIGHTSQUARED SUBSIDIARY LLC,      :
SKYTERRA HOLDINGS (CANADA) INC., AND  :
SKYTERRA (CANADA) INC.,        :
                                              :

                     Plaintiff-Intervenors,  :
                                     :

             - against-           :
                                   :

SP SPECIAL OPPORTUNITIES LLC,     :
DISH NETWORK CORPORATION,       :
ECHOSTAR CORPORATION,         :
AND CHARLES W. ERGEN,         :
                     Defendants.     :
-----------------------------------------------------------------------X

**<u>POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

A P P E A R A N C E S:

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
By:    Matthew S. Barr, Esq.
       Alan J. Stone, Esq.
       Michael L. Hirschfeld, Esq.
       Andrew M. Leblanc, Esq.


*Attorneys for Plaintiff-Intervenors and Debtors and Debtors in Possession*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
By:    David M. Friedman, Esq.
       Jed I. Bergman, Esq.
       Christine A. Montenegro, Esq.


*Attorneys for Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc.*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:    Rachel C. Strickland, Esq.
       Tariq Mundiya, Esq.
       James C. Dugan, Esq.
       Matthew Freimuth, Esq.


*Attorneys for Defendants Charles W. Ergen, SP Special Opportunities, LLC, and Special Opportunities Holdings LLC*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
By:    Robert J. Giuffra, Jr., Esq.
       Brian T. Frawley, Esq.
       Brian D. Glueckstein, Esq.


*Attorneys for Defendants DISH Network Corporation, EchoStar Corporation, and L-Band Acquisition, LLC*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:    Paul M. Basta, Esq.
       Joshua A. Sussberg, Esq.

*Attorneys for Special Committee of Boards of Directors of LightSquared Inc. and LightSquared GP Inc.*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP
One Bryant Park
New York, NY 10036
By:    Philip C. Dublin, Esq.
       Michael S. Stamer, Esq.

*Attorneys for Intervenors U.S. Bank National Association and MAST Capital Management, LLC*

WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
By:    Thomas E Lauria, Esq.
       Glenn M. Kurtz, Esq.
       Andrew C. Ambruoso, Esq.
       Julia M. Winters, Esq.

*Attorneys for Intervenor Ad Hoc Secured Group of LightSquared LP Lenders*

## TABLE OF CONTENTS

THE PARTIES..................................................................................................................2

PROCEDURAL HISTORY................................................................................................4

FINDINGS OF FACT.......................................................................................................8

   I.    The Parties and Certain Relevant Third Parties ...................................................9

   II.   The LightSquared LP Credit Agreement and the
        Restrictions on the Transfer of LP Debt ...........................................................12

   III.  Background Regarding SPSO's Purchases of LP Debt ........................................19

         A.  Messrs. Ergen and Kiser Investigate Whether DISH and EchoStar
             Can Purchase LP Debt .........................................................................19

         B.  Messrs. Ergen and Kiser Create the Bal Harbour Entities,
             and Then SPSO, to Purchase LP Debt ...................................................22

         C.  SPSO and Mr. Ketchum Did Not Reveal that Mr. Ergen
             Was Behind the LP Debt Purchases.......................................................26

   IV.  SPSO is Solely a Front for Mr. Ergen.................................................................27

         A.  SPSO Was Undercapitalized and Funded Solely at Mr. Ergen's Discretion.........28

         B.  SPSO Votes Against Extension of LightSquared's Negotiations with Lenders....30

         C.  SPSO's LP Debt Purchases...................................................................32

         D.  Mr. Ergen's Desire to Obtain a Blocking Position in LP Debt............................34

   V.   Mr. Ergen Acted, at Least in Part, for the Benefit of DISH in
        Acquiring LP Debt Through SPSO .....................................................................36

         A.  Mr. Kiser's Role in SPSO's LP Debt Purchases.....................................37

         B.  Mr. Ergen Uses DISH Employees, Resources, and Legal Counsel to
             Facilitate the LP Debt Purchases ..........................................................39

         C.  DISH Board Members and Management Take No Action Upon Learning of
             Mr. Ergen's LP Debt Acquisition .........................................................40

         D.  Mr. Ergen Controls the Boards of DISH and EchoStar .........................44

i

E.  Soon After Acquiring a Blocking Position, Mr. Ergen Makes a
    Presentation to the DISH Board that Contemplates a DISH Bid..........................45

VI.  DISH Contemplates and Makes a Bid for LightSquared at Mr. Ergen's Behest ..............48

    A.  DISH Forms a Special Committee to Evaluate a DISH Bid and the
        Propriety of Mr. Ergen's LP Debt Purchases..........................................................48

    B.  Mr. Ergen Makes a "Personal" Bid That Sets the Floor and
        Ensures He Will Be Repaid in Full......................................................................49

    C.  The DISH Special Committee ...............................................................................50

VII.  LightSquared as a Strategic Investment for DISH..............................................................58

    A.  DISH and EchoStar's Prior Acquisitions of Spectrum Assets..............................58

    B.  Mr. Ergen's Consideration of LightSquared's Spectrum Assets ..........................60

    C.  DISH's Pursuit of Sprint and Clearwire ...............................................................62

VIII.  Mr. Ergen's Assertion That He Was Making a Personal Investment is
      Belied by the Evidence .....................................................................................................62

    A.  SPSO's Purchases of LP Debt Were Inconsistent with Mr. Ergen's
        Personal Past Investment Strategy ........................................................................63

    B.  The Price at Which Mr. Ergen Attempted to Purchase the LP Debt and
        Offered for the LP Preferred Interests is Inconsistent with the
        "Great Investment" Premise ..................................................................................65

IX.  LightSquared and Harbinger Were Aware or at Least Had a Strong Suspicion
     That Mr. Ergen was Acquiring LightSquared Debt...........................................................66

    A.  Although Public Information Provided No Certainty as to
        Who Was Behind Sound Point's Purchases, There Was
        Ample Reason to Believe It Was Mr. Ergen..........................................................66

    B.  Harbinger and LightSquared Add DISH to the List of Disqualified
        Companies Because They Believe Mr. Ergen Is Buying LP Debt ........................72

    C.  Neither Harbinger Nor LightSquared Attempted to Use a
        Rule 2004 Subpoena to Determine Who Was Buying
        LightSquared Debt Through Sound Point...............................................................73

    D.  LightSquared and Moelis Representatives Also Suspect Mr. Ergen
        Is Buying Debt Through Sound Point.....................................................................74

E. LightSquared and Harbinger Make Inquiries to Determine
Who Is Behind Sound Point's Purchases but Fail to
Take Action Based Upon Their Suspicions ..........................................................75

F. On May 21, 2013, LightSquared and Harbinger Definitively Learn that
Mr. Ergen is Behind SPSO ...................................................................................78

X. SPSO Delays Closing Hundreds of Millions of Dollars in LP Debt Trades
For Several Months During a Critical Time in LightSquared's Bankruptcy Case...........78

A. Mr. Kiser, with Sound Point's Assistance, Delays the
Closing of LP Debt Trades ...................................................................................79

B. There Was No True Economic Benefit for Messrs. Ergen and Kiser to
Keep the LP Debt Trades Open ............................................................................84

C. LP Debt Trades Were Not Left Open Due to Liquidity Constraints ...................86

XI. LightSquared and its Creditors Were Injured by SPSO's Conduct ..................................88

A. Negotiations with the Ad Hoc Secured Group Are
Affected by SPSO's Pending LP Debt Trades.......................................................89

B. Once SPSO Discloses its Blocking Position and Joins the
Ad Hoc Secured Group, Plan Negotiations Cease .................................................89

C. Within Weeks of SPSO's Joining the Ad Hoc Secured Group,
The LBAC Bid is Adopted ...................................................................................91

D. LightSquared's Negotiations with Creditors Come to an End after the
Filing of the Ad Hoc Secured Group Plan ............................................................93

E. LBAC and DISH Seek to Obtain Broad Releases for Themselves and Their
Affiliates in the Ad Hoc Secured Group Plan.......................................................93

DISCUSSION ..................................................................................................................94

I. Introduction.......................................................................................................................94

II. SPSO Cannot Be Held Liable for Breach of the Express
Terms of the Credit Agreement ........................................................................................96

A. SPSO Was Not Technically Prohibited from Purchasing LP Debt ......................96

III.   SPSO's Acquisition of the LP Debt Violated the Spirit of the
       Credit Agreement and is a Breach of the Implied Covenant of
       Good Faith and Fair Dealing..................................................................99

       A.  SPSO's LP Debt Purchases...................................................................99

       B.  Mr. Ergen's Conduct in the Spring of 2013 Establishes that
           He Was Acting for DISH ....................................................................107

       C.  Breach of the Implied Covenant of Good Faith and Fair Dealing.......................123

IV.    The SPSO Claim Shall Not Be Disallowed ....................................................132

       A.  The SPSO Claim is Not Void or Voidable Even Though the Court
           Finds an Implied Breach and Even if the Court
           Were to Have Found an Express Breach .............................................132

       B.  The Inaction and Delay of LightSquared and Harbinger
           Preclude the Award of Affirmative Damages.......................................135

V.     SPSO's Claim Shall be Equitably Subordinated to the Extent of
       Injury Caused to Innocent Creditors .........................................................143

       A.  Applicable Law .................................................................................143

       B.  Mobile Steel Prong I: SPSO's Inequitable Conduct ............................154

           1.  Breach of the Implied Covenant of Good Faith and Fair Dealing................154

           2.  SPSO, Through the Conduct of Messrs. Kiser and Ketchum,
               Purposefully Delayed the Closing of LP Debt Trades...................................155

       C.  Mobile Steel Prong II: SPSO's Conduct Harmed LightSquared's Creditors ......167

CONCLUSION.......................................................................................................168

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Between April 13, 2012 and April 26, 2013, Charles Ergen, through an entity named

SPSO, purchased approximately $844 million of the senior secured debt of LightSquared LP, a

debtor in these chapter 11 cases.  Mr. Ergen – the founder, chairman of the board of directors,

and controlling shareholder of DISH Network – bought the debt, he says, without any strategic

intent to benefit DISH.   Rather, he was interested in acquiring LightSquared debt personally

because he "liked the investment" and because he had been advised that DISH itself was not

eligible to purchase the debt due to restrictions in the LightSquared LP Credit Agreement.  The

"diligence" on the purchaser eligibility issue, such as it was, was conducted by Mr. Ergen's

longtime friend Jason Kiser, the Treasurer of DISH, who from time to time worked on personal

matters for Mr. Ergen.  Mr. Kiser also arranged the trades on behalf of Mr. Ergen, on "his own

time" while at work at DISH.  Promptly after Mr. Ergen's initial debt purchase in the face

amount of $5 million on April 13, 2012, and particularly after his significant debt purchase in the

face amount of $247 million on May 4, 2012, the press began to speculate about the identity of

the SPSO purchaser, publishing stories with headlines such as "LightSquared [Term Loan]

Trades North of 70 as Ergen Enters the Picture" and "Ergen Builds Cash Pile Amidst

LightSquared Restructuring Talks."  The trades and the press reports did not go unnoticed by

LightSquared, especially after the news that it was Carl Icahn who had sold his nearly quarter

billion dollar position in the debt to SPSO.  Philip Falcone, the founder and principal owner of

Harbinger Capital Partners, which is the principal shareholder of LightSquared, reacted to the

news swiftly and strategically, writing in an email message: "Well I'm working on giving him a

nice surprise," referring to Mr. Ergen and to LightSquared's May 9, 2012 modification of its

Credit Agreement's Disqualified Companies list to include DISH.

1

The game was afoot.  Almost two years of moves and counter moves have ensued, with Lightsquared's other stakeholders sometimes watching from the sidelines and sometimes entering the fray – all under the watchful gaze of the Federal Communications Commission, which to this day has not taken definitive action to clarify the status of LightSquared's valuable spectrum assets.  The questions before the Court, among others, are whether SPSO's debt purchases violated the LightSquared LP Credit Agreement and whether its now approximately $1 billion claim (inclusive of interest) should therefore be disallowed, or, alternatively, whether SPSO's claim should be equitably subordinated by virtue of its conduct in connection with the debt purchases and/or in connection with these chapter 11 cases.  The Court's analysis is as follows.[1]

## THE PARTIES

Plaintiffs LightSquared LP, LightSquared Inc., LightSquared Investors Holdings Inc., TMI Communications Delaware Limited Partnership, LightSquared GP Inc., ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as debtors and debtors in possession (collectively, with certain of their affiliated debtors and debtors in possession, "LightSquared" or the "Debtors") provide wholesale mobile satellite communications and broadband services throughout North America.  Through its ownership of several satellites and licenses to use mobile satellite service spectrum issued by the Federal Communications Commission (the "FCC"), LightSquared delivers voice and data services to mobile devices used

---

[1]    This Decision supersedes this Court's bench decision read into the record on May 8, 2014.

by the military, first responders and other safety professionals, and individuals throughout North America.  (*See* Declaration of Marc R. Montagner [Bankr. Docket No. 3] ¶¶ 18-31.) [2]

Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger") own in excess of 82 percent of the common equity of LightSquared and assert a general unsecured claim against LightSquared LP and claims against LightSquared Inc.  (*See* Adv. Docket No. 1 ¶ 17.)

Defendant DISH Network Corporation ("DISH") is a public corporation organized and existing under the laws of the state of Nevada with its principal place of business in Englewood, Colorado.  DISH provides broadband and satellite television services and aims to expand its broadband offerings, including by building a terrestrial broadband network.  (PX0781 ¶¶ 30, 43.) In addition to its satellite broadcast business, DISH owns significant spectrum assets, including mobile satellite spectrum.  (*Id.*)  DISH is a direct competitor of LightSquared.  (*Id.* ¶ 30; Jan. 13 Tr. (Ergen) 14:13-18; Jan. 10 Tr. (Kiser) 70:24-71:1; PX0013 at 10; Montagner Dep. 72:13-74:7; PX0159 at L2AP0007578.) [3]

Defendant EchoStar Corporation ("EchoStar") is a public corporation organized and existing under the laws of the State of Nevada with its principal place of business in Englewood, Colorado.  EchoStar is a satellite communications company that currently operates, leases, or manages a number of satellites, including the satellites that provide services to DISH.  EchoStar

---

[2]      Citations to "Adv. Docket No. __" refer to docket entries in this adversary proceeding, Adv. Pro. 13-1390-scc (Bankr. S.D.N.Y.) (the "Adversary Proceeding") and citations to "Bankr. Docket No. __" refer to docket entries in the Debtors' bankruptcy case, *In re LightSquared Inc.*, Case No. 12-12080-scc (Bankr. S.D.N.Y.).

[3]      Citations to the trial transcripts of the Adversary Proceeding, dated January 9 through January 17, 2014 and March 17, 2014, will be referenced as "Jan. __ Tr. (witness) [page:line] or "Mar. __ Tr. (counsel) [page:line]." Citations to deposition testimony from the Adversary Proceeding will be referenced as "Witness Dep. [page:line]."

is a direct competitor of LightSquared.  (PX0781 ¶ 31; Jan. 10 Tr. (Kiser) 15:15-21; Jan. 13 Tr.

(Ergen) 15:8-12.)

Defendant SP Special Opportunities LLC ("SPSO") is a limited liability company

organized and existing under the laws of the State of Delaware with its principal place of

business nominally in New York, New York.  SPSO's sole member and managing member is

Special Opportunities Holdings LLC ("SO Holdings").  SO Holdings is a Delaware limited

liability company whose sole member and managing member is Defendant Charles W. Ergen

("Ergen").

Defendant Charles W. Ergen, a natural person, is the founder, chairman of the boards of

directors, and majority owner of both DISH and EchoStar.  Mr. Ergen – personally and through

his family trusts – beneficially owns and controls over 88 percent of DISH's voting shares and

over 80 percent of EchoStar's voting shares.   Mr. Ergen owns approximately 53 percent of

DISH.  Mr. Ergen also wholly owns and controls SO Holdings and SPSO.  (PX0700 ¶¶ 1-2; Jan.

13 Tr. (Ergen) 94:19-95:2, 208:18-211:20; Howard Dep. 37:25-38:16; PX0372 at 2, 5; PX0371

at 2.)

## PROCEDURAL HISTORY

On May 14, 2012 (the "Petition Date"), LightSquared commenced a voluntary

bankruptcy case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Southern District of New York.  ([Bankr.

Docket No. 1].)

On August 6, 2013, Harbinger commenced the Adversary Proceeding against Mr. Ergen,

DISH, EchoStar, L-Band Acquisition, LLC ("LBAC"), SPSO, SO Holdings, Sound Point Capital

Management LP ("Sound Point"), and Mr. Stephen Ketchum, alleging inequitable conduct,

fraud, aiding and abetting fraud, tortious interference with prospective economic advantage, tortious interference with contractual relationship, unfair competition, and civil conspiracy; and seeking equitable disallowance of claims, compensatory and punitive damages, costs and fees, interest, and other appropriate relief.  (*See* Adv. Docket No. 1.)

On August 22, 2013, LightSquared intervened in the Adversary Proceeding on limited grounds.  (Adv. Docket No. 15.)  U.S. Bank National Association ("U.S. Bank"), Mast Capital Management LLC ("Mast"), and the Ad Hoc Secured Group of LightSquared LP Lenders (the "Ad Hoc Secured Group") also intervened on the same day.  (Adv. Docket Nos. 12, 14.)

On September 9, 2013, motions to dismiss were filed by each of the defendants in the Adversary Proceeding.  (Adv. Docket Nos. 29, 30, 32, 33, 34, 35.)[4]  On September 30, 2013, Harbinger amended its complaint as of right (the "Harbinger Amended Complaint").  (Adv. Docket No. 43.)  Between October 3 and October 5, 2013, each of the defendants filed a motion to dismiss the Harbinger Amended Complaint.  (Adv. Docket Nos. 44, 45, 46.)  After the filing of additional oppositions and replies, this Court held a hearing on October 29, 2013.

By Order dated November 14, 2013 (the "November Order"), this Court granted Defendants' motions to dismiss the Harbinger Amended Complaint.  (PX0770.)  The Court also granted Harbinger leave to file a second amended complaint that did not assert claims on Harbinger's own behalf, but that merely set forth an objection, pursuant to section 502 of the Bankruptcy Code, to SPSO's claim.  (*Id*.)  The Court also authorized LightSquared to file a complaint setting forth the basis for its intervention.  (*Id*.)  On November 21, 2013, the Court issued its Memorandum Decision Granting Motions to Dismiss Complaint ("Decision on the

---

[4]    The motions to dismiss filed in the Adversary Proceeding on September 9, 2013 were subsequently amended.  *See* Adv. Docket Nos. 37, 38, 39.

5

Motions to Dismiss"), which set forth the bases for the November Order.  (Adv. Docket No. 68; *Harbinger Capital Partners LLC v. Ergen (In re LightSquared Inc.)*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013).)

On November 15, 2013, LightSquared filed a Complaint-in-Intervention (the "LightSquared Complaint") against SPSO, DISH, EchoStar, and Mr. Ergen (collectively, the "Defendants") seeking:  (i) a declaration that SPSO is not an "Eligible Assignee" under LightSquared's October 10, 2010 Credit Agreement, as amended, modified, and restated (the "Credit Agreement") (PX0004), (ii) disallowance of SPSO's claim under 11 U.S.C. § 502(b), and (iii) equitable disallowance of SPSO's claim.  (PX0771.)  The LightSquared Complaint further alleges breach of contract against SPSO, as well as tortious interference with contractual relations against all Defendants.  (*Id*.)  The LightSquared Complaint also seeks equitable subordination as a remedy.  (*Id*.)

On December 2, 2013, Harbinger filed a Second Amended Complaint (the "Harbinger Second Amended Complaint," and, together with the LightSquared Complaint, the "Complaints"), seeking (i) a declaration that SPSO is not an "Eligible Assignee" under the Credit Agreement, (ii) disallowance of SPSO's claim under 11 U.S.C. § 502(b), (iii) equitable disallowance of SPSO's claim, and (iv) equitable subordination of SPSO's claim under 11 U.S.C. § 510.  The Harbinger Second Amended Complaint further alleges breach of contract against SPSO.  (PX0781.)

On November 25 and November 26, 2013, the Defendants filed motions to dismiss the LightSquared Complaint,[5] and, on December 5, 2013, SPSO filed a motion to dismiss the

---

[5]        Adv. Docket Nos. 69, 70, 72, 73.

Harbinger Second Amended Complaint. (Adv. Docket No. 84.)  After the filing of oppositions

and replies, the Court held a hearing on December 10, 2013.

By Order dated December 12, 2013 (the "December Order"), the Court granted in part

and denied in part Defendants' motions to dismiss the Complaints.  (PX0784.)  The December

Order dismissed all of the claims asserted in the Harbinger Second Amended Complaint, except

for Harbinger's claim seeking disallowance of SPSO's claim under 11 U.S.C. § 502(b).  (*Id*. ¶ 3.)

With respect to the LightSquared Complaint, the Court granted Defendants' motions only as to

LightSquared's equitable disallowance claim against SPSO and its tortious interference claim

against SPSO.  (*Id*. ¶ 2.)  The Court retained jurisdiction to hear and determine all matters arising

from the interpretation, implementation, and enforcement of the December Order.  (*Id*. ¶ 4.)

Answers to the remaining counts of the LightSquared Complaint and the Harbinger Second

Amended Complaint were filed on December 24, 2013.  (Adv. Docket Nos. 102, 103, 104.)  Pre-

trial briefs were filed by the parties on January 7 and January 8, 2013.  (Adv. Docket Nos. 113,

115, 119, 121.)

On January 9, 2014, the Court commenced a trial[6] in the Adversary Proceeding and heard

live testimony from eight witnesses: (a) Charles Ergen; (b) Thomas Cullen; (c) Stephen

Ketchum; (d) Jason Kiser; (e) Philip Falcone; (f) Douglas Smith; (g) William Q. Derrough; and

(h) Mark S. Hootnick.

The parties also submitted additional evidence consisting of (i) over 800 exhibits and

(ii) excerpts from the deposition transcripts of six witnesses in lieu of live testimony.  Deposition

---

[6]    At the request of the parties, the Court bifurcated the Adversary Proceeding trial into two phases: liability
and damages.  The liability phase of the trial, which was held between January 9 and 17, 2014, and on March 17,
2014, will be referred to herein as the "Trial."  The second phase of the trial, in which the extent of equitable
subordination to be imposed on SPSO will be determined, has not yet been scheduled by the Court.

designations were submitted from the deposition transcripts of: (a) Steven Goodbarn; (b) Gary

Howard; (c) Marc Montagner; (d) Robert Olson; (e) David Rayner; and (f) Joseph Roddy.

The Court requested that proposed findings of fact and post-trial briefs be submitted by

LightSquared and Harbinger (together, "Plaintiffs") on February 24, 2014, and by Defendants on

March 10, 2014.  Those dates were subsequently modified by the Court.  On February 24, 2014

and March 10, 2014, respectively, Plaintiffs submitted their (i) post-trial brief and proposed

findings of fact and (ii) supplemental post-trial brief and supplemental proposed findings of fact.

(Adv. Docket Nos. 132, 133, 137, 138.)  On March 14, 2014, Defendants submitted proposed

findings of fact and post-trial briefs, together with a response to Plaintiffs' supplemental post-

trial brief.  (Adv. Docket Nos. 140, 141, 142, 143, 144.)  Closing arguments were held on March

17, 2014.

In addition, a flurry of sanctions motions and replies has been filed by the parties, each of

which remains *sub judice*.  (*See* Adv. Docket Nos. 145, 146, 148, 151, 152, 154, 158.)

This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.  Pursuant to 28 U.S.C. §§ 157 and 1334(b), the Court has jurisdiction to

consider this matter a "core" proceeding.  Venue is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

## **FINDINGS OF FACT**

The following constitute this Court's findings of fact and conclusions of law pursuant to

Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Having considered the voluminous

evidence, testimonial and documentary, including all exhibits admitted into evidence, as well as

Plaintiffs' and Defendants' post-trial proposed findings of fact and briefs, and mindful that a

court should not blindly accept findings of fact and conclusions of law proffered by the parties

(*see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*), 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)), and having conducted an independent analysis of the law and the facts, the Court makes the following Findings of Fact and Conclusions of Law:[7]

## I.    The Parties and Certain Relevant Third Parties

1.      In 1980, Mr. Ergen founded EchoSphere LLC ("EchoSphere") with James DeFranco and Mr. Ergen's wife, Cantey Ergen.  (Jan. 13 Tr. (Ergen) 11:24-12:7, 12:21-13:11.) EchoSphere became EchoStar, which later split into EchoStar and DISH.  (Jan. 13 Tr. (Ergen) 14:19-24.)  Today, EchoStar is a technology company that manufactures set-top boxes and builds and operates satellites.  (Rayner Dep. 27:10-18; Jan. 13 Tr. (Ergen) 14:25-15:7.)

2.      DISH sells satellite television services.  (Jan. 13 Tr. (Ergen) 14:13-18.)  EchoStar is a supplier to DISH, but they are separate companies.  (Jan. 13 Tr. (Ergen) 15:8-12.)

3.      DISH's board of directors has ten members, four of whom are independent under NASDAQ rules.  (Jan. 13 Tr. (Ergen) 15:13-21; see also 3/22/13 DISH Network Corp. Schedule 14A at 2-3; 9/17/13 DISH Network Corp. Form 8-K at 1; 11/5/13 DISH Network Form 8-K at 1; 2/21/14 DISH Network Corp. Form 10-K at 99.)  The DISH Board of Directors has four regularly-scheduled meetings a year, but on average, the DISH Board will meet between eight and ten times a year.  (Jan. 13 Tr. (Ergen) 16:11-14.)  Discussions at the DISH board level cover many subjects, including potential acquisitions, the raising of capital, the strategic direction of the company, and personnel issues within the company.  (Jan. 13 Tr. (Ergen) 16:21-25.)

---

[7]      The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

4.      Neither DISH nor EchoStar has an interest in SPSO.  (PX0767 (Goodbarn Nevada Dep.) 32:24-33:2, 90:10-23; Olson Dep. 14:6-15:14, 26:7-27:11; Jan. 13 Tr. (Ergen) 36:7-9.)

5.      Mr. Ergen, as the holder of a majority share of voting rights (approximately 88 percent and 79.4 percent of the total voting power in DISH and EchoStar, respectively), has the ability to elect a majority of the directors for both companies and control all other matters requiring the approval of their stockholders.  (Jan. 13 Tr. (Ergen) 94:19-95:2, 208:18-211:20; Howard Dep. 37:25-38:16; PX0372 at 2, 5; PX0371 at 2.)  Mr. Ergen voted for each of the current DISH Board members, and he testified that he does not know whether it is possible for someone to be a director of DISH without his vote.  (Ergen Dep. 18:5-16, 26:19-25; Jan. 13 Tr. (Ergen) 95:3-5.)  As a result of Mr. Ergen's dominance, both DISH and EchoStar are "controlled compan[ies] as defined in the Nasdaq listing rules."  (PX0349 at 39-40; PX0350 at 34.)

6.      Mr. Thomas Cullen ("Cullen") is the Executive Vice President of Corporate Development at DISH, a position he has held since June 2011.  (Jan. 17 Tr. (Cullen) 98:19-20, 101:3-5.)

7.      Mr. Jason Kiser ("Kiser") is the Treasurer of DISH and Vice President of Corporate Development at DISH and EchoStar, and, together with Messrs. Ergen and Cullen, is part of the corporate development team at DISH and EchoStar.  (Jan. 10 Tr. (Kiser) 15:25-16:6, 68:24-69:2, 69:20-22.)  Mr. Kiser arranged SPSO's trades in the secured debt of LightSquared LP ("LP Debt") pursuant to direction from Mr. Ergen by placing the orders for the amount and pricing of the debt and arranging to provide the funds to close the trades.  (Jan. 10 Tr. (Kiser) 25:6-8.)

8.      Mr. Stephen Ketchum ("Ketchum") is the founder and sole managing partner of Sound Point.  (Jan. 15 Tr. (Ketchum) 13:13-19.)  Sound Point is an investment management and

advisory firm that served as trading manager and investment advisor for SPSO and executed

SPSO's purchases of LP Debt.  (Jan. 15 Tr. (Ketchum) 20:14-17.)  Messrs. Kiser and Ketchum

had a twenty-year long relationship that involved work related to both EchoStar and DISH.  Mr.

Ketchum served as the point of contact between Sound Point and Messrs. Kiser and Ergen.  (Jan.

15 Tr. (Ketchum) 14:19-22, 93:23-94:3; Jan. 10 Tr. (Kiser) 24:10-25:8.)

9.      SPSO was formed by Sound Point for the exclusive purpose of serving as the

investment vehicle through which Mr. Ergen made trades in LP Debt (PX0162; PX0171;

PX0183; PX0224; Jan. 10 Tr. (Kiser) 30:16-21, 31:20-32:14; PX0700 ¶¶ 1-2), without those

purchases being traceable to Mr. Ergen (see Jan. 10 Tr. (Kiser) 30:16-21, 31:20-22, 32:2-14,

90:6-12, 90:25-91:20; Jan. 13 Tr. (Ergen) 36:13-37:4, 49:20-50:25; PX0117; PX0290 at LSQ-

SPCD-000006771; PX0298).

10.     Mr. Steven R. Goodbarn ("Goodbarn") is a member of the DISH Board of

Directors and was a member of the special committee of independent directors of DISH that was

formed to evaluate and make recommendations regarding a possible bid by DISH for

LightSquared's assets (the "Special Committee").  (PX0768 ¶ 2.)

11.     Mr. Gary S. Howard ("Howard") is a former member of the DISH Board of

Directors and was a member of the Special Committee.  (PX0768 ¶¶ 2, 53.)

12.     Harbinger began acquiring the securities of LightSquared's predecessor, SkyTerra

Communications, Inc. ("SkyTerra"), in 2006 and eventually took control of the company in early

2010, renaming it LightSquared LP.  (Jan. 16 Tr. (Falcone) 14:23-16:11.)

13.     Harbinger currently owns about 80 to 85 percent of the stock of LightSquared.

(Jan. 16 Tr. (Falcone) 18:8-12.)  About 30 to 40 percent of Harbinger's assets are invested in

LightSquared, and Harbinger has invested approximately $1.8 to $2 billion in LightSquared. (Jan. 16 Tr. (Falcone) 81:3-19.)

14.     Mr. Philip Falcone ("Falcone") is the portfolio manager of Harbinger Capital Partners LLC.  (Jan. 16 Tr. (Falcone) 12:3-13.)  Mr. Falcone has been trading high yield distressed debt for over 20 years.  (Jan. 16 Tr. (Falcone) 13:13-18.)  Mr. Falcone has between $500 and $700 million invested in Harbinger, which is a majority of his net worth.  (Jan. 16 Tr. (Falcone) 80:6-20.)

15.     Mr. Falcone is a member of LightSquared's board of directors, having joined the Board in early 2012.  (Jan. 16 Tr. (Falcone) 17:25-18:1; 82:1-3.)  A majority of the LightSquared Board of Directors is controlled by Harbinger.  (Jan. 16 Tr. (Falcone) 81:23-25.)

## II.     The LightSquared LP Credit Agreement and the Restrictions on the Transfer of LP Debt

16.     In 2010, LightSquared obtained authorization from the FCC to build an ancillary terrestrial network ("ATC Network") that would integrate its satellite service with terrestrial satellite ground stations to provide fourth generation long term evolution (4G-LTE) broadband mobile services throughout the United States.  (DX054 ¶¶ 5-7, 29-30, 33.)  To finance the buildout of its ATC Network, on October 1, 2010, LightSquared LP and certain of its affiliates entered into the Credit Agreement with UBS AG, Stamford Branch ("UBS"), as Administrative Agent, and entities that were, or would serve as, lenders under the Credit Agreement (collectively, the "Lenders").  (*Id.* ¶ 37.)  The Credit Agreement is governed by New York law. (PX0004 at HARBAP00004158, § 10.09(a).)

17.     The Credit Agreement restricts transfers of the LP Debt.  Section 10.04(a) of the Credit Agreement provides, in pertinent part:

> [N]o Lender may assign or otherwise transfer any of its rights or
> obligations hereunder except (i) to an Eligible Assignee in

12

accordance with the provisions of paragraph (b) of this <u>Section 10.04</u>, (ii) by way of participation in accordance with the provisions of paragraph (d) of this <u>Section 10.04</u> or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by Borrower shall be null and void).

(PX0004 at HARBAP00004153.)

18.     Section 10.04(b) states that assignments of LP Debt are permitted to Eligible Assignees: "Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement . . . ." (PX0004 at HARBAP00004154.)

19.     The term "Eligible Assignee" is defined in Section 1.01 of the Credit Agreement as follows: "[A]ny person to whom it is permitted to assign Loans and Commitments pursuant to Section 10.04(b)(i); *provided* that 'Eligible Assignee' shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person or any Disqualified Company." (*Id.* at HARBAP0004058 (emphasis in original).)

20.     The term "Eligible Assignee" also excludes "any natural person." (PX0004 at HARBAP0004058, §1.01.)  Thus, pursuant to Section 10.04(b)(i), a natural person may not take an assignment of LP Debt ("Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement . . ."). (PX0004 at HARBAP00004154.)  Pursuant to Section 10.04(d), a natural person also may not receive a Participation in LP Debt ("Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent sell participations to any person (other than a natural person, Borrower or any of its Affiliates or any Disqualified Company . . ."). (*Id.* at HARBAP00004155.)

13

21.     Mr. Ergen, as a natural person, is not an Eligible Assignee and is not permitted to own the LP Debt.

22.     "Disqualified Company" is defined in Section 1.01 as follows:

> [A]ny operating company which is a direct competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a), and thereafter, upon the consent of the Administrative Agent . . . such additional bona fide operating companies which are direct competitors of the Borrower as may be identified to the Administrative Agent from time to time and notified to the Lenders.  A Disqualified Company will include any known subsidiary thereof.

(PX0004 at HARBAP0004057-58.)  The Credit Agreement thus prohibits assignment or other transfer of the LP Debt to a LightSquared competitor named on Schedule 1.01(a) or a known subsidiary of such a competitor.

23.     The word "Subsidiary" in the definition section of the Credit Agreement is defined, "with respect to any person (the 'parent')," as including, "any other person that is otherwise Controlled by the parent. . . ."  (PX0004 at HARBAP0004073, § 1.01.)  "Controlled" is defined to mean "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise. . . ."  (*Id.* at HARBAP0004056, § 1.01.)

24.     SPSO, SO Holdings, and Mr. Ergen were not initially included on Schedule 1.01(a) of the Credit Agreement, which, as of the inception of the Credit Agreement on October 1, 2010, did include EchoStar.  (PX0004 at HARBAP00004166.)

25.     On May 9, 2012, LightSquared amended the Disqualified Company list, Schedule 1.01(a) of the Credit Agreement, to add additional LightSquared competitors, including, among others, DISH.  (PX0142.)  On May 12, 2012, LightSquared again amended the Disqualified Company list to add Cablevision.  (Jan. 16 Tr. (Falcone) 49:17-19; PX0901 at

14

HARBAP00011331; *see also* PX0190.)  Each of DISH and EchoStar is a Disqualified Company

under the Credit Agreement.  SPSO is not a "known subsidiary" of any company identified as a

Disqualified Company.

26.    According to its CEO, LightSquared amended the Disqualified Company list on

May 9 and 12, 2012, immediately prior to the Petition Date, "to make sure that the list of

disqualified companies included all of [LightSquared's] competitors, because we didn't want

competitors involved in the capital structure.  We thought it was important as we were entering

bankruptcy to make these updates."  (Jan. 9 Tr. (Smith) 126:22-127:24; PX0161.)

27.    The Credit Agreement defines the term "Affiliate" as "when used with respect to

a specified person, another person that directly, or indirectly through one or more intermediaries,

Controls or is Controlled by or is under common Control with the person specified."  (PX0004 at

HARBAP00004050-4051.)

28.    On September 18, 2010, UBS proposed a draft of the Credit Agreement which did

not include the concept of a Disqualified Company, but rather stated that an Eligible Assignee

"shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person or any

person listed on Schedule 1.01(a)."  (PX0001 at L2AP0009323.)  UBS's draft did not restrict

transfers to affiliates or "Affiliates" of companies or persons listed on Schedule 1.01(a); it only

restricted transfers to companies or persons listed in Schedule 1.01(a).  (PX0001 at

L2AP0009323.)

29.    On September 19, 2010, counsel for LightSquared proposed comments to UBS's

draft.  LightSquared's draft restricted transfers of LP Debt to any "Affiliate" of a company or

person listed on Schedule 1.01(a).  (PX0003.)  Specifically, the draft stated that an Eligible

Assignee "shall not include Borrower or any of its Affiliates or Subsidiaries, any natural person

or any Competitor." (PX0003 at L2AP0011786 (emphasis added).) It further stated,

"'Competitor' shall mean (i) any person listed on Schedule 1.01(a), (ii) any other competitor of

the Borrower that is designated as such in writing to the Administrative Agent by the Borrower

from time to time and (iii) any Affiliate of any such person." (PX0003 at L2AP0011784.)

Therefore, in this draft, transfers were restricted to any person or company listed on Schedule

1.01(a) as well as their "Affiliates."

30.    On September 21, 2010, counsel for UBS proposed revisions to LightSquared's

September 19, 2010 draft. (PX0002.) Those revisions removed the transfer restriction on any

Affiliate of a company listed on Schedule 1.01(a) and, instead, restricted transfers to any

Disqualified Company and "any known subsidiary thereof." (PX0002 at L2AP0011532.) The

language from this draft defining Eligible Assignee and Disqualified Company is what appears

in the final, executed Credit Agreement. (PX0002 at L2AP0011532; PX0004 at

HARBAP00004057-4058.)

31.    LightSquared Inc.'s Fourth Amended and Restated Stockholders' Agreement

includes the defined term "Affiliates" and prohibits the transfer of any equity securities to "any

of the entities set forth in Schedule 2.1(a)(ii) or any of their respective Affiliates." (PX0007 at

HARBAP00010483.) LightSquared did not include a similar restriction on the transfer of its

bank debt under the Credit Agreement.

32.    Persons holding LP Debt are entitled to receive substantial non-public information

about LightSquared and are granted access to LightSquared's officers and employees for

information regarding LightSquared's ongoing business and operations. Prior to initial funding,

LightSquared provided to the Lenders, among other things, multiple years of financial

statements, plus current forecasts of anticipated financial performance (PX0004 at

16

HARBAP00004092-93, § 3.04); a listing of all interests in real property owned or leased by

Borrower, together with representations regarding title, etc. (*id.* at HARBAP00004093-94,

§ 3.05); a listing of all copyrights, patents, and trademarks owned or licensed by Borrower,

together with representations regarding same (*id.* at HARBAP00004094, § 3.06); and copies of

all material agreements relating to the business operated by the Borrower (*id.* at

HARBAP00004095-96, § 3.09.)  Under the Credit Agreement, these disclosures must be updated

regularly by the Borrower.

33.    To meet this obligation, the Borrower must furnish to Lenders the type of

information that would be included in annual and quarterly reports on SEC Forms 10-K and 10-

Q (PX0004 at HARBAP00004108-9, §§ 5.01(a)-(b)), annual and quarterly budgets (*id.* at

HARBAP00004110, § 5.01(h)), and "such other information regarding the operations, business

affairs and financial condition of [Borrower, its parents and its subsidiaries] . . . as . . . any

Lender may reasonably request, including, without limitation, updates on the Network build-

out." (*Id.* at HARBAP00004110, § 5.01(j).)  Each Lender also has the right to inspect and make

copies of Borrower's financial records; to inspect Borrower's properties; and to "discuss the

affairs, finances, accounts and condition of [Borrower, its parents and its affiliates] with the

officers and employees thereof and advisors therefor (including independent accountants)." (*Id.*

at HARBAP00004113-14, § 5.07(a).)

34.    The Credit Agreement also provides that each Lender must "designate at least one

individual to receive Private Side Communications [*i.e.*, communications containing material

non-public information] on its behalf . . . and identify such designee (including such designee's

contact information) on such Lender's Administrative Questionnaire." (PX0004 at

HARBAP00004149, § 10.01(d).)  A Lender may elect not to receive material non-public

17

information, but must, if so electing, waive "any and all claims based on or arising out of, not having access to Private Side Communications." (*Id.*)

35.    SPSO did not waive its right to receive confidential information about LightSquared.  To the contrary, SPSO specifically identified in the several Lender Questionnaires it provided to the Administrative Agent one or more persons to whom such information was to be delivered. (PX0198; PX0227; PX0282; PX0317; PX0362; PX0363; PX0365; PX0367; PX0411; PX0563; PX0618; PX0638; PX0658; PX0672; PX0728; PX0733; PX0849; PX0851.)  Those individuals had access to information on LightSquared.  (*See, e.g.,* PX0919-922.)

36.    Under the express terms of the Credit Agreement, LightSquared's rights under the Credit Agreement cannot be waived.  Section 10.02(b) explicitly requires written consent by the parties before a party may be found to have waived the terms of the Credit Agreement:

> Required Consents.  Subject to Sections 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Trustee (in the Case of any Security Document) and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders . . . .

(PX0004 at HARBAP00004149-50.)

37.    Section 10.04(a) of the Credit Agreement states that only those transferees permitted under the terms of the Credit Agreement receive any rights, remedies, or claims thereunder:

> Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby,

18

Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(PX0004 at HARBAP0004153-54.)

38.      Section 10.04(b) provides that "[a]ny assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph [relating to assignments] shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(d)."  (PX0004 ¶ 10.04(b).)

39.      Section 10.04(d) provides that LightSquared "agrees that any breach by any Lender or participant or sub-participant of the restrictions on assignment hereunder (including, without limitation, to Disqualified Companies) shall not excuse, in any respect, performance by the Borrower under the Loan Documents."  (PX0004 ¶ 10.04(d).)

40.      Section 10.16 of the Credit Agreement states that "all obligations of the Loan Parties [the Borrower and Guarantors] hereunder shall be absolute and unconditional irrespective of . . . any lack of validity or enforceability of any Loan Document or any other . . . circumstance which might otherwise constitute a defense available to, or a discharge of, the Loan Parties." (PX0004 ¶ 10.16.)

## III.     Background Regarding SPSO's Purchases of LP Debt

### A.     Messrs. Ergen and Kiser Investigate Whether DISH and EchoStar Can Purchase LP Debt

41.      In the fall of 2011, Mr. Ergen believed the spectrum and satellites of LightSquared might be an attractive investment opportunity for DISH and therefore began looking into acquiring LightSquared's LP Debt.  (Jan. 13 Tr. (Ergen) 109:3-9; Jan. 10 Tr. (Kiser) 27:12-18.)

19

42.     Mr. Ergen asked Mr. Kiser, the Treasurer of DISH and a Vice President of

Corporate Development at DISH and EchoStar, to provide him with information concerning a

potential purchase by DISH of LightSquared's LP Debt.  (Jan. 10 Tr. (Kiser) 27:19-28:5, 32:25-

33:11, 77:7-18; Jan. 13 Tr. (Ergen) 25:4-18, 32:15-33:14, 112:10-113:23, 129:21-130:24.)  Mr.

Ergen stated that, when Mr. Kiser was first asked to check whether DISH could own the LP

Debt, Mr. Kiser was acting in his capacity as Treasurer of DISH.  (Jan. 13 Tr. (Ergen) 112:10-

113:13; PX0832 at 88-89.)  Mr. Kiser testified that when he initially inquired into who could

purchase the LP Debt – and until it was clear that the companies could not purchase the debt –

the LightSquared investment was considered a corporate opportunity for DISH and EchoStar.

(Jan. 10 Tr. (Kiser) 32:25-34:7.)

43.     Indeed, at the time when Messrs. Ergen and Kiser investigated purchasing the LP

Debt, their roles and responsibilities at DISH and EchoStar included identifying potential

investments and acquisitions for both companies.  (Jan. 10 Tr. (Kiser) 68:24-69:9; Jan. 13 Tr.

(Ergen) 95:6-24.)

44.     After Mr. Ergen's initial request to determine whether DISH could purchase LP

Debt, Mr. Kiser compiled information on LightSquared's spectrum and capital structure, which

he shared with Mr. Ergen.  (Jan. 10 Tr. (Kiser) 28:6-17.)

45.     After providing this information to and discussing this information with Mr.

Ergen, Mr. Kiser continued his examination into whether DISH and EchoStar could buy the LP

Debt.  (Jan. 10 Tr. (Kiser) 28:18-21.)  To that end, Mr. Kiser sought and obtained Mr. Ergen's

permission to retain Sound Point to facilitate purchases of the LP Debt and asked Sound Point's

founder, Mr. Ketchum – a longtime investment banker for EchoStar who had worked with Mr.

Kiser for over twenty years on EchoStar and DISH-related transactions – if DISH was permitted

to purchase the LP Debt.  (Jan. 15 Tr. (Ketchum) 14:19-22; PX0116 at LSQ-SPCD-000000904;

Jan. 13 Tr. (Ergen) 32:15-25; Jan. 10 Tr. (Kiser) 25:19-22.)

46.     Mr. Ketchum acknowledged that the LightSquared transactions were the first time

in twenty years of working with Mr. Kiser on behalf of DISH and EchoStar that he was asked to

handle a personal investment for Mr. Ergen.  (Jan. 15 Tr. (Ketchum) 13:22-25, 14:19-22, 94:4-

7.)

47.     At Mr. Kiser's request, Mr. Ketchum reviewed the Credit Agreement and

determined that neither EchoStar nor DISH was eligible to purchase the LP Debt.  (Jan. 10 Tr.

(Kiser) 28:18-29:9, 78:18-79:1; Jan. 13 Tr. (Ergen) 32:22-25; Jan. 15 Tr. (Ketchum) 49:23-

50:19, 95:10-14.)

48.     Subsequently, Mr. Kiser consulted with Sullivan and Cromwell LLP ("Sullivan &

Cromwell"), outside counsel to DISH and EchoStar, to determine whether DISH could purchase

the LP Debt, providing Sullivan & Cromwell with excerpts from the Credit Agreement.  (Jan. 10

Tr. (Kiser) 29:10-30:3, 118:14-18, 120:2-4; Jan. 13 Tr. (Ergen) 32:15-33:5.)  No counsel other

than Sullivan & Crowmwell, including in-house counsel for DISH, in-house counsel for

Echostar, or counsel for Mr. Ergen and SPSO, were consulted on this issue.  (Jan. 13 Tr. (Ergen)

32:15-33:3, 114:17-23, 180:23-181:2, 198:17-21; Jan. 10 Tr. (Kiser) 28:18-29:19, 78:24-79:22.)

49.     After reviewing the Credit Agreement and consulting with Sound Point and

Sullivan & Cromwell, Mr. Kiser determined that both DISH and EchoStar were restricted from

buying the LP Debt, and communicated this to Mr. Ergen.  (Jan. 10 Tr. (Kiser) 29:10-15, 30:4-9,

78:24-80:3, 121:8-22.)

50.     In the fall of 2011, when Mr. Kiser, Mr. Ketchum, and Sullivan & Cromwell

initially determined that both DISH and EchoStar were prohibited from purchasing the LP Debt

under the terms of the Credit Agreement, only EchoStar – but not DISH – was listed as a

Disqualified Company on Schedule 1.01(a) of the Credit Agreement.  (PX0004 at

HARBAP00004166; PX0144; PX0151; Jan. 15 Tr. (Ketchum) 50:9-51:2.)  DISH was

subsequently added to the list of Disqualified Companies in May 2012.  (PX0142.)

> **B.     Messrs. Ergen and Kiser Create the Bal Harbour Entities, and Then SPSO, to Purchase LP Debt**

51.     After learning that DISH was prohibited under the Credit Agreement from

purchasing the LP Debt, Mr. Kiser nonetheless asked Sound Point to monitor the prices and

volume of the LP Debt.  (Jan. 10 Tr. (Kiser) 30:4-9.)

52.     In January, February, and March 2012, Mr. Ergen was seeking to acquire LP Debt

for 40 cents on the dollar or less.  (Jan. 10 Tr. (Kiser) 41:6-15; Jan. 13 Tr. (Ergen) 39:24-40:3;

DX011; DX016; DX018; DX019;DX022; PX0021.)  During that time, Mr. Kiser was monitoring

the price of the debt for Mr. Ergen, but the debt was not yet trading at a price at which Mr. Ergen

wanted to buy.  (Jan. 10 Tr. (Kiser) 39:18-41:1, 42:24-43:15; DX011; DX016; DX018; DX019;

DX022; PX0021; PX0032.)

53.     On or after May 9, 2012, Messrs. Ergen, Kiser, and Ketchum were aware that the

Credit Agreement prohibited competitors DISH and EchoStar from purchasing the LP Debt.  In a

May 9, 2012 email, Mr. Ketchum reported to Mr. Kiser that "[a]n amendment was just created

whereby DISH Network Corp., DBSD, Clearwire, DirecTV, XM Satellite Radio Inc. were

named as disqualified buyers."  Mr. Ketchum specifically pointed out that "Charlie is not

named."  (PX0144.)  The following day, Mr. Ketchum sent Mr. Kiser the original list of

Disqualified Companies, as well as the exact language of the amendment.  (PX0151; PX0155; *cf.*

PX0190.)  The copy of the amendment that Mr. Ketchum sent to Mr. Kiser included a

handwritten note circling the term "Disqualified Company," explaining that this term "includes

22

any known subsidiary thereof." (PX0155 at SPSO-00001608.)  Mr. Ketchum understood the term "subsidiary" to include any corporate entity controlled by a designated Disqualified Company.  (Jan. 15 Tr. (Ketchum) 52:18-53:16; PX0155.)

54.   Mr. Kiser further inquired of Sullivan & Cromwell in 2011 whether there were other ways for DISH or EchoStar to take advantage of "the LightSquared opportunity." (Jan. 10 Tr. (Kiser) 81:18-82:5.)  Mr. Kiser discussed with Sullivan & Cromwell whether an investment vehicle could buy the LP Debt.  (Jan. 10 Tr. (Kiser) 30:10-12.)  Mr. Ergen testified that "[w]hen I talk to lawyers it's . . . more about, you know, how can I do this, as opposed to what the law says." (PX0866; Jan. 13 Tr. (Ergen) 199:4-7.)

55.   No evidence was submitted demonstrating any exploration of the possibility of DISH or EchoStar purchasing the LP Debt through an "affiliate," nor any analysis of the possible corporate opportunity involved with such a structure.

56.   Given the transfer restrictions in the Credit Agreement, if DISH and EchoStar could not buy LP Debt, then Mr. Ergen determined that he had an interest in "personally" purchasing the debt.  (Jan. 10 Tr. (Kiser) 33:9-15, 77:11-18.)  Accordingly, Mr. Kiser consulted with Sullivan & Cromwell to determine whether Mr. Ergen could buy the LP Debt, after which he understood that this would not work either, because the Credit Agreement barred Mr. Ergen and all other "natural persons" from buying the LP Debt.  This led him to set up an investment vehicle.  (Jan. 10 Tr. (Kiser) 30:16-21, 80:4-6, 120:20-24.)

57.   Mr. Kiser structured the LP Debt purchases through a special purpose vehicle ("SPV"), initially directing the creation of two companies, Bal Harbour Capital Management LLC ("Bal Harbour Capital") and Bal Harbour Holdings, LLC (together with Bal Harbour Capital, the "Bal Harbour Entities").  (Jan. 10 Tr. (Kiser) 30:16-31:4, 87:3-8.)  The Bal Harbour

Entities were incorporated in December 2011. (DX046; *see also* Delaware Department of State, Division of Corporations website (http://corp.delaware.gov/).)

58.    After the Bal Harbour Entities had been formed, Mr. Kiser realized that a Littleton, Colorado address had been used in its formation documents. Mr. Ergen resides in Littleton, which is near Englewood, Colorado, where DISH and EchoStar are headquartered. (Jan. 10 Tr. (Kiser) 32:2-14, 35:21-24; Jan. 13 Tr. (Ergen) 36:13-20.) Concerned that the Colorado address would compromise Mr. Ergen's anonymity, Mr. Kiser directed Sound Point to create new SPVs to replace the Bal Harbour Entities. (Jan. 10 Tr. (Kiser) 32:2-14, 90:6-12, 91:12-20; Jan. 13 Tr. (Ergen) 35:24-36:6, 36:21-37:4, 49:20-50:25; PX0117.)

59.    Mr. Ketchum suggested to Mr. Kiser that the new entity's name be SP Special Opportunities, LLC – a name suggesting Sound Point ownership. (PX0165.) Following Mr. Ketchum's suggestion, Mr. Kiser directed Sound Point to set up SPSO and SO Holdings on May 16, 2012.[8] (PX0221; PX0183; Jan. 10 Tr. (Kiser) 31:10-32:1, 91:9-11.)

60.    Rather than listing a Colorado address, the SO Holdings and SPSO formation documents listed a Delaware address. (PX0183 at SPSO-00000512, SPSO-00000514.) As Mr. Kiser testified, SPSO's address was specifically chosen to deflect any possible connection between Mr. Ergen and Sound Point's purchases of the LP Debt. (Jan. 10 Tr. (Kiser) 32:2-14.)

61.    It was important to Messrs. Ergen and Kiser that the public not know they were behind Sound Point's purchases. (Jan. 10 Tr. (Kiser) 30:16-21, 31:20-22, 32:2-14, 90:25-91:20; Jan. 13 Tr. (Ergen) 36:13-20; PX0171; PX0183; PX0224; PX0290 at LSQ-SPCD-000006771; PX0298.)

---

[8]    The capital structure of SPSO and SO Holdings was set up to mirror that of the Bal Harbour Entities. (PX0224; PX0221; PX0058.)

62.     SPSO's first trade in LightSquared debt was made on April 13, 2012, at a price of 48.75 cents on the dollar.  (Jan. 10 Tr. (Kiser) 35:25-36:13; Jan. 13 Tr. (Ergen) 42:16-18; PX0859.)  The second trade was executed on May 3, 2012, at 59 cents on the dollar.  (PX0859.)

63.     On May 4, 2012, SPSO entered into a trade for a $247 million block of LP Debt, paying approximately $149 million.  (PX0859.)  Between April 13 and May 4, 2012 (prior to LightSquared's Petition Date on May 14, 2012), SPSO purchased a total of approximately $287 million in face amount of LP Debt.  These initial purchases were made at prices between 48.75 cents and 60.25 cents on the dollar and cost Mr. Ergen a total of approximately $172 million. (PX0859.)

64.     Following SPSO's purchase of the $247 million piece of debt, news reports speculated that Mr. Ergen was the purchaser of the debt.  (Jan. 10 Tr. (Kiser) 37:5-13.)  On May 7, 2012, a *Reuters* story on the trade mentioned that Mr. Steven Ketchum of Sound Point previously counted Mr. Ergen as one of his investment banker clients and that DISH owned wireless airwaves "similar to LightSquared."  (PX0121.)  On May 9, 2012, an *LCD News* story carried the headline, "LightSquared TL trades north of 70 as Ergen enters the picture." (DX045.) On May 10, 2012, a *Wall Street Journal* blog, "Deal Journal," published an entry titled "Ergen Builds Cash Pile Amid LightSquared Restructuring Talks."  (DX396.)  Following the publication of those articles, the price of LightSquared's debt increased.  (PX0859; DX047.)

65.     Mr. Ergen testified that when he started buying LightSquared debt, he did not have an idea of how much debt SPSO would eventually buy, and he was not interested in achieving a "blocking position" in the debt.  (Jan. 13 Tr. (Ergen) 43:17-44:8.)

66.     Even after creating the Bal Harbour Entities and SPSO and purchasing large quantities of LP Debt, Messrs. Ergen and Kiser continued to check whether DISH or EchoStar

25

could purchase the LP Debt directly.  (PX0243.)  On October 4, 2012, Mr. Kiser wrote to Mr.

Ergen, "I still can't get confirmation the restricted list [LightSquared] had in place that prevented

the company from buying them has fallen away due to the BK."  (*Id.*)  The same day, Mr. Ergen

responded, "[i]f we can't be sure the company can buy them, then I am interested to increase my

position at the 75 level at least up to a 33% ownership level of the class."  (*Id.*)

67.    Mr. Ergen and Mr. Kiser checked the restrictions again in order to understand

whether LightSquared's bankruptcy filing had altered any of the restrictions, such that DISH

could now purchase LP Debt.  (Jan. 13 Tr. (Ergen) 240:23-241:14.)  Nevertheless, Mr. Ergen

believed that it was not worth contacting the banks and undermining his anonymity to determine

whether the transfer restriction had in fact fallen away.  (Jan. 13 Tr. (Ergen) 49:14-50:13.)

## C.    SPSO and Mr. Ketchum Did Not Reveal that Mr. Ergen Was Behind the LP Debt Purchases

68.    Sound Point endeavored not to disclose SPSO's connection to Mr. Ergen.  For

example, on May 2, 2012, Mr. Ketchum advised a Sound Point employee that "Echostar wants

up to $50mm LightSquared," and asked him to reach out to Seaport, a middleman, but directed

that "we can't tip our hand."  The employee replied, "Yeah, i haven't indicated anything to

anyone."  (PX0088.)  The following day, the employee reported that he spoke with Seaport and

noted that Kevin Gerlitz, another Sound Point employee, was concerned that the trade would

show Bal Harbour Capital as the buyer in the documentation.  The employee asked, "Will this

create problems?"  Mr. Ketchum responded, "Possibly.  Sh*t."  (PX0089.)  Indeed, Sound Point

was not even willing to disclose the identity of the buyer to Jefferies as the middleman, even if

Jefferies created an ethical wall.  (PX0100.)

69.    A few days later, on May 5, 2012, Mr. Ketchum sent an email to Mr. Kiser

describing a voicemail he received from a *Wall Street Journal* reporter regarding Sound Point,

stating he was "obviously" not going to call the reporter back, even though he "clearly didn't

understand what Sound Point is." (PX0119.) Mr. Ketchum further noted that the reporter "did

not mention Charlie or EchoStar" in his voicemail. (*Id.*) Mr. Kiser forwarded Mr. Ketchum's

email to Mr. Ergen, explaining that Mr. Kiser had spoken to Mr. Ketchum about the issue and

that "[t]here might just be a lot of people fishing all over the place based on speculation (they're

[*sic*] weren't a lot of other logical buyers)." (*Id.*)

70.     Similarly, on May 7, 2012, after receiving a press inquiry, Mr. Ketchum reached

out to Mr. Kiser and asked whether they should "employ a more strenuous strategy" around

denying to the press that Mr. Ergen was behind SPSO. (PX0124.) Additionally, email

exchanges demonstrate Messrs. Ketchum and Kiser making light of the fact that there were

rumors in the press indicating that Carlos Slim ("Slim") was behind Sound Point's purchases of

the LP Debt, noting that Mr. Ketchum would "continue to get looks" because he's "Carlos

Slim's main man" and that a news report suggesting it was Slim and not Ergen was "[m]aybe []

right."[9] (*See* PX0271; PX0216; Jan. 15 Tr. (Ketchum) 91:20-92:3.)

**IV.     SPSO is Solely a Front for Mr. Ergen**

71.     Further evidencing that Sound Point viewed SPSO as being identical to Mr.

Ergen, Sound Point entered into a Trading Management Agreement with SPSO on April 15,

2012 – a month before SPSO and SO Holdings were even formed.[10] (PX0055 at LSQ-SPCD-

---

[9]     Carlos Slim is the principal of the Mexican telecommunications companies Telmex Internacional and
America Movil (PX0895 (Cellular News, *America Movil, Telmex to Invest $880 Mn in Peru Through 2012*, (Apr.
18, 2010), available at *http://www.cellular-news.com/story/42891.php* (last visited Feb. 24, 2014)).)

[10]     On April 5, 2012, Bal Harbour Capital entered into a trading management agreement with Sound Point,
granting Sound Point non-discretionary authority to execute trades on its behalf. (PX0131 at LSQ-SPCD-
000011949; Jan. 15 Tr. (Ketchum) 15:5-14.) Bal Harbour Capital was initially capitalized with one dollar ($1.00)
and itself had no right to secure additional funding. (Jan. 15 Tr. (Ketchum) 19:18-25; PX0058 at LSQ-SPCD-
000012134; PX0147 at SPSO-00001602; Ergen Dep. 120:2-10.) Under Bal Harbour Capital's Limited Liability
Company Agreement, Mr. Ergen had no obligation to make further capital contributions beyond the initial one
(continued...)

00000750; Jan. 15 Tr. (Ketchum) 18:22-25, 99:9-19; PX0221.)  Mr. Ketchum could not recall

another instance where he entered into a Trading Management Agreement with an entity that had

not yet been formed.  (Jan. 15 Tr. (Ketchum) 19:5-10; PX0049; PX0083; PX0084; PX0087;

PX0088; PX0224.)  Mr. Ketchum knew he was dealing with Mr. Ergen and had no doubt that

Mr. Ergen had the financial wherewithal to fund the trades.

### A.    SPSO was Undercapitalized and Funded Solely at Mr. Ergen's Discretion

72.    SPSO is wholly owned by its one Managing Member, SO Holdings, and Mr.

Ergen wholly owns and is the sole Managing Member of SO Holdings.[11]  (PX0221 at LSQ-

SPCD-000005552, 5557, 5560, 5565; Jan. 10 Tr. (Kiser) 31:15-19.)

73.    SPSO – the vehicle on behalf of which most of the LP Debt trades were initiated

and all of the trades closed – was formed with a *de minimis* amount of funding.  (Jan. 10 Tr.

(Kiser) 56:22-57:6; Jan. 13 Tr. (Ergen) 127:20-25; PX0529; PX0530; PX0560; PX0859.)  The

operating agreements for both SPSO and SO Holdings require that the Managing Member – Mr.

Ergen – make an initial capital contribution of ten dollars ($10.00) for each entity.  (PX0221 at

LSQ-SPCD-000005553, 5558, 5561, 5566; Jan. 15 Tr. (Ketchum) 18:5-21.)  Mr. Ergen testified

that this initial contribution to SPSO "wasn't very much," (Jan. 10 Tr. (Ergen) 127:18-25), and

Mr. Kiser ignored Mr. Ketchum's recommendation, based on advice from Sound Point's CFO,

that Mr. Ergen's other SPV, Bal Harbour Capital, be capitalized initially with $500,000.  (Jan. 10

Tr. (Kiser) 87:24-88:3.)

---

dollar capital contribution (PX0058 at LSQ-SPCD-000012127 ("[T]he Managing Member shall have no right or
obligation to make any further capital contributions in the Company.").)

[11]    The Bal Harbour Entities also were solely owned by Mr. Ergen.  (PX0058 at LSQ-SPCD-000012124;
PX0059 at SPSO-00000396.)

74.     Neither the SPSO operating agreement nor SO Holdings operating agreement requires additional capital contributions from Mr. Ergen as Managing Member.  (PX0221 at LSQ-SPCD-000005553, 5561 ("[t]he Managing Member is entitled, but not required, to make additional contributions to the capital of the Company").)

75.     Bear Creek Asset Management LLC ("Bear Creek") is a registered investment advisor that manages fixed-income instruments for high-net-worth individuals and corporations.  (Roddy Dep. 17:8-11.)   Bear Creek manages DISH's and EchoStar's corporate cash in short-term investment accounts.  (Jan. 10 Tr. (Kiser) 22:1-9; Jan. 13 Tr. (Ergen) 24:14-15; Roddy Dep. 43:3-14.)  Bear Creek also manages a substantial amount of Mr. Ergen's personal assets.  (Jan. 10 Tr. (Kiser) 22:9-13; Jan. 13 Tr. (Ergen) 24:11-13.)

76.     Mr. Ergen was the only person who could make the decision to transfer funds from his account at Bear Creek to Bal Harbour Capital or SPSO for settlement of the LightSquared trades.  (Jan. 10 Tr. (Kiser) 57:7-58:12, 87:13-19; Jan. 15 Tr. (Ketchum) 99:9-19; PX0046; PX0055; PX0116 at LSQ-SPCD-000000905 (Mr. Ergen had "full discretion over the investment decisions" in his accounts at Sound Point); Jan. 10 Tr. (Kiser) 24:6-9 (Mr. Ergen "makes his own decision" with respect to his investments).)

77.     The initial capital contribution amounts for SPSO and SO Holdings were insufficient to buy a significant amount of LP Debt.  (Jan. 15 Tr. (Ketchum) 18:8-21, 20:4-13.)

78.     Although Mr. Ketchum knew that the Bal Harbour Entities and SPSO did not have sufficient funds in their accounts to cover the purchases of LP Debt prior to the closing of the trades, Mr. Ketchum did not perform a credit check with respect to SPSO and did not have an understanding of SPSO's financial resources or wherewithal.  (Jan. 15 Tr. (Ketchum) 20:18-25; PX0062; PX0066; PX0070.)

79.     Sound Point nevertheless traded on behalf of Mr. Ergen's minimally-funded entities because Mr. Ketchum understood that the entities were backstopped by Mr. Ergen. (PX0052; PX0056; PX0058; PX0059; PX0074.)  For instance, on April 13, 2012, Sound Point initiated a $5 million LP Debt trade for Bal Harbour Capital, even though at that time the Bal Harbour account had not yet been funded.  (PX0859; PX0066; PX0049; PX0050; PX0062; PX0070.)  On April 17, 2012, Mr. Ketchum wrote to Kiser that, "[w]e need to get the Citi account open for BH Holdings and get $500,000 in the account before we do any more LightSquared trades."  (PX0066.)

80.     Mr. Ketchum testified that Sound Point was "comfortable" that Mr. Ergen would pay for SPSO's LightSquared debt purchases because "[i]t was implicit that if we executed a trade, SPSO would pay to settle the trade."  Sound Point understood that this money would come from Mr. Ergen, and Mr. Ketchum stated that Sound Point was satisfied that the trades would be settled based on Mr. Ergen's credit rather than SPSO's credit.  (Jan. 15 Tr. (Ketchum) 21:1-22:8, 120:13-16; Jan. 10 Tr. (Kiser) 57:7-59:5, 61:5-9, 74:11-19; DX229; PX0041; PX0052 at LSQ-SPCD-000005238 (documentation for Bal Harbour BNP Paribas account stated that Mr. Ergen had "$100 million +" of liquid net worth); PX0091; PX0116 at LSQ-SPCD-00000904.)

**B.     SPSO Votes Against Extension of LightSquared's Negotiations with Lenders**

81.     In early 2012, both Messrs. Ergen and Kiser knew that there was a strong possibility that LightSquared would file for bankruptcy.  (*See, e.g.*, PX0033 (February 20, 2012 email from Mr. Cullen to Messrs. Ergen and Kiser enclosing article on LightSquared's default on $56 million payment to Inmarsat); PX0075 (April 27, 2012 email from Mr. Cullen to Mr. Kiser enclosing *Wall Street Journal* article discussing bankruptcy as an imminent possibility); PX0078 (April 30, 2012 email from Mr. Kiser to Mr. Ergen enclosing *Wall Street Journal* article discussing Mr. Falcone's attempt to get a one week "extension on default"); PX0121 (May 7,

30

2012 email from Mr. Cullen to Messrs. Ergen and Kiser enclosing *Reuters* story noting

LightSquared's "uncertain future" and the possibility of a default); PX0163 (May 11, 2012 email

from Mr. Kiser to Mr. Ergen enclosing *Debtwire* article suggesting LightSquared could file for

bankruptcy).)

82.     Throughout early 2012, Mr. Ketchum kept Mr. Kiser apprised as he monitored

LightSquared's situation.  (PX0031; PX0039; PX0044; PX0064; PX0074.)  On May 4, 2012 –

prior to LightSquared's bankruptcy filing – SPSO was notified that, in connection with the $247

million in LP Debt that SPSO had agreed to purchase but had not yet closed on, it had the right

to vote on a proposed amendment to the Credit Agreement that would give LightSquared more

time to attempt to reach an agreement with the LP Lenders and avoid bankruptcy.  In an email on

Friday, May 4, 2012, Mr. Kiser wrote to Mr. Ergen, in part, that "[t]he seller is inclined to vote to

approve this one week extension of time to continue negotiations, and so if the buyer does not

direct the seller to the contrary, that is how the seller will vote."  (Jan. 10 Tr. (Kiser) 111:13-

112:5; PX0111.)  The amendment was due several days later, on Monday, but responses were

sought before the weekend if possible.  (PX0097.)  Mr. Ergen replied to Mr. Kiser's email, "I

would have them vote no."  (Jan. 10 Tr. (Kiser) 113:13-15, 113:23-25; Jan. 13 Tr. (Ergen) 166:1-

167:16; PX0111.)  Following Mr. Ergen's direction, Mr. Kiser directed Sound Point to vote "no"

on the amendment.  (Jan. 10 Tr. (Kiser) 116:18-117:21; PX0097; PX0109.)  A Sound Point

employee relayed these instructions to Mr. Ketchum, commenting "[n]o extension, so they want

it to file bankruptcy."  Mr. Ketchum replied, "[n]o surprise there."  (PX0096.)

83.     While Mr. Ergen testified that he determined to vote "no" because he did not have

the documents necessary to decide how to vote (Jan. 13 Tr. (Ergen) 166:1-167:16, 261:13-

263:8), the record reflects that the amendment documents likely could have been obtained by

Sound Point, had Messrs. Ergen and/or Kiser indicated an interest in reviewing them over the weekend.  When a Sound Point employee told Mr. Kiser that "I might have figured out a way to get the docs . . . please stand by," Mr. Kiser simply responded "[w]e'll vote no."  (PX0097; PX0096.)  Mr. Kiser also conceded that, before voting no, he made no effort to discuss with any of the LP Lenders why they wanted to extend the default deadline.  (Jan. 10 Tr. (Kiser) 118:10-13; PX0097.)  After seeing the email exchanges between Messrs. Kiser and Ketchum concerning the availability of the amendment documents, Mr. Ergen testified, "I'm disappointed that [Kiser] answered no. . . . That's not the way I would have done it. . . ."  (Jan. 13 Tr. (Ergen) 262:13-263:8.)

### C.    SPSO's LP Debt Purchases

84.    Mr. Ergen funded SPSO's debt purchases from his personal account at Bear Creek.  None of the money used to fund SPSO's purchases of LightSquared debt came from DISH or EchoStar.  (Jan. 13 Tr. (Ergen) 59:11-12; Jan. 10 Tr. (Kiser) 57:18-23; Rayner Dep. 23:14-24:2, 24:13-23; Olson Dep. 14:6-15:14.)

85.    Mr. Robert Olson, DISH's Chief Financial Officer ("Olson"), testified that if DISH money had been used to fund the trades, he would have known because DISH's controller, Paul Orban, would need to approve the transactions.  (Olson Dep. 14:10-15:14.)

86.    Mr. Ergen's Bear Creek account that was used to fund SPSO's trades in LightSquared debt is titled the "Lindsey Revocable Trust" account (Jan. 10 Tr. (Kiser) 58:13-17; Roddy Dep. 17:24-18:8; DX326), and was set up in 2000 for estate planning purposes.  (Jan. 13 Tr. (Ergen) 61:17-23, 62:7-8.)  Mr. Ergen is its sole beneficiary and is authorized to make investments for the trust, and his wife, Cantey Ergen, is a co-trustee.  (Jan. 13 Tr. (Ergen) 61:17-23, 62:7-8, 252:18-20.)  Bear Creek understood that the Lindsey Revocable Trust was a personal trust account for Mr. Ergen.  (Roddy Dep. 17:24-18:8.)

87.    Mr. Ergen does not have an agreement or understanding with DISH regarding SPSO's investment in LightSquared debt, and he understands that the money he personally invested in LightSquared debt is at risk.  (Jan. 13 Tr. (Ergen) 233:6-16.)  Thus, if SPSO's claim in LightSquared receives an impaired recovery, Mr. Ergen bears the sole risk.  (Jan. 13 Tr. (Ergen) 233:6-16.)  In addition, there is no agreement pursuant to which DISH or EchoStar will share in any gains from SPSO's investments.  Mr. Olson confirmed that there are no agreements between Mr. Ergen and DISH related to Mr. Ergen's purchases of LightSquared debt.  (Olson Dep. 26:7-27:11.)

88.    Between April 13, 2012 and April 26, 2013, SPSO contracted to purchase over $1 billion in face amount of LP Debt, of which it actually closed trades for $844,323,097.83 in face amount.  When a trade was scheduled to close, Mr. Kiser would contact Bear Creek and tell it how much money was needed to close the trade.  (Jan. 10 Tr. (Kiser) 21:23-22:13; 57:7-17.)  Mr. Ergen would then authorize the wire transfer and Bear Creek would liquidate investments to fund the transfer.  (Jan. 10 Tr. (Kiser) 21:23-22:13, 57:7-17.)

89.    The following chart sets forth SPSO's trades in LP Debt, including the trade and closing dates, par amount, purchase price, cost, broker, and settlement status:

| Trade Date | Closing Date | Par | Price | Cost | Counterparty | Status |
|---|---|---|---|---|---|---|
| 04/13/12 | 09/06/12 | 5,000,000.00 | 48.750 | 2,437,500 | UBS | Settled |
| 05/03/12 | 07/23/12 | 4,545,500.00 | 59.00 | 2,681,845 | Jefferies | Settled |
| 05/03/12 | 07/26/12 | 20,000,000.00 | 59.250 | 11,850,000 | Seaport | Settled |
| 05/03/12 | 09/06/12 | 3,000,000.00 | 58.750 | 1,762,500 | UBS | Settled |
| 05/03/12 | 09/06/12 | 2,000,000.00 | 58.500 | 1,170,000 | UBS | Settled |
| 05/03/12 | 07/23/12 | 5,000,000.00 | 59.000 | 2,950,000 | Jefferies | Settled |
| 05/04/12 | 05/31/12 | 247,259,046.62 | 60.250 | 148,973,576 | Jefferies | Settled |
| 10/04/12 | 11/30/12 | 19,417,287.99 | 78.500 | 15,242,571 | Jefferies | Settled |
| 10/23/12 | 02/06/13 | 3,000,000.00 | 83.750 | 2,512,500 | UBS | Settled |
| 11/15/12 | 01/08/13 | 7,997,057.00 | 81.750 | 6,537,594 | Jefferies | Settled |
| 12/12/12 | 6/11/13 | 2,000,000.00 | 84.000 | 1,680,000 | Goldman Sachs | Settled |

| Trade Date | Closing Date | Par | Price | Cost | Counterparty | Status |
|---|---|---|---|---|---|---|
| 12/13/12 | 03/12/13 | 7,000,000.00 | 86.000 | 6,020,000 | Jefferies | Settled |
| 12/20/12 | 04/09/13 | 14,782,302.32 | 85.500 | 12,934,515 | UBS | Settled |
| 12/28/12 | 03/13/13 | 15,000,000.00 | 88,500 | 13,275,000 | Jefferies | Settled |
| 01/02/13 | 03/07/13 | 20,000,000.00 | 89.125 | 17,825,000 | Jefferies | Settled |
| 01/05/13 | 04/05/13 | 6,000,000.00 | 89.125 | 5,347,500 | Jefferies | Settled |
| 01/03/13 | 03/07/13 | 17,999,999.97 | 89.250 | 16,065,000 | Jefferies | Settled |
| 01/07/13 | 05/24/13 | 7,000,000.00 | 89.500 | 6,265,000 | Jefferies | Settled |
| 01/14/13 | 05/24/13 | 9,410,420.00 | 91.500 | 8,610,534 | Jefferies | Settled |
| 02/01/13 | 07/23/13 | 20,000,000.00 | 91.875 | 18,375,000 | JPM | Settled |
| 03/25/13 | 05/24/13 | 88,262,536.00 | 93.375 | 84,180,394 | Jefferies | Settled |
| 03/28/13 | - | 168,759,227.85 | 96.000 | 162,008,859 | Jefferies | Unsettled |
| 04/01/13 | 6/25/13 | 5,500,000.00 | 96.000 | 5,280,000 | Seaport | Settled |
| 04/19/13 | 6/14/13 | 122,250,172.79 | 96.000 | 117,360,166 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 145,712,408.57 | 96.000 | 139,883,912 | Jefferies | Settled |
| 04/26/13 | 6/18/13 | 46,186,366.57 | 96.00 | 44,338,912 | Jefferies | Settled |
|  |  |  |  |  |  |  |
| Total Purchased |  | 1,013,082,326.30 | 84.45 | 855,567,877 |  |  |
| Total Settled |  | 844,323,097.83 |  | 693,559,018 |  | Settled |
| Total Unsettled |  | 168,759,227.85 |  |  |  | Unsettled |

(*See* PX0859 at 4.)

### D.    Mr. Ergen's Desire to Obtain a Blocking Position in LP Debt

90.    Mr. Ergen's strategy in acquiring LP Debt included the acquisition of a blocking

position that would enable SPSO to enforce "certain rights" during the bankruptcy proceeding.

(Jan. 10 Tr. (Kiser) 47:22-48:10, 56:11-14; Jan. 13 Tr. (Ergen) 172:10-174:2; DX047.)

91.    Mr. Ergen understood that creditors could be treated differently as a result of his

investments in Loral, which went through a bankruptcy process.  Mr. Ergen ended up with equity

while other investors ended up with cash.  (Jan. 13 Tr. (Ergen) 52:6-11.)  Based on that

experience, Mr. Ergen believed that 33 percent was a "meaningful percentage in bankruptcy,"

and that with that percentage, he "couldn't get jammed with a different kind of currency than

somebody else in that class might get."[12]  (Jan. 13 Tr. (Ergen) 51:12-18, 172:25-173:3.)  Mr.

Ergen had a sizeable enough position in LightSquared to protect that he decided to acquire a

blocking position; he stated that he "knew there were ways that [he] might be able to protect

[his] investment if [he] got a third that [he] wouldn't have if [he had] half of that."  (Jan. 13 Tr.

(Ergen) 51:12-24.)

92.     At Mr. Ergen's direction, Mr. Kiser (through Sound Point) regularly monitored

how close SPSO was to reaching a blocking position and kept a close eye on developments in the

bankruptcy itself.  (*See* PX0244; PX0264; PX0276; PX0288; PX0289; PX0375; PX0379;

PX0306; Jan. 15 Tr. (Ketchum) 102:7-12; *see also* PX0064; PX0096; PX0413; PX0239;

PX0344; PX0262.)[13]

93.     After Mr. Ergen decided to acquire a 33 percent stake in the LP Debt, Mr. Kiser

asked Mr. Ketchum to track whether SPSO had a blocking position and to supply Mr. Kiser with

the information about the calculation of a blocking position.  (Jan. 15 Tr. (Ketchum) 102:7-16;

25:11-26:18, 48:19-25, 102:7-12, 104:16-21; PX0244; PX0144.)  Notwithstanding such request,

Mr. Kiser did not share SPSO's investment strategy with Mr. Ketchum.  (Jan. 15 Tr. (Ketchum)

102:7-16.)

94.     On March 28, 2013 – the date on which Messrs. Ergen and Kiser believed they

had achieved their goal of obtaining a blocking position – Mr. Ketchum sent an email to Mr.

Kiser, stating "You just bought a spectrum company."  Later in that same email chain, Mr.

Ketchum observed to one of his colleagues that "we now control the company."  (PX0385.)

---

[12]     Mr. Kiser understood that a blocking position is desirable and protects one's investment by preventing others from unilaterally changing one's rights.  (Jan. 10 Tr. (Kiser) 54:11-17.)

[13]     Although Mr. Ketchum initially testified that he did not recall discussing acquiring a blocking position with Mr. Kiser, he later admitted that Mr. Kiser told him that "he was very interested in tracking whether or not SPSO had a blocking position with respect to LightSquared."  (Jan. 15 Tr. (Ketchum) 102:7-12.)

## V.   Mr. Ergen Acted, at Least in Part, for the Benefit of DISH in Acquiring LP Debt Through SPSO

95.    In the course of amassing a substantial position in LP Debt, Mr. Ergen used DISH's employees, resources, facilities, and counsel.  Members of the DISH and EchoStar boards and DISH's management also were made aware of Mr. Ergen's purchases; there was no evidence presented reflecting any action or investigation by the DISH Board with respect to SPSO's LP Debt trades.

96.    It is within the scope of Mr. Ergen's broad authority to lead strategic acquisitions of spectrum assets for DISH and EchoStar.  (Jan. 10 Tr. (Kiser) 69:3-6, 69:23-70:9; Jan. 13 Tr. (Ergen) 95:6-16, 96:15-24; Howard Dep. 33:25-34:12; *see also* PX0010.)  Mr. Ergen, as the Chairman of the Boards of DISH and EchoStar, is an officer and a full-time, salaried employee of DISH and EchoStar.  (Jan. 13 Tr. (Ergen) 11:13-14, 94:4-18, 94:8-18; PX0349 at 20, 31; PX0350 at 17, 34.)  In that capacity, Mr. Ergen "focus[es] on [the] strategic direction of the company" which includes acquisitions and strategic investments.  (Jan. 13 Tr. (Ergen) 95:6-16; Jan. 10 Tr. (Kiser) 69:3-9; Howard Dep. 33:25-34:11; *see also* PX0010.)  His responsibilities include the strategic pursuit of spectrum assets, which Mr. Ergen sees as necessary to compete with the large wireless carriers, to further DISH's strategic goal of diversifying away from its core Pay-TV business.  (Jan. 10 Tr. (Kiser) 70:10-19; Jan. 13 Tr. (Ergen) 96:15-24, 100:25-101:4; Howard Dep. 30:15-31:13, 33:10-35:13; PX349 at ii.)

97.    Mr. Ergen's role in managing the strategic direction of DISH and EchoStar includes the companies' attempts to acquire, or merge with, numerous spectrum-owning companies.  (Jan. 13 Tr. (Ergen) 101:5-103:5.)  Mr. Ergen is "responsible for what DISH does in connection with the LightSquared bankruptcy" and he "leads bids of this nature" as part of his responsibilities for DISH.  (PX0767 (Goodbarn Nevada Dep.) at 186:25-96, 232:12-17.)

98.    Mr. Kiser testified that Mr. Ergen "typically" is involved in strategic investments, and Mr. Kiser could not point to a single strategic investment made by DISH and EchoStar that Mr. Ergen had opposed.  (Jan. 10 Tr. (Kiser) 69:23-70:9.)  Further, Mr. Ergen, who achieves board consensus before bringing issues to vote, has not voted against a single board resolution in the past five years.  (Jan. 13 Tr. (Ergen) 236:3-8.)

99.    DISH has two policies governing investments made on behalf of the company. (Jan. 10 Tr. (Kiser) 23:10-11.)  One policy governs the company's cash management projects and outlines how Bear Creek may invest the company's money.  (Jan. 10 Tr. (Kiser) 23:11-21.) The second policy governs the company's strategic investments and states that "[a]ny investment not otherwise permitted by the Corporation's cash management policy shall not exceed $125 million in any single transaction or series of related transactions without approval of the Board of Directors; and investments not otherwise permitted by the Corporation's cash management policy shall not exceed $200 million in aggregate in any calendar quarter without approval of the Board of Directors."  (DX331; Jan. 10 Tr. (Kiser) 23:10-24:5; Olson Dep. 12:15-23, 20:7-23.)

A.    **Mr. Kiser's Role in SPSO's LP Debt Purchases**

100.    Mr. Kiser has been employed by DISH and its predecessor companies for 27 years.  (Jan. 10 Tr. (Kiser) 14:4-9, 15:25-16:1, 69:10-22; Jan. 13 Tr. (Ergen) 21:12-14.)  As DISH's Treasurer, he focuses on corporate development, including capital-raising, investor relations, strategic acquisitions and investments, and the purchase of marketable securities.  (Jan. 10 Tr. (Kiser) 16:2-6, 108:16-20, 140:6-18; Jan. 17 Tr. (Cullen) 139:18-140:5.)  Mr. Kiser also performs corporate development services for EchoStar pursuant to a management services agreement between DISH and EchoStar.  (Jan. 10 Tr. (Kiser) 69:10-22.)

101.    As Treasurer of DISH, Mr. Kiser reports directly to Mr. Ergen.  Under DISH's bylaws, Mr. Kiser must "perform all duties commonly incident to his office and such other duties

as may, from time to time, be assigned to him by . . . the Chairman of the Board of Directors."
(PX0821 at § 5.2(f).)  Accordingly, Mr. Kiser receives authorization from Mr. Ergen in making
strategic investments for DISH's portfolio.  (Jan. 10 Tr. (Kiser) 69:3-9.)

102.    In the course of his duties, Mr. Kiser likewise has been involved in numerous
proposed or actual transactions on behalf of DISH or EchoStar, including transactions involving
Clearwire, Sprint, Blockbuster Inc., DBSD, and TerreStar.  (Jan. 17 Tr. (Cullen) 139:16-140:9;
Kiser Dep. 117:23-118:6, 173:18-21.)  Mr. Ergen testified that "Kiser, in his role at DISH over
the years, had been involved in a number of transactions and was familiar with looking at capital
structures and interpreting those capital structures and determining things such as who could buy
debt or if—and if there were any restrictions."  (Jan. 13 Tr. (Ergen) 162:9-16.)

103.    The scope of Mr. Kiser's employment and authority extends to transacting and
monitoring trades on behalf of DISH, including purchases of other companies' debt and
interacting with Bear Creek.  (Jan. 10 Tr. (Kiser) 21:23-22:18.)

104.    For example, when DISH made a decision sometime in early 2012 to make a
strategic investment in LodgeNet, a company that provides pay-per-view movie services to hotel
rooms, Mr. Ergen authorized Mr. Kiser to acquire LodgeNet debt on behalf of DISH, and Mr.
Kiser – without authorization from the DISH Board – worked with Sound Point to execute the
trades.  (Jan. 13 Tr. (Ergen) 128:12-129:20; Jan. 15 Tr. (Ketchum) 14:11-18.)  Similarly, when
DISH acquired DBSD, Mr. Kiser checked for restrictions on competitors purchasing debt and
then executed the trades of distressed debt.  (Jan. 10 Tr. (Kiser) 106:21-107:16, 108:8-15.)

105.    Mr. Kiser acted on direction from Mr. Ergen when he purchased the LP Debt,
interacted with Bear Creek, and oversaw and monitored the LP Debt trades – precisely the same
functions Mr. Kiser performs for DISH and EchoStar.  (*See*, *e.g.*, Jan. 10. Tr. (Kiser) 84:13-22,

86:18-87:23; PX0031; PX0037; PX0064; PX0068; PX0078; PX0096; PX0136; PX0239;

PX0344; PX0422; PX0295; PX0331; PX0390.)

106.    Even after Mr. Ergen began purchasing the LP Debt, there were times when it was

unclear to Mr. Kiser whether he was working for Mr. Ergen personally or for DISH.  When he

investigated whether the restrictions on DISH purchases had fallen away in the bankruptcy, he

"asked a question for the company . . . I think I've also got an obligation to the company just as

he does.  I'm a fiduciary for the company."  (Jan. 10 Tr. (Kiser) 83:19-84:24.)  Further

illustrating these overlapping and conflicting roles, Mr. Kiser testified that "I think I took one hat

off and put the other hat on."  (Jan. 10 Tr. (Kiser) 84:23-24.)

**B.    Mr. Ergen Uses DISH Employees, Resources, and Legal Counsel to Facilitate the LP Debt Purchases**

107.    Prior to and throughout the period in which Messrs. Ergen and Kiser were

amassing LP Debt, other DISH employees, including Mr. Cullen – another member of DISH's

corporate development group – closely monitored news relating to LightSquared and reported on

those events to Messrs. Ergen and Kiser.  (PX0018; PX0033; PX0075; PX0187; PX0223;

PX0195; PX0393; PX0407; PX0408; PX0438.)

108.    Mr. Kiser transacted business on behalf of SPSO from his DISH office,[14] using

DISH's computers, phone lines, and email and outside investment bankers during general

business hours.[15]  (Jan. 10 Tr. (Kiser) 42:4-8; PX0042.)  Although the purchases were

purportedly done on Mr. Ergen's behalf, Kiser received no compensation apart from his salary at

DISH for directing nearly $1 billion in LP Debt trades.  Compensation was allegedly

---

[14]    Mr. Ergen also used his assistant at DISH to assist with SPSO matters.  (PX0560; PX0059.)

[15]    Mr. Kiser kept no log of the amount of time he spent working for Mr. Ergen personally compared to how much time he was working for DISH.  (Jan. 10 Tr. (Kiser) 103:9-17.)

unnecessary because Kiser (a 27-year veteran of DISH/EchoStar) performed the trades "for the

experience" and because, as Mr. Ergen testified, "he gets to spend time with me and I think he

likes that."  (Jan. 10 Tr. (Kiser) 26:13-19, 74:25-75:7; Jan. 13 Tr. (Ergen) 23:15-24:1, 133:7-10.)

109.    Mr. Ergen has a family office, a personal asset manager (Bear Creek), and stock

brokers that he uses regularly.  (Jan. 13 Tr. (Ergen) 23:3-4, 26:15-17, 126:15-21, 127:2-3; Jan. 10

Tr. (Kiser) 21:6-12.)  He has also made personal investments through a hedge fund, GSO.  (Jan.

13 Tr. (Ergen) 126:22-127:3.)  Yet, Mr. Ergen used DISH employees and facilities to acquire the

LP Debt.  (Jan. 13 Tr. (Ergen) 127:4-13.)

110.    Mr. Kiser consulted DISH's outside counsel at Sullivan & Cromwell (whom Mr.

Ergen never retained as personal counsel) to determine initially whether DISH and, later, Mr.

Ergen, was prohibited from purchasing the LP Debt.  (Jan. 10 Tr. (Kiser) 29:10-30:9, 33:9-34:7,

77:11-18, 80:4-6, 119:16-120:4, 120:11-24; PX0144.)  Mr. Ergen relied on this advice for

months, and did not retain personal counsel until the spring of 2013, after SPSO gained its

blocking position.  (Jan. 13 Tr. (Ergen) 67:1-11.)

### C.    DISH Board Members and Management Take No Action Upon Learning of Mr. Ergen's LP Debt Acquisition

111.    In May 2012, news reports began speculating that Mr. Ergen was behind Sound

Point's purchases of LP Debt.  (PX0121; PX0898.)  Mr. Ergen testified that no DISH or

EchoStar Board member asked him about his purchases prior to his May 2, 2013 presentation to

the DISH Board.  (Jan. 13 Tr. (Ergen) 119:20-120:3; Jan. 10 Tr. (Kiser) 37:10-24.)  In response

to questioning from the Court, Mr. Ergen testified that once he learned that he could purchase the

LP Debt personally, he did not apprise the DISH Board, its general counsel, or Mr. Cullen that

he was acquiring the LP Debt because he did not believe that he had a fiduciary obligation to do

so once he confirmed it was not a corporate opportunity for DISH or EchoStar.  (Jan. 13 Tr.

(Ergen) 37:17-38:9.)

112.    On May 10, 2012, *The Denver Post* reported that Charlie Ergen "has snatched up

$350 million worth of debt in LightSquared."  (PX0898.)  A DISH spokesman declined to

comment on the article.  After reading the *Denver Post* article, DISH board member Gary

Howard sent an email that same day to Stanton Dodge, DISH's General Counsel ("Dodge"),

Tom Ortolf, a member of the Boards of Directors of DISH and EchoStar, and Mr. Goodbarn, a

member of the Board of Directors of DISH, asking if the article was accurate.  (DX397.)

113.    In response to Mr. Howard's email, Mr. Dodge sent an email on May 16, 2012 to

the entire DISH Board, including Mr. Ergen and DISH's associate counsel, Brandon Ehrhart,

stating:

> further to [G]ary's email below and since another board member
> inquired about the recent press reports regarding LightSquared
> bonds, [I] wanted to send a brief note to the full board.  [T]he
> company did not buy any LightSquared bonds.

(DX397.)  What follows in the email is redacted.

114.    Mr. Dodge's email did not answer the Board members' pointed question whether

Ergen was buying the LP Debt.  When Mr. Dodge asked Mr. Ergen about the news report, Mr.

Ergen responded that there "might be some truth" to the report.  (Jan. 13 Tr. (Ergen) 116:3-22,

118:23-119:19.)  There is no evidence in the record that (i) Mr. Dodge made further inquiry or

(ii) Mr. Ergen ever told Mr. Dodge that, in the fall of 2011, Mr. Kiser had investigated whether

DISH could purchase LP Debt and had consulted on that topic with Sullivan & Crowmwell.

There is also no evidence that Mr. Dodge, who has fiduciary obligations to DISH, informed the

DISH Board whether a corporate opportunity was implicated by Mr. Ergen's LP Debt purchases.

115.    Shortly thereafter, on July 23, 2012, Mr. Ehrhart attended a call with DISH's outside counsel, Scott Miller, of Sullivan & Cromwell, to discuss "LightSquared debt." (PX0892.)  Mr. Miller previously handled DISH's mergers and acquisition work, including with respect to Sling Media, Sirius, and TerreStar.  (PX0918.)

116.    Carl Vogel, a DISH Board member, asked Mr. Kiser, as well as others, if the news reports about Mr. Ergen's purchases were true.  Mr. Kiser testified that he never responded to Mr. Vogel's email because Mr. Vogel's question was addressed to multiple people and because "it was Charlie's personal business."  (Jan. 10 Tr. (Kiser) 37:16-38:9.)  When Mr. Vogel received an email on August 9, 2012 from Jim Millstein, of Millstein & Co., L.P., a restructuring firm, inquiring whether DISH was purchasing LightSquared's debt, he did not deny DISH's involvement.  Rather, he forwarded the email to Mr. Cullen and advised Mr. Millstein to "contact Tom Cullen or Charlie to discuss."  (PX0232.)  Similarly, Mr. Ehrhart received an email from Brendan O'Neill of Canadian law firm Goodmans LLP, stating, "[n]ot sure if DISH is involved at all from the press, but thought I might just reach out in case any assistance was required from us."  Like Mr. Vogel, Mr. Ehrhart did not deny DISH's involvement, only replying "[h]ope you are well too Brendan."  (PX0420.)

117.    In April 2013, DISH spokesman Bob Toevs ("Toevs"), head of Corporate Communications, also sent several emails to Mr. Ergen and several senior officers, including Messrs. Cullen, Dodge, Clayton, and Jeff Blum (a Senior Vice President and Deputy General Counsel), about a news article discussing DISH amassing LightSquared debt through Sound Point, and noting that Mr. Toevs "has not commented."  (PX0393; PX0407; PX0408.)  Mr. Toevs' April 2, 2013 email referred to past coverage on the very same issue and had links to news stories dating back to May 2012.  (PX0393; PX0408.)  None of these top DISH executives

responded to the e-mail to inquire whether Mr. Ergen in fact was buying the LP Debt, and Mr.

Ergen testified that, apart from Messrs. Kiser, Cullen, and Dodge, he did not speak to anyone

regarding his LP Debt purchases until the May 2, 2013 board presentation.  (Jan. 13 Tr. (Ergen)

116:3-22, 119:20-24.)

118.    Mr. Cullen, a Federal Rule of Civil Procedure 30(b)(6) representative for DISH,

testified that Mr. Kiser was the only person at DISH who knew about Mr. Ergen's LP Debt

purchases prior to May 2013.  (Jan. 17 Tr. (Cullen) 121:21-122:9.)  Mr. Cullen testified that he

reached this conclusion without speaking to any DISH board members or senior management,

other than Mr. Olson, DISH's Chief Financial Officer, and Mr. Kiser.  (*Id.* 122:12-123:4.)

119.    Mr. Cullen works closely with Mr. Ergen in the corporate development group, is

considered to be "Ergen's closest confidante on all things wireless," and leads DISH's strategic

acquisitions. (PX0890 (May 3, 2013 *Reuters* article.))  When news stories surfaced in the second

quarter of 2012 about Mr. Ergen buying LightSquared debt and Mr. Cullen asked Mr. Ergen

about these reports, Mr. Ergen confirmed to Mr. Cullen that there either "is" or "might be"

"some truth" to the reports and said nothing else.  (Jan. 17 Tr. (Cullen) 117:8-18; Jan. 13 Tr.

(Ergen) 116:3-22.)

120.    Mr. Cullen acknowledged that he, Mr. Ergen, and Mr. Kiser discussed

LightSquared, among other several other "MSS[16] players," "continuously," throughout 2012.

(Jan. 17 Tr. (Cullen) 134:9-18.)  While Mr. Cullen testified that he did not know that Mr. Kiser

was assisting Mr. Ergen with his LP Debt acquisitions, he confirmed that he repeatedly sent

emails to Messrs. Ergen and Kiser about LightSquared during the period in which the purchases

were made.  (Jan. 17 Tr. (Cullen) 110:22-111:7, 112:2-13, 119:12-120:12, 133:7-134:8; PX0075;

---

[16]    "MSS" stands for Mobile Satellite Services.

43

PX0195; PX0223; PX0393.)  Although Mr. Cullen testified that it was routine practice for him to send updates about MSS companies to the corporate development group, he generally did not include any of the other group members on the emails concerning LightSquared.  (Jan. 17 Tr. (Cullen) 134:4-135:8; PX0075; PX0195; PX0393; PX0438.)  In fact, when Mr. Toevs forwarded an article regarding an inquiry from *The Wall Street Journal* regarding the Sound Point purchases to Mr. Cullen, Mr. Cullen forwarded that email only to Mr. Kiser.  (PX0393.)

121.    Mr. Cullen acknowledged that, as an executive, he owed fiduciary obligations to DISH.  Nevertheless, he testified that when he learned that Mr. Ergen was buying the LP Debt: (i) he did not ask Mr. Ergen why DISH was not buying the debt, (ii) he did not ask in-house counsel whether there was an issue with Mr. Ergen making a personal investment in the debt, and (iii) he did not take any steps to determine whether Mr. Ergen's purchases were a corporate opportunity.  (Jan. 17 Tr. (Cullen) 143:1-20.)

122.    Further, when Mr. Cullen learned through news reports in May 2013 that Mr. Ergen's entity, LBAC, made a bid for LightSquared's spectrum assets (see ¶¶ 136-38, *infra*) he did not ask Mr. Ergen if he was usurping a corporate opportunity.  (Jan. 17 Tr. (Cullen) 143:25-145:16.)  Indeed, Mr. Cullen, who typically is involved in DISH's acquisition process, stated that he did not know for over two months that LBAC's bid had been presented to DISH on May 2, 2013 as an opportunity.  (Jan. 17 Tr. (Cullen) 144:3-146:19; PX0890.)

### D.    Mr. Ergen Controls the Boards of DISH and EchoStar

123.    Mr. Ergen, as the holder of a majority share of voting rights (approximately 88 percent and 79.4 percent of the total voting power in DISH and EchoStar, respectively), has the ability to elect a majority of the directors for the companies and control all other matters requiring the approval of their stockholders.

124.    When asked if "[i]t was [his] view that nobody else could act in an independent way of Charlie," DISH's independent director, Mr. Goodbarn, responded, "[t]hat is correct." (PX0767 (Goodbarn Nevada Dep.) at 233:25-234:3.)

125.    DISH and EchoStar, in public filings, state that their "future success will depend to a significant extent upon the performance of Charles W. Ergen," the loss of whom "could have a material adverse effect [on the companies'] business, financial condition and results of operation," and "place substantial weight on Mr. Ergen's recommendations in light of his role as Chairman and as co-founder and controlling shareholder of DISH Network." (PX0349 at 32; PX0350 at 27; PX0372 at 24; PX0371 at 21.)

**E.    Soon After Acquiring a Blocking Position, Mr. Ergen Makes a Presentation to the DISH Board that Contemplates a DISH Bid**

126.    As noted, by March 28, 2013, Mr. Ergen achieved a blocking position, having contracted to purchase $168 million in LP Debt on that date.[17]   (Jan. 13 Tr. (Ergen) 174:20-178:3; PX0379; PX0859.)

127.    Mr. Ergen testified that, in April 2013, he began to contemplate making a "personal" acquisition of LightSquared because of changes in the wireless industry and at the FCC.  (Jan. 13 Tr. (Ergen) 65:4-9; Jan. 10 Tr. (Kiser) 65:12-16.)  At that time, the wireless industry was going through a "seismic shift," including the consolidation of several companies and an increasing transmission of data.  (Jan. 13 Tr. (Ergen) 65:10-19.)  As Mr. Kiser explained,

> [T]here were a lot of pieces in the wireless industry that were moving around; a lot of the industry was consolidating at a pace

---

[17]    On March 28, 2013, believing it could buy LP Preferred Interests, SPSO entered into a bundled trade of LP Debt and LP Preferred Interests.  (PX0859; DX136.)  The March 28, 2013 bundled trade remained open for several months afterwards but never closed, and Mr. Ergen does not own the LP Debt that was the subject of this trade. Regardless, Mr. Ergen's subsequent purchases of LP Debt in April 2013 brought him to a "blocking position." (PX0859.)

that's probably unlike any other.  So, you know, the company had been in discussions, and we're still in discussions with other wireless companies, companies that had spectrum and were complimentary to the portfolio assets that DISH had.  And as the pieces on the chessboard were starting to move and avenues were – people were getting lined up, companies like MetroPCS had been acquired, you know, Sprint and ClearWire were on the block, and, you know, DISH was making attempts to purchase them, I think as Charlie saw those pieces start to move, it started to look more interesting to potentially own the asset.

(Jan. 10 Tr. (Kiser) 65:17-66:8.)

128.    Mr. Ergen also testified that he believed in April 2013 that if he wanted to make a bid for LightSquared, he would have to do so by July 15, 2013 – the date on which the Debtors' exclusive periods would terminate pursuant to the Exclusivity Stipulation.[18]  (Jan. 13 Tr. (Ergen) 66:9-15.)  Given the risk that a consensual plan of reorganization might be negotiated before exclusivity expired, Mr. Ergen understood that he had to act quickly if he wanted to try to acquire LightSquared's assets and provide "the opportunity for DISH and EchoStar to participate if they chose to do so."  (Jan. 13 Tr. (Ergen) 66:9-15; 67:5-11; 77:8-20.)

129.    Once he became interested in LightSquared as an acquisition target, Mr. Ergen asked Mr. Kiser to retain bankruptcy counsel.  (Jan. 13 Tr. (Ergen) 67:1-11; Jan. 10 Tr. (Kiser) 66:9-19.)  In April 2013, Mr. Ergen hired Willkie Farr & Gallagher LLP ("Willkie Farr"), who

---

[18]     On January 17, 2013, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan to July 20, 2013.  ([Bankr. Docket Nos. 485-88]; DX352.)  After a contested hearing on January 31, 2013, LightSquared negotiated the Stipulation Between Parties in Interest Regarding Entry of Order Pursuant to 11 U.S.C. § 1121(d) Further Extending LightSquared's Exclusive Periods To File a Plan of Reorganization and Solicit Acceptances Thereof (the "Exclusivity Stipulation").  On February 13, 2013, this Court entered an order incorporating the terms of the Exclusivity Stipulation.  ([Bankr. Docket No. 522]; PX0852.)  The Exclusivity Stipulation extended the Debtors' exclusive periods to July 15, 2013, and it required the parties to engage in good faith negotiations regarding the terms of a consensual chapter 11 plan.  (PX0852 at 3-4; Jan. 13 Tr. (Ergen) 77:3-20.)  If a consensual plan was not reached by July 15, a sales process of LightSquared's assets would begin.  (PX0852 at Ex. A ¶6.)

had represented DISH in the TerreStar bankruptcy, to serve as his bankruptcy counsel.  (Jan. 13

Tr. (Ergen 180:23-181:10.)

130.    By early May 2013, Mr. Ergen had concluded that he was interested in a potential

acquisition of LightSquared.  (Jan. 13 Tr. (Ergen) 77:3-78:2.)  At that time, DISH was consumed

with a potential acquisition of Sprint, and if DISH acquired Sprint, DISH would not have enough

capital to acquire LightSquared also.  (Jan. 13 Tr. (Ergen) 67:21-68:2; PX0767 (Goodbarn

Nevada Dep.) 32:11-23.)  DISH also was considering a potential acquisition of Clearwire at that

time.  PX0767 (Goodbarn Nevada Dep.) 30:15-25; Jan. 13 Tr. (Ergen) 20:17-21.)

131.    On May 1 and 2, 2013 – just over a month after obtaining a blocking position –

Mr. Ergen made presentations to the Boards of EchoStar and DISH, respectively, informing them

about his acquisition of LightSquared debt and his proposal for DISH and/or EchoStar to acquire

LightSquared's assets for $2 to $2.1 billion (the "Ergen Presentation").  (PX0867; PX0767

(Goodbarn Nevada Dep.) at 21:1-18; Howard Dep. 55:3-15, 56:24-57:13, 87:11-88:3, 141:13-20;

Jan. 13 Tr. (Ergen) 77:3-7, 77:21-78:2, 78:17-79:9, 80:11-13; PX0480; PX0492.)

132.    The Ergen Presentation informed the Boards that Mr. Ergen's blocking position in

the LP Debt could help facilitate any bid for LightSquared's assets:

> [Ergen's] substantial interests in L2 debt and preferred stock
> compliment [*sic*] any acquisition strategy and could have
> significant influence in L2's chapter 11 cases.

(PX0867; Jan. 13 Tr. (Ergen) 182:11-183:11.)

133.    The Ergen Presentation proposed a course of action, stating:  "[s]ubmit offer now,

subject to minimal conditions, and require prompt acceptance (e.g., by May 15) before marketing

process gets underway."  (PX0867 at SPSO-00011828.)  If, however, LightSquared did not

accept the proposal, the presentation continued:  "NewCo will have the ability to see results of

marketing process and, if process is unsuccessful, revert with different bid later."  The Ergen

Presentation also described the chapter 11 timing considerations: "L2 has the exclusive right to file a chapter 11 plan until July 15.  L2 likely to begin exploring strategic alternatives in early June if no restructuring or sale strategy emerges." (PX0867 at SPSO-00011828.)  The presentation contained an "Illustrative Transaction Timeline" that outlined a schedule of events related to a potential transaction, including the execution of a purchase agreement by May 31, 2013.  (PX867.)

134.    At the time of the Ergen Presentation, Mr. Ergen understood that the DISH Board[19] had not performed any analysis of LightSquared.  (Jan. 13 Tr. (Ergen) 207:15-17.)[20]  Mr. Ergen understood that the DISH Board had not authorized a DISH bid in May 2013, and it had not passed a resolution authorizing him to make a bid personally.  (Jan. 13 Tr. (Ergen) 208:4-13.)

## VI.    DISH Contemplates and Makes a Bid for LightSquared at Mr. Ergen's Behest

### A.    DISH Forms a Special Committee to Evaluate a DISH Bid and the Propriety of Mr. Ergen's LP Debt Purchases

135.    Shortly after Mr. Ergen made his May 2, 2013 presentation to the DISH Board regarding a potential acquisition of LightSquared's assets, on May 8, 2013, the Board formed a special committee consisting of directors independent of Mr. Ergen – Messrs. Goodbarn and Howard – to examine the propriety of Mr. Ergen's purchases of the LP Debt and the prospect of a DISH bid for LightSquared's assets.  Pursuant to resolutions recorded in the May 8, 2013 minutes of the DISH Board, the Special Committee was vested with the power and authority to:

---

[19]    On May 31, 2013, after a "long series of discussions," a committee of the EchoStar Board rejected the opportunity to participate in the LBAC bid because it involved more speculative risk than the company wanted to take on given its financial resources at the time, and participation in the bid would limit EchoStar's ability with respect to other potential strategic investments.  (Rayner Dep. 25:17-26:3; 26:18-27:9.)

[20]    As both Mr. Goodbarn and Mr. Howard testified, at that time, DISH was consumed with a potential acquisition of Sprint and Clearwire, and the DISH Board could not focus on a potential acquisition of LightSquared, which was a far lower priority than the other two potential acquisitions. (PX0767 (Goodbarn Nevada Dep.) 32:4-23, 88:5-10, 88:14-20, 95:20-24, 104:9-12, 123:13-20; Howard Dep.176:11-177:2, 177:25-178:10; Jan. 17 Tr. (Cullen) 102:8-103:4, 121:15-20.)

(i) review and evaluate a potential bid (including any potential conflicts of interest) and engage in discussions and/or negotiations; (ii) negotiate definitive agreements with the parties concerning the terms and conditions of the potential bid; and (iii) determine whether such terms and conditions are fair to DISH.  (PX0768 (Howard Nevada Affidavit) ¶¶ 8-10; PX0491 at DISH_NY000000002-4.)  The Board formally resolved that the Special Committee's authority would expire *only* upon the Special Committee's "determination, in its sole and absolute discretion, as set forth in its written notice to the Chairman of the Board of Directors" as long as a bid for LightSquared remained viable.  (PX0491 at DISH_NY0000000005.)

### B.    Mr. Ergen Makes a "Personal" Bid That Sets the Floor and Ensures He Will Be Repaid in Full

136.    Without consulting the newly-formed Special Committee, on May 15, 2013, Mr. Ergen submitted an unsolicited bid for LightSquared LP's spectrum assets for $2 billion (the "LBAC Bid").  (PX0768 (Howard Nevada Affidavit) ¶ 14; PX0504; PX0513; Jan. 13 Tr. (Ergen) 80:11-19.)  LBAC did not exist at the time the offer was made and was not formed until two weeks later, on May 28, 2013.  (PX0837-838; Jan. 13 Tr. (Ergen) 191:8-192:25.)[21]

137.    The LBAC Bid expressly stated the buyer of the LightSquared assets would be "owned by one or more of Charles Ergen, affiliated companies and/or other third parties."  (PX0504 at GH_L2_00450.)  As detailed in the Ergen Presentation, Mr. Ergen priced the bid at $2 billion, approximately the total amount of the outstanding LP Debt, in what he characterized as an effort to induce serious consideration by LightSquared's LP Debt creditors.  (PX0504; PX0867.)

---

[21]    At the time LightSquared received the bid, it had not been formally disclosed that Mr. Ergen was behind the SPSO LP Debt purchases. (Jan. 16 Tr. (Falcone) 69:22-25, 71:24-72:2.)

138.    A key feature of the LBAC Bid, which was non-binding and expired on May 31,

2013, was LBAC's apparent "willingness to fund the Purchase Prices, on a non-refundable

basis," prior to receipt of FCC and Industry Canada approvals and authorizations.  (Jan. 13 Tr.

(Ergen) 80:20-81:7; PX0504.)   The $2 billion bid would have enabled Mr. Ergen to be paid in

full on his LP Debt investment and receive $140 million in profit as well as "significant" interest.

(Jan. 13 Tr. (Ergen) 132:20-133:6, 134:6-15, 233:20-234:7.)

139.    When asked what would have happened if the DISH Board had wished to offer a

lower price than Mr. Ergen's, Mr. Ergen stated that "[a]ll they needed to say was, Charlie, don't

do it."  (Jan. 13 Tr. (Ergen) 207:18-20.)

140.    Mr. Ergen's testimony that he was prepared to proceed with the LBAC Bid as a

"personal investment" was not credible.  (Jan. 13 Tr. (Ergen) 245:17-247:9.)  At the time of the

LBAC Bid, Mr. Ergen did not have any financing agreements lined up with investors and had not

even received a term sheet related to a possible financing of the "acquisition."  He did not

receive as much as a draft term sheet until July 18, 2013 – two months *after* his bid would have

expired.  (Jan. 13 Tr. (Ergen) 185:20-186:7, 193:15-25, 195:23-196:13; DX285.)  Even then,

under the term sheet, Mr. Ergen would have had to provide over a billion dollars in cash.  (Jan.

13 Tr. (Ergen) 87:3-88:20.)  To obtain that amount of cash, Mr. Ergen testified that he would

have used $300-$500 million of his personal liquid cash and borrowed the rest against his

EchoStar stock.  (Jan. 13 Tr. (Ergen) 88:21-89:1.)

C.    **The DISH Special Committee**

141.    On or about May 17, 2013, the Special Committee set out to engage independent

counsel and independent financial advisors, as authorized by the resolutions of the DISH Board.

(PX0910; PX0534; PX0491 at DISH_NY000000004; PX0768 (Howard Nevada Affidavit) ¶ 11.)

When Mr. Ergen learned that the Special Committee wished to engage counsel, he was opposed

to the idea, emailing "[w]hy would we have special committee counsel.  You are way ahead of your skis here."  (DX188.)  As a result, the Special Committee, following Mr. Ergen's direction, delayed the engagement of independent advisors.  (PX0768 (Howard Nevada Affidavit) ¶¶ 22, 25, 26.)  At a May 31, 2013 meeting, Mr. Ergen suggested that the Special Committee should delay engaging its financial advisor, as, in Mr. Ergen's view, there would "be little activity, if any, in the coming weeks" regarding a LightSquared transaction.  (PX0768 (Howard Nevada Affidavit) ¶ 25.)  Perella Weinberg ("PWP"), the financial advisor to the Special Committee, was ultimately retained on June 28, 2013, after the Sprint and Clearwire deals had failed to proceed.  (*See* DX0224 (email from Gary Howard to DISH Board); PX0768 (Howard Nevada Affidavit) ¶ 33.)[22]

142.    After delaying the retention of its professionals and keeping the committee in what Mr. Howard later described as a "holding pattern," Mr. Ergen suddenly reversed course in early July, urging the Special Committee to complete its evaluation quickly and make a recommendation to the DISH Board.  (PX0768 at ¶ 34.)

143.    According to its members, the Special Committee did not have documents detailing Mr. Ergen's ownership of LightSquared debt and preferred stock other than what Mr. Ergen presented to the Board in May.   (Howard Dep. 76:8-15.)   Following that meeting, the Special Committee requested that Mr. Ergen provide the Committee with information regarding SPSO's trades.  (PX0767 (Goodbarn Nevada Dep.) 92:23-93:1; Jan. 13 Tr. (Ergen) 82:18-83:13.)  The Special Committee made repeated requests for such information from Mr. Ergen.

---

[22]    In addition to PWP, the Special Committee also retained Cadwalader, Wickersham & Taft LLP as counsel. (Jan. 13 Tr. (Ergen) 82:1-8; 85:9-21; Howard Dep. 190:8-13; DX224; DX255.)

144.    On June 2, 2013, the Special Committee again requested information regarding further details of the bank debt and preferred stock purchases Mr. Ergen made through SPSO. (DX213; Howard Dep. 143:15-144:24.)  As of June 5, 2013, the Committee still had not received the schedule of Mr. Ergen's trades.  (DX219; PX0767 (Goodbarn Nevada Dep.) 128:25-129:12.)

145.    The June 17, 2013 meeting minutes make it clear that the Special Committee was still looking for information relating to Mr. Ergen's trades:  "The Committee discussed the need for additional information from Mr. Ergen regarding his acquisition of LightSquared debt and/or preferred stock, as well as regarding the rationale and business case for an acquisition by the Corporation of LightSquared's L-Band Mobile Satellite Service Spectrum."  (DX238.)

146.    Following the June 17 meeting, the Special Committee sent Mr. Ergen a letter requesting information regarding his trades in LightSquared debt.  (DX244; DX238; Jan. 13 Tr. (Ergen) 83:14-85:8.)  The letter stated that "[w]e would also appreciate further detail regarding your relationship with Sound Point Capital Management and its affiliate SP Special Opportunities, LLC . . . as it relates to the LightSquared opportunity and your acquisition, whether directly or indirectly, of any interests in any claims, loan obligations or preferred equity securities of LightSquared."  (DX244 at GH_L2_000111.)

147.    On July 6, 2013, Mr. Howard informed the DISH Board that the Special Committee had "no further insight into the bond purchases made by Charlie's entity."  (DX224; Goodbarn Nevada Dep. 165:3-10, 165:16-21.)  As of July 21, 2013, the Special Committee still had not received the information it requested regarding Mr. Ergen's trades in LightSquared debt. (PX0767 (Goodbarn Nevada Dep.) 208:5-12.)

148.    Mr. Howard testified that the Special Committee was interested in determining whether there was a way that DISH could have bought LP Debt notwithstanding the transfer

restrictions.  (Howard Dep. 204:14-205:15.)  Mr. Ergen never provided the Special Committee

with the requested information on his trades.  (PX0767 (Goodbarn Nevada Dep.) at 92:10-93:15,

128:16-129:12, 129:21-130:5; PX0768 (Howard Nevada Affidavit) ¶¶ 27, 28, 30; PX0605;

PX0663; DX224; PX0654.)  Mr. Goodbarn testified that Mr. Ergen did not share information

regarding his trades with the Special Committee as a ploy to insulate himself from this adversary

proceeding.  (PX0767 (Goodbarn Nevada Dep.) at 104:23-105:6.)

149.    Upon learning of the LBAC Bid from news alerts on May 20 and 21, 2013,[23] Mr.

Howard stated that he was surprised, as it "was [his] expectation that Mr. Ergen would not make

any LightSquared bid without first discussing it with the DISH Board and the Special Committee

in order to get their approval, since any such bid could impact DISH's own strategy vis-à-vis

LightSquared."[24]

150.    When asked whether the Special Committee considered proposing that DISH

make a bid for LightSquared's spectrum in an amount below that of the LBAC Bid, Mr.

Goodbarn stated that the LBAC Bid "made it difficult socially to do that . . . [b]ecause [Ergen's]

put a line in the sand on a bid and we're part of a, you know, a DISH board and he owns a

majority of the company."  (PX0767 (Goodbarn Nevada Dep.) at 100:7-21.)  Pressed further on

why it would be difficult for DISH to make a bid lower than Mr. Ergen's bid, Mr. Goodbarn

explained that if Mr. Ergen had committed to a $2 billion bid with no other bidder present, and

the Special Committee then bid $1.5 billion, Mr. Ergen may take "a big loss" on his debt

---

[23]    Mr. Howard stated that he was not aware that Mr. Ergen had made a personal bid to purchase LightSquared's assets until Mr. Goodbarn forwarded to him an updated Charles Schwab news alert on May 21, 2013.  (*See* PX0768 (Howard Nevada Affidavit) at ¶ 15.)  He confirmed that the Special Committee had not been advised of and had not approved of the LBAC Bid.  (*Id.* at ¶ 20.)  He was concerned that, by making the bid, "Mr. Ergen was narrowing the scope and ability of the Special Committee to fully explore alternative strategies for DISH to pursue with respect to LightSquared, as well as to define and/or negotiate Mr. Ergen's role with respect to DISH's strategy."  (*Id.* at  ¶ 21.)

[24]    *Id.* at ¶ 15.

investment and "that does not make a very happy chairman."  (PX0767 (Goodbarn Nevada Dep.) at 100:22-101:5.)

151.    On July 3, 2013, Mr. Ergen sent to Messrs. Goodbarn, Howard, and David Moskowitz, an in-house attorney and a Senior Vice President for DISH and EchoStar, via email (the "Ergen Transmittal Email"), a presentation for the Special Committee and the DISH Board. (PX0927.)

152.    In the Ergen Transmittal Email, Mr. Ergen states, "This is just a high level view of lightsquared and its potential relation to dish.  Please feel free to share with the board or advisors.  Also, not on here would be the possibility of freeing up at least two of the existing dbsd/terrestar satellites that could possibly be monetized."  (*Id.* at DISH_PLAN000003150.)

153.    The six-page presentation, attached to the Ergen Transmittal Email, was dated July 8, 2013 and was entitled "Strategic Investment Opportunity – L-Band Acquisition, LLC" (the "Ergen July 8 Presentation").  (PX0928.)  The Ergen July 8 Presentation was delivered to the Special Committee and PWP, among other recipients, at a special meeting of the DISH Board on July 8, 2013.

154.    The Ergen July 8 Presentation provided, for discussion purposes in the context of considering whether DISH would participate in the LBAC Bid, certain valuation information relating to LightSquared's spectrum as of that date.

155.    Under a line item entitled "Implied Net Primary Asset Value," the Ergen July 8 Presentation lists a range of values of between $3.341 billion and $5.213 billion, with a mid-point of $4.277 billion, referring to Mr. Ergen's estimate of the value of 20 MHz of LightSquared's spectrum assets and its satellites, excluding its 10MHz of lower downlink spectrum.

156.    Under the heading "Implied Supplemental Asset Value," the Ergen July 8

Presentation lists a range of values of between $1.833 billion and $3.783 billion, with a mid-

point of $2.308 billion, for what it identifies as the total of (i) 5.0 MHz of "Reclaimed Unuseable

[*sic*] AWS-4," (ii) 5.0 MHz of "Reclaimed Impaired AWS-4," and (iii) "L-Band Downlink

Spectrum." *Id.* at 5 (DISH_PLAN000003114).  The Implied Supplemental Asset Value was Mr.

Ergen's estimate of (a) the increase in value of DISH's existing spectrum that would flow from

DISH's acquisition of LightSquared's spectrum, which would permit unusable and impaired

uplink AWS-4 spectrum to be converted to downlink and (b) his range of values for 20 MHz of

LightSquared's downlink spectrum.  In other words, the supplemental value of LightSquared's

assets to DISH was estimated by Mr. Ergen to be between $1.833 billion and $3.783 billion.

157.    Combined with the Implied Net Primary Asset Value of $3.341 billion to $5.213

billion, the total value of LightSquared's assets in DISH's hands (the "Combined Implied Net

Primary and Supplemental Asset Value") was estimated by Mr. Ergen to be between $5.174

billion and $8.996 billion, with a midpoint of $7.085 billion.

158.    On or about July 21, 2013, PWP provided two reports to the DISH Board – a

nine-page presentation entitled "Project Discus Summary Conclusions," dated July 21, 2013 and

a 69-page PWP document, dated July 2013, entitled "Project Discus Discussion Materials" (the

"PWP Report").  (PX0929; PX0930.)  In a section captioned "Illustrative Value of DISH's Use

Cases Related to LightSquared," the PWP Report concludes, "The cumulative value of the

illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-

$13.3bn."  (*Id.* at 39 (DISH_PLAN135).)  The PWP Report also recites that "In June 2013,

[SPSO] joined the Ad Hoc Secured Group to prevent termination of LightSquared LP's

obligations of the Exclusivity stipulation." (PX930 at 66 (DISHSC_PLAN00000162).)

159.    On July 21, 2013, the Special Committee presented its conclusions to the DISH Board, recommending that DISH pursue the LBAC Bid for $2.2 billion, subject to five express conditions, four of which implicated further review and decision making by the Special Committee:

(i)    that any material changes to the terms of the bid and/or APA would be subject to the review and approval of the Committee;

(ii)    that DISH would acquire one hundred percent of LBAC, to the exclusion of EchoStar;

(iii)    that the Committee and its legal and financial advisors would remain involved in all negotiations regarding the proposed transaction going forward;

(iv)    that the Committee would review and approve the terms of the acquisition by DISH of Mr. Ergen's interest in LBAC; and

(v)    that the Committee expressly reserved the right to obtain all of the requested information regarding Mr. Ergen's acquisition of debt and/or other securities issued by LightSquared as well as the right to evaluate potential corporate opportunity issues.

(PX0716 at GH_L2_000973-74; PX0768 at ¶ 47.)

160.    Immediately after the Special Committee delivered its conditional approval of the LBAC Bid, the DISH Board disbanded the Special Committee without giving any advance notice to the Special Committee.  Other than Messrs. Howard and Goodbarn, who abstained, the Board's vote was unanimous (PX0768 (Howard Nevada Affidavit) ¶¶ 49-52; DX400), notwithstanding that (i) the conditions set forth in the Special Committee's conditional approval had not been satisfied (PX0736) and (ii) the resolutions creating the Special Committee allowed disbandment only upon the Special Committee's decision, with the bid remaining viable. (PX0491 at DISH_NY0000000005.)

161.     After the Special Committee was disbanded, on July 22, 2013, DISH agreed to buy LBAC from Mr. Ergen for a dollar, without the Special Committee reviewing the terms of the acquisition agreement.  (Howard Dep. 315:10-316:3; Jan. 13 Tr. (Ergen) 195:6-8.)

162.     On July 23, 2013, DISH announced its intention to bid through LBAC for LightSquared's spectrum for $2.2 billion (the "DISH/LBAC Bid").  Mr. Howard learned of the bid through the "wires" and did not even know whether the bid was submitted by DISH or by Mr. Ergen.  (PX0725.)  On July 24, 2013, the Special Committee wrote a letter to the DISH Board expressing its surprise at its disbandment and noting that the five conditions remained unsatisfied.  (PX0736.)  On July 25, 2013, Mr. Howard resigned from the DISH Board, an action taken so suddenly that DISH risked delisting from the NASDAQ.  (PX0746; *see also* PX0741; DX313.)

163.     On July 23, 2013, DISH announced that it had executed a Plan Support Agreement (the "PSA"), pursuant to which LBAC would act as the stalking horse bidder for the Ad Hoc Secured Group's plan of reorganization (the "Ad Hoc Secured Group Plan").  (Jan. 13 Tr. (Ergen) 195:6-12; PX0730.)  There was no document submitted into evidence reflecting the involvement of the Special Committee in (i) the negotiation and documentation of DISH's purchase of LBAC from Mr. Ergen or (ii) the negotiation of documents that were critical to the LightSquared acquisition – the PSA and the Asset Purchase Agreement (the "APA").  Mr. Howard stated that neither the Special Committee nor its advisors were ever asked to participate in negotiations with the Ad Hoc Secured Group, and neither the Special Committee nor its counsel had been involved in negotiating the APA.  (PX0768 (Howard Nevada Affidavit) at ¶¶ 42, 46.)

164.    The APA, incorporated by reference into the PSA, contained a broad release for all claims against Mr. Ergen, DISH, EchoStar, and SPSO (an entity which purportedly has no ties or relationship with DISH).  (PX0823 § 7.6; PX0841 at 11, n.9, 70, 88; 17 C.F.R. § 240.12b-2.)

## VII.    LightSquared as a Strategic Investment for DISH

### A.    DISH and EchoStar's Prior Acquisitions of Spectrum Assets

165.    DISH's strategic goals include participation in the wireless space and contemplate the need for a great deal of spectrum.  (Jan. 13 Tr. (Ergen) 26:18-20, 96:18-98:22, 100:25-101:4.)  Mr. Ergen testified that spectrum is a limited resource that currently suffers from a shortage, with the amount of data flowing over available spectrum doubling every year.  (Jan. 13 Tr. (Ergen) 47:3-48:10, 96:5-14; PX0747 at SPSO-00012492.)  Mr. Falcone concurred with Mr. Ergen's view of spectrum, referring to wireless spectrum as "beachfront property."  (Jan. 16 Tr. (Falcone) 15:17-16:1).

166.    DISH and EchoStar have for years been attempting to acquire, or merge with, numerous spectrum-owning companies, including actual and potential transactions involving DBSD, TerreStar Networks ("TerreStar"), Sirius XM Holdings, Inc., Clearwire Corp., Sprint Corp., and Inmarsat plc.  (Jan. 13 Tr. (Ergen) 95:6-96:4, 101:5-103:5, 105:11-108:10.)

167.    DISH and EchoStar have a history of purchasing distressed or discounted debt of their targets as a step toward an eventual acquisition, including acquiring a blocking position in distressed satellite companies in bankruptcy, such as DBSD and TerreStar, enabling them to acquire the companies' spectrum assets at a discount.  (Jan. 13 Tr. (Ergen) 100:25-103:9; Jan. 10 Tr. (Kiser) 108:21-109:6, 106:24-107:3; Howard Dep. 285:15-24.)

168.    In DISH's acquisition of TerreStar through bankruptcy, Mr. Ergen and DISH employed a three-step strategy.  First, EchoStar became the largest secured creditor of TerreStar

and the second-biggest shareholder in the parent, TerreStar Corp.  (PX0012 (EchoStar 10-Q Jun. 30, 2011 at 14).)  Second, DISH became the ultimate purchaser of TerreStar as a stalking horse bidder, repaying EchoStar in full.  (DX008 (DISH 8-K Jun. 16, 2011 at 2).)  Third, DISH entered into a purchase agreement with TerreStar whereby both the debt-buyer (EchoStar) and the acquirer (DISH) obtained broad releases that ensured EchoStar's claims would be paid in full. (Jan. 13 Tr. (Ergen) 105:14-17; PX0011 at 1, 5, 9 n.4, 61.)

169.    DISH's acquisition of DBSD through the bankruptcy process, in which Mr. Ergen was also intimately involved, employed a similar strategy.  (Jan. 13 Tr. (Ergen) 106:7-10.)  DISH acquired a blocking position in DBSD's first lien debt and attempted to acquire a blocking position in DBSD's second lien debt to facilitate its acquisition.  (Jan. 13 Tr. (Ergen) 104:4-10, 105:11-13, 106:2-10; PX0831 (*In re DBSD North America, Inc*., 634 F.3d 79, 104 (2d Cir. 2011) ("DISH purchased the claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring DBSD's spectrum rights, not protecting its claim")); PX0864 (*In re DBSD North America, Inc*., 421 B.R. 133, 136 (Bankr. S.D.N.Y. 2009) (quoting DISH document stating that DISH "believe[d] there is a strategic opportunity to obtain a blocking position in the 2nd Priority Convertible Notes and control the bankruptcy process for this potentially strategic asset.").)  Despite the bankruptcy court's designating DISH's votes, DISH ultimately acquired DBSD's spectrum assets and was repaid in full on its debt holdings. (PX0864, 421 B.R. at 143 (designating DISH's votes).)

170.    In March 2012, DISH gained control of DBSD and TerreStar's spectrum, now known as AWS-4 spectrum, which, as of at least January 17, 2014, DISH had still not deployed. (Jan. 13 Tr. (Ergen) 101:5-14, 147:22-25; Jan. 17 Tr. (Cullen) 111:21-24; DX024; Jan. 10 Tr. (Kiser) 109:7-9; Jan. 17 Tr. (Cullen) 139:2-9.)

### B.    Mr. Ergen's Consideration of LightSquared's Spectrum Assets

171.    Mr. Ergen testified that in 2011, he considered, for at least a second time, a DISH investment in LightSquared.[25]  (Jan. 13 Tr. (Ergen) 109:3-9.)  Mr. Ergen believed that LightSquared was "very similar" to DBSD and TerreStar – companies DISH had recently acquired – and that its spectrum "could fit with the existing spectrum [that DISH owns] in the long-term."[26]  (Jan. 13 Tr. (Ergen) 109:10-16, 111:5-16; PX747.)

172.    In order for DISH to operate a terrestrial wireless network, it needs uplink spectrum to pair with its downlink spectrum; because LightSquared has clean uplink spectrum,[27] this creates a natural synergy.  (Jan. 9 Tr. (Smith) 125:4-21.)  LightSquared's L-Band spectrum is a "natural pairing" for DISH, given that LightSquared's uplink spectrum is "safe to use as uplink spectrum."  (Jan. 9 Tr. (Smith) 114:22-126:2.)   LightSquared's spectrum could be repurposed as uplink-only spectrum and paired with the spectrum DISH acquired with TerreStar and DBSD, which can be converted to downlink[28] – thereby avoiding known interference

---

[25]    Many years earlier, EchoStar had been interested in LightSquared's predecessor company, SkyTerra, prior to Harbinger's own investment.  (Jan. 13 Tr. (Ergen) 111:23-112:9; Jan. 16 Tr. (Falcone) 15:12-16:11.)

[26]    Mr. Ergen recognized the value in LightSquared's spectrum, testifying that it is "great collateral."  (Jan. 13 Tr. (Ergen) 214:25-215:9.)  Had DISH been able to directly purchase the LP Debt, which constituted discounted notes supported by oversecured collateral, it would have realized the same economic benefits as Mr. Ergen.  (*Id.* 215:13-17, 215:25-216:8; *see also* PX0587.)

[27]    The interference issues raised before the FCC relate primarily to LightSquared's downlink spectrum.

[28]    After DISH acquired 40 MHz of AWS-4 spectrum from DBSD and TerreStar, it applied for a waiver of the ATC requirement, which would allow DISH to build out a terrestrial-only wireless network.  In December of 2012, the FCC issued a decision that authorized DISH to use its AWS-4 spectrum on a standalone terrestrial basis.  However, the FCC's authorization came with a restriction:  because DISH's AWS-4 uplink spectrum is immediately adjacent to downlink H-block spectrum – and the presence of uplink and downlink spectrum immediately adjacent to one another results in interference between the bands – there was a need for a "guard band" or transition zone, in between the two spectrum bands.  Accordingly, the FCC imposed strict power limitations of 5mW EIRP on mobile transmissions at 2000-2005Mhz and a requirement that DISH accept all interference flowing from the H-block into this 5 MHz of DISH's AWS-4 spectrum.  This requirement meant that 5 MHz of DISH's acquired spectrum became largely unusable, and DISH only has 35 MHz usable spectrum of the 40 MHz that it acquired from DBSD and TerreStar.  To maximize the full value of the 40MHz of its newly acquired AWS-4 spectrum, DISH would have to convert all of the AWS-4 spectrum to downlink spectrum (which it requested in September 2013 and obtained approval for in December 2013) and find uplink spectrum elsewhere.  (DX411 (October 21, 2013 DISH letter summarizing meetings requesting waiver from FCC); DX339 (December 20, 2013 FCC order granting waiver).)

problems with the uplink portion of that spectrum. (PX0154; PX0195; Jan. 13 Tr. (Ergen) 151:18-25.)

173.   LightSquared has significant blocks of usable uplink spectrum. Indeed, LightSquared is presently, and has been for some time, the only significant source of available uplink spectrum to acquire. (*See* PX0195 ("one potentially logical technical solution that could combine LightSquared's spectrum (as uplinks) with the TerreStar and DBSD spectrum (if that was all converted to downlinks)").)

174.   Mr. Ergen testified that had he acquired LightSquared, his plan would entail "two or three years to clean up LightSquared['s spectrum]," *i.e.*, obtain the necessary FCC approvals, and that he believed "at the end of the process, there would be . . . twenty megahertz of uplink spectrum." (Jan. 13 Tr. (Ergen) 245:17-246:21.)

175.   The DISH Special Committee concluded in June 2013 that the purchase of LightSquared's spectrum assets "would be an attractive opportunity for the Corporation's shareholders, given that such an acquisition could enhance the value of the spectrum already owned by the Corporation." (PX0716 at GH_L2_000972.) DISH and Mr. Ergen were aware of the inherent value in LightSquared's spectrum and its actual and potential synergies with DISH's spectrum.

176.   As set forth in paragraphs 153-57 *supra*, the Ergen July 8 Presentation was delivered to the DISH Special Committee and PWP, financial advisor to the DISH Special Committee, among other recipients, at a special meeting of the DISH Board on July 8, 2013. The Combined Implied Net Primary and Supplemental Asset Value listed in the presentation – *i.e*., the estimated total value of LightSquared's assets in DISH's hands – was estimated by Mr. Ergen to be between $5.174 billion and $8.996 billion, with a midpoint of $7.085 billion.

177.    Mr. Ergen acknowledged during a DISH earnings call on August 6, 2013 that

LightSquared's spectrum would be beneficial to DISH:  LightSquared is "interesting to [DISH]"

because the spectrum "potentially could fit with the existing spectrum that [DISH has] in long

term. . . .  So putting all that spectrum together at the same time maintaining the ability to use the

satellite for voice and data . . . makes a lot of sense."  (PX0747 at SPSO-00012486.)

### C.    DISH'S Pursuit of Sprint and Clearwire

178.    At the same time that DISH was ostensibly pursuing the Sprint and Clearwire

transactions,[29] Mr. Ergen was simultaneously pursuing LightSquared's assets to preserve

optionality for DISH in case DISH's bids for Sprint and Clearwire fell through.  Mr. Ergen has

stated publicly that: "I like, strategically, to have a lot of optionality and it's easier to make good

choices when you have options."  (PX0839 at 7.)  Thus, he pursued LightSquared as an

alternative for DISH if the Sprint and Clearwire acquisitions fell through—as they ultimately did.

(PX0832 (Ergen Nevada Dep.) at 135:23-136:3 (a DISH bid for LightSquared could be a "Plan

B" if potential deal with Sprint did not work out), 140:22-141:23 (Mr. Ergen made the bid for

LightSquared's spectrum to preserve DISH and EchoStar's "optionality" to participate); Jan. 13

Tr. (Ergen) 186:25-187:20 (the bid "opened up the optionality for DISH to the extent they lost

Sprint"); PX0908 at 10 ("we realize [SoftBank is] a formidable competitor and we have to be

prepared to win and we have to be prepared to lose").)

### VIII.   Mr. Ergen's Assertion That He Was Making a Personal Investment Is Belied by the Evidence

179.    Mr. Ergen's substantial purchases of LP Debt are not consistent with his historical

personal investments.  Mr. Ergen has a history of investing in low-risk, diversified, liquid assets

---

[29]     On January 8, 2013, DISH made an unsolicited and non-binding bid for Clearwire, (DX106; PX0315).
DISH ultimately withdrew its tender offer on June 26, 2013.  (DX257.)  On April 15, 2013, DISH made a bid for
Sprint (DX153) but abandoned its bid for Sprint on June 21, 2013.  (DX250.)

– not investing substantially all of his liquid assets in the distressed debt of a single company.

Moreover, while Mr. Ergen's willingness to pay near par for the distressed LP Debt is consistent

with a plan to obtain a blocking position – and indeed, a majority position – in order to acquire

the underlying company, such purchases are somewhat inconsistent with a personal investment

by a typical creditor seeking to make a profit on distressed debt by buying low and selling high.

### A.    SPSO's Purchases of LP Debt Were Inconsistent with Mr. Ergen's Personal Past Investment Strategy

180.    Bear Creek manages investments for Mr. Ergen in a trust account known as the

Lindsey Revocable Trust (the "Trust").  (Roddy Dep. 18:3-8.)  Ordinarily, the Trust – in the

names of both Mr. Ergen and his wife, as co-trustees – contains "almost all of [Mr. Ergen's]

assets."  (Jan. 13 Tr. (Ergen) 61:13-21.)  The Trust account is conservatively managed, with most

securities rated "A" or better, and diversified across "[m]unicipal taxable securities, [and]

commercial paper."  (Roddy Dep. 57:9-58:3, 58:20-22, 59:6-12; Jan. 13 Tr. (Ergen) 168:4-14.)

181.    Mr. Ergen has never directed Bear Creek to invest in distressed debt, and Bear

Creek has never invested more than 50 percent of Mr. Ergen's funds in the stock of a single

issuer.  (Roddy Dep. 60:20-61:5.)  Indeed, no more than ten percent of Mr. Ergen's funds could

be invested in any single issuer, and the only distressed debt investment that Mr. Kiser could

recall Mr. Ergen investing in was an indirect investment through the portfolio of a hedge fund,

GSO.  (Roddy Dep. 74:5-13.)  Moreover, prior to investing in the LP Debt, Mr. Ergen had never

invested his personal funds in a competitor of DISH or a company he considered to be a strategic

opportunity for DISH, nor had he previously invested in spectrum assets or bought distressed

debt in a company that owned spectrum assets.  (Jan. 10 Tr. (Kiser) 100:2-21; Jan. 13 Tr. (Ergen)

122:18-123:4, 154:16-155:12, 156:11-14.)

182.     When it came to LightSquared, however, Mr. Ergen deviated from his past

investment practices, and invested nearly all of his non-DISH/EchoStar assets – approximately

$700 million – to acquire the LP Debt.  (Jan. 13 Tr. (Ergen) 170:20-172:9; PX0832 (Ergen

Nevada Dep.) 105:19-106:10; PX0859.)  Aside from his ownership in DISH and EchoStar, Mr.

Ergen's investment in LightSquared is by far his largest personal investment.  (Jan. 10 Tr.

(Kiser) 102:2-14; Jan. 13 Tr. (Ergen) 153:17-21.)  Bear Creek's managing director testified that

Mr. Ergen transferred "probably" over $700 million from the Trust to the Bal Harbour Entities

and SPSO, and that Bear Creek had never seen Mr. Ergen pull out that much money in a period

of 13 months for the benefit of the same beneficiary or beneficiaries.  (Roddy Dep. 95:16-96:6;

*see also* PX0814 at BC001351-68; PX0811 at BC00428-497; PX0809; Jan. 13 Tr. (Ergen)

169:4-170:19.)[30]

183.     According to Mr. Ergen, if the Ad Hoc Secured Group Plan had been confirmed

per the proposed schedule, he would not only have been repaid in full, but he would have

received approximately $150 million in profit plus a "significant" amount in interest.  (Jan. 13

Tr. (Ergen) 132:22-133:6, 134:6-15, 233:20-234:7.)

184.     Mr. Ergen testified that although he withdrew $700 million from a family trust, he

never informed his wife – a co-trustee of the Trust – that he had used the money to invest in the

LP Debt.  (Jan. 13 Tr. (Ergen) 120:8-21, 252:8-20.)  Indeed, although Mr. Ergen's wife is a

DISH board member (and a co-founder of DISH and EchoStar), she purportedly never asked him

whether he was purchasing the LP Debt prior to the May 2, 2013 board meeting.  (Jan. 10 Tr.

(Kiser) 15:5-21; Jan. 13 Tr. (Ergen) 119:20-120:7; PX0302 at 20.)  Notably, Mrs. Ergen was

---

[30]     Around that time, Bear Creek managed between $626 million and likely $750 million dollars for Ergen.
(Roddy Dep. 71:11-18.)  Today, it manages under $100 million.  (Roddy Dep. 72:22-73:5.)

among the recipients of the May 2012 email DISH's general counsel sent stating, in response to

a question over whether "charlie had bought $350 million light squared bonds," that "the

company did not buy any LightSquared bonds."  (DX397.)

185.    Mr. Ergen testified that he was interested in purchasing the LightSquared assets

personally if DISH declined to bid, but he had not made critical decisions essential to the

acquisition of a company, such as who would run the business, where key employees would be

officed, or how he would resolve the conflict of interest inherent in owning a DISH competitor.

(Jan. 13 Tr. (Ergen) 244:11-245:12.)

> **B.     The Price at Which Mr. Ergen Attempted to Purchase the LP Debt and
>         Offered for the LP Preferred Interests Is Inconsistent with the "Great
>         Investment" Premise**

186.    SPSO paid 96 cents on the dollar for approximately $320 million of LP Debt,

prices which are consistent with DISH's past practices of paying at or close to par for strategic

purposes.  (PX0864 (*In re DBSD North America, Inc.*, 421 B.R. at 140) (discussing DISH paying

par for debt); Jan. 13 Tr. (Ergen) 106:2-17.)  Mr. Ergen stated that, in 2013, he felt the LP Debt

was even more valuable because of changes in the industry and at the FCC, so he raised his limit

up to nearly par – 96 cents on the dollar – and bought whatever people would sell at that level.

(Jan. 13 Tr. (Ergen) 66:16-25.)

187.    As discussed *supra*, in October 2012, Mr. Ergen instructed Mr. Kiser to increase

his position in the LP Debt up to a level that would establish a blocking position.  (PX0243.)  By

March 25, 2013, Mr. Ergen needed to purchase another $112 million in the debt to reach that

goal.  (Jan. 13 Tr. (Ergen) 175:7-176:14; PX0379.)  On March 28, 2013, Mr. Ergen initiated a

trade for $168 million in LP Debt at 96 cents on the dollar – which was 50 percent more than he

initially paid in April 2012.  (Jan. 13 Tr. (Ergen) 176:17-178:3; PX0859.)  Mr. Ergen also sought

to purchase the Preferred Stock of LightSquared LP ("LP Preferred Interests") that was bundled

with that 96 cents on the dollar LP Debt and offered to pay between 92 and 95 cents on the dollar

for the LP Preferred Interests – approximately $122 million – just so, as Mr. Kiser testified, he

could have the privilege of obtaining the LP Debt with which it was bundled.  (Jan. 10 Tr.

(Kiser) 136:7-14.)  Mr. Ketchum testified that SPSO had been offered LP Preferred Interests

numerous times in the past, but only pursued the offer when it was bundled with the $168 million

in LP Debt.  (Jan. 15 Tr. (Ketchum) 108:12-22; *see also* PX0412 (April 4, 2013 e-mail from

Kiser telling Ketchum "We're only interested in the term loan.").)  Mr. Ergen denied the fact that

he was willing to pay that price because he wanted to get a blocking position.  (Jan. 13 Tr.

(Ergen) 174:3-18.)  Mr. Ergen's testimony is inconsistent with Mr. Ketchum's testimony that

Sound Point, Mr. Ergen, and Mr. Kiser shared the goal of obtaining a blocking position.  (Jan. 15

Tr. (Ketchum) 54:19-22; PX0305.)

## IX.    LightSquared and Harbinger Were Aware or at Least Had a Strong Suspicion that Mr. Ergen Was Acquiring LightSquared Debt

### A.    Although Public Information Provided No Certainty as to Who Was Behind Sound Point's Purchases, There Was Ample Reason to Believe It Was Mr. Ergen

188.    Starting in 2011, and continuing into 2013, Harbinger and LightSquared closely

monitored the sales and transfers of LightSquared's bank debt.  (Jan 16 Tr. (Falcone) 18:19-22;

Montagner Dep. 85:18-86:21; DX108; DX139; DX156; DX159; DX164; DX173; DX211;

DX391; DX392; PX0141; PX0324; PX0358; PX0373; PX0403.)  Around May 2012, when

LightSquared filed for bankruptcy, LightSquared was updating, several times a week, a list of the

"pro forma" holders of LightSquared debt, which contained information on open and settled

trades.  (PX0141; Montagner Dep. 65:23-68:5.)

189.    Ten days before LightSquared filed for bankruptcy protection, Mr. Falcone

learned that SoundPoint was buying LightSquared debt.  (Jan. 16 Tr. (Falcone) 20:17-20.)

However, given that Sound Point reportedly only had approximately $178 million in assets under management but was "purchasing" over $200 million of LP Debt, it prompted suspicion that Sound Point was not the identity of the ultimate purchaser.  (Jan. 17 Tr. (Hootnick) 17:21-18:6; PX0122.)

190.    The identity of the purchaser behind Sound Point was the subject of widespread speculation in the media.  News reports and blogs at various times connected Mr. Ketchum and Sound Point to Mr. Ergen, Carlos Slim, and the Dolan family (which controlled Cablevision).  (*See e.g.*, PX0095; PX0121; PX0122; PX0154; PX0195; DX144.)

191.    On April 30, 2012, Paul Voigt of Jefferies privately told Mr. Falcone that he was going to trade $250 million of LightSquared debt the following day.  (DX447.)  Around this time, Mr. Falcone had heard rumors that Carl Icahn was looking to sell his $250 million of LP Debt.  (Jan. 16 Tr. (Falcone) 94:20-95:15.)  Mr. Falcone responded, "To?"  (DX447.)  Several days later, on May 4, 2012, Mr. Falcone answered his own question, and in an email to Mr. Voigt referring to the $250 million trade, wrote, "You sold to Ergen."[31]  (DX033; Jan. 16 Tr. (Falcone) 30:11-31:15.)  Mr. Falcone testified that he sent the email because "[he] believed, at that time, that Ergen was involved and that they may have sold to Ergen."  (Jan. 16 Tr. (Falcone) 31:12-15.)

192.    On May 4, 2012, Ian Estus, an analyst-trader at Harbinger Capital, investigated Sound Point and forwarded a November 2, 2011 article to Mr. Falcone noting that Mr. Ketchum

---

[31]    Following SPSO's purchase of the $250 million piece of debt, news reports speculated that Mr. Ergen was buying the debt.  (Jan. 10 Tr. (Kiser) 37:5-13.)  On May 7, 2012, a *Reuters* story on the trade mentioned that Mr. Steven Ketchum of Sound Point previously counted Mr. Ergen as one of his investment banker clients and that DISH owned wireless airwaves "similar to LightSquared."  (PX0121.)  On May 9, 2012, an *LCD News* story carried the headline "LightSquared TL trades north of 70 as Ergen enters the picture."  (DX045.)  On May 10, 2012, a *Wall Street Journal* blog, "Deal Journal," published an entry titled "Ergen Builds Cash Pile Amid LightSquared Restructuring Talks."  (DX396.)

had a relationship with the Dolan family.  Mr. Estus noted, "This is the guy running Sound

Point.  An old article, but looks like the guy has close ties with the Dolan family."  (PX0095.)

193.    On May 5, 2012, Mr. Falcone responded to an email regarding Mr. Ergen from

Mr. Cohen of Knighthead, and wrote, "Maybe we shouldn't file if he is circling the wagons.

Though I think is [*sic*] a positive.  May bring in another strategic."  (Jan. 16 Tr. (Falcone) 33:8-

12; DX035.)  Mr. Falcone testified that he intended to convey that to "have a strategic kind of

kicking the tires on your company . . . validate[s] the asset and it may bring in - - it may prompt

other strategics to get involved."  (Jan. 16 Tr. (Falcone) 35:3-10, 96:8-12.)

194.    On May 6, 2012, Mr. Falcone emailed Matthew Goldstein of *Reuters* and wrote

that Mr. Ergen bought LightSquared debt from Carl Icahn, and that Mr. Ergen's purchase would

"prompt more strategics to step in."  (DX036; DX037; Jan. 16 Tr. (Falcone) 36:17-22.)  Later in

the day, Mr. Goldstein told Mr. Falcone that he heard the buyer was Sound Point, and Mr.

Falcone responded, "Fronting for [E]rgen."  (DX037.)  Mr. Falcone never indicated to Mr.

Goldstein that he was speculating.  (Jan. 16 Tr. (Falcone) 105:23-106:4.)  When Mr. Falcone sent

these emails to Mr. Goldstein, he believed Mr. Ergen was purchasing LightSquared's debt.  (Jan.

16 Tr. (Falcone) 38:6-15, 102:3-7.)

195.    On May 7, 2012, Mr. Falcone sent an email to Thomas Cullen of DISH and

wrote, "Good purchase."  (DX378; Jan. 16 Tr. (Falcone) 39:21-40:1.)  Mr. Falcone testified that

Mr. Cullen later called Mr. Falcone, but Mr. Falcone never called him back.[32]  (Jan. 16 Tr.

(Falcone) 40:2-7.)

---

[32]    On December 18, 2012, Mr. Falcone again sent an email to Mr. Cullen and wrote, "We should talk.  I know
you guys are buying the bonds through Sound Point.  One of his guys has been talking."  (DX097.)

196.    On May 7, 2012, Reuters published an article about the recent trade to Mr.

Ketchum of a position formerly held by Carl Icahn, noting that Mr. Ketchum had previously

worked as an investment banker and "one of his clients was Charlie Ergen's satellite company."

(PX0121; *see also* PX0122.)  Similarly, on May 10, 2012, a *Wall Street Journal* blog noted that

the counterparty on the Icahn trade was a "small hedge fund with ties to Ergen" and speculated

that DISH's then-recent sale of $1.9 billion worth of high yield bonds could be used to buy the

LP Debt.  However, the article, with the aid of DISH, refuted its own claim stating that "[t]he

official line out of Dish is that the proceeds from the bond sale will go to pay down debt

maturing in 2013 and 2014."  (DX396.)

197.    On May 8, 2012, Mr. Falcone emailed Gil Ha, a banker at Greenhill & Co. who

had a relationship with AT&T, and wrote, "Ergen now involved in LS."  (DX043.)  Mr. Falcone

testified that he sent this email because he thought that if AT&T knew Mr. Ergen was involved

in LightSquared, AT&T might be more likely to invest in LightSquared.  (Jan. 16 Tr. (Falcone)

41:20-22, 118:15-119:14.)

198.    On May 8, 2012, Mr. Falcone emailed Ara Cohen of Knighthead, a senior creditor

of LightSquared, and wrote, "I can understand why u guys balked; Charlie will definitely give u

guys 25% and an independent board and your full claim."  (DX382.)

199.    On May 10, 2012, a Harbinger Capital employee advised Mr. Falcone that he had

"heard from a couple of people that [E]rgen may not be the guy behind [K]etchum.  Some

rumors are that it might be the [D]olans, who like [E]rgen are close to [K]etchum."  Mr. Falcone

did not believe the employee was referring to the Dolans personally, but rather to Cablevision,

which the Dolans control.  (Jan. 16 Tr. (Falcone) 45:18-46:20; PX0149.)

200.    On May 16, 2012, Mr. Falcone sent an email to Greg Bensinger, a reporter at *The Wall Street Journal*, saying that Mr. Ergen and Carlos Slim were involved in buying LightSquared's debt.  (DX386.)  Mr. Falcone also offered Mr. Bensinger an "exclusive" if he would write a story, stating, "Let me know before I tell someone else if u are going to write anything."  (DX386.)  Mr. Falcone understood that Mr. Bensinger may write an article based on the information Mr. Falcone had provided.  (Jan. 16 Tr. (Falcone) 54:15-22, 108:25-109:4.)

201.    On July 9, 2012, *Forbes* indicated that, while speculation following the Icahn trade had focused on Mr. Ergen, "holes have appeared in the thesis that Ergen is backing Sound Point" and "people involved have begun to speculate it might be Carlos Slim or others behind the purchase.  Sources have speculated that Cablevision, owned by the Dolan family and one of the country's largest telecom and media company [*sic*], could be a potential suitor as well." (PX0304 at KCM0013841; *see also* PX0195 (Tim Farrar, *How many billionaires does it take to screw in a LightSquared?*).)

202.    On October 10, 2012, Mr. Falcone was  told by an employee at Jefferies, who said he was "very close to [Ergen's] right hand guy," that he would be "shocked if he is lying" about Mr. Ergen not being behind Sound Point's purchases of LP Debt.  (PX0254.)

203.    New reports continued to indicate throughout 2012 and into 2013 that Mr. Ergen and DISH may be behind Sound Point's LP Debt acquisitions, but no press article definitively confirmed Mr. Ergen's involvement.  An April 4, 2013 *Wall Street Journal* article noted, "[i]t is unclear whether Mr. Ergen or his company, satellite-television operator Dish Network Corp. . . . has played a role in Sound Point's trading.  Mr. Ergen hasn't addressed the trades, and the company declined to comment."  (DX144.)  The same day, an individual working in the telecommunications industry forwarded Mr. Falcone the article, telling him that Carlos Slim was

"with Charlie on the debt."  The individual explained that he "was in Mexico and was told by [Slim's] investment guy . . . that Carlos and Charlie are very tight and Carlos owns Dish Mexico."  (PX0409.)

204.    Although representatives of LightSquared had, at times in the spring of 2012, speculated that Mr. Ergen, Mr. Slim, Cablevision, Telephonica, or SK Telecom were purchasing LightSquared debt through SPSO, as Mr. Montagner testified, "[i]t was all speculation at the time.  No one knew."  (Montagner Dep. 64:20-65:10.)  Similarly, depending on the day and the information he received or the rumors that were circulating, Mr. Falcone suspected that anyone from Mr. Ergen on behalf of DISH or EchoStar; Sprint; James Dolan on behalf of Cablevision; Carlos Slim; AT&T; or one of the "big PE shops" was behind Sound Point's purchases.  (Jan. 16 Tr. (Falcone) 23:24-24:10, 48:21-49:19, 51:2-21, 62:16-63:24, 72:25-74:9; *see also* PX0095; PX0167; PX0158; PX0312; PX0537; PX0540; PX0356.)

205.    On October 4, 2012, Mr. Falcone sent an email to Omar Jaffrey, a banker who has worked in the telecommunications space (and now is the principal of Melody Capital, a plan sponsor), and wrote, "You may want to circle up w[ith] your contact at AT&T and let him know Ergen continues to buy bonds."  (DX388; Jan. 16 Tr. (Falcone) 56:3-8.)  When Mr. Falcone sent this email, he believed Mr. Ergen was the buyer of the debt.  (Jan. 16 Tr. (Falcone) 123:14-18, 124:7-9.)  Mr. Falcone also testified that he sent the email in the hope that Mr. Jaffrey would corroborate his belief that Mr. Ergen was buying debt and get AT&T interested in LightSquared. (Jan. 16 Tr. (Falcone) 56:9-57:5.)

206.    Even as late as March 28, 2013, Drew McKnight of Fortress Investment Group, LLC ("Fortress") and Mr. Falcone both expressed in an email exchange that it was beneficial that

a potential strategic investor, Mr. Ergen, was buying Fortress' LightSquared preferred stock. (DX395; Jan. 16 Tr. (Falcone) 140:24-142:4.)

207.    Mr. Falcone testified that he also "suspected" Carlos Slim or Cablevision might have been acquiring LightSquared debt.  (Jan. 16 Tr. (Falcone) 23:24-24:10.)  He also repeatedly characterized his emails that stated that Mr. Ergen was buying debt as "fishing expedition[s]" for information.  (Jan. 16 Tr. (Falcone) 39:3-10, 41:20-42:9, 56:13-20, 124:20-125:7.)

208.    In the spring of 2013, Harbinger and LightSquared were monitoring SPSO's open and closed trades particularly closely to determine whether SPSO's holdings would exceed the holdings of the Ad Hoc Secured Group, which would trigger the invalidation of certain provisions of the Exclusivity Stipulation, including the obligation to conduct a formal sale process for LightSquared's assets after the exclusivity period terminated:  "[W]e were monitoring the holdings throughout the entire case.  But at this point in time it was particularly relevant given a threshold in the exclusivity stip."  (Jan. 17 Tr. (Hootnick) 74:8-15.)

209.    Mr. Falcone testified that, at least as of March 2013, he wanted to "blow up" the Ad Hoc Secured Group because he did not want LightSquared to have to market or sell its assets. (Jan. 16 Tr. (Falcone) 142:20-143:17.)

**B.      Harbinger and LightSquared Add DISH to the List of Disqualified Companies Because They Believe Mr. Ergen Is Buying LP Debt**

210.    On May 6, 2012, in response to an email from Mr. Cohen of Knighthead regarding Mr. Ergen, Mr. Falcone wrote, "Well I'm working on giving him a nice surprise." (DX038.)

211.    Three days later, on May 9, 2012, LightSquared amended its list of Disqualified Companies (see ¶¶ 25-26, *supra*), and Mr. Falcone sent a list of additional Disqualified

Companies under the Credit Agreement to Paul Voigt of Jefferies.  (DX443; DX383; Jan. 16 Tr. (Falcone) 112:14-114:25.)

212.    Two of the companies on the May 9 amendment to the list of Disqualified Companies, DISH and DBSD North America, Inc., are affiliated with Mr. Ergen, but none is affiliated with Mr. Slim.  (Jan. 16 Tr. (Falcone) 115:6-16; DX443.)  Mr. Falcone testified that he sent this email to Mr. Voigt because he thought Mr. Ergen or DISH was buying LightSquared debt through Sound Point.  (Jan. 16 Tr. (Falcone) 114:16-25, 117:22-118:5.)  Indeed, after DISH was added to the list of Disqualified Companies under the Credit Agreement, Mr. Falcone told Mr. Voigt that "DISH or soundpoint [*sic*] can no longer buy."[33]  (DX384.)

### C.    Neither Harbinger Nor LightSquared Attempted to Use a Rule 2004 Subpoena to Determine Who Was Buying LightSquared Debt Through Sound Point

213.    Had they been confused about the identity of the purchaser behind SPSO, Harbinger or LightSquared could have sought discovery under Bankruptcy Rule 2004.  When asked about this option at trial, Mr. Falcone attempted to deny that he knew what a Rule 2004 subpoena was, initially testifying that he first heard of it a week before the Trial at his deposition on January 8, 2014 (Jan. 16 Tr. (Falcone) 129:8-130:8) and then backtracking, minutes later, when confronted with a May 16, 2013 email in which he wrote, "We should also put the '2004' item up as well."  (Jan. 16 Tr. (Falcone) 131:22-132:10; DX405.)

---

[33]    Based on this and other emails, it is clear that Jefferies, the market maker in LightSquared debt, was aware of the connection between Mr. Ergen and SPSO, and that Jefferies was talking to Mr. Falcone about SPSO's trades before they closed.  (DX033 (May 4, 2012 Falcone email to Voigt:  "You sold to Ergen"); DX377 (May 7, 2012 Falcone email to Voigt forwarding a list of Disqualified Companies including EchoStar:  "not sure how Charlie gets around this one"); DX443 (May 9, 2012 Falcone email to Voigt attaching Notice to Administrative Agent:  "not sure I would want to trade these anymore and get stuck"); DX055 (May 17, 2012 Falcone email to Voigt:  "Ergen and Carlos Slim"); DX089 (November 16, 2012 Falcone email to Voigt:  "[W]hat was the date the first block traded out of [I]cahn into [E]rgen[?]").)

214.    Mr. Falcone then testified that, in fact, before Mr. Ergen publicly disclosed his interest in SPSO, he had discussions with his legal team regarding issuing a Rule 2004 subpoena. (Jan. 16 Tr. (Falcone) 131:24-132:22.)

215.    Mr. Montagner testified that he understood LightSquared could have served a subpoena on the holders of its secured debt to identify who was behind SPSO.  (Montagner Dep. 57:5-9.)  Mr. Hootnick, a Managing Director at Moelis & Company ("Moelis"), LightSquared's financial advisor, also testified that he was involved in discussions with LightSquared regarding the use of discovery to find out who was purchasing LightSquared debt through Sound Point, but LightSquared decided not to pursue such discovery.  (Jan. 17 Tr. (Hootnick) 67:10-22.)

216.    Ultimately, neither Harbinger nor LightSquared ever tried to use a Bankruptcy Rule 2004 subpoena to find out who was behind SPSO's purchases of LP Debt.  (Jan. 16 Tr. (Falcone) 131:10-132:22.)

**D.    LightSquared and Moelis Representatives Also Suspect Mr. Ergen Is Buying Debt Through Sound Point**

217.    Mr. Hootnick testified that it was "our view" that Mr. Ergen was purchasing LightSquared debt through Sound Point.[34]  (Jan. 17 Tr. (Hootnick) 62:3-6; *see also id.* 16:13-23.) He further testified that Moelis "never really believed" that Mr. Slim was behind Sound Point. (Jan. 17 Tr. (Hootnick) 87:12-19.)

218.    Mr. Montagner held the same beliefs.  On May 7, 2012, after seeing news reports that Sound Point had purchased LightSquared debt, Mr. Montagner emailed Stan Holtz of Moelis and wrote, "Ketchum, with his 175 MM fund, bought 350 of the debt on Friday[.]  He is probably a front for Charlie Ergen."  (DX040; Montagner Dep. 60:21-61:15.)

---

[34]    Mr. Hootnick's belief did not change with the passage of time.  He testified that he understood, at least as of April 3, 2013, that *The Wall Street Journal* had very good sources saying that Mr. Ergen was behind Sound Point's purchases of LightSquared debt.  (DX140; Jan. 17 Tr. (Hootnick) 63:11-21.)

219.    Mr. Montagner testified that he was not aware of anyone at LightSquared doing anything to try to stop Sound Point's debt purchases.  (Montagner Dep. 64:20-65:19, 104:19-25, 105:6-17.)

**E.    LightSquared and Harbinger Make Inquiries to Determine Who Is Behind Sound Point's LP Debt Purchases but Fail to Take Action Based on Their Suspicions**

220.    LightSquared and Harbinger made efforts before and after LightSquared's bankruptcy filing to uncover the identity of the party behind Sound Point's purchases.  (Jan. 16 Tr. (Falcone) 23:12-15, 24:20-24.)  In early May 2012, Mr. Icahn, a substantial holder of the LP Debt, sold a large block of LP Debt to Sound Point, spawning press speculation.  (Jan. 9 Tr. (Smith) 127:25-128:18; Jan. 17 Tr. (Hootnick) 19:8-11; PX0121).)

221.    Upon learning of Sound Point's purchase, Mr. Smith, having never heard of Sound Point, asked Messrs. Montagner and Hootnick to find out who was behind Sound Point's purchases.  (Jan. 9 Tr. (Smith) 127:16-129:3.)  Similarly, Harbinger instructed Barry Ridings of Lazard Freres & Co LLC to reach out to Mr. Ergen.  (PX0899.)  Despite trying "a number of times," they "could never verify who was behind Sound Point."  (Jan. 9. Tr. (Smith) 129:4-13; *see also* Jan. 16 Tr. (Falcone) 47:4-9.)  As Mr. Hootnick testified, "[t]here were a lot of suspicions that that was the case, but we could not get confirmation on that topic."  (Jan. 17 Tr. (Hootnick) 54:18-55:10.)

222.    Mr. Montagner also asked Kurt Haufler, Treasurer of LightSquared, to reach out to UBS to obtain information regarding LightSquared's debt trading activity.  Mr. Haufler was not able to confirm through UBS who was behind Sound Point.  (Montagner Dep. 49:9-50:17, 51:6-17.)

223.     Further, both Messrs. Montagner and Holtz reached out directly to Mr. Ketchum to inquire who was behind SPSO.  (Jan. 17 Tr. (Hootnick) 17:16-18:13, 59:14-60:20.)  Mr. Ketchum intentionally rebuffed their inquiries.  (*See* Jan. 15. Tr. (Ketchum) 88:22-89:22.)

224.     Mr. Montagner left multiple voicemails for Mr. Ketchum in May 2012, around the time press reports surfaced connecting Mr. Ergen to the LP Debt purchases.  Mr. Ketchum returned one call "late one night" and left a voicemail.  That voicemail was the only direct communication Mr. Montagner had with Mr. Ketchum.  (Jan. 15 Tr. (Ketchum) 88:22-89:14.)  As Mr. Ketchum admitted, he understood that Mr. Montagner had contacted him seeking information about Sound Point and SPSO, but Mr. Ketchum intentionally avoided speaking with Mr. Montagner, only returning one call at an "odd hour" because he did not want to speak to him.  (Jan. 15 Tr. (Ketchum) 88:22-89:14.)

225.     Mr. Montagner also asked Mr. Holtz to schedule a meeting with Mr. Ketchum.  Mr. Holtz told Mr. Montagner that Mr. Ketchum did not want to meet with LightSquared at that time.  Mr. Holtz did not get any further information.  (Montagner Dep. 53:25-54:21.)  Mr. Ketchum admitted to receiving Mr. Holtz's inquiries, but did not give him information about Sound Point's LP Debt purchases.  (Jan. 15 Tr. (Ketchum) 89:15-22.)

226.     LightSquared's investigation continued in 2013.  As reflected in the minutes of LightSquared's board of directors meeting on April 18, 2013, Moelis and Sound Point had a meeting, but Sound Point would not disclose its investors or beneficial owners.  (Jan. 9 Tr. (Smith) 154:25-155:15; PX0443.)

227.     Moelis persisted in its efforts, calling "Mr. Ketchum regularly and meet[ing] with him regularly, and . . . continu[ing] during that period [*i.e.*, spring 2013] to try and find out who Sound Point—if they were representing somebody and what their intention was."  Mr. Ketchum

continued to refuse to identify Sound Point's investors or intentions.  (Jan. 17 Tr. (Hootnick) 23:13-24; Jan. 15 Tr. (Ketchum) 88:22-89:22; PX0443.)

228.    Further, Mr. Hootnick directly "ask[ed] Mr. Ketchum if he was working with Mr. Ergen . . . but [Ketchum] refused to answer any of those questions."  (Jan. 17. Tr. (Hootnick) 19:8-20; Jan. 15 Tr. (Ketchum) 88:22-89:14; 89:18-22.)  Mr. Hootnick also reached out to Rachel Strickland of Willkie Farr, who had represented Mr. Ergen in the TerreStar bankruptcy, to see whether she would shed light on whether Mr. Ergen was involved in SPSO's LP Debt purchases.  (Jan. 17 Tr. (Hootnick) 19:21-21:3, 64:3-9.)  Despite more than six phone calls and "a couple" of lunch meetings, Ms. Strickland would not confirm whether Mr. Ergen was involved.  (Jan. 17 Tr. (Hootnick) 20:22-21:3.)

229.    Aside from relying on LightSquared and its financial advisor to determine for whom Sound Point was purchasing the LP Debt, Mr. Falcone undertook his own extensive efforts to ascertain who was behind SPSO, "turn[ing] over every rock," including enlisting the help of LightSquared management and reaching out to "people on the street," reporters, Mr. Cullen of DISH, and representatives of AT&T and Sprint.  (Jan. 16 Tr. (Falcone) 22:1-11.)  Mr. Falcone further utilized Harbinger employees and advisors, as well as colleagues and acquaintances, to gather information.  (Jan. 16 Tr. (Falcone) 36:17-37:15, 38:6-22, 39:3-10, 39:18-40:7, 40:8-12, 41:8-19, 43:23-44:2, 44:21-45:17, 47:4-9, 53:11-54:22, 55:14-56:1, 56:3-57:8, 59:11-20, 59:21-60:22; DX037; DX097; PX0142; DX358; DX378; DX386.)  Neither Harbinger nor LightSquared took any legal action to determine the identity of the party behind SPSO.

### F. On May 21, 2013, LightSquared and Harbinger Definitively Learn that Mr. Ergen is Behind SPSO

230.    On May 21, 2013, counsel for Mr. Ergen disclosed to counsel for LightSquared that Mr. Ergen was the sole investor in SPSO.  (PX0539; Jan. 9 Tr. (Smith) 129:14-18; Jan. 16 Tr. (Falcone) 24:11-19; Jan. 17 Tr. (Hootnick) 15:25-16:12.)

231.    Hours before receiving confirmation, Mr. Falcone advised representatives and advisors for Harbinger and LightSquared that "[i]f I were a betting man I would say that Sound Point is Slim."  (Jan. 16 Tr. (Falcone) 72:25-73:18; PX0540.)  Upon receipt of counsel's email confirming that Mr. Ergen was in fact the ultimate purchaser of Sound Point's LP Debt, Mr. Falcone responded "[f]ortunately, I'm not a betting man."  (Jan. 16 Tr. (Falcone) 73:19-74:9; PX0537.)

### X. SPSO Delays Closing Hundreds of Millions of Dollars in LP Debt Trades for Several Months During a Critical Time in LightSquared's Bankruptcy Case

232.    Messrs. Ergen and Kiser testified that there were "economic" reasons for leaving the LP Debt trades open for as long as possible, that they were prepared to close "as soon as the upstreams paperwork" was done, and that they never intended to delay the settlement of the trades.  (Jan. 10 Tr. (Kiser) 64:5-25, 128:20-23; Jan. 13 Tr. (Ergen) 63:7-9.)  The documentary evidence is to the contrary.  Efforts were undertaken to delay the closing of SPSO's LP Debt trades in that, among other things:  (i) Mr. Ergen was insistent on holding onto his money for as long as possible; (ii) Mr. Ketchum – at Mr. Kiser's direction – gave false excuses to SPSO's counterparties to delay the closing of the trades; (iii) Mr. Ergen had no incentive to close the LP Debt trades because he could direct the vote on the trades even before they settled; (iv) there is no evidence in the record that a decision to settle the LP Debt trades was driven by a return Mr. Ergen received on his assets held at Bear Creek; (v) a delay in settling the LP Debt trades was not due to liquidity concerns because hundreds of millions of dollars of Mr. Ergen's Bear Creek

investments were liquidated and held in Mr. Ergen's account and additional investments could have been liquidated in a matter of days; and (vi) inconsistent and contradictory testimony was given regarding the reasons why settlement was delayed, including the need to complete "upstreams paperwork." (*See, e.g.*, PX0204; PX0481; PX0466; PX0498; PX0495; Jan. 10 Tr. (Kiser) 64:5-25, 95:20-23, 128:24-131:23; Roddy Dep. 66:7-25, 85:17-86:4, 87:9-16.)

### A.    Mr. Kiser, with Sound Point's Assistance, Delays the Closing of LP Debt Trades

233.    Mr. Kiser testified that Mr. Ergen delayed closing hundreds of millions of dollars in LP Debt trades because Mr. Ergen was insistent on holding onto his capital for as long as possible and would only fund trades when they needed to close. (Jan. 10 Tr. (Kiser) 57:4-6; Jan. 13 Tr. (Ergen) 59:13-22.) Thus, when Sound Point entered into a trade for LP Debt, Mr. Kiser would have to create the liquidity necessary to fund the purchases and wire the funds to the accounts set up for SPSO. (Jan. 10 Tr. (Kiser) 87:13-23.) Prior to closing a trade, Messrs. Kiser and Ergen provided Bear Creek – the financial manager for DISH, EchoStar, and Mr. Ergen – with a wire transfer authorization and Bear Creek would liquidate assets to fund the trades. (Jan. 10 Tr. (Kiser) 21:23-22:18, 57:7-58:12; Jan. 10 Tr. (Ergen) 57:7-15; Roddy Dep. 42:18-43:14, 45:3-19.)

234.    Of the 25 trades entered into by SPSO for purchases of LP Debt, eighteen of them took over two months to settle, and, of those eighteen trades, six took over four months to settle. (PX0859.) By May 20, 2013, SPSO had contracted for, but had failed to settle, approximately $593,757,000 in face amount of LP Debt trades (and approximately $610,000,000 counting trades held by brokers on that date) – more than 33 percent of the total outstanding LP Debt obligations—and had kept open a number of trades that it had entered into as far back as December 12, 2012. *Id.*

235.    SPSO's counterparties to the hundreds of millions of dollars in open LP Debt

trades repeatedly reached out to Sound Point to settle the trades and were paper-work ready to do

so.  (Jan. 15 Tr. (Ketchum) 80:23-81:6, 85:15-25, 105:4-16, 109:8-111:12; PX0279; PX0495 at

SPSO-00003025; PX0859; PX0204; PX0209; PX0270; PX0308; PX0319; PX0328; PX0339.)

Messrs. Kiser and Ergen, contrary to their testimony, delayed closing even when they knew

counterparties were anxious to close.  To assuage the concerns of SPSO's counterparties, Sound

Point offered various excuses to counterparties.  Mr. Ketchum testified that he did not know

specifically why SPSO was unable to close the LP Debt trades timely and only knew Mr. Kiser

wanted to delay.  (Jan. 15 Tr. (Ketchum) 69:3-16; *see, e.g.*, PX0204 (Sound Point employee

emailing Mr. Ketchum on June 4, 2012 regarding a LightSquared trade entered into on May 3,

2012 and stating, "Jefferies is looking to settle the other two trades.  Do you want to?  Or

delay?"); PX0481; PX0523.)

236.    For example, on January 14, 2013, UBS sought to close a trade with SPSO that

had been pending for months.  Mr. Ketchum, in an email to his colleague, said he "forwarded

this to EchoStar."  Three days later, the colleague asked Mr. Ketchum, "would you mind

following up with EchoStar [because] UBS has asked to close again."  By January 24, 2013,

UBS again was pressuring Sound Point to close the trades, "emailing to close daily," and Sound

Point continued to delay.  "Try and hold them off for another day," another Sound Point

employee responded.  (PX0348; *see also* PX0319 (Sound Point on January 14, 2013, replying

"[s]orry but we are not able to settle that one right now" in response to weekly inquiries from

UBS); PX0328 (Sound Point internally discussing following up with "Echostar" regarding UBS

trade); PX0364 (March 7, 2013 Sound Point email stating it would be able to settle "next week"

in response to repeated inquiries since February 2013 regarding a December 2012 trade).)

237.    On February 19, 2013, a Sound Point employee asked Mr. Ketchum to follow up

with Mr. Kiser regarding ongoing email and telephone requests from Jefferies to close multiple

trades, with trade dates going back as early as October 23, 2012.  (PX0347; PX0859.)  The

employee reminded Mr. Ketchum that "[w]e have been pushing Jefferies off for nearly 3 weeks."

(PX0347.)

238.    Then, on April 23, 2013, Mr. Ketchum wrote to Mr. Kiser, "Kevin [of Sound

Point] thinks we can hold [Jefferies] off on any payments until at least May 15" in connection

with over $289 million in LP Debt that had not settled.  (PX0458; PX0441; PX0859.)  Jefferies

followed up with Sound Point on April 25, 2013, seeking to close $88 million of the open LP

Debt purchases.  (PX0466.)  Mr. Ketchum inquired internally as to whether he could blame

SPSO's delay on the "upstreams," *i.e.*, the work required to trace back the chain of ownership to

original lenders, but he was told by Sound Point personnel that such work had already been

completed.  (PX0466; Jan. 15 Tr. (Ketchum) 76:9-77:8.)

239.    When a Sound Point employee asked Mr. Ketchum for a "reason and an eta" to

give Jefferies, another employee suggested telling Jefferies "we are waiting on funding from our

investor."  Mr. Ketchum rejected that idea, and proposed a different excuse:  "Let's not say that.

Let's just say we are in the process of exiting some other large positions we have to pay for this

and that I have spoken with Steve Sander (head of sales) [at Jefferies] about this."  (PX0466; *see

also* PX0468 (Mr. Ketchum stating that they should tell Sound Point that "our LP wants time to

dispose of other assets"); PX0308 (Jefferies repeatedly inquiring whether funds are available);

PX0341 (Sound Point writing to Jefferies that they are "still waiting on the funds"); Jan. 10 Tr.

(Kiser) 63:15-20.)

240.    On May 9, 2013, Jefferies emailed Sound Point again, imploring Mr. Ketchum to address the open trades.  (PX0498.)  As of that date, SPSO had seven open trades with Jefferies, totaling approximately $588 million in LP Debt from trades dating back as far as January 2013.  (PX0859.)  Mr. Sanders of Jefferies pleaded in an email to Mr. Ketchum:  "this is a big problem for me. I would like to come down and talk to you this afternoon around 4 or 5pm mano a mano[.]  Is this possible?"  Mr. Ketchum replied, offering the party line established the day before – that he was waiting for other "trades to settle."  Mr. Ketchum went on to state that he had "already pushed extremely hard to get to where we are now in terms of closing."  (PX0498.)  Notwithstanding the pressure from Jefferies, none of the open trades closed for another several weeks.  (PX0859.)

241.    Knowing Jeffries was anxious to close the open trades and aware that the volume of unsettled LP Debt trades was substantial, Sound Point prepared a schedule of "Proposed Settlement Dates" to send to Mr. Kiser – selecting proposed dates up to four months or more after the initiation of the trade as illustrated by the following chart included in an email exchanged between Messrs. Ketchum and Kiser on May 8, 2013:

**Proposed Settlement Dates**

| Trade Date | Cost | Type | Desk | Settlement Date | Cumulative |
|---|---|---|---|---|---|
| 01/07/13 | | TLB | JEFF | 05/17/13 | |
| 01/14/13 | | TLB | JEFF | 05/17/13 | |
| 12/12/12 | | TLB | GS | 06/01/13 | |
| 03/25/13 | | TLB | JEFF | 06/01/13 | |
| 02/01/13 | | TLB | JPM | 07/01/13 | |
| 03/28/13 | | TLB | JEFF | 07/01/13 | |
| 04/01/13 | | TLB | SEAPORT | 07/01/13 | |
| 03/28/13 | | Pref | JEFF | 07/15/13 | |
| 04/19/13 | | TLB | JEFF | 08/01/13 | |
| 04/26/13 | | TLB | JEFF | 08/15/13 | |

(PX0495 at SPSO-00003025; *see also* PX0460; PX0461; PX0474; PX0497; PX0454 (April 22,

2013 internal Sound Point email noting that the amount of unsettled trades had "jumped to

almost $404 [million]"); Jan. 15 Tr. (Ketchum) 109:1-111:12.)  Sound Point provided the

proposed settlement dates to Jefferies to give assurance (even though there was none) that the LP

Debt trades would close.  (Jan. 15 Tr. (Ketchum) 123:12-124:1.)  Mr. Ketchum stated that the

"proposed settlement dates" in the schedule he emailed to Mr. Kiser on May 8 were suggested by

Mr. Ketchum as a "compromise solution" in order to get the open Jefferies trades settled, and he

proposed the schedule to Mr. Kiser before conveying such dates to Jefferies in order to see if a

schedule of this kind was capable of execution by SPSO.  (Jan.15 Tr. (Ketchum) 124:12-17.)[35]

Mr. Ketchum's testimony that these dates were "projections" of the dates upon which he thought

the open trades would close was not credible; rather, these dates reflect a gameplan for delaying

the closings.[36]

242.    Sound Point also performed an internal analysis on May 8, 2013 which showed

that, to settle the LP Debt trades with Jefferies, SPSO took an average of 69 days after the trade

date and 38 days after the "contractual settlement date" of "T+20," or twenty days after the trade

date.  (PX0493.)  There is no reason for Sound Point to have performed such an analysis other

than to provide support for its proposed further delays.  Indeed, trade counterparties were keenly

aware of SPSO's failure to adhere to the industry norms for the timing of settlements.  For

---

[35]    *See also* Jan. 15 Tr. (Ketchum) 132:8-15 ("my job was to find a date, propose a date to SPSO that I thought
was reasonable in the context of closing distressed trades, obtain permission from SPSO, and in particular, Jason, to
go back and offer those dates to Jefferies so that they could be mollified and feel that there was some sort of
definition around when the trades would be closed.").

[36]    Mr. Kiser testified that he instructed Mr. Ketchum to prepare a schedule for him showing unsettled trades
and expected settlement dates so that he could have the money available on those dates, in order to avoid the "back-
and-forth" with counterparties who may not have been ready to close when the funds were made available.  (Jan. 10
Tr. (Kiser) 63:25-64:14 ("And it got to a point where I told Steve, hey, look, get me a list and tell me when these
things will trade so that we can have the money available for them rather than doing this back-and-forth type of
thing.").  This testimony was also not credible.

example, Jefferies emailed Sound Point, "[w]e are past the T+20 date and would really like to get this off our books." (PX0205; *see also* PX0209; PX0270; PX0234.)

243. Frustrated with the unprecedented delay in closing the trades, Jefferies complained internally that "[w]hat the buyer has done is not market protocol" and separately to its immediate counterparty that "we remain beholden to [Sound Point] as far as continuing to make progress." (PX0538; PX0880.)

### B. There was No True Economic Benefit for Messrs. Ergen and Kiser to Keep the LP Debt Trades Open

244. Messrs. Kiser and Ergen consistently testified that they were "in no rush to close" because it was to Mr. Ergen's economic benefit to wait as long as possible before closing on the trades. (Jan. 10 Tr. (Kiser) 97:23-99:14; Jan. 13 Tr. (Ergen) 157:16-158:6.) As Mr. Kiser testified, Mr. Ergen "was getting a return on his capital and his investments. So if he didn't have to pay for it and he can make money on another end where his money was invested, that seemed like a smart move." (Jan. 10 Tr. (Kiser) 98:3-6.) However, Bear Creek account statements reflect that Mr. Ergen earned a relatively low rate of interest on the funds in his trust accounts. (PX0796-818.)

245. On July 9, 2013, SPSO filed with the Court a joinder; annexed as Exhibit A to the joinder was an amended stipulation (the "SPSO Stipulation") stating that "the timing of closing of each of SPSO's acquisitions of Prepetition LP Obligations was primarily driven by the sellers of such claims." (PX0699 ¶ 16.) This was not true. A prior July 3, 2013 stipulation, which was modified and amended by the SPSO Stipulation, had stated that "SPSO's trade counterparties did not request that SPSO settle or close the trades for several months" and that "SPSO and Ergen took no action to delay" the closing of any of the trades. (PX0699; PX0858.) Each of these statements by SPSO's counsel was contradicted by Messrs. Ergen, Kiser, and Ketchum.

246.    Mr. Ergen understood that he did not need to "rush" to close the trades because he could direct the vote of the LP Debt he had purchased without settling on the trade, as it was common practice for the seller of the LP Debt to give the buyer the option to vote on matters relating to the LP Debt.  (Jan. 13 Tr. (Ergen) 163:1-10; Jan. 10 Tr. (Kiser) 64:17, 97:25, 129:7-13; PX0111.)

247.    There were economic costs associated with leaving the LP Debt trades open for extended periods of time that were not taken into account, despite the parties' awareness of such costs.  If SPSO failed to close certain LP Debt trades by the closing date specified in the purchase agreement, it was charged a penalty "cost of carry fee" and in some instances had to forgo receiving a share of Adequate Protection Payments[37] for the unsettled trade.  (*See Agreed Final Order (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay*  [Bankr. Docket No. 136] at 18 (granting adequate protection for Lenders); Jan. 15 Tr. (Ketchum) 81:1-82:3; PX0493; *see, e.g.*, DX104 at LSQ-SPCD-000000176 (imposing "AP Payment" and "cost of carry" fees from T+20 to settlement date); DX109 at LSQ-SPCD-000000285; PX0851 at SPSO-00000072; PX0650 at LSQ-SPCD-000000073.)   Despite these economic costs, Sound Point only closed one LP Debt trade – the May 4, 2012 purchase of $247 million in LP Debt from Carl Icahn's company Icahn Enterprises LP – within the contractual settlement period.  (Jan. 15 Tr. (Ketchum) 82:7-15; PX0493; PX0859.)

---

[37]     "Adequate Protection Payments" refer to the payments of $6,250,000, made on the first business day of each month, and distributed as interest payments to holders of LP Debt after the payment of nonprofessional and professional fees pursuant to the *Agreed Final Order (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* (Bankr. Docket No. 136 at 18), and the *Amended Final Order Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay*.  (Bankr. Docket No. 136 at 18-19; Bankr. Docket No. 544 at 18-19.)

248.    Neither Mr. Kiser nor Mr. Ergen monitored the interest earned on the specific assets of the Trust selected for liquidation, and they had no involvement in the selection of those assets.  (Jan. 10 Tr. (Kiser) 128:24-131:23.)

249.    Bear Creek, in its sole discretion, decided which assets to liquidate from the Trust, and Messrs. Ergen and Kiser both testified that they had no knowledge of how the assets were liquidated.  (Jan. 13 Tr. (Ergen) 159:20-24.)  Bear Creek's corporate representative testified that he selected assets for liquidation based on "which ones are the easiest to liquidate closest to the market value," and generally selected assets with low interest rates, consistent with the overall conservative nature of the Trust.  (Roddy Dep. 57:9-58:3, 58:20-22, 59:6-12, 69:7-11.)  The Bear Creek representative was not aware that SPSO may have to pay cost of carry fees and forego Adequate Protection Payments if the LP Debt trades were not closed by a certain date and, therefore, this had no impact on assets selected for liquidation.  (Roddy Dep. 67:15-69:22, 86:5-87:3.)  Only Messrs. Ergen and Kiser, and not the Bear Creek representatives, were aware that SPSO was accruing (and possibly missing out on) Adequate Protection Payments by delaying the closing of trades.  (PX0258; PX0256; PX0259.)

## C.    LP Debt Trades Were Not Left Open Due to Liquidity Constraints

250.    Messrs. Ergen, Kiser, and Ketchum offered two main explanations to account for the lengthy delays between the trade and settlement dates:  (1) Mr. Ergen did not have immediate liquid funds available (Jan. 10 Tr. (Kiser) 129:23-131:18; Jan. 15 Tr. (Ketchum) 69:3-25); and (2) the necessary paperwork or "upstreams" were not complete.  (Jan. 10 Tr. (Kiser) 62:1-17, 128:24-129:22.)  Neither explanation is credible.

251.    Mr. Kiser gave inconsistent testimony as to the role of liquidity in the settlement delays.  At Trial, he denied that liquidity caused any delays.  (Jan. 10 Tr. (Kiser) 128:24-129:13.)

When reminded that he had stated otherwise at his deposition, Mr. Kiser conceded that he "gave that as an example of one thing" that caused delays. (Jan. 10 Tr. (Kiser) 129:23-130:1.)

252.    Contrary to the testimony of Mr. Kiser and Mr. Ketchum (Jan. 10 Tr. (Kiser) 129:23-131:18; Jan. 15 Tr. (Ketchum) 84:10-14), a lack of available liquidity does not explain the significant delays in closing.  SPSO's LP Debt purchases were funded by Mr. Ergen's assets held in the Trust.  When SPSO was ready to close a trade, Mr. Ergen would authorize a wire transfer from the Trust, which Bear Creek made available for transfer within several days. (Roddy Dep. 66:12-25, 85:17-86:4, 87:9-16; PX0091; PX0273; PX0353; PX0519.)  Mr. Ergen testified: "As far as I know, I don't believe, other than several days, or perhaps a Friday where it didn't make economic sense to wire money, that there was [*sic*] any delays because of that reason."  (Jan. 13 Tr. (Ergen) 159:13-19.)

253.    Neither Mr. Kiser nor Mr. Ergen could identify a single instance in which liquidating assets to free up funds for SPSO took longer than a few days.  (Jan. 10 Tr. (Kiser) 132:10-20; Jan. 13 Tr. (Ergen) 158:7-159:19.)  In at least one case, liquid funds were readily available, but Mr. Kiser instructed Bear Creek to hold off on wiring funds.  (*See* PX0530 (Kiser instructs Bear Creek on May 20, 2013 to "[w]ait for the green light from me prior [to] sending. Obviously it's not going today so just check with me each morning.").)  The account statements produced by Bear Creek reflect that, as of April 30, 2013, some $461 million held in the Trust account had been liquidated, and, as of May 31, 2013, approximately $207 million in liquid funds still remained in the Trust account.  (PX0810; PX0812.)

254.    Despite acknowledging that he had testified at his deposition that liquidity issues were the sole cause for delay, Mr. Kiser testified at Trial that delays were primarily caused by the amount of time it took to complete the necessary paperwork, and that he waited until Mr.

87

Ketchum advised him that a LightSquared trade needed to close and then arranged for the

necessary liquidity.  (Jan. 10 Tr. (Kiser) 62:1-17, 95:20-96:4, 129:23-130:1.)  Yet, Mr. Kiser

admitted that, even when provided with notice that counterparties were ready to close, he sought

to defer settlement as long as possible.  (Jan. 10 Tr. (Kiser) 64:5-25, 97:23-98:6.)  There were

numerous instances over a course of months in which SPSO's counterparties repeatedly asked

Sound Point to settle hundreds of millions in open trades before Messrs. Kiser and Ergen finally

arranged for settlement.  (*See e.g.*, Jan. 15 Tr. (Ketchum) 85:2-13; PX0859.)

255.    Mr. Ketchum testified that he had no conversations with Mr. Kiser as to why

funds were not available for closing and had no understanding of Mr. Ergen's liquidity at that

time.  (Jan. 15 Tr. (Ketchum) 70:7-15.)  When funds did not arrive timely, he assumed, based on

remarks "from Mr. Kiser that things had to be sold, cash had to be raised to settle those trades,

and so informed counterparties."  (Jan. 15 Tr. (Ketchum) 84:10-14.)

## XI.    LightSquared and its Creditors Were Injured by SPSO's Conduct

256.    At various points during LightSquared's bankruptcy, LightSquared, Harbinger,

and the Ad Hoc Secured Group attempted to work together on the terms of a consensual plan of

reorganization.  (Jan. 17 Tr. (Hootnick) 21:24-22:24; Jan. 9 Tr. (Smith) 130:3-18; Montagner

Dep. 75:21-76:5.)

257.    On February 13, 2013, this Court entered the Second Exclusivity Extension

Order, incorporating the terms of the Exclusivity Stipulation.  (Docket No. 522; PX0852.)  The

Exclusivity Stipulation extended LightSquared's exclusivity period to July 15, 2013, and

required the parties to engage in good faith negotiations regarding the terms of a consensual

chapter 11 plan.  (PX0852 at 3-4.)  If a consensual plan was not reached by July 15, 2013, a sales

process for LightSquared's assets would begin.  (PX0852 at Ex. A ¶6.)  The Exclusivity

Stipulation also provided that it could be terminated if the Ad Hoc Secured Group, collectively, ceased to be the largest holder of the LP Debt.  (Id. at ¶ 15.)

### A. Negotiations with the Ad Hoc Secured Group Are Affected by SPSO's Pending LP Debt Trades

258.   In late March 2013, Sound Point entered into trades with Fortress and Providence Capital LLC ("Providence") to purchase their significant LP Debt holdings, as well as their LP Preferred Interests.  (DX136; DX139.)  As a result of these trades, Fortress and Providence thereafter ceased participating in negotiations with respect to a consensual plan of reorganization for the Debtors.  (Jan. 17 Tr. (Hootnick) 21:4-17, 22:4-23:7; Jan. 16 Tr. (Falcone) 75:13-76:8; PX0611; *see also* PX0617.)  In an April 18, 2013 meeting of the LightSquared Board of Directors, Mr. Montagner reported that LightSquared had met with several large holders of the LP Debt to explore ideas for a consensual plan of reorganization.  However, "further discussions were halted after Sound Point agreed to purchase the LP preferred stock from these investors." (PX0443 at L2AP0000924.)

259.   As Sound Point continued to purchase large blocks of the LP Debt, LightSquared was not sure which lenders to negotiate with and whether the Ad Hoc Secured Group was able to carry a class such that it could enter into a binding commitment with respect to a plan.  (Jan. 9 Tr. (Smith) 130:3-131:12; Jan. 17. Tr. (Hootnick) 69:1-12; Jan. 16 Tr. (Falcone) 14:9-20, 22:15-21, 145:5-15, 151:24-152:2; PX0465; PX0486.)

### B. Once SPSO Discloses its Blocking Position and Joins the Ad Hoc Secured Group, Plan Negotiations Cease

260.   Mr. Ergen made the LBAC Bid on May 15, 2013 and announced his LP Debt holdings on May 21, 2013.  The LBAC Bid and Mr. Ergen's announcement were made at a time when LightSquared's Board and management team were exploring whether a joint venture or

strategic partnership would allow LightSquared to raise capital and form the basis for a plan to emerge from bankruptcy. (Jan. 17 Tr. (Hootnick) 27:11-22; Jan. 9 Tr. (Smith) 134:22-135:1.)

261.    Beginning in late May 2013 and continuing thereafter, LightSquared's financial advisor Moelis contacted over 90 parties to discuss a joint venture or strategic partnership. (Jan. 17 Tr. (Hootnick) 28:6-16.) Parties approached included the "existing telecom parties with wireless operations in the United States: AT&T, Verizon, Sprint and T-Mobile." (Jan. 17 Tr. (Hootnick) 28:17-23, 77:16-18.) LightSquared and Moelis proposed a "low-cost option" for an equity investment by strategic investors, but advised that LightSquared was "certainly open to anything." (Jan. 9 Tr. (Smith) 140:21-142:11.)

262.    On June 7, 2013, the Debtors received Court approval to enter into and perform under an engagement letter with Jefferies in connection with securing potential exit financing for the Debtors [Bankr. Docket No. 667], after which a "road show" kicked off to seek to raise capital.

263.    On July 1, 2013, Mr. Montagner reported to the LightSquared Board that, after the Bankruptcy Court approved the engagement letter with Jefferies, LightSquared "immediately embarked on marketing efforts, including approximately 50 investor meetings. The Company is seeking a commitment from investors by July 15th with two pre-conditions to funding: 1) FCC approval of the Company's alternative spectrum plan and 2) court approval of a plan of reorganization." (PX0679; Montagner Dep. 165:25-166:22.)

264.    According to Mr. Hootnick, with respect to meetings with Sprint, AT&T, and T-Mobile, "there was a lot of interest in the L-Band . . . [b]ut one of the main reactions was doesn't Charlie Ergen already own this." While Moelis went to "great lengths" to assure potential partners that Mr. Ergen did not own LightSquared, Mr. Hootnick stated that "it was somewhat

challenging" in light of a *Bloomberg* article reporting that Mr. Ergen was "on his way to acquiring LightSquared." (Jan. 17 Tr. (Hootnick) 28:17-23, 29:21-30:22, 77:13-78:1.)

265.   Similarly, Mr. Smith, who attended the meetings with Sprint, AT&T, T-Mobile, and Verizon, testified that these parties questioned whether they should get involved in light of Mr. Ergen's blocking position and the LBAC Bid; strategics believed that LightSquared's ownership was a "foregone conclusion." (Jan. 9 Tr. (Smith) 137:9-138:13.)

266.   Mr. Hootnick testified that potential strategic partners were also concerned about Mr. Ergen's involvement because they believed that he was acquiring spectrum "to warehouse" it and "not for a financial return." (Jan. 17 Tr. (Hootnick) 32:4-34:14.) At Trial, Mr. Cullen confirmed that, despite the fact that DISH has not yet deployed the spectrum assets it acquired from DBSD and TerreStar in March 2012, it continues to pursue additional spectrum, and intended to participate in the then-upcoming auctions for H Block and AWS-3 spectrum assets. He also testified that DISH intends to wait until it can "understand the totality of spectrum" that it can "partner or pair[,] before you start deploying on any towers." (Jan. 17 Tr. (Cullen) 149:5-150:3.)

267.   On June 15, 2013, Mr. Hootnick advised Mr. Falcone that Moelis was "pushing forward with some of the strategic discussions and [we']re reviewing smaller capital raises" but "[c]learly the ad hoc group changes have chilled that avenue." (PX0645.)

**C.    Within Weeks of SPSO's Joining the Ad Hoc Secured Group, the LBAC Bid is Adopted**

268.   On June 13, 2013, SPSO joined the Ad Hoc Secured Group in order to keep the Exclusivity Stipulation in effect. (PX0858 at ¶ 13; PX0852 at Ex. A ¶¶ 7, 8.)[38] After SPSO

---

[38]   SPSO's counsel also stated in closing arguments of the Trial that SPSO joined the Ad Hoc Secured Group solely for the purpose of maintaining the "lender protections" of the Exclusivity Stipulation. Mar. 17 Tr.
(continued...)

joined the Ad Hoc Secured Group, neither Mr. Ergen nor SPSO participated in any meetings of

the Ad Hoc Secured Group (Jan. 13 Tr. (Ergen) 89:7-9).

269.    Within days of SPSO's joining the Ad Hoc Secured Group, several hundred

million dollars of its "hung" trades closed, making SPSO the controlling member of the group by

virtue of the size of its holdings.  (PX0649 at L2AP0008732; PX0625; PX0859.)

270.    On April 4, 2013, the Ad Hoc Secured Group had submitted a proposed plan term

sheet to LightSquared and indicated its willingness to commence discussions with respect

thereto.  (PX0410.)  The term sheet contemplated a plan in which all creditor and preferred

equity classes would receive a full recovery and LightSquared would emerge from bankruptcy

with its spectrum assets intact.  (*Id.* at HARBAP00015399-400; *see also* Jan. 17 Tr. (Hootnick)

21:24-22:24.)[39]  Also, on May 15, 2013 – the same day that Mr. Ergen submitted the LBAC Bid

– the parties exchanged a revised term sheet for a consensual plan of reorganization.  (PX0505;

DX335; DX174.)  The revised term sheet provided for an infusion of new capital to be obtained

by Harbinger and/or LightSquared and a reorganization, such that a sale of LightSquared's assets

would be avoided.  (PX0505 at HARBAP00005107-13.)

271.    On May 21, 2013, the parties began to consider a plan that bifurcated the class of

creditors holding LP Debt by providing a different recovery scheme for SPSO and non-SPSO

holders of LP Debt.  For example, a term sheet exchanged with the Ad Hoc Secured Group on

May 24, 2013 envisioned that SPSO would receive full cash recovery while non-SPSO lenders

would receive cash recovery and warrants.  (PX0561.)

---

(Strickland) 189:12-191:4 ("[SPSO] was very much focused on those lender protections, and that's why it joined the group.")

[39]    While a sale of LightSquared's assets was a possible resolution, it was not the primary goal the parties contemplated at that time.  Indeed, prior to the summer of 2013, Moelis did not engage in any discussions regarding a sale.  (Jan. 17 Tr. (Hootnick) 83:15-23.)

272.    Once SPSO had acquired a blocking position and joined the Ad Hoc Secured

Group, LightSquared believed it was effectively impossible for it to reach a consensual deal with

the Ad Hoc Secured Group.  (Jan. 16 Tr. (Falcone) 182:23-183:2; 226:4-16.)

### D.    LightSquared's Negotiations with Creditors Come to an End After the Filing of the Ad Hoc Secured Group Plan

273.    Approximately one month after SPSO joined the Ad Hoc Secured Group, on July

23, 2013, the Ad Hoc Secured Group filed the PSA, seeking approval of the DISH/LBAC Bid.

(PX0823.)  Negotiations towards a plan in which LightSquared would continue as a going

concern came to an end.  (Jan. 16 Tr. (Falcone) 76:9-25, 225:14-20; PX0823.)

274.    The PSA bound the Ad Hoc Secured Group to support the DISH/LBAC Bid,

stating that the parties to the PSA "[s]hall not directly or indirectly seek, solicit, support, or vote

in favor of any other plan, sale, proposal, or offer of dissolution, winding up, liquidation,

reorganization, merger, or restructuring of the Debtors other than the Plan[.]"  (PX0823 at

1.1(a)(6).)  Accordingly, at that time and pursuant to its contractual obligations, the Ad Hoc

Secured Group ceased negotiating with any other party, including LightSquared, toward any

other plan of reorganization.

### E.    LBAC and DISH Seek to Obtain Broad Releases for Themselves and Their Affiliates in the Ad Hoc Secured Group Plan

275.    The Ad Hoc Secured Group Plan and the APA filed therewith included broad

releases for LBAC and its affiliates, including DISH, EchoStar, and Mr. Ergen and his affiliates,

including SPSO, requiring that SPSO's claim be allowed in its full face amount. (*See First

Amended Joint Chapter 11 Plan for LightSquared LP, et al., Proposed by the Ad Hoc Secured

Group of LightSquared LP Lenders* [Bankr. Docket No. 970, Ex. A] § 13.1; Stalking Horse

Agreement, filed October 28, 2013 [Bankr. Docket No. 970, Ex. F] § 3.2(a)(ii) & n.9.)

276.    On multiple occasions, Defendants represented that the DISH/LBAC Bid and

SPSO's LP Debt purchases were separate and independent transactions.  (PX0731 at 29:18-31:4;

PX0766 at 9:4-24.)  Other than characterizing the releases as "customary," Defendants were

unable to explain why, if Mr. Ergen and SPSO were not acting for DISH, the APA – which was

between DISH and LightSquared – included a release for Mr. Ergen personally as well as for

SPSO.  (PX0765; Dec. 10 Tr. 137:16-21.)

277.    The Nevada Court presiding over the action captioned *In re DISH Network

Corporation Derivative Litigation*, Case No.: A-13-686775-B also recognized the conflict of

interest inherent in a DISH release that benefits Mr. Ergen personally.  In granting a limited

preliminary injunction on November 27, 2013, the Nevada Court found that "the U.S.

Bankruptcy Trustee has made an objection to the scope of the release in the bankruptcy plans,

including the Ad Hoc Secured Group's plan," and that while "DISH has a significant interest in

exploring the possibility of . . . modifying the release and carving out claims against SPSO and

Ergen," it was also the case that "DISH is unable to explore this option so long as DISH's

actions in the LightSquared bankruptcy relating to the release provisions are controlled by

Ergen."  (PX0780 (Findings of Fact and Conclusions of Law, dated November 27, 2013, issued

by District Judge Gonzalez) at 15.)  Accordingly, the Nevada Court enjoined "Ergen or anyone

acting on his behalf . . . from participation, including any review, comment, or negotiations

related to the release . . . for any conduct which was outside the scope of his activities related to

DISH and LBAC."  (*Id.*)

## DISCUSSION

## I.    Introduction

The Complaints assert a variety of causes of action against Defendants DISH, EchoStar,

SPSO, and Mr. Ergen.  The Complaints seek redress against Mr. Ergen and the entities he

controls for his allegedly unlawful conduct in purchasing the LP Debt in violation of the

provisions of the Credit Agreement that prohibit Disqualified Companies from purchasing LP

Debt. Under one or more of several theories of liability,[40] Plaintiffs maintain that SPSO is not an

Eligible Assignee and that, therefore, the claim of SPSO[41] should be disallowed or, in the

alternative, subordinated, pursuant to section 510(c) of the Bankruptcy Code. The Complaints

also assert that SPSO and Mr. Ergen engaged in additional inequitable conduct during the course

of these cases, conduct which Plaintiffs assert provides further reason for the Court to impose the

remedy of equitable subordination to redress the harm caused to innocent creditors. For the

reasons discussed below, the Court has determined that, although the SPSO Claim shall not be

disallowed, it shall be equitably subordinated in an amount to be determined.[42]

---

[40]    Plaintiffs must prove their claims for breach of contract and tortious interference by a preponderance of the evidence. *See Dollar Phone Corp. v. Dun & Bradstreet Corp.*, No. 13-1428-cv, 2014 WL 1042916 at *1 (2d Cir. March 19, 2014) (holding that in order to recover from a defendant for breach of contract, a plaintiff must prove the elements of breach by a preponderance of the evidence) (citing *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 24, 42 (2d Cir. 2011)); *Raymond v. Marks*, No. 96-9337, 1197 WL 345984 at*1 (2d Cir. June 24, 1997) ("Under New York law, the party asserting a breach of contract claim has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence."); *In re Cross Media Marketing Corp.*, 367 B.R. 435, 460 (S.D.N.Y. 2007) (holding that plaintiff failed to meet the standard of proving tortious interference with a contract by a preponderance of the evidence). To establish a claim by a preponderance of the evidence means "to prove that something is more likely so than not so." *Abrams v. United States*, No. 66-CIV-1585, 1970 WL 432 at *1 (S.D.N.Y. Nov. 19, 1970).

[41]    As a holder of LP Debt under the Credit Agreement, SPSO holds a secured claim against LightSquared LP on account of such debt. This claim will be referred to herein as the "SPSO Claim."

[42]    The Court is permitted to make inferences from the evidence presented, including concerning a party's intent, motive and purpose. *See Bankr. Servs., Inc. v. Ernst & Young (In re CBI Holding Co.)*, 529 F.3d 432, 450-53 (2d Cir. 2008) (finding that the inferences made by the court from certain witness testimony were not "clearly erroneous" where there was an absence of "direct evidence" and such testimony was not contradicted by extrinsic evidence). While it is clear that an inferences must be "more than a guess" *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F. Supp. 2d 279, 300 (W.D.N.Y. 2006), the Court is permitted to make an inference that is reasonably drawn from the evidence proffered. *See Dep't of Econ. Dev.* v. *Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 474 (S.D.N.Y. 1996) ("An inference . . . is a logical conclusion drawn from facts . . . not a guess that is merely consistent with such facts."). "According to the Restatement, '[t]he word "intent" is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 279 (Bankr. S.D.N.Y. 2013) (citations omitted).

## II.    SPSO Cannot Be Held Liable for Breach of the Express Terms of the Credit Agreement

### A.    SPSO Was Not Technically Prohibited from Purchasing LP Debt

At the center of this contractual dispute is the term "Eligible Assignee," a common term included in loan agreements in order to limit a lending institution's ability to assign the loan to other entities.  *See, e.g.*, *Meridian Sunrise Village, LLC v. NB Distressed Debt Investment Fund Limited (In re Meridian Sunrise Village LLC)*, No. 13-40342, 2014 WL 909219 (W.D. Wash. Mar. 7, 2014).  Here, the Credit Agreement permits only "Eligible Assignees" to acquire LP Debt.  Excluded from the definition of "Eligible Assignee" are (i) natural persons and (ii) "Disqualified Companies" and, as such, these entities are not eligible to purchase LP Debt.  A "Disqualified Company" is defined in the Credit Agreement, in relevant part, as "any operating company which is a direct competitor of the Borrower," and set forth on Schedule 1.01(a), as well as "any known subsidiary thereof."[43]  Although "Subsidiary" (uppercase) is defined in the Credit Agreement, in relevant part, as "any other person that is otherwise Controlled[44] by the parent and/or one or more subsidiaries of the parent," the word "subsidiary" as used in the definition of Disqualified Company is not capitalized.

As "Disqualified Companies" included on Schedule 1.01(a), DISH and EchoStar were not permitted to purchase the LP Debt.  Nor was Mr. Ergen permitted to purchase the debt personally, as the Credit Agreement does not permit a "natural person" to be an Eligible Assignee.  SPSO, however, was not precluded by the express terms of the Credit Agreement from purchasing the LP Debt, inasmuch as it is not an operating company which is a direct

---

[43]    DX5 (Credit Agreement) § 1.01.

[44]    "Control" under the Credit Agreement is defined, in relevant part, as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through ownership of voting securities, by contract or otherwise . . . ."  Credit Agreement § 1.01.

competitor of LightSquared listed on Schedule 1.01(a). If, however, SPSO is a "known subsidiary" of a Disqualified Company, it cannot be an Eligible Assignee.

Because the capitalized term "Subsidiary" was not utilized in the definition of Disqualified Company, the Court looks to the commonly understood definition of the word "subsidiary." The dictionary definition of "subsidiary," used as a noun, is a shortened version of "subsidiary corporation," which is defined by *Black's Law Dictionary* as "[a] corporation in which a parent corporation has a controlling share."[45] Similarly, courts have held that a subsidiary is commonly understood to mean a corporation "that is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock." *Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 975 F. Supp. 2d 392 (S.D.N.Y. 2013) (quoting William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 26 (2012)). As the Delaware Supreme Court has observed, the "ordinary and plain meaning" of subsidiary requires ownership of more than half the stock of the subsidiary by the parent. *Liggett Grp., Inc.* v. *Ace Prop. & Cas. Ins. Co.*, 798 A.2d 1024, 1035 (Del. 2002); *see* 18 AM. JUR. 2d *Corporations* § 41 ("a subsidiary corporation is one in which another corporation, a parent corporation, owns a majority of the shares of its stock"). Neither DISH nor EchoStar controls SPSO by reason of its ownership of a majority of the shares of SPSO. In fact, the evidence has established that Mr. Ergen wholly owns SPSO. SPSO is not a subsidiary of DISH or EchoStar.[46]

---

[45]     *Black's Law Dictionary* (9th Ed. 2009).

[46]     Defendants also emphasize that, under established principles of contract interpretation, all words in a contract must be given effect. Under the express terms of the Credit Agreement, only an entity that is a "***known*** subsidiary" of a "Disqualified Company" may be ineligible to acquire the LP Debt. (Credit Agreement §§ 1.01, 10.04(b) (emphasis added).) By its terms, this provision requires that the "subsidiary" be "known" to the Lender, as Section 10.04 relates only to the Lenders' right to assign the LP Debt, and only a Lender can breach Section 10.04.

(continued...)

While the term "subsidiary" is well-understood to reference ownership, the broader term "affiliate" (used elsewhere throughout the Credit Agreement) includes entities controlled by, or under common control with, one another. *See Del. Ins. Guar. Ass'n* v. *Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) ("[T]he terms 'affiliate' and 'subsidiary' carry their own legal significance[.] . . . Affiliate refers to a 'corporation that is related to another corporation by shareholding or other means of control,' and subsidiary refers to a 'corporation in which a parent corporation has a controlling share[.]'"). While SPSO may in fact be an affiliate of DISH and EchoStar, the definition of "Disqualified Company" in the Credit Agreement does not include the term "Affiliate" (which the Credit Agreement defines, in relevant part, as "with respect to a specified person, another person that . . . is under common Control with the person specified . . . ."). By its terms, the Credit Agreement does not prohibit affiliates of Disqualified Companies from buying LP Debt.

Moreover, as this Court previously observed in its Decision on the Motions to Dismiss, even if one were to assume that the term "subsidiary" as used in the definition of "Disqualified Company" has the meaning of the defined term "Subsidiary"[47] such that control by DISH or EchoStar was the key inquiry, Plaintiffs have not proven that DISH or EchoStar has the ability to control SPSO or that Mr. Ergen acts subject to the control of Dish or EchoStar as an agent would. In fact, Plaintiffs allege just the opposite – that Mr. Ergen controls DISH and EchoStar, makes decisions on their behalf, and acts with complete authority for DISH and EchoStar to

---

There is no evidence in the record that any Lender knew that SPSO was a "subsidiary" of DISH or EchoStar, such that SPSO would be rendered a "known subsidiary."

[47]    As noted *supra*, "Subsidiary" is defined in the Credit Agreement, in relevant part, as "any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent," and "Control" is defined, in relevant part, as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through ownership of voting securities, by contract or otherwise . . . ." Credit Agreement § 1.01.

carry out those decisions. Accordingly, in analyzing the plain words of the Credit Agreement,
SPSO is an Eligible Assignee, and the Court finds no breach of an express term of the Credit
Agreement.[48]

### III. SPSO's Acquisition of the LP Debt Violated the Spirit of the Credit Agreement and is a Breach of the Implied Covenant of Good Faith and Fair Dealing

Although the Court declines to find that SPSO breached an express term of the Credit
Agreement, there nonetheless remains the question of whether SPSO's acquisition of LP Debt
was made on behalf of DISH or for the benefit of DISH and, if so, what consequences flow from
that conclusion. There is overwhelming evidence in the record that SPSO's acquisition of LP
Debt, at least as of April 2013 and possibly earlier, was carried out for the benefit of DISH, with
the tacit approval of (or at least no interference by) the members of the DISH Board and certain
members of DISH senior management, including its CFO and General Counsel. The facts are
these.

#### A. SPSO's LP Debt Purchases

##### 1. Mr. Ergen Identifies LightSquared as "Attractive" in the Fall of 2011 and Begins Buying LP Debt in April 2012

Mr. Ergen testified that, in the fall of 2011, he believed the spectrum and satellites of
LightSquared might be an attractive investment opportunity for DISH and therefore began
looking into acquiring LightSquared's LP Debt. He asked Jason Kiser, the Treasurer of DISH
and a Vice President of Corporate Development at DISH and EchoStar, to provide him with
information. Mr. Kiser testified at Trial that, until it was clear that DISH and EchoStar could not

---

[48]     The Complaints assert tortious interference claims against DISH, EchoStar, and Mr. Ergen. To recover on
a claim for tortious interference, a party must prove (i) the existence of a valid contract between the plaintiff and a
third party, (ii) defendant's knowledge of the contract, (iii) defendant's intentional procurement of the third party's
breach of the contract without justification, (iv) actual breach of the contract, and (v) damages resulting therefrom.
*See Kirch v. Liberty Media Corp.*, 449 F.3d 338, 401-02 (2d. Cir. 2006). Because the Court finds no breach of an
express term of a contract, the Court also finds that Plaintiffs have failed to prove their claims against DISH,
EchoStar, and Mr. Ergen for tortious interference with contract.

purchase the debt, the LightSquared investment was considered a corporate opportunity.  After

reviewing the Credit Agreement and consulting with Sound Point and Sullivan & Cromwell,

DISH's corporate counsel (and not Mr. Ergen's personal counsel), Mr. Kiser determined that

both DISH and EchoStar were prohibited from buying the LP Debt, and communicated this to

Mr. Ergen.  No evidence was submitted that Mr. Kiser or Mr. Ergen made a more formal inquiry

to the Boards of Directors of DISH or EchoStar or consulted with management of either

company prior to making any personal purchases of LP Debt.  Having gotten the "all clear" from

Mr. Kiser, Mr. Ergen, through Bal Harbour Capital and then SPSO, began purchasing the LP

Debt in April 2012.

In order to enable Mr. Ergen to purchase the LP Debt, Mr. Kiser created two limited

liability companies, the Bal Harbour Entities, which were subsequently replaced by two other

entities: (i) Special Opportunities Holdings LLC, which is solely owned by Mr. Ergen, and (ii) its

wholly owned subsidiary, SPSO.  Mr. Kiser testified that the change to SPSO as the investment

vehicle was necessary because the formation documents of the Bal Harbour Entities listed a

Littleton, Colorado address, which Mr. Ergen and Mr. Kiser determined may have compromised

Mr. Ergen's anonymity and "might lead people to Mr. Ergen's doorstep."[49]  Defendants maintain

that Mr. Ergen desires to keep his personal investments confidential; Plaintiffs allege that the

desire for anonymity here stems from Mr. Ergen's intent to conceal his purchases of LP Debt to

facilitate his intentional violation of the Credit Agreement.

## 2.      The LP Debt is "a good investment"

Between April 13, 2012 and April 26, 2013, Mr. Ergen, through SPSO, contracted to

purchase over $1 billion in face amount of LP Debt, of which SPSO actually closed trades for

---

[49]      *See* Post-Trial Brief of Defendants SP Special Opportunities, LLC and Charles W. Ergen, p. 8.

approximately $844 million in face amount. Specifically, prior to LightSquared's Petition Date

on May 14, 2012, SPSO purchased a total of approximately $287 million in face amount of LP

Debt, with SPSO's largest purchase comprised of the May 4, 2012 purchase of Carl Icahn's

approximately $247 million dollar position. These initial purchases were made at prices between

48.75 cents and 60.25 cents on the dollar. Mr. Ergen testified that, at this time, he believed the

debt was "a good investment" and that he did not have an idea of how much debt SPSO would

eventually buy.[50]

### 3.    "I would have them vote no" on LightSquared's Forbearance Request

On May 4, 2012, after Mr. Ergen agreed to purchase Mr. Icahn's $247 million dollar

position in the LP Debt but before the trade closed, SPSO was given the option of directing the

seller's vote on whether to authorize an amendment to the Credit Agreement pursuant to which

the Lenders would forbear from exercising remedies and which would have allowed

LightSquared to continue to work toward a consensual arrangement with its lenders and possibly

avoid a bankruptcy filing. Despite (i) being told that Mr. Icahn was inclined to support the

request for a short forbearance and (ii) not having reviewed the terms of the amendment itself,

Mr. Ergen directed a "no" vote on the Friday evening prior to the Monday response deadline.

His testimony that he voted "no" because he had been unable to review the proposed amendment

was not credible, as the evidence reveals that the amendment documents could have been

obtained by Sound Point, had Mr. Ergen and Mr. Kiser indicated an interest in reviewing them

over the weekend.[51] There was also no evidence introduced that Mr. Kiser or Mr. Ergen made

---

[50]    Jan. 13 Tr. (Ergen) 43:17-44:8.

[51]    When confronted at Trial with the information that Mr. Kiser had been told by Sound Point that it could
potentially obtain the documents for Mr. Kiser's review, Mr. Ergen blamed Mr. Kiser, testifying, "I'm disappointed
that [Kiser] answered no. . . . That's not the way I would have done it." (Jan. 13 Tr. (Ergen) 262:13-263:8.)

any effort to discuss the proposed amendment with any of the other Lenders.  While the Debtors

argue that these actions on the part of Mr. Ergen reveal that, with respect to LP Debt, Mr. Ergen

was not interested in acting like a traditional creditor, it is worth noting that there is nothing that

requires a creditor to support a forbearance request.  That Messrs. Kiser and Ergen failed to

testify truthfully about the reasons for the "no" vote is significant, however, and it is part of a

troubling pattern of non-credible testimony.

### 4.    There "might be some truth" to the Press Reports of Mr. Ergen's LightSquared LP Debt Purchases

After SPSO purchased Mr. Icahn's $247 million dollar position in the LP Debt, *The

Denver Post* reported that Mr. Ergen had "snatched up" $350 million of LightSquared debt.  This

article prompted an email from Gary Howard, a DISH Board member, to Stanton Dodge, DISH's

General Counsel, and two other members of the DISH Board, asking if the story was accurate.

Mr. Dodge's May 16, 2012 email reply, on which he copied the entire DISH Board, including

Mr. Ergen, stated, "further to gary's email below and since another board member inquired about

the recent press reports regarding LightSquared bonds, I wanted to send a brief note to the full

board.  [T]he company [DISH] did not buy any LightSquared bonds."

Notably, Mr. Dodge's reply did not address the direct question of whether Mr. Ergen had

purchased LightSquared debt personally and there is no evidence that any member of the DISH

Board followed up in order to receive a clear response to this question, consistent with the

fiduciary duties owed by the DISH directors to examine whether the purchases may have been a

corporate opportunity.  While the Court will not insert itself in matters of DISH corporate

governance that are the province of DISH and its shareholders, the Court will infer from this

inaction that the members of the DISH Board, who, from press reports, had more than an inkling

of Mr. Ergen's purchases, were tacitly acquiescing to Mr. Ergen's foray into LightSquared's

capital structure, and they did not see fit to double check the corporate opportunity questions it

obviously raised.  Mr. Dodge's reply reveals the apparent attitude of members of the DISH

Board and senior management that, where Mr. Ergen was concerned, it was best not to ask a lot

of questions and to let him conduct his business as he saw fit.

Members of DISH senior management also first learned from the press of Mr. Ergen's LP

Debt purchases, made their own inquiries to Mr. Ergen directly, and were rebuffed.  After Mr.

Ergen did not provide them with candid answers, they also did not inquire further.  Specifically,

when Mr. Dodge confronted Mr. Ergen about a press report of his purported purchases of the LP

Debt, Mr. Ergen responded, coyly, that there "might be some truth" to the report.[52]  There is no

evidence that Mr. Dodge made further inquiry.[53]  Mr. Cullen, who, as Executive Vice President

of Corporate Development, leads DISH's strategic acquisitions and is considered to be "Ergen's

closest confidante on all things wireless," also asked Mr. Ergen about the reports of his

LightSquared debt purchases but was only able to elicit confirmation from Mr. Ergen that there

either "is" or "might be" "some truth" to the reports.[54]  At Trial, Mr. Cullen acknowledged that

he owed fiduciary duties to DISH, but testified that, upon learning of Mr. Ergen's purchases of

LP Debt, he (i) did not ask Mr. Ergen why DISH was not buying the debt, (ii) did not ask in-

house counsel whether there was an issue with Mr. Ergen making a personal investment in the

---

[52]    Jan. 13 Tr. (Ergen) 116:3-22, 118:23-119:19.  There also no evidence in the record that Mr. Ergen ever told Mr. Dodge that Mr. Kiser had investigated previously whether DISH could purchase the debt and consulted on that topic with Sullivan & Cromwell.

[53]    At Trial, in response to a question from the Court about whether no stone had been left unturned to find a way for DISH to participate in purchasing LightSquared Debt, Mr. Ergen testified that, before any trades closed, he "had a conversation" with Mr. Dodge and it was his "understanding that [Mr. Dodge] checked with outside counsel himself as to whether there was any opportunity for DISH."   (Jan. 13 Tr. (Ergen) 243:7-19.)  This testimony is inconsistent with all other evidence in the record that Mr. Ergen checked solely with Mr. Kiser, who checked with Mr. Ketchum and with Sullivan & Cromwell, before purchasing LP Debt.

[54]    Jan. 17 Tr. (Cullen) 117:8-18; Jan. 13 Tr. (Ergen) 116:3-22.

debt, and (iii) did not take any steps to determine whether Mr. Ergen's purchases were a corporate opportunity.[55]

Together, these emails and conversations reveal a striking lack of candor between Mr. Ergen and members of DISH's board of directors and senior management. In addition to demonstrating that Mr. Ergen directed the actions of the DISH Board, as stated by one of its members,[56] the inquiries (or lack thereof) posed to Mr. Ergen also suggest that the DISH Board and senior executives may have been unconcerned about Mr. Ergen's personal LightSquared debt purchases (and later, his LBAC Bid) because they had confidence that his strategy would inure to the benefit of DISH. Regardless, it is notable that there were no further inquiries; Mr. Ergen testified at Trial that, apart from Messrs. Kiser, Cullen, and Dodge, he did not speak to anyone regarding his LP Debt purchases until the May 2 board presentation.[57]

### 5. "If we can't be sure the company can buy . . . then I am interested to increase my position"

After his initial purchases in April and May of 2012, Mr. Ergen did not pursue any purchases of LP Debt until October 4, 2012. Around that time, Mr. Ergen asked Mr. Kiser to check whether the restrictions on DISH's ability to acquire LightSquared debt had changed as a result of LightSquared's bankruptcy filing. After Mr. Kiser wrote to Mr. Ergen that he could not get confirmation that the restrictions on DISH purchasing the debt had fallen away, Mr. Ergen

---

[55]     Jan. 17 Tr. (Cullen) 143:1-24. In April 2013, DISH spokesman Bob Toevs also sent several emails to Mr. Ergen and several senior officers, including Messrs. Cullen, Dodge, Clayton, and Jeff Blum (a Senior Vice President and Deputy General Counsel), about a news article discussing DISH amassing LightSquared debt through Sound Point, and noting that Toevs "has not commented." (PX0393; PX0407; PX0408.) Mr. Toevs' April 2, 2013 email referred to past coverage on the very same issue and had links to news stories dating back to May 2012. (PX0393; PX0408.) No evidence was provided that any of these top DISH executives responded to the e-mail to inquire whether Mr. Ergen in fact was buying the LP Debt.

[56]     DISH's independent director, Mr. Goodbarn, acknowledged Mr. Ergen's domination of the DISH Board. When asked if "[i]t was [his] view that nobody else [on the Board] could act in an independent way of Charlie," Mr. Goodbarn responded, "[t]hat is correct." (PX0767 (Goodbarn Nevada Dep.) at 233:25-234:3.)

[57]     Jan. 13 Tr. (Ergen) 116:3-22, 119:20-24.

responded, "[i]f we can't be sure the company can buy them, then I am interested to increase my position at the 75 level at least up to a 33% ownership level of the class."[58]

This statement by Mr. Ergen establishes that, at least as of that moment in time, the preferred purchaser of the LP Debt was DISH. Mr. Kiser's testimony that the reason for again checking the Credit Agreement was to confirm that there was no corporate opportunity for DISH was not credible and is not consistent with the precise words of Mr. Ergen's directive. In fact, it would appear that there did exist a path for DISH to become a Lender under the Credit Agreement: the Credit Agreement, by its express terms, contains no restrictions on affiliates of Disqualified Companies becoming Lenders. The Court was presented with no evidence that the DISH Board was in fact aware of this and considered whether to create an affiliate to purchase LP Debt, nor any other evidence to support the contention that Mr. Ergen's focus was on making sure that he was not usurping a DISH corporate opportunity.[59] Notwithstanding, from Mr. Ergen's choice of words in inquiring about whether DISH could purchase the LP Debt, the Court can reasonably draw an inference that Mr. Ergen's oft-repeated statement that his investment was conceived of and always intended to be purely for personal purposes was not truthful. It is clear that DISH was the preferred purchaser.

After Mr. Ergen decided to acquire, through SPSO, at least a 33 percent stake in LightSquared debt, Mr. Kiser asked Mr. Ketchum to track whether SPSO had a blocking

---

[58]    PX0243.

[59]    Mr. Howard, one of two independent board members on the Special Committee formed by the DISH Board of directors on May 8, 2013, testified that, while the Special Committee had been advised by Mr. Ergen of "his view" that the Credit Agreement precluded DISH from acquiring LightSquared securities, "[t]he Special Committee did not, however, reach a conclusion regarding whether the LightSquared credit agreement resolved the issue . . . ." (PX0768 (Howard Nevada Affidavit) at ¶ 17.) Mr. Howard also testified at his deposition that the Special Committee was interested in determining whether there was a way that DISH could have bought LP Debt notwithstanding the transfer restrictions. (Howard Dep. 204:14-205:15.)

position.[60]   Although Mr. Ketchum initially testified that he did not recall discussing with Mr.

Kiser the acquisition of a blocking position, he later admitted that Mr. Kiser told him "he was

very interested in tracking whether or not SPSO had a blocking position with respect to

LightSquared."[61]   Mr. Ketchum was not a credible witness on this point and many others.

### 6.   March 28, 2013: "you just bought a spectrum company"

When asked about the desire for a blocking position, both Mr. Kiser and Mr. Ergen

testified that 33 percent ownership of the LP Debt would provide SPSO, and therefore Mr.

Ergen, with a "blocking" position such that SPSO could enforce "certain rights" during the

bankruptcy proceeding.[62]   However, neither Mr. Ergen nor Mr. Kiser would admit to any

intended linkage between obtaining a blocking position in LP Debt and a making a bid for

LightSquared, or how the former could pave the way for the latter – DISH's acquisition of

LightSquared spectrum.[63]

---

[60]     As Defendants point out, the term "blocking position" refers to acquiring one-third of a debt issuance, but it does not formally "block" anything.  Section 1126(c) of the Bankruptcy Code provides that a class of creditors is deemed to have voted in favor of a plan of reorganization if two-thirds in amount and more than one-half in number of such creditors votes in favor of the plan, meaning that a class of creditors with more than one-third in amount voting to reject a plan will not be an accepting class.

[61]     Defendants emphasize that Mr. Ergen turned down three offers to purchase large amounts of LP Debt on October 9, 2012 (which purchases would have given Mr. Ergen a blocking position) because the prices were too high as proof that SPSO's purchases of LP Debt were for investment purposes only.  The Court find that this fact only proves that Mr. Ergen's acquisition strategy may not yet have been fully formed at that point in time, and thus, he was in fact acting primarily as an investor in the fall of 2012.

[62]     (Jan. 10 Tr. (Kiser) 47:22-48:10, 56:11-14; Jan. 13 Tr. (Ergen) 172:10-174:2; DX047.)  Mr. Ergen testified that he believed that 33 percent was a "meaningful percentage in bankruptcy," and that with that percentage, he "couldn't get jammed with a different kind of currency than somebody else in that class might get."  (Jan. 13 Tr. (Ergen) 51:12-18, 172:25-173:3.)  Mr. Ergen testified that he had a sizeable enough position in LightSquared to protect that he decided to get a blocking position.  (Jan. 13 Tr. (Ergen) 51:12-24.)

[63]     Plaintiffs emphasize how DISH and EchoStar have executed this "loan-to-own strategy" in other cases – namely, DBSD and Terrestar – where acquisition of a blocking position in the debt facilitated an acquisition of the assets at a discount.  Plaintiffs argue that the purchase of LightSquared debt here reprises the strategy that DISH and EchoStar have pursued before.  (See Plaintiff's Post-Trial Brief [Adv. Docket No. 133] at pp. 8, 17.)  The Court is disinclined to consider Defendants' past practices as proof of anything in this matter and, accordingly, gives little weight to such comparisons.

It is clear from the evidence, however, that such a strategy began to emerge by late March/early April of 2013. By March 25, 2013, Mr. Ergen needed to purchase another $112 million of LP Debt to reach a blocking position. On March 28, 2013, he initiated a trade for $168 million face amount of LP Debt at 96 cents on the dollar – almost double the price he initially paid for LP Debt in April 2012. Notably, in this trade, he also sought to purchase the LP Preferred Interests that were bundled with the LP Debt and offered to pay between 92 and 95 cents on the dollar for that – or approximately $122 million – just so, as Mr. Kiser testified, Mr. Ergen could have the "privilege" of obtaining that LP Debt.[64] At Trial, Mr. Ergen continued to deny the fact that he was willing to pay that price because he wanted to secure a blocking position, instead stating that he bought substantial amounts at close to par because he "loved the investment."[65] Notwithstanding, on March 28, 2013 – the date Messrs. Ergen and Kiser believed they had achieved their intended goal of obtaining a blocking position, provided the trade closed[66] – Mr. Ketchum sent an email to Mr. Kiser, stating "You just bought a spectrum company." Later in that same email chain, Mr. Ketchum noted internally to his colleague, "we now control the company."[67]

### B.    Mr. Ergen's Conduct in the Spring of 2013 Establishes that He Was Acting for DISH

Mr. Ergen acknowledged at Trial that his LightSquared strategy had changed as of April 2013. Mr. Ergen testified that, at that time, because of changes in the wireless industry and at the FCC, he saw a "window of opportunity." He stopped looking at LightSquared as a debt

---

[64]    Jan. 10 Tr. (Kiser) 136:7-14.

[65]    Jan. 13 Tr. (Ergen) 174:3-18.

[66]    As set forth in footnote 17, *supra*, the March 28, 2013 bundled trade remained open for several months afterwards but never closed, and Mr. Ergen does not own the LP Debt that was the subject of this trade. Regardless, Mr. Ergen's April 2013 trades brought him to a "blocking position."

[67]    PX0385.

investment and began to view it as a potential acquisition candidate.[68]  Mr. Ergen testified that he had a general understanding of the Exclusivity Stipulation and believed that if he wanted to make a bid for LightSquared, he would have to do so by July.[69]  He hired Willkie Farr as bankruptcy counsel because, in his words, "I don't need them for an investment, but I need then if I'm going to reach out, if I'm potentially going to look at LightSquared as an acquisition."[70]

### 1. $320 million of LP Debt at 96 Cents on the Dollar and Confidence in the Collateral

Through four separate trades entered into between April 1, 2013 and April 26, 2013, Mr. Ergen, through SPSO, purchased approximately $320 million of LP Debt at 96 cents on the dollar.  These were the final purchases of LP Debt completed by SPSO, bringing its total ownership of LP Debt to approximately $844 million in face value, the face amount it still owns today.  When asked about his substantial purchases at 96 cents on the dollar, Mr. Ergen testified that he "was very confident in the collateral" and, as a result, he bought whatever people would sell at that price because he "felt that it was a great investment."[71]

Noticeably absent from the picture painted by Mr. Ergen's testimony is the fact that SPSO's April 2013 acquisitions of $320 million face amount of LP Debt at 96 cents on the dollar (which gave SPSO more than 50 percent ownership of the LP Debt) achieved by indirection something that it could not have achieved directly – the creation of leverage for DISH to acquire

---

[68]    Jan. 13 Tr. (Ergen) 65:4-66:3.

[69]    Jan. 13 Tr. (Ergen) 66:9-15 (". . . and then there also was the fact that the bankruptcy was coming up in July.  And if I was interested, I would have to . . . – either you're going to make a bid there or somebody else was going to.  And while I didn't know in that time frame that I would make a bid, I knew that it would take time to prepare.").  The Court understands Mr. Ergen's mention of the "bankruptcy coming up in July" to refer to the stipulated date for termination of the Debtors' exclusive periods to file a plan, which was approaching on July 15, 2013.

[70]    Jan. 13 Tr. (Ergen) 67:1-11.

[71]    Jan. 13 Tr. (Ergen) 66:19-25.

LightSquared's assets. It is within the scope of Mr. Ergen's broad authority as chairman of the

Boards of Directors of both DISH and EchoStar to lead DISH and EchoStar's strategic

acquisitions of spectrum assets, and the evidence demonstrates that Mr. Ergen's objective

beginning in April 2013 included preserving for DISH the option to bid for LightSquared's

spectrum assets. While, in May 2012, it may have been unclear even to Mr. Ergen whether he

was investing in LP Debt for his own benefit or for the benefit of DISH, as of April 26, 2013 – a

few days before Mr. Ergen formally presented the opportunity to DISH – there is no doubt that

he was acting for the benefit of DISH.[72]

### 2.    "Mr. Ergen's substantial interests in L2 debt and preferred stock compliment [*sic*] any acquisition strategy"

Mr. Ergen's actions at the DISH and EchoStar board meetings held on May 1 and 2, 2013

– shortly after SPSO obtained its blocking position and DISH completed the April 3 Capital

Raise – further reveal his intention to benefit DISH by his debt acquisition and pave the way for

DISH to acquire LightSquared's spectrum assets. After disclosing his LP Debt acquisition to the

boards of DISH and EchoStar for the first time, Mr. Ergen gave the Ergen Presentation,

indicating his proposal for "any combination of Mr. Ergen, EchoStar, and/or DISH based on

---

[72]    Approximately one week after Mr. Ergen acquired a blocking position in the LP Debt, and at the same time he was contemplating making what he has characterized as a personal bid for LightSquared's assets, DISH issued a series of notes that raised $2.3 billion in capital (the "April 3 Capital Raise"), approximately the same amount as DISH's ultimate bid for LightSquared. DISH's press release for the April 3 Capital Raise specifically stated the "net proceeds of the offering are intended to be used for general corporate purposes, which may include wireless and spectrum-related strategic transactions." (PX0847; Jan. 13 Tr. (Ergen) 178:4-179:2; PX0904; PX0906.) Defendants, under no obligation to do so, did not provide any evidence regarding DISH's intended use of the funds from the April 3 Capital Raise, and Plaintiffs did not meet their burden to show that the intended use of the April 3 Capital Raise was to pay for a DISH acquisition of LightSquared's assets. Accordingly, the Court will draw no inferences on this topic. The Court has been informed that the notes issued in connection with the April 3 Capital Raise remained outstanding as of the date of the conclusion of Trial.

company interest" to acquire LightSquared's assets for $2 to $2.1 billion.[73]  Specifically, the

Ergen Presentation informed each board that Mr. Ergen's blocking position in the LP Debt could

help facilitate any bid for LightSquared's assets:

> Mr. Ergen's substantial interests in L2 debt and preferred stock
> compliment [*sic*] any acquisition strategy and could have
> significant influence in L2's chapter 11 cases.[74]

Mr. Ergen understood the critical nature of the timing of any bid, and he testified at Trial

that, given the July 15 termination of the Debtors' exclusive periods, it was likely that

LightSquared would "begin exploring strategic alternatives in early June if no restructuring or

sale strategy emerges."[75]  His understanding was that "anyone could come to the Court to make

an offer for LightSquared, that that might be a corporate opportunity for DISH and for

EchoStar."[76]  Because Mr. Ergen recognized, however, that the DISH Board was at the time

focusing on the potential Sprint and Clearwire transactions, had performed no analysis of

LightSquared, and did not authorize a bid for LightSquared at that time, Mr. Ergen planned to

make a bid "personally" to preserve "optionality" for DISH and/or EchoStar to bid on

LightSquared assets.[77]  He did not, however, seek approval from either board to make a bid

personally.

---

[73]    The Ergen Presentation states that the proposed acquisition vehicle would be "NewCo," which would be "formed by any combination of Mr. Ergen, EchoStar, and/or DISH based on company interest."  (PX0867 at SPSO-00011825).

[74]    Ergen Presentation, PX0867 at SPSO-00011824.

[75]    Ergen Presentation, PX0867 at SPSO-00011828.

[76]    Jan. 13 Tr. (Ergen) 77:10-17.

[77]    Mr. Ergen's testimony that he pursued LightSquared as an alternative for DISH if the Sprint and Clearwire acquisitions fell through – as they ultimately did – is clear on this point.  (*See* PX0832 (Ergen Nevada Dep.) at 135:23-136:3 (a DISH bid for LightSquared could be a "Plan B" if potential deal with Sprint did not work out), 140:22-141:23 (Mr. Ergen made the bid for LightSquared's spectrum to preserve DISH and EchoStar's "optionality" to participate); Jan. 13 Tr. (Ergen) 186:25-187:20 (the bid "opened up the optionality for DISH to the extent they lost Sprint").)

### 3.    Mr. Ergen Makes a Bid Himself, Keeping Options Open for DISH

Two weeks later, on May 15, 2013, Mr. Ergen, by his counsel, submitted an unsolicited cash bid for LightSquared's spectrum for $2 billion[78] on behalf of LBAC, which had not yet been formed.[79]  The wording of the LBAC Bid provided optionality for DISH to be the ultimate purchaser, stating that the newly-formed buyer would be "owned by one or more of Charles Ergen, affiliated companies and/or other third parties."[80]  Non-binding and expiring on May 31, 2013, the bid emphasized LBAC's "willingness to fund the Purchase Prices, *on a non-refundable basis*, prior to receipt of FCC and Industry Canada approvals and authorizations . . .",[81] and it explicitly stated that the cash purchase price of $2 billion could be used to pay off the LP Debt. With its lack of conditionality and offer of cash consideration sufficient to pay off the LP Debt in full, the LBAC Bid accomplished the objective, set forth in the Ergen Presentation given to the DISH Board less than two weeks earlier, of proposing a bid that would "be highly attractive to stakeholders and put pressure on L2 fiduciaries to consider [the] proposal."[82]

The existence of the LBAC Bid quickly hit the press.  Upon learning of the bid, no member of the Boards of Directors or management of DISH or EchoStar formally objected to Mr. Ergen having made a personal bid for LightSquared's assets.  Mr. Cullen, a top DISH executive, stated that he learned of the LBAC Bid through news reports but did not ask Mr. Ergen if he was usurping a corporate opportunity, despite not being aware at that time that Mr.

---

[78]    PX0504.

[79]    LBAC was formed approximately two weeks later, on May 28, 2013.

[80]    PX0504 at GH_L2_00450.

[81]    PX504 (emphasis in original).

[82]    PX0867 at SPSO-00011826.

Ergen had presented the DISH Board with the option to make a bid.[83]  The Court can infer from the inaction of DISH's Board and management upon learning of Mr. Ergen's personal bid that they either (i) understood that the LBAC Bid and the strategy behind it were ultimately for the benefit of DISH, even if the bid was made by Mr. Ergen personally at that time or (ii) did not wish to impede Mr. Ergen's forward movement on his own bid, notwithstanding their fiduciary obligations.

### 4. "You are way ahead of your skis here"

On May 8, 2013 (one week *prior* to the LBAC Bid), the DISH Board had formed a special committee consisting of two directors independent of Mr. Ergen – Mr. Goodbarn and Mr. Howard.  Pursuant to board resolutions, the Special Committee was vested with the power and authority to:  (i) review and evaluate (including any potential conflicts of interest arising out of Mr. Ergen's proposal to the DISH board regarding LightSquared and his personal interest in LightSquared) a potential bid for LightSquared and whether such a bid was in the best interests of DISH and its shareholders, and to discuss and/or negotiate such a transaction; (ii) negotiate definitive agreements with the parties concerning the terms and conditions of the potential transaction; and (iii) determine whether such terms and conditions were fair to DISH.[84]  The board formally resolved that the Special Committee's authority would expire only upon the Special Committee's "determination, in its sole and absolute discretion, as set forth in its written notice to the Chairman of the Board of Directors" as long as a bid for LightSquared remains viable.[85]  As it turned out, such resolutions were not worth the paper they were written on.

---

[83]    Jan. 17 Tr. (Cullen) 143:25-145:19.

[84]    PX0768 (Howard Nevada Affidavit) ¶ 9; PX0491 at DISH_NY000000002-4.

[85]    PX0491 at DISH_NY0000000005.

The evidence reveals that these board resolutions were quickly and flagrantly disregarded. Despite being in existence for three months, the Special Committee was forced to work under a compressed timetable because of Mr. Ergen's interference with its ability to begin its task. Upon learning on May 22, 2013 of the Special Committee's recent engagement of independent counsel, Mr. Ergen pushed its members to hold off, asking why Special Committee counsel was needed and cautioning that "[y]ou are way ahead of your skis here."[86] Similarly, at a May 31, 2013 meeting, Mr. Ergen suggested that the Special Committee should delay engaging its financial advisor, as, in Mr. Ergen's view, there would "be little activity, if any, in the coming weeks" regarding a LightSquared transaction.[87] After delaying the retention of its professionals and keeping the committee in what Mr. Howard later described as a "holding pattern," Mr. Ergen suddenly reversed course in early July, urging the Special Committee to complete its evaluation quickly and make a recommendation to the DISH Board.[88]

The existence and amount of the LBAC Bid created a significant challenge to the Special Committee's task of evaluating a potential DISH bid and determining what terms and conditions were fair to DISH. Upon learning of the LBAC Bid from news alerts on May 20 and 21, 2013,[89] Mr. Howard stated that he was surprised, as it "was [his] expectation that Mr. Ergen would not

---

[86]    DX0188, *see also* PX0767 (Goodbarn Nevada Dep.) at 102:2-103:15 ("[Ergen] felt we were moving too fast as a committee" given that the Special Committee was trying to seek trading information from him, he had unsettled trades, and he was tied up with Sprint and Clearwire at the time).

[87]    PX0768 at ¶ 25. PWP, the financial advisor to the Special Committee, was ultimately retained on June 28, 2013, after the Sprint and Clearwire deals had failed to proceed. *See* DX0224 (email from Gary Howard to DISH Board); PX0768 at ¶ 33.

[88]    PX0768 at ¶ 34.

[89]    Mr. Howard stated that he was not aware that Mr. Ergen had made a personal bid to purchase LightSquared's assets until Mr. Goodbarn forwarded to him the updated Charles Schwab news alert on May 21, 2013. *See* PX0768 at ¶ 15. He confirmed that the Special Committee had not been advised of and had not approved of the LBAC Bid. *Id.* at ¶ 20. He also articulated his concern that, by making the bid, "Mr. Ergen was narrowing the scope and ability of the Special Committee to fully explore alternative strategies for DISH to pursue with respect to LightSquared, as well as to define and/or negotiate Mr. Ergen's role with respect to DISH's strategy. *Id.* at ¶ 21.

make any LightSquared bid without first discussing it with the DISH Board and the Special

Committee in order to get their approval, since any such bid could impact DISH's own strategy

vis-à-vis LightSquared."[90]

When asked whether the Special Committee considered proposing that DISH make a bid

for LightSquared's spectrum below the amount of the LBAC Bid, Mr. Goodbarn stated that the

LBAC Bid "made it difficult socially to do that . . . [b]ecause [Ergen's] put a line in the sand on a

bid and we're part of a, you know, a DISH board and he owns a majority of the company."[91]

Pressed further on why it would be difficult for DISH to make a bid lower than Mr. Ergen's bid,

Mr. Goodbarn explained that, if Mr. Ergen had committed to a $2 billion bid with no other

bidder present, and the Special Committee then bid $1.5 billion, Mr. Ergen may take "a big loss"

on his debt investment and "that does not make a very happy chairman."[92]  These statements by

an independent board member demonstrate that Mr. Ergen, as chairman of the Board and

majority owner of DISH, exercised significant control.  The Special Committee did not

determine to bid at a lower price, as Mr. Ergen had already staked out the territory with a bid that

would ensure that he, as a substantial holder of LP Debt, would be paid in full, and no one was

interested in making him unhappy by altering that.

Furthermore, although the role of the Special Committee included evaluating any

potential conflicts of interest, the repeated requests of the Special Committee to Mr. Ergen for

information regarding his LP Debt trades were ignored, and Mr. Ergen never provided the

Special Committee with the requested schedule of his trades.  The Special Committee's stated

reasons for seeking such information were significant – "to assess Mr. Ergen's conflict, to

---

[90]     *Id.*

[91]     PX0767 (Goodbarn Nevada Dep.) at 100:7-21.

[92]     PX0767 (Goodbarn Nevada Dep.) at 100:22-101:5.

determine the potential profit that Mr. Ergen would make if DISH made a successful bid . . . ,

and to assess whether DISH should have been entitled to pursue the corporate opportunity of

buying LightSquared debt before permitting Mr. Ergen to do so for his personal account."[93]  Mr.

Howard stated that he did not recall ever hearing from Mr. Ergen or his counsel that the

Committee's requests for information were improper or that Mr. Ergen had no obligation under

DISH's charter to bring potential corporate opportunities to the attention of the DISH Board,[94]

yet, Mr. Ergen provided no reason for leaving the Special Committee in the dark on this key

inquiry.[95]

On July 3, 2013, Mr. Ergen sent to the Special Committee and David Moskowitz, an in-

house attorney and a Senior Vice President for DISH and EchoStar, via email, a presentation for

the Special Committee and the DISH Board.[96]  In the email, Mr. Ergen stated, "This is just a high

level view of lightsquared and its potential relation to dish.  Please feel free to share with the

board or advisors.  Also, not on here would be the possibility of freeing up at least two of the

existing dbsd/terrestar satellites that could possibly be monetized."[97]  The presentation, dated

July 8, 2013, was entitled "Strategic Investment Opportunity – L-Band Acquisition, LLC.[98]  It

was delivered to the DISH Board of Directors by Mr. Ergen at a special meeting on July 8, 2013.

The Ergen July 8 Presentation provided, for discussion purposes in the context of considering

---

[93]    PX0768 (Howard Nevada Affidavit) at ¶ 16.

[94]    PX0768 (Howard Nevada Affidavit) at ¶ 18.

[95]    PX0767 (Goodbarn Nevada Dep.) 92:10-93:15; 128:35-130:5); *see also* DX0224 (July 6, 2013 email from Howard to DISH board in which Mr. Howard writes "[f]or reasons better articulated by Charlie, the special committee has no further insight into the bond purchases made by Charlie's entity."), PX0768 (Howard Nevada Affidavit) at ¶ 17 ("Despite repeated requests and discussions, Mr. Ergen never provided the Special Committee with the requested documentation regarding his investment in and ownership of LightSquared debt or preferred stock.")

[96]    PX0927.

[97]    *Id.* at DISH_PLAN000003150.

[98]    PX0928.

whether DISH would participate in the LBAC Bid, certain valuation information relating to LightSquared's spectrum as of that date.

Under a line item entitled "Implied Net Primary Asset Value," the Ergen July 8 Presentation lists a range of values of between $3.341 billion and $5.213 billion, with a mid-point of $4.277 billion, referring to Mr. Ergen's estimate of the value of 20 MHz of LightSquared's spectrum assets and its satellites, excluding its 10MHz of lower downlink spectrum.  Under the heading "Implied Supplemental Asset Value," the Ergen July 8 Presentation lists a range of values of between $1.833 billion and $3.783 billion, with a mid-point of $2.308 billion, for what it identifies as the total of (i) 5.0 MHz of "Reclaimed Unuseable [*sic*] AWS-4," (ii) 5.0 MHz of "Reclaimed Impaired AWS-4," and (iii) "L-Band Downlink Spectrum."[99]  The Implied Supplemental Asset Value was Mr. Ergen's estimate of (a) the increase in value of DISH's existing spectrum that would flow from DISH's acquisition of LightSquared's spectrum, which would permit unusable and impaired uplink AWS-4 spectrum to be converted to downlink and (b) his range of values for 20 MHz of LightSquared's downlink spectrum.  In other words, the supplemental value of LightSquared's assets to DISH was estimated by Mr. Ergen to be between $1.833 billion and $3.783 billion.  Combined with the Implied Net Primary Asset Value of $3.341 billion to $5.213 billion, the total value of LightSquared's assets in DISH's hands was estimated by Mr. Ergen to be between $5.174 billion and $8.996 billion, with a midpoint of $7.085 billion.

On July 21, 2013, the Special Committee presented its conclusions to the DISH Board,[100] recommending that DISH pursue the LBAC Bid for $2.2 billion, subject to five express

---

[99]        *Id.* at 5.

[100]        At this meeting, PWP provided a nine-page presentation entitled "Project Discus Summary Conclusions" to the DISH Board.  (PX0929 at 2.)  In a section captioned "Illustrative Value of DISH's Use Cases Related to

(continued...)

conditions, four of which implicated further review and decision making by the Special

Committee:

> (vi)    that any material changes to the terms of the bid and/or APA would be subject to the review and approval of the Committee;

> (vii)   that DISH would acquire one hundred percent of LBAC, to the exclusion of EchoStar;

> (viii)  that the Committee and its legal and financial advisors would remain involved in all negotiations regarding the proposed transaction going forward;

> (ix)    that the Committee would review and approve the terms of the acquisition by DISH of Mr. Ergen's interest in LBAC; and

> (x)     that the Committee expressly reserved the right to obtain all of the requested information regarding Mr. Ergen's acquisition of debt and/or other securities issued by LightSquared as well as the right to evaluate potential corporate opportunity issues.[101]

Even though the DISH board resolutions permitted disbandment of the Special

Committee only upon the Committee's own decision so long as a bid for LightSquared remained

viable, the DISH Board abruptly disbanded the Special Committee without advance notice

immediately after the Special Committee delivered its conditional approval of the LBAC Bid.

Other than Messrs. Howard and Goodbarn, who abstained, the DISH Board's vote was

unanimous.[102]  On July 22, 2013, DISH agreed to buy LBAC from Mr. Ergen for one dollar

---

LightSquared," the PWP Report concludes, "The cumulative value of the illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-$13.3bn." (*Id.* at 39 (DISH_PLAN135).)

[101]    (PX0716 at GH_L2_000973-74.); PX0768 at ¶ 47.  According to Mr. Howard, because the Special Committee had not yet received the requested information on Mr. Ergen's purchases of LP Debt, the Special Committee "informed the Board that it had been unable to completed its evaluation of potential conflicts of interest associated with the LightSquared acquisition, but made clear that it would continue to evaluate those potential conflicts and take appropriate action once its evaluation was completed."  *Id.* at ¶ 49.

[102]    PX0768 (Howard Nevada Affidavit) ¶¶ 49-50; DX400.  Mr. Howard testified that, at the time the vote was taken, he "did not believe that the Special Committee had completed all of its work and therefore did not believe that it should be disbanded at that time."  PX0768 at ¶ 50.  On July 24, 2013, Mr. Goodbarn and Mr. Howard sent a letter to the DISH Board in which they reiterated their conditional recommendation in favor of a potential LightSquared acquisition and stated that they did not recommend or endorse the disbandment of the Special Committee.  *Id.* at ¶ 52.  No response to that letter was introduced into evidence.

without the Special Committee ever reviewing the terms of the acquisition agreement.[103]  On

July 23, 2013, DISH announced its intention to bid through LBAC for LightSquared's

spectrum.[104]

The Special Committee had been disbanded despite the fact that its conditions remained

unsatisfied; in particular, the Committee had neither negotiated nor approved the draft plan

support agreement or the draft asset purchase agreement, which were filed with the Court

together with the Ad Hoc Secured Group Plan on July 23, 2013[105] and which explicitly stated

that they were subject to further negotiations and approval by DISH.[106]  One notable feature of

the APA, incorporated by reference into the PSA, was its broad release of all claims against Mr.

Ergen, DISH, EchoStar, and SPSO and contemplation of the full allowance of the SPSO

Claim.[107]  The proposal of such a release belies the assertions made by SPSO and DISH that they

have no ties to one another and supports the inference that Mr. Ergen and SPSO were acting for

DISH in creating a path for DISH, through LBAC, to take over as purchaser, while still

---

[103]    Howard Dep. 315:10-316:3; Jan. 13 Tr. (Ergen) 195:6-8.

[104]    On July 24, 2013, the Special Committee wrote a letter to the DISH Board expressing its surprise at its disbandment and noting that the five conditions remained unsatisfied.  (PX0736.)  On July 25, 2013, Mr. Howard resigned from the board, an action taken so suddenly that DISH risked delisting from the NASDAQ.  PX0746; *see also* PX0741; DX313.

[105]    The joint chapter 11 plan of reorganization filed on July 23, 2013 was proposed by the Ad Hoc Group of Secured Lenders, of which SPSO was a member at that time. *See First Amended Joint Chapter 11 Plan for LightSquared LP, et al., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Bankr. Docket No. 970].

[106]    Mr. Howard testified that the first time he heard that Mr. Ergen was negotiating a proposed joint chapter 11 plan with the Ad Hoc Secured Group was during a July 18, 2013 board meeting.  The Special Committee and its advisors were not invited to participate in these negotiations with the Ad Hoc Secured Group.  *See* PX0768 at ¶ 42. At a meeting of the Special Committee on July 21, 2013, counsel for the committee discussed a draft asset purchase agreement with the committee that had been provided to counsel by Mr. Ergen's counsel.  Mr. Howard stated that neither the committee nor its counsel had been involved in negotiating this agreement.  *Id.* at ¶ 46.  Mr. Howard further testified that he learned of the existence of the PSA after a draft of it was annexed to a Form 8-K filed by DISH, and the Special Committee was neither involved in negotiating this agreement nor had they recommended that DISH enter into it.  *Id.* at ¶ 51.

[107]    *See First Amended Joint Chapter 11 Plan for LightSquared LP, et al., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders* [Bankr. Docket No. 970, Ex. A] § 13.1; Stalking Horse Agreement, filed October 28, 2013, [Bankr. Docket No. 970, Ex. F] § 3.2(a)(ii) & n.9.

protecting Mr. Ergen from any downside on his substantial investment.  Despite many attempts to characterize it otherwise, the proposal of such a release reveals the strong linkage between SPSO's debt and DISH's bid and the inability to disguise such linkage with so-called "separate hats."

While it is not the Court's role to pass judgment on the corporate governance practices of DISH, the Court nonetheless concludes that the facts surrounding the Special Committee process show that, notwithstanding the existence of the Special Committee, Mr. Ergen himself was the driving force behind each step DISH took on the path toward the DISH/LBAC Bid, including the actions taken in connection with Mr. Ergen's evolving acquisition strategy in the spring and summer of 2013.  Although the Special Committee was created to be independent, the blatant disregard of the conditions set forth in its recommendation for DISH's participation in a LightSquared acquisition, its abrupt dissolution by the DISH Board, and its lack of involvement in the negotiations of the LBAC transactional documents as they evolved in the late summer and into the fall of 2013, despite the explicit board resolutions to the contrary, indicate that the Special Committee was little more than window dressing.[108]

## 5.   Mr. Ergen was Not Acting Solely on His Own Behalf in Making a "Personal" Bid or in Purchasing LP Debt

Even after acknowledging his change of strategy in April 2013 and his interest in making a bid for LightSquared,[109] and faced with allegations that his debt purchases and the LBAC Bid were made in contemplation of a potential DISH acquisition of LightSquared spectrum, Mr.

---

[108]     While not part of the record of the Adversary Proceeding, the Court notes that, on the evening of January 7, 2014, DISH, by counsel, terminated the DISH/LBAC Bid.  Additional grounds for equitable subordination in connection with the termination have been alleged by the Debtors and the Ad Hoc Secured Group, and such matters are part of the record on confirmation of the Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of Bankruptcy Code.

[109]     Jan. 13 Tr. (Ergen) 65:4-66:15.

Ergen has continued to deny that he acted other than for his own personal benefit.  Specifically,

Mr. Ergen steadfastly maintains that he had an interest in purchasing and owning LightSquared's

spectrum assets *personally* and was prepared to own and operate a spectrum business himself.  In

response to the Court's questioning, Mr. Ergen testified that he believes he could operate a

spectrum business without creating a conflict with DISH.[110]  At the time of the May 15 LBAC

Bid, however, Mr. Ergen did not have any financing agreements lined up with investors and had

not even received a term sheet related to a possible financing; a draft term sheet was only

received by Mr. Ergen on July 18, 2013,[111] and its draft form indicated that no deal had been

reached.  Mr. Ergen also stated that, at the time of the LBAC Bid, he had made no decisions

about headquarters, employees, or management of his personal spectrum company.[112]  Taken as

a whole, Mr. Ergen's statements that he was prepared to run a spectrum business personally (and

in competition with DISH) are farfetched, to say the least.  Rather, they cause the Court to

conclude that, at the time of the April 2013 LP Debt purchases and the LBAC Bid, the intended

strategic investor was not Mr. Ergen, but rather, DISH.[113]

     The evidence demonstrates that Mr. Ergen's substantial investment in LightSquared debt

in April 2013 was made in full contemplation and in furtherance of DISH's potential acquisition

---

[110]     Jan. 13 Tr. (Ergen) 245:17-247:20 (suggesting possible uses for spectrum that did not conflict with DISH, such as "ground-to-air communications" and "machine-to-machine").

[111]     The LBAC Bid stated that its proposal expired on May 31, 2013 if not accepted by LightSquared prior to that time.  *See* PX0504.  It was subsequently extended beyond that date.

[112]     Jan. 13 Tr. (Ergen) 244:16-245:12 ("I had seen where LightSquared headquarters were; I know something about LightSquared and their business.  And I would have plenty of time to – I wouldn't be able to manage the company until the FCC approved it.  So I would have plenty of time to make all those decisions.")

[113]     Notably, Mr. Ergen confirmed at Trial that, had DISH won its bid for Sprint, he would have withdrawn his personal bid for LightSquared.  (Jan. 13 Tr. (Ergen) 188:11-190:15.)  While his stated reason for such action was that, under those circumstances, he would not have had the personal time to go through the two or three-year process with the FCC to "clean up" LightSquared, an inference can be drawn that the true reason for withdrawal of the LBAC Bid would be that DISH, Mr. Ergen's intended buyer for LightSquared's assets, would not have the capital necessary to complete both transactions.

of LightSquared spectrum.  The Ergen July 8 Presentation and the valuation contained therein

demonstrate the significant benefit to DISH from acquiring LightSquared's spectrum, with the

"Implied Net Supplemental Asset Value" to DISH (which had a midpoint of $2.308 billion)

alone coming in above the LBAC Bid amount of $2.2 billion, without even looking at the total

aggregate value of the spectrum to DISH, which Mr. Ergen estimated at a value of between

$5.174 billion and $8.996 billion.  Such an enormous value could not have simply occurred to

Mr. Ergen in an epiphany in the days or weeks before making such a detailed presentation to the

DISH Board; rather, Mr. Ergen must have perceived the synergistic value reflected in this

presentation much earlier, as he monitored the actions of the FCC and the movement of the

pieces on the wireless spectrum chessboard, some of which he himself was moving.

In their post-trial brief, SPSO and Mr. Ergen also argue that the evidence does not

establish that SPSO's LP Debt purchases were for the benefit of DISH because, as an initial

matter, purchasing even one-third of the outstanding debt of the company did not confer on

SPSO any rights to acquire the company.[114]  As Mr. Ergen himself stated in the Ergen

Presentation, however, his "substantial interests in L2 debt and preferred stock compliment [*sic*]

any acquisition strategy and could have significant influence in L2's chapter 11 cases."[115]  A

competitor who obtains a substantial position in the debt of a distressed company and then bids

for the assets often has a significant advantage, which dissuades other bidders from participating

in any sale process.  While Mr. Ergen's substantial near-par purchases of LP Debt in April 2013

are consistent with a plan to obtain a blocking position in order to acquire the underlying

company, they are somewhat inconsistent with a personal investment by a typical creditor

---

[114]     *See* Post-Trial Brief of Defendants SP Special Opportunities, LLC and Charles W. Ergen [Adv. Docket No. 142], p. 34.

[115]     PX0867.

seeking to make a profit on distressed debt by buying low and selling high.  Indeed, Mr. Ergen's

final purchase of LP Debt on April 26, 2013 was made just one week prior to his presentation to

the DISH Board on May 2, 2013,[116] and less than three weeks before he made the LBAC Bid.

While Mr. Ergen's substantial investment in LP Debt reflects (he says) his confidence in the

intrinsic value of LightSquared's spectrum assets, it also reflects his certainty, that, in his

capacity as DISH's controlling shareholder and chairman of its board of directors, he could cause

DISH to do what he wanted to effect the acquisition of the assets at a price that would return his

investment, and possibly make a profit, while also benefiting DISH with valuable spectrum.

And the Ergen July 8 Presentation makes clear just how valuable LightSquared spectrum could

be for DISH, permitting unusable and impaired uplink AWS-4 spectrum owned by DISH to be

converted to downlink and yielding a supplemental value to DISH of $1.833 billion to $3.783

billion.  Given the control Mr. Ergen exercised over the DISH Board (as evidenced in particular

by his bullying of the Special Committee), it is clear that Mr. Ergen believed that, after making

the LBAC Bid, he could and would get DISH to step in as purchaser.[117]

Finally, Mr. Ergen's substantial LP Debt purchases are wholly inconsistent with his

investing history.  The evidence demonstrates that, before his investment in LightSquared, Mr.

Ergen had a history of diversified investing in conservative, low-risk, liquid assets, rather than

investing a substantial sum in the distressed debt of a single company.  In fact, the evidence

reveals that Mr. Ergen had never made a personal investment in distressed debt of anything close

---

[116]     The Court notes the importance of the specific dates on which events occurred in this matter. In his
pleadings and at oral argument, Mr. Ergen's broad-brush approach to dates (for example, stating "Spring 2013"
instead of "April 26, 2013") clearly is a device to deflect focus on the specific timeline of Mr. Ergen's conduct.

[117]     As discussed *supra*, the stated unwillingness of the Special Committee to propose a DISH bid for
LightSquared's assets in an amount lower than the LBAC Bid (which bid provided Mr. Ergen with payment in full
on his LP Debt) confirms that even the independent members of the DISH Board believed they could not propose a
bid lower than Mr. Ergen's.

to the magnitude of his eventual $844 million investment in LightSquared, nor had he ever made

a significant personal investment (i) in a competitor of DISH or EchoStar, (ii) in a company

considered a strategic investment for either one, or (iii) in any company owning spectrum assets.

According to Mr. Ergen, he did not even discuss the almost $1 billion investment with his wife,

who was also the co-trustee of the trust that funded the purchases.  Mr. Ergen, who testified that,

as the chairman of DISH, he focuses "on strategic direction of the company,"[118] was clearly

planning for DISH, and the inconsistency of his LightSquared investment with his prior investing

history only lends further support to the inference that SPSO's debt purchases were made to pave

the way for DISH to acquire control of LightSquared's assets.

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Based on the foregoing, the Court concludes that the conduct of Mr. Ergen and SPSO,

undertaken on behalf of or for the benefit of DISH, was an end-run around the Eligible Assignee

provisions of the Credit Agreement that breached the implied covenant of good faith and fair

dealing arising under the Credit Agreement.[119]  *See Standard Chartered Bank v. AWB (USA)*

*Ltd.*, No. 05 Civ. 2013 (AKH), 2010 WL 532515, at *14 (S.D.N.Y. Feb. 16, 2010).  Simply put,

that which a corporation is contractually unable to accomplish itself in its own name cannot be

accomplished by interposing a shell company.  As the court stated in *Standard Chartered*, "[i]t is

not a matter of piercing corporate veils. . . . It is a matter of requiring a party to . . . honor the

---

[118]    Jan. 13 Tr. (Ergen) 95:6-9.

[119]    While a party is precluded from recovering on both a claim for breach of the implied covenant of good faith and fair dealing and a claim for breach of contract at the same time (*see*, *e.g.*, *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2007)), where the meaning of a contact is in doubt, a party may plead breach of the implied covenant of good faith and fair dealing as an alternative theory to its breach of contract claim.  *Id.*; *see also Fantozzi v. Axsys Techs., Inc.*, 2008 U.S. Dist. LEXIS 94040 (S.D.N.Y. Nov. 6, 2008) at *21-22.  Here, LightSquared has asserted a single claim for recovery in the form of a breach of contract claim, presenting its equitable theory of breach of the implied covenant of good faith and fair dealing in the alternative, which the Court finds permissible.

contract and its covenants and not attempt to defeat assigned rights by interjecting an affiliated company." *Id.*

Under New York law, every contract contains an implied covenant of good faith and fair dealing in the course of performance. *See Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631 (S.D.N.Y. 2010), *aff'd in relevant part*, 381 F. App'x 117 (2d Cir. 2010) ("*Empresas*"). That implied covenant is, in spirit "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (citing *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted)).[120] In *Empresas*, a case in this District, District Judge Rakoff found that conduct technically permissible under a credit agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve a result that is prohibited by the agreement and which would do away with the "fruits" of the contract. *Id.* at 632.

The facts of *Empresas* are straightforward. Empresas Cablevisión ("Cablevisión") borrowed $225 million from JPMorgan Chase ("JPMorgan"). The governing credit agreement restricted JPMorgan's ability to assign the loan to another party without Cablevisión's prior written consent. *Id.* at 627. The credit agreement did allow JPMorgan to sell "participations" in the loan (which it could do without Cablevisión's consent), but only if the relationship between JPMorgan and Cablevisión, as well as JPMorgan's rights and obligations under the credit agreement, remained unchanged. *Id.* In his decision, Judge Rakoff noted that Cablevisión negotiated for and obtained a veto right over assignments in order to protect against the

---

[120]    *See also* RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981) ("Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified . . . [where the actor evades] the spirit of the bargain . . . ."); *InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005) (quoting Restatement).

possibility of an "unsuitable party" being given the rights to enforce restrictive covenants or to receive information under the loan. *Id*. at 631.

Subsequently, JPMorgan agreed to assign 90 percent of the loan to Banco Inbursa, S.A. ("Inbursa"), a bank under common ownership with a competitor of Cablevisión.[121] *Id.* at 629. After JPMorgan sought Cablevisión's consent, Cablevisión's counsel replied by letter stating that it would not consent to the proposed assignment because

> . . . it would be inappropriate, and could cause serious harm to our business and our competitive position if one of our major competitors is allowed to gain access to confidential and competitively sensitive information about us, or to exert any control over our business affairs and hinder the development of our business.

The letter also stated that JPMorgan's sale of a participation of 90 percent of the loan to Inbursa (instead of an assignment) would similarly be unacceptable and would violate the "duty of good faith" owed by JPMorgan under the credit agreement. Notwithstanding, JPMorgan proceeded ahead with negotiating a sale of a 90 percent participation in the loan to Inbursa and did not disclose the participation to Cablevisión even after the participation agreement was signed.[122] By selling a participation rather than assigning the loan, JPMorgan avoided the transfer restrictions in the credit agreement that necessitated borrower consent.

When Cablevisión learned of the agreement between JPMorgan and Inbursa, it promptly sought a preliminary injunction preventing JPMorgan from effectuating the transfer. It argued

---

[121]     Inbursa is a Mexican bank controlled by Carlos Slim Helú and his family, who also held a controlling interest in Telmex, a Mexican communications conglomerate that owned over 80 percent of telephone land lines in Mexico and was seeking to expand into other telecommunications markets at the time of the *Empresas* decision. *Id.* at 627.

[122]     The participation agreement also contained numerous non-standard terms, including permitting Inbursa to request and receive nearly unlimited information from Cablevisión and providing that in the event of default by Cablevisión, "the Participation Agreement 'shall be terminated and replaced by an assignment agreement . . . whereupon the Participant shall become a Lender.'" *Id.* at 630. Inbursa also obtained a provision that would have allowed it to declare an event of default and trigger the outright assignment in the event that Cablevisión refused to provide the confidential information requested. *Id.* at 632.

that the participation agreement was, for all relevant purposes, "a disguised but unconsented-to assignment" that breached the credit agreement or that "so subverts the purposes underlying Cablevisión's right to veto assignments of the loan as to breach the covenant of good faith and fair dealing implied by law in the Credit Agreement." *Id.* at 631.

Judge Rakoff enjoined the transfer, finding that JPMorgan violated the implied covenant of good faith and fair dealing by attempting, through the "guise" of a purported participation, to effectuate a prohibited assignment that it could not have implemented directly. *Id.* at 631. While the court observed that JPMorgan's argument that the participation agreement was "technically consistent" with the credit agreement "[s]uperficially . . . may be correct," its actions were nevertheless impermissible because they "effectuated what is in substance a forbidden assignment" that the transfer restrictions were designed to prevent, thus undermining Cablevisión's veto rights under the credit agreement. *Id.* at 631, 633. Had the transfer been allowed, the participation agreement would have given Inbursa the potential to access extensive confidential information about the business, affairs, and financial condition of Cablevisión, all of which Cablevisión desired to keep its competitors from obtaining. *Id.* at 630-631. Thus, the Court granted Cablevisión's request for a preliminary injunction, concluding that "JPMorgan violated, at a minimum, the covenant of good faith and fair dealing automatically implied by law in the credit agreement" and that "[s]uch an end-run, if not a downright sham" was not permissible as it did away with the "fruits" of the contract.[123] *Id.* at 632.

---

[123]    At closing argument in the Adversary Proceeding, counsel for DISH informed the Court that, on appeal, the Second Circuit subsequently reversed Judge Rakoff's *Empresas* order.  (Mar. 17 Tr. (Giuffra) 300:23-303:3 ("The Second Circuit, in a summary order, reversed the injunction, insofar as the participation was not allowed. . .").)  This interpretation of the Second Circuit's order is incorrect.  As counsel for the Debtors correctly pointed out, the Second Circuit affirmed Judge Rakoff's *Empresas* decision.  Because Inbursa and JPMorgan had already completed the transfer of a 90 percent participation interest in the loan, however, the Second Circuit, after affirming Judge Rakoff's order, simply ordered the District Court to review and modify the injunction to require JPMorgan to comply with the implied covenant of good faith and fair dealing by prohibiting, pending a trial to determine whether

(continued...)

Here, as in *Empresas*, in which consent to sell a participation was technically not required by the credit agreement, the Court's finding that SPSO is technically an Eligible Assignee under the Credit Agreement might end the analysis. But, as in *Empresas*, contractual language must be read in context.[124] The context here requires reading the Eligible Assignee provision and the rest of the Credit Agreement in the context of the intent, on the part of LightSquared, to prevent competitors from gaining access to its capital structure. This intent was readily apparent from the face of the Credit Agreement and is overtly evidenced by (i) the language utilized in the definitions of Eligible Assignee and of "Disqualified Company" (which refers to direct competitors of LightSquared) designed to limit ownership of the LP Debt[125] and

---

or not damages were owed, the exercise of any right under the participation agreement that might give Inbursa or its affiliates a competitive advantage over Cablevisión. *See* 381 Fed. Appx. 117 (2d Cir. 2010); Mar. 17 Tr. (Leblanc) 350:25-351:20.

[124]    In this Adversary Proceeding, DISH, LBAC, and SPSO have argued that the Court should look only to the literal terms of the document, without regard to context, when adjudicating the asserted claim for breach of the Credit Agreement. Notably, however, these parties have made the contrary argument in the Debtors' main cases when seeking a declaration that both the PSA and the DISH/LBAC Bid were terminated in their entirety. In arguing that the DISH/LBAC Bid did not remain irrevocable until the earlier of sixty days after entry of the Confirmation Order and February 15, 2014, DISH and LBAC sought to avoid the application of the literal terms of the bid procedures order entered in the Debtors' cases [Bankr. Docket No. 892], which so stated, by relying on context and the parties' intent. *See* Objection of LBAC to the January 13, 2014 Statement of the Ad Hoc Secured Group and Notice of Intent to Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief [Bankr. Docket No. 1232] at 14 ("Examined in its full context . . . , the plain language of the pertinent provision which was added at the Court's request, paragraph (j) of the Bid Procedures [Order], makes clear that this was the extent of LBAC's commitment"), 14-17 (citing to numerous hearing transcripts to demonstrate that "the statements of . . . parties . . . subsequent to the September 30 hearing further clarify all parties' understanding that LBAC's commitment to move forward with the LBAC Bid was governed by the PSA, not the Bid Procedures Order").

[125]    *See, e.g., Meridian Sunrise Village, LLC v. NB Distressed Debt Investment Fund Limited (In re Meridian Sunrise Village LLC)*, 2014 WL 909219 (holding that, while courts will first look to the face of the document and the plain language of the agreement to determine its meaning, a court may rely on extrinsic evidence even in the absence of ambiguity, and finding that the parties had intentionally limited the term "Eligible Assignees" in the loan agreement at issue in order to exclude assignment to "distressed asset hedge funds who candidly admit they seek to 'obtain outright control' of assets").

(ii) LightSquared's May 9 and May 12, 2012 amendments to the Credit Agreement to add additional LightSquared competitors, including DISH, to the list of Disqualified Companies.[126]

As set forth in detail in paragraphs 32-34, *supra*, pursuant to the Credit Agreement, Eligible Assignees are entitled to receive substantial non-public information about LightSquared and are granted access to LightSquared's officers and employees for information regarding LightSquared's ongoing business and operations[127] and also receive a right to vote on certain material matters, including waivers, exercises of remedies, and other similar matters. The Debtors have appropriately pointed out that one could reasonably expect a competitor to vote differently than a non-competitor lender on material matters concerning LightSquared, and, more significantly, a competitor given access to material non-public information about LightSquared may use it to LightSquared's detriment, given that a competitor may possess a desire to see LightSquared fail. As a result, LightSquared has a legitimate basis for its desire to prohibit competitors from becoming holders of its LP Debt.

The problem is that the Credit Agreement was not crafted sharply enough to achieve that intent. Moreover, the problem was exacerbated by the lack of action by LightSquared in the face

---

[126] As Mr. Smith testified at Trial, LightSquared amended the Disqualified Company (pre-bankruptcy) list "to make sure that the list of disqualified companies included all of [LightSquared's] competitors, because we didn't want competitors involved in the capital structure. We thought it was important as we were entering bankruptcy to make these updates." Jan. 9 Tr. (Smith) 126:22-127:24; PX0161.

[127] *See*, *e.g.*, Credit Agreement § 3.04 (requiring LightSquared to provide several years of financial statements and projections), § 3.05 (listing all real property owned or leased), § 3.06 (listing all intellectual property owned or licensed), § 3.09 (all material agreements relating to LightSquared's business), § 5.01(a) and § 5.01(b) (requiring annual and quarterly updates containing information that would be included on SEC Forms 10-K and 10-Q), § 5.01(h) (annual and quarterly budgets), and § 5.01(j) (a general catchall for information reasonably requested by a Lender). In addition, under Section 5.07 (a), each Lender also has the right to inspect LightSquared's properties and "discuss the affairs, finances accounts and condition" of LightSquared with its officers, employees, accountants and advisors.

of rampant public speculation about the debt purchases.[128]  Mr. Ergen found a loophole in the

express terms of the Credit Agreement and exploited it.  That is not wrong in and of itself.  The

wrong arises from Mr. Ergen's purchases of the LP Debt, beginning in the spring of 2013, when

he intended his "substantial interests" in the debt to complement any acquisition strategy and

have "significant influence" in the bankruptcy cases;[129] he intended and preferred that it be DISH

that acquired LightSquared debt (and ultimately its spectrum), and he pursued such purchases to

preserve valuable options for the benefit of DISH.  These purchases violate the spirit of the

Credit Agreement, as the harm that LightSquared sought to avoid – a competitor entering its

capital structure and acting against its interests – has now come to pass.  Mr. Ergen's use of

SPSO to evade the terms of the Credit Agreement that prevented him and DISH from buying the

LP Debt thus deprived LightSquared of the fruits of the Credit Agreement's restrictions.

While technically permitted to buy LP Debt, SPSO was essentially a front used by Mr.

Ergen to implement his strategy for the benefit of DISH**,** a forbidden Lender under the Credit

Agreement.  That SPSO's acquisition strategy was formulated specifically to achieve an end-run

around the restrictions in the Credit Agreement is amply supported by the record.  The Court

thus concludes that, at least as of mid-April 2013, during the period in which SPSO acquired an

additional $320 million of LP Debt, Mr. Ergen, through SPSO, was not acting on his own behalf

to acquire LP Debt as a personal investment; rather, he was acting to acquire a strategic

advantage which he knew he would have to tender to the DISH Board to give DISH the option of

---

[128]    SPSO focuses on the notable distinction between the facts of *Empresas* and the Adversary Proceeding on
this point.  In *Empresas*, Cablevisión actively opposed Inbursa's use of a participation structure to circumvent the
assignment restrictions.  *See Empresas*, 680 F. Supp. 2d at 628.  Here, the evidence demonstrates that Plaintiffs were
aware as early as May 2012 that there was at least some possibility that Mr. Ergen was behind SPSO's debt
purchases.  Yet, as SPSO continued to acquire additional LP Debt, Plaintiffs did not act in any way to seek to
prohibit SPSO from making such purchases.  As will be discussed more fully *infra*, for this reason, the Court
declines to award damages to Plaintiffs.

[129]    *See* PX0867 (Ergen Presentation).

making a bid LightSquared's spectrum assets, assets which were clearly attractive to DISH, whether or not DISH consummated a transaction with Sprint.[130]

The record also supports the conclusion that Mr. Ergen's strategy was deployed on behalf of DISH as early as October 2012, when he told Mr. Kiser, "[i]f we can't be sure the company can buy them, then I am interested to increase my position at the 75 level at least up to a 33% ownership level of the class."  Simply put, had he then been advised that DISH was permitted to buy the LP Debt, Mr. Ergen's words reflect his preference that DISH (not SPSO) buy the debt. But having identified a roadblock in the Credit Agreement, Mr. Ergen simply created a special purpose vehicle, drove around the roadblock, and took an alternate route to his destination.

Nor can it be seriously maintained that Mr. Ergen did not personally direct and indeed control virtually every aspect of the process leading to the formulation of the LBAC Bid and its ultimate pursuit by DISH.  From his stunning lack of candor with the DISH Board and management to the stonewalling and disbanding of the Special Committee, the message is loud and clear: no one crosses or even questions the actions of the Chairman.  Charles Ergen is, in every sense, the controlling shareholder of DISH and wields that control as he sees fit.  His acquisition through SPSO of the LP Debt violated the covenant of good faith and fair dealing automatically implied by law in the Credit Agreement.[131]

Indeed, the extent to which DISH itself believed an end-run around the terms of the Credit Agreement was perfectly acceptable was made crystal clear during closing arguments.

---

[130]    *See* Ergen Presentation (stating that Mr. Ergen's "substantial interests in L2 debt and preferred stock compliment [*sic*] any acquisition strategy and could have significant influence in L2's chapter 11 cases."); *see also* Ergen July 8 Presentation.

[131]    Because the Court has declined to hold any of the Defendants liable for breach of the express terms of the Credit Agreement, it is not necessary to address the parties' myriad arguments regarding the applicability of the doctrines of agency, imputation, ratification, and alter ego.

When asked by the Court if an affiliate of DISH could have purchased LP Debt without running

afoul of the Credit Agreement, counsel for DISH agreed, "based on the words of the contract."[132]

After a further hypothetical situation was posed to counsel – if SPSO hypothetically had a side

agreement with DISH that DISH would guarantee the return of Mr. Ergen's capital on his

investment of LP Debt – counsel responded that he still believed that SPSO would not have

breached the Credit Agreement under such a scenario, even if SPSO was hedged with a

Disqualified Company such as DISH.[133]   DISH's view, in other words, is that if the Credit

Agreement does not explicitly prohibit a particular transfer by its express terms, any contrivance

or subterfuge to avoid running afoul of those express terms is a-ok.  This cannot be correct.

Finally, Defendants' attempts to distinguish *Empresas* are unavailing.  They argue that

*Empresas* is entirely different from this case because, in *Empresas*, JPMorgan *colluded* with

Inbursa to alter fundamentally the agreement between Cablevisión and JPMorgan, and Inbursa

actively bargained for non-standard provisions in the participation agreement with JPMorgan,

both facts which are not present here.[134]   Regardless of whether collusion occurred here or not

(and there have been no allegations that Mr. Ergen in fact colluded with any Lenders from whom

he purchased LP Debt), and notwithstanding the fact that SPSO's LP Debt purchases were made

under standard terms, the violation of the spirit of the Credit Agreement in each case remains the

same.  Having been informed more than once that DISH and EchoStar could not purchase the LP

---

[132]     Mar. 17 Tr. (Giuffra) 293:14-21.  Counsel further added that "there is a definition of affiliate in this contract, which does what they want it to do, which would have picked up SPSO, which would have picked up Mr. Ergen.  And that's not what it says in the transfer provision." *Id.* at 300:8-11.

[133]     *See* Mar. 17 Tr. (Giuffra) 313:17-315:1 ("Your Honor, it's because the contract wasn't drafted with a broad transfer restriction. . . . I think we still win.").

[134]     Defendants also argue that the legal analysis in *Empresas* is distinguishable based on the procedural posture of the case.  This argument lacks merit because the legal analysis concerning the parties' good faith and fair dealing or lack thereof remains unchanged, whether evaluated in the context of a preliminary injunction or, as here, in the liability phase.

Debt under the express terms of the Credit Agreement, Mr. Ergen sought to do indirectly what he knew was not permitted directly.  As in *Empresas*, although the LP Debt purchases by SPSO may have appeared "superficially" permissible, those purchases (which, by April 2013, were made essentially for DISH in contemplation of a potential DISH acquisition) were intended to circumvent the Credit Agreement's restrictions on transfers to DISH.  Contrary to Defendants' assertions, the restrictions on competitors becoming Lenders were bargained for by LightSquared in the same way that Cablevisión bargained for the right to veto assignees but neglected to include in such provision the right to veto parties purchasing participations.

SPSO must be held accountable for its conduct, in context.  Mr. Ergen's multiple hats – personal, SPSO, LBAC, DISH – cannot be selectively deployed to disguise SPSO or insulate SPSO from responsibility for its actions in using a "guise" to achieve an "end run" around the substance of the Eligible Assignee restrictions in the Credit Agreement and undercut what Mr. Ergen certainly knew the restrictions were designed to prevent.  *See Empresas*, 680 F. Supp. 2d 625.

## IV.    The SPSO Claim Shall Not Be Disallowed

### A.    The SPSO Claim is Not Void or Voidable Even Though the Court Finds an Implied Breach and Even if the Court Were to Have Found an Express Breach

Section 502 of the Bankruptcy Code provides that a properly filed proof of claim is deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  Various other subsections of section 502 set forth the grounds for disallowing a claim, including section 502(b)(1), which authorizes disallowance because the claim is unenforceable under any agreement or applicable law.  Section 502(b) provides: "[T]he court . . . shall allow such claim in such amount, except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."  11 U.S.C. § 502(b).

SPSO maintains that, even if it was not an Eligible Assignee, the SPSO Claim would *still* be enforceable against the LightSquared LP estate, as nothing in the Credit Agreement treats transfers as void or voidable even if they are made in violation of the transfer restrictions. The Court concludes that SPSO is correct on this point. Even if the Court had found that SPSO breached the express terms of the Credit Agreement and was not an Eligible Assignee, the plain language of the Credit Agreement does not support disallowance of the SPSO Claim.

Plaintiffs argue that the Credit Agreement provides that a transferee who is not an Eligible Assignee acquires no rights under the Credit Agreement, and, therefore, such transferee cannot assert a claim against the company with respect to any purchase of LP Debt. Accordingly, they argue, any claim of SPSO based on the Credit Agreement must be disallowed. In support of this argument, Plaintiffs rely on Section 10.04(a) of the Credit Agreement, which provides that

> Nothing in this Agreement, express or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnities) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Credit Agreement § 10.04(a).

As Mr. Ergen and SPSO point out, however, Plaintiffs fail to mention other relevant provisions of the Credit Agreement which provide that any breach by any Lender or participant[135] of the transfer restrictions under the Credit Agreement does not excuse

---

[135]    Section 10.04(b) of the Credit Agreement provides that "[a]ny assignment or transfer by a Lender of rights or obligations under [the Credit] Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(d)." Credit Agreement § 10.04(b). Thus, even if an assignment by a Lender is invalid, it would be treated as a sale of a participation, and, pursuant to Section 10.04(d), a breach by a participant still does not excuse performance by LightSquared.

performance by LightSquared.  Specifically, Section 10.04(d) of the Credit Agreement provides,

in pertinent part, that LightSquared

> agrees that any breach by any Lender or participant or sub-participant of the
> restrictions on assignment hereunder (including, without limitation, to
> Disqualified Companies) shall not excuse, in any respect, performance by the
> Borrower under the Loan Documents.

Credit Agreement § 10.04(d).  Contrary to Plaintiffs' argument, Section 10.04(d) of the

Agreement makes clear that neither a breach of the express terms of the Credit Agreement nor a

breach of the implied covenant of good faith and fair dealing renders wrongfully transferred debt

claims unenforceable against LightSquared and therefore disallowable.  SPSO also points out

that similar language has been found insufficient to invalidate transfers.  *See LCE Lux HoldCo*

*S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, 287 F.R.D. 230, 235 (S.D.N.Y. 2012).[136]

Under any circumstances, even in the case of an express breach, in order for a claim to be

disallowable, the contract must expressly provide that any breach of the contract, such as an

assignment in violation of the agreement, shall render the assignment wholly void or invalid.

*See In re 785 Partners LLC*, 2012 WL 401497 at *3 (Bankr. S.D.N.Y. Feb. 7, 2012) (citing

*Pravin Banker Assocs., Ltd. V. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997))

(assignment of a loan is valid, rendering the assignee "a secured creditor and party in interest" in

---

[136]    In *LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, the agreement at issue contained a provision prohibiting assignment without consent, specifically stating that "[n]either party may assign any of its right under the Agreement without the prior written consent of the other parties, which will not be unreasonably withheld."   The agreement went on to provide that "[s]ubject to the preceding sentence, this Agreement will apply . . . to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement."  287 F.R.D. at 235. The defendant argued that the only way to give meaning to the phrase "subject to the preceding sentence" was to read the second sentence to mean that the benefits of the agreement inured only to permitted assigns, thus rendering an assignment in violation of the agreement void.  The court found that the agreement did "not contain the typical 'talismanic' language that renders an assignment void," and that, given the ambiguities in the phrasing of the agreement on this point, was unwilling to void the assignment at issue.  *Id.* at 235-36 (stating that "assignments made in contravention of a prohibition clause in a contract are void if the contract contains clear, definite, and appropriate language declaring the invalidity of such assignments") (citation omitted).

the bankruptcy, even if the assignee did not meet the definition of an Eligible Lender, where the

contract lacked language invalidating an improper assignment)); *see also See Purchase Partners,*

*LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012) (contractual

provisions prohibiting assignments are not enforceable except where "the relevant provision of

the contract contains 'clear, definite, and appropriate' language declaring an assignment

invalid") (quoting *Sullivan v. Int'l Fid. Ins. Co.*, 96 A.D.2d 555, 556 (2d Dep't 1983)); *In re*

*Britton*, 288 B.R. 170, 173 (Bankr. N.D.N.Y. 2002) (quoting *Pravin Banker Assocs. Ltd. v.*

*Banco Popular Del Peru*, 109 F.3d at 856) (finding that under New York law, "to preclude the

power to assign, or cause an assignment violative of contractual provisions to be wholly void, [a

contractual] clause must contain express provisions that any assignment shall be void or invalid

if not made in a certain specified way").

Here, the Credit Agreement does not contain clear language voiding an assignment to a

party that is not an Eligible Assignee or invalidating a claim by such party relating to the Credit

Agreement; thus, even if the Court had found that SPSO is not an Eligible Assignee under the

express terms of the Credit Agreement, the SPSO Claim would not be void or voidable.

## B.    The Inaction and Delay of LightSquared and Harbinger Preclude the Award of Affirmative Damages

Beginning in May 2012, LightSquared and Harbinger knew or had strong reason to

believe that Mr. Ergen was purchasing LP Debt.  Substantial documentary evidence in the record

reflects that, at a minimum, beginning with the sale of Carl Icahn's $247 million LP Debt

position to a Sound Point client on May 4, 2012, which was reported in the press,[137] the Debtors

and Mr. Falcone harbored serious suspicions that Mr. Ergen had entered LightSquared's capital

---

[137]    *See*, *e.g.*, DX396 (May 10, 2012, *Wall Street Journal* blog, "Deal Journal," entry titled "Ergen Builds Cash Pile Amid LightSquared Restructuring Talks").

structure.  For example, on May 5, 2012, Mr. Falcone responded to an email from a

LightSquared creditor, writing "[m]aybe we shouldn't file if [Ergen] is circling the wagons.

Though I think [it] is a positive.  May bring in another strategic."  (DX035 (Falcone to Ara

Cohen of Knighthead); *see also* DX040 (May 7, 2012, Marc Montagner of LightSquared to Stan

Holtz of Moelis:  "Ketchum, with his 175MM fund, bought 350 of the debt on Friday.  He is

probably a front for Charlie Ergen."); DX382 (May 8, 2012, Falcone to Ara Cohen:  "I can

understand why u guys balked; Charlie will definitely give u guys 25% and an independent

board and your full claim.").)  Sarcasm aside, Mr. Falcone's surmise that the buyer of LP Debt

was Mr. Ergen was also set forth in a number of emails he sent to members of the press.  *See*

DX037 (May 6, 2012, Falcone to Matthew Goldstein of *Reuters*:  "Ergen.  Will prompt more

strategics to step in."); DX386 (May 16, 2012, Falcone to Greg Bensinger of *The Wall Street

Journal*:  "Carlos Slim apparently [is] involved with Ergen" as purchasers of LP Debt, and, after

questions from Mr. Bensinger, adding that "He clearly wants the spectrum and the satellites.  Let

me know before I tell someone else if u are going to write anything.").)  After sending these

emails, Mr. Falcone testified, he understood that *The Wall Street Journal* may write an article

based on the information provided.[138]

LightSquared and Harbinger attempt to explain such email correspondence as either idle

banter, or, with respect to the media, as a "fishing expedition" to prod for information on the

identity of the buyer.  When asked at Trial about his emails to Mr. Bensinger of *The Wall Street

Journal* about Mr. Ergen and Carlos Slim, Mr. Falcone explained that he was "trying to get

[Bensinger] to get information for me to confirm, because, before he does anything, he's got to

---

[138]    *See* Jan. 16 Tr. (Falcone) 54:15-22, 108:25-109:4.

go out and corroborate."[139]  Other emails touting Mr. Ergen as a purchaser were, according to

Mr. Falcone, sent either (i) to fish for information or (ii) in the hope that Mr. Ergen's presence

would get other competitors interested in LightSquared as strategic investors.  For example, on

October 4, 2012, Mr. Falcone emailed Omar Jaffrey, a banker,[140] telling him "[y]ou may want to

circle up w[ith] your contact at AT&T and let him know Ergen continues to buy bonds."

(DX0388.)  At Trial, Mr. Falcone explained that, in sending this email, he was fishing for

information to "corroborate what [he] believed," and he was also hoping Mr. Jaffrey could "get

AT&T involved" because LightSquared was looking for strategic investors at the time.[141]  As

Mr. Falcone testified, to "have a strategic kind of kicking the tires on your company . . .

validate[s] the asset and it may bring in—it may prompt other strategics to get involved."[142]

　　　None of these emails reflects alarm on the part of Mr. Falcone or LightSquared that a

competitor who might act against LightSquared's interests had likely entered its capital structure

or that the uncertain identity of such party was troubling to them.  Quite the contrary, the

correspondence in evidence reveals that Mr. Falcone conveniently used his suspicions of Mr.

Ergen's trading in LP Debt as an item to publicize in order to drum up possible interest in

---

[139]　　Jan. 16 Tr. (Falcone) 109:6-8.  When asked at Trial about why he exchanged emails with reporters, Mr. Falcone testified that "[s]ometimes they have good information," as he was trying to find out who was buying LightSquared debt.  *Id.* at 36:9-16.

[140]　　Mr. Jaffrey is now a principal of Melody Capital Partners, one of the sponsors of the Debtors' Third Amended Joint Plan of Reorganization.

[141]　　Jan. 16 Tr. (Falcone) 56:17-57:5.  On May 8, 2012, Mr. Falcone had sent a similar email to Gil Ha, a banker at Greenhill & Co., who had a relationship with AT&T, stating "Ergen now involved in LS."  DX043.  Mr. Falcone testified that he sent this email to both (i) fish for intelligence as to who had purchased Mr. Icahn's position and (ii) see if AT&T, after viewing Mr. Ergen's investment as validation, would possibly be interested in investing in LightSquared.  *Id.* at 41:17-42:9; 118:21-119:14.

[142]　　Jan. 16 Tr. (Falcone) 35:3-10.  Other emails admitted into evidence show that Mr. Falcone had also contacted DISH directly in what appears to have been an attempt to goad them into corroborating that Mr. Ergen was purchasing LP Debt.  *See* DX0378 (May 7, 2012, Falcone to Thomas Cullen of DISH, "Good purchase."); DX097 (December 18, 2012, Falcone to Thomas Cullen of DISH:  "Tom, we should talk. I know you guys are buying the bonds through Sound Point.  One of his guys has been talking.").

LightSquared from strategic investors, some of whom were themselves LightSquared

competitors. And, as the trading price of LP Debt increased from 48 cents on the dollar in April

2012 to 96 cents on the dollar in April 2013, Mr. Falcone seemed even less inclined to complain

about the allegedly harmful presence of a competitor in the capital structure. Even as late as

March 28, 2013, Mr. Falcone and Drew McKnight of Fortress both expressed in an email

exchange their views that it was beneficial that a potential strategic investor, Mr. Ergen, was also

buying LP Preferred Interests in addition to LP Debt.[143] Mr. Falcone explained at Trial that he

considered this a validation of spectrum value, and, in addition, as stated in the email exchange,

he felt that Mr. Ergen's LP Debt acquisition could help to "blow up" the Ad Hoc Secured Group

unless Mr. Ergen joined them.[144] While, at Trial, he denied that he knew the details of the

Exclusivity Stipulation (which required the Debtors to start preparatory work on a sale process

on June 3, 2013 and to commence a formal sale process on July 15, 2013 upon the termination of

exclusivity, if the Ad Hoc Secured Group still remained the largest group of holders of LP Debt

and no consensual deal between the parties had been achieved), Mr. Falcone admitted that he

understood that such requirement would fall away if Mr. Ergen became the largest holder of LP

Debt.

At Trial, Mr. Falcone maintained that, depending on the day and the information he

received, his belief changed as to who was behind Sound Point's purchases. For example, when

asked if, on May 9, 2012, he still believed that it was Mr. Ergen buying the LP Debt, he

answered that "I don't know if it was the Carlos Slim and Charlie Ergen day, but it could have

---

[143]     DX0395 (McKnight to Falcone: ". . . at end of day really need a strategic involved here to maximize value and I think you're getting it. Pretty huge for them to pay up on preferred. Think it's a positive all around." Falcone reply: "I do too.")

[144]     Jan. 16 Tr. (Falcone) 141:11-143:17.

been one or the other." (Jan. 16 Tr. (Falcone) 115:4-5; *see also id.* at 58:4-11 ("I just didn't

know. You know, depending on – at this point in time what minute of the day it was, I had

believed, on one hand, it could be AT&T, and then six minutes later I changed my mind, I think

it's Ergen.").) The contention that Mr. Falcone and LightSquared were unsure whether the

purchaser of the LP Debt was related to DISH, rather than Carlos Slim (the owner of one of the

largest telecommunications empires in the world) or Cablevision (one of the largest cable

providers in the United States and a Disqualified Company) – all competitors of LightSquared –

suggests that LightSquared was not overly concerned about the presence of any these parties in

its capital structure. In fact, the addition of DISH to the Credit Agreement's list of Disqualified

Companies on May 9, 2012, appears to have been pursued by Mr. Falcone at least partially in

spite in order to trap Mr. Ergen in a minority position in the LP Debt after he had acquired Mr.

Icahn's position. On May 6, 2012, after learning of the purchase of Mr. Icahn's $247 million

position in the LP Debt, Mr. Falcone wrote to Ara Cohen of Knighthead, "Well I'm working on

giving [Ergen] a nice surprise" by adding DISH to the list of Disqualified Companies. (DX038).

Despite the significant amount of documentary evidence indicating that they knew or

should have known, LightSquared and Harbinger maintain that it was not until May 21, 2013

that they first received confirmation that Mr. Ergen was the party behind SPSO's purchases of

LP Debt.[145] They argue that, prior to being informed by SPSO's counsel on May 21, 2013,

public information provided them with no certainty as to who was behind SPSO's purchases.

They emphasize the widespread speculation in the media and that news reports, blogs, and

---

[145]    As support for this assertion, LightSquared and Harbinger point to emails exchanged between Mr. Falcone and representatives and advisors for Harbinger and LightSquared on May 21, 2013, when they purportedly did not yet know the identity of Sound Point's client. In those emails, Falcone stated that "[i]f I were a betting man I would say that Sound Point is Slim." (Jan. 16 Tr. (Falcone) 72:25-73:18; PX0540.) Upon receipt of the email from counsel confirming Ergen was in fact the ultimate buyer of Sound Point's LP Debt purchases, Falcone responded "[f]ortunately, I'm not a betting man." (Jan. 16 Tr. (Falcone) 73:19-74:9; PX0537.)

rumors at various times pointed to Carlos Slim, the Dolan Family, or Mr. Ergen as the

purchaser.[146]  Moreover, LightSquared and Harbinger maintain that they made diligent efforts to

determine who was behind Sound Point's purchases of LP Debt, pointing to, among other things,

voicemails left by Mr. Montagner for Mr. Ketchum; efforts by Moelis to obtain information from

Mr. Ketchum and from Willkie Farr;[147] their attempts through UBS; and Mr. Falcone's efforts to

reach out to "people on the street" such as reporters, Mr. Cullen, and representatives of AT&T

and Sprint.[148]

Notwithstanding the fact that, beginning in May 2012, there was a long history of

speculation in the press but no definitive confirmation that Mr. Ergen was the purchaser,[149] it is

clear from the totality of the evidence that, for nearly a year, LightSquared knew or had reason to

believe that Mr. Ergen was behind SPSO.  Despite LightSquared's protestations that it attempted

to ascertain the identity of the purchaser (and the efforts to which it points), the fact remains that

---

[146]    *See, e.g.*, PX0095 (May 4, 2012, trader at Harbinger to Falcone: "[Ketchum] is the guy running South Point.  An old article, but looks like the guy has close ties with the Dolan family."); PX149 (May 10, 2012, email from Harbinger employee to Falcone that he had "heard from a couple of people that [E]rgen may not be the guy behind [K]etchum.  Some rumors are that it might be the [D]olans, who like [E]rgen are close to [K]etchum."); PX0304 (July 9, 2012, *Forbes* article noting that "holes have appeared in the thesis that Ergen is backing Sound Point" and "people involved have begun to speculate it might be Carlos Slim or others behind the purchase.  Sources have speculated that Cablevision, owned by the Dolan family and one of the country's largest telecom and media company [*sic*], could be a potential suitor as well."); DX045 (May 9, 2012, *LCD News* story headlined "LightSquared [Term Loan] trades north of 70 as Ergen enters the picture.").

[147]    Mr. Hootnick testified at Trial that Moelis called "Mr. Ketchum regularly and [met] with him regularly, and . . . continu[ed] during that period [*i.e.*, spring 2013] to try and find out who Sound Point—if they were representing somebody and what their intention was."  Mr. Ketchum continued to refuse to identify its investors or intentions.  (Jan. 17 Tr. (Hootnick) 23:13-24; Jan. 15 Tr. (Ketchum) 88:22-89:22; PX0443.)  Mr. Hootnick directly "ask[ed] Mr. Ketchum if he was working with Mr. Ergen . . . but [Ketchum] refused to answer any of those questions."  (Jan. 17. Tr. (Hootnick) 19:8-20.  Mr. Hootnick also reached out to Rachel Strickland of Willkie Farr, who had represented Ergen in the TerreStar bankruptcy, to see whether she would shed light on whether Mr. Ergen was involved in SPSO's LP Debt purchases.  (Jan. 17 Tr. (Hootnick) 19:21-21:3, 64:3-9.)  Despite more than six phone calls and "a couple" of lunch meetings, Mr. Ergen's counsel would not confirm whether he was involved.  (Jan. 17 Tr. (Hootnick) 20:22-21:3.)

[148]    Jan. 16 Tr. (Falcone) 22:1-11.

[149]    Indeed, an April 4, 2013 *Wall Street Journal* article noted, "[i]t is unclear whether Mr. Ergen or his company, satellite-television operator Dish Network Corp. . . . has played a role in Sound Point's trading.  Mr. Ergen hasn't addressed the trades, and the company declined to comment."  (DX144.)

LightSquared, a chapter 11 debtor, did nothing to seek to obtain that information through the many tools available to it, including Bankruptcy Rule 2004, or to seek any relief from this Court with respect to the debt purchases by SPSO, which relief may have included a motion to enforce the restrictions in the Credit Agreement or an injunction similar to that obtained in *Empresas*.  In fact, there appears to have been a certain degree of ambivalence as to whether the presence of Mr. Ergen was a positive or a negative for LightSquared (i) in its search for strategic investors and (ii) in terms of the implication of Mr. Ergen's holdings on the requirements set forth in the Exclusivity Stipulation.  Regardless of LightSquared's ultimate view, what is clear that is that no action was ever taken.

LightSquared's breach of contract allegations have been asserted too late in the game to be actionable.  The equitable doctrine of laches requires that the following elements be shown: (i) conduct giving rise to the situation complained of, (ii) delay by the plaintiff in asserting a claim despite the opportunity to do so, (iii) lack of knowledge on the defendant's part that a claim would be asserted, and (iv) injury or prejudice to the defendant if relief is granted to the plaintiff.  *Caldor Corp. v. S Plaza Assocs. (In re Caldor Inc.)*, 217 B.R. 121, 134 (Bankr. S.D.N.Y. 1998) (citations omitted).  To equitably estop a plaintiff from asserting its claims, a defendant must demonstrate that the plaintiff (i) made a false representation or concealed material facts, (ii) intended that such conduct would be acted upon by the defendant, and (iii) had knowledge of the true facts.  *Id.* (citations omitted).  In their answer to the LightSquared Complaint,[150] SPSO and Mr. Ergen raise each of these equitable doctrines (and others) as defenses barring any recovery against them.

---

[150]      Adv. Docket No. 102.

The Court finds that, while all of the elements of the doctrines of laches or equitable estoppel may not have been met, sufficient elements of each doctrine have been satisfied to preclude the pursuit or award of affirmative damages to LightSquared and Harbinger with respect to SPSO's conduct in acquiring LP Debt.  The Court has concluded that LightSquared and Harbinger knew or had strong suspicions that Mr. Ergen was behind SPSO's purchases through Sound Point.  Yet, even assuming any uncertainty on the part of LightSquared and Harbinger, they failed to act to confirm the identity of the purchaser of LP Debt and, once confirmed, they failed to take any action to prevent Mr. Ergen from closing trade after trade, instead delaying in filing suit until after Mr. Ergen had acquired $844 million in LP Debt and had made a bid for LightSquared's assets.  Meanwhile, for over one year, SPSO had purchased its LP Debt and, other than in connection with the bundled March 28, 2013 trade, never heard a peep of protest from LightSquared.  As far as SPSO could reasonably conclude, the Debtors appeared to have no concern about SPSO's status as a purchaser.  Such inaction and delay now preclude the Court from making an affirmative award of damages to LightSquared on account of Mr. Ergen's conduct.[151]

---

[151]    The conduct of LightSquared and Harbinger upon learning of SPSO's LP Debt purchases, however, has no effect on whether or not the conduct of Mr. Ergen and SPSO in acquiring the LP Debt satisfies the first and seond prongs of the *Mobile Steel* test for equitable subordination of SPSO's claim – whether SPSO and Mr. Ergen engaged in "inequitable conduct" and whether such conduct harmed innocent creditors.  Subject to limited exceptions, "[c]ourts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code."  *In re Auto. Professionals, Inc.*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008).  With respect to "equitable subordination, [the test] focuses only on the actions of guilty creditors and the resulting impact on innocent creditors."  *Id.* at 260.  "Inequitable conduct by the debtor is noticeably absent from the list of relevant considerations."  *Id.*  Thus, consideration of the debtor's conduct, as opposed to the guilty creditor, and allowing the unclean hands defense "would be inconsistent with the traditional test for equitable subordination, the substantial case law allowing subordination despite debtors' participation in wrongdoing, and the purpose of equitable subordination. *Id.*; *accord In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors."), *aff'd*, 493 F.3d 82 (2d Cir. 2007).

## V.    SPSO's Claim Shall Be Equitably Subordinated to the Extent of Injury Caused to Innocent Creditors

Although SPSO cannot be found to have breached the technical requirements of the

Credit Agreement, its conduct and that of its principal are nonetheless far from blameless.  Mr.

Ergen's carefully crafted and strategically deployed decision to acquire the LP Debt despite the

restrictions in the Credit Agreement and in furtherance, at least as of April 2013, of his strategic

objective to acquire LightSquared's assets for DISH supports equitable subordination of SPSO's

claim to the extent creditors have been injured by such conduct.  Moreover, as discussed in detail

below, SPSO's additional misconduct in connection with the delayed closing of hundreds of

millions of dollars of LP Debt trades – and its stunning lack of candor on this issue – provides an

additional basis for equitable subordination of the SPSO Claim.  Taken as a whole, SPSO's

conduct not only violates the covenant of good faith and fair dealing implied in all contracts but

also constitutes an affront to the duty of good faith imposed on those who participate in chapter

11 proceedings.

### A.    Applicable Law

Bankruptcy courts have broad equitable powers and have the ability to invoke equitable

principles to achieve fairness and justice in the reorganization process.  *See Momentum Mfg.*

*Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir.

1994); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title"); *see also Law v. Siegel*, 134

S. Ct. 1188, 1195 (2014) (a bankruptcy court has statutory authority to "issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code

(quoting 11 U.S.C. § 105(a)), but the bankruptcy court's equitable powers, including the power

to impose sanctions, must be "exercised within the confines of the Bankruptcy Code" (internal

quotations and citations omitted)).  The doctrine of equitable subordination, codified in section

510(c) of the Bankruptcy Code, is one such equitable power that a bankruptcy court may employ

to rearrange the priorities of creditors' interests and to place all or part of a wrongdoer's claim in

an inferior status, in order to achieve a just result in the reorganization of a debtor.

The equitable subordination doctrine empowers a bankruptcy court to consider whether,

"notwithstanding the apparent legal validity of a particular claim, the conduct of the claimant in

relation to other creditors is or was such that it would be unjust or unfair to permit the claimant

to share *pro rata* with the other claimants of equal status." *In re Adler, Coleman Clearing Corp.*,

277 B.R. 520, 563 (S.D.N.Y. 2002) (Gerber, J.) ("*Adler*") (citing *80 Nassau Assocs. v. Crossland*

*Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 837 (Bankr. S.D.N.Y. 1994) (Bernstein,

C.J.) ("*80 Nassau Assocs.*")); *In re Enron Corp.*, 333 B.R. 205, 221 (Bankr. S.D.N.Y. 2005)

(Gonzalez, J.) ("*In re Enron*") ("a bankruptcy court can subordinate any claim held by a creditor

found to have engaged in inequitable conduct to achieve a 'just' result for the debtor's estate").

First articulated in the seminal case of *Pepper v. Litton*, 308 U.S. 295 (1939), the doctrine itself

empowers the court to look beyond the apparent facial validity of a claim and evaluate the

conduct giving rise to the claim.

The test for equitable subordination was originally articulated in *Benjamin v. Diamond*

*(In re Mobile Steel Corp.)*, 563 F. 2d 692 (5th Cir. 1977) ("*Mobile Steel*"), and has since been

adopted by Courts in the Southern District of New York.  *See 80 Nassau Assocs.*, 277 B.R. at

563; *Adler*, 277 B.R. at 564; *In re Enron*, 333 B.R. at 217; *ABF Capital Mgmt. v. Kidder,*

*Peabody & Co. (In re Granite Partners)*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (Bernstein,

C.J.) ("*Granite Partners*").  As such, in order for this Court to exercise its power of equitable

subordination, three conditions must be satisfied: (i) "[t]he claimant must have engaged in some

type of inequitable conduct;" (ii) "[t]he misconduct must have resulted in injury to the creditors

of the bankrupt or conferred an unfair advantage on the claimant;" and (iii) "[e]quitable

subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act."

*Mobile Steel*, 563 F.2d at 700; *80 Nassau Assocs.*, 277 B.R. at 563; *Granite Partners*, 210 B.R. at

514.[152]

In determining whether these three conditions are satisfied, *Mobile Steel* instructs the

Court to be mindful of three principles.  First, inequitable conduct directed against the debtor or

its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was

related to the acquisition or assertion of that claim.[153]  *Mobile Steel*, 563 B.R. at 700-01; *see also*

*Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228,

234 (3d Cir. 2003), *cert. denied*, 540 U.S. 825 (2003). ("*Papercraft*")[154] ("The inequitable

conduct may arise out of any unfair act by the creditor as long as the conduct affects the

bankruptcy results of other creditors").  Second, a claim or claims should be subordinated to the

extent (and only to the extent) necessary to offset the harm which the debtor and its creditors

suffered on account of the inequitable conduct.  *Id.*  And third, an objection resting on equitable

grounds must contain some substantial factual basis to support its allegation of impropriety.  *Id.*

---

[152]    Although the second prong of the *Mobile Steel* test is stated in the disjunctive, the better view (and the one followed by courts in this District) is that injury must be shown; and "unfair" advantage to the claimant, in the absence of injury to creditors, is not sufficient.  *See Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 388 (Bankr. S.D.N.Y. 2007) (Gropper, J.); *see also In re Mr. R's Prepared Foods, Inc.* 251 B.R. 24, 29 (Bankr. D. Ct. 2000) ("In the [Second Circuit], the second requirement for equitable subordination involves a conjunctive test, requiring a showing of both unfair advantage to one creditor and harm to the debtor or its other creditors." (citing *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 611 (2d Cir. 1983) (grammatical changes in original)); *In re Vermont Electric Generation & Transmission Cooperative, Inc. v. Rural Utility Serv., U.S. Dep't of Agric.*, 240 B.R. 476, 485 (Bankr. D. Vt. 1999).

[153]    This Decision reflects a disposition of the Complaints asserted by the Debtors and Harbinger in the Adversary Proceeding; SPSO's conduct in these cases which is unrelated to claim acquisition is the subject of objections asserted in connection with the Debtors' Third Amended Joint Plan of Reorganization.

[154]    For ease of comprehension and unless otherwise noted, all references to *Papercraft* are to the Third Circuit's opinion, 323 F.3d 228 (3d Cir. 2003), *cert. denied*, 540 U.S. 825 (2003).

### 1.    Mobile Steel Prong I: Inequitable Conduct

Prong I of the *Mobile Steel* tests requires a showing that the claimant engaged in some type of inequitable conduct.  Inequitable conduct is not limited to fraud or breach of contract, rather, it includes even lawful conduct that shocks one's good conscience.  As Judge Bernstein noted in *80 Nassau Assocs.*, inequitable conduct means, among other things,

> a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct."

169 B.R. at 837 (quoting *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985)) (other citations omitted); *In re Lois/USA, Inc.*, 264 B.R. 69, 134 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("*Lois/USA*"); *Adler*, 277 B.R. at 663-564.  Traditionally, equitable subordination was inapplicable to ordinary creditors (as opposed to insiders), but it is now well-settled that the doctrine applies to general creditors or "non-insiders," though the circumstances warranting equitable subordination of a non-insider's claim arise less frequently because the opportunities for abuses triggering equitable subordination tend to be more readily available to insiders.  *See Lois/USA*, 264 B.R. at 134 (citing *80 Nassau Assocs.*, 169 B.R. at 838) (other citations omitted).

In order to identify the precise type of conduct supporting equitable subordination of a non-insider's claim, some courts have applied a heightened standard of wrongdoing, the majority requiring conduct that is "gross and egregious." *80 Nassau Assocs.*, 169 B.R. at 838 (citing *Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 119 (E.D. Pa. 1993)); *Bank of New Richmond v. Production Credit Ass'n (In re Osborne)*, 42 B.R. 988, 997 (W.D. Wisc. 1984).  However, courts in this District have held that there is no different or heightened standard by which to judge a non-insider's conduct, though there may be fewer traditional grounds available because neither undercapitalization nor breach of fiduciary duty

applies to the conduct of a non-insider.  *See 80 Nassau Assocs.*, 169 B.R. at 839.  Unless the non-insider has dominated or controlled the debtor to gain an unfair advantage, the type of inequitable conduct that justifies subordination of a non-insider's claim is "breach of an existing, legally recognized duty arising under contract, tort or other area of the law." *Id.* at 838; *accord Lois/USA*, 264 B.R. at 136; *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 44 (Bankr. E.D.N.Y. 2006).

        In commercial cases, the proponent of equitable subordination must demonstrate, for example, "a substantial breach of contract and advantage-taking by the creditor." *80 Nassau Assocs.*, 169 B.R. at 838 (citations omitted); *accord Lois/USA*, 264 B.R. at 136.  Where a proponent is able to establish inequitable conduct in connection with contractual obligations, courts have granted equitable subordination.  *See Developmental Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 804-05 (Bankr. S.D. Fl. 2000) (holding that creditor's creation of a scheme to circumvent contractual obligations, including negative covenants in the loan documents, which provided it with an unfair advantage warranted equitable subordination of its allowed claim).

        In the absence of a contractual breach, the proponent must demonstrate "fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity." *80 Nassau Assocs.*, 169 B.R. at 838 (citations omitted); *accord Lois/USA*, 264 B.R. at 136.  A violation of the implied covenant of good faith and fair dealing may provide grounds for equitable subordination.  *See Lois/USA*, 264 B.R. at 136 & n.167 (declining to make a substantive determination with respect to the extent to which a claim for violation of the implied covenant of good faith and fair dealing would support equitable subordination pending further development of the facts, but noting that, if proven, such conduct may justify equitable

subordination); *see also In re Enron*, 333 B.R. at 220 (holding that section 510(c) of the

Bankruptcy Code affords the court discretion when considering subordination of claims based on

common law concepts of the equitable doctrine, and stating that "the bankruptcy court has the

[equitable] power to sift the circumstances surrounding any claim to see that injustice or

unfairness is not done in administration of the bankrupt estate") (quoting *Pepper v. Litton*, 308

U.S. at 305) (grammatical changes in original)).  Accordingly, creditor misconduct in connection

with the chapter 11 process itself – irrespective of applicable non-bankruptcy law – provides an

appropriate predicate for equitable subordination of such creditor's claim.

### 2. Mobile Steel Prong II: Injury

Once inequitable conduct has been found, the Court must next determine whether the

claimant's conduct caused injury to the debtor or its creditors, or resulted in an unfair advantage

to the claimant.  *Mobile Steel*, 563 F.2d at 700-01; *In re Vargas Enterprises, Inc.* 440 B.R. 224,

240 (S.D.N.Y. 2010) (Sullivan, J.).  For a creditor to have achieved an unfair advantage as

required under the *Mobile Steel* test, there must have been a benefit to the creditor.  In turn, for

equitable subordination to be warranted, such a benefit, or unfair advantage, must have resulted

in an injury to the debtor or its creditors.  Without injury, there would be no reason to equitably

subordinate the claim.  *See 9281 Shore Road Owners Corp. v. Seminole Realty Co.*, 187 B.R.

837, 853-854 (E.D.N.Y. 1995); *see also Nisselson v. Softbank AM Corp. (In re MarketXT*

*Holdings Corp.)*, 361 B.R. 369, 388 (Bankr. S.D.N.Y. 2007) (Gropper, J.) (denying non-insider

creditor's motion to dismiss, finding that the complaint raised core equitable subordination issues

that were sufficient to state a claim under the *Mobile Steel* test that the creditor "engaged in (x)

some type of inequitable conduct that (y) resulted in injury to other creditors *and* an unfair

advantage to itself" (emphasis added)).

Equitable subordination requires that a party prove unfair advantage and injury to creditors because subordination is a remedial measure designed to offset the harm resulting from the inequitable conduct; it is not penal in nature. *See Mobile Steel*, 563 F.2d at 700 ("a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct").  In calculating the extent to which a claim should be subordinated, the bankruptcy court should "attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination." *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, Civil Action No. 00-2180, 2002 WL 34702177 at *3 (W.D. Pa. Feb. 20, 2002). While the harm and amount of injury should be based upon the supportive evidence of the record, *id*., the remedy of equitable subordination should remain flexible to deal with the inequitable conduct at issue.  As the court noted in *In re Teltronics Servs., Inc.*:

> The remedy of equitable subordination must remain sufficiently flexible to deal with manifest injustice resulting from the violation of the rules of fair play . . . where ingenuity spawns unprecedented vagaries of unfairness, bankruptcy courts should not decline to recognize their marks, nor hesitate to turn the twilight for offending claimants into a new dawn for other creditors.

29 B.R. 139, 172 (Bankr. E.D.N.Y. 1983).

Because equitable subordination is remedial rather than punitive in nature, the extent of equitable subordination of a claim is not related to the amount paid for the claim by the offending claimant.  The purpose of equitable subordination is to protect creditors against unfairness and to restore creditors to the position that they would have been in if the misconduct

did not occur. [155]  As such, there is no justification for linking equitable subordination of a claim

to the amount the creditor paid for the claim or the profit the creditor received or may receive

from such purchase; if the injury sustained by the estate and other creditors is greater, the

equitable subordination should be greater.  Conversely, if the injury to creditors is less than the

profit realized by the offending creditor, the extent of equitable subordination should be less.

Simply put, and contrary to *Papercraft*, there is no nexus between the amount a creditor pays for

its claim and the amount of injury sustained by other creditors of the estate as a result of the

creditor's misconduct.  Indeed, capping the recovery on a creditor's claim at the amount it paid

for the claim is inconsistent with the notion that equitable subordination is remedial in nature.[156]

Rather, a court should engage in an evaluation of the harm that the estate's other creditors

suffered as a result of the creditor's misconduct based upon the supportive evidence of the

record.

To that end, *Papercraft* identifies three categories of economic harm that provide a useful

template for determining the extent of equitable subordination: (1) quantifiable monetary harm

that results from delay; (2) harm that results from uncertainty; and (3) harm that results from

---

[155]    As this Court made clear in its Decision on the Motions to Dismiss, section 510(c) of the Bankruptcy Code does not provide for the subordination of a claim to an equity interest.  *See, e.g., Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 504 (Bankr. W.D. Pa. 2007) (Section 510(c) only "authorizes the subordination of *claims to other claims or interests to other interests* but its language does not extend to treatment of interests vis-à-vis claims") (citations omitted) (emphasis in original); *Town & Country Corp. v. Hare & Co. (In re Town & Country Corp.)*, 2000 Bankr. LEXIS 1755 at *16-17 (1st Cir. B.A.P. 2000) (Section 510(c) is designed to "deal with equitable subordination of claims to other claims or interest to other interests . . . . The Panel will not import some other interpretation to § 510(c) when its language is clear and unambiguous on its face."); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 836-837 (Bankr. S.D.N.Y. 1994) (Section 510(c) "empowers the Bankruptcy Court, under 'principles of equitable subordination,' to subordinate, for purposes of distribution, claims to other claims, and interests to other interests...."); 4 COLLIER ON BANKRUPTCY ¶ 510.05 at 510-17 (16th ed. 2013) ("Under subsection (c)(1), claims may be subordinated to claims, and interests may be subordinated to interests, but claims may not be subordinated to interests.").  This is so because equitable subordination of debt to equity would constitute a penalty, not a remedy, as there is nothing equitable about allowing a debtor to evade a valid obligation enforceable under applicable law.

[156]    Linking equitable subordination (or other bankruptcy rights and remedies) to the amount paid for a claim in the secondary market opens a Pandora's Box of sizable proportions.

delay that can be measured by professional fees and administrative expenses incurred by the estate as a result of the litigation.  *Papercraft*, 323 F.3d at 232.

The facts of *Papercraft* (a ten-year litigation saga that resulted in a suite of eight decisions) are instructive.  Citicorp Venture Capital ("CVC"), an insider and fiduciary of the debtor, Papercraft, attempted to take control of Papercraft's assets and obtain a significant profit at the expense of other creditors by secretly purchasing claims against Papercraft for a deeply discounted amount and then objecting to the confirmation of a plan of reorganization proposed by the debtor, in favor of a competing plan favoring CVC.  *Id.* at 231-232 (citing *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, 165 B.R. 980 (Bankr. W.D. Pa. 1994)). Papercraft's unsecured creditors' committee filed a motion for summary judgment seeking to limit the allowance of claims held by CVC.  *Id.*  The bankruptcy court issued a Memorandum Opinion and Order, finding that the purchases at issue were all found to have occurred during the seven month period between the time that debtor filed its plan of reorganization and the time it filed its disclosure statement, and therefore, CVC's purchases at a discount, without disclosure, while an insider, constituted breaches of CVC's fiduciary duty to Papercraft.  *Id.* at 231 (citing *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, 187 B.R. 486, at 498-99 (Bankr. W.D. Pa. 1995)). Accordingly, the bankruptcy court limited CVC's allowed claim and distribution in the plan of reorganization to the purchase price of the claim.  *Id*.

After a subsequent trial on the issue of equitable subordination of CVC's claim, the court withdrew and vacated its prior decision, finding that CVC breached its fiduciary duty to debtor as an insider for failing to disclose its identity in purchasing the claims and, as an equitable subordination remedy, limiting CVC's claim to the purchase price of the claim.  *Id.* at 231; *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, 187 B.R. 486.  But the bankruptcy court

declined to equitably subordinate CVC's claim, holding that further subordination of CVC's thus-limited claim pursuant to the principles of equitable subordination was not appropriate because the bankruptcy court was already limiting CVC's allowed claim to the amount it paid for such claim. *Papercraft*, 323 F.3d at 231 (citing *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, 187 B.R. at 501-502).

The parties then cross-appealed, and, on appeal, the district court affirmed the bankruptcy court's factual findings that CVC acted inequitably and caused injury to Papercraft and its creditors and agreed with the bankruptcy court's finding that CVC's claim should be limited to the amount it paid for such claim so as to eliminate any potential profit. *Papercraft*, 323 F.3d at 232 (citing *In re Papercraft Corp. v. Comm. of Creditors Holding Unsecured Claims*, 211 B.R. 813, 827 (W.D. Pa. 1997)). The district court reversed the bankruptcy court on the issue of further subordination and held that any subordination beyond the limitation of CVC's recovery to the amount paid for such claims should be supported by factual findings and reconciled with principles of equity. Accordingly, the district court remanded the case to the bankruptcy court for a further finding on the extent to which CVC's limited allowed claim should be equitably subordinated. *Papercraft*, 323 F.3d at 232 (citing *In re Papercraft Corp. v. Comm. of Creditors Holding Unsecured Claims*, 211 B.R. at 827).

On remand, the bankruptcy court found that CVC's recovery would be further subordinated for (i) additional administrative expenses incurred during the delay caused by CVC, (ii) interest and dividends lost by creditors during the delay, and (iii) professional fees and expenses incurred and/or paid by the estate. *Papercraft*, 323 F.3d at 232 (citing *In re Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, 247 B.R. 625, 628 (Bankr. W.D. Pa. 2002)).

Additional appeals ensued, and the district court affirmed the bankruptcy court's

decision, but the court reduced the lost interest component of the subordinated claim. *In re*

*Papercraft Corp. v. Citicorp Venture Capital, Ltd.*, Civil Action No. 00-2180, 2002 WL

34702177 (W.D. Pa. Feb. 20, 2002). Ultimately, the Third Circuit upheld the additional

subordination of CVC's claim for attorneys' fees, reasoning that the bankruptcy court did not

award a monetary judgment for attorneys' fees to penalize CVC, but rather, to return other

creditors to the position they would have been in had CVC not acted inequitably, and affirmed

the district court's reduction of the lost interest component of CVC's subordinated claim.

*Papercraft*, 323 F.3d at 234.

In determining the amount of harm, the bankruptcy court in *Papercraft* explained that it

need not arrive at a figure with "precise accuracy" and that any difficulty in precisely quantifying

the harm should not redound to the benefit of the wrongdoer. *In re Papercraft Corp. v. Citicorp*

*Venture Capital, Ltd.*, Civil Action No. 00-2180, 2002 WL 34702177 at *9-10 (citing *In re*

*Papercraft Corp.*, 247 B.R. at 630).

### 3.    Mobile Steel Prong III: Consistency with the Bankruptcy Code

The third prong of the *Mobile Steel* test acknowledges that equitable subordination cannot

be used to alter the statutory scheme imposed by bankruptcy law. Accordingly, while a

bankruptcy court can apply the equitable doctrine at its discretion, its power to subordinate an

allowed claim is not boundless and courts cannot use equitable principles to disregard

unambiguous statutory language of the Bankruptcy Code. *In re Enron*, 333 B.R. at 218-19

(citing *United States v. Noland*, 517 U.S. 535, 543 (1996) (citations omitted)); *Law v. Siegel*, 134

S. Ct. 1188, 1195 (2014).

The application of the third prong of the *Mobile Steel* test ensures that the "full breadth of

the remedy of equitable subordination is available while ensuring that its reach does not violate

any provision of the Bankruptcy Code or become punitive as opposed to remedial." *In re Enron*, 333 B.R. at 219. The requirement that subordination be consistent with bankruptcy law comes into play only after the Court has concluded that the first two prongs have been satisfied. *80 Nassau Assocs.*, 169 B.R. at 841. By virtue of the codification of the doctrine in section 510(c) of the Code, the third prong of the *Mobile Steel* doctrine warrants little attention.

## B.    Mobile Steel Prong I: SPSO's Inequitable Conduct

### 1.    Breach of the Implied Covenant of Good Faith and Fair Dealing

As the Court has found, Mr. Ergen's acquisition of LP Debt through SPSO violated the spirit and purpose of the Credit Agreement restrictions designed to prevent competitors from purchasing LP Debt and breached the Credit Agreement's implied covenant of good faith and fair dealing. This Court has held that a violation of the implied covenant of good faith and fair dealing may provide grounds for equitable subordination. *See Lois/USA*, 264 B.R. at 136, n.167 (declining to make a substantive determination with respect to the extent to which a claim for violation of the implied covenant of good faith and fair dealing would support equitable subordination pending further development of the facts, but noting that if proven, such conduct may justify equitable subordination). Although many aspects of SPSO's conduct are, as has been suggested, "perfectly lawful"[157] – including making purchases anonymously, acquiring a blocking position, and making an unsolicited cash bid for distressed assets – its purchase of LP Debt in order to preserve a strategic option for the benefit of DISH, a Disqualified Company, violated the spirit of the Credit Agreement's restrictions on competitors owning LP Debt. Such conduct, as described more fully above, constitutes inequitable conduct sufficient to warrant equitable subordination of the SPSO Claim.

---

[157]    *See* Post-Trial Brief of Defendants SP Special Opportunities, LLC and Charles W. Ergen [Adv. Docket No. 142], pp. 7-8.

### 2. SPSO, Through the Conduct of Messrs. Kiser and Ketchum, Purposefully Delayed the Closing of LP Debt Trades

In addition to SPSO's inequitable conduct in acquiring the LP Debt, SPSO also engaged in inequitable conduct by effectively sidelining hundreds of millions of dollars of LP Debt during the weeks and months leading to the Court-sanctioned termination of exclusivity on July 15, 2013, all while SPSO, Mr. Ergen, and, eventually LBAC/DISH, fine-tuned their bid strategy. SPSO, through Mr. Ergen, did so by purposefully delaying the closing of LP Debt trades in the face of repeated demands to close and despite the ready availability of the funds necessary to close. Even if SPSO's acquisition of LP Debt was faultless, its intentional delay in closing its trades of LP Debt alone is sufficient to constitute the type of inequitable conduct necessary for the imposition of equitable subordination by the Court. The evidence of purposeful delay could not be more clear.

SPSO was formed by Mr. Ergen with an initial capital contribution of only ten dollars, and its operating agreement did not require additional capital contributions from Mr. Ergen as Managing Member.[158] Even though Sound Point knew that SPSO was funded with an insufficient amount of initial capital to buy a significant amount of LP Debt, Sound Point nevertheless traded for SPSO because Mr. Ketchum understood that SPSO was backstopped by Mr. Ergen.[159] The evidence establishes that, after Sound Point executed a trade for SPSO, the trade would be funded only very shortly before or on the closing date. At that time, Mr. Kiser would contact Mr. Ergen's asset manager, Bear Creek, and tell Bear Creek how much money was needed to close the trade, after which Mr. Ergen would then authorize the wire transfer and

---

[158]    PX0221 at LSQ-SPCD-000005553, 5561 ("[t]he Managing Member is entitled, but not required, to make additional contributions to the capital of the Company").

[159]    Jan. 15 Tr. (Ketchum) 18:8-21, 20:4-13; PX0023; PX0024; PX0046; PX0048; PX0052; PX0056; PX0058; PX0059; PX0074.

Bear Creek would liquidate investments to fund the transfer.[160]  Liquidity was not created by Mr.

Kiser immediately upon placing a trade; rather, as admitted by Mr. Kiser at Trial, only after

delaying for as long as possible on closing a trade were the funds for the purchase wired for

closing.[161]

Of the 25 trades entered into by SPSO for purchases of LP Debt, eighteen of them took

over two months to settle, and, of those eighteen trades, six took over four months to settle.[162]

By May 20, 2013, SPSO had contracted for, but had failed to settle, approximately $593,757,000

in face amount of LP Debt trades (and approximately $610,000,000 counting trades held by

brokers on that date) — more than 33 percent of the total outstanding LP Debt obligations—and

had kept open a number of trades that it had entered into as far back as December 12, 2012.[163]

Mr. Kiser explained the delays as stemming from the fact that he and Mr. Ergen were not

in any rush to close the trades of LP Debt; in their view, the trades "didn't need to be closed until

you absolutely had to," as "there wasn't an economic benefit to doing it."[164]  As Mr. Kiser

testified, Mr. Ergen "was getting a return on his capital and his investments.  So if he didn't have

to pay for it and he can make money on another end where his money was invested, that seemed

like a smart move."[165]  The documentary evidence on this point is to the contrary, as account

statements produced by Bear Creek indicate that Mr. Ergen earned a relatively low rate of

---

[160]    Mr. Ergen was the only person who could authorize the transfer of funds from his account at Bear Creek to Bal Harbour or SPSO for settlement of the LightSquared trades.  Jan. 10 Tr. (Kiser) 21:23-22:13, 58:7-12.

[161]    Jan. 10 Tr. (Kiser) (Q: Well, in fact, you didn't want to pay unless—you didn't want to pay until you absolutely had to, right?  A: That's right.  We were in no rush to close.  Q: You wanted to wait until the last possible minute?  A: Well, as I said before, there was no economic benefit.)

[162]    PX0859.

[163]    PX0859.

[164]    Jan. 10 Tr. (Kiser) 64:17-25 (stating that Mr. Ergen had his capital invested elsewhere and was making a return on money that would have been liquidated).

[165]    Jan. 10 Tr. (Kiser) 98:3-6.

interest on the funds in his trust accounts.[166]  In addition, there were economic penalties imposed

on SPSO for leaving LP Debt trades open for an extended period of time, including having to

forgo adequate protection payments;[167] this fact further undermines the "economic" explanation

advanced by Mr. Kiser to explain the delay.  Moreover, no evidence was introduced that either

Mr. Ergen or Mr. Kiser took the possibility of a penalty to SPSO into account in determining

(i) when to close unsettled trades or (ii) which of Mr. Ergen's assets to liquidate to pay for

SPSO's LP Debt trades, despite the fact that Messrs. Ergen and Kiser had been made aware of

how the adequate protection payments worked.[168]  Bear Creek, which independently selected

which of Mr. Ergen's assets would be liquidated to fund the trades, was not even made aware

that SPSO possibly would have to pay cost of carry fees and forego adequate protection

payments if the LP Debt trades were not closed by a certain date.[169]  In fact, there is no evidence

that any analysis at all was done by Mr. Ergen, Mr. Kiser, or Bear Creek to determine the return

on any of the assets in Mr. Ergen's personal trust to determine which assets to liquidate for

closing.  The "economic benefit" justification for delaying the closing of trades simply does not

pass muster.

---

[166]        PX0796-818.

[167]        If SPSO failed to close certain LP Debt trades within the closing date specified in the purchase agreement, it was charged a penalty "cost of carry fee" and in some instances had to forgo receiving a share of Adequate Protection Payments for the unsettled trade.  (*See Agreed Final Order (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties, and (C) Modifying Automatic Stay* [Bankr. Docket No. 136] at 18 (granting adequate protection for Lenders); Jan. 15, 2014 (Ketchum) 81:1-82:3; PX0493; DX104 at LSQ-SPCD-000000176 (imposing "AP Payment" and "cost of carry" fees from T+20 to settlement date); DX109 at LSQ-SPCD-000000285; PX0851 at SPSO-00000072; PX0650 at LSQ-SPCD-000000073.)

[168]        PX0258; PX0256; PX0259 (emails discussing adequate protection payments).

[169]        Roddy Dep. 86:5-87:3. Bear Creek selected assets for liquidation based on "which ones are the easiest to liquidate closest to the market value," and generally selected assets with low interest rates, consistent with the overall conservative nature of the Trust.  (Roddy Dep. 57:9-58:3, 58:20-22, 59:6-12, 69:7-11; Jan. 13 Tr. (Ergen) 168:4-14.)

Liquidity concerns were another purported reason for the delayed closing of the LP Debt trades, according to Mr. Kiser.[170]  At Trial, Mr. Kiser initially denied that liquidity reasons caused any delays, until he was reminded that he had testified otherwise at his deposition and then recalled giving that as an explanation.[171]  Asked if there was ever a time when Mr. Ergen lacked the liquidity to promptly close a trade, Mr. Kiser testified at Trial that, where Mr. Ergen may not have had "immediate funds available, [yes], that occurred."[172]  Mr. Kiser equivocated, however, when pressed as to whether he could identify any investments that Mr. Ergen would have needed to exit which would take longer than three days, saying that "it depended. . . . [Mr. Ergen] had things that were all over the gamut of types of investments. . . . [some] were a lot less liquid."[173]  Mr. Kiser's testimony on the liquidity issue lacks credibility; and even Mr. Ergen admitted that, as far as he knew, there was not a delay in closing because of any liquidity issues, stating that "I don't believe, other than several days, or perhaps a Friday where it didn't make economic sense to wire money, that there was [*sic*] any delays because of that reason."[174]  Bear Creek also confirmed that, after Mr. Ergen authorized a wire transfer from his personal trust, Bear Creek could make it available for transfer within several days.[175]  Mr. Ergen's account statements reflect that funds were liquidated on a rolling basis from the investments held by his personal trust, with hundreds of millions of dollars in cash sometimes sitting in Mr. Ergen's trust

---

[170]    Mr. Ketchum testified that it was his "understanding from [Mr]. Kiser that things had to be sold, cash had to be raised to settle those trades." Jan. 15 Tr. (Ketchum) 84:13-14.  When asked about the lengthy delays between the trade and settlement dates and whether all of these delays were because the money was not coming from the Ergen family office, Mr. Ketchum responded, "Correct." *Id.* 86:1-3.

[171]    Jan. 10 Tr. (Kiser) 128:24-129:13; 129:23-130:1.

[172]    Jan. 10 Tr. (Kiser) 129:23-130:6.

[173]    *Id.* 130:7-131:23.

[174]    Jan. 13 Tr. (Ergen) 159:13-19.

[175]    Roddy Dep. 66:12-67:14.  Around that time, Bear Creek managed between $626 million and likely $750 million dollars for Mr. Ergen.  (Roddy Dep. 71:11-18.)

account for several weeks before it was used to fund a trade.[176]  The evidence further shows that,

in at least one case, liquid funds were readily available, but Mr. Kiser instructed Bear Creek to

hold off on wiring funds.[177]  The alleged liquidity issue was clearly manufactured by Mr. Kiser;

and the lies to counterparties regarding liquidity were passed along by Mr. Ketchum, who was

often informed by Mr. Kiser that funds were "not available" to close a trade[178] and asked no

further questions.

Mr. Kiser and Mr. Ergen also blamed the delays in closing the SPSO LP Debt trades on

the need to complete "upstream" paperwork and on "false starts" from both the seller and the

SPSO sides of the trades.  Neither of these was a credible explanation for what the documentary

evidence clearly reveals was a concerted effort to delay on the part of Messrs. Kiser and Ergen.

Mr. Ergen testified that the variation in the dates between trading and closing an LP Debt trade

had to do with the upstream paperwork that had to be done to verify who the actual owners were,

which "was not that easy" and "could take anywhere from weeks to months."[179]  Because of this

time to "verify" and the need to have both documents and funding ready to close a trade, Mr.

Kiser testified that there were a lot of "false starts" that "went both ways."[180]  None of this

testimony was credible.

---

[176]    The account statements produced by Bear Creek reflect that, as of April 30, 2013, some $461 million held in the Trust account had been liquidated, and, as of May 31, 2013, approximately $207 million in liquid funds still remained in the Trust account.  (PX0810; PX0812.)

[177]    *See* PX0530 (Mr. Kiser instructing Bear Creek on May 20, 2013 to "[w]ait for the green light from me prior [to] sending. Obviously it's not going today so just check with me each morning.").  By that time, at least $207 million in assets which had been liquidated by Bear Creek in order to fund trades remained in the Trust account. (PX0812.)

[178]    Jan. 15 Tr. (Ketchum) 74:12-20 (testifying as to his understanding that trades that had been delayed for over a month or more could not be closed by Sound Point because the funds had not been sent by Mr. Ergen's family office, and Mr. Ketchum had been told that such trades could not close because the funds were "not available.").

[179]    Jan. 13 Tr. (Ergen) 62:17-63:6.

[180]    Jan. 10 Tr. (Kiser) 63:13-25.

The volume of emails admitted into evidence reveals that counterparties to the trades that had been held open for months were, in fact, ready and eager to close, and they became more frustrated as time went on.  Parties repeatedly reached out to Sound Point to settle trades, but often they could get little traction.  (*See*, *e.g.*, PX0319 (Sound Point e-mail on January 14, 2013, replying "[s]orry but we are not able to settle that one right now" in response to weekly inquiries from UBS seeking to close a trade); PX0364 (March 7, 2013 Sound Point email stating it would be able to settle "next week" in response to repeated inquiries since February 2013 regarding a December 2012 trade).)  In particular, Jefferies, the executing broker for the majority of the LP Debt trades, was pushed aside for months by Sound Point, which provided excuse after excuse for the failure to close numerous open trades.  In February 2013, Jefferies sent ongoing email and telephone requests to Sound Point to close multiple trades, with trade dates dating back as early as October 23, 2012.[181]  At that time, an employee of Mr. Ketchum's reminded him that "[w]e have been pushing Jefferies off for nearly 3 weeks."[182]  On April 23, 2013, Mr. Ketchum wrote to Mr. Kiser that "Kevin [of Sound Point] thinks we can hold [Jefferies] off on any payments until at least May 15" in connection with over $289 million in LP Debt trades that had not settled.[183]  After Jefferies followed up with Sound Point on April 25, 2013, seeking to close $88 million of open trades,[184] Mr. Ketchum inquired internally whether he could plausibly blame SPSO's delay on the "upstreams," but he was told by Sound Point personnel that the work had already been completed.[185]  Mr. Ketchum then emailed back and forth with a colleague about

---

[181]    PX0347; PX0859.

[182]    PX0347.

[183]    PX0458; PX0441; PX0859.

[184]    PX0466.

[185]    PX0466; Jan. 15 Tr. (Ketchum) 76:9-77:8.

which lie to use – whether he should tell the counterparty "that we are still doing legal work on

the upstreams," that "we are waiting for funding from our investor," or that "we are in the

process of exiting some other large positions we have to pay for this."  It was ultimately

determined that the colleague should use the latter excuse, together with the statement that Mr.

Ketchum "[has] spoken with Steve Sander (head of sales) [at Jefferies] about this."[186]  The need

to delay Jefferies was based on Mr. Ketchum's understanding from Mr. Kiser that SPSO did not

have capital available to fund the trade and, thus, Jefferies needed to be "put off" for a period of

time.[187]

As of May 9, 2013, SPSO had seven open trades with Jefferies, totaling approximately

$588 million in LP Debt trades dating back as far as January 2013.  Jefferies was imploring

Sound Point to close the trades.[188]  Mr. Sander of Jefferies appealed to Mr. Ketchum:  "this is a

big problem for me. I would like to come down and talk to you this afternoon around 4 or 5pm

mano a mano[.]  Is this possible?"  Mr. Ketchum replied that he was waiting for other "trades to

settle" (a lie) and that he had "already pushed extremely hard to get to where we are now in

terms of closing."[189]  None of the open trades closed for another several weeks.[190]

As he knew Mr. Ergen did not like to hold up funds which could be invested

elsewhere,[191] Mr. Kiser testified that he instructed Mr. Ketchum to prepare a schedule for him

---

[186]      PX0466; *see also* Jan. 15 Tr. (Ketchum) 76:20-78:7; PX0308 (Jefferies repeatedly inquiring whether funds
are available); PX0341 (Sound Point writing to Jefferies that they are "still waiting on the funds"); Jan. 10 Tr.
(Kiser) 63:15-20.

[187]      *Id.* 78:18-79:15.

[188]      PX0498.

[189]      PX0498.

[190]      PX0859.

[191]      *See, e.g.*, PX041 (March 26, 2012 email from Ketchum to Kiser in which Ketchum suggests setting up a
prime brokerage account at BNP to fund the trades and wiring $500,000 to open the account, to which Kiser replies

(continued...)

showing unsettled trades and expected settlement dates so that he could have the money available on those dates, in order to avoid the "back-and-forth" with counterparties who may not have been ready to close when the funds were made available.[192]  This testimony was not credible.  Mr. Ketchum also testified that proposed settlement dates for the unsettled trades were requested by Jefferies, and he tried to act as an intermediary between SPSO and Jeffries "an anxious counterparty who was trying to get trades settled."[193]  Mr. Ketchum stated that the "proposed settlement dates" in the schedule he emailed to Mr. Kiser on May 8, 2013, which were up to four months or more after the trade date, were suggested by Mr. Ketchum as a "compromise solution" in order to get the open Jefferies trades settled, and he proposed the schedule to Mr. Kiser before conveying such dates to Jefferies in order to see if a schedule of this kind was capable of execution by SPSO.[194]  While it is not clear whether such proposed dates were actually sent to Jefferies, Mr. Ketchum's testimony on this point was not credible.  The proposed settlement dates contained in the schedule emailed from Mr. Ketchum to Mr. Kiser on May 8, 2013 reflect not a prediction for liquidity planning purposes of when trades would be ready to close, but rather a gameplan for delaying the closing of the open trades for as long as possible.  In fact, in addition to this schedule, Sound Point had also prepared an analysis of the average days it took to settle an LP Debt trade with Jefferies after the trade date (69 days) and

---

"[i]t'll be a lot easier if we don't have to fund $$ until we have a trade to settle. . . [Ergen] won't be a big fan of just putting $$ out for opening an account.")

[192]    Jan. 10 Tr. (Kiser) 63:25-64:14 ("And it got to a point where I told Steve, hey, look, get me a list and tell me when these things will trade so that we can have the money available for them rather than doing this back-and-forth type of thing"); PX0495.

[193]    Jan. 15 Tr. (Ketchum) 123:14-124:17.

[194]    *Id.*, *see also id.* 132:8-15 ("my job was to find a date, propose a date to SPSO that I thought was reasonable in the context of closing distressed trades, obtain permission from SPSO, and in particular, Jason, to go back and offer those dates to Jefferies so that they could be mollified and feel that there was some sort of definition around when the trades would be closed.")

the average days after the industry-norm "contractual settlement date" of "T+20," or twenty days

after the trade date (38 days).[195]   There is no reason for Sound Point to have performed such an

analysis other than to provide support for its proposed further delays.  In fact, with the exception

of the Icahn trade, *all* of SPSO's trades failed to close before a T+20 contractual settlement

date.[196]

Astonishingly, Mr. Ketchum testified on direct examination that, even when the

counterparty to a trade was ready and eager to settle a trade, Mr. Kiser had instructed him to

delay the closing.  *See* Jan. 15 Tr. (Ketchum) 69:3-6 (Q: "Did you ever have a discussion with

Mr. Kiser in which you and Mr. Kiser agreed that you should delay the closing of the trade?"  A:

"Yes."); *see also* PX0204 (Sound Point employee emailing Mr. Ketchum on June 4, 2012

regarding a LightSquared trade entered into on May 3, 2012 and stating, "Jefferies is looking to

settle the other two trades.  Do you want to?  Or delay?").  Mr. Kiser admitted that even when

directly informed that counterparties were ready to close, he sought to defer settlement as long as

possible.[197]  This goal was evident in much of the documentary evidence submitted.  (*See*, *e.g.*,

PX0495 (Mr. Ketchum to Mr. Kiser "We need to close our March 25 trade before month end, for

example May 25 or so, to stave off Jefferies"); PX0466).

---

[195]     PX0493.

[196]     On March 17, 2014, during closing arguments in the Adversary Proceeding, counsel for SPSO and Mr. Ergen argued, for the first time, that the delay in closing SPSO's LP Debt trades during the period between March and June 2013 was caused by a "moratorium" imposed by Jefferies as the trade intermediary.  Counsel represented that this "moratorium" was reflected in a document in the existing record.  After the hearing, counsel filed a letter to the Court which attached emails reflecting the purported "moratorium," none of which had been previously produced or were otherwise in the record.  On March 21, 2014, counsel for the Plaintiffs filed a supplement to their previously-filed motion for sanctions, seeking additional sanctions in connection with, among other "discovery misconduct," SPSO's failure to have produced the "moratorium" document.  [Adv. Docket No. 148].  The sanctions motions remain *sub judice*.

[197]     Jan. 10 Tr. (Kiser) 64:5-25, 97:23-98:6.

The time period in which the foregoing delays occurred was a crucial time in the

Debtors' chapter 11 cases.  The Exclusivity Stipulation, approved by this Court in February

2013, extended the Debtors' exclusive periods to file a plan of reorganization to July 15, 2013.

If the parties did not reach a deal for a consensual plan by June 3, 2013, preparatory work for a

sale process for all or substantially all of the Debtors' assets was required to begin, with the

formal sale process commencing on July 15, 2013.[198]  In the spring of 2013, LightSquared and

its stakeholders – in particular, significant holders of LP Debt – were involved in negotiations

with respect to terms for a consensual plan of reorganization.[199]  Beginning in late May 2013 and

continuing thereafter, Moelis also contacted over 90 parties to discuss a joint venture or strategic

partnership.[200]  On June 7, 2013, the Debtors received Court approval to enter into and perform

under an engagement letter with Jefferies in connection with securing potential exit financing for

the Debtors,[201] after which a "road show" kicked off to seek to raise capital.  During this period,

SPSO continued to amass large quantities of LP Debt and intentionally delayed the closing of

large blocks of trades, all without formally revealing its identity.  As a result, all of these parallel

movements forward by the parties were stymied.  LightSquared has alleged that it was not sure

which lenders to negotiate with and whether the Ad Hoc Secured Group would be able to carry a

---

[198]    PX0852 at Ex. A.

[199]    On April 4, 2013, the Ad Hoc Secured Group submitted a proposed plan term sheet to LightSquared and indicated their willingness to commence discussions with respect thereto.  (PX0410.)  The term sheet contemplated a plan in which all creditor and preferred equity classes would receive a full recovery and LightSquared would emerge from bankruptcy with its spectrum assets intact.  (*Id.* at HARBAP00015399-400; *see also* Jan. 17 Tr. (Hootnick) 21:24-22:24.)  Also, on May 15, 2013—the same day that LBAC submitted its bid for LightSquared's assets—the parties exchanged a revised term sheet for a consensual plan of negotiation.  (PX0505; DX335; DX174.)  The revised term sheet provided for an infusion of new capital to be obtained by Harbinger and/or LightSquared, and reorganization, such that a sale of LightSquared's assets would be avoided.  (PX0505 at HARBAP00005107-13.)  A term sheet exchanged with the Ad Hoc Secured Group on May 24, 2013 envisioned that SPSO would receive full cash recovery while non-SPSO lenders would receive cash recovery and warrants.  (PX0561.)

[200]    Jan. 17 Tr. (Hootnick) 28:6-16.

[201]    Bankr. Docket No. 667.

164

class such that it could enter into a binding commitment with respect to a plan, such that any hope of achieving a consensual plan during this period was derailed.  Without spending the cash necessary to close hundreds of millions of dollars of open trades and by intentionally leaving them in limbo for three to four months or longer, Mr. Ergen arrogated to himself the power to control the forward motion or lack thereof of the bankruptcy cases beginning in April 2013.

Indeed, the Exclusivity Stipulation provided that it could be terminated if the Ad Hoc Secured Group, collectively, ceased to be the largest holder of LP Debt.  On June 13, 2013, SPSO "joined" the Ad Hoc Secured Group, specifically to ensure that the termination conditions contained in Paragraph 15 of the stipulation would not be triggered.[202]  Within days of nominally joining the Ad Hoc Secured Group, several hundreds of millions of dollars in "hung" trades just happened to close, making SPSO the controlling member of the group by virtue of the size of its holdings.[203]  SPSO's decision to join the Ad Hoc Secured Group was undoubtedly made for the strategic purpose of controlling the sale process for the Debtors' assets, with DISH as the buyer, and the fact that it rendered the negotiated and Court-ordered exclusive period meaningless was ignored.  Mr. Ergen understood that the Exclusivity Stipulation would terminate in July,[204] and enabling the stipulation to remain in place until then furthered his interest of keeping the status

---

[202]   PX0858 (Stipulation by SP Special Opportunities, LLC in Aid of Discovery in Connection with Emergency Motion of the Ad Hoc Secured Group of LightSquared LP Lenders to Enforce This Court's Order Pursuant to 11 U.S.C. § 1121(d) Further Extending LightSquared's Exclusive Periods to File a Plan of Reorganization and to Solicit Acceptances Thereof, dated July 3, 2013) at ¶ 13.  SPSO's counsel also stated in closing arguments of the Trial that SPSO joined the Ad Hoc Secured Group solely for the purpose of maintaining the "lender protections" of the Exclusivity Stipulation.  (Mar. 17 Tr. (Strickland) 189:12-191:4 ("[SPSO] was very much focused on those lender protections, and that's why it joined the group."))

[203]   PX0649 at L2AP0008732; PX0625; PX0859.

[204]   Jan. 13 Tr. (Ergen) 66:9-15 (". . . and then there also was the fact that the bankruptcy was coming up in July.  And if I was interested, I would have to . . . – either you're going to make a bid there or somebody else was going to.  And while I didn't know in that time frame that I would make a bid, I knew that it would take time to prepare.").  The Court understands Mr. Ergen's mention of the "bankruptcy coming up in July" to refer to the stipulated date for termination of the Debtors' exclusive periods to file a plan, which was approaching on July 15, 2013.

quo until the DISH Board had authorized DISH to step into the shoes of LBAC and pursue the

LBAC Bid.  While a creditor who is not an insider is not a fiduciary, a creditor nevertheless does

not have the unfettered right to engage in such purposeful obstruction of the process.  SPSO

failed to act in a way that is consistent with the most basic concepts of good faith that are fairly

to be expected of chapter 11 creditors, especially those who voluntarily join the capital structure

of a debtor well after distress has set in.

As SPSO vehemently maintains, many aspects of SPSO's conduct are entirely acceptable

(albeit aggressive) and do not provide grounds for equitable subordination.  Such lawful and

acceptable conduct includes: buying distressed debt; buying distressed debt anonymously;

buying distressed debt anonymously at prices close to par; acquiring a blocking position in a

class of debt; and making an unsolicited bid for assets of a debtor.  Nothing in the Court's

decision should in any way alter such conduct in the distressed debt marketplace.  The

Bankruptcy Code and the chapter 11 process tolerate and even contemplate self-interested and

aggressive creditor behavior.  Nevertheless, SPSO's conduct in acquiring the LP Debt and in

controlling the conduct of the chapter 11 case through purposeful delays in closing hundreds of

millions of dollars of LP Debt trades during a critical timeframe in these cases breaches the outer

limits of what can be tolerated.

While it is generally acceptable to obtain and deploy a blocking position to control the

vote of a class with respect to a proposed plan of reorganization, it is not acceptable to deploy a

blocking position to control the conduct of the case itself, to subvert the intended operation of a

court-approved exclusivity termination arrangement, and to prevent the Court from directing and

having visibility into events unfolding in the case.  In response to the allegations that they

purposefully sidelined hundreds of millions of dollars in debt and prevented the chapter 11 cases

from moving forward, SPSO and Mr. Ergen say "no harm, no foul," citing to the fact that there is no evidence that SPSO's conduct had any impact on plan negotiations in the spring and summer of 2013. But that is not true. Had there been clarity with respect to the ownership of LP Debt during that time period, the parties may have made substantial progress on a plan, and it is possible that the Debtors' exclusive periods could have been extended, which would have been a "game changer" in the course of the Debtors' cases.

### C.    Mobile Steel Prong II: SPSO's Conduct Harmed LightSquared's Creditors

Having acquired a controlling position in the LP Debt by the use of a special purpose vehicle whose special purpose was to achieve an end-run around the Credit Agreement, and then purposefully sidelining hundreds of millions of dollars of LP Debt while fine-tuning its acquisition strategy, SPSO has harmed the creditors of LightSquared. Having seized control of the class of LP Debt, SPSO then seized control of the case itself, rendering meaningless the heavily negotiated and Court-ordered process leading to the termination of exclusivity on July 15, 2013. SPSO's inequitable conduct has inflicted as yet unquantified harm on LightSquared's creditors as a result of the delay, uncertainty, and increased administrative costs suffered by these estates. While various numbers and calculations of harm have been suggested by Plaintiffs and by the Ad Hoc Secured Group, quantification of the amount of harm is beyond the agreed-upon scope of this first phase of the Adversary Proceeding and will be determined after further proceedings before this Court.[205]

---

[205] The third prong of the test for equitable subordination set forth in *Mobile Steel* test states that equitable subordination cannot be used to alter the statutory scheme imposed by bankruptcy law. As equitable subordination has since been codified in section 510(c) of the Bankruptcy Code, the Court need not address the third prong of the *Mobile Steel* separately in this Decision.

## CONCLUSION

SPSO has gone to great lengths to identify the many things it did that are "perfectly lawful" and just plain "smart" and warns, ominously, that any finding of liability would roil the debt markets. But its otherwise lawful pursuit of aggressive and profitable distressed debt transactions does not entitle it to do what it did to the LightSquared estates and cases. As Mr. Ergen so colorfully explained during Trial, "[y]ou can live in a bubble if you want to . . . and probably never get any disease. But you go play in the mud and the dirt and you probably aren't going to get disease either because you get immune to it. So you pick your poison and I think we choose to go play in the mud."[206] Here, playing in the mud involved end-running the LightSquared Credit Agreement and then purposefully holding in limbo hundreds of millions of dollars of debt trades and undermining the ability of the Debtors, the constituents, and even the Court to conduct the case. Determining the amount of harm that has occurred to these estates as a result of SPSO's conduct, while difficult, will not be impossible and the SPSO Claim will be subordinated accordingly.

For all of the foregoing reasons, the Court finds that the SPSO Claim shall be equitably subordinated in an amount to be determined after further proceedings before this Court.

IT IS SO ORDERED.

Dated: June 10, 2014
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE

---

[206]   Jan. 13 Tr. (Ergen) 199:23-200:4 (video played at Trial).