Rachel C. Strickland
Tariq Mundiya
James C. Dugan
Matthew S. Freimuth
Alexander L. Cheney
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LIGHTSQUARED INC., *ET AL.*, | : | Case No. 12-12080 (SCC) |
| Debtors. | : | Jointly Administered |

------------------------------------------------------------- x   Adv. Proc. No. 13-01390 (SCC)

| | |
|---|---|
| LIGHTSQUARED LP, LIGHTSQUARED INC., LIGHTSQUARED INVESTORS HOLDINGS INC., TMI COMMUNICATIONS DELAWARE LIMITED PARTNERSHIP, LIGHTSQUARED GP INC., ATC TECHNOLOGIES, LLC, LIGHTSQUARED CORP., LIGHTSQUARED INC. OF VIRGINIA, LIGHTSQUARED SUBSIDIARY LLC, SKYTERRA HOLDINGS (CANADA) INC., AND SKYTERRA (CANADA) INC., | : : : : : : |
| Plaintiff-Intervenors, | : |
| vs. | : |
| SP SPECIAL OPPORTUNITIES, LLC, DISH NETWORK CORPORATION, ECHOSTAR CORPORATION, AND CHARLES W. ERGEN, | : : |
| Defendants. | : |

------------------------------------------------------------- x

**DEFENDANTS SP SPECIAL OPPORTUNITIES, LLC AND CHARLES W. ERGEN'S**
**OPPOSITION TO HARBINGER CAPITAL PARTNERS, LLC'S**
**MOTION FOR LEAVE TO APPEAL AND TO EXPEDITE APPEAL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND .....................................................................................................3

I.      The Debtors File For Bankruptcy ...............................................................3

II.     The Debtors, Harbinger, And The Ad Hoc Group Disagree On How The Debtors
        Should Exit Bankruptcy ..............................................................................3

III.    Harbinger Initiates This Adversary Proceeding..........................................5

IV.     The March Plan Confirmation Hearing .......................................................6

V.      The Bankruptcy Court Reads Its Decisions From The Bench ...........................6

VI.     Harbinger Prepares To Sue The FCC .........................................................9

VII.    The Parties File Notices Of Appeal .........................................................10

ARGUMENT ........................................................................................................11

I.      Leave To Appeal Should Be Denied Because An Interlocutory Appeal Of The
        Issues Harbinger Identifies Is Not Warranted.................................................11

        A.     The Court's Holding Regarding Damages For Breach Of Contract Is Not
               Appropriate For Interlocutory Appeal. .................................................13

        B.     The Bankruptcy Court's Rejection Of Harbinger's And The Debtors' Contractual
               Disallowance Claim Does Not Warrant Interlocutory Review............................16

        C.     The Bankruptcy Court's Rejection Of Harbinger's And The Debtors' Equitable
               Disallowance Claim Does Not Warrant Interlocutory Review............................18

        D.     The Ten Other Issues For Which Harbinger Seeks Interlocutory Appeal Do Not
               Satisfy The Requirements For Leave To Appeal....................................21

        E.     Harbinger Has Not Shown Exceptional Circumstances Warranting Interlocutory
               Review. ...................................................................................22

II.     Harbinger's Appeal Does Not Require Expedited Treatment. .........................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),*
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..............................................................................19

*In re 127 John St. Assocs.,*
    No. M-47 (SHS), 2005 WL 911488 (S.D.N.Y. April 18, 2005) ......................................10

*In re 785 Partners LLC,*
    No. 11-13702 (SMB), 2012 WL 401497 (Bankr. S.D.N.Y. Feb. 7, 2012).......................17

*In re Britton,*
    288 B.R. 170 (Bankr. N.D.N.Y. 2002) .............................................................................17

*DeCarlo v. Archie Comic Publ'ns Inc.,*
    127 F. Supp. 2d 497 (S.D.N.Y. 2001) ..............................................................................15

*In re DPH Holdings Corp.,*
    468 B.R. 603 (S.D.N.Y. 2012)..........................................................................................14

*Ellsworth v. Myers (In re Cross Media Mktg.),*
    No. 07 CV 878 (GBD), 2007 WL 2743577 (S.D.N.Y. Sept. 19, 2007) ...........................12

*In re Enron Corp.,*
    06 Civ. 7828(SAS), 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007).....................13, 18, 19

*In re Enron Creditors Recovery Corp.,*
    410 B.R. 374 (S.D.N.Y. 2008)..........................................................................................13

*Ferreira* v. *Modell's Sporting Goods, Inc.,*
    No. 11 Civ. 2395 (DAB), 2013 WL 1344697 (S.D.N.Y. Mar. 28, 2013) ........................11

*Fox v. Bank Mandiri (In re Perry H. Koplik & Sons, Inc.),*
    377 B.R. 69 (S.D.N.Y. 2007)............................................................................................18

*Futter v. Duffy (In re Futter Lumber Corp.),*
    473 B.R. 20 (E.D.N.Y. 2012) ...........................................................................................21

*Gen. Elec. Cap. Corp. v. Armadora, S.A.,*
    37 F.3d 41 (2d Cir. 1994) .................................................................................................15

*Grede v. Bank of N.Y.,*
    No. 08 C 2582, 2009 U.S. Dist. LEXIS 6184 (N.D. Ill. Jan. 27, 2009)............................19

*Law v. Siegel,*
    134 S.Ct. 1188 (2014)................................................................................................20, 21

*Law Debenture Trust Co. of N.Y. v. Calpine (In re Calpine Corp.)*,
    356 B.R. 585 (S.D.N.Y. 2007).......................................................................................11

*LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*,
    287 F.R.D. 230 (S.D.N.Y. 2012) .................................................................................17

*LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*,
    185 F.3d 61 (2d Cir. 1999)...........................................................................................10

*Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd.*
    *(In re Lehman Bros. Holdings, Inc.)*,
    422 B.R. 403 (S.D.N.Y. 2009).....................................................................................12

*In re Manhattan Inv. Fund Ltd.*,
    288 B.R. 52 (S.D.N.Y. 2002)..................................................................................11, 12

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) .........................................................................19

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988).....................................................................................................21

*Picard v. Madoff*,
    464 B.R. 578 (S.D.N.Y. 2011)................................................................................12, 13

*In re Poseidon Pool & Spa Recreational, Inc.*,
    443 B.R. 271 (E.D.N.Y. 2010) .....................................................................................12

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*,
    914 F. Supp. 2d 480 (S.D.N.Y. 2012)..........................................................................17

*Shimer v. Fugazy (In re Fugazy)*,
    982 F.2d 769 (2d Cir. 1992).........................................................................................10

*SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*,
    No. 06-CV-15375KMK, 2007 WL 1119753 (S.D.N.Y. Apr. 12, 2007) .........................21

*Wausau Bus. Ins. Co. v. Turner Const. Co.*,
    151 F. Supp. 2d 488 (S.D.N.Y. 2001)..........................................................................19

*In re World Trade Ctr. Disaster Site Litig.*,
    469 F. Supp. 2d 134 (S.D.N.Y. 2007).....................................................................11, 13

*In re WorldCom, Inc.*,
    No. M-47 HB, 2003 WL 21498904 (S.D.N.Y. June 30, 2003) .......................................12

SP Special Opportunities, LLC ("SPSO") and Charles W. Ergen (together with SPSO, the "Ergen Defendants") respectfully submit this opposition to Harbinger Capital Partners LLC's ("Harbinger") motion for leave to appeal and to expedite appeal (the "Motion") of certain issues from the June 10, 2014 *Post-Trial Findings of Fact and Conclusions of Law* (the "June Decision") and three other non-final decisions and orders issued by Judge Shelley C. Chapman (the "Bankruptcy Court") in this adversary proceeding and these bankruptcy cases.[1]

## PRELIMINARY STATEMENT

While purporting to seek leave to file an expedited interlocutory appeal to advance the reorganization efforts of LightSquared, Inc. and certain of its affiliates ("LightSquared" or the "Debtors"), Harbinger's Motion is little more than another strategic move to try to gain leverage in negotiations over a plan of reorganization by threatening to cause unnecessary delay and expenses for all parties. Tellingly, neither the Debtors nor any other party to the June Decision is currently seeking leave to appeal. Instead, the Debtors and a group of their lenders (the "Ad Hoc Group") have reserved their rights to *either join or oppose* the Motion, making clear that this appeal is, first and foremost, a bargaining chip in negotiations over the Debtors' reorganization.

The thirteen issues Harbinger identifies in its Motion as requiring review do not satisfy the stringent requirements for granting leave to file an interlocutory appeal. Harbinger, the Debtors' largest equity holder, claims that three issues in the June Decision require *expedited* interlocutory review because they each impact the ultimate structure of the Debtors' reorganization, and Harbinger claims it is "enormously difficult" for the parties to confirm a plan

---

[1] On December 2, 2013, Harbinger filed a Motion for Leave to Appeal (the "December Motion") (i) *Order Granting Motions to Dismiss the Amended Complaint*, dated November 14, 2013 (the "November Order"), and (ii) *Memorandum Decision Granting Motions to Dismiss Complaint*, dated November 21, 2013 (the "November Decision"). Since the Motion seeks leave to appeal the November Order and November Decision, the Court, on consent of the parties, dismissed the December Motion as moot on June 30, 2014.

without an immediate appeal of those issues.  Those issues are whether the Bankruptcy Court erred in (a) not awarding affirmative damages to LightSquared for SPSO's breach of LightSquared's Credit Agreement (as defined below), (b) concluding that SPSO's claims could not be disallowed under Section 502(b) of the Bankruptcy Code, and (c) holding that the Bankruptcy Code did not support a claim for equitable subordination.

Harbinger fails to acknowledge, however, that those three issues are deeply intertwined with many of the other *ten* issues it intends to include in its *non-expedited* interlocutory appeal, as well as the issues that the Ergen Defendants, the Debtors, and the Ad Hoc Group are certain to raise on appeal after a final judgment is entered.  The review of even a subset of those issues now will require the Court to delve into the record in this case to resolve issues of both law and fact—and the record is extensive.  The June Decision alone totals 168 pages, and the briefs filed by the parties after the liability trial in the adversary proceeding total more than 500 pages.  The post-trial briefs and findings of fact also reference hundreds of exhibits, as well as filings and hearing transcripts from both the adversary proceeding and bankruptcy dockets, the latter of which spans more than two years.

It would be highly inefficient for the Court to grant Harbinger's request for an expedited appeal and hear only a small subset of issues now, when the Court will likely have to review numerous related issues after the Bankruptcy Court enters final judgment.  It also would be highly inefficient for the Court to hear all thirteen issues that Harbinger seeks to appeal on an interlocutory basis, given that such a review would require the Court to engage in a comprehensive examination of the extensive record in this case two times—once on an interlocutory basis and again after final judgment is entered by the Bankruptcy Court in the adversary proceeding.  Such a process would be especially inefficient given that the Bankruptcy

Court has scheduled a trial on the damages phase of the adversary proceeding for the last week of August 2014, and will likely render final judgment before this Court will even have had the opportunity to hear argument on Harbinger's expedited appeal.

No party will be prejudiced by waiting to appeal until after final judgment is entered in the adversary proceeding and reserving all appeals until after a final judgment will be most efficient for the Court and the parties. The Court should deny the Motion.

## BACKGROUND

### I.    The Debtors File For Bankruptcy

Prior to filing for bankruptcy, LightSquared sought to develop a nation-wide cellular network using certain bands of electromagnetic spectrum it leased or owned. (Friedman Decl., Ex. A (June Decision) at 2-3.) However, in early 2012, the FCC, which regulates the use of spectrum in the United States, caused LightSquared to suspend its efforts to build a wireless network, citing concerns advanced by, among others, the U.S. Department of Transportation and the U.S. Department of Defense, that LightSquared's use of certain of its spectrum bands would interfere with global positioning system devices.[2]  The suspension of LightSquared's efforts to build a wireless network ultimately constituted an event of default under a credit agreement pursuant to which LightSquared had borrowed money from lenders (the "Credit Agreement"). In May 2012, LightSquared filed for chapter 11 bankruptcy protection. (Friedman Decl., Ex. A (June Decision) at 4.)

### II.    The Debtors, Harbinger, And The Ad Hoc Group Disagree On How The Debtors Should Exit Bankruptcy

Throughout the Debtors' bankruptcy, the Ad Hoc Group has battled the Debtors'

---

[2] Dugan Decl., Ex. A, (Feb. 14, 2012 FCC Press Release, available at http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-312479A1.pdf.)

largest equity holder, Harbinger, and Harbinger's controlling member, Philip Falcone, over the path the Debtors should take to exit bankruptcy.  Until recently, the Ad Hoc Group had sought to have the Debtors sell their assets to pay their creditors, while Mr. Falcone and Harbinger had sought to avoid any sale in the hope that LightSquared could obtain FCC approval to use its spectrum to develop a cellular network, thereby rendering the spectrum more valuable (and potentially enabling Harbinger to retain its equity investment).  Indeed, the Debtors, which historically have been dominated by Harbinger, twice extended the periods in which they had the exclusive right to file a plan of reorganization, which had the effect of extending the Debtors' bankruptcy for more than a year.  The Ad Hoc Group objected to both extensions.  After the exclusive period finally expired in the summer of 2013, the Ad Hoc Group entered into a plan support agreement pursuant to which the Debtors' assets would be sold at auction, with DISH Network Corporation ("DISH") providing an opening bid of $2.2 billion; the Bankruptcy Court scheduled the auction for December 2013.  On the day of the auction, the Debtors cancelled the auction to pursue an alternative deal that would permit the Debtors to retain their assets and Harbinger to maintain its equity interest in the Debtors.  That deal, however, fell through within a matter of days.

In January 2014, the FCC made an extraordinary and unsolicited filing in LightSquared's bankruptcy case, stating that it could not predict whether it would grant LightSquared's application to modify its license to use its spectrum to build a cellular network, and that it was unlikely to make any decision on that application in 2014.  On July 1, 2014, the National Telecommunications and Information Administration forward to the FCC (for inclusion in the FCC's record) a letter from the U.S. Department of Transportation outlining the "DOT's continuing concerns relating to the proposal by LightSquared . . . to operate terrestrial wireless

handsets in the 1626.5-1660.5 MHz band and the potential impact on the Global Positioning System (GPS)."[3]  The DOT's letter outlines concerns that the DOT has regarding LightSquared's uplink spectrum interfering with GPS receivers and "question[ed] whether the Commission has the necessary and sufficient information before it to approve" LightSquared's application.

## III.    Harbinger Initiates This Adversary Proceeding

Mr. Ergen is the founder, Chairman, and majority shareholder of DISH, a provider of satellite television services.  (Friedman Decl., Ex. A (June Decision) at 9-10.)  During 2012 and 2013, Mr. Ergen purchased more than $800 million in par value of LightSquared's debt in the distressed debt market through an investment vehicle called SPSO, making SPSO LightSquared's largest single creditor.  (*Id.* at 1.)

On August 6, 2013, Harbinger initiated this adversary proceeding against SPSO, Mr. Ergen, and others, claiming that SPSO was not permitted to buy LightSquared's debt under the transfer restrictions in the Credit Agreement.  (*Id.* at 4-5.)  On August 22, 2013, the Debtors intervened in the action on limited grounds.  The Defendants filed motions to dismiss, Harbinger and the Debtors filed amended complaints, and the Defendants moved to dismiss those claims as well.  The following claims asserted by the Debtors survived the Defendants' motions to dismiss: (i) declaratory relief that SPSO is not an Eligible Assignee under the Credit Agreement; (ii) breach of contract against SPSO; (iii) disallowance of SPSO's claims under 11 U.S.C. § 502(b); and (iv) tortious interference with contractual relations against the Ergen Defendants and other parties.  Harbinger's contractual disallowance claim under 11 U.S.C. § 502(b) also survived.

On January 9, 2014, the Bankruptcy Court commenced a seven-day evidentiary hearing to determine the Defendants' liability for these claims (the "Liability Trial").

---

[3] Dugan Decl., Ex. B (July 1, 2014 NTIA Letter).

**IV.    The March Plan Confirmation Hearing**

On February 14, 2014, the Debtors filed their Third Amended Plan of Reorganization (the "Plan").  The Plan proposed paying all of LightSquared's senior secured creditors, except SPSO, in full, in cash upon the Bankruptcy Court's confirmation of the Plan. (Dugan Decl., Ex. C (5/8/14 Hr'g Tr.) at 146.)  In addition, the Plan provided that Harbinger would retain its equity interest in the Debtors.  SPSO, on the other hand, would receive a third lien, unsecured seven-year note in exchange for the senior secured debt that it now holds.  (*Id*. at 133.)  SPSO objected to the Plan.  (*Id*. at 152.)  On March 19, 2014, the Bankruptcy Court commenced a hearing on whether to confirm the Plan (the "Plan Confirmation Hearing").

**V.    The Bankruptcy Court Reads Its Decisions From The Bench**

On May 8, 2014, the Bankruptcy Court read from the bench its findings of fact and conclusions of law from the Plan Confirmation Hearing and the Liability Trial.  (*Id*.)  With respect to the Plan Confirmation Hearing, the Bankruptcy Court announced that it would not confirm the Plan because it treated SPSO unfairly.  (*Id*. at 132.)  The Bankruptcy Court indicated that it would subsequently file its findings of fact and conclusions of law from the Plan Confirmation Hearing and the Liability Trial.  (*Id*. at 7-8.)  The Bankruptcy Court's findings of fact and conclusions of law from the Plan Confirmation Hearing have not yet been filed.

On June 10, 2014, the Bankruptcy Court filed its findings of fact and conclusions of law from the Liability Trial, which constitute the June Decision.  (Friedman Decl., Ex. A (June Decision).)  In the June Decision, the Bankruptcy Court found that while the Credit Agreement prohibited DISH and its "known subsidiaries" from buying LightSquared's debt, it did not prohibit *affiliates* of DISH, which arguably includes SPSO (which is owned by Charles Ergen, the controlling shareholder of DISH), from buying the debt.  (*Id*. at 98.)  In fact, the Bankruptcy Court found that a restriction on transfers of debt to affiliates of companies that were

expressly prohibited from buying debt, like DISH, was *removed* from the Credit Agreement during its negotiation. (*Id*. at 16.) Therefore, the Bankruptcy Court concluded that "in analyzing the plain words of the Credit Agreement, SPSO is an Eligible Assignee, and the Court finds no breach of an express term of the Credit Agreement." (*Id*. at 99.) Since SPSO did not breach the Credit Agreement, the Bankruptcy Court rejected the Debtors' claim for tortious interference of contractual relations. (*Id*.)

The Bankruptcy Court also concluded that since SPSO was an Eligible Assignee, SPSO had a valid debt claim against LightSquared. (*Id*. at 135.) Thus, the Bankruptcy Court rejected Harbinger's and the Debtors' claims for disallowance under 11 U.S.C. § 502(b). (*Id*. at 133.) In addition, it concluded that even if SPSO was not an Eligible Assignee, SPSO would still have a valid debt claim because the Credit Agreement expressly stated that debt transferred in violation of the transfer restrictions remained enforceable against LightSquared. (*Id*. at 133-34 ("Plaintiffs fail to mention other relevant provisions in the Credit Agreement which provide that any breach by any Lender or participant of the transfer restrictions under the Credit Agreement does not excuse performance by LightSquared.").)

Despite finding that SPSO was permitted to buy LightSquared's debt under the express terms of the Credit Agreement, the Bankruptcy Court, nevertheless, concluded that at least some of SPSO's debt purchases constituted a breach of the implied covenant of good faith and fair dealing. (*Id*. at 129.) That holding was based on the Bankruptcy Court's finding that SPSO's motive for buying LightSquared debt—at least for purchases made after March 2013— was to influence the bankruptcy proceedings to help DISH acquire LightSquared's spectrum assets through a cash bid. (*Id*. at 120-121 ("The evidence demonstrates that Mr. Ergen's substantial investment in LightSquared debt in April 2013 was made in full contemplation and in

furtherance of DISH's potential acquisition of LightSquared spectrum.").)  The Bankruptcy

Court did not find that DISH actually acquired LightSquared's debt, or that the Credit

Agreement prohibited DISH from bidding to acquire LightSquared's spectrum assets, or that

SPSO was the alter ego of DISH.  (*See id.* at 130 n. 131.)  In fact, the Bankruptcy Court found

that DISH board members were unaware that Mr. Ergen had started buying LightSquared debt.

(*Id.* at 40-43.)    Nevertheless, the Bankruptcy Court concluded that when SPSO bought

LightSquared debt with the intent to benefit an asset acquisition by DISH, it was as if DISH had

purchased the debt itself.  (*Id.* at 129 ("[SPSO's debt] purchases violate[d] the spirit of the credit

agreement, as the harm that LightSquared sought to avoid, a competitor [DISH] entering its

capital structure and acting against its interests, has now come to pass.").)  Since DISH was not

permitted to buy LightSquared debt, the Bankruptcy Court concluded that SPSO's motive for

buying the debt turned contractually permitted debt purchases into a breach of the implied

covenant of good faith and fair dealing.  (*Id.* at 123.)

       The Bankruptcy Court did not, however, award the Debtors affirmative damages

for SPSO's breach of the implied covenant.  (*Id.* at 135-142.)  The Bankruptcy Court found that

the Debtors and Harbinger knew or should have known, as early as May 2012, that Mr. Ergen

was buying LightSquared debt through SPSO but waited for more than a year to take any action.

(*Id.* at 142 ("Such inaction and delay now preclude the Court from making an affirmative award

of damages to LightSquared on account of Mr. Ergen's conduct.").)  It also found that Mr.

Falcone believed Mr. Ergen's debt purchases were *helpful* to the Debtors and Harbinger.  Indeed,

Mr. Falcone repeatedly told the press and market participants that Mr. Ergen was purchasing

LightSquared debt in the hopes it would spur investment in the Debtors, which undermined any

claim that the Debtors or Harbinger believed SPSO's debt purchases were harmful.  (*Id*. at 67-70.)

Despite finding that the Debtors knew or should have known that Mr. Ergen, through SPSO, was buying hundreds of millions of dollars of LightSquared's debt as early as May 2012, the Bankruptcy Court found that the Debtors did not know that SPSO was the owner of its debt, and thus did not know with whom to negotiate a plan of reorganization, because SPSO did not close certain of its debt trades in 2013 quickly enough.  (*Id*. at 164-65.)  The Bankruptcy Court found that this prevented the Debtors from negotiating a consensual plan of reorganization with its creditors, delaying the resolution of the Debtors' bankruptcy.  (*Id*.)  Thus, the Bankruptcy Court concluded that SPSO's delay in closing trades was improper.[4]  (*Id*. at 166.)

Based on its findings that SPSO (i) breached the implied covenant and (ii) delayed closing some of its trades, the Bankruptcy Court concluded that a portion of SPSO's debt claim could be equitably subordinated to the claims of other creditors.  (*Id*. at 143.)  The Bankruptcy Court indicated that the amount of SPSO's debt claim to be subordinated will be based on the harm caused by SPSO's breach and delayed debt trades, which will be determined at a future hearing (the "Subordination Hearing").  (*Id*. at 168.)

## VI.   Harbinger Prepares To Sue The FCC

Soon after the Bankruptcy Court announced that it would not confirm the Plan—which would have allowed Harbinger to retain its equity interest in LightSquared—it was widely reported in the press that Harbinger was preparing to sue the FCC for revoking the Debtors' right

---

[4] The Bankruptcy Court reached this conclusion without finding that SPSO would have had a duty to negotiate with the Debtors even if the Debtors knew SPSO owned the debt.  The Bankruptcy Court also found that SPSO did not have a duty to disclose that it was buying debt for the benefit of Mr. Ergen.  (Friedman Decl., Ex. A (June Decision) at 166 ("Such lawful and acceptable conduct includes . . . buying debt anonymously . . . .").)

to use certain spectrum.[5]    (Dugan Decl., Exs. D – F.)   On June 12, 2014, five Harbinger-appointed members of the Board of Directors of LightSquared—including Mr. Falcone—resigned, presumably in anticipation of the lawsuit.  (*See* Dugan Decl., Ex. H.)

## VII.    The Parties File Notices Of Appeal

On June 19, 2014, Harbinger filed a notice of appeal and the Motion, seeking leave to appeal thirteen issues from several interlocutory orders of the Bankruptcy Court, with expedited treatment of three of those issues.

The Ergen Defendants also intend to appeal issues from the June Decision following a final judgment in the adversary proceeding, which will be entered after the Subordination Hearing is completed.  The Ergen Defendants believe an interlocutory appeal now would be inefficient and would lead to expensive and time-consuming proceedings that may, ultimately, prove to be unnecessary.   Nevertheless, in an abundance of caution, the Ergen Defendants filed a notice of appeal of the June Decision on June 23, 2014 to foreclose any argument that the Ergen Defendants waived their right to appeal the June Decision.[6]

On June 24, 2014, the Debtors and the Ad Hoc Group filed their respective notices of appeal.  Like the Ergen Defendants, the Debtors and the Ad Hoc Group both indicated that the June Decision was not a final order appealable as of right, but were filing notices of

---

[5] On June 3, 2014, the Bankruptcy Court held an emergency status conference regarding those press reports.  (Dugan Decl., Ex. G (6/3/14 Hr'g Tr.) at 7 (Chapman:  "I was in receipt of headlines that indicated that Harbinger had met with the FCC . . . .").)  The material portions of the conference are under seal.

[6] The June Decision does not finally resolve all issues relating to the claims asserted against SPSO in the adversary proceeding, and it directs that further proceedings—a hearing to determine the amount of SPSO's claim that can be subordinated—must occur before a final order and judgment can be entered.  Therefore, the June Decision is not a final order appealable as of right.   *See Shimer v. Fugazy (In re Fugazy)*, 982 F.2d 769, 775-76 (2d Cir. 1992) (holding that a bankruptcy court's adversary proceeding decision finding the defendant liable is not final because it contemplates further proceedings to calculate the damages award); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) (finding that judgment entered as to liability that did not specify the dollar amount owed, was not final and appealable); *In re 127 John St. Assocs.*, No. M-47 (SHS), 2005 WL 911488, at *4 (S.D.N.Y. April 18, 2005) ("If an order resolves one element of a dispute but contemplates further proceedings to resolve other matters, it does not qualify as a final order.").

appeal so as not to waive their right to appeal following the entry of a final judgment. However, the Debtors and the Ad Hoc Group left it unclear as to whether they would join or oppose Harbinger's effort to seek interlocutory appeal of the issues identified in the Motion.

## ARGUMENT

I.   **Leave To Appeal Should Be Denied Because An Interlocutory Appeal Of The Issues Harbinger Identifies Is Not Warranted.**

Federal courts "strongly disfavor[]" interlocutory appeals because they "prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134, 144 (S.D.N.Y. 2007). The Second Circuit, in fact, "urge[s] the district courts to exercise great care in [granting leave to appeal], because it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Ferreira* v. *Modell's Sporting Goods, Inc*., No. 11 Civ. 2395, 2013 WL 1344697, at *2 (S.D.N.Y. Mar. 28, 2013) (citations and internal quotes omitted); *see also Law Debenture Trust Co. of N.Y. v. Calpine (In re Calpine Corp.)*, 356 B.R. 585, 593 (S.D.N.Y. 2007) ("[O]nly exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.") (quotation omitted); *In re Manhattan Inv. Fund Ltd.*, 288 B.R. 52, 56 (S.D.N.Y. 2002) ("Certification of a permissive interlocutory appeal is limited to extraordinary cases where appellate review might avoid protracted and expensive litigation . . . .") (internal quotations omitted). Therefore, a party seeking interlocutory appeal also "has the burden of showing *exceptional circumstances* . . . to overcome the general aversion to piecemeal litigation and to show that the circumstances warrant a departure from the basic policy of postponing appellate review until after entry of a final

judgment." *In re WorldCom, Inc.*, No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. 2003)

(internal citations omitted, emphasis added).

A movant seeking leave to appeal an interlocutory order must demonstrate that

the order "(1) involves a controlling question of law; (2) to which there is substantial ground for

difference of opinion; and (3) [that] an immediate appeal from the order may materially advance

the ultimate termination of the litigation." *Ellsworth v. Myers (In re Cross Media Mktg.)*, No. 07

CV 878, 2007 WL 2743577, at *2 (S.D.N.Y. Sept. 19, 2007) (quoting 28 U.S.C. § 1292(b)).

"[A]ll three requirements . . . must be met for a court to grant leave to appeal." *In re Poseidon*

*Pool & Spa Recreational, Inc.*, 443 B.R. 271, 275 (E.D.N.Y. 2010).

The first requirement is satisfied by establishing that the issue for which the

movant seeks interlocutory appeal involves "a pure question of law that the reviewing court

could decide quickly and cleanly without having to study the record. The question on the

interlocutory appeal must also be controlling in the sense that reversal of the bankruptcy court's

order would terminate the action or determination of the question would materially affect the

litigation's outcome." *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re*

*Lehman Bros. Holdings, Inc.)*, 422 B.R. 403, 406 (S.D.N.Y. 2009) (internal quotations and

citations omitted). To satisfy the second requirement, the moving party must establish that

"genuine doubt exists as to the correct applicable legal standard relied on in the order. Genuine

doubt exists where (1) there is conflicting authority on the issue or (2) the issue is particularly

difficult and of first impression." *Picard v. Madoff*, 464 B.R. 578, 582 (S.D.N.Y. 2011) (internal

quotations and citations omitted). "[I]t is not sufficient that the relevant case law is less than

clear or allegedly not in accord, or that there is a strong disagreement among the parties. A mere

claim that a district court's decision was incorrect does not suffice to establish substantial ground

for difference of opinion." *In re Enron Corp.*, 06 Civ. 7828(SAS), 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007) (internal quotations and citations omitted). "Rather, the district court must analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one in which there is *substantial* ground for dispute." *Id.* (internal citations omitted). Finally, the third element is satisfied by showing that an "appeal promises to advance the time for trial or shorten the time required for trial. Courts place particular emphasis on the importance of this last factor." *Id.* at *2 (internal quotations and citations omitted).

Even when the movant has satisfied all requirements for leave to appeal, judges maintain "unfettered discretion to deny certification of an order for interlocutory appeal" for any reason. *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d at 144 (citation omitted); *see also In re Enron Creditors Recovery Corp.*, 410 B.R. 374, 379 (S.D.N.Y. 2008) ("[E]ven assuming the party can demonstrate these precise conditions, the appellate court may deny the appeal for any reason, including docket congestion.").

For the reasons stated below, Harbinger has failed to establish that an interlocutory appeal is warranted here.

### A.    The Court's Holding Regarding Damages For Breach Of Contract Is Not Appropriate For Interlocutory Appeal.

As an initial matter, Harbinger does not have standing to appeal the Bankruptcy Court's holding denying the Debtors affirmative damages on their breach of contract claim. In the November Decision, the Bankruptcy Court dismissed Harbinger's breach of contract claim because Harbinger is not a party to the Credit Agreement, and only the Debtors' breach of contract claim proceeded to trial. (Friedman Decl., Ex. C (November Decision) at 37.) Harbinger cannot now appeal the Bankruptcy Court's holding with respect to a claim it did not

have at trial.  *See In re DPH Holdings Corp.*, 468 B.R. 603, 612 (S.D.N.Y. 2012) ("An appellant must also establish prudential standing, meaning, as relevant here, that he must 'assert his own legal rights and interests and not those of third parties.'") (citation omitted).  Therefore, the Motion should be denied with respect to the contract damages issue on that basis alone.  Even if Harbinger could appeal the Bankruptcy Court's holding, the contract damages issue does not warrant interlocutory review.

The issue of damages is not a controlling question of law.  The Bankruptcy Court already determined SPSO breached the implied covenant, and a reversal of the damages holding would only mean that the Debtors can recover affirmative damages.  Also, the Court's consideration of Harbinger's appeal, even if done on an expedited basis, likely will be contemporaneous with the Subordination Hearing, which is the last matter to heard before a final judgment is entered.  Therefore, an interlocutory review would not impact the Subordination Hearing.  Harbinger also fails to explain how a reversal of the Bankruptcy Court will materially impact a confirmation hearing that has already been scheduled for August 2014.  An expedited interlocutory appeal will not terminate the litigation or materially impact its outcome.

Additionally, Harbinger raises no "substantial doubt" that the Bankruptcy Court had the authority to conclude that LightSquared's actions following SPSO's debt purchases foreclosed an award of damages.  The Bankruptcy Court found that Harbinger and the Debtors not only knew Mr. Ergen was buying LightSquared debt through SPSO, and that Mr. Ergen was the Chairman and majority shareholder of DISH, but that Harbinger and the Debtors believed the debt purchases were beneficial to the Debtors.  (Friedman Decl., Ex. A (June Decision) at 67-70.)  Those findings negate any claim that the Debtors suffered injury as a result of SPSO's debt purchases.  Harbinger's Motion makes no attempt to dispute those findings.  In addition,

Harbinger's argument that defenses such as equitable estoppel "can never be exerted [on] behalf of one who has acted fraudulently" has no application here, where the Bankruptcy Court found a breach of the implied covenant, not fraud or deceit. *See DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 511 (S.D.N.Y. 2001) (equitable estoppel "applies in actions for breach of contract"); *see also Gen. Elec. Cap. Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994) (party estopped where it failed to assert its position regarding a contract until the other party had acted to its detriment).

Finally, an interlocutory review of the Bankruptcy Court's holding with respect to damages for breach of the implied covenant will not materially advance the termination of the litigation. To fully address that issue, the Court will have to evaluate the record to determine whether Harbinger's and the Debtors' conduct demonstrates that the purchases were not considered harmful to the Debtors. In addition, after a final judgment is entered, the Ergen Defendants intend to appeal the Bankruptcy Court's holding that SPSO breached the implied covenant. A review of those issues also will require the Court to delve into the extensive record in both the adversary proceeding and the bankruptcy cases to resolve issues of law and fact. If the Ergen Defendants' appeal is successful, the issue of whether the Debtors can recover damages for a breach of the implied covenant will be rendered moot. It would, therefore, be inefficient for the Court to grant leave to appeal the damages issue now, when the Court may later determine that there was no breach. The Debtors and the Ad Hoc Group also intend to raise other issues on appeal after the entry of a final judgment, and those issues likely will overlap with the issues for which Harbinger seeks an expedited interlocutory appeal. The better approach, therefore, would be to follow the general rule of waiting until a final judgment is entered and reviewing all issues raised on appeal at the same time.

**B.     The Bankruptcy Court's Rejection Of Harbinger's And The Debtors'
Contractual Disallowance Claim Does Not Warrant Interlocutory Review.**

Harbinger argues that SPSO's debt claim should be disallowed under New York

law and the Credit Agreement because the Bankruptcy Court found that SPSO is not an Eligible

Assignee permitted to buy LightSquared debt.  (Mot. at 10 ("[T]he Bankruptcy Court concluded

that even though SPSO was not an Eligible Assignee . . . of LP Debt, SPSO's claim is not void or

voidable . . . .").)  Harbinger mischaracterizes the Order.  As explained above, the Bankruptcy

Court actually found that "in analyzing the plain words of the Credit Agreement, *SPSO is an

Eligible Assignee*."  (Friedman Decl., Ex. A at 99 (emphasis added).)  Thus, an appeal of the

contractual disallowance issue would not, as Harbinger contends, involve a straightforward

analysis of whether the Credit Agreement directs that debt transferred to a buyer who is not an

Eligible Assignee is void.  Instead, for the Court to overturn the Bankruptcy Court's holding, the

Court would first have to decide that SPSO is not an Eligible Assignee, which would require a

review of the extensive record in this case.  Thus, an appeal of the Bankruptcy Court's holding

with respect to contractual disallowance does not involve a pure question of law.

Likewise, there is no substantial ground for disagreement that the Bankruptcy

Court applied the correct standard.  Since the Bankruptcy Court found that SPSO is an Eligible

Assignee, its conclusion that SPSO has a valid debt claim is entirely consistent with New York

law and the terms of the Credit Agreement.  Indeed, Harbinger does not even contend that an

Eligible Assignee's debt claim can be invalid under the Credit Agreement.

Even if the Bankruptcy Court had found SPSO was not an Eligible Assignee,

there is no substantial ground for disagreement regarding the Bankruptcy Court's finding that

SPSO would still have a valid debt claim.  Harbinger does not dispute that, under New York law,

the Credit Agreement must expressly provide that an assignment in violation of the transfer

restrictions renders the assignment wholly void or invalid in order to disallow SPSO's claim.
(*See* Friedman Decl., Ex. A (June Decision) at 134-35 (citing *In re 785 Partners LLC*, No. 11-13702 (SMB), 2012 WL 401497, at *3 (Bankr. S.D.N.Y. Feb. 7, 2012); *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012); *In re Britton*, 288 B.R. 170, 173 (Bankr. N.D.N.Y. 2002).  Instead, Harbinger claims that section 10.04(a) of the Credit Agreement renders debt transferred in violation of the Credit Agreement void, but Harbinger ignores the fact that language similar to 10.04(a) has been found insufficient to invalidate transfers.[7]  *See LCE Lux HoldCo S.a.r.l. v. Entretenimiento GM de Mexico S.A. de C.V.*, 287 F.R.D. 230, 235 (S.D.N.Y. 2012).  Harbinger also ignores the Bankruptcy Court's finding that "nothing in the Credit Agreement treats transfers as void or voidable even if they are made in violation of the transfer restrictions," and that section 10.04(d) of the Credit Agreement[8] "makes clear that neither a breach of the express terms of the Credit Agreement nor a breach of the implied covenant of good faith and fair dealing renders wrongfully transferred debt claims unenforceable against LightSquared and therefore disallowable."  (Friedman Decl., Ex. A (June Decision) at 133-34.)  Therefore, Harbinger merely disagrees with the Court's construction of the Credit Agreement, which is insufficient to warrant interlocutory appeal.  *See In re Enron Corp.*, 2007 WL 2780394, at *1 ("A mere claim that a Court's decision was incorrect does not suffice to establish substantial ground for difference of opinion."); *Fox v. Bank Mandiri (In re*

---

[7] Section 10.04(a) provides that:  "Nothing in this Agreement, express or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnities) any legal or equitable right, remedy or claim under or by reason of this Agreement."  (Friedman Decl., Ex. A (June Decision) at 133.)

[8] Section 10.04(d) provides that LightSquared LP "agrees that any breach by any Lender or participant or sub-participant of the restrictions on assignment hereunder (including, without limitation, to Disqualified Companies) shall not excuse, in any respect, performance by the Borrower under the Loan Documents."  (Friedman Decl., Ex. A (June Decision) at 134.)

*Perry H. Koplik & Sons, Inc.*), 377 B.R. 69, 74 (S.D.N.Y. 2007) ("[A] bare claim that a bankruptcy court's ruling was incorrect is not sufficient to satisfy the standard.").

Finally, interlocutory review of the Bankruptcy Court's contractual disallowance claim will not materially advance the termination of the litigation. Even if the Court found that a transfer in violation of the Credit Agreement was void, the Bankruptcy Court determined that SPSO was an Eligible Assignee allowed to buy debt. (Friedman Decl., Ex. A (June Decision) at 99.) Therefore, a reversal would not change the Bankruptcy Court's conclusion that SPSO has a valid debt claim. Also, even if the Court determined that a breach of the implied covenant rendered SPSO's debt claim void, SPSO intends to appeal, after a final judgment, the holding that SPSO breached the implied covenant. Thus, like the issue of damages, an interlocutory appeal of the contractual disallowance issue could be rendered moot, and an interlocutory appeal would be inefficient and contrary to the law.

### C.    The Bankruptcy Court's Rejection Of Harbinger's And The Debtors' Equitable Disallowance Claim Does Not Warrant Interlocutory Review.

The Bankruptcy Court's holding, in the November Decision, that equitable disallowance is not a valid claim also is not a controlling issue of law, and its reversal would not materially advance the termination of the litigation. If that holding is reversed, the Bankruptcy Court would then have to decide whether SPSO's conduct warranted equitable disallowance. Since equitable disallowance was not a claim in dispute during the Liability Trial, the Bankruptcy Court may have to conduct an additional trial to determine whether SPSO's claim could be disallowed. Thus, an appeal of this issue will not terminate or materially advance the litigation. Also, even if no further proceedings were required for the Bankruptcy Court to determine whether to disallow SPSO's claim, the Bankruptcy Court's determination undoubtedly would take into account its conclusion that SPSO breached the implied covenant of good faith

and fair dealing.  Since SPSO intends to appeal that finding, an interlocutory appeal of the equitable disallowance holding could, like the other two issues above, be rendered moot by a subsequent appeal to the Court.

Harbinger also fails to establish that there is substantial ground for disagreement with respect to the Bankruptcy Court's decision.  Harbinger claims that there "exists a substantial difference of opinion" regarding the availability of an equitable disallowance claim, citing to the *Adelphia* bankruptcy case and one out-of-district case.  (Mot. at 20-21.)  However, those cases are not controlling authority here, and the fact that lower courts have decided the issue differently is insufficient to establish that substantial grounds for disagreement exist.  *Wausau Bus. Ins. Co. v. Turner Const. Co.*, 151 F. Supp. 2d 488, 494 (S.D.N.Y. 2001) (no interlocutory appeal where appellant "failed to proffer any controlling authority that would raise a substantial ground for a difference of opinion on this question"); *In re Enron Corp.*, 2007 WL 2780394, at *1 ("[I]t is not sufficient that the relevant case law is less than clear or allegedly not in accord.").

Harbinger also fails to confront the weight of authority against its position, which the Court fully addressed in the November Decision.  (*See* Friedman Decl., Ex. C (November Decision) at 21-22 n. 27 (citing *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002); *Grede v. Bank of N.Y.*, No. 08 C 2582, 2009 U.S. Dist. LEXIS 6184, *27-28 (N.D. Ill. Jan. 27, 2009).)  Harbinger also fails to address the recent Supreme Court case *Law v. Siegel*, 134 S.Ct. 1188 (2014), which supports the Bankruptcy Court's decision.  At issue in *Siegel* was whether a bankruptcy court exceeded the limits of its authority when it relied on section 105(a) of the Bankruptcy Code—which allowed it to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of" the Bankruptcy Code—to allow a chapter 7 trustee to surcharge its legal fees against the debtor's homestead exemption, which was protected from creditors by section 522 of the Bankruptcy Code. *Id.* at 1192, 1194-95. This issue was, as the Bankruptcy Court noted, "structurally similar to the one before this Court: does the Code allow a bankruptcy court to exercise its equitable powers to contravene a specific contrary provision of the Code?" (Friedman Decl., Ex. C (November Decision) at 23.) The Bankruptcy Court held that it does not. (*Id.*) Therefore, the Bankruptcy Court dismissed the claim, finding that the doctrine of equitable disallowance contravenes the language of section 502(b) of the Bankruptcy Code, which provides that a bankruptcy court "shall allow" a claim subject to certain exceptions, and a creditor's alleged inequitable conduct is not an enumerated exception. (*Id.* at 20-22.)

As the Bankruptcy Court stated in dismissing the equitable disallowance claims here: "the bankruptcy court does not possess unlimited equitable powers untethered to specific Code provisions." (*Id.* at 23.)[9] The Supreme Court's decision in *Siegel* is in accord: "in exercising those statutory and inherent powers [under section 105(a) of the Bankruptcy Code], a bankruptcy court may not contravene specific statutory provisions." *Siegel*, 134 S.Ct. at 1194. "'[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." *Id.* (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

Given the significant authority supporting the Bankruptcy Court's decision on the absence of authority to order equitable disallowance, Harbinger has not established that there is substantial ground for a difference of opinion. *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 06-

---

[9] At oral argument on SPSO's motion to dismiss, the Bankruptcy Court similarly stated: "I do not believe that the bankruptcy court has the power to disallow a claim in the first instance that is otherwise allowable under 502. I do not believe that the bankruptcy court has the power to reorder priorities by subordinating debt to equity without express authority by Congress which I believe is lacking." (Dugan Decl., Ex. I (10/29/13 Hr'g Tr.) at 130:1-6.)

No. CV-15375KMK, 2007 WL 1119753, at *2 (S.D.N.Y. Apr. 12, 2007) ("For there to be a substantial ground for difference of opinion under the law, there must be substantial doubt that the district court's order was correct.") (quotation omitted).

    **D.**    **The Ten Other Issues For Which Harbinger Seeks Interlocutory Appeal Do Not Satisfy The Requirements For Leave To Appeal.**

Harbinger's Motion fails to even address the other ten issues Harbinger intends to include in its interlocutory appeal. Those issues are plainly improper for interlocutory review. For example, some of the issues will require the Court to resolve issues of fact based on a review of the extensive record in these cases.[10] *See Futter v. Duffy (In re Futter Lumber Corp.)*, 473 B.R. 20, 27 (E.D.N.Y. 2012) ("[W]here a legal issue is essentially fact based in nature interlocutory appeal is not appropriate.") (internal quotations and citations omitted). Other issues involve matters of pleading, which also are improper for interlocutory review.[11] *See In re Manhattan Inv. Fund, Ltd.*, 288 B.R. at 56 ("[T]he Second Circuit has held that challenges to the sufficiency of a pleading are not generally the appropriate subjects of interlocutory review."). Harbinger makes no showing that these additional ten issues are appropriate for interlocutory review, and they plainly are not appropriate. The Court should deny the Motion.

---

[10] (*See, e.g.*, Mot. at 12, Issues 4 ("Whether the Bankruptcy Court erred in holding that SPSO did not breach express provisions of the Credit Agreement?") and 5 ("Whether the Bankruptcy Court erred in holding that SPSO's inequitable conduct began sometime after its first acquisition of LP Debt rather than contemporaneously with its first acquisition of LP Debt?").)

[11] (*See, e.g.,* Mot. at 12-13, Issues 8 ("Whether the Bankruptcy Court erred in holding that Harbinger failed to plead facts to support a finding of fraud under New York law?"), 10 ("Whether the Bankruptcy Court erred in holding Harbinger failed to plead sufficient facts to support a claim for aiding and abetting fraud under New York law?"), 11 ("Whether the Bankruptcy Court erred in holding Harbinger failed to plead sufficient facts to support a finding of tortious interference with prospective economic advantage under New York law?"), 12 ("Whether the Bankruptcy Court erred in holding that Harbinger failed to plead sufficient facts to support a finding of unfair competition under New York law?"), and 13 ("Whether the Bankruptcy Court erred in holding Harbinger failed to plead sufficient facts to support a finding of civil conspiracy under New York law?").)

**E.    Harbinger Has Not Shown Exceptional Circumstances Warranting Interlocutory Review.**

Harbinger's claims that the Debtors will suffer imminent harm absent an interlocutory appeal is belied by the fact that the Debtors did not seek an interlocutory appeal and only filed a notice of appeal "in an abundance of caution to prevent any waiver of its right to appeal the [June Decision] following the entry of a final judgment in the Adversary Proceeding." The Debtors also reserved their rights to join in or oppose Harbinger's Motion.  The fact that the Debtors did not immediately seek leave to file an interlocutory appeal makes clear that the Debtors do not believe they are facing imminent harm.

In any event, Harbinger's references to the potential harm that could befall the Debtors are unfounded.  Harbinger's principal argument is that it is "enormously difficult" to craft a confirmable plan of reorganization absent an interlocutory appeal, and thus an appeal is necessary to advance negotiations among the parties.  However, Harbinger fails to explain how expedited interlocutory review of the three issues it identifies in the Motion, each of which could be rendered moot by appeals following a final judgment, will materially affect plan confirmation proceedings for a plan that has not yet been filed.  Indeed, if it is true that LightSquared is solvent, then the Debtors can submit a plan paying all of LightSquared's creditors, including SPSO (regardless of the amount of its claim that is subordinated), in full, in cash.

Harbinger's own Motion makes clear that it is not concerned about the parties' inability to get a plan confirmed but, rather, that a plan contrary to its equity interests *will be confirmed*.  This tactic of threatening to harm the Debtors unless it gets what it wants is consistent with Harbinger's recent preparations to sue the FCC.  Such a lawsuit would be devastating to the Debtors' reorganization efforts, scuttling the Debtors' chances of obtaining regulatory approval while such a lawsuit is pending and making it unlikely that the Debtors

could raise sufficient financing to exit bankruptcy.  Harbinger knows this, and it likely will use the threat of its lawsuit to gain leverage in plan negotiations with the Debtors.  Indeed, Mr. Falcone and the other Harbinger-appointed members of LightSquared Inc.'s Board of Directors recently resigned, undoubtedly to try to avoid a claim that they breached their fiduciary duties to the Debtors in the event Harbinger files the suit.[12]  Holding up proceedings in the lower court to give one party a tactical advantage is not a proper basis to grant leave to appeal, and the Court should not permit Harbinger to misuse the legal process in this way.

In addition, Harbinger's concerns about its ability to seek redress in the courts are baseless.  If a non-consensual plan of reorganization to which Harbinger objects is confirmed, Harbinger can seek to appeal the Bankruptcy Court's confirmation of that plan.  In addition, it is not contemplated that a plan will be confirmed before a final judgment is entered in the adversary proceeding.  In fact, both the Subordination Hearing and a hearing on confirmation of a new plan or reorganization already have been scheduled for the last week of August 2014.

Also, the Subordination Hearing is scheduled for August 2014, and final judgment will likely be entered shortly after the Subordination Hearing is concluded.  A short delay of Harbinger's appeal until after final judgment will not prejudice the Debtors.  The Debtors have been in bankruptcy for over two years, and rather than pushing for a speedy

---

[12] Harbinger and Mr. Falcone are no strangers to underhanded conduct.  According to the SEC, "[c]lients and market participants alike were victimized as Falcone unscrupulously used fund assets to pay his personal taxes, manipulated the market for certain bonds, favored some clients at the expense of others, and violated trading rules intended to prohibit manipulative short sales."  *See* Dugan Decl., Ex. J, SEC Press Release, *Philip A. Falcone and Harbinger Charged with Securities Fraud* (June 27, 2012), available at http://www.sec.gov/News/PressRelease/ Detail/PressRelease/1365171482856#.Uiq3QNLOtnM (quoting Robert Khuzami, Director of the SEC's Division of Enforcement).  Harbinger and Falcone have paid millions of dollars in fines and penalties for their manipulation of the securities markets and Falcone has been banned from the securities industry for five years.  As an SEC press release stated, "'Falcone and Harbinger engaged in serious misconduct that harmed investors, and their admissions leave no doubt that they violated the federal securities laws,' said Andrew Ceresney, Co-Director of the SEC's Division of Enforcement. 'Falcone must now pay a heavy price for his misconduct by surrendering millions of dollars and being barred from the hedge fund industry.'"  Dugan Decl., Ex. K, SEC Press Release, *Philip Falcone and Harbinger Capital Agree to Settlement* (Aug. 19, 2013), available at http://www.sec.gov/News/PressRelease/ Detail/PressRelease/1370539780 222#.UirA79LOtnM.)

resolution of the bankruptcy, the Debtors have twice extended its periods to have the exclusive right to file a plan of reorganization, effectively extending the bankruptcy for more than a year. In addition, the Debtors' senior lenders, including SPSO, have repeatedly consented to the Debtors' use of cash collateral and provided additional debtor-in-possession financing to fund the administration of the estates throughout this bankruptcy.  Harbinger makes no showing that the Debtors will not continue to receive such consent or financing going forward.   Indeed, Harbinger itself argues that LightSquared LP is a solvent debtor (Mot. at 2 n. 3), which, if true, makes it highly likely that lenders will continue to extend financing to the Debtors.

No exceptional circumstances warranting an interlocutory appeal exist here.  An interlocutory appeal will lead to additional expensive, time-consuming, and unnecessary hearings, and it will cast doubt over the ongoing negotiations over a plan of reorganization. Therefore, the Motion should be denied.

## II.    Harbinger's Appeal Does Not Require Expedited Treatment.

For the reasons stated above, there is no basis for Harbinger's appeal to be heard on an expedited basis.  An expedited appeal will not finally resolve all issues bearing on the Debtors' reorganization, and it will not materially advance proceedings in the Bankruptcy Court. In addition, a review of all issues the parties intend to appeal will require the Court to review the extensive record in this case, which will be exceptionally difficult to do on an expedited basis.

Harbinger's request for expedited review of just three out of the thirteen issues it seeks to appeal is an attempt to distract from Harbinger's true motivation in seeking leave to appeal—to cause unnecessary expense and delay for all parties involved in order to gain leverage in settlement negotiations.  Harbinger's Motion should be denied.

**CONCLUSION**

For the foregoing reasons, the Ergen Defendants respectfully request that the

Court deny Harbinger's Motion and grant such further relief as this Court deems just and proper.


Dated: July 3, 2014                                   Respectfully submitted,
       New York, New York

                                                      WILLKIE FARR & GALLAGHER LLP

                                                       /s/ James C. Dugan
                                                      Rachel C. Strickland
                                                      Tariq Mundiya
                                                      James C. Dugan
                                                      Matthew S. Freimuth
                                                      Alexander L. Cheney
                                                      787 Seventh Avenue
                                                      (212) 728-8000
                                                      New York, New York 10019
                                                      jdugan@willkie.com

                                                      *Counsel for SP Special Opportunities, LLC
                                                      and Charles W. Ergen*

12267166